# In the
# United States Court of Appeals
## for the Federal Circuit

### Nos. 23-1925, -1926, -1928, -1929, -1979

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Cross-Appellant.*

_____

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01450, IPR2021-01451, IPR2021-01452 and IPR2021-01453.

_____

### Nos. 23-2010, -2011, -2012

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Appellee.*

_____

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-00189, IPR2022-00190 and IPR2022-00191.

_____

## RESPONSE AND REPLY BRIEF OF APPELLANTS
## STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.

SHARON A. HWANG
ROBERT A. SURRETTE
SCOTT P. MCBRIDE
SEAN C. SPARROW
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
shwang@mcandrews-ip.com
bsurrette@mcandrews-ip.com
smcbride@mcandrews-ip.com
ssparrow@mcandrews-ip.com

*Counsel for Appellants*

 

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ..............................................................................1

I.      SUMMARY OF ARGUMENT ......................................................4

II.     STRYKER'S APPEAL ................................................................5

    A.      THE COURT SHOULD REVERSE THE BOARD'S
        FINDING THAT SLATER DOES NOT MEET THE TENSILE
        LOAD LANGUAGE (GROUNDS 1 AND 2)....................................6

        1.      Reversal is Appropriate Because the "Tensile Load"
                Clause Merely States the Result of the Structural
                Limitations ................................................................7

        2.      The Board Legally Erred by Implicitly Construing the
                "Tensile Load" Clause to Require a Particular Screw
                Thread Engagement ..................................................12

        3.      No Substantial Evidence Supports the Board's Finding of
                No Anticipation .......................................................16

                a.      A POSITA Would Understand that Slater's
                      Disclosure of its Bone Plate and Lag Screw
                      Configuration Teaches the Transfer of Tensile Load
                      from the Screw to the Plate .............................17

                b.      Contrary to OsteoMed's Contention, Slater Also
                      Discloses the "Tension Band Construct" Described
                      in the Challenged Patents ................................22

                  c.      The Finite Element Analysis Confirms that Slater
                      Discloses Tensile Load Transfer to the Plate .................26

    B.      OSTEOMED'S ALTERNATE BASIS FOR AFFIRMANCE
        RELIES ON AN INCORRECT CONSTRUCTION OF
        "TRAJECTORY"...................................................................28

C.     THE COURT SHOULD REVERSE THE BOARD'S FINDING THAT CLAIMS 8 AND 9 OF THE '085 PATENT (THE "CENTRAL AXIS CLAIMS") ARE NOT ANTICIPATED BY SLATER (IPR2021-01453 GROUND 1) .........31

D.     THE COURT SHOULD VACATE THE BOARD'S FINDINGS BASED ON FALKNER (GROUNDS 3-4 AND IPR2022-00189-00191 GROUND 2) ..................................34

     1.     At a Minimum, Remand is Required for the Board to Fully Consider Dr. Holmes' Timely Response Declaration ..................................................................35

     2.     There is No Substantial Evidence that Falkner's Blade Plate Requires Modifications for Use Across a Joint ...............40

     3.     OsteoMed's Alternate Basis for Affirmance Was Not Considered by the Board...........................................................43

III.    OSTEOMED'S CROSS APPEAL ................................................44

A.     THE COURT SHOULD AFFIRM THE BOARD'S "CLAIM CONSTRUCTION" AND ANTICIPATION FINDING...................45

     1.     The Board's "Construction" was Correct .................................46

     2.     OsteoMed's Presumed Construction Contradicts the Intrinsic Evidence ....................................................................49

          a.     OsteoMed Cites No Evidence for its Plain Meaning Argument .........................................................50

          b.     The Specification Does Not Support OsteoMed's Construction .....................................................52

          c.     The Extrinsic Evidence Does Not Support OsteoMed's Construction ..................................................53

     3.     OsteoMed had Ample Notice that the Meaning of "At the Thickened Portion of the Bridge Portion" was in Dispute .......55

     4.     OsteoMed Does Not Challenge the Board's Anticipation Finding under this Claim Construction....................................57

B.   THE BOARD'S FINDING THAT SLATER ANTICIPATES EVEN UNDER OSTEOMED'S OVERLY NARROW CONSTRUCTION IS SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................................57

　　　1.   Stryker's Argument under OsteoMed's Construction was Timely ...........................................................................57

　　　2.   The Board's Alternate Basis for Anticipation is Supported by Substantial Evidence .........................................60

CONCLUSION ..........................................................................................63

# TABLE OF AUTHORITIES

**Cases**

*AMP Plus, Inc. v. DMF, Inc.*,
   2022 WL 16844516 (Fed Cir. Nov. 10, 2022)....................................62

*Anacor Pharms., Inc. v. Iancu*,
   889 F.3d 1372 (Fed. Cir. 2018)..........................................39

*Apple Inc. v. Andrea Elecs. Corp.*,
   949 F.3d 697 (Fed. Cir. 2020)...........................................39

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   839 F.3d 1034 (Fed. Cir. 2016).........................................62

*Application of Mason*,
   244 F.2d 733 (C.C.P.A. 1957) ............................................9

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
   406 F.3d 1365 (Fed. Cir. 2005).........................................19

*Axonics, Inc. v. Medtronic, Inc.*,
   75 F.4th 1374 (Fed. Cir. 2023) .........................................59

*Broadcom Corp. v. Netflix, Inc.*,
   No. 2022-1764, 2023 WL 4115909 (Fed. Cir. June 22, 2023)...........47

*Calcutt v. Fed. Deposit Ins. Corp.*,
   598 U.S. 623 (2023) ................................................. 43, 44

*Carrum Techs., LLC v. Unified Pats., LLC*,
   No. 2020-2204, 2021 WL 3574209 (Fed. Cir. Aug. 13, 2021) ...........13

*Chimie v. PPG Industries, Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005).........................................28

*Constant v. Advanced Micro-Devices, Inc.*,
   848 F.2d 1560 (Fed. Cir. 1988).........................................27

*Corephotonics, Ltd. v. Apple Inc.*,
   84 F.4th 990 (Fed. Cir. 2013) ..........................................58

*Corning v. Fast Felt Corp.*,
   873 F.3d 896 (Fed. Cir. 2017).............................. 13, 14, 27

*D'Agostino v. MasterCard Int'l Inc.*,
   844 F.3d 945 (Fed. Cir. 2016)..........................................16

*Dayco Prod. v. Total Containment Inc.*,
    329 F.3d 1358 (Fed. Cir. 2003)............................................................36

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)............................................................15

*EcoNova, Inc. v. DPS Utah*,
    No. 1:12-CV-174, 2013 WL 65460 (D. Utah Jan. 4, 2013) ......................... 51, 54

*Ericsson Inc. v. Intell. Ventures I LLC*,
    890 F.3d 1336 (Fed. Cir. 2018)....................................................... 31, 41

*Ericsson Inc. v. Intell. Ventures I LLC*,
    901 F.3d 1374 (Fed. Cir. 2018)............................................................59

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)............................................................................43

*Genentech, Inc. v. Hospira, Inc.*,
    946 F.3d 1333 (Fed. Cir. 2020)....................................................... 20, 36

*Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm, Inc.*,
    825 F.3d 1360 (Fed. Cir. 2016)............................................................39

*Google Inc. v. Intell. Ventures II LLC*,
    701 F. App'x 946 (Fed. Cir. 2017) .......................................................40

*Google LLC v. Ji-Soo Lee*,
    759 F. App'x 992 (Fed. Cir. 2019) .......................................................13

*Hamilton Beach Brands, Inc. v. f'real Foods LLC*,
    908 F.3d 1328 (Fed. Cir. 2018)............................................................59

*Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*,
    814 F. App'x 592 (Fed. Cir. 2020) .......................................................32

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990)........................................................ 8, 42

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
    340 F.3d 1314 (Fed. Cir. 2003)............................................................32

*Homeland Housewares, LLC v. Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017)..............................................................8

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
    877 F.3d 1361 (Fed. Cir. 2017)............................................................14

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017)............................................................40

*In re Bayer Aktiengesellschaft*,
   488 F.3d 960 (Fed. Cir. 2007)....................................................................62

*In re Chudik*,
   851 F.3d 1365 (Fed. Cir. 2017)..................................................................42

*In re Haase*,
   542 F. App'x 962 (Fed. Cir. 2013) .............................................................26

*In re Nuvasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016)..................................................................39

*In re Schreiber*,
   128 F. 3d 1473 (Fed. Cir. 1997).............................................................. 8, 42

*In re Universal Elecs., Inc.*,
   No. 2022-1230, 2023 WL 3335536 (Fed. Cir. May 10, 2023)...........................40

*Intell. Ventures II LLC v. Ericsson Inc.*,
   685 F. App'x 913 (Fed. Cir. 2017) .............................................................36

*Intell. Ventures II LLC v. Ericsson Inc.*,
   686 F. App'x 900 (Fed. Cir. 2017) ......................................................... 55, 56

*Intelligent Bio Systems, Inc. v. Illumina Cambridge, Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016)..................................................................59

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005)..................................................................53

*Laitram, LLC v. Ashworth Bros.*,
   No. 2022-1044, 2023 WL 3449148 (Fed. Cir. May 15, 2023)...........................54

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1049 (Fed. Cir. 2009)..................................................................21

*MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007)..................................................................47

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008).............................................................. 34, 62

*NorthMobileTech LLC v. Simon Prop. Grp., Inc.*,
   No. 11-CV-287-WMC, 2012 WL 1035380 (W.D. Wis. Mar. 27, 2012) ............50

*Nystrom v. Trex Co.*,
   424 F.3d 1136 (Fed. Cir. 2005)..................................................................50

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..................................................................54

*Provisur Techs., Inc. v. Weber, Inc.*,
  50 F.4th 117 (Fed. Cir. 2022) ....................................................... 16, 40

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
  8 F.4th 1285 (Fed. Cir. 2021) ............................................................53

*Sec. & Exch. Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947)............................................................................44

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
  511 F.3d 1186 (Fed. Cir. 2008)...........................................................27

*Surgalign Spine Techs., Inc. v. LifeNet Health*,
  No. 2021-1117, 2022 WL 1073606 (Fed. Cir. Apr. 11, 2022)............13

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
  407 F.3d 1371 (Fed. Cir. 2005)...........................................................12

*Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*,
  988 F.2d 1165 (Fed. Cir. 1993)................................................... 8, 9, 12

*Thermal Dynamics Corp. v. TATRAS, Inc.*,
  No. 04-152-PB, 2004 WL 4957314 (D.N.H., Dec. 9, 2004)................9

*VirnetX Inc. v. Apple Inc.*,
  No. 2022-1523, 2023 WL 6933812 (Fed. Cir. Oct. 20, 2023) .................... 20, 36

*VirnetX Inc. v. Cisco Sys., Inc.*,
  776 F. App'x 698 (Fed. Cir. 2019) .............................................. 16, 40

**Statutes**
5 U.S.C. § 554........................................................................................55

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '608 Patent | U.S. Patent No. 8,529,608 (Appx409-423) |
| '776 Patent | U.S. Patent No. 9,351,776 (Appx424-436) |
| '716 Patent | U.S. Patent No. 9,763,716 (Appx437-450) |
| '085 Patent | U.S. Patent No. 10,245,085 (Appx451-463) |
| Board | Patent Trial & Appeal Board |
| FWD | Final Written Decision |
| Gall | Dr. Kenneth Gall, Stryker's expert |
| Holmes | Dr. George Holmes, Stryker's expert |
| IPR | *Inter Partes* Review |
| OsteoMed | Patent Owner and Appellee/Cross-Appellant, OsteoMed LLC |
| POSITA | Person of Ordinary Skill in the Art |
| Related IPRs | IPR2022-00487 and IPR2022-00488 filed by OsteoMed against Stryker's Patents and asserting the same Slater reference as in the instant appeals |
| Sherman | Michael Sherman, OsteoMed's expert in IPR2022-00487 and IPR2022-00488 ("related IPRs") |
| Sommers | Mark Sommers, OsteoMed's expert |
| Stryker | Petitioner and Appellant, Stryker Corporation and Wright Medical Technology, Inc. |

**INTRODUCTION**

With respect to Grounds 1 and 2 ("the Slater grounds") for the '608, '776, and '716 patents, OsteoMed does not dispute that Slater discloses the structural limitations of the challenged claims. Nor does OsteoMed dispute that Slater discloses the transfer of tensile load ***regardless*** of whether Slater's screw threads are anchored solely in the second bone or anchored partially in the second bone and partially in the first bone. Under these circumstances, the evidence of record supports only one conclusion—that the tensile load language is met. Because the Board rejected Stryker's anticipation and obviousness challenges to the '608, '776, and '716 patents based solely on the tensile load language, the Board's final written decisions regarding the Slater grounds should be reversed.

With respect to the Slater grounds for claims 8 and 9 of the '085 patent, there is no substantial evidence to support the Board's finding of no anticipation, nor does OsteoMed cite any. The Board's finding is based solely on OsteoMed's unsupported conjecture that a screw hole that allows a screw to be placed at an angle within a predetermined allowable range necessarily cannot have a central axis. But Figure 9 of Slater plainly shows a central axis of the inner surface of a transfixation screw hole for a screw—all that is required by the claims. OsteoMed asserts only that the bone plate shown in Figure 9 is allegedly a different embodiment than the bone plate

1

shown in the Figure 1 schematic, an argument contradicted by Slater's express disclosure of a single preferred embodiment in Figures 1-13.

With respect to Grounds 3 and 4 ("the Falkner grounds"), there is no substantial evidence to support the Board's finding that Falkner does not disclose a plate for use across two bones. Falkner itself repeatedly states that its plate can be so used. Moreover, Falkner's teachings were confirmed by unrebutted expert testimony from both Stryker's expert Dr. Holmes and OsteoMed's expert Mr. Sherman, who repeatedly and unambiguously opined that "there are no practical differences between fusing a joint…and fusing a bone fracture," and that "bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades." The Board failed to meaningfully consider Falkner or the unrebutted expert testimony, instead crediting the unsupported musings of OsteoMed and a former employee Mr. Sommers, who posited without analysis or elaboration that the Falkner plate would "very likely" require "extensive modifications" in order to be used across a joint. Such musings, which contradict Falkner, Dr. Holmes, and even OsteoMed's own expert Mr. Sherman, do not constitute substantial evidence and cannot support a finding of no anticipation.

OsteoMed cross-appeals the Board's decision finding claims 1-7 of the '085 patent unpatentable, charging that the Board erred in determining that a screw hole

"at the thickened portion of the bridge portion" encompasses a screw hole "adjacent to the bridge portion as the specification describes." But the Board's finding is consistent with the specification, which repeatedly describes the preferred embodiment as having a screw hole adjacent to the thickened portion of the bridge portion. Even under OsteoMed's proposed construction, which is inconsistent with the specification's description of the bridge portion as "typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes," Appx460(8:33-37), the Board found that Slater still anticipates. The Board explained that, if the bridge portion is not free of voids such as positioning holes, then Slater's bridge portion would also simply encompass its transfixation screw hole. Either way, substantial evidence supports the Board's findings and the Court should affirm.

## I.    SUMMARY OF ARGUMENT

| IPR | Claims | Board's Finding | Addressed Below |
|-----|--------|-----------------|-----------------|
| IPR2021-01450 | '608 Patent Claims 1-6, 8-14, 17 | Not unpatentable | Slater Tensile Load Claims (II.A.)<br><br>Slater Concurrence (II.B)<br><br>Falkner Joint Fusion Claims (II.D) |
| IPR2021-01451 | '776 Claims 1-6, 8-13 | Not unpatentable | Slater Tensile Load Claims (II.A.)<br><br>Slater Concurrence (II.B)<br><br>Falkner Joint Fusion Claims (II.D) |
| IPR2021-01452 | '716 Claims 1-6, 8-13, 16-19 | Not unpatentable | Slater Tensile Load Claims (II.A.)<br><br>Slater Concurrence (II.B)<br><br>Falkner Joint Fusion Claims (II.D) |

| IPR | Claims | Board's Finding | Addressed Below |
|---|---|---|---|
| IPR2021-01453 | '085 Claims 1-9 | Claims 1-7 unpatentable<br><br>Claims 8 and 9 not unpatentable | Slater Bridge Portion Claims (III-cross appeal)<br><br>Slater Central Axis Claims (II.C.) |
| IPR2022-00189 | '608 Patent Claim 16 | Not unpatentable | Same as IPR2021-01450 |
| IPR2022-00190 | '776 Patent Claim 15 | Not unpatentable | Same as IPR2021-01451 |
| IPR2022-00191 | '716 Patent Claims 15 and 21 | Not unpatentable | Same as IPR2021-01452 |

## II.    STRYKER'S APPEAL

The Board committed reversible error by: (1) finding Slater does not meet the tensile load limitation (based on incorrect implicit claim construction and failure to consider unrebutted evidence of anticipation); (2) finding Slater does not teach the central axis limitation based on a misunderstanding of the claim language; and (3) finding Falkner does not disclose a bone plate for use across two bones despite Falkner's express disclosure and OsteoMed's admissions to the contrary. OsteoMed's response fails to identify substantial evidence supporting the Board's erroneous findings on any ground and confirms that the Board's decisions should be reversed and/or vacated.

**A. THE COURT SHOULD REVERSE THE BOARD'S FINDING THAT SLATER DOES NOT MEET THE TENSILE LOAD LANGUAGE (GROUNDS 1 AND 2)**

The relevant "tensile load limitations" recite:

the transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, through the joint, and into the second discrete bone ***so as to absorb tensile load*** when the second discrete bone is loaded relative to the first discrete bone ***thereby transferring the tensile load*** from the second discrete bone, through the screw into said head and said bridge portion.

and

the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint, ***enabling said screw to absorb tensile load*** when the second bone is loaded ***permitting transfer of the tensile load*** through said screw into said bridge.

Neither the Board nor OsteoMed dispute that Slater discloses all of the structural limitations of the challenged claims (in green), including those that result in or enable the absorption and transfer of tensile load. ECF 29, 32. Yet the Board, at OsteoMed's urging, found that, notwithstanding the presence of each of the structural limitations, Slater does not expressly or inherently disclose that the screw "absorbs" and "transfers" tensile load through the screw and into the screw head and bridge portion of the bone plate. Appx21-25. The Board's conclusion of no anticipation turns on its erroneous findings that (1) the "tensile load" clause requires

further disclosures in Slater beyond the structural limitations, (2) tensile load can only be absorbed and transferred if the threads of the Slater screw engage only the second bone in Slater's so-called two-bone embodiment, and (3) a POSITA would not understand Slater's bone plate and screw configuration to expressly or inherently disclose the transfer of tensile load from the screw to the plate.  If the Court finds any of these findings erroneous—reversal or, at a minimum, remand is required.

### 1.    Reversal is Appropriate Because the "Tensile Load" Clause Merely States the Result of the Structural Limitations

The Board's finding of no anticipation makes no sense given that Slater discloses all of the structural limitations of the challenged claims.  OsteoMed surprisingly argues that this argument was waived (ECF 34, 26), even though it has been front and center in all of Stryker's briefs.  Appx521-522, Appx1107, Appx1121-1124 (explaining that Slater discloses the absorption and transfer of tensile load "*because* the threads on the transfixation screw and the portion of the screw head that abuts the inner surface of the screw hole act as a vise to the second bone and the plate, with the first bone held in between").  The claim language makes clear that the absorption and transfer of tensile load results from the structural configuration of the transfixation screw across the joint with the screw head abutting the inner surface of the screw hole to allow transfer of load to the bone plate. Appx420(12:27-28 ("*so as to* absorb tensile load *when* the second discrete bone is loaded"), 12:29 ("*thereby* transferring the tensile load")), Appx421(13:28-29

("**enabling** said screw to absorb tensile load **when** the second bone is loaded"),

13:29-30 ("**permitting** transfer of the tensile load")).  This should end the inquiry

because the "tensile load" language does not define any structure and merely recites

the intended result of using the claimed plate or system.  ECF 29, 32 (citing

*Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378–79 (Fed. Cir.

2017)); *see also Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468

(Fed. Cir. 1990)  ("apparatus claims cover what a device *is*, not what a device

*does*."); *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997) (finding that

functional limitations did not give claim patentable weight).

OsteoMed does not even attempt to address *Homeland*, where the Court

reversed the Board's finding of no anticipation for a challenged claim with a

functional limitation because the prior art figure disclosed "all of the structural

limitations . . . regard-less of intended use."  *Homeland*, 865 F.3d. at 1378-1379.

And its efforts to distinguish Stryker's other cases fall flat.  For example, OsteoMed

alleges that *Texas Instruments* is limited to a "whereby" clause "which is not present

in the Tensile Load Claims."  ECF 34, 26 (citing *Texas Instruments Inc. v. U.S. Int'l

Trade Comm'n*, 988 F.2d 1165 (Fed. Cir. 1993)).  But the limitation at issue recites

"**thereby** transferring the tensile load from the second discrete bone, through the

screw into said head and said bridge portion."  Appx420(cl.1).  A "thereby" clause

is treated no different than a "whereby" clause.  *See e.g.*, *Thermal Dynamics Corp.*

8

*v. TATRAS, Inc.,* No. 04-152-PB, 2004 WL 4957314, at *6 (D.N.H., Dec. 9, 2004) ("[T]he 'thereby' clause, like the 'whereby' clauses in *Texas Instruments* and *Israel,* merely states one result."). Moreover, *Texas Instruments* involved both a "whereby" clause ***and*** a "to preclude" clause, both of which "merely describe the result of arranging the components of the claims in the manner recited in the claims." 988 F.2d at 1172. The same reasoning applies here.

Nor is the import of a "whereby" or "thereby" clause limited only to method claims, as OsteoMed incorrectly contends. *Application of Mason*, 244 F.2d 733, 735 (C.C.P.A. 1957) ("Claims 10 and 11 also include a functional statement as to what happens when one of the web portions is torn transversely along a tearing line. That statement, however, does not define any structure and accordingly cannot serve to distinguish claims 10 and 11, which are not process claims, from the reference."). This is especially so where, as here, experts for both parties acknowledge that configuring the transfixation screw across the joint with the screw head abutting the bone plate as claimed necessarily results in the absorption and transfer of tensile load through the screw into the bone plate. ECF 29, 25-27, Appx3184-3185(72:10-73:17) ("In combination with claim one, the description in there, it necessarily means that the load is transferred into that bridge portion."), *compare* Appx3179-3180(67:23-68:7) ("So the tensile forces that are created, they come from the fact that the distal portion of the screw sits in the second bone. And then the shaft of the screw extends

through the first bone, and the head is sitting inside the plate. With that, you have –

the tension within the screw gets directly transferred into the head of the screw and,

therefore, into the plate where it's anchored in.") *with* Appx420(cl. 1.) (structural

limitations: "the transfixation screw comprises a head configured to abut the inner

surface of the transfixation screw hole and a shaft configured to contiguously extend

through the first discrete bone, through the joint, and into the second discrete bone");

*see also* Appx3180-3187(68:8-70:3, 70:16-19, 74:6-25, 75:5-22), Appx1824-

1857(¶¶114, 153-154), Appx3024-3035(¶¶37-50), Appx2918-2919(¶¶121-123).

That the tensile load transfer simply follows from the structural limitations is

further supported by the fact that, other than the recitation in the claims, the

Challenged Patents do not expressly describe the transfer of tensile load from the

bones, through the transfixation screw, and to the bridge portion of the bone plate.

Appx3029-3031(¶44), Appx3176-3187(64:19-75:22).    While OsteoMed feigns

incredulity in its Response brief, it simply cites the same passage as Stryker—a

passage that nowhere indicates how tensile load is transferred from the screw into

the bridge portion of the bone plate.  ECF 35, 24-25.

However, the parties agree that a POSITA reviewing the Challenged Patents

would understand that the transfixation screw (described as a lag screw), which is

positioned at an angle across the joint with its screw head abutting the bone plate, is

intended to absorb and transfer tensile load into the bone plate.  Appx3179-

3187(67:23-68:7, 68:17-24, 70:1-3, 72:10-73:17, 74:6-25, 75:5-22), Appx1824-1857(¶¶114, 153-154), Appx3024-3033(¶37-50), Appx2918-2919(¶¶121-123). The record shows that the purpose of a screw of any type is to absorb and transfer tensile load. Appx3029-3031(¶44). Indeed, OsteoMed's expert Mr. Sommers testified that "as a lag screw functions, the distal thread portion is engaging with the second bone and creates a tension within the screw that at that point gets transferred into the head" and that the tension gets to the bridge portion "via the head of the screw that sits inside the plate." Appx3186(74:6-25). Mr. Sommers then explained how Figure 2 of the Challenged Patents shows "in concept" how load is transferred into the bridge portion "because you know that those threads, at an oblique angle, interface with the second bone. And the head interfaces and is in contact with the plate. And, therefore, there is a transfer of load." Appx3187(75:1-22).

Stryker's expert, Dr. Gall, explained how Slater discloses the same fundamental concept:

> In Slater, when the fixation screw (25) advances through the opening (26) and into the second discrete bone (talus bone 3), the second discrete bone (talus bone 3) is loaded relative to (pulled toward) the first discrete bone (tibial bone 4), and tensile load is transferred from the second discrete bone (talus bone 3), through the screw into the screw head (e.g., proximal end of fixation screw 25) and into the bridge portion (portions of 5 and 20 or portions of 81 and 90) of the plate.

Appx1824-1826(¶114). In an attempt to describe this fundamental concept in simple terms, Dr. Gall further explained that

> [t]his transfer occurs because the threads on the screw and the portion of the screw head that abuts the inner surface of the screw hole ***act essentially as a vise***, to the second bone and the plate, with the first bone held in between.  The threads and the portion of the screw that abuts the inner surface of the screw hole apply forces along the length of the screw.

Appx3024-3035(¶¶37-50).   In short, like the Challenged Patents, the structural elements of Slater, including the screw head configured to abut the inner surface of the transfixation screw hole and the shaft configured to extend through the joint, necessarily results in the transfer of tensile load.  The Board erred to the extent that it required a further showing, and its finding of no anticipation should be reversed. *See, e.g.*, *Texas Instruments*, 988 F.2d at 1172 (interpreting "whereby/to preclude" clauses); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1376 (Fed. Cir. 2005) (affirming the district court's construction of disputed claim terms that "merely described the intended results.").

### 2.    The Board Legally Erred by Implicitly Construing the "Tensile Load" Clause to Require a Particular Screw Thread Engagement

OsteoMed contends that the Board did not construe the tensile load language but rather simply found Stryker's evidence of anticipation to be insufficient. However, rather than addressing whether the claimed structure of Slater would lead to the transfer of tensile load, Appx420(12:23-27), the Board incorrectly assessed whether Slater's screw only engages the second bone in Slater's two-bone "embodiment," wrongly assuming that tensile load could only be transferred under

such circumstances. By doing so, the Board committed a claim construction error by requiring an additional, unclaimed structural limitation—screw threads that engage only the second bone and not the first bone. Appx21-22. This construction is a direct result of OsteoMed distorting Dr. Gall's "vise" explanation and urging the Board to focus solely on whether Slater teaches that the threads of its lag screw engage only with the second bone (the talus) in Slater's two-bone configuration. Appx1060-1061.

This Court has consistently recognized that adding structural limitations not present in the claim to "effectively construe" a term when analyzing the prior art is legal error. *Surgalign Spine Techs., Inc. v. LifeNet Health*, No. 2021-1117, 2022 WL 1073606, at *6 (Fed. Cir. Apr. 11, 2022) (reversing where "it is clear" the Board added a limitation creating an erroneous "as-applied construction"); *Google LLC v. Ji-Soo Lee*, 759 F. App'x 992, 996 (Fed. Cir. 2019) ("We have reversed or vacated and remanded final written decisions of the Board when the Board departs from the proper construction [of a claim term] when assessing patentability in view of the prior art."); *Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-02 (Fed. Cir. 2017) ("We conclude that the Board erred in effectively construing the claims to exclude such materials."). Here, the Board misinterpreted the scope of the tensile load language and applied it to Slater. *Carrum Techs., LLC v. Unified Pats., LLC*, No. 2020-2204, 2021 WL 3574209, at *5 (Fed. Cir. Aug. 13, 2021) ("[T]he Board implicitly adopted

13

a construction…that is inconsistent with the phrase's plain and ordinary meaning when read in light of the specification."); *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017) ("Board findings establishing the scope of the patented subject matter may fall within the ambit of claim construction."). Such claim construction issues are reviewed *de novo*. *Corning*, 873 F.3d at 901.

*Importantly*, while Stryker's expert Dr. Gall certainly indicated that, when used to fuse two bones, a POSITA would understand that Slater's lag screw would be threaded into the second bone (the talus) and not into the first bone (tibia) in order to maximize compression, the record shows that having the threads in only the second bone is *not required* to meet the tensile load limitation. Appx522(citing Appx1824-1827(¶114)), Appx3024-3033(¶¶37-47). For example, Dr. Gall explained that even "where a small portion of threads on a lag screw engage the tibia [first bone], compression through lag-effect can be achieved between the tibia and the talus. While this is not ideal, compression still occurs." Appx3032-3033(¶47, n. 3), *see also* Appx1122-1123(citing Appx3025-3033(¶¶39-40, 44, 47)), Appx3182(70:11-21). This concept is also discussed in the Challenged Patents, which expressly recognize that "where the transfixation screw 150 is threadably engaged with [first] bone 104a, the threading on transfixation screw 150 may provide a footing against [first] bone 104a which may also absorb a portion of the

tension forces transmitted up the shaft of transfixation screw 150 from [second] bone 104b when a load is applied to joint 106." Appx417(6:4-12).

Thus, while Stryker does assert that a POSITA would understand the threads of Slater to only engage the second bone, the challenged claims cannot properly be construed to require such a configuration, especially where the evidence shows that some tensile load is transferred even if the screw threads engage the first bone. Appx3032-3033(¶47, n. 3), Appx417(6:4-12). While OsteoMed relies on the Board's statement that "Slater lacked any disclosure 'that the threads of the screw may engage the end of the first bone adjacent the second bone ***and still provide satisfactory results,***'" ECF 34, 28-29 citing Appx22, this again fails to address the actual claim language—which does not require "satisfactory results" or any particular amount of load transfer. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014) ("Anticipation challenges under § 102 must focus only on the limitations actually recited in the claims."). The challenged claims do not specify a particular ***amount*** of tensile load that must be absorbed and/or transferred by the transfixation screw. Appx3034-3035(¶49). As such, the undisputed fact that a lag screw such as in Slater absorbs and transfers tensile load ***regardless*** of whether the abbreviated threads of the Slater lag screw are solely in the second bone or whether they extend into the first bone ***is dispositive of anticipation***, even under the Board's limited view.

OsteoMed does not dispute that the Board did not consider evidence that tensile load can be transferred regardless of whether the lag screw threads engage only the second bone. Thus, either the Board erroneously construed the claim to require Slater's lag screw to only engage the second bone or it failed to address the full scope of Stryker's arguments. Either way, the Board's finding of no anticipation cannot stand. *See D'Agostino v. MasterCard Int'l Inc.*, 844 F.3d 945, 950 (Fed. Cir. 2016) ("[t]he Board departed from or misapplied the above-stated clear meaning when—whether as a matter of claim construction or as a matter of application to Cohen" it required an additional limitation); *VirnetX Inc. v. Cisco Sys., Inc.*, 776 F. App'x 698, 702 (Fed. Cir. 2019) ("Board failed to meaningfully address [patentee's] argument"); *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123-24 (Fed. Cir. 2022) (same).

### 3. No Substantial Evidence Supports the Board's Finding of No Anticipation

In addition to the Board's legally erroneous construction of the "tensile load" language, its finding that a POSITA would not understand Slater to expressly or inherently disclose the transfer of tensile load from its lag screw into its bone plate is simply not supported by substantial evidence. Such finding also improperly assumes that a POSITA lacks even the most basic understanding of the laws of physics. Slater undisputedly discloses a lag screw positioned across a joint with the lag screw head abutting the bone plate—which demonstrates to a POSITA that

16

tensile load is being transferred to the bone plate when in use.  Appx3180-3182(68:17-69:14,    69:23-25,    70:1-19),    Appx3218-3219(106:19-107:17), Appx3607-3608(42:4-43:1),  Appx3614(49:18-23),  Appx1824-1857(¶¶114, 134-136, 153-154), Appx3024-3035(¶¶37-47, 50), Appx2918-2919(¶¶121-123).  To erase any doubt, Slater further includes a finite element analysis that *expressly* describes the tensile load transfer.  The Board's finding of no anticipation could only be reached by ignoring the clear disclosure of Slater from the viewpoint of a POSITA.

> **a.    A POSITA Would Understand that Slater's Disclosure of its Bone Plate and Lag Screw Configuration Teaches the Transfer of Tensile Load from the Screw to the Plate**

While OsteoMed attempts to parse Slater into a "three-bone embodiment" and "two-bone embodiment," it is undisputed that, like the Challenged Patents, Slater discloses a lag screw "adapted for insertion in the plate of figures 1 and 2." Appx2503-2504(12:32-13:3), Appx2520(Fig. 4), *see also* Appx1826 (Dr. Gall addressing this disclosure).[1]  A lag screw is a screw having an abbreviated thread portion.    Appx3181-3182(69:23-24, 70:1-3), Appx3025-3027(¶¶39-40).    It is

---

[1] Tellingly, OsteoMed does not dispute that Slater teaches the additional limitation of claim 9 "wherein the transfixation screw comprises *a lag screw* having: at a first end of the shaft adjacent to the head, *an unthreaded portion configured to extend through the first bone*; and at a second end of the shaft adjacent to the top, *a threaded portion configured to extend into the second bone*." Appx1066, Appx420(cl. 9).

undisputed that a lag screw is used to create lag effect, a common concept in orthopedics. Appx3180-3182(68:17-70:22), *see also* Appx415-418(2:22-41, 6:45-7:17). Both parties' experts further agree that a POSITA would understand that lag effect is most effectively achieved by either (1) ensuring that the abbreviated threaded portion of the transfixation screw is threaded into the second bone with the unthreaded shank left to rotate freely in the first bone, or (2) by over drilling the hole in the first bone to allow for the threaded shank to rotate freely within the first bone. Appx3180-3182(68:17-70:19), Appx3025-3033(¶¶39-47), Appx2918-2919(¶¶121-123). Thus, Slater's mere disclosure of a lag screw positioned across the joint (shown in Figures 1 and 4) would alone be sufficient for a POSITA to understand how to use the screw in the alleged "two-bone embodiment." Appx2918(¶122), Appx3180(68:17-24), Appx3186(74:6-13).

Here, in addition to illustrating the lag screw, Slater further *expressly* describes the screw as having "a longer shank to increase depth of penetration" and "an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone." Appx2503-2504(12:32-13:4), Appx2520(Fig. 4). Thus, there can be no true dispute that Slater *expressly* describes how its lag screw threads interact with the bones in a "three-bone embodiment." ECF 29, 34-36. In particular, by indicating that the shank has an abbreviated thread portion "to allow the majority of the shank to *slide*

*through* aligned tibial and talus screw holes finally anchoring in the calcaneus bone"

Slater expressly teaches that the screw threads engage only with the calcaneus bone.

Appx1824-1857(¶¶114, 134-135, 153-154), Appx3180-3186(68:17-70:3, 70:16-19,

74:9-13), Appx2918(¶122). If the threaded portion was engaged with either the tibia

or talus, the shank could not "slide through" the tibial and talus screw holes.

Appx2503-2504(12:32-13:4), Appx3026-3031(¶¶40, 42, 44).

Similarly, there can be no reasonable question that a POSITA would

understand that the abbreviated thread portion engages the talus instead of the

calcaneus when used to fuse two bones, allowing the shank to "slide through" the

tibial screw hole. Appx2503-2504(12:32-13:4), Appx1824-1857(¶¶114, 134-136,

153-154), Appx3024-3033(¶¶37-47), Appx3593-3614(28:23-30:1, 30:23-31:3,

33:14-19, 49:18-23), Appx3182(70:11-19), Appx2918-2919(¶¶121-123), *see*

*Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373-74 (Fed. Cir. 2005)

(reversing finding of no anticipation where POSITA would understand the prior art

to disclose the limitation and could combine the prior art description with his own

knowledge to make the claimed invention).

After all, Slater's description of the screw shown in Figure 4 applies to both

the two-bone and three-bone pathways shown in Figure 1. Appx2503-2504(12:32-

13:4), Appx3026-3027(¶40), Appx1824-1857(¶¶114, 134-136, 153-154),

Appx3024-3033(¶¶37-47). For example, as Dr. Gall explained, "Slater discloses

that the size of the transfixation screw may be adjusted when fusing the tibia and the talus, depending on the patient's anatomy." Appx3026-3027(¶40), citing Appx2507(16:30-32) ("Screw sizes may be adjusted to allow for particular insertion points and specific characteristics (e.g. bone density) of bone at points of fixation."). Even Mr. Sherman, OsteoMed's expert in the related IPRs, opined that "while Slater depicts three specific angles and two discrete lengths of screws in Figure 1 . . . *[i]t is reasonable for the surgeon to select a screw length and angle that only engages 2 bones* for some arthroplasty procedures and 3 bones for others depending on the surgical goals for the procedure." Appx1114 citing Appx2912(¶109). Thus, while anticipation requires disclosure within the four corners of Slater, it is equally well-understood that prior art must be considered from the viewpoint of a POSITA. *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1340 (Fed. Cir. 2020) ("Anticipation is established when 'one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was disclosed in that single reference.'"); *VirnetX Inc. v. Apple Inc.*, No. 2022-1523, 2023 WL 6933812, at *4 (Fed. Cir. Oct. 20, 2023) ("The core inquiry is whether a person of ordinary skill in the art would understand the reference to disclose the limitation in question, rather than merely 'envisage' a limitation that is in fact missing from the reference").

Here, the Board inconsistently states on the one hand that "even if [] Slater describes a three-bone embodiment where the threads only engage the third bone, Slater provides insufficient support for Stryker's position that the threads of screw type 70 only engage the second bone in Slater's two-bone embodiment," while, on the other hand, acknowledging that "Figure 1 makes clear that the disclosed plate and screw can be used with any of the disclosed screw orientations, such that ***any discussion of that plate should be read as part of the two-bone embodiment Stryker relies on as well as the three-bone embodiment***." *Compare* Appx22 *with* Appx196. The Board further acknowledged in its Institution Decision that "[t]he two-bone embodiment appears to be an 'alternate' embodiment only insofar as it reflects another angled pathway for the screw so it anchors in a second and not a third bone." Appx651-652. The Board's findings are "internally inconsistent and not supported by substantial evidence." *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1064 (Fed. Cir. 2009).

> **b.    Contrary to OsteoMed's Contention, Slater Also Discloses the "Tension Band Construct" Described in the Challenged Patents**

In its Response, OsteoMed attempts to distinguish the Slater disclosure from Mr. Sommers' testimony that "you can tell, just by looking at a figure, that load is transferred into the bridge portion of the bone plate" "by the type of the screw and the plate."  In particular, OsteoMed argues that Figure 2 of the Challenged Patents "depicts the specific angle at which the transfixation screw will be inserted, depicts threads on the transfixation screw that will be used to create the lag effect and tension band construct detailed in the specification, and depicts the engagement between the head of the transfixation screw and the corresponding structure of the transfixation screw hole."  ECF 34, 25.

**'608 Patent - Figure 2**



*FIG. 2*

So too, do Figures 1 and 4 of the Slater reference.  As shown below, such figures depict the specific angles at which the transfixation screw will be inserted, the threads on the transfixation screw that will be used to create the lag effect and tension band construct, and the engagement between the head of the transfixation screw and the corresponding structure of the transfixation screw hole.



It is noteworthy that Figure 2 of the Challenged Patents provides no more information on which bone(s) will be engaged by the screw threads than Figure 4 of Slater:



*Compare* Appx417(6:50-53) ('608 patent stating "transfixation screw 150 may be a lag screw that includes a head 152 coupled to a shaft 154 having an unthreaded portion 156 and a threaded portion 158 that ends at a tip 156") *with* Appx2503-2504(12:34-13:4) (Slater stating the screw "has an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneous bone").  OsteoMed cannot have it both ways: if a POSITA can tell that the screw in Figure 2 transfers tensile load, the same is true of Slater.

Finally, OsteoMed does not dispute that Slater discloses the additional limitations set forth in dependent claims 2-5, 9, and 12-14 of the '608 patent, claims 2-5, 9, and 12-13 of the '776 and '716 patents, and claims 3 and 6 of the '085 patents, which are directed to the tension band construct, the transfixation angle, and the lag screw.  Appx415-417(2:42-50, 5:53-57, 6:12-18, 6:25-44).  In particular, neither the Board nor OsteoMed dispute that Slater discloses a transfixation screw that crosses the neutral bending axis of the joint.  Appx25, ECF 34, 20-34, 41-45.  This is plainly apparent from every exemplary path shown in Slater Figure 1.  Appx2502-2504(11:19-27, 12:3-4, 12:32-13:4, 13:20-25), Appx1827-1831(¶¶115-120).



Appx523-525. This creates a tension band construct that enables the transfixation screw to absorb tension forces that would otherwise draw the tension side of the joint apart when a load is placed on the joint. Appx417(6:12-18), Appx1827-1838(¶¶115-136). OsteoMed admits that the tension band construct provides "the advantage that the screw will 'absorb the tension forces that would otherwise draw the tension side of the joint 106 apart when a load is placed on joint 106.'" ECF 34, 11, 24-25. Such admissions are inconsistent with the Board's current view that Slater does not disclose the transfer of tensile load from the second bone through the screw into the screw head and to the bridge portion of the plate.

### c. The Finite Element Analysis Confirms that Slater Discloses Tensile Load Transfer to the Plate

Slater's Finite Element Analysis ("FEA") confirms that tensile load is transferred from the transfixation screw into the bone plate. The FEA is a simulated in-vivo analysis of the Slater plate to determine its capacity to withstand anticipated loadings. Appx2508(17:16-21). OsteoMed does not and cannot dispute that the FEA provides a specific example demonstrating that tensile load is transferred to the plate. Appx2508-2511(17:16-20:11), *see In re Haase*, 542 F. App'x 962, 967 (Fed. Cir. 2013) ("the only 'result' required by [the] claims is a reduction in turbidity— regardless of how large that reduction is or how well it compares to other results in [the prior art]. . . . Nothing more is needed."). Instead, OsteoMed repeats the Board's flawed analysis that the testing does not show "actual load of the plate on a patient" and uses "an idealized tibia." ECF 34, 29-30 citing Appx24. But neither the Board nor OsteoMed provide an explanation for why *in vivo* data from an actual patient on a patient's tibia is necessary to demonstrate that the limitations are met, or why such data would provide a different result than the simulated *in vivo* test.

Nor do they explain why simulated *in vivo* testing of the plate is insufficient to demonstrate the transfer of tensile load to the plate—especially as it is *more* than what is provided for in the challenged patent. Moreover, the FEA demonstrates to a POSITA that when used as depicted in the figures, the plate disclosed in Slater transfers tensile load. *Cf. Constant v. Advanced Micro-Devices, Inc.,* 848 F.2d 1560,

1569 (Fed. Cir. 1988) (prior art anticipatory where it "is at least at the same level of technical detail as the disclosure in the [challenged] patent."); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1193-94 (Fed. Cir. 2008) (same). There is no substantial evidence to the contrary.

***

The evidence confirms that the purpose of a screw between bone portions is to transfer load. Appx3187(75:5-13), Appx3179-3180(67:15-68:24), Appx3186(74:6-25), Appx3024-3035(¶¶37-50), *see also* Appx1332(106:17-24). While the evidence further shows that a POSITA would understand that Slater's lag screw would be used to achieve lag effect, Stryker also provided evidence that using a lag screw in a sub-optimal way by allowing the screw threads to anchor in both the first and the second bone would still result in tensile load transfer, albeit less efficiently. There can be no reasonable dispute that using Slater as described with a transfixation screw having its screw head abutting the bone plate will result in the transfer of tensile load.

Thus, the Board's finding that Slater's screw does not transfer load lacks support by substantial evidence. *See, e.g.*, *Corning*, 873 F.3d at 901 ("On the evidence and arguments presented to the Board, there is only one possible evidence-supported finding: the Board's rejection of Owens Corning's challenge, when the

correct construction is employed, is not supported by substantial evidence."). The Board's finding of no anticipation should be reversed.

## B. OSTEOMED'S ALTERNATE BASIS FOR AFFIRMANCE RELIES ON AN INCORRECT CONSTRUCTION OF "TRAJECTORY"

Recognizing the frailty of its "tensile load" position, OsteoMed argues as a back-up that the Court can affirm based on OsteoMed's proffered construction of "trajectory" as set forth in the concurring opinion. ECF 34, 32. According to OsteoMed, the claimed "trajectory" means "a fixed angle relative to the neutral bending axis of the joint." Appx1039, ECF 34, 33. OsteoMed contends that a transfixation screw hole that allows a screw to be inserted at more than one angle falls outside the scope of the claims. Appx1039-1041, Appx1055-1058, Appx1160-1162, Appx1170. This Court should reject OsteoMed's proffered claim construction for several reasons.

First, in construing "trajectory", OsteoMed reads a limitation ("fixed angle") into the claims that simply is not there. It is axiomatic that claim construction begins with the words of the claim (*e.g., Chimie v. PPG Industries, Inc*., 402 F.3d 1371, 1377 (Fed. Cir. 2005)). The independent claims require only that the inner surface of the transfixation screw hole is configured to direct the transfixation screw through the transfixation screw hole such that it extends at a trajectory configured to pass through the first bone, a portion of the joint, and the second bone. Appx420-421(cls.

1, 11), Appx435-436(cls. 1, 10), Appx448-450(cls. 1, 10, 16), Appx462(cl. 1).

Nowhere is the "inner surface" of the transfixation screw hole required to be

"*configured to direct a screw at a single trajectory*." Appx54-55.

Moreover, during prosecution, the International Search Authority pointed out

that the trajectory of the screw depends on, among other things, the features of *the*

*screw*, such as the diameter of the screw shaft:

> [C]laim 11 attempts to define the inner surface of the screw hole in
> terms of the result to be achieved, namely the trajectory of the screw
> with respect to the first and second bones. However, this definition is
> not clear since the screw does not belong to the claimed plate and said
> *trajectory depends on several screw features, likes its diameter (if the*
> *diameter of the screw is smaller than that of the screw hole, the screw*
> *may tilt within the hole, thereby affecting the trajectory)*.

Appx1109-1110(citing Appx2143(151)). Alone, the shape of the inner surface of

the transfixation screw hole cannot ensure that the screw is placed at any one "fixed

angle" as OsteoMed nonsensically asserts. Appx3009-3010(¶¶12-13). Dr. Gall

explained that "[t]o direct a screw at a single fixed angle, the transfixation screw

hole would need to be designed as an elongated, cylindrical-like and threaded hole

to be used with a screw designed to mate with the dimensions of the hole."

Appx3010(¶14). The challenged patents contain no such disclosure.

Led astray by OsteoMed, the concurrence erroneously *limited* Slater's

disclosure as describing the transfixation screw hole as "slotted" or "oblong."

Appx47-53. The concurrence relies on OsteoMed's citation to Slater dependent

claim 26, which recites "wherein the second portion of the plate includes a slotted opening…" Appx2515(24:4-8). But the concurrence strangely ignores that other dependent claims describe the transfixation screw hole as being "oblique" and/or including a "formation" or "countersunk recess" for receiving a screw head, and the Slater figures and text clearly show an angled (oblique) transfixation screw hole, not a slotted hole. Appx2515-2522(cls. 10-12, 33, 45-47, 63-64, Figs. 1, 5-6, 9-10).



Notably, OsteoMed does not dispute the Board's finding that Slater anticipates the trajectory limitation in its Cross-Appeal of IPR2021-01453. ECF 34, 41-54. OsteoMed failed to propose a construction of "trajectory" for the '085 patent, even though claim 1 of the '085 patent recites language similar to the independent claims of the '608, '776, and '716 patents. Appx8019-8020, Appx462(cl. 1). The Board's *majority* decision in IPR2021-01453 stands in stark contrast to the concurrence's remarks in IPR2021-01450-1452, finding that "Petitioner fully

addresses the [trajectory] limitation and provides credible declaration support along with citations to relevant portions of Slater." Appx209(n.10 citing Appx2502(11:19-25("'formation 27 *is configured so that screw 25 is implanted at an angle* within a predetermined allowable angular range.'")) (original emphasis).  There is no basis to disturb such a finding with respect to the same claim element as used in the '608, '716, and '776 patents.

### C.    THE COURT SHOULD REVERSE THE BOARD'S FINDING THAT CLAIMS 8 AND 9 OF THE '085 PATENT (THE "CENTRAL AXIS CLAIMS") ARE NOT ANTICIPATED BY SLATER (IPR2021-01453 GROUND 1)

For claims 8 and 9 of the '085 patent, the so-called "central axis claims," the Board's finding of no anticipation was based solely on its assumption that a hole that allows screws to be positioned at "an angle within a predetermined allowable angular range" cannot have a "central axis."   ECF 34, 31-32.   OsteoMed identifies no substantial evidence to support the Board's finding.   *See Ericsson Inc. v. Intell. Ventures I LLC*, 890 F.3d 1336, 1346 (Fed. Cir. 2018) ("an unsupported opinion is not substantial evidence").

Dependent claims 8 and 9 recite "a central axis of the inner surface of the transfixation screw hole defines the trajectory," referring back to the "trajectory" recited in independent claim 1.  Appx463(cl. 8).  Independent claim 1 recites "the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation

31

screw extends at a trajectory configured to pass through a first position on the first discrete bone and a second position on the second discrete bone once the plate is placed across the joint." Appx462(cl. 1). Thus, while claim 1 allows the screw to be angled at any trajectory configured to pass across the joint, claim 8 recites that the screw should be angled at the same trajectory as the central axis of the screw hole.

As Stryker and Dr. Gall pointed out, Figure 9 of Slater plainly demonstrates that the Slater transfixation screw hole has a central axis. Appx8778-8784(¶¶160-169), Appx7537-7540, Appx8086-8087, Appx3636-3637(71:23-72:4). It is clearly possible for a transfixation screw to be positioned such that its trajectory matches the trajectory of the central axis of the Slater transfixation screw hole, regardless of whether it is also possible for the screw to be positioned at additional trajectories. Appx9120-9122(¶¶28-30), Appx3658-3661(93:9-96:5). Indeed, "[t]he anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n. 6 (Fed. Cir. 2003). For that reason "the full scope of the prior art reference's disclosure is considered" and "prior art references should be considered for all that they teach…" *Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*, 814 F. App'x 592, 595-97 (Fed. Cir. 2020) (reversing finding of no anticipation

because reference taught the elements of the claim and how they could be used together).

OsteoMed's only argument in response is that Figure 9 is a different embodiment than Figure 1, an argument contrary to Slater's express disclosure. ECF 34, 32. Slater expressly states that its figures depict different aspects of one preferred embodiment, not multiple embodiments. Appx9105-9110(¶¶6-11); Appx2500(9:21-26)("BRIEF DESCRIPTION OF THE DRAWINGS: The present invention will now be described in more detail according to *a* preferred, but non limiting embodiment and with reference to the accompanying illustrations"), Appx2501(10:31)("DETAILED DESCRIPTION OF ***THE*** PREFERRED EMBODIMENT"). For example, Figure 9 is a cross-sectional, side elevation view of the plate shown in Figure 5. Appx2501(10:14-16), Appx2506(15:19-20). The description of Figure 5 refers back to Figure 1, confirming that each of the figures disclose different aspects of the same preferred embodiment. Appx2504-2505(13:5-6 ("Figure 5 shows a side elevation view of a plate 80 according to a preferred embodiment isolated from an ankle joint"), 14:1-3 ("As may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis")), *see also* Appx2500-2501(9:21-10:32). At a minimum, Slater Figures 1 and 9 are directly related to each other and are not distinct teachings

such that they support a finding of anticipation.  *Cf. NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

Considering the entirety of Slater's disclosure, no substantial evidence supports the Board's findings on the central axis claims.  Because the Board found every other limitation met, the Court should reverse the Board's judgment and hold claims 8 and 9 of the '085 patent anticipated.

### D.    THE COURT SHOULD VACATE THE BOARD'S FINDINGS BASED ON FALKNER (GROUNDS 3-4 AND IPR2022-00189-00191 GROUND 2)

OsteoMed does not dispute that the Board's conclusions on Falkner are premised on the assumption that Falkner's plate would require significant modifications in order to be used across a joint.  Appx35-38.  Glaringly absent from OsteoMed's Response, however, is an explanation of how this assumption could be true given its own expert's repeated opinions that "there are *no practical differences* between fusing a joint . . . and fusing a bone fracture," and that "bone plates configured for arthrodesis and bones plates configured to fuse bone fractures have been *used interchangeably for decades.*"    Appx2805(¶164), Appx2816-2818(¶¶191, 193), Appx2836(¶228), Appx2923(¶134), Appx2927(¶149), Appx2962-2963(¶249).  Of course, if there are no practical differences between fusing a joint and fusing a bone fracture, and if bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably

for decades, it makes no sense to assume that Falkner's plate would require "significant modifications" to be used for joint fusion (arthrodesis). Nor does OsteoMed identify any structural characteristics that differentiate bone plates used for fractures and those used for joints. The Board's finding of no anticipation cannot stand.

### 1. At a Minimum, Remand is Required for the Board to Fully Consider Dr. Holmes' Timely Response Declaration

As an initial matter, Dr. Holmes' declaration was not untimely. The Holmes Declaration was properly proffered on Reply in response to the Board's adoption of OsteoMed's surprising argument in its POR, contrary to the plain disclosure of Falkner, that the Falkner bone plate would require extensive modifications to be used across a joint. Appx665-666, Appx1068-1070.

As Stryker explained (ECF 29, 55-56), Falkner repeatedly makes clear that its plate may be used "for bone fusion at a joint." Appx2535(¶62), ECF 29, 55, Appx2531-2532, Section II.D.2. Falkner states that "plate 22 may span a joint, such as joint 30 between tibia 26 and talus 32" (Appx2531(¶21)), "[t]he fixation device may be configured to span any suitable bone discontinuity so that the fixation device fixes the relative position of bone fractures (and/or bones) disposed on opposing sides of the bone discontinuity" (Appx2531(¶27)), "exemplary discontinuities for use with the bone plates described herein may include joints," (Appx2531(¶28)), and "these bone plates may be used to fuse joints, such as fusion of the tibiotalocalcaneal

(ankle joint)" (Appx2531(¶29)). Paragraph 62 of Falkner, in particular, is a step-by-step surgical guide on how to use the same Falkner plate across either a fracture or a joint. Appx2535(¶62). Nowhere does Falkner say that the plate would require **any** redesign or modification in order to be used across a joint.

Stryker could not have predicted that OsteoMed (and the Board) would ignore Falkner's express teaching that its bone plate could be used across a joint. Upon realizing the Board's and OsteoMed's apparent inability to segregate the Falkner bone plate from the exemplary bone fracture illustrated in Figure 1 of the Falkner reference, Stryker offered rebuttal expert testimony in its Reply from an experienced surgeon (Dr. Holmes) that "a POSITA would understand that the plate shown in Figure 1 of Falkner could be used for fusing a tibiotalar joint without modifying the plate itself" —confirming Stryker's petitioned theory. Appx3070-3071(¶36). Stryker did not "introduce[] in its reply a 'new theory of invalidity by reference to new evidence'" as was improper in *Intelligent Bio-Sys.*, but rather, properly "continued to argue, just as it had in its petition" that Falkner disclosed the limitation. *Intell. Ventures II LLC v. Ericsson Inc.*, 685 F. App'x 913, 922 (Fed. Cir. 2017). Of course, Falkner must be considered from the viewpoint of a POSITA. *See, e.g.*, *Genentech*, 946 F.3d at 1340; *VirnetX*, 2023 WL 6933812 at *4; *Dayco Prod. v. Total Containment Inc.*, 329 F.3d 1358, 1368-69 (Fed. Cir. 2003).

Dr. Holmes' analysis included the same Falkner bone plate superimposed on an exemplary joint.



Appx2527(Fig.1), Appx3070-3071(¶36).

Contrary to OsteoMed's argument, Dr. Holmes' analysis did not stray from Stryker's original Petition, nor did it involve modifying anything other than the bones on which the plate is positioned.  Appx3050(¶3), Appx3064-3071(¶¶25-36). This is consistent with the opinions of OsteoMed's expert, Mr. Sherman, who acknowledged that bone plates used for joint fusion are interchangeable with those used for fracture fixation.    Appx2805(¶164), Appx2816-2818(¶¶191, 193),

Appx2836(¶228), Appx2923(¶134), Appx2927(¶149), Appx2962-2963(¶249).  Dr. Holmes explained that a POSITA would not assume that the Falkner plate could only be positioned exactly as shown in Figure 1 relative to only the specific transverse fracture illustrated in the figure.  Appx3069-3070(¶35).  While OsteoMed's other expert, Mr. Sommers, initially opined that the Falkner plate could only be positioned exactly as shown in Figure 1, he eventually conceded that it was up to the surgeon's discretion to determine where to position the Falkner plate relative to a bone discontinuity.  Appx3232(120:7-13), Appx3065-3066(¶27).

With regard to the removal of portions of the first bone and the second bone to facilitate joint fusion (see annotated Modified figure), Dr. Holmes explained, consistent with Falkner and the Challenged Patents, that surgeons must perform an osteotomy of the bones of the joint to remove bone spurs and to ensure that the bones will mate together.  Appx3066-3068(¶¶29-32), Appx2535(¶62), Appx416(4:37-43). In particular, surgeons typically shave the tibia straight across to create a flat surface to oppose the flat surface of the talus to facilitate joint fusion.  Appx3067-3068(¶31). This is not a design modification to the bone plate, but simply a routine step to prepare the bones for joint fusion.

Dr. Holmes further explained that "for both joint fusion and fracture fixation, it is common for surgeons to use plate benders when necessary to ensure that the bone plate conforms to the surfaces of the bones."  Appx3069-3071(¶¶34, 36).  This

is specifically contemplated by Falkner and is not a design modification to the Falkner plate.  Appx2532-2535(¶¶34, 62).

OsteoMed does not dispute that it was given appropriate notice of Dr. Holmes' Declaration, including the opportunity to depose Dr. Holmes and to submit a sur-reply addressing his declaration.  *See Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm, Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016).  This is all that is required under the circumstances.  *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380 (Fed. Cir. 2018) ("the petitioner in an inter partes review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner."); *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) (finding reply declaration and arguments "responsive to arguments raised in [the] Patent Owner Response").

OsteoMed now argues that the Board adequately addressed Dr. Holmes' declaration because it "summarized Dr. Holmes' opinions in detail" and concluded that "Patent Owner has the better position."  ECF 34, 35 citing Appx34-35.  But this Court holds "it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument."  *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).  Stryker made it clear that "the Board's *analyses* in the conclusory decisions are near replicas of the *analyses* in the respective Institution Decisions"—which are all devoid of any analysis regarding

Dr. Holmes. ECF 29, 64. As Stryker explained, this is insufficient. ECF 29, 63 citing *Google Inc. v. Intell. Ventures II LLC*, 701 F. App'x 946, 953 (Fed. Cir. 2017) and *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017).

OsteoMed simply ignores this precedent. ECF 34, 35. It does not dispute that the Board's "analysis" adopted Patent Owner's argument and stated "[t]o make the plate so configured as claimed ***would apparently*** require at least some level of redesign or modification." Appx35. The Board does not cite any evidence to support this position (Appx35), let alone overcome unrebutted expert testimony to the contrary. And OsteoMed does not dispute that the Board's analysis was ***a copy and paste*** from its institution decision, which was written ***before*** the Holmes Declaration was proffered in response to that decision. ECF 29, 59, 63-65. Thus the "Board failed to meaningfully address [patentee's] argument." *VirnetX*, 776 F. App'x at 702; *In re Universal Elecs., Inc.*, No. 2022-1230, 2023 WL 3335536, at *3-4 (Fed. Cir. May 10, 2023) (Board has not "'done its job' when it avoids an applicant's primary argument"); *Provisur*, 50 F.4th at 123-24 (same); ECF 29, 64-65 (citing additional cases).

### 2. There is No Substantial Evidence that Falkner's Blade Plate Requires Modifications for Use Across a Joint

The Board erred by finding, contrary to Falkner's disclosure and without any evidentiary citation, that "[t]o make the [Falkner] plate so configured as claimed would apparently require at least some level of redesign and modification." Appx35.

While the Board did not even cite it, the only evidence OsteoMed offered was the

conclusory statement of its expert that the Falkner plate "would ***very likely*** require

extensive modifications" in order to work across a joint. Appx3545-3546(¶135).

Mr. Sommers did not elaborate on this statement. Mr. Sommers' speculative and

unsupported testimony cannot be substantial evidence in light of Falkner's repeated

disclosures. *See infra*. "To contradict a reference, an unsupported opinion is not

substantial evidence." *Ericsson*, 890 F.3d at 1346. "[T]his is not a matter of

credibility but of technological evidence." *Id*.

OsteoMed argues that there are "numerous design modifications required

under Dr. Holmes' version of Falkner" (ECF 34, 37) yet fails to identify a single

modification to the Falkner bone plate itself that would be required for it to be used

with a joint rather than with the fracture illustrated in Figure 1.[2] Nor can it, given its

own expert's unambiguous and repeated opinion that there is no practical difference

between fusing a joint and fusing a bone fracture. Appx2805(¶164), Appx2816-

2818(¶¶191, 193), Appx2836(¶228), Appx2923(¶134), Appx2927(¶149),

Appx2962-2963(¶249). Indeed, the patentability of the challenged apparatus and

---

[2] For example, OsteoMed identifies only the "modification" of the location of the
plate itself relative to the bone discontinuity. ECF 34, 37-38. Re-positioning the
bone plate relative to the exemplary bone shown in Figure 1 is not a modification to
the bone plate, let alone an "extensive" modification, as OsteoMed misleadingly
argued to the Board. Appx1068-1070.

system claims depend on the claimed structure, not the intended use or purpose of that structure. *In re Schreiber*, 128 F.3d at 1477 ("the absence of a disclosure relating to function does not defeat the Board's finding of anticipation. It is well settled that the recitation of a new intended use for an old product does not make a claim to that old product patentable."). Falkner not only includes all of the structural limitations in the claims, it also expressly specifies that its disclosed bone plate can be used across a joint. Appx2531-2535(¶¶21, 27, 28, 29, 33, 34, 62).

OsteoMed also relies on *In re Chudik*, 851 F.3d 1365, 1375 (Fed. Cir. 2017). But in *Chudik*, the Court held that "rotating [the prior art device] so that the protruding surface faces the glenoid cavity would require relocating the screws for [the device] to remain operable" which "would constitute a significant and impermissible modification *to the prior art device*. Here, Dr. Holmes explained how Falkner's plate would be "used for fusing a tibiotalar joint *without modifying the plate itself*." Appx3070(¶36). And it is well-established that "apparatus claims cover what a device is, not what a device does." *Hewlett-Packard*, 909 F.2d at 1468. Thus, the device of Falkner anticipates the claims, even if it would need to be applied to a joint instead of the particular transverse fracture shown in Figure 1.

Finally, OsteoMed points to the Board's speculation that the alleged "modifications" of the Falkner plate "*might* be simple, even arguably obvious, changes for the person of ordinary skill in the art." ECF 34, 37 citing Appx35.

42

However, that a POSITA *might* alter the bone plate is simply not relevant here because there is no evidence that *any* design modifications are necessary.  *See Hewlett–Packard,* 340 F.3d at 1324 n. 6 ("The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed.").  There is no evidence or argument that Falkner's disclosure is non-enabling as to use across the joint.  To the contrary, the only evidence-supported finding is that a POSITA would understand that Falkner's disclosed plate can be used to span two bones, as Falkner itself states.  That is all that is required for anticipation.  *Id.*

### 3. OsteoMed's Alternate Basis for Affirmance Was Not Considered by the Board

Finally, OsteoMed argues that other limitations may not be met if Falkner is used across two bones, and that the Court should affirm on these unaddressed limitations.  ECF 34, 39-41.  But the Board made no such findings, and the Court cannot make fact findings in the first instance to provide an alternate basis for affirmance.  *Calcutt v. Fed. Deposit Ins*. Corp., 598 U.S. 623, 629 (2023) ("A 'reviewing court…is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.") (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Rather, "if the grounds propounded by the agency for its decision 'are inadequate or

improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" *Calcutt*, 598 U.S. at 629 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Thus, while OsteoMed's arguments are without merit,[3] they are for the Board to consider on remand.

## III.    OSTEOMED'S CROSS APPEAL

For its Cross-Appeal, OsteoMed argues that the Board's finding that claims 1-7 of the '085 patent are unpatentable hinge on its allegedly erroneous construction of the claim limitation "an aperture defining a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion." ECF 34, 41. While OsteoMed focuses its attention on the meaning of the term "at," the dispositive issue here relates to the meaning of the term "bridge portion," and whether a "bridge portion" can contain any holes such as a transfixation screw hole. If the bridge portion cannot contain holes (as set forth in Appx460(8:33-37)), then "at the thickened portion of the bridge portion" encompasses Slater's transfixation screw hole, which, like the preferred embodiment, is positioned next to, or adjacent, "the

---

[3] OsteoMed cannot properly inject non-existent claim limitations into this appeal. ECF 34, 39. OsteoMed argues that limitations such as "*a transfixation screw* that crosses the neutral bending axis" cannot be met by Dr. Holmes' modified Falkner plate "because *the screw* fails to cross the neutral bending axis . . ." *Id.* Both the claims and specification only require *the trajectory* to cross the neutral bending axis. *E.g.*, Appx420-421(cls. 2, 12), Appx417(5:53-57, 6:12-15, 6:23-25).

thickened portion of the bridge portion." If the bridge portion can contain holes (contrary to the definition set forth in the '085 patent), then Slater's transfixation screw hole extends through the thickened portion of the bridge portion.



Appx7530-7531, Appx8083-8085. Under either circumstance, the Board found that Slater anticipates. The Board's anticipation findings under both constructions are supported by substantial evidence, and thus the Court should affirm.

### A.   THE COURT SHOULD AFFIRM THE BOARD'S "CLAIM CONSTRUCTION" AND ANTICIPATION FINDING

The Board correctly found that the claim language "at the thickened portion of the bridge portion" encompasses Slater's disclosure of a transfixation screw hole 'at', or adjacent to, the bridge portion. Relying on Figure 4 of the '085 patent, OsteoMed creates a straw man argument in an attempt to illustrate that the Board's construction "plainly contradicts the language of the claim" by "includ[ing] the area adjacent to the bridge portion," such that "the hole may not even be on the bridge portion at all, much less on the specific thickened portion of the bridge portion as

required by Claim 1." ECF 34, 43. OsteoMed then urges the Court to adopt its so-called "plain meaning" construction of "at," which, to the extent it can be understood, excludes the preferred embodiment and contradicts the intrinsic evidence. This Court should reject OsteoMed's specious arguments.

### 1.     The Board's "Construction" was Correct

The '085 patent indicates that "bridge portion 130" is "configured to span across joint 106" and "typically *defined by* an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130." Appx460(8:31-37). The '085 patent further discloses that transfixation screw hole 102 "may be disposed along the center line 138 of spine 124, immediately adjacent to bridge portion 130." Appx460(8:61-63). In particular, "the portion of bone plate 100 that includes transfixation screw hole 102 may be thicker than other portions of bone plate 100. For example, transfixation screw hole 102 may be included in thickened section 136 adjacent to bridge portion 130." Appx461(9:4-7). Notably, the '085 patent *nowhere* describes the transfixation screw hole as extending through the bridge portion.

Contrary to OsteoMed's contentions, the Board did not construe "at" to mean "adjacent." Rather, the Board declined to reach Stryker's argument that the ordinary meaning of the claim term "at" is "in, on, or near," finding instead that "because we view the limitation 'at the bridge portion' as *at least encompassing a hole adjacent*

46

*to the bridge portion as the specification describes*, we need not reach Petitioner's argument that we should construe 'at the bridge portion' to mean 'near the bridge portion." Appx205. This is because the preferred (and only) disclosed embodiment of the '085 patent describes the transfixation screw hole as being positioned "adjacent the bridge portion." Appx460-461(8:61-63, 8:63-9:3, 9:4-9). To be clear, the Board did not *limit* "at the thickened portion of the bridge portion" to mean "adjacent to the thickened portion of the bridge portion," but instead merely found that the claim language *at least encompassed* the preferred embodiment. Finding that the claims cover the preferred embodiment is, of course, consistent with this Court's longstanding precedent. *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."); *Broadcom Corp. v. Netflix, Inc.*, No. 2022-1764, 2023 WL 4115909, at *1 (Fed. Cir. June 22, 2023) (affirming unpatentability and rejecting PO's proposed construction, which "would exclude this preferred embodiment when the disk library contains no computer").

By taking the Board's finding out of context, OsteoMed theorizes that two orange areas drawn into Figure 4[4] are "'adjacent to the bridge portion' and would therefore fall within the scope of the Board's construction, but are not 'at the thickened portion of the bridge portion.'" ECF 34, 44. There is simply no basis for OsteoMed's straw man argument. The Board at no point addressed Figure 4 of the '085 patent, let alone the orange areas OsteoMed highlights for the first time on appeal. In any event, while the '085 patent does not expressly describe the transfixation screw hole 202 of Figure 4 relative to a bridge portion (Appx462(11:6-12:2)), Figure 4 plainly shows transfixation screw hole 202, like transfixation screw hole 102 of Figure 2, as being adjacent to the void-less portion of the bone plate spanning the joint ("the bridge portion") and within a thickened portion of the bone plate. This is consistent with the Board's finding that the claim language at least encompasses "a hole adjacent to the bridge portion as the specification describes."

OsteoMed's argument that the Board somehow ignored the language "thickened portion" appears to be a semantic argument based on the Board's shorthand references to "at the bridge portion." Notwithstanding the shorthand reference, however, it is undisputed that the transfixation screw hole of the preferred

---

[4] Figure 4 of the '085 patent illustrates a lapidus bone plate intended for tarso-metatarsal (TMT) joint fusion, a different bone plate than the MTP plate shown in Figures 2-3 for metatarso-phalangeal joint fusion. Appx462(11:6-10).

embodiment is positioned in a thickened portion of the plate adjacent the void-less, thickened[5] bridge portion.  Appx454-455(Figs. 2, 3), Appx461(9:4-18).  Similarly, Slater's transfixation screw hole is positioned in a thickened portion of the plate adjacent the void-less, thickened bridge portion.  Appx2499-2500(8:31-9:8), Appx2505(14:19-29), Appx2519-2522(Figs. 1, 5, 7, 9), *see also* Section III.B.  While the Slater bone plate is at its maximum thickness in the bridge portion extending over the joint, the transfixation screw hole adjacent the bridge portion is still in a thickened section of the bone plate, which is all that is required by the claim.  Appx8763-8766(¶¶140-141(annotating Slater Fig. 7)), Appx9118-9120(¶¶24-27), Appx2499-2500(8:31-9:8), Appx2505(14:19-29), Appx2515(24:17-19).  As such, the Board's finding should be affirmed.

### 2.    OsteoMed's Presumed Construction Contradicts the Intrinsic Evidence

To the extent OsteoMed argues that "at the thickened portion of the bridge portion" encompasses only transfixation screw holes that extend "through the thickened portion of the bridge portion" (even though the bridge portion is defined

---

[5] Contrary to OsteoMed's confusing argument, neither the Board nor Stryker disputes that the claims require the bridge portion to be thickened.  ECF 34, 45-47.  However, this does not mean that every thickened part of the bone plate is the "bridge portion," as OsteoMed appears to argue.  The specification defines the "bridge portion" as the portion of the plate configured to span across the joint.  Appx460(8:31-37).

in the specification as being free of voids or holes), OsteoMed is wrong.  Indeed, the

Board rejected OsteoMed's approach because

> (1) [OsteoMed] fails to explain why a hole 'at the bridge portion' as the claim requires does not encompass what the specification describes as a hole 'adjacent to' the bridge portion; (2) [OsteoMed does not respond [Stryker's] argument that the specification stresses the advantages of a bridge portion free of voids and holes, which would preclude [OsteoMed's] implicit reading of 'at the bridge portion' that requires a hole on or a part of the bridge portion; and (3) [OsteoMed] does not cite to any portion of the specification in support of its implicit reading of the claim that shows a transfixation screw hole going through the bridge portion of the plate.

Appx206.  So too should this Court.

### a.    OsteoMed Cites No Evidence for its Plain Meaning Argument

As set forth above, OsteoMed fails to cite *any* evidence that "at the thickened

portion of the bridge portion" means "through the thickened portion of the bridge

portion.  ECF 34, 42-45.  OsteoMed is not entitled to a claim scope that is "divorced

from the context of the written description and prosecution history."  *Nystrom v.

Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).

In contrast, the Board recognized that Stryker offered evidence on the plain

meaning of "at."  Appx203 citing Appx8083, Appx9155 ("at… 1- used as a function

word to indicate presence or occurrence in, on, or ***near***").[6]  The Board also correctly

---

[6] Numerous courts have recognized such a meaning of "at."  *E.g.*, *NorthMobileTech LLC v. Simon Prop. Grp., Inc.*, No. 11-CV-287-WMC, 2012 WL 1035380, at *2 (W.D. Wis. Mar. 27, 2012) ("On its face, the language (particularly the word 'at') unambiguously indicates that there must be a determination that the wireless

noted that the patent itself repeatedly describes the screw hole as "adjacent to the bridge portion 130."[7] Appx205, Appx460-461(8:61-63, 8:63-9:3, 9:4-9). Stryker's expert further explained that interpreting "at the thickened portion of the bridge portion" to mean that the hole traverses through the bridge portion (as OsteoMed argues) would make no sense because "[i]f the transfixation screw hole were disposed in the portion of the plate that spans the joint, the screw would have insufficient purchase in the first metatarsal (104a)" and "would not result in a successful joint fusion of two bones." Appx9119(¶26). This is consistent with the disclosure of the '085 patent, which explains that "the placement of transfixation screw hole 102 *adjacent* to bridge portion 130 may enable transfixation screw 102 to penetrate the first metatarsal 104a." Appx460-461(8:63-9:3). Thus, a POSITA would understand the meaning of "at the thickened portion of the bridge portion" to encompass a hole at least adjacent to the bridge portion spanning the joint.

---

communication device is physically present within, *or close to*, the shopping facility."); *EcoNova, Inc. v. DPS Utah*, No. 1:12-CV-174, 2013 WL 65460, at *14 (D. Utah Jan. 4, 2013) ("'at' is synonymous with *'adjacent' and means 'near.'*")

[7] OsteoMed admits that the specification "uses the phrase 'adjacent to' when it meant for a desired location to be *near* something." Appx8124-1825. The Board stated "adjacent" and "near" are "synonymous." Appx1263(37:4-6).

### b. The Specification Does Not Support OsteoMed's Construction

OsteoMed attempts to reconcile that the bridge portion is expressly described as "free of voids such as positioning holes or screw holes," arguing that "while it is ***typical*** to avoid holes in the bridge portion, when holes are applied to this region, it is especially important to increase the bending strength of the bridge portion by thickening it." ECF 34, 47. This makes no sense. Indeed, Dr. Gall opined that "[a]ny plate material that is cored or hollowed-out of the bridge portion would 'reduce the bending strength' of the bridge portion and would not serve the purposes of the bridge portion which is 'to increase the bending strength.' (*Id.* at 8:36-39)." Appx9119(¶25).

Instead of citing to evidence, OsteoMed creates yet another straw man argument in which it provides self-serving annotations to Figure 4 of the '085 patent that simply assume that the "bridge portion" includes transfixation screw hole 202. ECF 34, 46. But the Board did not address this argument, nor should this Court consider it now. As discussed above, the patent does not label or even mention a "bridge portion" with respect to the lapidus plate illustrated in Figure 4. Appx462(11:5-12:3). Like its rejected claim construction argument, OsteoMed's annotations of Figure 4 are inconsistent with the specification's disclosure that the "bridge portion [is] configured to span across the joint" and is "defined by an unbroken section of spine [] that is ***free of voids*** such as positioning holes or screw

holes that could potentially reduce the bending strength of [the] bridge portion." Appx460(8:31-37), Appx9118-9119(¶¶24-25) (explaining how a POSITA would not understand the "bridge portion" to encompass the screw hole).[8] They are also inconsistent with a POSITA's understanding that the transfixation screw hole should not be disposed in the portion of the plate that spans the joint, but rather, adjacent to it. Appx9119(¶26). This Court recognizes that "[u]nsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005).

### c. The Extrinsic Evidence Does Not Support OsteoMed's Construction

It is well-established that extrinsic evidence cannot change the meaning of a term that is clear from the intrinsic record. *E.g.*, *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1290 (Fed. Cir. 2021). Yet OsteoMed nonsensically argues that the Board's construction of "at the thickened bridge portion" is somehow undermined because related patents merely claim that the transfixation screw hole is "disposed along the spine." ECF 34, 48. But the claims of the related patents shed no light on the dispute here—whether the transfixation screw hole must be "at" the

---

[8] To the extent that Figure 4 is considered, it further supports the Board's construction. As described above, Figure 4 shows a screw hole *adjacent to* a void-less bridge portion spanning the joint. *See* Section III.A.1.

bridge portion (i.e., near or adjacent to) as the claims recite and as the specification discloses or "through the thickened portion of the bridge portion" as OsteoMed argues.

OsteoMed next argues that because *Stryker's* patents use the phrase "at or adjacent to," that somehow narrows the plain meaning of "at" in the context of the '085 patent to exclude "adjacent." ECF 34, 49. Putting aside that Stryker's patents are irrelevant to the construction here, it is well-established that "preference for avoiding superfluous language is not an inflexible rule—we must still consider all other principles of claim construction, including how a skilled artisan would have understood the term and how it is used in the specification." *Laitram, LLC v. Ashworth Bros.*, No. 2022-1044, 2023 WL 3449148, at *4 (Fed. Cir. May 15, 2023). It is not uncommon to use clarifying language e.g. "at or adjacent" to make clear that one is using the full, broad meaning of the word. *E.g.*, *EcoNova,* 2013 WL 65460, at *14 (construing "at" in "at or adjacent" to be "synonymous with 'adjacent'"). That *Stryker's* patents provided additional clarity on the scope of its claims simply does not change the scope of the claims here. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (recognizing that "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning").

### 3. OsteoMed had Ample Notice that the Meaning of "At the Thickened Portion of the Bridge Portion" was in Dispute

OsteoMed surprisingly argues that the Board somehow violated 5 U.S.C. § 554(b)(3), (c) by allegedly "adopting the construction that it did" without giving OsteoMed "reasonable notice of the change" and "opportunity to present argument under the new theory." ECF 34, 50, citing *Belden*, 805 F.3d at 1080. First, the Board did not construe "at" to mean "adjacent," but instead simply found that Slater discloses "a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion," as set forth in Stryker's Petition. Appx205. In doing so, the Board rejected OsteoMed's argument that "at the bridge portion" should be construed to mean "through the bridge portion." Appx206, *see also Intell. Ventures II LLC v. Ericsson Inc.*, 686 F. App'x 900, 905 (Fed. Cir. 2017) (distinguishing *Belden* and rejecting argument that Board violated APA by rejecting both parties' constructions).

Second, OsteoMed was clearly on notice that the "construction" of "at the thickened portion of the bridge portion" was at issue given that OsteoMed first raised the issue in its POR by implicitly construing the term to mean "through the thickened portion of the bridge portion." Appx8033-8035. OsteoMed also had notice and an opportunity to dispute the term "at" in its sur-reply. Appx8083-8084(Stryker arguing on reply that "Dr. Gall's identification of Slater's transfixation screw hole as being adjacent to the bridge portion is consistent with the meaning of 'at the

thickened portion of the bridge portion.'"), Appx8124-8126(OsteoMed arguing on sur-reply that Stryker's proposed construction "is contrary to the specification, which uses the phrase "adjacent to" when it meant for a desired location to be near something.").

Moreover, the Board explicitly questioned OsteoMed's counsel about the construction of "at" meaning "adjacent to" at the oral hearing, asking: "I take it, you would disagree with the construction of 'at' meaning 'adjacent to'?" Appx1285(59:5-6).  OsteoMed disputed the construction without hesitation. Appx1285(59:7-12).  This Court recognizes that a patent owner has notice and an opportunity to respond where, as here, "[t]he Board questioned counsel about [the disputed term] at oral argument, asked for [a] reaction to a hypothetical construction, and issued its construction in its Final Written Decision." *Intell. Ventures II LLC*, 686 F. App'x at 906.  Indeed, like the patent owner in *Intell. Ventures II*, OsteoMed had an additional opportunity to respond to such a construction by seeking rehearing, but instead chose to forego its rights.  *Id*.  Therefore, OsteoMed "was on notice that construction of this claim term was central to the case, and both sides extensively litigated the issue." *Id.*

### 4. OsteoMed Does Not Challenge the Board's Anticipation Finding under this Claim Construction

Because the Board's "construction" was correct and OsteoMed does not challenge the Board's finding of anticipation under this construction, the Court should affirm.

### B. THE BOARD'S FINDING THAT SLATER ANTICIPATES EVEN UNDER OSTEOMED'S OVERLY NARROW CONSTRUCTION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Even if the Court ignores the intrinsic evidence and adopts OsteoMed's construction requiring the transfixation screw hole to extend through the thickened portion of the bridge portion, the Board's finding that Slater anticipates should be affirmed. The Board analyzed anticipation even under OsteoMed's construction, and OsteoMed fails to show that the Board's finding of anticipation is unsupported by substantial evidence.

### 1. Stryker's Argument under OsteoMed's Construction was Timely

As the Board recognized, when first confronted with OsteoMed's incorrect construction of "at the thickened portion of the bridge portion" to mean the screw hole must extend through the bridge portion, Stryker explained that even under such an erroneous construction, Slater anticipates. Appx207. In particular, Stryker argued in its Reply that "if the Board allows Patent Owner to pursue a construction that contradicts the intrinsic evidence such that the claimed 'bridge portion' can

57

include voids such as the transfixation screw hole, Slater still discloses this claim element." Appx8085. Citing to Dr. Gall's Reply Declaration, Stryker explained that "[t]he bridge portion would simply be expanded to include Slater's transfixation screw hole." Appx8085, Appx9119-9120(¶27).



The Board agreed that Stryker's argument was properly "responsive to Patent Owner's argument in its Response that the bridge must include the transfixation screw hole, which Petitioner could not have reasonabl[y] foreseen given that the '085 patent specification describes the hole as adjacent to the bridge and that the bridge preferably lacks voids and holes." Appx207. While OsteoMed cites *Corephotonics* (ECF 34, 51), it ignores the actual holding in *Corephotonics* that "the responsiveness restriction is grounded in the Board's regulations, compliance with which [the Court] review[s] for abuse of discretion." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1002-1008 (Fed. Cir. 2013) (recognizing "Board has discretion

to determine…when a reply contention crosses the line from the responsive to the new"). OsteoMed does not even attempt to meet the abuse of discretion standard.

*Intelligent Bio-Systems*, also cited by OsteoMed, is similarly inapposite because in that case, the Petitioner's reply cited "'a number of non-patent literature references which were not relied upon to support unpatentability in the Petition.'" 821 F.3d 1359, 1369 (Fed. Cir. 2016). Stryker's reply did no such thing. As this Court has consistently recognized, when a patent owner presents a new construction, the Board "must give a petitioner an opportunity to respond to the new construction." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1381 (Fed. Cir. 2023); *see also Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1380 (Fed. Cir. 2018); *Hamilton Beach Brands, Inc. v. f'real Foods LLC*, 908 F.3d 1328, 1338 (Fed. Cir. 2018).

Moreover, if OsteoMed is permitted to assert a broader understanding of "bridge portion" (*see supra*), it is only fair that the Board apply the same broader understanding of the bridge portion to Slater. As the Board recognized, "if the '085 patent discloses a bridge portion that includes the transfixation screw hole, then we agree with Petitioner that Slater discloses a bridge portion that includes a transfixation screw hole." Appx207.

### 2.    The Board's Alternate Basis for Anticipation is Supported by Substantial Evidence

While OsteoMed now argues that even if Slater discloses a screw hole "at the bridge portion" it does not disclose the screw hole "***at the thickened portion*** of the bridge portion" (ECF 34, 53), it did not present such an argument to the Board. Appx8122-8126.  Indeed, as the Board noted, "Patent Owner does not argue against the merits of Petitioner's position."  Appx207.

In any event, OsteoMed's new argument is based on the narrowest possible view of a single figure of Slater, without considering the entirety of the disclosure. The Board recognized that Slater "repeatedly describes its bridge portion as thicker than both of its ends, claims this aspect of its plate in dependent claim 29, and even provides specific dimensions consistent with its description of a thickened bridge portion thicker than the ends of the plate."  Appx200.  For example, Slater explains that "the plate depth changes at different locations.  Preferably, the depth at the beginning and end points of the L shaped contour over the ankle joint (the bridge portion) in the second region will be at its maximum thickness.  This location adjacent the ankle joint will preferably be the thickest part of the plate and will preferably fall within the range of 4-8mm."  Appx2499-2515(24:17-19, 14:18-30, 8:25-9:11(describing how thickness gradually tapers toward the proximal and distal points of the plate)), Appx9108-9118(¶¶10, 17-23 (Dr. Gall explaining thickness in

Slater)).  In short, Slater itself establishes that its transfixation screw hole is "at the thickened portion of the bridge portion."

In addition, as Dr. Gall explained, referring to Figures 1 and 7 of Slater, "the transfixation screw hole is 'disposed along the spine at the thickened portion of the bridge portion.'"  Appx9119-9120(¶27).



That the transfixation screw hole 93 is at the thickened portion of the bridge portion is plainly evident in Figure 7.



As explained above in Section II.C., schematic Figure 1 and Figure 7 illustrate different views of the same preferred embodiment. Appx9105-9108(¶¶6-9), Appx2500-2505(9:21-26, 10:32, 13:5-14:10, 14:1-3). Figures 1 and 7 are not distinct teachings and are directly related to each other. *Cf. Net MoneyIN, Inc.*, 545 F.3d at 1371; *see also AMP Plus, Inc. v. DMF, Inc.*, 2022 WL 16844516, at *5 (Fed Cir. Nov. 10, 2022). OsteoMed's brief cites no evidence to the contrary. ECF 34, 52-54.

Regardless, even if there were competing evidence (and there is not), that does not show that the Board's findings are not supported by the substantial evidence described above. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 966 (Fed. Cir. 2007) ("Where the evidence of record is conflicting and supports both [conclusions], the substantial evidence standard of review dictates that we affirm the Board."); *Apple Inc. v. Samsung Elecs. Co., Ltd.,* 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc) ("Our job is not to review whether Samsung's losing position was also supported by substantial evidence or to weigh the relative strength of Samsung's evidence against Apple's evidence."). Thus, the Board's decision that claims 1-7 of the '085 patents are anticipated by Slater should be affirmed.

## CONCLUSION

For the Slater grounds (Section II.A), this Court should reverse the Board's findings with respect to the tensile load language of the '608, '776, and '716 patents. For the '085 patent, this Court should affirm the Board's finding that claims 1-7 are anticipated by Slater (Section III) and reverse the Board's finding that claims 8-9 are not unpatentable (Section II.C). For the Falkner grounds (Section II. D), this Court should vacate the Board's FWDs for all the challenged patents and remand with instructions to consider the Holmes Declaration and the remaining, unaddressed limitations.

Respectfully submitted,

Dated: April 12, 2024

*/s/ Sharon A. Hwang*
SHARON A. HWANG
ROBERT A. SURRETTE
SCOTT P. MCBRIDE
SEAN C. SPARROW
MCANDREWS, HELD & MALLOY LTD.
500 W. Madison Street, Suite 3400
Chicago, Illinois 60661
(312) 775-8000
shwang@mcandrews-ip.com
bsurrette@mcandrews-ip.com
smcbride@mcandrews-ip.com
ssparrow@mcandrews-ip.com

*Counsel for Appellants*

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  23-1925/-1926/-1928/-1929/-1979/-2010/-2011/-2012

**Short Case Caption:**  Stryker Corporation v. OsteoMed LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,537  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/12/2024

Signature:  /s/ Sharon A. Hwang

Name:  Sharon A. Hwang

Save for Filing