**Nos. 23-1925, -1926, -1928, -1929,  -1979, -2010, -2011, -2012**
**Volume II of III, Appx409 to Appx3232**

# In the
# United States Court of Appeals
## for the Federal Circuit

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Cross-Appellant.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in
Nos. IPR2021-01450, IPR2021-01451, IPR2021-01452 and IPR2021-01453.

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Appellee.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in
Nos. IPR2022-00189, IPR2022-00190 and IPR2022-00191.

## CORRECTED JOINT APPENDIX

DEVON C. BEANE
JASON A. ENGEL
JONAH B. HEEMSTRA
K&L GATES LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602-4207
(312) 807-4436
devon.beane@klgates.com
jason.engel@klgates.com
Jonah.Heemstra@klgates.com

SHARON A. HWANG
ROBERT A. SURRETTE
SCOTT P. MCBRIDE
SEAN C. SPARROW
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
shwang@mcandrews-ip.com
bsurrette@mcandrews-ip.com
smcbride@mcandrews-ip.com
ssparrow@mcandrews-ip.com

 

**2023-1925**
**APPENDIX INDEX**

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| **Final Written Decisions** | | |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01450, 03/08/2023 | Appx1 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01451, 03/08/2023 | Appx58 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01452, 03/08/2023 | Appx115 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01453, 03/08/2023 | Appx176 |
| 34 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00189, 05/30/2023 | Appx244 |
| 33 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00190, 05/30/2023 | Appx298 |
| 35 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00191, 05/30/2023 | Appx353 |
| **Patents** | | |
| 1001 | U.S. Patent No. 8,529,608 Terrill, 04/28/2009 | Appx409 |
| 1001 | U.S. Patent No. 9,351,776 Terrill, 08/30/2013 | Appx424 |
| 1001 | U.S. Patent No. 9,763,716 Terrill, 05/05/2016 | Appx437 |
| 1001 | U.S. Patent No. 10,245,085 Terrill, 09/18/2017 | Appx451 |
| **Certified Lists** | | |
| N/A | Certified List of Materials from the USPTO for IPR2021-01450, 07/03/2023 | Appx464 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01451, 07/03/2023 | Appx467 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01452, 07/03/2023 | Appx470 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01453, 07/03/2023 | Appx473 |
| N/A | Certified List of Materials from the USPTO for IPR2022-00189, 07/25/2023 | Appx476 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| N/A | Certified List of Materials from the USPTO for IPR2022-00190, 07/25/2023 | Appx479 |
| N/A | Certified List of Materials from the USPTO for IPR2022-00191, 07/25/2023 | Appx482 |
| **Docket for IPR2021-01450** | | |
| 2 | Petition for *Inter Partes* Review, 08/30/2021 | Appx485 |
| 6 | Decision Institution of *Inter Partes* Review, 03/11/2022 | Appx635 |
| 20 | Order Granting Petitioners' Motion to Submit Supplemental Information, 05/13/2022 | Appx996 |
| 23 | Patent Owner Response, 06/17/2022 | Appx1017 |
| 27 | Petitioners' Reply to Patent Owner Response, 09/19/2022 | Appx1096 |
| 33 | Patent Owner Sur-Reply, 11/02/2022 | Appx1154 |
| 42 | Record of Oral Hearing, 01/27/2023 | Appx1227 |
| **Petitioners' Exhibits for IPR2021-01450** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,529,608 | Appx1756 |
| 1004 | Prosecution File History of U.S. 8,529,608 | Appx1993 |
| 1005 | WO 2007/131287 A1 to Slater | Appx2491 |
| 1006 | U.S. Patent Application Publication No. 2005/0171544 A1 to Falkner | Appx2526 |
| 1025 | Declaration of Michael Sherman filed in IPR2022-00487 | Appx2730 |
| 1026 | Declaration of Michael Sherman filed in IPR2022-00488 | Appx2853 |
| 1027 | Reply Declaration of Kenneth A. Gall, Ph.D. | Appx3000 |
| 1028 | Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS in Support of Petitioners' Reply | Appx3048 |
| 1030 | Mark Sommers Deposition Transcript, 08/24/2022 | Appx3112 |
| 1041 | Petitioners' Demonstrative Slides for IPR2021-01450, -01451, -01452, and -01453 | Appx3270 |
| **Patent Owner's Exhibits for IPR2021-01450** | | |
| 2002 | Declaration of Mark Sommers, MS | Appx3494 |
| 2003 | Kenneth A. Gall, Ph.D. Deposition Transcript, 05/19/2022 | Appx3566 |
| 2006 | George B. Holmes, Jr., M.D. Deposition Transcript, 10/21/2022 | Appx3865 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| **Docket for IPR2021-01451** | | |
| 6 | Decision Institution of *Inter Partes* Review, 03/11/2022 | Appx4165 |
| 23 | Patent Owner Response, 06/17/2022 | Appx4533 |
| **Exhibits for IPR2021-01451** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. | Appx5152 |
| **Docket for IPR2021-01452** | | |
| 6 | Decision Institution of *Inter Partes* Review, 03/16/2022 | Appx5912 |
| 23 | Patent Owner Response, 06/17/2022 | Appx6301 |
| **Docket for IPR2021-01453** | | |
| 2 | Petition for *Inter Partes* Review, 08/30/2021 | Appx7496 |
| 6 | Decision Institution of *Inter Partes* Review, 03/17/2022 | Appx7631 |
| 23 | Patent Owner Response, 06/17/2022 | Appx7999 |
| 27 | Petitioners' Reply to Patent Owner Response, 09/19/2022 | Appx8063 |
| 33 | Patent Owner Sur-Reply, 11/02/2022 | Appx8116 |
| **Exhibits for IPR2021-01453** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. | Appx8688 |
| 1027 | Reply Declaration of Kenneth A. Gall, Ph.D. | Appx9100 |
| 1031 | Merriam-Webster's Collegiate Dictionary, p. 77 | Appx9153 |
| 2002 | Declaration of Mark Sommers, MS | Appx9156 |
| **Docket for IPR2022-00189** | | |
| 11 | Decision Institution of *Inter Partes* Review, 06/01/2022 | Appx9319 |
| **Docket for IPR2022-00190** | | |
| 10 | Decision Institution of *Inter Partes* Review, 06/01/2022 | Appx10750 |
| **Docket for IPR2022-00191** | | |
| 11 | Decision Institution of Inter Partes Review, 06/01/2022 | Appx11537 |
| **ADDITIONAL MATERIALS** | | |
| | U.S. Patent No. 10,993,751 Prandi, 01/07/2021 | Appx12237 |



US008529608B2

(12) **United States Patent**     (10) **Patent No.:**   **US 8,529,608 B2**
Terrill et al.     (45) **Date of Patent:**   **Sep. 10, 2013**

(54) **BONE PLATE WITH A TRANSFIXATION SCREW HOLE**

(75) Inventors: **Lance Nathan Terrill**, Dallas, TX (US); **Bruce R. Werber**, Scottsdale, AZ (US)

(73) Assignee: **OsteoMed LLC**, Addison, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 596 days.

(21) Appl. No.: **12/431,017**

(22) Filed: **Apr. 28, 2009**

(65) **Prior Publication Data**

US 2010/0274293 A1    Oct. 28, 2010

(51) **Int. Cl.**
*A61B 17/80*    (2006.01)

(52) **U.S. Cl.**
USPC ........................................... **606/286**; 606/280

(58) **Field of Classification Search**
USPC ................. 606/280, 282, 283, 286–289, 906; 623/21.11, 21.15, 21.19
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,025,008 A | 4/1912 | Miner | |
| 1,105,105 A | 7/1914 | Sherman | |
| 1,869,726 A | 8/1932 | Youngren | |
| 2,133,859 A | 10/1938 | Hawley | |
| 2,398,915 A | 4/1946 | Bell | |
| 2,443,363 A | 6/1948 | Townsend et al. | |
| 2,489,870 A | 11/1949 | Dzus | |
| 2,501,978 A | 3/1950 | Wichman | |
| 2,561,550 A | 7/1951 | Wright | |
| 2,737,835 A | 3/1956 | Herz | |
| 3,463,148 A | 8/1969 | Treace | |

| | | | |
|---|---|---|---|
| 3,534,731 A | 10/1970 | Muller | 128/92 |
| 3,552,389 A | 1/1971 | Allgower et al. | 128/92 |
| 3,593,709 A | 7/1971 | Halloran | 128/92 |
| 3,668,972 A | 6/1972 | Allgower et al. | 90/11 |
| 3,695,259 A | 10/1972 | Yost | 128/92 |
| 3,716,050 A | 2/1973 | Johnston | 128/92 |
| 3,741,205 A | 6/1973 | Markolf et al. | 128/92 |
| 3,779,240 A | 12/1973 | Kondo | 128/92 |
| 3,807,394 A | 4/1974 | Attenborough | 128/92 |
| 4,219,015 A | 8/1980 | Steinemann | 128/92 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 468 655 A2 | 10/2004 |
| EP | 1 897 509 A1 | 9/2007 |
| WO | WO 2007/131287 A1 | 11/2007 |

OTHER PUBLICATIONS

"An Improved Bone Clamp and a Plate for Internal Fixation of Fractures", by Jean Verbrugge; *J Bone Joint Surg Am.* 1946; 28: 174-175.

(Continued)

*Primary Examiner* — Nicholas Woodall
(74) *Attorney, Agent, or Firm* — Fulbright & Jaworski LLP

(57) **ABSTRACT**

A system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw includes a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

**17 Claims, 3 Drawing Sheets**



STRYKER Exhibit 1001
Page 1 of 15
IPR2021-01450

**US 8,529,608 B2**

Page 2

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,338,921 A | 7/1982 | Harder et al. .............. 126/446 |
| 4,338,926 A | 7/1982 | Kummer et al. ............... 128/92 |
| 4,364,382 A | 12/1982 | Mennen .................... 128/92 |
| 4,408,601 A | 10/1983 | Wenk ...................... 128/92 |
| 4,484,570 A | 11/1984 | Sutter et al. ................ 128/92 |
| 4,488,543 A | 12/1984 | Tornier .................... 128/92 |
| 4,493,317 A | 1/1985 | Klaue ..................... 128/92 |
| 4,503,848 A | 3/1985 | Caspar et al. ............... 128/92 |
| 4,513,744 A | 4/1985 | Klaue ..................... 128/92 |
| 4,565,193 A | 1/1986 | Streli ..................... 128/92 |
| 4,573,458 A | 3/1986 | Lower ..................... 128/92 |
| 4,651,724 A | 3/1987 | Berentey et al. ............. 128/92 |
| 4,683,878 A | 8/1987 | Carter .................... 128/92 |
| 4,794,918 A | 1/1989 | Wolter .................... 128/92 |
| 4,800,874 A | 1/1989 | David et al. ............... 128/92 |
| 4,838,252 A | 6/1989 | Klaue .................... 128/92 |
| 4,867,144 A | 9/1989 | Karas et al. ............... 128/92 |
| 4,955,886 A | 9/1990 | Pawluk ................... 606/69 |
| 4,959,065 A | 9/1990 | Arnett et al. .............. 606/69 |
| 5,002,544 A | 3/1991 | Klaue et al. .............. 606/69 |
| 5,006,120 A | 4/1991 | Carter ................... 606/69 |
| 5,015,249 A | 5/1991 | Nakao et al. ............. 606/142 |
| 5,021,056 A | 6/1991 | Hofmann et al. ............ 606/86 |
| 5,041,113 A | 8/1991 | Biedermann et al. .......... 606/61 |
| 5,053,036 A | 10/1991 | Perren et al. .............. 606/69 |
| 5,053,039 A | 10/1991 | Hofmann et al. ............ 606/87 |
| 5,057,111 A | 10/1991 | Park .................... 606/69 |
| 5,085,660 A | 2/1992 | Lin ..................... 606/73 |
| 5,129,903 A | 7/1992 | Luhr et al. ............... 606/71 |
| 5,151,103 A | 9/1992 | Tepic et al. .............. 606/69 |
| 5,190,544 A | 3/1993 | Chapman et al. ............ 606/69 |
| 5,234,431 A | 8/1993 | Keller ................... 606/70 |
| 5,269,784 A | 12/1993 | Mast .................... 606/69 |
| 5,304,180 A | 4/1994 | Slocum .................. 606/69 |
| 5,330,535 A | 7/1994 | Moser et al. .............. 623/20 |
| 5,344,421 A | 9/1994 | Crook ................... 606/69 |
| 5,380,327 A | 1/1995 | Eggers et al. ............. 606/69 |
| 5,387,102 A | 2/1995 | Wagner et al. ............ 433/173 |
| 5,443,467 A | 8/1995 | Biedermann et al. .......... 606/65 |
| 5,474,553 A | 12/1995 | Baumgart ................. 606/71 |
| 5,486,176 A | 1/1996 | Hildebrand et al. .......... 606/71 |
| 5,487,741 A | 1/1996 | Maruyama et al. ........... 606/60 |
| 5,501,684 A | 3/1996 | Schlapfer et al. ........... 606/73 |
| 5,531,746 A | 7/1996 | Errico et al. .............. 606/61 |
| 5,549,612 A | 8/1996 | Yapp et al. ............... 606/69 |
| 5,578,034 A | 11/1996 | Estes ................... 606/61 |
| 5,591,166 A | 1/1997 | Bernhardt et al. ........... 606/61 |
| 5,601,553 A | 2/1997 | Trebing et al. ............. 606/61 |
| 5,603,713 A | 2/1997 | Aust et al. ............... 606/61 |
| 5,607,426 A | 3/1997 | Ralph et al. .............. 606/61 |
| 5,607,428 A | 3/1997 | Lin ..................... 606/69 |
| 5,620,448 A | 4/1997 | Puddu ................... 606/87 |
| 5,643,265 A | 7/1997 | Errico et al. .............. 606/70 |
| 5,662,655 A | 9/1997 | Laboureau et al. ........... 606/75 |
| 5,674,222 A | 10/1997 | Berger et al. ............. 606/69 |
| 5,676,667 A | 10/1997 | Hausman ................. 606/69 |
| 5,681,311 A | 10/1997 | Foley et al. .............. 606/61 |
| 5,709,686 A | 1/1998 | Talos et al. .............. 606/69 |
| 5,725,588 A | 3/1998 | Errico et al. .............. 623/22 |
| 5,733,287 A | 3/1998 | Tepic et al. .............. 606/69 |
| 5,735,853 A | 4/1998 | Olerud ................... 606/71 |
| 5,741,258 A | 4/1998 | Klaue et al. .............. 606/70 |
| 5,746,742 A | 5/1998 | Runciman et al. ........... 606/69 |
| 5,749,872 A | 5/1998 | Kyle et al. ............... 606/69 |
| 5,749,875 A | 5/1998 | Puddu ................... 606/87 |
| 5,810,823 A | 9/1998 | Klaue et al. .............. 606/69 |
| 5,931,838 A | 8/1999 | Vito .................... 606/61 |
| 5,938,664 A | 8/1999 | Winquist et al. ........... 606/69 |
| 5,951,558 A | 9/1999 | Fiz ..................... 606/70 |
| 5,954,722 A | 9/1999 | Bono ................... 606/69 |
| 5,964,762 A | 10/1999 | Biedermann et al. ......... 606/69 |
| 6,001,099 A | 12/1999 | Huebner ................. 606/69 |
| 6,093,188 A | 7/2000 | Murray .................. 606/69 |
| 6,117,173 A | 9/2000 | Taddia et al. ........... 623/16.11 |
| 6,139,550 A | 10/2000 | Michelson ............... 606/69 |
| 6,152,927 A | 11/2000 | Farris et al. ............. 606/69 |
| 6,183,475 B1 | 2/2001 | Lester et al. ............. 606/69 |
| 6,193,721 B1 | 2/2001 | Michelson ............... 606/70 |
| 6,206,881 B1 | 3/2001 | Frigg et al. .............. 606/69 |
| 6,224,602 B1 | 5/2001 | Hayes ................... 606/69 |
| 6,228,085 B1 | 5/2001 | Theken et al. ............. 606/61 |
| 6,235,032 B1 | 5/2001 | Link .................... 606/69 |
| 6,235,033 B1 | 5/2001 | Brace et al. .............. 606/69 |
| 6,235,034 B1 | 5/2001 | Bray .................... 606/71 |
| 6,241,731 B1 | 6/2001 | Fiz ..................... 606/65 |
| 6,261,291 B1 | 7/2001 | Talaber et al. ............ 606/69 |
| 6,302,883 B1 | 10/2001 | Bono ................... 606/69 |
| 6,309,393 B1 | 10/2001 | Tepic et al. .............. 606/69 |
| 6,315,779 B1 | 11/2001 | Morrison et al. ........... 606/69 |
| 6,322,562 B1 | 11/2001 | Wolter .................. 606/69 |
| 6,342,055 B1 | 1/2002 | Eisermann et al. .......... 606/69 |
| 6,348,052 B1 | 2/2002 | Sammarco ............... 606/69 |
| 6,383,186 B1 | 5/2002 | Michelson ............... 606/69 |
| 6,413,259 B1 | 7/2002 | Lyons et al. .............. 606/69 |
| 6,454,770 B1 | 9/2002 | Klaue ................... 606/69 |
| 6,503,250 B1 | 1/2003 | Paul .................... 606/69 |
| 6,527,776 B1 | 3/2003 | Michelson ............... 606/70 |
| 6,533,789 B1 | 3/2003 | Hall, IV et al. ............ 606/69 |
| 6,575,975 B2 | 6/2003 | Brace et al. .............. 606/69 |
| 6,595,993 B2 | 7/2003 | Donno et al. ............. 606/71 |
| 6,602,255 B1 | 8/2003 | Campbell et al. ........... 606/69 |
| 6,623,486 B1 | 9/2003 | Weaver et al. ............. 606/69 |
| 6,669,701 B2 | 12/2003 | Steiner et al. ............. 606/69 |
| 6,682,531 B2 | 1/2004 | Winquist et al. ........... 606/69 |
| 6,695,846 B2 | 2/2004 | Richelsoph et al. .......... 606/71 |
| 6,719,759 B2 | 4/2004 | Wagner et al. ............. 606/69 |
| 6,755,832 B2 | 6/2004 | Happonen et al. ........... 606/69 |
| 6,755,833 B1 | 6/2004 | Paul et al. ............... 606/69 |
| 6,821,278 B2 | 11/2004 | Frigg et al. .............. 606/69 |
| 6,890,334 B2 | 5/2005 | Brace et al. .............. 606/69 |
| 6,945,973 B2 | 9/2005 | Bray .................... 606/69 |
| 7,001,389 B1 | 2/2006 | Navarro et al. ............ 606/71 |
| 7,128,744 B2 | 10/2006 | Weaver et al. ............. 606/69 |
| 7,175,624 B2 | 2/2007 | Konieczynski et al. ........ 606/71 |
| 7,179,260 B2 | 2/2007 | Gerlach et al. ............ 606/69 |
| 7,273,481 B2 | 9/2007 | Lombardo et al. ........... 606/69 |
| 7,288,095 B2 | 10/2007 | Baynham et al. ........... 606/69 |
| 7,309,340 B2 | 12/2007 | Fallin et al. ............ 606/104 |
| 7,311,712 B2 | 12/2007 | Dalton .................. 606/71 |
| 7,331,961 B2 | 2/2008 | Abdou ................... 606/71 |
| 2001/0037112 A1 | 11/2001 | Brace et al. ............. 606/69 |
| 2002/0082606 A1 | 6/2002 | Suddaby ................. 606/69 |
| 2003/0040749 A1 | 2/2003 | Grabowski et al. .......... 606/71 |
| 2003/0078583 A1 | 4/2003 | Biedermann et al. ......... 606/69 |
| 2003/0187440 A1 | 10/2003 | Richelsoph et al. ......... 606/69 |
| 2003/0187442 A1 | 10/2003 | Richelsoph et al. ......... 606/70 |
| 2003/0199876 A1 | 10/2003 | Brace et al. ............. 606/69 |
| 2004/0015169 A1 | 1/2004 | Gause ................... 606/63 |
| 2004/0034354 A1 | 2/2004 | Paul .................... 606/70 |
| 2004/0059334 A1 | 3/2004 | Weaver et al. ............ 606/69 |
| 2004/0059335 A1 | 3/2004 | Weaver et al. ............ 606/69 |
| 2004/0087951 A1 | 5/2004 | Khalili ................. 606/69 |
| 2004/0127901 A1 | 7/2004 | Huebner et al. ........... 606/69 |
| 2005/0010226 A1 * | 1/2005 | Grady et al. ............. 606/69 |
| 2005/0065521 A1 | 3/2005 | Steger et al. ............. 606/69 |
| 2005/0070904 A1 | 3/2005 | Gerlach et al. ............ 606/69 |
| 2005/0080421 A1 | 4/2005 | Weaver et al. ............ 606/69 |
| 2005/0131413 A1 | 6/2005 | O'Driscoll et al. .......... 606/73 |
| 2005/0234455 A1 | 10/2005 | Binder et al. ............. 606/69 |
| 2006/0015102 A1 | 1/2006 | Toullec et al. ............ 606/69 |
| 2006/0036249 A1 | 2/2006 | Baynham et al. ........... 606/69 |
| 2006/0173459 A1 | 8/2006 | Kay et al. ............... 606/69 |
| 2006/0235396 A1 | 10/2006 | Sanders et al. ............ 606/69 |
| 2006/0235397 A1 | 10/2006 | Sanders et al. ............ 606/69 |
| 2006/0241592 A1 | 10/2006 | Myerson et al. ........... 606/61 |
| 2006/0241607 A1 | 10/2006 | Myerson et al. ........... 606/69 |
| 2006/0241608 A1 | 10/2006 | Myerson et al. ........... 606/69 |
| 2007/0055253 A1 | 3/2007 | Orbay et al. ............. 606/69 |
| 2007/0088360 A1 | 4/2007 | Orbay et al. ............. 606/69 |
| 2007/0123880 A1 | 5/2007 | Medoff .................. 606/69 |
| 2007/0162020 A1 | 7/2007 | Gerlach et al. ............ 606/69 |
| 2007/0233115 A1 | 10/2007 | Sixto et al. .............. 606/69 |
| 2007/0239163 A1 * | 10/2007 | Strnad et al. ............. 606/72 |
| 2007/0260244 A1 | 11/2007 | Wolter .................. 606/60 |

STRYKER Exhibit 1001
Page 2 of 15
IPR2021-01450

**US 8,529,608 B2**

Page 3

| | | | |
|---|---|---|---|
| 2007/0276383 A1 | 11/2007 | Rayhack ........................ | 606/69 |
| 2007/0276386 A1 | 11/2007 | Gerlach et al. ................. | 606/72 |
| 2008/0015591 A1 | 1/2008 | Castaneda et al. ............. | 606/69 |
| 2008/0015592 A1 | 1/2008 | Long et al. ..................... | 606/69 |

OTHER PUBLICATIONS

Arthrex, Midfoot Plating Techniques, Surgical Technique (12 pages), 2007.

PCT Invitation to Pay Additional Fees and, Where Applicable, Protest Fee; International Application No. PCT/US2010/031328; International Filing Date Apr. 16, 2010.

PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US2010/031328; International Filing Date: Apr. 16, 2010.

* cited by examiner

STRYKER Exhibit 1001
Page 3 of 15
IPR2021-01450



*FIG. 2*

*FIG. 1*

STRYKER Exhibit 1001
Page 4 of 15
IPR2021-01450



*FIG. 3*

STRYKER Exhibit 1001
Page 5 of 15
IPR2021-01450



*FIG. 4*

STRYKER Exhibit 1001
Page 6 of 15
IPR2021-01450

US 8,529,608 B2

**1**

## BONE PLATE WITH A TRANSFIXATION SCREW HOLE

### TECHNICAL FIELD

The present disclosure relates to a device for securing bones together, and more particularly, to a bone plate with a transfixation screw hole.

### BACKGROUND

When performing certain medical procedures, such as reconstructing a joint that has been damaged due to bone or soft tissue trauma, a surgeon may need to fuse the bones of the joint together in a configuration that approximates the natural geometry of the joint. One way to achieve this objective is to attach the bones of the joint to a plate that holds the bones in alignment with one another while they fuse together.

### SUMMARY

The present disclosure relates generally to orthopedic devices. More specifically, the present disclosure relates to a bone plate with a transfixation screw hole for securing the bones of a joint together and a method for using the same.

In particular embodiments, a system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate further includes a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Depending upon design, a central axis of the inner surface of the transfixation screw hole may define the trajectory, and the trajectory may be configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

In particular embodiments, a plate for securing bones together may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint.

In particular embodiments, a method for securing bones together across a joint includes placing a plate over a first bone on a first side of a joint and a second bone on a second

**2**

side of the joint. The plate may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to the first bone, a second end that includes at least one attachment point for attaching the second end to the second bone, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The method may further include attaching the plate to the first bone and the second bone, and inserting a transfixation screw into the first bone and the second bone through the transfixation screw hole. The transfixation screw may include a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Particular embodiments of the present disclosure may provide a number of technical advantages, including for example, the ability to tightly couple the bones of a joint together by inserting a transfixation screw across the joint through a bone plate. In particular embodiments, the transfixation screw may have a "lag effect" that enables the bones of the joint to be approximated one another by rotation of the transfixation screw. For example, the transfixation screw may include an unthreaded portion configured to rotate freely within the first bone and a threaded portion configured to threadably engage the second bone. When the transfixation screw is rotated, the unthreaded portion of the transfixation screw may rotate freely within the first bone while the threaded portion of the transfixation screw advances into the second bone, drawing the second bone toward the first bone and compressing the joint. These technical advantages (e.g., the presence of the transfixation screw across the joint, and the lag effect of the transfixation screw) may increase the contact pressure on the bony interface of the joint, increasing the probability of a positive fusion.

Depending upon design, the inner surface of the transfixation screw hole in the plate may direct the transfixation screw along a trajectory that crosses a neutral bending axis of the joint as the transfixation screw passes from the first bone to the second bone. This technical advantage may create a "tension band" construct that enables the transfixation screw to absorb a portion of the mechanical stress that would otherwise be imposed upon the plate above the joint when a load is applied to the joint. This technical advantage may enhance the integrity and reliability of the plate and increase the load that the plate may support without increasing plate thickness. Other technical advantages of the present disclosure will be readily apparent to one skilled in the art from the following figures, descriptions, and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some, or none of the enumerated advantages.

### BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present disclosure and its advantages, reference is now made to the following descriptions, taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a failed metatarso-phalangeal joint in the big toe of a human foot;

STRYKER Exhibit 1001
Page 7 of 15
IPR2021-01450

US 8,529,608 B2

3                                                        4

FIG. **2** illustrates a bone plate being used in conjunction with a transfixation screw to repair the failed metatarso-phalangeal joint of FIG. **1** according to an example embodiment of the present disclosure;

FIG. **3** illustrates a more detailed isometric view of the bone plate of FIG. **2**; and

FIG. **4** illustrates a bone plate adapted for use on a tarso-metatarsal joint according to an example embodiment of the present disclosure.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The metatarso-phalangeal joint is a joint between a meta-tarsal bone of the foot and the proximal phalanx of a toe. It is common, particularly in sports, for the first metatarso-pha-langeal joint (e.g., the metatarso-phalangeal joint of the big toe) to be injured as a result of trauma to or hyper extension of the big toe. In other scenarios, degradation of the metatarso-phalangeal joint may be caused by arthritis. Minor injuries to the metatarso-phalangeal joint, such as a sprain, may often be treated using conservative measures such as immobilization and icing of the toe, accompanied by rest and anti-inflammatory medication. These measures may be followed by taping or splinting of the injured joint to help prevent recurrent hyperextensions of the toe.

In more severe cases involving major trauma to the bone or soft tissue of the metatarso-phalangeal joint, as illustrated in FIG. **1**, conservative measures may be ineffective, and surgery may be required. One procedure for reconstructing a severely damaged metatarso-phalangeal joint involves fusing the bones of the joint together using plates and/or screws. More particularly, a fusion procedure may involve reducing the opposing faces of the bones of the joint to a bleeding bone bed, approximating the bones with one another, and screwing the bones together to promote fusion. In some cases, the bones may be screwed together without the use of a plate. However, this option may not provide adequate lateral support for the bones, possibly allowing them to shift out of alignment, resulting in a malunion or a nonunion of the joint.

Another option for surgically repairing a severely damaged metatarso-phalangeal joint involves securing the bones of the joint together using a plate. In this procedure, after the bones of the joint have been approximated next to one another, the plate may be laid across the joint. The plate may then be screwed to the bones of the joint to hold them in alignment next to one another, enabling the joint fuse. However, when a load is placed upon the joint (e.g., when weight is placed upon the foot) it is possible for the plate to bend or break above the joint. This may cause the bones of the joint to fall out of approximation, resulting in a non-union (e.g., a failed fusion of the joint). Consequently, the ability to rigidly hold the bones of a joint in tight approximation without bending or breaking is one metric for judging the effectiveness of a joint-fixation plate.

One way to increase the durability and reliability of a joint-fixation plate is to include a transfixation screw hole in the plate that enables a transfixation screw to transfix the joint through the plate. As explained in more detail below, once the transfixation screw is screwed across the joint, it may absorb some of the stress that would otherwise be exerted on the plate when a load is placed upon the joint. This may reduce the strain on the plate, increasing its reliability and durability. Additionally, while the plate may provide lateral support for the joint, the transfixation screw may hold the bones of the joint in tight approximation, increasing the likelihood of a positive fusion of the joint. This may be particularly impor-

tant on the plantar side of the joint due to tensile stresses exerted on that side of the joint when loaded.

FIGS. **2-3** illustrate an example embodiment of a bone plate **100** that includes a transfixation screw hole **102** in accordance with the present disclosure. More particularly, FIG. **2** illustrates bone plate **100** being used in conjunction with a transfixation screw **150** to repair the failed metatarso-phalangeal joint of FIG. **1**. FIG. **3** illustrates a more detailed isometric view of bone plate **100**. For reference purposes, bone plate **100** and its various features may be referred to as having a top surface intended to face away from the bones of joint **106** and a bottom surface intended to face toward the bones of joint **106** (e.g., to be placed upon the bones of joint **106**). Though particular features of bone plate **100** may be explained using such intended placement as a point of reference, this method of explanation is not meant to limit the scope of the present disclosure to any particular configuration or orientation of bone plate **100**.

As shown in FIG. **2**, bone plate **100** is being used to reconstruct a failed joint **106** of a human foot. In particular, FIG. **2** illustrates transfixation screw **150** being inserted through bone plate **100** into a first bone **104**a and a second bone **104**b (collectively, bones **104**) in order to fuse joint **106** (show collapsed in FIG. **1**). Bone **104**a refers to the bone positioned directly beneath transfixation screw hole **102** (e.g., touching the bottom surface of transfixation screw hole **102**) while bone **104**b refers to the bone positioned on the opposite side of joint **106**. Although bone **104**a is illustrated and described as the first metatarsal, bone **104**b is illustrated and described as the first proximal phalanx, and joint **106** is illustrated and described as the metatarso-phalangeal joint **106** of the big toe, one of ordinary skill in the art will appreciate those specific examples are presented for the sake of explanatory clarification and will further appreciate that bones **104** and joint **106** may generically refer to any suitable set of bones forming any suitable joint in the body.

In a typical procedure, a surgeon may use bone plate **100** to fuse joint **106** according to the following example surgical procedure. To begin the procedure, the surgeon may create an incision over joint **106** to expose bones **104**. After exposing bones **104**, the surgeon may perform any pre-fusion steps such as removing cartilage from joint **106** and reducing the opposing faces of bones **104** to a bleeding bone bed. Following the pre-fusion steps, the surgeon may approximate bones **104** by positioning them next to one in a desired configuration for fusion. The surgeon may then secure bones **104** together by placing bone plate **100** across joint **106** such that transfix-ation screw hole **102** overlies bone **104**a. The surgeon may screw bone plate **100** to bones **104**, for example by inserting one or more bone screws **134** into one or more screw holes located on either end of bone plate **100**, after which, the surgeon may create a path for transfixation screw **150**. To create a path for transfixation screw **150**, the surgeon may drill a pilot hole into bones **104** through transfixation screw hole **102**. In particular embodiments, the surgeon may use the central axis **116** of transfixation screw hole **102** as a guide to establish the trajectory for the pilot hole. Once the pilot hole has been created, transfixation screw **150** may be inserted into the pilot hole through transfixation screw hole **102** and screwed into bones **104** until the head of transfixation screw **150** abuts the inner surface of transfixation screw hole **102**. After bones **104** have been secured together using transfix-ation screw **150**, the surgeon may close the incision, leaving bones **104** to fuse together.

To facilitate the process of aligning bones **104**, bone plate **100** may include one or more joint-specific characteristics that may conform to the natural geometry of joint **106** or

STRYKER Exhibit 1001
Page 8 of 15
IPR2021-01450

**Appx416**

US 8,529,608 B2

**5**

bones 104. For example, in the case of the metatarso-pha-langeal joint, bone plate 100 may include a rise (similar to rise 210 in FIG. 4) that fits over the head on the dorsal section of metatarsal 104a. This may enable bone plate 100 to be seated firmly against the head of metatarsal 104a and provide a natural footing for bone plate 100 against metatarsal 104a. In other embodiments, the rise may be eliminated from bone plate 100 and the dorsal head of metatarsal 104a may be ground down to enable bone plate 100 to be laid flush against bones 104.

Depending upon design, bone plate 100 may further include a dorsiflexion angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural elevation of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a dorsiflexion angle between first end 126b and second end 126a may reduce the force on bone plate 100 during activities such as walking. Furthermore, bone plate 100 may include a valgus angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural lateral alignment of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a valgus angle in bone plate 100 may further help to reduce the force on bone plate 100 during activities such as walking. In particular embodiments, to provide lateral support for joint 106, the ends of plate 100 may be may be curved around the medial side of bones 104. One of ordinary skill in the art will appreciate that above-described characteristics of bone plate 100 were described with respect to the metatarso-phalangeal joint for the sake of explanatory simplicity and will further appreciate that particular embodiments of bone plate 100 may be adapted equally as well to approximate the natural geometry of virtually any joint 106 in the body without departing from the scope of the present disclosure.

As mentioned above, transfixation screw 150, once inserted across joint 106, may absorb a portion of the stress that would otherwise be exerted on the portion of bone plate 100 spanning across joint 106 when a load is placed upon joint 106. For example, in the case of the metatarso-pha-langeal joint 106, activities that place weight on the foot, such as walking or standing, may cause metatarso-phalangeal joint 106 to flex. Due to the biomechanics of the foot, when the metatarso-phalangeal joint 106 flexes, the upper or "dorsal" side of joint 106 will compress together, while the bottom or "plantar" side of joint 106 will draw apart under tension. This is generally true for any hinge-type joint. The line about which the force on joint 106 transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106. In other words, neutral bending axis 118 defines the boundary line that separates the tension side of joint 106 from the compression side of joint 106.

When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 (as show in FIG. 2), a "tension band" construct is created that puts transfixation screw 150 under tension when joint 106 flexes. Normally, the plantar side of bone 104a (e.g., the portion of bone 104a on the tension side of joint 106) will draw away from the plantar side of bone 104b when a load is applied to joint 106. However, when transfixation screw 150 is screwed across joint 106 such that the head 152 of trans-fixation screw 150 abuts the inner surface of transfixation screw hole 102, the portion of transfixation screw 150 engaged with bone 104b will pull against the head 152 of transfixation screw 150 when a load is applied to joint 106. Since the head of transfixation screw 150 is braced against the inner surface of transfixation screw hole 102, it will absorb

**6**

the tension forces transmitted up the shaft of transfixation screw 150, preventing the plantar side of bone 104b from drawing away from the plantar side of bone 104a.

In particular embodiments, the interface between bone 104a and transfixation screw 150 may provide another mechanism for absorbing the tension forces transmitted up the shaft of transfixation screw 150. For example, if transfix-ation screw 150 is threadably engaged with bone 104a, the threading on transfixation screw 150 may provide a footing against bone 104a which may also absorb a portion of the tension forces transmitted up the shaft of transfixation screw 150 from bone 104b when a load is applied to joint 106. In either case, once transfixation screw 150 has been screwed into joint 106 along a trajectory that crosses the neutral bend-ing axis 118 of joint 106, a tension band construct may be created that enables transfixation screw 150 to absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106.

In particular embodiments, transfixation screw hole 102 may be used to establish the trajectory for transfixation screw 150. For example, bone plate 100 may be configured such that, once bones 104 have been approximated and bone plate 100 has been placed across joint 106, the central axis 116 of transfixation screw hole 102 may align along a trajectory that crosses the neutral bending axis 118 of joint 106. For example, the central axis 116 of transfixation screw hole 102 may be configured to pass though joint 106 at a transfixation angle 114 of about 30 degrees to about 70 degrees relative to neutral bending axis 118 to achieve the desired tension band construct once bone plate 100 is secured across joint 106. In one example embodiment, central axis 116 may be config-ured to pass through joint 106 at a transfixation angle 114 of about 50 degrees. Consequently, by drilling a pilot hole along central axis 116, a surgeon may create a path for transfixation screw 150 that spans from a first position 120 on bone 104a located on the compression side of joint 106 to a second position 122 on bone 104b located on the tension side of joint 106, creating the desired tension band construct for transfix-ation screw 150. Alternatively, a surgeon may forgo drilling a pilot hole and may instead use a transfixation screw 150 having a self drilling feature. In that case, the surgeon could achieve a tension band construct by screwing the transfixation screw 150 directly into joint 106 along the trajectory of cen-tral axis 116.

Transfixation screw 150 may be any component of hard-ware having a head 152 configured to abut the surface of bone plate 100 and a shaft 154 operable to secure bones 104 together in a fixed configuration. For example, transfixation screw 150 may be a nut and bolt assembly, a pin assembly, or a bone screw. As another example and not by way of limita-tion, transfixation screw 150 may be a lag screw that includes a head 152 coupled to a shaft 154 having an unthreaded portion 156 and a threaded portion 158 that ends at a tip 156. Once transfixation screw 150 is screwed into bones 104 through transfixation screw hole 102, this configuration of transfixation screw 150 may result in a lag effect that may tighten the interface between bones 104 when transfixation 150 is rotated. In particular embodiments, the length of shaft 154 may be less than the length of the portion of central axis 116 that passes through bones 104 in order to keep tip 156 from protruding out of bone 104b (e.g., out of the plantar aspect of first proximal phalanx 104b) when transfixation screw 150 screwed into bones 104.

To achieve a lag effect, a surgeon, after affixing bone plate 100 across joint 106 and drilling a pilot hole for transfixation screw 150 as described above, may screw transfixation screw 150 into joint 106 until unthreaded portion 156 extends com-

STRYKER Exhibit 1001
Page 9 of 15
IPR2021-01450

US 8,529,608 B2

7

8

pletely through bone 104a and threaded portion 158 threadably engages bone 104b. At this point, further rotation of transfixation screw 150 may cause threaded portion 158 to advance further into bone 104b, causing bone 104b to ride up further onto shaft 154 and press against bone 104a while unthreaded portion 156 spins freely within bone 104a. Transfixation screw 150 may be further rotated under these conditions until head 152 comes to bear on the inner surface of transfixation screw hole 102, cinching bone 104a between the bottom surface of bone plate 100 and bone 104b. This may create a tight interface between bones 104, increasing the chance of a positive fusion. In another example procedure, a lag effect may be achieved by drilling a pilot hole in bone 104a that is larger in diameter than shaft 154. This may enable transfixation screw 150 to spin freely within bone 104a to achieve the desired lag effect, even if the entirety of shaft 154 is threaded.

FIG. 3 illustrates an external view of the top surface of bone plate 100. In particular embodiments, bone plate 100 may be characterized by a substantially thin construction that generally includes an elongate spine 124 having a first end 126a that includes at least one attachment point 128 for attaching first end 126a to bone 104a, a second end 126b comprising at least one attachment point 128 for attaching second end 126b to bone 104b, and a bridge portion 130 disposed between ends 126 configured to span across joint 106. Bone plate 100 may further include a transfixation screw hole 102, and a compression hole 132 which may be used to cinch bones 104 together using a bone screw 134.

Each attachment point 128 may be any mechanism or fixture operable to serve as a rigid point of attachment between bone plate 100 and a bone 104. As one example and not by way of limitation, an attachment point 128 may be an untreaded screw hole in bone plate 100 configured to accept a bone screw 134. As another example and not by way of limitation, an attachment point 128 may be a threaded screw hole that provides a locking interface between bone screw 134 and bone plate 100. To accomplish this locking interface, the under side of the head of screw 134 may include threads that interfere with the threading on the inside of the threaded screw hole to lock bone screw 134 into bone plate 100. Consequently, once bone screw 134 is screwed into bone 104 through the threaded screw hole, bone screw 134 may be prevented from loosening or backing out of bone 104. An example system for providing a locking interface between a screw hole and a screw is presented in U.S. Provisional Application No. 61/106,511, entitled, "Angulated Locking Plate/ Screw Interface." In particular embodiments, the inner surface of transfixation screw hole 102 may also be threaded to provide a locking interface between transfixation screw 150 and bone plate 100. In this case, the head of transfixation screw 150 may also be threaded.

As another example and not by way of limitation, an attachment point 128 may be any type of clip or clamp included on bone plate 100 operable to rigidly affix bone plate 100 to a bone. One of ordinary skill in the art will appreciate that the above-described embodiments of attachment points 128 were presented for the sake of explanatory clarification and will further appreciate that the present disclosure contemplates each attachment point 128 being any suitable mechanism or fixture operable to serve as a rigid point of attachment between bone plate 100 and bone 104.

Spine 124 may generally define the central portion of bone plate 100 spanning along the length of bone plate 100. As an example and not by way of limitation, spine 124 may include a contiguous linear or curvilinear section of bone plate 100 spanning from the tip of first end 126a to the tip of second end 126b. As mentioned above, spine 124 includes a bridge portion 130 configured to span across joint 106. Since bridge portion 130 is configured to span across joint 106, it is typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130. Depending upon design, bridge portion 130 may include a thickened section 136 of bone plate 100 to increase the bending strength of bridge portion 130. This may lessen the risk of bridge portion 130 bending or breaking above joint 106 when a load is applied to joint 106.

In particular embodiments, thickened section 136 may be defined by a thickened ridge of material in bone plate 100 having its greatest thickness along bridge portion 130 and gradually decreasing in thickness as one moves away from bridge portion 130 along the length of bone plate 100 toward ends 126. The increased material thickness may provide central section 130 with a higher section modulus than the proximal and distal areas of the plate located at ends 126. In a typical design, thickened section 136 may be about 100% to 200% thicker than the adjacent portions of bone plate 100. Including thickened section 136 in bone plate 100 may confer a number of advantages over plates of uniform thickness, one of which is the ability to efficiently increase the section modulus (and strength) of bridge portion 130 without adding material thickness to the entirety of bone plate 100.

Transfixation screw hole 102 may be defined by an inner surface of bone plate 100 surrounding a generally circular opening in bone plate 100. As an example and not by way of limitation, transfixation screw hole 102 may be disposed along the center line 138 of spine 124, immediately adjacent to bridge portion 130. In the case of a bone plate 100 designed for use on the first metatarso-phalangeal joint, the placement of transfixation screw hole 102 adjacent to bridge portion 130 may enable transfixation screw 102 to penetrate the first metatarsal 104a on the dorsal aspect of the metatarsal head and pass into the plantar cortex of the first medial phalanx 104b, transfixing the metatarso-phalangeal joint 106.

In particular embodiments, the portion of bone plate 100 that includes transfixation screw hole 102 may be thicker than other portions of bone plate 100. For example, transfixation screw hole 102 may be included in thickened section 136, adjacent to bridge portion 130. This may enable a countersink to be created around transfixation screw hole 102 so that the head 152 of transfixation screw 150 may rest flush with the top surface of bone plate 100 once transfixation screw 150 is screwed into transfixation screw hole 102. The increased plate thickness around transfixation screw hole 102 may also enable transfixation screw hole 102 to be machined into bone plate 100 at an angle relative to the top surface of bone plate 100 (e.g., other than perpendicular to the top surface of bone plate 100).

As mentioned above, in particular embodiments, bone plate 100 may include a compression hole 132 for tightening bones 104 together using a bone screw 134. Compression hole 132 may be defined by an inner surface of bone plate 100 surrounding a generally oblong opening in bone plate 100. More particularly, the inner surface of compression hole 132 may have a narrow end 131a, and a wide end 131b that includes a horse-shoe-shaped countersink 133. To compress bones 104 together using compression hole 132, a surgeon may use the following example procedure. The surgeon may begin by attaching the second end 126b of bone plate 100 to bone 104b using the attachment points 128 located on end 126b. The surgeon may then manually approximate bone 104a against bone 104b, placing bone 104a under compression hole 132. While holding bone 104a against the bottom

STRYKER Exhibit 1001
Page 10 of 15
IPR2021-01450

Appx418

US 8,529,608 B2

9

surface of compression hole 132, either by hand or using a clamp, the surgeon may drill a pilot hole for bone screw 134 into bone 104a. The trajectory of the pilot hole may be generally perpendicular to the top surface of bone plate 100 and be located approximately in the center of narrow end 131a (e.g., located at the focus of narrow end 131a).

After creating the pilot hole, the surgeon may then screw bone screw 134 into the pilot hole until the head of bone screw 134 comes into contact with countersink 133 near the tips 135 of countersink 133. To facilitate the compression feature, the underside of the head of bone screw 134 may be generally conical, having a taper angle approximately equal to the taper angle of countersink 133. Once the head of bone screw 134 is in contact with counter sink 133 near tips 135, further rotation of bone screw 135 may cause the head of bone screw 134 to ride down into countersink 133, drawing bone plate 100 further up onto bone 104a and causing bones 104 to press together at the interface of joint 106. After approximating bones 104 by screwing bone screw 134 into compression hole 132 as just described, the surgeon may use other attachment points 128 to further secure bone plate 100 to bone 104a. The surgeon may also screw transfixation screw 150 into joint 106 through transfixation screw hole 102 after tightening bones 104 together using compression hole 132. Depending upon design, compression hole 132 may be threaded to provide a locking interface for bone screw 134.

In particular embodiments, bone plate 100 may comprise one or more positioning holes 140 that may be used to position bone plate 100 relative to the bones 104 of joint 106. To position bone plate 100 using a positioning hole 140, a surgeon may insert a K-wire into one of the bones 104, after which the surgeon may position bone plate 100 on bone 104 by inserting the K-wire through positioning hole 140 and sliding bone plate 100 down onto bone 104. Additionally, the surgeon may rotate bone plate 100 about the K-wire using positioning hole 140 to achieve a desired orientation of bone plate 100 relative to bone 104. To ensure that bone plate 100 may be precisely positioned on bone 104 using a K-wire, the diameter of positioning hole 140 may be approximately equal to the diameter of the K-wire. Once bone plate 100 has been properly positioned, the surgeon may secure bone plate 100 to bone 104, temporarily for example, by inserting another K-wire into another one of positioning holes 140, or more permanently, using attachment points 128.

In particular embodiments, the bottom surface of bone plate 100 may include one or more contact reduction features 146 which may reduce the amount of surface area of bone plate 100 that contacts bones 104 when bone plate 100 is secured across joint 106. As an example and not by way of limitation, the bottom surface of bone plate 100 may include one or more channels, notches, or other recesses which may reduce (e.g., minimize) the amount of bone plate 100 that contacts bones 104. This may lessen the amount of vascular impingement caused by bone plate 100, promoting blood flow to bones 104 and bone growth. In particular embodiments, each of the screw holes in bone plate 100 (e.g., attachment points 128, compression hole 132, or transfixation screw hole 102) may include a countersink capable of seating the head of a screw flush with the top surface of bone plate 100. This feature may provide several benefits such as lessening the chance of uncomfortable impingement on the surrounding soft tissue, and reducing patient palpation and visualization of bone plate 100.

In particular embodiments, bone plate 100 may further include flared hips 148 adjacent to transfixation screw hole 102. Flared hips may generally be defined by a widened section of bone plate 100. As an example and not by way of

10

limitation, flared hips 148 may include two generally parabolic wings extending laterally from spine 124, symmetrically opposed to one another about transfixation screw hole 102. As will be appreciated by one of skill in the art, the entry point for transfixation screw 150 into bone 104a may be generally located at the center of the bottom side of transfixation screw hole 102 when transfixation screw is inserted into transfixation screw hole 102 along central axis 116. Consequently, in embodiments where transfixation screw hole 102 is formed into bone plate 100 at an angle, the entry point for transfixation screw 150 may be out of sight (e.g., covered up by the top of transfixation screw hole 102) when bone plate 100 is viewed from above. Therefore, to help a surgeon precisely position the entry point for transfixation screw 150 onto a desired location on bone 104a, the entry point for transfixation screw 150 (e.g., the center of the bottom side of transfixation screw hole 102) may reside directly in between the widest portion of flared hips 148. Accordingly, by positioning the widest portion of hips 148 directly adjacent to the desired location for transfixation screw 150 on bone 104a, the surgeon may confidently position the entry point for transfixation screw 150 at the desired location, even when the entry point is out of sight. Flared hips 148 may also increase the strength of bone plate 100 around transfixation screw hole 102, lessening the chance of plate deformation or breakage.

Depending upon design, bone plate 100 may be formed from any material or combination of materials suitable for forming medical implants. Such materials may have high strength-to-weight ratios and may be inert to human body fluids. As an example and not by way of limitation, bone plate 100 may be formed from a forged titanium alloy. Titanium may provide several benefits as a material for bone plate 100 such as being relatively lightweight, providing adequate strength for withstanding forces typically experienced by a bone plate, and being visible in radiographs of the implant region.

FIG. 4 illustrates an example embodiment of a bone plate 200 adapted for use in a Lapidus procedure where bone plate 200 may be secured across the first tarso-metatarsal (TMT) joint 206, located between the first metatarsal 204a and the first cuneiform 204b. Though bone plate 200 is adapted for placement over the TMT joint, particular embodiments of bone plate 200 may include some or all of the features of bone plate 100 described above, appropriately adapted to conform to the TMT joint 206. For example, when used on TMT joint 206, transfixation screw hole 202 may be configured to guide a transfixation screw 250 from the dorsal aspect of metatarsal 204a to the plantar aspect of first cuneiform 204b in order to transfix TMT joint 206. Likewise, bone plate 200 may include some or all of the features described with respect to bone plate 200, appropriately adapted to conform to the MPJ joint 106. For reference purposes, like numbers may be used to refer to like features between bone plate 100 and bone plate 200.

Bone plate 200 may generally be "H-shaped" and include an elongate spine 224 having a plurality of flanges 242 extending laterally therefrom. Each flange 242 may further include one or more attachment points 228 (similar or identical to attachment points 128 described above) for attaching bone plate 200 to a bone 204. Flanges 242 may serve as a primary mechanism for attaching bone plate 200 to bones 204, although particular embodiments of bone plate 200 may further include one or more additional attachment points 228 disposed along spine 224 for attaching bone plate 200 to bones 204.

Each flange 242 may be any type of rigid lateral extension from spine 224. As an example and not by way of limitation, each flange 242 may be a rigid rounded tab extending laterally

STRYKER Exhibit 1001
Page 11 of 15
IPR2021-01450

Appx419

US 8,529,608 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

from the side of spine 224. Depending upon design, each flange 242 may be separated from the next by a gap 244, which may enable a surgeon to independently contour each flange 242 to a desired position (e.g., to conform flanges 242 to match the geometry of bones 204). Furthermore, each flange 242 may be relatively thinner than spine 224 to reduce the mechanical force needed to contour flanges 242 up or down relative to spine 224. This thinning of flanges 242 may confer a number of advantages over plates having uniform thickness, such as for example, providing a surgeon with the ability to easily contour flanges 242 to a desired position. In particular embodiments, flanges 242 may enable a surgeon to contour bone plate 200 such that attachments points 242 are located on both the medial and dorsal aspects of bones 204. Once a flange 242 has been contoured to a desired position, it may be affixed to bone 204 using an attachment point 228.

To facilitate the process of aligning bones 204, bone plate 200 may include one or more features which mimic the natural geometry of the TMT joint 206. For example, bone plate 200 may include a rise 210 of approximately 0 mm to 5 mm (e.g., 2 mm) that mimics the natural elevation of the first metatarsal 204a relative to the first cuneiform 204b. As another example and not by way of limitation, bone plate 200 may include a varus angle of about 0 degrees to about 30 degrees (e.g., 15 degrees) between the first end 226a of the plate and the second end 226b of the plate that mimics the natural elevation of first metatarsal 204a relative to first cuneiform 204b. In particular embodiments, bone plate 200 may be symmetric about center line 238 to enable bone plate 200 to be applied to either the left foot or the right foot, without substantial modification.

The particular embodiments disclosed above are illustrative only, as particular embodiments of the present disclosure may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular illustrative embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the present disclosure. In particular, every range of values (e.g., "from about a to about b," or, equivalently, "from approximately a to b," or, equivalently, "from approximately a-b") disclosed herein is to be understood as referring to the power set (the set of all subsets) of the respective range of values. The terms in the claims have their plain, ordinary meaning unless otherwise explicitly and clearly defined by the patentee.

Although the present disclosure has been described in several embodiments, a myriad of changes, substitutions, and modifications may be suggested to one skilled in the art, and it is intended that the present disclosure encompass such changes, substitutions, and modifications as fall within the scope of the present appended claims.

What is claimed is:

1. A system for securing two discrete bones together across a joint between the two bones, comprising:
the plate comprises:
an elongate spine having:
a first end comprising:
at least one fixation point for attaching the first end to a first discrete bone on a first side of an intermediate joint; and
a first inner surface configured to substantially conform with a geometry of the first discrete bone;
a second end comprising:

at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and
a second inner surface configured to substantially conform with a geometry of the second discrete bone; and
a bridge portion disposed between the first end and the second end, the bridge portion configured to span across the joint, at least a portion of said bridge portion having a thickness greater than at least a portion of the thickness of either the first end or the second end; and
a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends the bridge portion at a trajectory configured to pass through a first position on the first discrete bone, a portion of the joint, and a second position on the second discrete bone once the plate is placed across the joint; and
the transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion.

2. The system of claim 1, wherein:
a central axis of the inner surface of the transfixation screw hole defines the trajectory; and
the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

3. The system of claim 2, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

4. The system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis.

5. The system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

6. The system of claim 1, wherein the inner surface of the transfixation screw hole is configured to lockably engage the head of the transfixation screw.

7. The system of claim 1, wherein the plate further include a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

8. The system of claim 1, wherein each at least one attachment point comprises a threaded screw hole defined by a threaded inner surface configured to lockably engage one of a plurality of locking bone screws.

9. The system of claim 1, wherein the transfixation screw comprises a lag screw having:
at a first end of the shaft adjacent to the head, an unthreaded portion configured to extend through the first bone; and
at a second end of the shaft adjacent to the tip, a threaded portion configured to extend into the second bone.

10. The system of claim 1, wherein the elongate spine is configured to form an angle between the first inner surface

STRYKER Exhibit 1001
Page 12 of 15
IPR2021-01450

Appx420

US 8,529,608 B2

13

and the second inner surface, the angle substantially conforming to a natural bend at a joint between the first bone and the second bone.

**11**. A plate for securing two discrete bones together across an intermediate joint, comprising:

an elongate spine having:

a first end comprising:

at least one fixation point for attaching the first end to a first discrete bone on a first side of a joint; and

a first inner surface configured to substantially conform with a geometry of the first bone;

a second end comprising:

at least one fixation point for attaching the second end to a second bone on a second side of the joint; and

a second inner surface configured to substantially conform with a geometry of the second bone; and

a bridge portion disposed between the first end and the second end, the bridge portion configured to span across the joint; and

a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint, enabling said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge, wherein at least a portion of said bridge portion

14

and said transfixation screw hole has a thickness greater than at least a portion of said first and second ends.

**12**. The plate of claim **11**, wherein:

a central axis of the inner surface of the transfixation screw hole defines the trajectory; and

the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

**13**. The plate of claim **12**, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

**14**. The plate of claim **11**, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

**15**. The plate of claim **11**, wherein the plate further includes a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

**16**. The plate of claim **11**, further comprising a first flared hip on a first side of the plate and a second flared hip on a second side of the plate, the flared hips comprising two generally parabolic wings extending laterally from the spine and being symmetrically opposed to one another about the transfixation screw hole.

**17**. The plate of claim **11**, wherein the elongate spine is configured to form an angle between the first inner surface and the second inner surface, the angle substantially conforming to a natural bend at a joint between the first bone and the second bone.

*    *    *    *    *

STRYKER Exhibit 1001
Page 13 of 15
IPR2021-01450

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,529,608 B2                                          Page 1 of 1
APPLICATION NO.   : 12/431017
DATED             : September 10, 2013
INVENTOR(S)       : Lance N. Terrill et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

At column 12, claim number 1, line number 18, remove "extends the bridge" and replace with --extends through the bridge--.

Signed and Sealed this
Twenty-ninth Day of October, 2013

Teresa Stanek Rea
*Deputy Director of the United States Patent and Trademark Office*

STRYKER Exhibit 1001
Page 14 of 15
IPR2021-01450

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,529,608 B2
APPLICATION NO.     : 12/431017
DATED               : September 10, 2013
INVENTOR(S)         : Lance Nathan Terrill et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 651 days.

Signed and Sealed this
Third Day of March, 2015

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

STRYKER Exhibit 1001
Page 15 of 15
IPR2021-01450

**Appx423**



US009351776B2

(12) **United States Patent**        (10) **Patent No.:**        **US 9,351,776 B2**
Terrill et al.                        (45) **Date of Patent:**        *May 31, 2016

(54) **BONE PLATE WITH A TRANSFIXATION SCREW HOLE**

(71) Applicant: **OsteoMed LLC**, Addison, TX (US)

(72) Inventors: **Lance Nathan Terrill**, Dallas, TX (US); **Bruce R. Werber**, Scottsdale, AZ (US)

(73) Assignee: **OsteoMed LLC**, Addison, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 146 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/015,900**

(22) Filed: **Aug. 30, 2013**

(65) **Prior Publication Data**

US 2014/0074173 A1        Mar. 13, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/431,017, filed on Apr. 28, 2009, now Pat. No. 8,529,608.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A61B 17/80* | (2006.01) |
| *A61B 17/88* | (2006.01) |
| *A61B 17/84* | (2006.01) |

(52) **U.S. Cl.**
CPC ......... *A61B 17/8057* (2013.01); *A61B 17/8061* (2013.01); *A61B 17/88* (2013.01); *A61B 17/809* (2013.01); *A61B 17/8014* (2013.01); *A61B 17/8052* (2013.01); *A61B 17/8085* (2013.01); *A61B 17/848* (2013.01)

(58) **Field of Classification Search**
CPC ........................... A61B 17/80; A61B 17/8061
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,025,008 | A | 4/1912 | Miner |
| 1,105,105 | A | 7/1914 | Sherman |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1468655 A2 | 10/2004 |
| EP | 1897509 A1 | 9/2007 |

(Continued)

OTHER PUBLICATIONS

Office Action issued for Japanese Patent Application No. 2012-508524, dated Dec. 3, 2013, 10 pages with English language translation.

(Continued)

*Primary Examiner* — Nicholas Woodall
(74) *Attorney, Agent, or Firm* — Norton Rose Fulbright US LLP

(57) **ABSTRACT**

A system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw includes a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

**15 Claims, 3 Drawing Sheets**



STRYKER Exhibit 1001
Page 1 of 13
IPR2021-01451

**Appx424**

**US 9,351,776 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,869,726 | A | 8/1932 | Youngren |
| 2,133,859 | A | 10/1938 | Hawley |
| 2,398,915 | A | 4/1946 | Bell |
| 2,443,363 | A | 6/1948 | Townsend et al. |
| 2,489,870 | A | 11/1949 | Dzus |
| 2,501,978 | A | 3/1950 | Wichman |
| 2,561,550 | A | 7/1951 | Wright |
| 2,737,835 | A | 3/1956 | Herz |
| 3,463,148 | A | 8/1969 | Treace |
| 3,534,731 | A | 10/1970 | Muller |
| 3,552,389 | A | 1/1971 | Allgower et al. |
| 3,593,709 | A | 7/1971 | Halloran |
| 3,668,972 | A | 6/1972 | Allgower et al. |
| 3,695,259 | A | 10/1972 | Yost |
| 3,716,050 | A | 2/1973 | Johnston |
| 3,741,205 | A | 6/1973 | Markolf et al. |
| 3,779,240 | A | 12/1973 | Kondo |
| 3,807,394 | A | 4/1974 | Attenborough |
| 4,219,015 | A | 8/1980 | Steinemann |
| 4,338,921 | A | 7/1982 | Harder et al. |
| 4,338,926 | A | 7/1982 | Kummer et al. |
| 4,364,382 | A | 12/1982 | Mennen |
| 4,408,601 | A | 10/1983 | Wenk |
| 4,484,570 | A | 11/1984 | Sutter et al. |
| 4,488,543 | A | 12/1984 | Tornier |
| 4,493,317 | A | 1/1985 | Klaue |
| 4,503,848 | A | 3/1985 | Caspar et al. |
| 4,513,744 | A | 4/1985 | Klaue |
| 4,565,193 | A | 1/1986 | Streli |
| 4,573,458 | A | 3/1986 | Lower |
| 4,651,724 | A | 3/1987 | Berentey et al. |
| 4,683,878 | A | 8/1987 | Carter |
| 4,794,918 | A | 1/1989 | Wolter |
| 4,800,874 | A | 1/1989 | David et al. |
| 4,838,252 | A | 6/1989 | Klaue |
| 4,867,144 | A | 9/1989 | Karas et al. |
| 4,955,886 | A | 9/1990 | Pawluk |
| 4,959,065 | A | 9/1990 | Arnett et al. |
| 5,002,544 | A | 3/1991 | Klaue et al. |
| 5,006,120 | A | 4/1991 | Carter |
| 5,015,249 | A | 5/1991 | Nakao et al. |
| 5,021,056 | A | 6/1991 | Hoffmann et al. |
| 5,041,113 | A | 8/1991 | Biedermann et al. |
| 5,053,036 | A | 10/1991 | Perren et al. |
| 5,053,039 | A | 10/1991 | Hofmann et al. |
| 5,057,111 | A | 10/1991 | Park |
| 5,085,660 | A | 2/1992 | Lin |
| 5,129,903 | A | 7/1992 | Luhr et al. |
| 5,151,103 | A | 9/1992 | Tepic et al. |
| 5,190,544 | A | 3/1993 | Chapman et al. |
| 5,234,431 | A | 8/1993 | Keller |
| 5,269,784 | A | 12/1993 | Mast |
| 5,304,180 | A | 4/1994 | Slocum |
| 5,330,535 | A | 7/1994 | Moser et al. |
| 5,344,421 | A | 9/1994 | Crook |
| 5,380,327 | A | 1/1995 | Eggers et al. |
| 5,387,102 | A | 2/1995 | Wagner et al. |
| 5,443,467 | A | 8/1995 | Biedermann et al. |
| 5,474,553 | A | 12/1995 | Baumgart |
| 5,486,176 | A | 1/1996 | Hildebrand et al. |
| 5,487,741 | A | 1/1996 | Maruyama et al. |
| 5,501,684 | A | 3/1996 | Schlapfer et al. |
| 5,531,746 | A | 7/1996 | Errico et al. |
| 5,549,612 | A | 8/1996 | Yapp et al. |
| 5,578,034 | A | 11/1996 | Estes |
| 5,591,166 | A | 1/1997 | Bernhardt et al. |
| 5,601,553 | A | 2/1997 | Trebing et al. |
| 5,603,713 | A | 2/1997 | Aust et al. |
| 5,607,426 | A | 3/1997 | Ralph et al. |
| 5,607,428 | A | 3/1997 | Lin |
| 5,620,448 | A | 4/1997 | Puddu |
| 5,643,265 | A | 7/1997 | Errico et al. |
| 5,662,655 | A | 9/1997 | Laboureau et al. |
| 5,674,222 | A | 10/1997 | Berger et al. |
| 5,676,667 | A | 10/1997 | Hausman |
| 5,681,311 | A | 10/1997 | Foley et al. |
| 5,709,686 | A | 1/1998 | Talos et al. |
| 5,725,588 | A | 3/1998 | Errico et al. |
| 5,733,287 | A | 3/1998 | Tepic et al. |
| 5,735,853 | A | 4/1998 | Olerud |
| 5,741,258 | A | 4/1998 | Klaue et al. |
| 5,746,742 | A | 5/1998 | Runciman et al. |
| 5,749,872 | A | 5/1998 | Kyle et al. |
| 5,749,875 | A | 5/1998 | Puddu |
| 5,810,823 | A | 9/1998 | Klaue et al. |
| 5,931,838 | A | 8/1999 | Vito |
| 5,938,664 | A | 8/1999 | Winquist et al. |
| 5,951,558 | A | 9/1999 | Fiz |
| 5,954,722 | A | 9/1999 | Bono |
| 5,964,762 | A | 10/1999 | Biedermann et al. |
| 6,001,099 | A | 12/1999 | Huebner |
| 6,093,188 | A | 7/2000 | Murray |
| 6,117,173 | A | 9/2000 | Taddia et al. |
| 6,139,550 | A | 10/2000 | Michelson |
| 6,152,927 | A | 11/2000 | Farris et al. |
| 6,183,475 | B1 | 2/2001 | Lester et al. |
| 6,193,721 | B1 | 2/2001 | Michelson |
| 6,206,881 | B1 | 3/2001 | Frigg et al. |
| 6,224,602 | B1 | 5/2001 | Hayes |
| 6,228,085 | B1 | 5/2001 | Theken et al. |
| 6,235,032 | B1 | 5/2001 | Link |
| 6,235,033 | B1 | 5/2001 | Brace et al. |
| 6,235,034 | B1 | 5/2001 | Bray |
| 6,241,731 | B1 | 6/2001 | Fiz |
| 6,261,291 | B1 | 7/2001 | Talaber et al. |
| 6,302,883 | B1 | 10/2001 | Bono |
| 6,309,393 | B1 | 10/2001 | Tepic |
| 6,315,779 | B1 | 11/2001 | Morrison et al. |
| 6,322,562 | B1 | 11/2001 | Wolter |
| 6,342,055 | B1 | 1/2002 | Eisermann et al. |
| 6,348,052 | B1 | 2/2002 | Sammarco |
| 6,383,186 | B1 | 5/2002 | Michelson |
| 6,413,259 | B1 | 7/2002 | Lyons et al. |
| 6,454,770 | B1 | 9/2002 | Klaue |
| 6,503,250 | B2 | 1/2003 | Paul |
| 6,527,776 | B1 | 3/2003 | Michelson |
| 6,533,789 | B1 | 3/2003 | Hall, IV et al. |
| 6,575,975 | B2 | 6/2003 | Brace et al. |
| 6,595,993 | B2 | 7/2003 | Donno et al. |
| 6,602,255 | B1 | 8/2003 | Campbell et al. |
| 6,623,486 | B1 | 9/2003 | Weaver et al. |
| 6,669,701 | B2 | 12/2003 | Steiner et al. |
| 6,682,531 | B2 | 1/2004 | Winquist et al. |
| 6,695,846 | B2 | 2/2004 | Richelsoph et al. |
| 6,719,759 | B2 | 4/2004 | Wagner et al. |
| 6,755,832 | B2 | 6/2004 | Happonen et al. |
| 6,755,833 | B1 | 6/2004 | Paul et al. |
| 6,821,278 | B2 | 11/2004 | Frigg et al. |
| 6,890,334 | B2 | 5/2005 | Brace et al. |
| 6,945,973 | B2 | 9/2005 | Bray |
| 7,001,389 | B1 | 2/2006 | Navarro et al. |
| 7,128,744 | B2 | 10/2006 | Weaver et al. |
| 7,175,624 | B2 | 2/2007 | Konieczynski et al. |
| 7,179,260 | B2 | 2/2007 | Gerlach et al. |
| 7,273,481 | B2 | 9/2007 | Lombardo et al. |
| 7,288,095 | B2 | 10/2007 | Baynham et al. |
| 7,309,340 | B2 | 12/2007 | Fallin et al. |
| 7,311,712 | B2 | 12/2007 | Dalton |
| 7,331,961 | B2 | 2/2008 | Abdou |
| 2001/0037112 | A1 | 11/2001 | Brace et al. |
| 2002/0082606 | A1 | 6/2002 | Suddaby |
| 2003/0040749 | A1 | 2/2003 | Grabowski et al. |
| 2003/0078583 | A1 | 4/2003 | Biedermann et al. |
| 2003/0187440 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0187442 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0199876 | A1 | 10/2003 | Brace et al. |
| 2004/0015169 | A1 | 1/2004 | Gause |
| 2004/0034354 | A1 | 2/2004 | Paul |
| 2004/0059334 | A1 | 3/2004 | Weaver et al. |
| 2004/0059335 | A1 | 3/2004 | Weaver et al. |
| 2004/0087951 | A1 | 5/2004 | Khalili |
| 2004/0127901 | A1 | 7/2004 | Huebner et al. |
| 2005/0010226 | A1 | 1/2005 | Grady et al. |
| 2005/0065521 | A1 | 3/2005 | Steger et al. |

STRYKER Exhibit 1001
Page 2 of 13
IPR2021-01451

**Appx425**

**US 9,351,776 B2**

Page 3

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2005/0070904 A1 | 3/2005 | Gerlach et al. |
| 2005/0080421 A1 | 4/2005 | Weaver et al. |
| 2005/0131413 A1 | 6/2005 | O'Driscoll et al. |
| 2005/0234455 A1 | 10/2005 | Binder et al. |
| 2006/0015102 A1 | 1/2006 | Toullec et al. |
| 2006/0036249 A1 | 2/2006 | Baynham et al. |
| 2006/0173459 A1 | 8/2006 | Kay et al. |
| 2006/0235396 A1 | 10/2006 | Sanders et al. |
| 2006/0235397 A1 | 10/2006 | Sanders et al. |
| 2006/0241592 A1 | 10/2006 | Myerson et al. |
| 2006/0241607 A1 | 10/2006 | Myerson et al. |
| 2006/0241608 A1 | 10/2006 | Myerson et al. |
| 2007/0055253 A1 | 3/2007 | Orbay et al. |
| 2007/0088360 A1 | 4/2007 | Orbay et al. |
| 2007/0123880 A1 | 5/2007 | Medoff |
| 2007/0162020 A1 | 7/2007 | Gerlach et al. |
| 2007/0233115 A1 | 10/2007 | Sixto et al. |
| 2007/0239163 A1 | 10/2007 | Strnad et al. |
| 2007/0260244 A1 | 11/2007 | Wolter |
| 2007/0276383 A1 | 11/2007 | Rayhack |
| 2007/0276386 A1 | 11/2007 | Gerlach et al. |
| 2008/0015591 A1 | 1/2008 | Castaneda et al. |
| 2008/0015592 A1 | 1/2008 | Long et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2007-500069 A | 1/2007 |
| WO | WO-2007/131287 A1 | 11/2007 |

OTHER PUBLICATIONS

Arthrex, "Midfoot Plating Techniques," Surgical Techniques, 2007, 12 pages.
PCT Invitation to Pay Additional Fees and, Where Applicable, Protest Fee; International Applicaiton No. PCT/US2010/031328, International Filing Date Apr. 16, 2010.
PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US2010/031328; International Filing Date: Apr. 16, 2010.
Vergrugge, J., "An Improved Bone Clamp and a Plate for Internal Fixation of Fractures," J. Bone Joint Surg. Am., 1946, vol. 28, pp. 174-175.

STRYKER Exhibit 1001
Page 3 of 13
IPR2021-01451

STRYKER Exhibit 1001
Page 4 of 13
IPR2021-01451



*FIG. 1*

*FIG. 2*

STRYKER Exhibit 1001
Page 5 of 13
IPR2021-01451



*FIG. 3*



*FIG. 4*

STRYKER Exhibit 1001
Page 6 of 13
IPR2021-01451

US 9,351,776 B2

**1**

## BONE PLATE WITH A TRANSFIXATION SCREW HOLE

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of co-pending, commonly assigned, patent application Ser. No. 12/431,017 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed Feb. 25, 2002, the disclosure of which is hereby incorporated herein by reference.

### TECHNICAL FIELD

The present disclosure relates to a device for securing bones together, and more particularly, to a bone plate with a transfixation screw hole.

### BACKGROUND OF THE INVENTION

When performing certain medical procedures, such as reconstructing a joint that has been damaged due to bone or soft tissue trauma, a surgeon may need to fuse the bones of the joint together in a configuration that approximates the natural geometry of the joint. One way to achieve this objective is to attach the bones of the joint to a plate that holds the bones in alignment with one another while they fuse together.

### BRIEF SUMMARY OF THE INVENTION

The present disclosure relates generally to orthopedic devices. More specifically, the present disclosure relates to a bone plate with a transfixation screw hole for securing the bones of a joint together and a method for using the same. In particular embodiments, a system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate further includes a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Depending upon design, a central axis of the inner surface of the transfixation screw hole may define the trajectory, and the trajectory may be configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

In particular embodiments, a plate for securing bones together may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface con-

**2**

figured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint.

In particular embodiments, a method for securing bones together across a joint includes placing a plate over a first bone on a first side of a joint and a second bone on a second side of the joint. The plate may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to the first bone, a second end that includes at least one attachment point for attaching the second end to the second bone, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The method may further include attaching the plate to the first bone and the second bone, and inserting a transfixation screw into the first bone and the second bone through the transfixation screw hole. The transfixation screw may include a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Particular embodiments of the present disclosure may provide a number of technical advantages, including for example, the ability to tightly couple the bones of a joint together by inserting a transfixation screw across the joint through a bone plate. In particular embodiments, the transfixation screw may have a "lag effect" that enables the bones of the joint to be approximated with one another by rotation of the transfixation screw. For example, the transfixation screw may include an unthreaded portion configured to rotate freely within the first bone and a threaded portion configured to threadably engage the second bone. When the transfixation screw is rotated, the unthreaded portion of the transfixation screw may rotate freely within the first bone while the threaded portion of the transfixation screw advances into the second bone, drawing the second bone toward the first bone and compressing the joint. These technical advantages (e.g., the presence of the transfixation screw across the joint, and the lag effect of the transfixation screw) may increase the contact pressure on the bony interface of the joint, increasing the probability of a positive fusion.

Depending upon design, the inner surface of the transfixation screw hole in the plate may direct the transfixation screw along a trajectory that crosses a neutral bending axis of the joint as the transfixation screw passes from the first bone to the second bone. This technical advantage may create a "tension band" construct that enables the transfixation screw to absorb a portion of the mechanical stress that would otherwise be imposed upon the plate above the joint when a load is applied to the joint. This technical advantage may enhance the integrity and reliability of the plate and increase the load that the plate may support without increasing plate thickness. Other technical advantages of the present disclosure will be readily apparent to one skilled in the art from the following figures, descriptions, and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some, or none of the enumerated advantages.

STRYKER Exhibit 1001
Page 7 of 13
IPR2021-01451

**3**

### BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present disclosure and its advantages, reference is now made to the following descriptions, taken in conjunction with the accompanying drawings, in which:

FIG. 1 illustrates a failed metatarso-phalangeal joint in the big toe of a human foot;

FIG. 2 illustrates a bone plate being used in conjunction with a transfixation screw to repair the failed metatarso-phalangeal joint of FIG. 1 according to an example embodiment of the present disclosure;

FIG. 3 illustrates a more detailed isometric view of the bone plate of FIG. 2; and

FIG. 4 illustrates a bone plate adapted for use on a tarso-metatarsal joint according to an example embodiment of the present disclosure.

### DETAILED DESCRIPTION OF THE INVENTION

The metatarso-phalangeal joint is a joint between a metatarsal bone of the foot and the proximal phalanx of a toe. It is common, particularly in sports, for the first metatarsophalangeal joint (e.g., the metatarso-phalangeal joint of the big toe) to be injured as a result of trauma or hyper extension of the big toe. In other scenarios, degradation of the metatarsophalangeal joint may be caused by arthritis. Minor injuries to the metatarso-phalangeal joint, such as a sprain, may often be treated using conservative measures such as immobilization and icing of the toe, accompanied by rest and anti-inflammatory medication. These measures may be followed by taping or splinting of the injured joint to help prevent recurrent hyperextensions of the toe.

In more severe cases involving major trauma to the bone or soft tissue of the metatarso-phalangeal joint, as illustrated in FIG. 1, conservative measures may be ineffective, and surgery may be required. One procedure for reconstructing a severely damaged metatarso-phalangeal joint involves fusing the bones of the joint together using plates and/or screws. More particularly, a fusion procedure may involve reducing the opposing faces of the bones of the joint to a bleeding bone bed, approximating the bones with one another, and screwing the bones together to promote fusion. In some cases, the bones may be screwed together without the use of a plate. However, this option may not provide adequate lateral support for the bones, possibly allowing them to shift out of alignment, resulting in a malunion or a nonunion of the joint.

Another option for surgically repairing a severely damaged metatarso-phalangeal joint involves securing the bones of the joint together using a plate. In this procedure, after the bones of the joint have been approximated next to one another, the plate may be laid across the joint. The plate may then be screwed to the bones of the joint to hold them in alignment next to one another, enabling the joint fuse. However, when a load is placed upon the joint (e.g., when weight is placed upon the foot) it is possible for the plate to bend or break above the joint. This may cause the bones of the joint to fall out of approximation, resulting in a non-union (e.g., a failed fusion of the joint). Consequently, the ability to rigidly hold the bones of a joint in tight approximation without bending or breaking is one metric for judging the effectiveness of a joint-fixation plate.

One way to increase the durability and reliability of a joint-fixation plate is to include a transfixation screw hole in the plate that enables a transfixation screw to transfix the joint through the plate. As explained in more detail below, once the transfixation screw is screwed across the joint, it may absorb

**4**

some of the stress that would otherwise be exerted on the plate when a load is placed upon the joint. This may reduce the strain on the plate, increasing its reliability and durability. Additionally, while the plate may provide lateral support for the joint, the transfixation screw may hold the bones of the joint in tight approximation, increasing the likelihood of a positive fusion of the joint. This may be particularly important on the plantar side of the joint due to tensile stresses exerted on that side of the joint when loaded.

FIGS. 2-3 illustrate an example embodiment of bone plate 100 that includes a transfixation screw hole 102 in accordance with the present disclosure. More particularly, FIG. 2 illustrates bone plate 100 being used in conjunction with a transfixation screw 150 to repair the failed metatarsophalangeal joint of FIG. 1. FIG. 3 illustrates a more detailed isometric view of bone plate 100. For reference purposes, bone plate 100 and its various features may be referred to as having a top surface intended to face away from the bones of joint 106 and a bottom surface intended to face toward the bones of joint 106 (e.g., to be placed upon the bones of joint 106). Though particular features of bone plate 100 may be explained using such intended placement as a point of reference, this method of explanation is not meant to limit the scope of the present disclosure to any particular configuration or orientation of bone plate 100.

As shown in FIG. 2, bone plate 100 is being used to reconstruct a failed joint 106 of a human foot. In particular, FIG. 2 illustrates transfixation screw 150 being inserted through bone plate 100 into a first bone 104a and a second bone 104b (collectively, bones 104) in order to fuse joint 106 (show collapsed in FIG. 1). Bone 104a refers to the bone positioned directly beneath transfixation screw hole 102 (e.g., touching the bottom surface of transfixation screw hole 102) while bone 104b refers to the bone positioned on the opposite side of joint 106. Although bone 104a is illustrated and described as the first metatarsal, bone 104b is illustrated and described as the first proximal phalanx, and joint 106 is illustrated and described as the metatarso-phalangeal joint of the big toe, one of ordinary skill in the art will appreciate those specific examples are presented for the sake of explanatory clarification and will further appreciate that bones 104 and joint 106 may generically refer to any suitable set of bones forming any suitable joint in the body.

In a typical procedure, a surgeon may use bone plate 100 to fuse joint 106 according to the following example surgical procedure. To begin the procedure, the surgeon may create an incision over joint 106 to expose bones 104. After exposing bones 104, the surgeon may perform any pre-fusion steps such as removing cartilage from joint 106 and reducing the opposing faces of bones 104 to a bleeding bone bed. Following the pre-fusion steps, the surgeon may approximate bones 104 by positioning them next to one in a desired configuration for fusion. The surgeon may then secure bones 104 together by placing bone plate 100 across joint 106 such that transfixation screw hole 102 overlies bone 104a. The surgeon may screw bone plate 100 to bones 104, for example by inserting one or more bone screws 134 into one or more screw holes located on either end of bone plate 100, after which, the surgeon may create a path for transfixation screw 150. To create a path for transfixation screw 150, the surgeon may drill a pilot hole into bones 104 through transfixation screw hole 102. In particular embodiments, the surgeon may use the central axis 116 of transfixation screw hole 102 as a guide to establish the trajectory for the pilot hole. Once the pilot hole has been created, transfixation screw 150 may be inserted into the pilot hole through transfixation screw hole 102 and screwed into bones 104 until the head of transfixation screw

STRYKER Exhibit 1001
Page 8 of 13
IPR2021-01451

US 9,351,776 B2

**5**

150 abuts the inner surface of transfixation screw hole 102. After bones 104 have been secured together using transfixation screw 150, the surgeon may close the incision, leaving bones 104 to fuse together.

To facilitate the process of aligning bones 104, bone plate 100 may include one or more joint-specific characteristics that may conform to the natural geometry of joint 106 or bones 104. For example, in the case of the metatarso-phalangeal joint, bone plate 100 may include a rise (similar to rise 210 in FIG. 4) that fits over the head on the dorsal section of metatarsal 104a. This may enable bone plate 100 to be seated firmly against the head of metatarsal 104a and provide a natural footing for bone plate 100 against metatarsal 104a. In other embodiments, the rise may be eliminated from bone plate 100 and the dorsal head of metatarsal 104a may be ground down to enable bone plate 100 to be laid flush against bones 104.

Depending upon design, bone plate 100 may further include a dorsiflexion angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural elevation of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a dorsiflexion angle between first end 126b and second end 126a may reduce the force on bone plate 100 during activities such as walking. Furthermore, bone plate 100 may include a valgus angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural lateral alignment of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a valgus angle in bone plate 100 may further help to reduce the force on bone plate 100 during activities such as walking. In particular embodiments, to provide lateral support for joint 106, the ends of plate 100 may be may be curved around the medial side of bones 104. One of ordinary skill in the art will appreciate that above-described characteristics of bone plate 100 were described with respect to the metatarso-phalangeal joint for the sake of explanatory simplicity and will further appreciate that particular embodiments of bone plate 100 may be adapted equally as well to approximate the natural geometry of virtually any joint 106 in the body without departing from the scope of the present disclosure.

As mentioned above, transfixation screw 150, once inserted across joint 106, may absorb a portion of the stress that would otherwise be exerted on the portion of bone plate 100 spanning across joint 106 when a load is placed upon joint 106. For example, in the case of the metatarso-phalangeal joint 106, activities that place weight on the foot, such as walking or standing, may cause metatarso-phalangeal joint 106 to flex. Due to the biomechanics of the foot, when the metatarso-phalangeal joint 106 flexes, the upper or "dorsal" side of joint 106 will compress together, while the bottom or "plantar" side of joint 106 will draw apart under tension. This is generally true for any hinge-type joint. The line about which the force on joint 106 transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106. In other words, neutral bending axis 118 defines the boundary line that separates the tension side of joint 106 from the compression side of joint 106.

When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 (as show in FIG. 2), a "tension band" construct is created that puts transfixation screw 150 under tension when joint 106 flexes. Normally, the plantar side of bone 104a (e.g., the portion of bone 104a on the tension side of joint 106) will draw away from the plantar side of bone 104b when a load is applied to joint 106. However, when transfixation screw 150

**6**

is screwed across joint 106 such that the head 152 of transfixation screw 150 abuts the inner surface of transfixation screw hole 102, the portion of transfixation screw 150 engaged with bone 104b will pull against the head 152 of transfixation screw 150 when a load is applied to joint 106. Since the head of transfixation screw 150 is braced against the inner surface of transfixation screw hole 102, it will absorb the tension forces transmitted up the shaft of transfixation screw 150, preventing the plantar side of bone 104b from drawing away from the plantar side of bone 104a.

In particular embodiments, the interface between bone 104a and transfixation screw 150 may provide another mechanism for absorbing the tension forces transmitted up the shaft of transfixation screw 150. For example, if transfixation screw 150 is threadably engaged with bone 104a, the threading on transfixation screw 150 may provide a footing against bone 104a which may also absorb a portion of the tension forces transmitted up the shaft of transfixation screw 150 from bone 104b when a load is applied to joint 106. In either case, once transfixation screw 150 has been screwed into joint 106 along a trajectory that crosses the neutral bending axis 118 of joint 106, a tension band construct may be created that enables transfixation screw 150 to absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106.

In particular embodiments, transfixation screw hole 102 may be used to establish the trajectory for transfixation screw 150. For example, bone plate 100 may be configured such that, once bones 104 have been approximated and bone plate 100 has been placed across joint 106, the central axis 116 of transfixation screw hole 102 may align along a trajectory that crosses the neutral bending axis 118 of joint 106. For example, the central axis 116 of transfixation screw hole 102 may be configured to pass through joint 106 at a transfixation angle 114 of about 30 degrees to about 70 degrees relative to neutral bending axis 118 to achieve the desired tension band construct once bone plate 100 is secured across joint 106. In one example embodiment, central axis 116 may be configured to pass through joint 106 at a transfixation angle 114 of about 50 degrees. Consequently, by drilling a pilot hole along central axis 116, a surgeon may create a path for transfixation screw 150 that spans from a first position 120 on bone 104a located on the compression side of joint 106 to a second position 122 on bone 104b located on the tension side of joint 106, creating the desired tension band construct for transfixation screw 150. Alternatively a surgeon may forgo drilling a pilot hole and may instead use a transfixation screw 150 having a self drilling feature. In that case, the surgeon could achieve a tension band construct by screwing the transfixation screw 150 directly into joint 106 along the trajectory of central axis 116.

Transfixation screw 150 may be any component of hardware having a head 152 configured to abut the surface of bone plate 100 and a shaft 154 operable to secure bones 104 together in a fixed configuration. For example, transfixation screw 150 may be a nut and bolt assembly, a pin assembly, or a bone screw. As another example and not by way of limitation, transfixation screw 150 may be a lag screw that includes a head 152 coupled to a shaft 154 having an unthreaded portion 156 and a threaded portion 158 that ends at a tip 156. Once transfixation screw 150 is screwed into bones 104 through transfixation screw hole 102, this configuration of transfixation screw 150 may result in a lag effect that may tighten the interface between bones 104 when transfixation screw 150 is rotated. In particular embodiments, the length of shaft 154 may be less than the length of the portion of central axis 116 that passes through bones 104 in order to keep tip 156

STRYKER Exhibit 1001
Page 9 of 13
IPR2021-01451

US 9,351,776 B2

7

from protruding out of bone 104b (e.g., out of the plantar aspect of first proximal phalanx 104b) when transfixation screw 150 screwed into bones 104.

To achieve a lag effect, a surgeon, after affixing bone plate 100 across joint 106 and drilling a pilot hole for transfixation screw 150 as described above, may screw transfixation screw 150 into joint 106 until unthreaded portion 156 extends completely through bone 104a and threaded portion 158 threadably engages bone 104b. At this point, further rotation of transfixation screw 150 may cause threaded portion 158 to advance further into bone 104b, causing bone 104b to ride up further onto shaft 154 and press against bone 104a while unthreaded portion 156 spins freely within bone 104a. Transfixation screw 150 may be further rotated under these conditions until head 152 comes to bear on the inner surface of transfixation screw hole 102, cinching bone 104a between the bottom surface of bone plate 100 and bone 104b. This may create a tight interface between bones 104, increasing the chance of a positive fusion. In another example procedure, a lag effect may be achieved by drilling a pilot hole in bone 104a that is larger in diameter than shaft 154. This may enable transfixation screw 150 to spin freely within bone 104a to achieve the desired lag effect, even if the entirety of shaft 154 is threaded.

FIG. 3 illustrates an external view of the top surface of bone plate 100. In particular embodiments, bone plate 100 may be characterized by a substantially thin construction that generally includes an elongate spine 124 having a first end 126a that includes at least one attachment point 128 for attaching first end 126a to bone 104a, a second end 126b comprising at least one attachment point 128 for attaching second end 126b to bone 104b, and a bridge portion 130 disposed between ends 126 configured to span across joint 106. Bone plate 100 may further include a transfixation screw hole 102, and a compression hole 132 which may be used to cinch bones 104 together using a bone screw 134.

Each attachment point 128 may be any mechanism or fixture operable to serve as a rigid point of attachment between bone plate 100 and a bone 104. As one example and not by way of limitation, an attachment point 128 may be an unthreaded screw hole for bone 104 configured to accept a bone screw 134. As another example and not by way of limitation, an attachment point 128 may be a threaded screw hole that provides a locking interface between bone screw 134 and bone plate 100. To accomplish this locking interface, the underside of the head of screw 134 may include threads that interfere with the threading on the inside of the threaded screw hole to lock bone screw 134 into bone plate 100. Consequently, once bone screw 134 is screwed into bone 104 through the threaded screw hole, bone screw 134 may be prevented from loosening or backing out of bone 104. An example system for providing a locking interface between a screw hole and a screw is presented in U.S. Provisional Application No. 61/106,511, entitled, "Angulated Locking Plate/ Screw Interface." In particular embodiments, the inner surface of transfixation screw hole 102 may also be threaded to provide a locking interface between transfixation screw 150 and bone plate 100. In this case, the head of transfixation screw 150 may also be threaded.

As another example and not by way of limitation, an attachment point 128 may be any type of clip or clamp included on bone plate 100 operable to rigidly affix bone plate 100 to a bone. One of ordinary skill in the art will appreciate that the above-described embodiments of attachment points 128 were presented for the sake of explanatory clarification and will further appreciate that the present disclosure contemplates each attachment point 128 being any suitable mechanism or

8

fixture operable to serve as a rigid point of attachment between bone plate 100 and bone 104.

Spine 124 may generally define the central portion of bone plate 100 spanning along the length of bone plate 100. As an example and not by way of limitation, spine 124 may include a contiguous linear or curvilinear section of bone plate 100 spanning from the tip of first end 126a to the tip of second end 126b. As mentioned above, spine 124 includes a bridge portion 130 configured to span across joint 106. Since bridge portion 130 is configured to span across joint 106, it is typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130. Depending upon design, bridge portion 130 may include a thickened section 136 of bone plate 100 to increase the bending strength of bridge portion 130. This may lessen the risk of bridge portion 130 bending or breaking above joint 106 when a load is applied to joint 106.

In particular embodiments, thickened section 136 may be defined by a thickened ridge of material in bone plate 100 having its greatest thickness along bridge portion 130 and gradually decreasing in thickness as one moves away from bridge portion 130 along the length of bone plate 100 toward ends 126. The increased material thickness may provide central section 130 with a higher section modulus than the proximal and distal areas of the plate located at ends 126. In a typical design, thickened section 136 may be about 100% to 200% thicker than the adjacent portions of bone plate 100. Including thickened section 136 in bone plate 100 may confer a number of advantages over plates of uniform thickness, one of which is the ability to efficiently increase the section modulus (and strength) of bridge portion 130 without adding material thickness to the entirety of bone plate 100.

Transfixation screw hole 102 may be defined by an inner surface of bone plate 100 surrounding a generally circular opening in bone plate 100. As an example and not by way of limitation, transfixation screw hole 102 may be disposed along the center line 138 of spine 124, immediately adjacent to bridge portion 130. In the case of a bone plate 100 designed for use on the first metatarso-phalangeal joint, the placement of transfixation screw hole 102 adjacent to bridge portion 130 may enable transfixation screw 102 to penetrate the first metatarsal 104a on the dorsal aspect of the metatarsal head and pass into the plantar cortex of the first medial phalanx 104b, transfixing the metatarso-phalangeal joint 106.

In particular embodiments, the portion of bone plate 100 that includes transfixation screw hole 102 may be thicker than other portions of bone plate 100. For example, transfixation screw hole 102 may be included in thickened section 136, adjacent to bridge portion 130. This may enable a countersink to be created around transfixation screw hole 102 so that the head 152 of transfixation screw 150 may rest flush with the top surface of bone plate 100 once transfixation screw 150 is screwed into transfixation screw hole 102. The increased plate thickness around transfixation screw hole 102 may also enable transfixation screw hole 102 to be machined into bone plate 100 at an angle relative to the top surface of bone plate 100 (e.g., other than perpendicular to the top surface of bone plate 100).

As mentioned above, in particular embodiments, bone plate 100 may include a compression hole 132 for tightening bones 104 together using a bone screw 134. Compression hole 132 may be defined by an inner surface of bone plate 100 surrounding a generally oblong opening in bone plate 100. More particularly, the inner surface of compression hole 132 may have a narrow end 131a, and a wide end 131b that includes a horse-shoe-shaped countersink 133. To compress

STRYKER Exhibit 1001
Page 10 of 13
IPR2021-01451

US 9,351,776 B2

9

10

bones **104** together using compression hole **132**, a surgeon may use the following example procedure. The surgeon may begin by attaching the second end **126**b of bone plate **100** to bone **104**b using the attachment points **128** located on end **126**b. The surgeon may then manually approximate bone **104**a against bone **104**b, placing bone **104**a under compression hole **132**. While holding bone **104**a against the bottom surface of compression hole **132**, either by hand or using a clamp, the surgeon may drill a pilot hole for bone screw **134** into bone **104**a. The trajectory of the pilot hole may be generally perpendicular to the top surface of bone plate **100** and be located approximately in the center of narrow end **131** a (e.g., located at the focus of narrow end **131**a).

After creating the pilot hole, the surgeon may then screw bone screw **134** into the pilot hole until the head of bone screw **134** comes into contact with countersink **133** near the tips **135** of countersink **133**. To facilitate the compression feature, the underside of the head of bone screw **134** may be generally conical, having a taper angle approximately equal to the taper angle of countersink **133**. Once the head of bone screw **135** is in contact with counter sink **133** near tips **135**, further rotation of bone screw **135** may cause the head of bone screw **134** to ride down into countersink **133**, drawing bone plate **100** further up onto bone **104**a and causing bones **104** to press together at the interface of joint **106**. After approximating bones **104** by screwing bone screw **134** into compression hole **132** as just described, the surgeon may use other attachment points **128** to further secure bone plate **100** to bone **104**a. The surgeon may also screw transfixation screw **150** into joint **106** through transfixation screw hole **102** after tightening bones **104** together using compression hole **132**. Depending upon design, compression hole **132** may be threaded to provide a locking interface for bone screw **134**.

In particular embodiments, bone plate **100** may comprise one or more positioning holes **140** that may be used to position bone plate **100** relative to the bones **104** of joint **106**. To position bone plate **100** using a positioning hole **140**, a surgeon may insert a K-wire into one of the bones **104**, after which the surgeon may position bone plate **100** on bone **104** by inserting the K-wire through positioning hole **140** and sliding bone plate **100** down onto bone **104**. Additionally, the surgeon may rotate bone plate **100** about the K-wire using positioning hole **140** to achieve a desired orientation of bone plate **100** relative to bone **104**. To ensure that bone plate **100** may be precisely positioned on bone **104** using a K-wire, the diameter of positioning hole **140** may be approximately equal to the diameter of the K-wire. Once bone plate **100** has been properly positioned, the surgeon may secure bone plate **100** to bone **104**, temporarily for example, by inserting another K-wire into another one of positioning holes **140**, or more permanently, using attachment points **128**.

In particular embodiments, the bottom surface of bone plate **100** may include one or more contact reduction features **146** which may reduce the amount of surface area of bone plate **100** that contacts bones **104** when bone plate **100** is secured across joint **106**. As an example and not by way of limitation, the bottom surface of bone plate **100** may include one or more channels, notches, or other recessions which may reduce (e.g., minimize) the amount of bone plate **100** that contacts bones **104**. This may lessen the amount of vascular impingement caused by bone plate **100**, promoting blood flow to bones **104** and bone growth. In particular embodiments, each of the screw holes in bone plate **100** (e.g., attachment points **128**, compression hole **132**, or transfixation screw hole **102**) may include a countersink capable of seating the head of a screw flush with the top surface of bone plate **100**. This feature may provide several benefits such as less-

ening the chance of uncomfortable impingement on the surrounding soft tissue, and reducing patient palpation and visualization of bone plate **100**.

In particular embodiments, bone plate **100** may further include flared hips **148** adjacent to transfixation screw hole **102**. Flared hips may generally be defined by a widened section of bone plate **100**. As an example and not by way of limitation, flared hips **148** may include two generally parabolic wings extending laterally from spine **124**, symmetrically opposed to one another about transfixation screw hole **102**. As will be appreciated by one of skill in the art, the entry point for transfixation screw **150** into bone **104**a may be generally be located at the center of the bottom side of transfixation screw hole **102** when transfixation screw is inserted into transfixation screw hole **102** along central axis **116**. Consequently, in embodiments where transfixation screw hole **102** is formed into bone plate **100** at an angle, the entry point for transfixation screw **150** may be out of sight (e.g., covered up by the top of transfixation screw hole **102**) when bone plate **100** is viewed from above. Therefore, to help a surgeon precisely position the entry point for transfixation screw **150** onto a desired location on bone **104**a, the entry point for transfixation screw **150** (e.g., the center of the bottom side of transfixation screw hole **102**) may reside directly in between the widest portion of flared hips **148**. Accordingly, by positioning the widest portion of flared hips **148** directly adjacent to the desired location for transfixation screw **150** on bone **104**a, the surgeon may confidently position the entry point for transfixation screw **150** at the desired location, even when the entry point is out of sight. Flared hips **148** may also increase the strength of bone plate **100** around transfixation screw hole **102**, lessening the chance of plate deformation or breakage.

Depending upon design, bone plate **100** may be formed from any material or combination of materials suitable for forming medical implants. Such materials may have high strength-to-weight ratios and may be inert to human body fluids. As an example and not by way of limitation, bone plate **100** may be formed from a forged titanium alloy. Titanium may provide several benefits as a material for bone plate **100** such as being relatively lightweight, providing adequate strength for withstanding forces typically experienced by a bone plate, and being visible in radiographs of the implant region.

FIG. **4** illustrates an example embodiment of a bone plate **200** adapted for use in a Lapidus procedure where bone plate **200** may be secured across the first tarso-metatarsal (TMT) joint **206**, located between the first metatarsal **204**a and the first cuneiform **204**b. Though bone plate **200** is adapted for placement over the TMT joint, particular embodiments of bone plate **200** may include some or all of the features of bone plate **100** described above, appropriately adapted to conform to the TMT joint **206**. For example, when used on TMT joint **206**, transfixation screw hole **202** may be configured to guide a transfixation screw **250** from the dorsal aspect of metatarsal **204**a to the plantar aspect of first cuneiform **204**b in order to transfix TMT joint **206**. Likewise, bone plate **100** may include some or all of the features described with respect to bone plate **200**, appropriately adapted to conform to the MPJ joint **106**. For reference purposes, like numbers may be used to refer to like features between bone plate **100** and bone plate **200**.

Bone plate **200** may generally be "H-shaped", and include an elongate spine **224** having a plurality of flanges **242** extending laterally therefrom. Each flange **242** may further include one or more attachment points **228** (similar or identical to attachment points **128** described above) for attaching bone plate **200** to a bone **204**. Flanges **242** may serve as a primary mechanism for attaching bone plate **200** to bones

STRYKER Exhibit 1001
Page 11 of 13
IPR2021-01451

Appx434

US 9,351,776 B2

11

204, although particular embodiments of bone plate 200 may further include one or more additional attachment points 228 disposed along spine 224 for attaching bone plate 200 to bones 204.

Each flange 242 may be any type of rigid lateral extension from spine 224. As an example and not by way of limitation, each flange 242 may be a rigid rounded tab extending laterally from the side of spine 224. Depending upon design, each flange 242 may be separated from the next by a gap 244, which may enable a surgeon to independently contour each flange 242 to a desired position (e.g., to conform flanges 242 to match the geometry of bones 204). Furthermore, each flange 242 may be relatively thinner than spine 224 to reduce the mechanical force needed to contour flanges 242 up or down relative to spine 224. This thinning of flanges 242 may confer a number of advantages over plates having uniform thickness, such as for example, providing a surgeon with the ability to easily contour flanges 242 to a desired position. In particular embodiments, flanges 242 may enable a surgeon to contour bone plate 200 such that attachments points 242 are located on both the medial and dorsal aspects of bones 204. Once a flange 242 has been contoured to a desired position, it may be affixed to bone 204 using an attachment point 228.

To facilitate the process of aligning bones 204, bone plate 200 may include one or more features which mimic the natural geometry of the TMT joint 206. For example, bone plate 200 may include a rise 210 of approximately 0 mm to 5 mm (e.g., 2 mm) that mimics the natural elevation of the first metatarsal 204a relative to the first cuneiform 204b. As another example and not by way of limitation, bone plate 200 may include a varus angle of about 0 degrees to about 30 degrees (e.g., 15 degrees) between the first end 226a of the plate and the second end 226b of the plate that mimics the natural elevation of first metatarsal 204a relative to first cuneiform 204b. In particular embodiments, bone plate 200 may be symmetric about center line 238 to enable bone plate 200 to be applied to either the left foot or the right foot, without substantial modification.

The particular embodiments disclosed above are illustrative only, as particular embodiments of the present disclosure may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular illustrative embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the present disclosure. In particular, every range of values (e.g., "from about a to about b," or, equivalently, "from approximately a to b," or, equivalently, "from approximately a–b") disclosed herein is to be understood as referring to the power set (the set of all subsets) of the respective range of values. The terms in the claims have their plain, ordinary meaning unless otherwise explicitly and clearly defined by the patentee.

Although the present disclosure has been described in several embodiments, a myriad of changes, substitutions, and modifications may be suggested to one skilled in the art, and it is intended that the present disclosure encompass such changes, substitutions, and modifications as fall within the scope of the present appended claims.

What is claimed is:

1. A system for securing two discrete bones together across a joint between the two bones, comprising:
an elongate spine having:
a first end comprising:

12

at least one fixation point for attaching the first end to a first discrete bone on a first side of an intermediate joint; and
a first inner surface configured to substantially conform with a geometry of the first discrete bone;
a second end comprising:
at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and
a second inner surface configured to substantially conform with a geometry of the second discrete bone; and
a bridge portion disposed between the first end and the second end, the bridge portion configured to span across the joint, at least a portion of said bridge portion having a depth greater than at least a portion of the depth of either the first end or the second end; and
a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends the bridge portion at a trajectory configured to pass through a first position on the first discrete bone, a portion of the joint, and a second position on the second discrete bone once the plate is placed across the joint; and
a transfixation screw comprising a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to continuously extend through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion.

2. The system of claim 1, wherein:
a central axis of the inner surface of the transfixation screw hole defines the trajectory; and
the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

3. The system of claim 2, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

4. The system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis.

5. The system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

6. The system of claim 1, wherein the inner surface of the transfixation screw hole is configured to lockably engage the head of the transfixation screw.

7. The system of claim 1, wherein the plate further include a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

8. The system of claim 1, wherein at least one attachment point comprises a threaded screw hole defined by a threaded inner surface configured to lockably engage one of a plurality of locking bone screws.

9. The system of claim 1, wherein the transfixation screw comprises a lag screw having:
at a first end of the shaft adjacent to the head, an unthreaded portion configured to extend through the first bone; and

STRYKER Exhibit 1001
Page 12 of 13
IPR2021-01451

US 9,351,776 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

at a second end of the shaft adjacent to the tip, a threaded portion configured to extend into the second bone.

**10.** A plate for securing two discrete bones together across an intermediate joint, comprising:

an elongate spine having:

a first end comprising:

at least one fixation point for attaching the first end to a first discrete bone on a first side of a joint; and

a first inner surface configured to substantially conform with a geometry of the first bone;

a second end comprising:

at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and

a second inner surface configured to substantially conform with a geometry of the second bone;

a bridge portion disposed between the first end and the second end, the bridge portion configured to span across the joint; and

a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint, enabling said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge, wherein at least a portion of said bridge portion and said transfixation screw hole has a depth greater than at least a portion of said first and second ends.

**11.** The plate of claim **10**, wherein:

a central axis of the inner surface of the transfixation screw hole defines the trajectory; and

the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

**12.** The plate of claim **11**, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

**13.** The plate of claim **10**, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

**14.** The plate of claim **10**, wherein the plate further includes a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

**15.** The plate of claim **10**, further comprising a first flared hip on a first side of the plate and a second flared hip on a second side of the plate, the flared hips comprising two generally parabolic wings extending laterally from the spine and being symmetrically opposed to one another about the transfixation screw hole.

*   *   *   *   *

STRYKER Exhibit 1001
Page 13 of 13
IPR2021-01451



US009763716B2

(12) **United States Patent**
Terrill et al.

(10) **Patent No.:** **US 9,763,716 B2**
(45) **Date of Patent:** *Sep. 19, 2017

(54) **BONE PLATE WITH A TRANSFIXATION SCREW HOLE**

(71) Applicant: **OsteoMed LLC**, Addison, TX (US)

(72) Inventors: **Lance Nathan Terrill**, Dallas, TX (US); **Bruce R. Werber**, Scottsdale, AZ (US)

(73) Assignee: **OsteoMed LLC**, Addison, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/147,828**

(22) Filed: **May 5, 2016**

(65) **Prior Publication Data**

US 2016/0242830 A1    Aug. 25, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/015,900, filed on Aug. 30, 2013, now Pat. No. 9,351,776, which is a (Continued)

(51) **Int. Cl.**
*A61B 17/80* (2006.01)
*A61B 17/88* (2006.01)
*A61B 17/84* (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61B 17/8057* (2013.01); *A61B 17/8061* (2013.01); *A61B 17/88* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............................ A61B 17/80; A61B 17/861
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,025,008 | A | 4/1912 | Miner |
| 1,105,105 | A | 7/1914 | Sherman |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1468655 A2 | 10/2004 |
| EP | 1897509 A1 | 9/2007 |

(Continued)

OTHER PUBLICATIONS

PCT Invitation to Pay Additional Fees and, Where Applicable, Protest Fee; International Applicaiton No. PCT/US2010/031328, International Filing Date Apr. 16, 2010.

(Continued)

*Primary Examiner* — Nicholas Woodall
(74) *Attorney, Agent, or Firm* — Norton Rose Fulbright US LLP

(57) **ABSTRACT**

A system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw includes a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

**21 Claims, 3 Drawing Sheets**



STRYKER Exhibit 1001
Page 1 of 14
IPR2021-01452

**US 9,763,716 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 12/431,017, filed on Apr. 28, 2009, now Pat. No. 8,529,608.

(52) **U.S. Cl.**
CPC ......... *A61B 17/809* (2013.01); *A61B 17/8014* (2013.01); *A61B 17/8052* (2013.01); *A61B 17/8085* (2013.01); *A61B 17/848* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,869,726 A | 8/1932 | Youngren | |
| 2,133,859 A | 10/1938 | Hawley | |
| 2,398,915 A | 4/1946 | Bell | |
| 2,443,363 A | 6/1948 | Townsend et al. | |
| 2,489,870 A | 11/1949 | Dzus | |
| 2,501,978 A | 3/1950 | Wichman | |
| 2,561,550 A | 7/1951 | Wright | |
| 2,737,835 A | 3/1956 | Herz | |
| 3,463,148 A | 8/1969 | Treace | |
| 3,534,731 A | 10/1970 | Muller | |
| 3,552,389 A | 1/1971 | Allgower et al. | |
| 3,593,709 A | 7/1971 | Halloran | |
| 3,668,972 A | 6/1972 | Allgower et al. | |
| 3,695,259 A | 10/1972 | Yost | |
| 3,716,050 A | 2/1973 | Johnston | |
| 3,741,205 A | 6/1973 | Markolf et al. | |
| 3,779,240 A | 12/1973 | Kondo | |
| 3,807,394 A | 4/1974 | Attenborough | |
| 4,219,015 A | 8/1980 | Steinemann | |
| 4,338,921 A | 7/1982 | Harder et al. | |
| 4,338,926 A | 7/1982 | Kummer et al. | |
| 4,364,382 A | 12/1982 | Mennen | |
| 4,408,601 A | 10/1983 | Wenk | |
| 4,484,570 A | 11/1984 | Sutter et al. | |
| 4,488,543 A | 12/1984 | Tornier | |
| 4,493,317 A | 1/1985 | Klaue | |
| 4,503,848 A | 3/1985 | Caspar et al. | |
| 4,513,744 A | 4/1985 | Klaue | |
| 4,565,193 A | 1/1986 | Streli | |
| 4,573,458 A | 3/1986 | Lower | |
| 4,651,724 A | 3/1987 | Berentey et al. | |
| 4,683,878 A | 8/1987 | Carter | |
| 4,794,918 A | 1/1989 | Wolter | |
| 4,800,874 A | 1/1989 | David et al. | |
| 4,838,252 A | 6/1989 | Klaue | |
| 4,867,144 A | 9/1989 | Karas et al. | |
| 4,955,886 A | 9/1990 | Pawluk | |
| 4,959,065 A | 9/1990 | Arnett et al. | |
| 5,002,544 A | 3/1991 | Klaue et al. | |
| 5,006,120 A | 4/1991 | Carter | |
| 5,015,249 A | 5/1991 | Nakao et al. | |
| 5,021,056 A | 6/1991 | Hoffmann et al. | |
| 5,041,113 A | 8/1991 | Biedermann et al. | |
| 5,053,036 A | 10/1991 | Perren et al. | |
| 5,053,039 A | 10/1991 | Hofmann et al. | |
| 5,057,111 A | 10/1991 | Park | |
| 5,085,660 A | 2/1992 | Lin | |
| 5,129,903 A | 7/1992 | Luhr et al. | |
| 5,151,103 A | 9/1992 | Tepic et al. | |
| 5,190,544 A | 3/1993 | Chapman et al. | |
| 5,234,431 A | 8/1993 | Keller | |
| 5,269,784 A | 12/1993 | Mast | |
| 5,304,180 A | 4/1994 | Slocum | |
| 5,330,535 A | 7/1994 | Moser et al. | |
| 5,344,421 A | 9/1994 | Crook | |
| 5,380,327 A | 1/1995 | Eggers et al. | |
| 5,387,102 A | 2/1995 | Wagner et al. | |
| 5,443,467 A | 8/1995 | Biedermann et al. | |
| 5,474,553 A | 12/1995 | Baumgart | |
| 5,486,176 A | 1/1996 | Hildebrand et al. | |
| 5,487,741 A | 1/1996 | Maruyama et al. | |
| 5,501,684 A | 3/1996 | Schlapfer et al. | |
| 5,531,746 A | 7/1996 | Errico et al. | |
| 5,549,612 A | 8/1996 | Yapp et al. | |
| 5,578,034 A | 11/1996 | Estes | |
| 5,591,166 A | 1/1997 | Bernhardt et al. | |
| 5,601,553 A | 2/1997 | Trebing et al. | |
| 5,603,713 A | 2/1997 | Aust et al. | |
| 5,607,426 A | 3/1997 | Ralph et al. | |
| 5,607,428 A | 3/1997 | Lin | |
| 5,620,448 A | 4/1997 | Puddu | |
| 5,643,265 A | 7/1997 | Errico et al. | |
| 5,662,655 A | 9/1997 | Laboureau et al. | |
| 5,674,222 A | 10/1997 | Berger et al. | |
| 5,676,667 A | 10/1997 | Hausman | |
| 5,681,311 A | 10/1997 | Foley et al. | |
| 5,709,686 A | 1/1998 | Talos et al. | |
| 5,725,588 A | 3/1998 | Errico et al. | |
| 5,733,287 A | 3/1998 | Tepic et al. | |
| 5,735,853 A | 4/1998 | Olerud | |
| 5,741,258 A | 4/1998 | Klaue et al. | |
| 5,746,742 A | 5/1998 | Runciman et al. | |
| 5,749,872 A | 5/1998 | Kyle et al. | |
| 5,749,875 A | 5/1998 | Puddu | |
| 5,810,823 A | 9/1998 | Klaue et al. | |
| 5,931,838 A | 8/1999 | Vito | |
| 5,938,664 A | 8/1999 | Winquist et al. | |
| 5,951,558 A | 9/1999 | Fiz | |
| 5,954,722 A | 9/1999 | Bono | |
| 5,964,762 A | 10/1999 | Biedermann et al. | |
| 6,001,099 A | 12/1999 | Huebner | |
| 6,093,188 A | 7/2000 | Murray | |
| 6,117,173 A | 9/2000 | Taddia et al. | |
| 6,139,550 A | 10/2000 | Michelson | |
| 6,152,927 A | 11/2000 | Farris et al. | |
| 6,183,475 B1 | 2/2001 | Lester et al. | |
| 6,193,721 B1 | 2/2001 | Michelson | |
| 6,206,881 B1 | 3/2001 | Frigg et al. | |
| 6,224,602 B1 | 5/2001 | Hayes | |
| 6,228,085 B1 | 5/2001 | Theken et al. | |
| 6,235,032 B1 | 5/2001 | Link | |
| 6,235,033 B1 | 5/2001 | Brace et al. | |
| 6,235,034 B1 | 5/2001 | Bray | |
| 6,241,731 B1 | 6/2001 | Fiz | |
| 6,261,291 B1 | 7/2001 | Talaber et al. | |
| 6,302,883 B1 | 10/2001 | Bono | |
| 6,309,393 B1 | 10/2001 | Tepic | |
| 6,315,779 B1 | 11/2001 | Morrison et al. | |
| 6,322,562 B1 | 11/2001 | Wolter | |
| 6,342,055 B1 | 1/2002 | Eisermann et al. | |
| 6,348,052 B1 | 2/2002 | Sammarco | |
| 6,383,186 B1 | 5/2002 | Michelson | |
| 6,413,259 B1 | 7/2002 | Lyons et al. | |
| 6,454,770 B1 | 9/2002 | Klaue | |
| 6,503,250 B2 | 1/2003 | Paul | |
| 6,527,776 B1 | 3/2003 | Michelson | |
| 6,533,789 B1 | 3/2003 | Hall, IV et al. | |
| 6,575,975 B2 | 6/2003 | Brace et al. | |
| 6,595,993 B2 | 7/2003 | Donno et al. | |
| 6,602,255 B1 | 8/2003 | Campbell et al. | |
| 6,623,486 B1 | 9/2003 | Weaver et al. | |
| 6,669,701 B2 | 12/2003 | Steiner et al. | |
| 6,682,531 B2 | 1/2004 | Winquist et al. | |
| 6,695,846 B2 | 2/2004 | Richlsoph et al. | |
| 6,719,759 B2 | 4/2004 | Wagner et al. | |
| 6,755,832 B2 | 6/2004 | Happonen et al. | |
| 6,755,833 B1 | 6/2004 | Paul et al. | |
| 6,821,278 B2 | 11/2004 | Frigg et al. | |
| 6,890,334 B2 | 5/2005 | Brace et al. | |
| 6,945,973 B2 | 9/2005 | Bray | |
| 7,001,389 B1 | 2/2006 | Navarro et al. | |
| 7,128,744 B2 | 10/2006 | Weaver et al. | |
| 7,175,624 B2 | 2/2007 | Konieczynski et al. | |
| 7,179,260 B2 | 2/2007 | Gerlach et al. | |
| 7,273,481 B2 | 9/2007 | Lombardo et al. | |
| 7,288,095 B2 | 10/2007 | Baynham et al. | |
| 7,309,340 B2 | 12/2007 | Fallin et al. | |
| 7,311,712 B2 | 12/2007 | Dalton | |
| 7,331,961 B2 | 2/2008 | Abdou | |
| 2001/0037112 A1 | 11/2001 | Brace et al. | |
| 2002/0082606 A1 | 6/2002 | Suddaby | |
| 2003/0040749 A1 | 2/2003 | Grabowski et al. | |
| 2003/0078583 A1 | 4/2003 | Biedermann et al. | |

STRYKER Exhibit 1001
Page 2 of 14
IPR2021-01452

**US 9,763,716 B2**

Page 3

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0187440 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0187442 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0199876 | A1 | 10/2003 | Brace et al. |
| 2004/0015169 | A1 | 1/2004 | Gause |
| 2004/0034354 | A1 | 2/2004 | Paul |
| 2004/0059334 | A1 | 3/2004 | Weaver et al. |
| 2004/0059335 | A1 | 3/2004 | Weaver et al. |
| 2004/0087951 | A1 | 5/2004 | Khalili |
| 2004/0127901 | A1 | 7/2004 | Huebner et al. |
| 2005/0010226 | A1 | 1/2005 | Grady et al. |
| 2005/0065521 | A1 | 3/2005 | Steger et al. |
| 2005/0070904 | A1 | 3/2005 | Gerlach et al. |
| 2005/0080421 | A1 | 4/2005 | Weaver et al. |
| 2005/0131413 | A1 | 6/2005 | O'Driscoll et al. |
| 2005/0234455 | A1 | 10/2005 | Binder et al. |
| 2006/0015102 | A1 | 1/2006 | Toullec et al. |
| 2006/0036249 | A1 | 2/2006 | Baynham et al. |
| 2006/0173459 | A1 | 8/2006 | Kay et al. |
| 2006/0235396 | A1 | 10/2006 | Sanders et al. |
| 2006/0235397 | A1 | 10/2006 | Sanders et al. |
| 2006/0241592 | A1 | 10/2006 | Myerson et al. |
| 2006/0241607 | A1 | 10/2006 | Myerson et al. |
| 2006/0241608 | A1 | 10/2006 | Myerson et al. |
| 2007/0055253 | A1 | 3/2007 | Orbay et al. |
| 2007/0088360 | A1 | 4/2007 | Orbay et al. |
| 2007/0123880 | A1 | 5/2007 | Medoff |
| 2007/0162020 | A1 | 7/2007 | Gerlach et al. |
| 2007/0233115 | A1 | 10/2007 | Sixto et al. |
| 2007/0239163 | A1 | 10/2007 | Strnad et al. |
| 2007/0260244 | A1 | 11/2007 | Wolter |
| 2007/0276383 | A1 | 11/2007 | Rayhack |
| 2007/0276386 | A1 | 11/2007 | Gerlach et al. |
| 2008/0015591 | A1 | 1/2008 | Castaneda et al. |
| 2008/0015592 | A1 | 1/2008 | Long et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2007-500069 A | 1/2007 |
| WO | WO-2007/131287 A1 | 11/2007 |

OTHER PUBLICATIONS

PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US2010/031328, International Filing Date: Apr. 16, 2010.
Office Action issued for Japanese Patent Applicaiton No. 2012-508524, dated Dec. 3, 2013, 10 pages with English language translation.

STRYKER Exhibit 1001
Page 3 of 14
IPR2021-01452

STRYKER Exhibit 1001
Page 4 of 14
IPR2021-01452



*FIG. 1*

*FIG. 2*

STRYKER Exhibit 1001
Page 5 of 14
IPR2021-01452



*FIG. 3*



*FIG. 4*

STRYKER Exhibit 1001
Page 6 of 14
IPR2021-01452

US 9,763,716 B2

1

## BONE PLATE WITH A TRANSFIXATION SCREW HOLE

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of co-pending, commonly assigned, patent application Ser. No. 14/015,900 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed Aug. 30, 2013, which is a continuation of patent application Ser. No. 12/431,017 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed Apr. 28, 2009, the disclosures of which are hereby incorporated herein by reference in their entirety.

### TECHNICAL FIELD

The present disclosure relates to a device for securing bones together, and more particularly, to a bone plate with a transfixation screw hole.

### BACKGROUND OF THE INVENTION

When performing certain medical procedures, such as reconstructing a joint that has been damaged due to bone or soft tissue trauma, a surgeon may need to fuse the bones of the joint together in a configuration that approximates the natural geometry of the joint. One way to achieve this objective is to attach the bones of the joint to a plate that holds the bones in alignment with one another while they fuse together.

### BRIEF SUMMARY OF THE INVENTION

The present disclosure relates generally to orthopedic devices. More specifically, the present disclosure relates to a bone plate with a transfixation screw hole for securing the bones of a joint together and a method for using the same.

In particular embodiments, a system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate further includes a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Depending upon design, a central axis of the inner surface of the transfixation screw hole may define the trajectory, and the trajectory may be configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

In particular embodiments, a plate for securing bones together may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end

2

that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint.

In particular embodiments, a method for securing bones together across a joint includes placing a plate over a first bone on a first side of a joint and a second bone on a second side of the joint. The plate may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to the first bone, a second end that includes at least one attachment point for attaching the second end to the second bone, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The method may further include attaching the plate to the first bone and the second bone, and inserting a transfixation screw into the first bone and the second bone through the transfixation screw hole. The transfixation screw may include a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Particular embodiments of the present disclosure may provide a number of technical advantages, including for example, the ability to tightly couple the bones of a joint together by inserting a transfixation screw across the joint through a bone plate. In particular embodiments, the transfixation screw may have a "lag effect" that enables the bones of the joint to be approximated with one another by rotation of the transfixation screw. For example, the transfixation screw may include an unthreaded portion configured to rotate freely within the first bone and a threaded portion configured to threadably engage the second bone. When the transfixation screw is rotated, the unthreaded portion of the transfixation screw may rotate freely within the first bone while the threaded portion of the transfixation screw advances into the second bone, drawing the second bone toward the first bone and compressing the joint. These technical advantages (e.g., the presence of the transfixation screw across the joint, and the lag effect of the transfixation screw) may increase the contact pressure on the bony interface of the joint, increasing the probability of a positive fusion.

Depending upon design, the inner surface of the transfixation screw hole in the plate may direct the transfixation screw along a trajectory that crosses a neutral bending axis of the joint as the transfixation screw passes from the first bone to the second bone. This technical advantage may create a "tension band" construct that enables the transfixation screw to absorb a portion of the mechanical stress that would otherwise be imposed upon the plate above the joint when a load is applied to the joint. This technical advantage

STRYKER Exhibit 1001
Page 7 of 14
IPR2021-01452

US 9,763,716 B2

3

may enhance the integrity and reliability of the plate and increase the load that the plate may support without increasing plate thickness. Other technical advantages of the present disclosure will be readily apparent to one skilled in the art from the following figures, descriptions, and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some, or none of the enumerated advantages.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present disclosure and its advantages, reference is now made to the following descriptions, taken in conjunction with the accompanying drawings, in which:

FIG. 1 illustrates a failed metatarso-phalangeal joint in the big toe of a human foot;

FIG. 2 illustrates a bone plate being used in conjunction with a transfixation screw to repair the failed metatarso-phalangeal joint of FIG. 1 according to an example embodiment of the present disclosure;

FIG. 3 illustrates a more detailed isometric view of the bone plate of FIG. 2; and

FIG. 4 illustrates a bone plate adapted for use on a tarso-metatarsal joint according to an example embodiment of the present disclosure.

## DETAILED DESCRIPTION OF THE INVENTION

The metatarso-phalangeal joint is a joint between a metatarsal bone of the foot and the proximal phalanx of a toe. It is common, particularly in sports, for the first metatarsophalangeal joint (e.g., the metatarso-phalangeal joint of the big toe) to be injured as a result of trauma to or hyper extension of the big toe. In other scenarios, degradation of the metatarsophalangeal joint may be caused by arthritis. Minor injuries to the metatarso-phalangeal joint, such as a sprain, may often be treated using conservative measures such as immobilization and icing of the toe, accompanied by rest and anti-inflammatory medication. These measures may be followed by taping or splinting of the injured joint to help prevent recurrent hyperextensions of the toe.

In more severe cases involving major trauma to the bone or soft tissue of the metatarso-phalangeal joint, as illustrated in FIGURE I, conservative measures may be ineffective, and surgery may be required. One procedure for reconstructing a severely damaged metatarso-phalangeal joint involves fusing the bones of the joint together using plates and/or screws. More particularly, a fusion procedure may involve reducing the opposing faces of the bones of the joint to a bleeding bone bed, approximating the bones with one another, and screwing the bones together to promote fusion. In some cases, the bones may be screwed together without the use of a plate. However, this option may not provide adequate lateral support for the bones, possibly allowing them to shift out of alignment, resulting in a malunion or a nonunion of the joint.

Another option for surgically repairing a severely damaged metatarso-phalangeal joint involves securing the bones of the joint together using a plate. In this procedure, after the bones of the joint have been approximated next to one another, the plate may be laid across the joint. The plate may then be screwed to the bones of the joint to hold them in alignment next to one another, enabling the joint fuse. However, when a load is placed upon the joint (e.g., when weight is placed upon the foot) it is possible for the plate to

4

bend or break above the joint. This may cause the bones of the joint to fall out of approximation, resulting in a nonunion (e.g., a failed fusion of the joint). Consequently, the ability to rigidly hold the bones of a joint in tight approximation without bending or breaking is one metric for judging the effectiveness of a joint-fixation plate.

One way to increase the durability and reliability of a joint-fixation plate is to include a transfixation screw hole in the plate that enables a transfixation screw to transfix the joint through the plate. As explained in more detail below, once the transfixation screw is screwed across the joint, it may absorb some of the stress that would otherwise be exerted on the plate when a load is placed upon the joint. This may reduce the strain on the plate, increasing its reliability and durability. Additionally, while the plate may provide lateral support for the joint, the transfixation screw may hold the bones of the joint in tight approximation, increasing the likelihood of a positive fusion of the joint. This may be particularly important on the plantar side of the joint due to tensile stresses exerted on that side of the joint when loaded.

FIGS. 2-3 illustrate an example embodiment of a bone plate 100 that includes a transfixation screw hole 102 in accordance with the present disclosure. More particularly, FIG. 2 illustrates bone plate 100 being used in conjunction with a transfixation screw 150 to repair the failed metatarso-phalangeal joint of FIGURE I. FIG. 3 illustrates a more detailed isometric view of bone plate 100. For reference purposes, bone plate 100 and its various features may be referred to as having a top surface intended to face away from the bones of joint 106 and a bottom surface intended to face toward the bones of joint 106 (e.g., to be placed upon the bones of joint 106). Though particular features of bone plate 100 may be explained using such intended placement as a point of reference, this method of explanation is not meant to limit the scope of the present disclosure to any particular configuration or orientation of bone plate 100.

As shown in FIG. 2, bone plate 100 is being used to reconstruct a failed joint 106 of a human foot. In particular, FIG. 2 illustrates transfixation screw 150 being inserted through bone plate 100 into a first bone 104a and a second bone 104b (collectively, bones 104) in order to fuse joint 106 (show collapsed in FIG. 1). Bone 104a refers to the bone positioned directly beneath transfixation screw hole 102 (e.g., touching the bottom surface of transfixation screw hole 102) while bone 104b refers to the bone positioned on the opposite side of joint 106. Although bone 104a is illustrated and described as the first metatarsal, bone 104b is illustrated and described as the first proximal phalanx, and joint 106 is illustrated and described as the metatarso-phalangeal joint 106 of the big toe, one of ordinary skill in the art will appreciate those specific examples are presented for the sake of explanatory clarification and will further appreciate that bones 104 and joint 106 may generically refer to any suitable set of bones forming any suitable joint in the body.

In a typical procedure, a surgeon may use bone plate 100 to fuse joint 106 according to the following example surgical procedure. To begin the procedure, the surgeon may create an incision over joint 106 to expose bones 104. After exposing bones 104, the surgeon may perform any pre-fusion steps such as removing cartilage from joint 106 and reducing the opposing faces of bones 104 to a bleeding bone bed. Following the pre-fusion steps, the surgeon may approximate bones 104 by positioning them next to one in a desired configuration for fusion. The surgeon may then secure bones 104 together by placing bone plate 100 across joint 106 such that transfixation screw hole 102 overlies

STRYKER Exhibit 1001
Page 8 of 14
IPR2021-01452

US 9,763,716 B2

**5**

bone 104*a*. The surgeon may screw bone plate 100 to bones 104, for example by inserting one or more bone screws 134 into one or more screw holes located on either end of bone plate 100, after which, the surgeon may create a path for transfixation screw 150. To create a path for transfixation screw 150, the surgeon may drill a pilot hole into bones 104 through transfixation screw hole 102. In particular embodiments, the surgeon may use the central axis 116 of transfixation screw hole 102 as a guide to establish the trajectory for the pilot hole. Once the pilot hole has been created, transfixation screw 150 may be inserted into the pilot hole through transfixation screw hole 102 and screwed into bones 104 until the head of transfixation screw 150 abuts the inner surface of transfixation screw hole 102. After bones 104 have been secured together using transfixation screw 150, the surgeon may close the incision, leaving bones 104 to fuse together.

To facilitate the process of aligning bones 104, bone plate 100 may include one or more joint-specific characteristics that may conform to the natural geometry of joint 106 or bones 104. For example, in the case of the metatarso-phalangeal joint, bone plate 100 may include a rise (similar to rise 210 in FIG. 4) that fits over the head on the dorsal section of metatarsal 104*a*. This may enable bone plate 100 to be seated firmly against the head of metatarsal 104*a* and provide a natural footing for bone plate 100 against metatarsal 104*a*. In other embodiments, the rise may be eliminated from bone plate 100 and the dorsal head of metatarsal 104*a* may be ground down to enable bone plate 100 to be laid flush against bones 104.

Depending upon design, bone plate 100 may further include a dorsiflexion angle (of approximately 10 degrees) between the first end 126*b* of the plate and the second end 126*a* of the plate that mimics the natural elevation of the first metatarsal 104*a* relative to the first proximal phalanx 104*b*. The inclusion of a dorsiflexion angle between first end 126*b* and second end 126*a* may reduce the force on bone plate 100 during activities such as walking. Furthermore, bone plate 100 may include a valgus angle (of approximately 10 degrees) between the first end 126*b* of the plate and the second end 126*a* of the plate that mimics the natural lateral alignment of the first metatarsal 104*a* relative to the first proximal phalanx 104*b*. The inclusion of a valgus angle in bone plate 100 may further help to reduce the force on bone plate 100 during activities such as walking. In particular embodiments, to provide lateral support for joint 106, the ends of plate 100 may be may be curved around the medial side of bones 104. One of ordinary skill in the art will appreciate that above-described characteristics of bone plate 100 were described with respect to the metatarso-phalangeal joint for the sake of explanatory simplicity and will further appreciate that particular embodiments of bone plate 100 may be adapted equally as well to approximate the natural geometry of virtually any joint 106 in the body without departing from the scope of the present disclosure.

As mentioned above, transfixation screw 150, once inserted across joint 106, may absorb a portion of the stress that would otherwise be exerted on the portion of bone plate 100 spanning across joint 106 when a load is placed upon joint 106. For example, in the case of the metatarso-phalangeal joint 106, activities that place weight on the foot, such as walking or standing, may cause metatarso-phalangeal joint 106 to flex. Due to the biomechanics of the foot, when the metatarso-phalangeal joint 106 flexes, the upper or "dorsal" side of joint 106 will compress together, while the bottom or "plantar" side of joint 106 will draw apart under tension. This is generally true for any hinge-type joint. The

**6**

line about which the force on joint 106 transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106. In other words, neutral bending axis 118 defines the boundary line that separates the tension side of joint 106 from the compression side of joint 106.

When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 (as show in FIG. 2), a "tension band" construct is created that puts transfixation screw 150 under tension when joint 106 flexes. Normally, the plantar side of bone 104*a* (e.g., the portion of bone 104*a* on the tension side of joint 106) will draw away from the plantar side of bone 104*b* when a load is applied to joint 106. However, when transfixation screw 150 is screwed across joint 106 such that the head 152 of transfixation screw 150 abuts the inner surface of transfixation screw hole 102, the portion of transfixation screw 150 engaged with bone 104*b* will pull against the head 152 of transfixation screw 150 when a load is applied to joint 106. Since the head of transfixation screw 150 is braced against the inner surface of transfixation screw hole 102, it will absorb the tension forces transmitted up the shaft of transfixation screw 150, preventing the plantar side of bone 104*b* from drawing away from the plantar side of bone 104*a*.

In particular embodiments, the interface between bone 104*a* and transfixation screw 150 may provide another mechanism for absorbing the tension forces transmitted up the shaft of transfixation screw 150. For example, if transfixation screw 150 is threadably engaged with bone 104*a*, the threading on transfixation screw 150 may provide a footing against bone 104*a* which may also absorb a portion of the tension forces transmitted up the shaft of transfixation screw 150 from bone 104*b* when a load is applied to joint 106. In either case, once transfixation screw 150 has been screwed into joint 106 along a trajectory that crosses the neutral bending axis 118 of joint 106, a tension band construct may be created that enables transfixation screw 150 to absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106.

In particular embodiments, transfixation screw hole 102 may be used to establish the trajectory for transfixation screw 150. For example, bone plate 100 may be configured such that, once bones 104 have been approximated and bone plate 100 has been placed across joint 106, the central axis 116 of transfixation screw hole 102 may align along a trajectory that crosses the neutral bending axis 118 of joint 106. For example, the central axis 116 of transfixation screw hole 102 may be configured to pass through joint 106 at a transfixation angle 114 of about 30 degrees to about 70 degrees relative to neutral bending axis 118 to achieve the desired tension band construct once bone plate 100 is secured across joint 106. In one example embodiment, central axis 116 may be configured to pass through joint 106 at a transfixation angle 114 of about 50 degrees. Consequently, by drilling a pilot hole along central axis 116, a surgeon may create a path for transfixation screw 150 that spans from a first position 120 on bone 104*a* located on the compression side of joint 106 to a second position 122 on bone 104*b* located on the tension side of joint 106, creating the desired tension band construct for transfixation screw 150. Alternatively, a surgeon may forgo drilling a pilot hole and may instead use a transfixation screw 150 having a self drilling feature. In that case, the surgeon could achieve a tension band construct by screwing the transfixation screw 150 directly into joint 106 along the trajectory of central axis 116.

STRYKER Exhibit 1001
Page 9 of 14
IPR2021-01452

US 9,763,716 B2

7

Transfixation screw **150** may be any component of hardware having a head **152** configured to abut the surface of bone plate **100** and a shaft **154** operable to secure bones **104** together in a fixed configuration. For example, transfixation screw **150** may be a nut and bolt assembly, a pin assembly, or a bone screw. As another example and not by way of limitation, transfixation screw **150** may be a lag screw that includes a head **152** coupled to a shaft **154** having an unthreaded portion **156** and a threaded portion **158** that ends at a tip **156**. Once transfixation screw **150** is screwed into bones **104** through transfixation screw hole **102**, this configuration of transfixation screw **150** may result in a lag effect that may tighten the interface between bones **104** when transfixation **150** is rotated. In particular embodiments, the length of shaft **154** may be less than the length of the portion of central axis **116** that passes through bones **104** in order to keep tip **156** from protruding out of bone **104***b* (e.g., out of the plantar aspect of first proximal phalanx **104***b*) when transfixation screw **150** screwed into bones **104**.

To achieve a lag effect, a surgeon, after affixing bone plate **100** across joint **106** and drilling a pilot hole for transfixation screw **150** as described above, may screw transfixation screw **150** into joint **106** until unthreaded portion **156** extends completely through bone **104***a* and threaded portion **158** threadably engages bone **104***b*. At this point, further rotation of transfixation screw **150** may cause threaded portion **158** to advance further into bone **104***b*, causing bone **104***b* to ride up further onto shaft **154** and press against bone **104***a* while unthreaded portion **156** spins freely within bone **104***a*. Transfixation screw **150** may be further rotated under these conditions until head **152** comes to bear on the inner surface of transfixation screw hole **102**, cinching bone **104***a* between the bottom surface of bone plate **100** and bone **104***b*. This may create a tight interface between bones **104**, increasing the chance of a positive fusion. In another example procedure, a lag effect may be achieved by drilling a pilot hole in bone **104***a* that is larger in diameter than shaft **154**. This may enable transfixation screw **150** to spin freely within bone **104***a* to achieve the desired lag effect, even if the entirety of shaft **154** is threaded.

FIG. **3** illustrates an external view of the top surface of bone plate **100**. In particular embodiments, bone plate **100** may be characterized by a substantially thin construction that generally includes an elongate spine **124** having a first end **126***a* that includes at least one attachment point **128** for attaching first end **126***a* to bone **104***a*, a second end **126***b* comprising at least one attachment point **128** for attaching second end **126***b* to bone **104***b*, and a bridge portion **130** disposed between ends **126** configured to span across joint **106**. Bone plate **100** may further include a transfixation screw hole **102**, and a compression hole **132** which may be used to cinch bones **104** together using a bone screw **134**.

Each attachment point **128** may be any mechanism or fixture operable to serve as a rigid point of attachment between bone plate **100** and a bone **104**. As one example and not by way of limitation, an attachment point **128** may be an unthreaded screw hole in bone plate **100** configured to accept a bone screw **134**. As another example and not by way of limitation, an attachment point **128** may be a threaded screw hole that provides a locking interface between bone screw **134** and bone plate **100**. To accomplish this locking interface, the underside of the head of screw **134** may include threads that interfere with the threading on the inside of the threaded screw hole to lock bone screw **134** into bone plate **100**. Consequently, once bone screw **134** is screwed into bone **104** through the threaded screw hole, bone screw **134** may be prevented from loosening or back-

8

ing out of bone **104**. An example system for providing a locking interface between a screw hole and a screw is presented in U.S. Provisional Application No. 61/106,511, entitled, "Angulated Locking Plate/Screw Interface." In particular embodiments, the inner surface of transfixation screw hole **102** may also be threaded to provide a locking interface between transfixation screw **150** and bone plate **100**. In this case, the head of transfixation screw **150** may also be threaded.

As another example and not by way of limitation, an attachment point **128** may be any type of clip or clamp included on bone plate **100** operable to rigidly affix bone plate **100** to a bone. One of ordinary skill in the art will appreciate that the above-described embodiments of attachment points **128** were presented for the sake of explanatory clarification and will further appreciate that the present disclosure contemplates each attachment point **128** being any suitable mechanism or fixture operable to serve as a rigid point of attachment between bone plate **100** and bone **104**.

Spine **124** may generally define the central portion of bone plate **100** spanning along the length of bone plate **100**. As an example and not by way of limitation, spine **124** may include a contiguous linear or curvilinear section of bone plate **100** spanning from the tip of first end **126***a* to the tip of second end **126***b*. As mentioned above, spine **124** includes a bridge portion **130** configured to span across joint **106**. Since bridge portion **130** is configured to span across joint **106**, it is typically defined by an unbroken section of spine **124** that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion **130**. Depending upon design, bridge portion **130** may include a thickened section **136** of bone plate **100** to increase the bending strength of bridge portion **130**. This may lessen the risk of bridge portion **130** bending or breaking above joint **106** when a load is applied to joint **106**.

In particular embodiments, thickened section **136** may be defined by a thickened ridge of material in bone plate **100** having its greatest thickness along bridge portion **130** and gradually decreasing in thickness as one moves away from bridge portion **130** along the length of bone plate **100** toward ends **126**. The increased material thickness may provide central section **130** with a higher section modulus than the proximal and distal areas of the plate located at ends **126**. In a typical design, thickened section **136** may be about 100% to 200% thicker than the adjacent portions of bone plate **100**. Including thickened section **136** in bone plate **100** may confer a number of advantages over plates of uniform thickness, one of which is the ability to efficiently increase the section modulus (and strength) of bridge portion **130** without adding material thickness to the entirety of bone plate **100**.

Transfixation screw hole **102** may be defined by an inner surface of bone plate **100** surrounding a generally circular opening in bone plate **100**. As an example and not by way of limitation, transfixation screw hole **102** may be disposed along the center line **138** of spine **124**, immediately adjacent to bridge portion **130**. In the case of a bone plate **100** designed for use on the first metatarso-phalangeal joint, the placement of transfixation screw hole **102** adjacent to bridge portion **130** may enable transfixation screw **102** to penetrate the first metatarsal **104***a* on the dorsal aspect of the metatarsal head and pass into the plantar cortex of the first medial phalanx **104***b*, transfixing the metatarso-phalangeal joint **106**.

In particular embodiments, the portion of bone plate **100** that includes transfixation screw hole **102** may be thicker

STRYKER Exhibit 1001
Page 10 of 14
IPR2021-01452

**Appx446**

US 9,763,716 B2

9

than other portions of bone plate **100**. For example, transfixation screw hole **102** may be included in thickened section **136**, adjacent to bridge portion **130**. This may enable a countersink to be created around transfixation screw hole **102** so that the head **152** of transfixation screw **150** may rest flush with the top surface of bone plate **100** once transfixation screw **150** is screwed into transfixation screw hole **102**. The increased plate thickness around transfixation screw hole **102** may also enable transfixation screw hole **102** to be machined into bone plate **100** at an angle relative to the top surface of bone plate **100** (e.g., other than perpendicular to the top surface of bone plate **100**).

As mentioned above, in particular embodiments, bone plate **100** may include a compression hole **132** for tightening bones **104** together using a bone screw **134**. Compression hole **132** may be defined by an inner surface of bone plate **100** surrounding a generally oblong opening in bone plate **100**. More particularly, the inner surface of compression hole **132** may have a narrow end **131***a*, and a wide end **131***b* that includes a horse-shoe-shaped countersink **133**. To compress bones **104** together using compression hole **132**, a surgeon may use the following example procedure. The surgeon may begin by attaching the second end **126***b* of bone plate **100** to bone **104***b* using the attachment points **128** located on end **126***b*. The surgeon may then manually approximate bone **104***a* against bone **104***b*, placing bone **104***a* under compression hole **132**. While holding bone **104***a* against the bottom surface of compression hole **132**, either by hand or using a clamp, the surgeon may drill a pilot hole for bone screw **134** into bone **104***a*. The trajectory of the pilot hole may be generally perpendicular to the top surface of bone plate **100** and be located approximately in the center of narrow end **131** a (e.g., located at the focus of narrow end **131***a*).

After creating the pilot hole, the surgeon may then screw bone screw **134** into the pilot hole until the head of bone screw **134** comes into contact with countersink **133** near the tips **135** of countersink **133**. To facilitate the compression feature, the underside of the head of bone screw **134** may be generally conical, having a taper angle approximately equal to the taper angle of countersink **133**. Once the head of bone screw **135** is in contact with counter sink **133** near tips **135**, further rotation of bone screw **135** may cause the head of bone screw **134** to ride down into countersink **133**, drawing bone plate **100** further up onto bone **104***a* and causing bones **104** to press together at the interface of joint **106**. After approximating bones **104** by screwing bone screw **134** into compression hole **132** as just described, the surgeon may use other attachment points **128** to further secure bone plate **100** to bone **104***a*. The surgeon may also screw transfixation screw **150** into joint **106** through transfixation screw hole **102** after tightening bones **104** together using compression hole **132**. Depending upon design, compression hole **132** may be threaded to provide a locking interface for bone screw **134**.

In particular embodiments, bone plate **100** may comprise one or more positioning holes **140** that may be used to position bone plate **100** relative to the bones of joint **106**. To position bone plate **100** using a positioning hole **140**, a surgeon may insert a K-wire into one of the bones **104**, after which the surgeon may position bone plate **100** on bone **104** by inserting the K-wire through positioning hole **140** and sliding bone plate **100** down onto bone **104**. Additionally, the surgeon may rotate bone plate **100** about the K-wire using positioning hole **140** to achieve a desired orientation of bone plate **100** relative to bone **104**. To ensure that bone plate **100** may be precisely positioned on bone **104** using a

10

K-wire, the diameter of positioning hole **140** may be approximately equal to the diameter of the K-wire. Once bone plate **100** has been properly positioned, the surgeon may secure bone plate **100** to bone **104**, temporarily for example, by inserting another K-wire into another one of positioning holes **140**, or more permanently, using attachment points **128**.

In particular embodiments, the bottom surface of bone plate **100** may include one or more contact reduction features **146** which may reduce the amount of surface area of bone plate **100** that contacts bones **104** when bone plate **100** is secured across joint **106**. As an example and not by way of limitation, the bottom surface of bone plate **100** may include one or more channels, notches, or other recessions which may reduce (e.g., minimize) the amount of bone plate **100** that contacts bones **104**. This may lessen the amount of vascular impingement caused by bone plate **100**, promoting blood flow to bones **104** and bone growth. In particular embodiments, each of the screw holes in bone plate **100** (e.g., attachment points **128**, compression hole **132**, or transfixation screw hole **102**) may include a countersink capable of seating the head of a screw flush with the top surface of bone plate **100**. This feature may provide several benefits such as lessening the chance of uncomfortable impingement on the surrounding soft tissue, and reducing patient palpation and visualization of bone plate **100**.

In particular embodiments, bone plate **100** may further include flared hips **148** adjacent to transfixation screw hole **102**. Flared hips may generally be defined by a widened section of bone plate **100**. As an example and not by way of limitation, flared hips **148** may include two generally parabolic wings extending laterally from spine **124**, symmetrically opposed to one another about transfixation screw hole **102**. As will be appreciated by one of skill in the art, the entry point for transfixation screw **150** into bone **104***a* may be generally be located at the center of the bottom side of transfixation screw hole **102** when transfixation screw is inserted into transfixation screw hole **102** along central axis **116**. Consequently, in embodiments where transfixation screw hole **102** is formed into bone plate **100** at an angle, the entry point for transfixation screw **150** may be out of sight (e.g., covered up by the top of transfixation screw hole **102**) when bone plate **100** is viewed from above. Therefore, to help a surgeon precisely position the entry point for transfixation screw **150** onto a desired location on bone **104***a*, the entry point for transfixation screw **150** (e.g., the center of the bottom side of transfixation screw hole **102**) may reside directly in between the widest portion of flared hips **148**. Accordingly, by positioning the widest portion of hips **148** directly adjacent to the desired location for transfixation screw **150** on bone **104***a*, the surgeon may confidently position the entry point for transfixation screw **150** at the desired location, even when the entry point is out of sight. Flared hips **148** may also increase the strength of bone plate **100** around transfixation screw hole **102**, lessening the chance of plate deformation or breakage.

Depending upon design, bone plate **100** may be formed from any material or combination of materials suitable for forming medical implants. Such materials may have high strength-to-weight ratios and may be inert to human body fluids. As an example and not by way of limitation, bone plate **100** may be formed from a forged titanium alloy. Titanium may provide several benefits as a material for bone plate **100** such as being relatively lightweight, providing adequate strength for withstanding forces typically experienced by a bone plate, and being visible in radiographs of the implant region.

STRYKER Exhibit 1001
Page 11 of 14
IPR2021-01452

US 9,763,716 B2

**11**

FIG. 4 illustrates an example embodiment of a bone plate **200** adapted for use in a Lapidus procedure where bone plate **200** may be secured across the first tarso-metatarsal (TMT) joint **206**, located between the first metatarsal **204***a* and the first cuneiform **204***b*. Though bone plate **200** is adapted for placement over the TMT joint, particular embodiments of bone plate **200** may include some or all of the features of bone plate **100** described above, appropriately adapted to conform to the TMT joint **206**. For example, when used on TMT joint **206**, transfixation screw hole **202** may be configured to guide a transfixation screw **250** from the dorsal aspect of metatarsal **204***a* to the plantar aspect of first cuneiform **204***b* in order to transfix TMT joint **206**. Likewise, bone plate **100** may include some or all of the features described with respect to bone plate **200**, appropriately adapted to conform to the MPJ joint **106**. For reference purposes, like numbers may be used to refer to like features between bone plate **100** and bone plate **200**.

Bone plate **200** may generally be "H-shaped", and include an elongate spine **224** having a plurality of flanges **242** extending laterally therefrom. Each flange **242** may further include one or more attachment points **228** (similar or identical to attachment points **128** described above) for attaching bone plate **200** to a bone **204**. Flanges **242** may serve as a primary mechanism for attaching bone plate **200** to bones **204**, although particular embodiments of bone plate **200** may further include one or more additional attachment points **228** disposed along spine **224** for attaching bone plate **200** to bones **204**.

Each flange **242** may be any type of rigid lateral extension from spine **224**. As an example and not by way of limitation, each flange **242** may be a rigid rounded tab extending laterally from the side of spine **224**. Depending upon design, each flange **242** may be separated from the next by a gap **244**, which may enable a surgeon to independently contour each flange **242** to a desired position (e.g., to conform flanges **242** to match the geometry of bones **204**). Furthermore, each flange **242** may be relatively thinner than spine **224** to reduce the mechanical force needed to contour flanges **242** up or down relative to spine **224**. This thinning of flanges **242** may confer a number of advantages over plates having uniform thickness, such as for example, providing a surgeon with the ability to easily contour flanges **242** to a desired position. In particular embodiments, flanges **242** may enable a surgeon to contour bone plate **200** such that attachments points **242** are located on both the medial and dorsal aspects of bones **204**. Once a flange **242** has been contoured to a desired position, it may be affixed to bone **204** using an attachment point **228**.

To facilitate the process of aligning bones **204**, bone plate **200** may include one or more features which mimic the natural geometry of the TMT joint **206**. For example, bone plate **200** may include a rise **210** of approximately 0 mm to 5 mm (e.g., 2 mm) that mimics the natural elevation of the first metatarsal **204***a* relative to the first cuneiform **204***b*. As another example and not by way of limitation, bone plate **200** may include a varus angle of about 0 degrees to about 30 degrees (e.g., 15 degrees) between the first end **226***a* of the plate and the second end **226***b* of the plate that mimics the natural elevation of first metatarsal **204***a* relative to first cuneiform **204***b*. In particular embodiments, bone plate **200** may be symmetric about center line **238** to enable bone plate **200** to be applied to either the left foot or the right foot, without substantial modification.

The particular embodiments disclosed above are illustrative only, as particular embodiments of the present disclosure may be modified and practiced in different but equiva-

**12**

lent manners apparent to those skilled in the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular illustrative embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the present disclosure. In particular, every range of values (e.g., "from about a to about b," or, equivalently, "from approximately a to b," or, equivalently, "from approximately a-b") disclosed herein is to be understood as referring to the power set (the set of all subsets) of the respective range of values. The terms in the claims have their plain, ordinary meaning unless otherwise explicitly and clearly defined by the patentee.

Although the present disclosure has been described in several embodiments, a myriad of changes, substitutions, and modifications may be suggested to one skilled in the art, and it is intended that the present disclosure encompass such changes, substitutions, and modifications as fall within the scope of the present appended claims.

What is claimed is:

1. A system for securing two discrete bones together across

a joint between the two bones, comprising:
  an elongate spine having:
    a first end comprising:
      at least one fixation point for attaching the first end to a first discrete bone on a first side of an intermediate joint; and
      a first inner surface configured to substantially conform with a geometry of the first discrete bone;
    a second end comprising:
      at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and
      a second inner surface configured to substantially conform with a geometry of the second discrete bone; and
    a bridge portion disposed between the first end and the second end, at least a portion of said bridge portion having a depth greater than at least a portion of the depth of either the first end or the second end; and
    a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends the bridge portion at a trajectory configured to pass through a first position on the first discrete bone, a portion of the joint, and a second position on the second discrete bone; and
  a transfixation screw comprising a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion.

2. The system of claim 1, wherein:
  a central axis of the inner surface of the transfixation screw hole defines the trajectory; and

STRYKER Exhibit 1001
Page 12 of 14
IPR2021-01452

US 9,763,716 B2

13

the trajectory is configured to cross a neutral bending axis of the joint.

**3**. The system of claim **2**, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

**4**. The system of claim **2**, wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis.

**5**. The system of claim **2**, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

**6**. The system of claim **1**, wherein the inner surface of the transfixation screw hole is configured to lockably engage the head of the transfixation screw.

**7**. The system of claim **1**, wherein the spine further includes a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

**8**. The system of claim **1**, wherein at least one attachment point comprises a threaded screw hole defined by a threaded inner surface configured to lockably engage one of a plurality of locking bone screws.

**9**. The system of claim **1**, wherein the transfixation screw comprises a lag screw having:

at a first end of the shaft adjacent to the head, an unthreaded portion configured to extend through the first bone; and

at a second end of the shaft adjacent to the tip, a threaded portion configured to extend into the second bone.

**10**. A plate for securing two discrete bones together across an intermediate joint, comprising:

an elongate spine having:

a first end comprising:

at least one fixation point for attaching the first end to a first discrete bone on a first side of a joint; and

a first inner surface configured to substantially conform with a geometry of the first bone;

a second end comprising:

at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and

a second inner surface configured to substantially conform with a geometry of the second bone; and

a bridge portion disposed between the first end and the second end; and

a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone, enabling said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge, wherein at least a portion of said bridge portion and said transfixation screw hole has a depth greater than at least a portion of said first and second ends.

**11**. The plate of claim **10**, wherein:

a central axis of the inner surface of the transfixation screw hole defines the trajectory; and

the trajectory is configured to cross a neutral bending axis of the joint.

14

**12**. The plate of claim **11**, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

**13**. The plate of claim **10**, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

**14**. The plate of claim **10**, wherein the plate further includes a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

**15**. The plate of claim **10**, further comprising a first flared hip on a first side of the plate and a second flared hip on a second side of the plate, the flared hips comprising two generally parabolic wings extending laterally from the spine and being symmetrically opposed to one another about the transfixation screw hole.

**16**. A plate for securing two discrete bones together across an intermediate joint, comprising:

an elongate spine having:

a first end comprising:

at least one fixation point for attaching the first end to a first discrete bone on a first side of a joint; and

a first inner surface configured to substantially conform with a geometry of the first bone;

a second end comprising:

at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and

a second inner surface configured to substantially conform with a geometry of the second bone; and

a bridge portion disposed between the first end and the second end; and

a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone, enabling said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge, wherein at least a portion of said bridge portion and said transfixation screw hole has a thickness greater than at least a portion of said first and second ends.

**17**. The plate of claim **16**, wherein:

a central axis of the inner surface of the transfixation screw hole defines the trajectory; and

the trajectory is configured to cross a neutral bending axis of the joint.

**18**. The plate of claim **17**, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

**19**. The plate of claim **16**, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis.

**20**. The plate of claim **16**, wherein the plate further includes a compression hole defined by an inner surface in the plate surrounding an oblong opening, the inner surface of the compression hole including, at one end, a horse-shoe-shaped countersink.

**21**. The plate of claim **16**, further comprising a first flared hip on a first side of the plate and a second flared hip on a second side of the plate, the flared hips comprising two

STRYKER Exhibit 1001
Page 13 of 14
IPR2021-01452

US 9,763,716 B2

15    16

generally parabolic wings extending laterally from the spine
and being symmetrically opposed to one another about the
transfixation screw hole.

*  *  *  *  *

STRYKER Exhibit 1001
Page 14 of 14
IPR2021-01452

**Appx450**



US010245085B2

(12) **United States Patent**
    Terrill et al.

(10) Patent No.:     **US 10,245,085 B2**
(45) Date of Patent:        *Apr. 2, 2019

(54) **BONE PLATE WITH A TRANSFIXATION SCREW HOLE**

(71) Applicant: **OsteoMed LLC**, Addison, TX (US)

(72) Inventors: **Lance Nathan Terrill**, Dallas, TX (US); **Bruce R. Werber**, Scottsdale, AZ (US)

(73) Assignee: **OsteoMed LLC**, Addison, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/707,891**

(22) Filed: **Sep. 18, 2017**

(65) **Prior Publication Data**

US 2018/0000529 A1    Jan. 4, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/147,828, filed on May 5, 2016, now Pat. No. 9,763,716, which is a (Continued)

(51) **Int. Cl.**
    *A61B 17/80*        (2006.01)
    *A61B 17/88*        (2006.01)
    *A61B 17/84*        (2006.01)

(52) **U.S. Cl.**
    CPC ...... *A61B 17/8057* (2013.01); *A61B 17/8061* (2013.01); *A61B 17/88* (2013.01); (Continued)

(58) **Field of Classification Search**
    CPC .......................... A61B 17/8014; A61B 17/8061
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,025,008 A     4/1912  Miner
1,105,105 A     7/1914  Sherman
                        (Continued)

FOREIGN PATENT DOCUMENTS

EP     1468655 A2   10/2004
EP     1897509 A1    9/2007
                     (Continued)

OTHER PUBLICATIONS

Arthrex, "Midfoot Plating Techniques," Surgical Techniques, 2007, 12 pages.
                     (Continued)

*Primary Examiner* — Nicholas W Woodall
(74) *Attorney, Agent, or Firm* — Norton Ross Fulbright US LLP

(57)                    **ABSTRACT**

A system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw includes a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

**9 Claims, 3 Drawing Sheets**



STRYKER Exhibit 1001
Page 1 of 13
IPR2021-01453

**US 10,245,085 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 14/015,900, filed on Aug. 30, 2013, now Pat. No. 9,351,776, which is a continuation of application No. 12/431,017, filed on Apr. 28, 2009, now Pat. No. 8,529,608.

(52) **U.S. Cl.**
CPC .......... *A61B 17/809* (2013.01); *A61B 17/8014* (2013.01); *A61B 17/8052* (2013.01); *A61B 17/8085* (2013.01); *A61B 17/848* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,869,726 A | 8/1932 | Youngren | |
| 2,133,859 A | 10/1938 | Hawley | |
| 2,398,915 A | 4/1946 | Bell | |
| 2,443,363 A | 6/1948 | Townsend et al. | |
| 2,489,870 A | 11/1949 | Dzus | |
| 2,501,978 A | 3/1950 | Wichman | |
| 2,561,550 A | 7/1951 | Wright | |
| 2,737,835 A | 3/1956 | Herz | |
| 3,463,148 A | 8/1969 | Terace | |
| 3,534,731 A | 10/1970 | Muller | |
| 3,552,389 A | 1/1971 | Allgower et al. | |
| 3,593,709 A | 7/1971 | Halloran | |
| 3,668,972 A | 6/1972 | Allgower et al. | |
| 3,695,259 A | 10/1972 | Yost | |
| 3,716,050 A | 2/1973 | Johnston | |
| 3,741,205 A | 6/1973 | Markolf et al. | |
| 3,779,240 A | 12/1973 | Kondo | |
| 3,807,394 A | 4/1974 | Attenborough | |
| 4,219,015 A | 8/1980 | Steinemann | |
| 4,338,921 A | 7/1982 | Harder et al. | |
| 4,338,926 A | 7/1982 | Kummer et al. | |
| 4,364,382 A | 12/1982 | Mennen | |
| 4,408,601 A | 10/1983 | Wenk | |
| 4,484,570 A | 11/1984 | Sutter et al. | |
| 4,488,543 A | 12/1984 | Tornier | |
| 4,493,317 A | 1/1985 | Klaue | |
| 4,503,848 A | 3/1985 | Caspar et al. | |
| 4,513,744 A | 4/1985 | Klaue | |
| 4,565,193 A | 1/1986 | Streli | |
| 4,573,458 A | 3/1986 | Lower | |
| 4,651,724 A | 3/1987 | Berentey et al. | |
| 4,683,878 A | 8/1987 | Carter | |
| 4,794,918 A | 1/1989 | Wolter | |
| 4,800,874 A | 1/1989 | David et al. | |
| 4,838,252 A | 6/1989 | Klaue | |
| 4,867,144 A | 9/1989 | Karas et al. | |
| 4,955,886 A | 9/1990 | Pawluk | |
| 4,959,065 A | 9/1990 | Arnett et al. | |
| 5,002,544 A | 3/1991 | Klaue et al. | |
| 5,006,120 A | 4/1991 | Carter | |
| 5,015,249 A | 5/1991 | Nakao et al. | |
| 5,021,056 A | 6/1991 | Hoffmann et al. | |
| 5,041,113 A | 8/1991 | Biedermann et al. | |
| 5,053,036 A | 10/1991 | Perren et al. | |
| 5,053,039 A | 10/1991 | Hofmann et al. | |
| 5,057,111 A | 10/1991 | Park | |
| 5,085,660 A | 2/1992 | Lin | |
| 5,129,903 A | 7/1992 | Luhr et al. | |
| 5,151,103 A | 9/1992 | Tepic et al. | |
| 5,190,544 A * | 3/1993 | Chapman .............. A61B 17/72 |
| | | 606/280 | |
| 5,234,431 A | 8/1993 | Keller | |
| 5,269,784 A | 12/1993 | Mast | |
| 5,304,180 A | 4/1994 | Slocum | |
| 5,330,535 A | 7/1994 | Moser et al. | |
| 5,344,421 A | 9/1994 | Crook | |
| 5,380,327 A | 1/1995 | Eggers et al. | |
| 5,387,102 A | 2/1995 | Wagner et al. | |
| 5,443,467 A | 8/1995 | Biedermann et al. | |
| 5,474,553 A | 12/1995 | Baumgart | |
| 5,486,176 A | 1/1996 | Hildebrand et al. | |

| | | | |
|---|---|---|---|
| 5,487,741 A | 1/1996 | Maruyama et al. | |
| 5,501,684 A | 3/1996 | Schlapfer et al. | |
| 5,531,746 A | 7/1996 | Errico et al. | |
| 5,549,612 A | 8/1996 | Yapp et al. | |
| 5,578,034 A | 11/1996 | Estes | |
| 5,591,166 A | 1/1997 | Bernhardt et al. | |
| 5,601,553 A | 2/1997 | Trebing et al. | |
| 5,603,713 A | 2/1997 | Aust et al. | |
| 5,607,426 A | 3/1997 | Ralph et al. | |
| 5,607,428 A | 3/1997 | Lin | |
| 5,620,448 A | 4/1997 | Puddu | |
| 5,643,265 A | 7/1997 | Errico et al. | |
| 5,662,655 A | 9/1997 | Laboureau et al. | |
| 5,674,222 A | 10/1997 | Berger et al. | |
| 5,676,667 A | 10/1997 | Hausman | |
| 5,681,311 A | 10/1997 | Foley et al. | |
| 5,709,686 A | 1/1998 | Talos et al. | |
| 5,725,588 A | 3/1998 | Errico et al. | |
| 5,733,287 A | 3/1998 | Tepic et al. | |
| 5,735,853 A | 4/1998 | Olerud | |
| 5,741,258 A | 4/1998 | Klaue et al. | |
| 5,746,742 A | 5/1998 | Runciman et al. | |
| 5,749,872 A | 5/1998 | Kyle et al. | |
| 5,749,875 A | 5/1998 | Puddu | |
| 5,810,823 A | 9/1998 | Klaue et al. | |
| 5,931,838 A | 8/1999 | Vito | |
| 5,938,664 A | 8/1999 | Winquist et al. | |
| 5,951,558 A | 9/1999 | Fiz | |
| 5,954,722 A | 9/1999 | Bono | |
| 5,964,762 A | 10/1999 | Biedermann et al. | |
| 6,001,099 A | 12/1999 | Huebner | |
| 6,093,188 A | 7/2000 | Murray | |
| 6,117,173 A | 9/2000 | Taddia et al. | |
| 6,139,550 A | 10/2000 | Michelson | |
| 6,152,927 A | 11/2000 | Farris et al. | |
| 6,183,475 B1 | 2/2001 | Lester et al. | |
| 6,193,721 B1 | 2/2001 | Michelson | |
| 6,206,881 B1 | 3/2001 | Frigg et al. | |
| 6,224,602 B1 | 5/2001 | Hayes | |
| 6,228,085 B1 | 5/2001 | Theken et al. | |
| 6,235,032 B1 | 5/2001 | Link | |
| 6,235,033 B1 | 5/2001 | Brace et al. | |
| 6,235,034 B1 | 5/2001 | Bray | |
| 6,241,731 B1 | 6/2001 | Fiz | |
| 6,261,291 B1 | 7/2001 | Talaber et al. | |
| 6,302,883 B1 | 10/2001 | Bono | |
| 6,309,393 B1 | 10/2001 | Tepic | |
| 6,315,779 B1 | 11/2001 | Morrison et al. | |
| 6,322,562 B1 | 11/2001 | Wolter | |
| 6,342,055 B1 | 1/2002 | Eisermann et al. | |
| 6,348,052 B1 | 2/2002 | Sammarco | |
| 6,383,186 B1 | 5/2002 | Michelson | |
| 6,413,259 B1 | 7/2002 | Lyons et al. | |
| 6,454,770 B1 | 9/2002 | Klaue | |
| 6,503,250 B2 | 1/2003 | Paul | |
| 6,527,776 B1 | 3/2003 | Michelson | |
| 6,533,789 B1 | 3/2003 | Hall, IV et al. | |
| 6,575,975 B2 | 6/2003 | Brace et al. | |
| 6,579,975 B1 | 6/2003 | Brace et al. | |
| 6,595,993 B2 | 7/2003 | Donno et al. | |
| 6,602,255 B1 | 8/2003 | Campbell et al. | |
| 6,623,486 B1 | 9/2003 | Weaver et al. | |
| 6,669,701 B2 | 12/2003 | Steiner et al. | |
| 6,682,531 B2 | 1/2004 | Winquist et al. | |
| 6,695,846 B2 | 2/2004 | Richelsoph et al. | |
| 6,719,759 B2 | 4/2004 | Wagner et al. | |
| 6,755,832 B2 | 6/2004 | Happonen et al. | |
| 6,755,833 B1 | 6/2004 | Paul et al. | |
| 6,821,278 B2 | 11/2004 | Frigg et al. | |
| 6,890,334 B2 | 5/2005 | Brace et al. | |
| 6,945,973 B2 | 9/2005 | Bray | |
| 7,001,389 B1 | 2/2006 | Navarro et al. | |
| 7,128,744 B2 | 10/2006 | Weaver et al. | |
| 7,175,624 B2 | 2/2007 | Konieczynski et al. | |
| 7,179,260 B2 | 2/2007 | Gerlach et al. | |
| 7,273,481 B2 | 9/2007 | Lombardo et al. | |
| 7,288,095 B2 | 10/2007 | Baynham et al. | |
| 7,309,340 B2 | 12/2007 | Fallin et al. | |
| 7,311,712 B2 | 12/2007 | Dalton | |

STRYKER Exhibit 1001
Page 2 of 13
IPR2021-01453

Appx452

**US 10,245,085 B2**

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| 7,331,961 | B2 | 2/2008 | Abdou |
|---|---|---|---|
| 2001/0037112 | A1 | 11/2001 | Brace et al. |
| 2002/0082606 | A1 | 6/2002 | Suddaby |
| 2003/0040749 | A1 | 2/2003 | Grabowski et al. |
| 2003/0078583 | A1 | 4/2003 | Biedermann et al. |
| 2003/0187440 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0187442 | A1 | 10/2003 | Richelsoph et al. |
| 2003/0199876 | A1 | 10/2003 | Brace et al. |
| 2004/0015169 | A1 | 1/2004 | Gause |
| 2004/0034354 | A1 | 2/2004 | Paul |
| 2004/0059334 | A1 | 3/2004 | Weaver et al. |
| 2004/0059335 | A1 | 3/2004 | Weaver et al. |
| 2004/0087951 | A1 | 5/2004 | Khalili |
| 2004/0127901 | A1 | 7/2004 | Huebner et al. |
| 2005/0010226 | A1 | 1/2005 | Grady et al. |
| 2005/0065521 | A1 | 3/2005 | Steger et al. |
| 2005/0070904 | A1 | 3/2005 | Gerlach et al. |
| 2005/0080421 | A1 | 4/2005 | Weaver et al. |
| 2005/0131413 | A1 | 6/2005 | O'Driscoll et al. |
| 2005/0234455 | A1 | 10/2005 | Binder et al. |
| 2006/0015102 | A1 | 1/2006 | Toullec et al. |
| 2006/0036249 | A1 | 2/2006 | Baynham et al. |
| 2006/0173459 | A1 | 8/2006 | Kay et al. |
| 2006/0233596 | A1 | 10/2006 | Sanders et al. |
| 2006/0235396 | A1 | 10/2006 | Sanders et al. |
| 2006/0235397 | A1 | 10/2006 | Sanders et al. |
| 2006/0241592 | A1 | 10/2006 | Myerson et al. |
| 2006/0241607 | A1 | 10/2006 | Myerson et al. |
| 2006/0241608 | A1 | 10/2006 | Myerson et al. |
| 2007/0055253 | A1 | 3/2007 | Orbay et al. |
| 2007/0088360 | A1 | 4/2007 | Orbay et al. |
| 2007/0123880 | A1 | 5/2007 | Medoff |
| 2007/0213880 | A1 | 5/2007 | Medoff |

| 2007/0162020 | A1 | 7/2007 | Gerlach et al. | |
|---|---|---|---|---|
| 2007/0233106 | A1* | 10/2007 | Horan | A61B 17/8061 |
| | | | | 606/282 |
| 2007/0233115 | A1 | 10/2007 | Sixto et al. | |
| 2007/0239163 | A1 | 10/2007 | Strnad et al. | |
| 2007/0260244 | A1 | 11/2007 | Wolter | |
| 2007/0270850 | A1* | 11/2007 | Geissler | A61B 17/15 |
| | | | | 606/326 |
| 2007/0276383 | A1 | 11/2007 | Rayhack | |
| 2007/0276386 | A1 | 11/2007 | Gerlach et al. | |
| 2008/0015591 | A1 | 1/2008 | Castaneda et al. | |
| 2008/0015592 | A1 | 1/2008 | Long et al. | |

FOREIGN PATENT DOCUMENTS

| JP | 2007-500069 | A | 1/2007 |
|---|---|---|---|
| WO | WO-2007/131287 | A1 | 11/2007 |

OTHER PUBLICATIONS

PCT Invitation to Pay Additional Fees and, Where Applicable, Protest Fee; International Applicaiton No. PCT/US2010/031328, International Filing Date Apr. 16, 2010.

PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US2010/031328; International Filing Date: Apr. 16, 2010.

Vergrugge, J., "An Improved Bone Clamp and a Plate for Internal Fixation of Fractures," J. Bone Joint Surg. Am., 1946, vol. 28, pp. 174-175.

Office Action issued for Japanese Patent Applicaiton No. 2012-508524, dated Dec. 3, 2013, 10 pages with English language translation.

* cited by examiner

STRYKER Exhibit 1001
Page 3 of 13
IPR2021-01453

**U.S. Patent**    Apr. 2, 2019    Sheet 1 of 3    US 10,245,085 B2



FIG. 1

FIG. 2

STRYKER Exhibit 1001
Page 4 of 13
IPR2021-01453



*FIG. 3*

STRYKER Exhibit 1001
Page 5 of 13
IPR2021-01453

**Appx455**



*FIG. 4*

STRYKER Exhibit 1001
Page 6 of 13
IPR2021-01453

US 10,245,085 B2

1

# BONE PLATE WITH A TRANSFIXATION SCREW HOLE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of co-pending, commonly assigned, patent application Ser. No. 15/147,828 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed May 5, 2016, which is a continuation of patent application Ser. No. 14/015,900 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed Aug. 30, 2013, which is a continuation of patent application Ser. No. 12/431,017 entitled "BONE PLATE WITH A TRANSFIXATION SCREW HOLE," filed Apr. 28, 2009, U.S. Pat. No. 8,529,608, issued Sep. 10, 2013, the disclosures of which are hereby incorporated herein by reference in their entirety.

## TECHNICAL FIELD

The present disclosure relates to a device for securing bones together, and more particularly, to a bone plate with a transfixation screw hole.

## BACKGROUND OF THE INVENTION

When performing certain medical procedures, such as reconstructing a joint that has been damaged due to bone or soft tissue trauma, a surgeon may need to fuse the bones of the joint together in a configuration that approximates the natural geometry of the joint. One way to achieve this objective is to attach the bones of the joint to a plate that holds the bones in alignment with one another while they fuse together.

## BRIEF SUMMARY OF THE INVENTION

The present disclosure relates generally to orthopedic devices. More specifically, the present disclosure relates to a bone plate with a transfixation screw hole for securing the bones of a joint together and a method for using the same.

In particular embodiments, a system for securing bones together across a joint includes a transfixation screw and a plate. The plate includes an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate further includes a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory config- ured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first bone, across the joint, and into the second bone.

Depending upon design, a central axis of the inner surface of the transfixation screw hole may define the trajectory, and the trajectory may be configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

2

in particular embodiments, a plate for securing bones together may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to a first bone on a first side of a joint, a second end that includes at least one attachment point for attaching the second end to a second bone on a second side of the joint, and a bridge portion disposed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfix- ation screw extends alongside the bridge portion at a tra- jectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint.

In particular embodiments, a method for securing bones together across a joint includes placing a plate over a first bone on a first side of a joint and a second bone on a second side of the joint. The plate may include an elongate spine having a first end that includes at least one attachment point for attaching the first end to the first bone, a second end that includes at least one attachment point for attaching the second end to the second bone, and a bridge portion dis- posed between the first end and the second end configured to span across the joint. The plate may further include a transfixation screw hole disposed along the spine. The transfixation screw hole includes an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the transfixation screw extends along- side the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint. The method may further include attaching the plate to the first bone and the second bone, and inserting a transfixation screw into the first bone and the second bone through the transfixation screw hole. The transfixation screw may include a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to con- tiguously extend through the first bone, across the joint, and into the second bone.

Particular embodiments of the present disclosure may provide a number of technical advantages, including for example, the ability to tightly couple the bones of a joint together by inserting a transfixation screw across the joint through a bone plate. In particular embodiments, the trans- fixation screw may have a "lag effect" that enables the bones of the joint to be approximated with one another by rotation of the transfixation screw. For example, the transfixation screw may include an unthreaded portion configured to rotate freely within the first bone and a threaded portion configured to threadably engage the second bone. When the transfixation screw is rotated, the unthreaded portion of the transfixation screw may rotate freely within the first bone while the threaded portion of the transfixation screw advances into the second bone, drawing the second bone toward the first bone and compressing the joint. These technical advantages (e.g., the presence of the transfixation screw across the joint, and the lag effect of the transfixation screw) may increase the contact pressure on the bony interface of the joint, increasing the probability of a positive fusion.

Depending upon design, the inner surface of the transfix- ation screw hole in the plate may direct the transfixation screw along a trajectory that crosses a neutral bending axis of the joint as the transfixation screw passes from the first bone to the second bone. This technical advantage may

STRYKER Exhibit 1001
Page 7 of 13
IPR2021-01453

US 10,245,085 B2

**3**

create a "tension band" construct that enables the transfixation screw to absorb a portion of the mechanical stress that would otherwise be imposed upon the plate above the joint when a load is applied to the joint. This technical advantage may enhance the integrity and reliability of the plate and increase the load that the plate may support without increasing plate thickness. Other technical advantages of the present disclosure will be readily apparent to one skilled in the art from the following figures, descriptions, and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some, or none of the enumerated advantages.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present disclosure and its advantages, reference is now made to the following descriptions, taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a failed metatarso-phalangeal joint in the big toe of a human foot;

FIG. **2** illustrates a bone plate being used in conjunction with a transfixation screw to repair the failed metatarso-phalangeal joint of FIG. **1** according to an example embodiment of the present disclosure;

FIG. **3** illustrates a more detailed isometric view of the bone plate of FIG. **2**; and

FIG. **4** illustrates a bone plate adapted for use on a tarso-metatarsal joint according to an example embodiment of the present disclosure.

DETAILED DESCRIPTION OF THE INVENTION

The metatarso-phalangeal joint is a joint between a metatarsal bone of the foot and the proximal phalanx of a toe. It is common, particularly in sports, for the first metatarsophalangeal joint (e.g., the metatarso-phalangeal joint of the big toe) to be injured as a result of trauma to or hyper extension of the big toe. In other scenarios, degradation of the metatarsophalangeal joint may be caused by arthritis. Minor injuries to the metatarso-phalangeal joint, such as a sprain, may often be treated using conservative measures such as immobilization and icing of the toe, accompanied by rest and anti-inflammatory medication. These measures may be followed by taping or splinting of the injured joint to help prevent recurrent hyperextensions of the toe.

In more severe cases involving major trauma to the bone or soft tissue of the metatarso-phalangeal joint, as illustrated in FIG. **1**, conservative measures may be ineffective, and surgery may be required. One procedure for reconstructing a severely damaged metatarso-phalangeal joint involves fusing the bones of the joint together using plates and/or screws. More particularly, a fusion procedure may involve reducing the opposing faces of the bones of the joint to a bleeding bone bed, approximating the bones with one another, and securing the bones together to promote fusion. In some cases, the bones may be screwed together without the use of a plate. However, this option may not provide adequate lateral support for the bones, possibly allowing them to shift out of alignment, resulting in a malunion or a nonunion of the joint.

Another option for surgically repairing a severely damaged metatarso-phalangeal joint involves securing the bones of the joint together using a plate. In this procedure, after the bones of the joint have been approximated next to one another, the plate may be laid across the joint. The plate may

**4**

then be screwed to the bones of the joint to hold them in alignment next to one another, enabling the joint fuse. However, when a load is placed upon the joint (e.g., when weight is placed upon the foot) it is possible for the plate to bend or break above the joint. This may cause the bones of the joint to fall out of approximation, resulting in a nonunion (e.g., a failed fusion of the joint). Consequently, the ability to rigidly hold the bones of a joint in tight approximation without bending or breaking is one metric for judging the effectiveness of a joint-fixation plate.

One way to increase the durability and reliability of a joint-fixation plate is to include a transfixation screw hole in the plate that enables a transfixation screw to transfix the joint through the plate. As explained in more detail below, once the transfixation screw is screwed across the joint, it may absorb some of the stress that would otherwise be exerted on the plate when a load is placed upon the joint. This may reduce the strain on the plate, increasing its reliability and durability. Additionally, while the plate may provide lateral support for the joint, the transfixation screw may hold the bones of the joint in tight approximation, increasing the likelihood of a positive fusion of the joint. This may be particularly important on the plantar side of the joint due to tensile stresses exerted on that side of the joint when loaded.

FIGS. **2-3** illustrate an example embodiment of a bone plate **100** that includes a transfixation screw hole **102** in accordance with the present disclosure. More particularly, FIG. **2** illustrates bone plate **100** being used in conjunction with a transfixation screw **150** to repair the failed metatarso-phalangeal joint of FIG. **1**. FIG. **3** illustrates a more detailed isometric view of bone plate **100**. For reference purposes, bone plate **100** and its various features may be referred to as having a top surface intended to face away from the bones of joint **106** and a bottom surface intended to face toward the bones of joint **106** (e.g., to be placed upon the bones of joint **106**). Though particular features of bone plate **100** may be explained using such intended placement as a point of reference, this method of explanation is not meant to limit the scope of the present disclosure to any particular configuration or orientation of bone plate **100**.

As shown in FIG. **2**, bone plate **100** is being used to reconstruct a failed joint **106** of a human foot. In particular, FIG. **2** illustrates transfixation screw **150** being inserted through bone plate **100** into a first bone **104***a* and a second bone **104***b* (collectively, bones **104**) in order to fuse joint **106** (show collapsed in FIG. **1**). Bone **104***a* refers to the bone positioned directly beneath transfixation screw hole **102** (e.g., touching the bottom surface of transfixation screw hole **102**) while bone **104***b* refers to the bone positioned on the opposite side of joint **106**. Although bone **104***a* is illustrated and described as the first metatarsal, bone **104***b* is illustrated and described as the first proximal phalanx, and joint **106** is illustrated and described as the metatarso-phalangeal joint **106** of the big toe, one of ordinary skill in the art will appreciate those specific examples are presented for the sake of explanatory clarification and will further appreciate that bones **104** and joint **106** may generically refer to any suitable set of bones forming any suitable joint in the body.

In a typical procedure, a surgeon may use bone plate **100** to fuse joint **106** according to the following example surgical procedure. To begin the procedure, the surgeon may create an incision over joint **106** to expose bones **104**. After exposing bones **104**, the surgeon may perform any pre-fusion steps such as removing cartilage from joint **106** and reducing the opposing faces of bones **104** to a bleeding bone bed. Following the pre-fusion steps, the surgeon may

STRYKER Exhibit 1001
Page 8 of 13
IPR2021-01453

Appx458

US 10,245,085 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

approximate bones 104 by positioning them next to one in a desired configuration for fusion. The surgeon may then secure bones 104 together by placing bone plate 100 across joint 106 such that transfixation screw hole 102 overlies bone 104a. The surgeon may screw bone plate 100 to bones 104, for example by inserting one or more bone screws 134 into one or more screw holes located on either end of bone plate 100, after which, the surgeon may create a path for transfixation screw 150. To create a path for transfixation screw 150, the surgeon may drill a pilot hole into bones 104 through transfixation screw hole 102. In particular embodiments, the surgeon may use the central axis 116 of transfixation screw hole 102 as a guide to establish the trajectory for the pilot hole. Once the pilot hole has been created, transfixation screw 150 may be inserted into the pilot hole through transfixation screw hole 102 and screwed into bones 104 until the head of transfixation screw 150 abuts the inner surface of transfixation screw hole 102. After bones 104 have been secured together using transfixation screw 150, the surgeon may close the incision, leaving bones 104 to fuse together.

To facilitate the process of aligning bones 104, bone plate 100 may include one or more joint-specific characteristics that may conform to the natural geometry of joint 106 or bones 104. For example, in the case of the metatarso-phalangeal joint, bone plate 100 may include a rise (similar to rise 210 in FIG. 4) that fits over the head on the dorsal section of metatarsal 104a. This may enable bone plate 100 to be seated firmly against the head of metatarsal 104a and provide a natural footing for bone plate 100 against metatarsal 104a. In other embodiments, the rise may be eliminated from bone plate 100 and the dorsal head of metatarsal 104a may be ground down to enable bone plate 100 to be laid flush against bones 104.

Depending upon design, bone plate 100 may further include a dorsiflexion angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural elevation of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a dorsiflexion angle between first end 126b and second end 126a may reduce the force on bone plate 100 during activities such as walking. Furthermore, bone plate 100 may include a valgus angle (of approximately 10 degrees) between the first end 126b of the plate and the second end 126a of the plate that mimics the natural lateral alignment of the first metatarsal 104a relative to the first proximal phalanx 104b. The inclusion of a valgus angle in bone plate 100 may further help to reduce the force on bone plate 100 during activities such as walking. In particular embodiments, to provide lateral support for joint 106, the ends of plate 100 may be may be curved around the medial side of bones 104. One of ordinary skill in the art will appreciate that above-described characteristics of bone plate 100 were described with respect to the metatarso-phalangeal joint for the sake of explanatory simplicity and will further appreciate that particular embodiments of bone plate 100 may be adapted equally as well to approximate the natural geometry of virtually any joint 106 in the body without departing from the scope of the present disclosure.

As mentioned above, transfixation screw 150, once inserted across joint 106, may absorb a portion of the stress that would otherwise be exerted on the portion of bone plate 100 spanning across joint 106 when a load is placed upon joint 106. For example, in the case of the metatarso-phalangeal joint 106, activities that place weight on the foot, such as walking or standing, may cause metatarso-phalangeal joint 106 to flex. Due to the biomechanics of the foot, when the metatarso-phalangeal joint 106 flexes, the upper or "dorsal" side of joint 106 will compress together, while the bottom or "plantar" side of joint 106 will draw apart under tension. This is generally true for any hinge-type joint. The line about which the force on joint 106 transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106. In other words, neutral bending axis 118 defines the boundary line that separates the tension side of joint 106 from the compression side of joint 106.

When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 (as show in FIG. 2), a "tension band" construct is created that puts transfixation screw 150 under tension when joint 106 flexes. Normally, the plantar side of bone 104a (e.g., the portion of bone 104a on the tension side of joint 106) will draw away from the plantar side of bone 104b when a load is applied to joint 106. However, when transfixation screw 150 is screwed across joint 106 such that the head 152 of transfixation screw 150 abuts the inner surface of transfixation screw hole 102, the portion of transfixation screw 150 engaged with bone 104b will pull against the head 152 of transfixation screw 150 when a load is applied to joint 106. Since the head of transfixation screw 150 is braced against the inner surface of transfixation screw hole 102, it will absorb the tension forces transmitted up the shaft of transfixation screw 150, preventing the plantar side of bone 104b from drawing away from the plantar side of bone 104a.

In particular embodiments, the interface between bone 104a and transfixation screw 150 may provide another mechanism for absorbing the tension forces transmitted up the shaft of transfixation screw 150. For example, if transfixation screw 150 is threadably engaged with bone 104a, the threading on transfixation screw 150 may provide a footing against bone 104a which may also absorb a portion of the tension forces transmitted up the shaft of transfixation screw 150 from bone 104b when a load is applied to joint 106. In either case, once transfixation screw 150 has been screwed into joint 106 along a trajectory that crosses the neutral bending axis 118 of joint 106, a tension band construct may be created that enables transfixation screw 150 to absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106.

In particular embodiments, transfixation screw hole 102 may be used to establish the trajectory for transfixation screw 150. For example, bone plate 100 may be configured such that, once bones 104 have been approximated and bone plate 100 has been placed across joint 106, the central axis 116 of transfixation screw hole 102 may align along a trajectory that crosses the neutral bending axis 118 of joint 106. For example, the central axis 116 of transfixation screw hole 102 may be configured to pass through joint 106 at a transfixation angle 114 of about 30 degrees to about 70 degrees relative to neutral bending axis 118 to achieve the desired tension band construct once bone plate 100 is secured across joint 106. In one example embodiment, central axis 116 may be configured to pass through joint 106 at a transfixation angle 114 of about 50 degrees. Consequently, by drilling a pilot hole along central axis 116, a surgeon may create a path for transfixation screw 150 that spans from a first position 120 on bone 104a located on the compression side of joint 106 to a second position 122 on bone 104b located on the tension side of joint 106, creating the desired tension band construct for transfixation screw 150. Alternatively, a surgeon may forgo drilling a pilot hole and may instead use a transfixation screw 150 having a self

STRYKER Exhibit 1001
Page 9 of 13
IPR2021-01453

Appx459

US 10,245,085 B2

7 8

drilling feature. In that case, the surgeon could achieve a tension band construct by screwing the transfixation screw 150 directly into joint 106 along the trajectory of central axis 116.

Transfixation screw 150 may be any component of hardware having a head 152 configured to abut the surface of bone plate 100 and a shaft 154 operable to secure bones 104 together in a fixed configuration. For example, transfixation screw 150 may be a nut and bolt assembly, a pin assembly, or a bone screw. As another example and not by way of limitation, transfixation screw 150 may be a lag screw that includes a head 152 coupled to a shaft 154 having an unthreaded portion 156 and a threaded portion 158 that ends at a tip 156. Once transfixation screw 150 is screwed into bones 104 through transfixation screw hole 102, this configuration of transfixation screw 150 may result in a lag effect that may tighten the interface between bones 104 when transfixation 150 is rotated. In particular embodiments, the length of shaft 154 may be less than the length of the portion of central axis 116 that passes through bones 104 in order to keep tip 156 from protruding out of bone 104b (e.g., out of the plantar aspect of first proximal phalanx 104b) when transfixation screw 150 screwed into bones 104.

To achieve a lag effect, a surgeon, after affixing bone plate 100 across joint 106 and drilling a pilot hole for transfixation screw 150 as described above, may screw transfixation screw 150 into joint 106 until unthreaded portion 156 extends completely through bone 104a and threaded portion 158 threadably engages bone 104b. At this point, further rotation of transfixation screw 150 may cause threaded portion 158 to advance further into bone 104b, causing bone 104b to ride up further onto shaft 154 and press against bone 104a while unthreaded portion 156 spins freely within bone 104a. Transfixation screw 150 may be further rotated under these conditions until head 152 comes to bear on the inner surface of transfixation screw hole 102, cinching bone 104a between the bottom surface of bone plate 100 and bone 104b. This may create a tight interface between bones 104, increasing the chance of a positive fusion. In another example procedure, a lag effect may be achieved by drilling a pilot hole in bone 104a that is larger in diameter than shaft 154. This may enable transfixation screw 150 to spin freely within bone 104a to achieve the desired lag effect, even if the entirety of shaft 154 is threaded.

FIG. 3 illustrates an external view of the top surface of bone plate 100. In particular embodiments, bone plate 100 may be characterized by a substantially thin construction that generally includes an elongate spine 124 having a first end 126a that includes at least one attachment point 128 for attaching first end 126a to bone 104a; a second end 126b comprising at least one attachment point 128 for attaching second end 126b to bone 104b; and a bridge portion 130 disposed between ends 126 configured to span across joint 106. Bone plate 100 may further include a transfixation screw hole 102, and a compression hole 132 which may be used to cinch bones 104 together using a bone screw 134.

Each attachment point 128 may be any mechanism or fixture operable to serve as a rigid point of attachment between bone plate 100 and a bone 104. As one example and not by way of limitation, an attachment point 128 may be an unthreaded screw hole in bone plate 100 configured to accept a bone screw 134. As another example and not by way of limitation, an attachment point 128 may be a threaded screw hole that provides a locking interface between bone screw 134 and bone plate 100. To accomplish this locking interface, the underside of the head of screw 134 may include threads that interfere with the threading on the inside of the threaded screw hole to lock bone screw 134 into bone plate 100. Consequently, once bone screw 134 is screwed into bone 104 through the threaded screw hole, bone screw 134 may be prevented from loosening or backing out of bone 104. An example system for providing a locking interface between a screw hole and a screw is presented in U.S. Provisional Application No. 61/106,511, entitled, "Angulated Locking Plate/Screw Interface." In particular embodiments, the inner surface of transfixation screw hole 102 may also be threaded to provide a locking interface between transfixation screw 150 and bone plate 100. In this case, the head of transfixation screw 150 may also be threaded.

As another example and not by way of limitation, an attachment point 128 may be any type of clip or clamp included on bone plate 100 operable to rigidly affix bone plate 100 to a bone. One of ordinary skill in the art will appreciate that the above-described embodiments of attachment points 128 were presented for the sake of explanatory clarification and will further appreciate that the present disclosure contemplates each attachment point 128 being any suitable mechanism or fixture operable to serve as a rigid point of attachment between bone plate 100 and bone 104.

Spine 124 may generally define the central portion of bone plate 100 spanning along the length of bone plate 100. As an example and not by way of limitation, spine 124 may include a contiguous linear or curvilinear section of bone plate 100 spanning from the tip of first end 126a to the tip of second end 126b. As mentioned above, spine 124 includes a bridge portion 130 configured to span across joint 106. Since bridge portion 130 is configured to span across joint 106, it is typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130. Depending upon design, bridge portion 130 may include a thickened section 136 of bone plate 100 to increase the bending strength of bridge portion 130. This may lessen the risk of bridge portion 130 bending or breaking above joint 106 when a load is applied to joint 106.

In particular embodiments, thickened section 136 may be defined by a thickened ridge of material in bone plate 100 having its greatest thickness along bridge portion 130 and gradually decreasing in thickness as one moves away from bridge portion 130 along the length of bone plate 100 toward ends 126. The increased material thickness may provide central section 130 with a higher section modulus than the proximal and distal areas of the plate located at ends 126. In a typical design, thickened section 136 may be about 100% to 200% thicker than the adjacent portions of bone plate 100. Including thickened section 136 in bone plate 100 may confer a number of advantages over plates of uniform thickness, one of which is the ability to efficiently increase the section modulus (and strength) of bridge portion 130 without adding material thickness to the entirety of bone plate 100.

Transfixation screw hole 102 may be defined by an inner surface of bone plate 100 surrounding a generally circular opening in bone plate 100. As an example and not by way of limitation, transfixation screw hole 102 may be disposed along the center line 138 of spine 124, immediately adjacent to bridge portion 130. In the case of a bone plate 100 designed for use on the first metatarso-phalangeal joint, the placement of transfixation screw hole 102 adjacent to bridge portion 130 may enable transfixation screw 102 to penetrate the first metatarsal 104a on the dorsal aspect of the meta-

STRYKER Exhibit 1001
Page 10 of 13
IPR2021-01453

US 10,245,085 B2

9                                                                10

tarsal head and pass into the plantar cortex of the first medial phalanx 104*b*, transfixing the metatarso-phalangeal joint 106.

In particular embodiments, the portion of bone plate 100 that includes transfixation screw hole 102 may be thicker than other portions of bone plate 100. For example, transfixation screw hole 102 may be included in thickened section 136, adjacent to bridge portion 130. This may enable a countersink to be created around transfixation screw hole 102 so that the head 152 of transfixation screw 150 may rest flush with the top surface of bone plate 100 once transfixation screw 150 is screwed into transfixation screw hole 102. The increased plate thickness around transfixation screw hole 102 may also enable transfixation screw hole 102 to be machined into bone plate 100 at an angle relative to the top surface of bone plate 100 (e.g., other than perpendicular to the top surface of bone plate 100).

As mentioned above, in particular embodiments, bone plate 100 may include a compression hole 132 for tightening bones 104 together using a bone screw 134. Compression hole 132 may be defined by an inner surface of bone plate 100 surrounding a generally oblong opening in bone plate 100. More particularly, the inner surface of compression hole 132 may have a narrow end 131*a*, and a wide end 131*b* that includes a horse-shoe-shaped countersink 133. To compress bones 104 together using compression hole 132, a surgeon may use the following example procedure. The surgeon may begin by attaching the second end 126*b* of bone plate 100 to bone 104*b* using the attachment points 128 located on end 126*b*. The surgeon may then manually approximate bone 104*a* against bone 104*b*, placing bone 104*a* under compression hole 132. While holding bone 104*a* against the bottom surface of compression hole 132, either by hand or using a clamp, the surgeon may drill a pilot hole for bone screw 134 into bone 104*a*. The trajectory of the pilot hole may be generally perpendicular to the top surface of bone plate 100 and be located approximately in the center of narrow end 131*a* (e.g., located at the focus of narrow end 131*a*).

After creating the pilot hole, the surgeon may then screw bone screw 134 into the pilot hole until the head of bone screw 134 comes into contact with countersink 133 near the tips 135 of countersink 133. To facilitate the compression feature, the underside of the head of bone screw 134 may be generally conical, having a taper angle approximately equal to the taper angle of countersink 133. Once the head of bone screw 135 is in contact with counter sink 133 near tips 135, further rotation of bone screw 135 may cause the head of bone screw 134 to ride down into countersink 133, drawing bone plate 100 further up onto bone 104*a* and causing bones 104 to press together at the interface of joint 106. After approximating bones 104 by screwing bone screw 134 into compression hole 132 as just described, the surgeon may use other attachment points 128 to further secure bone plate 100 to bone 104*a*. The surgeon may also screw transfixation screw 150 into joint 106 through transfixation screw hole 102 after tightening bones 104 together using compression hole 132. Depending upon design, compression hole 132 may be threaded to provide a locking interface for bone screw 134.

In particular embodiments, bone plate 100 may comprise one or more positioning holes 140 that may be used to position bone plate 100 relative to the bones 104 of joint 106. To position bone plate 100 using a positioning hole 140, a surgeon may insert a K-wire into one of the bones 104, after which the surgeon may position bone plate 100 on bone 104 by inserting the K-wire through positioning hole 140

and sliding bone plate 100 down onto bone 104. Additionally, the surgeon may rotate bone plate 100 about the K-wire using positioning hole 140 to achieve a desired orientation of bone plate 100 relative to bone 104. To ensure that bone plate 100 may be precisely positioned on bone 104 using a K-wire, the diameter of positioning hole 140 may be approximately equal to the diameter of the K-wire. Once bone plate 100 has been properly positioned, the surgeon may secure bone plate 100 to bone 104, temporarily for example, by inserting another K-wire into another one of positioning holes 140, or more permanently, using attachment points 128.

In particular embodiments, the bottom surface of bone plate 100 may include one or more contact reduction features 146 which may reduce the amount of surface area of bone plate 100 that contacts bones 104 when bone plate 100 is secured across joint 106. As an example and not by way of limitation, the bottom surface of bone plate 100 may include one or more channels, notches, or other recessions which may reduce (e.g., minimize) the amount of bone plate 100 that contacts bones 104. This may lessen the amount of vascular impingement caused by bone plate 100, promoting blood flow to bones 104 and bone growth. In particular embodiments, each of the screw holes in bone plate 100 (e.g., attachment points 128, compression hole 132, or transfixation screw hole 102) may include a countersink capable of seating the head of a screw flush with the top surface of bone plate 100. This feature may provide several benefits such as lessening the chance of uncomfortable impingement on the surrounding soft tissue, and reducing patient palpation and visualization of bone plate 100.

In particular embodiments, bone plate 100 may further include flared hips 148 adjacent to transfixation screw hole 102. Flared hips may generally be defined by a widened section of bone plate 100. As an example and not by way of limitation, flared hips 148 may include two generally parabolic wings extending laterally from spine 124, symmetrically opposed to one another about transfixation screw hole 102. As will be appreciated by one of skill in the art, the entry point for transfixation screw 150 into bone 104*a* may be generally be located at the center of the bottom side of transfixation screw hole 102 when transfixation screw is inserted into transfixation screw hole 102 along central axis 116. Consequently, in embodiments where transfixation screw hole 102 is formed into bone plate 100 at an angle, the entry point for transfixation screw 150 may be out of sight (e.g., covered up by the top of transfixation screw hole 102) when bone plate 100 is viewed from above. Therefore, to help a surgeon precisely position the entry point for transfixation screw 150 onto a desired location on bone 104*a*, the entry point for transfixation screw 150 (e.g., the center of the bottom side of transfixation screw hole 102) may reside directly in between the widest portion of flared hips 148. Accordingly, by positioning the widest portion of hips 148 directly adjacent to the desired location for transfixation screw 150 on bone 104*a*, the surgeon may confidently position the entry point for transfixation screw 150 at the desired location, even when the entry point is out of sight. Flared hips 148 may also increase the strength of bone plate 100 around transfixation screw hole 102, lessening the chance of plate deformation or breakage.

Depending upon design, bone plate 100 may be formed from any material or combination of materials suitable for forming medical implants. Such materials may have high strength-to-weight ratios and may be inert to human body fluids. As an example and not by way of limitation, bone plate 100 may be formed from a forged titanium alloy.

STRYKER Exhibit 1001
Page 11 of 13
IPR2021-01453

Appx461

US 10,245,085 B2

11

Titanium may provide several benefits as a material for bone plate 100 such as being relatively lightweight, providing adequate strength for withstanding forces typically experienced by a bone plate, and being visible in radiographs of the implant region.

FIG. 4 illustrates an example embodiment of a bone plate 200 adapted for use in a Lapidus procedure where bone plate 200 may be secured across the first tarso-metatarsal (TMT) joint 206, located between the first metatarsal 204a and the first cuneiform 204b. Though bone plate 200 is adapted for placement over the TMT joint, particular embodiments of bone plate 200 may include some or all of the features of bone plate 100 described above, appropriately adapted to conform to the TMT joint 206. For example, when used on TMT joint 206, transfixation screw hole 202 may be configured to guide a transfixation screw 250 from the dorsal aspect of metatarsal 204a to the plantar aspect of first cuneiform 204b in order to transfix TMT joint 206. Likewise, bone plate 100 may include some or all of the features described with respect to bone plate 200, appropriately adapted to conform to the MPJ joint 106. For reference purposes, like numbers may be used to refer to like features between bone plate 100 and bone plate 200.

Bone plate 200 may generally be "H-shaped", and include an elongate spine 224 having a plurality of flanges 242 extending laterally therefrom. Each flange 242 may further include one or more attachment points 228 (similar or identical to attachment points 128 described above) for attaching bone plate 200 to a bone 204. Flanges 242 may serve as a primary mechanism for attaching bone plate 200 to bones 204, although particular embodiments of bone plate 200 may further include one or more additional attachment points 228 disposed along spine 224 for attaching bone plate 200 to bones 204.

Each flange 242 may be any type of rigid lateral extension from spine 224. As an example and not by way of limitation, each flange 242 may be a rigid rounded tab extending laterally from the side of the spine 224. Depending upon design, each flange 242 may be separated from the next by a gap 244, which may enable a surgeon to independently contour each flange 242 to a desired position (e.g., to conform flanges 242 to match the geometry of bones 204). Furthermore, each flange 242 may be relatively thinner than spine 224 to reduce the mechanical force needed to contour flanges 242 up or down relative to spine 224. This thinning of flanges 242 may confer a number of advantages over plates having uniform thickness, such as for example, providing a surgeon with the ability to easily contour flanges 242 to a desired position. In particular embodiments, flanges 242 may enable a surgeon to contour bone plate 200 such that attachments points 242 are located on both the medial and dorsal aspects of bones 204. Once a flange 242 has been contoured to a desired position, it may be affixed to bone 204 using an attachment point 228.

To facilitate the process of aligning bones 204, bone plate 200 may include one or more features which mimic the natural geometry of the TMT joint 206. For example, bone plate 200 may include a rise 210 of approximately 0 mm to 5 mm (e.g., 2 mm) that mimics the natural elevation of the first metatarsal 204a relative to the first cuneiform 204b. As another example and not by way of limitation, bone plate 200 may include a varus angle of about 0 degrees to about 30 degrees (e.g., 15 degrees) between the first end 226a of the plate and the second end 226b of the plate that mimics the natural elevation of first metatarsal 204a relative to first cuneiform 204b. In particular embodiments, bone plate 200 may be symmetric about center line 238 to enable bone plate

12

200 to be applied to either the left foot or the right foot, without substantial modification.

The particular embodiments disclosed above are illustrative only, as particular embodiments of the present disclosure may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular illustrative embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the present disclosure. In particular, every range of values (e.g., "from about a to about b," or, equivalently, "from approximately a to b," or, equivalently, "from approximately a-b") disclosed herein is to be understood as referring to the power set (the set of all subsets) of the respective range of values. The terms in the claims have their plain, ordinary meaning unless otherwise explicitly and clearly defined by the patentee.

Although the present disclosure has been described in several embodiments, a myriad of changes, substitutions, and modifications may be suggested to one skilled in the art, and it is intended that the present disclosure encompass such changes, substitutions, and modifications as fall within the scope of the present appended claims.

What is claimed is:

1. A system for securing a first discrete bone and a second discrete bone together across a joint between the first discrete bone and the second discrete bone, the system comprising:

a plate comprising:

an elongate spine having a first end comprising at least one attachment point for attaching the first end to the first discrete bone on a first side of the joint, a second end comprising at least one attachment point for attaching the second end to the second discrete bone on a second side of the joint, and a bridge portion disposed between the first end and the second end, the bridge portion having a portion configured to span across the joint, the bridge portion further comprising a thickened portion having a thickness greater than at least a portion of a thickness of either the first end or the second end; and

an aperture defining a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends at a trajectory configured to pass through a first position on the first discrete bone and a second position on the second discrete bone once the plate is placed across the joint.

2. The system of claim 1, further comprising a transfixation screw, said transfixation screw comprising a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, across the joint, and into the second discrete bone.

3. The system of claim 2, wherein the transfixation screw comprises a lag screw having:

at a first end of the shaft adjacent to the head, an unthreaded portion configured to extend through the first discrete bone; and

at a second end of the shaft adjacent to a tip of the transfixation screw, a threaded portion configured to extend into the second discrete bone.

STRYKER Exhibit 1001
Page 12 of 13
IPR2021-01453

Appx462

US 10,245,085 B2

13

14

4. The system of claim 1, wherein the inner surface of the transfixation screw hole is configured to lockably engage a head of a transfixation screw.

5. The system of claim 4, wherein the inner surface of the transfixation screw hole is threaded to provide a locking interface with a transfixation screw.

6. The system of claim 1, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

7. The system of claim 1 wherein the plate is configured to substantially conform to a geometry of the respective first and second discrete bones on which the plate is configured to be disposed.

8. The system of claim 1, wherein:
a central axis of the inner surface of the transfixation screw hole defines the trajectory; and
the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

9. The system of claim 8 wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis.

* * * * *

STRYKER Exhibit 1001
Page 13 of 13
IPR2021-01453

**Appx463**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>July 3, 2023</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**
_____

**Case IPR2021-01450**
**U. S. Patent 8,529,608 B2**
_____

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Prosecution History for IPR2021-01450**

| Date | Document |
|------|----------|
| 08/30/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 8,529,608 |
| 08/30/2021 | Petitioners' Power of Attorney |
| 09/14/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 09/20/2021 | Patent Owner's Mandatory Notices |
| 12/14/2021 | Patent Owner's Preliminary Response |
| 03/11/2022 | Decision - Institution of *Inter Partes* Review |
| 03/11/2022 | Scheduling Order |
| 03/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/05/2022 | Patent Owner's Amended Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/06/2022 | Patent Owner's Updated Mandatory Notices |
| 04/15/2022 | Petitioners' Motion to Submit Supplemental Information |
| 04/15/2022 | Petitioners' Submission of Proposed Supplemental Information |
| 04/25/2022 | Patent Owner's Response to Petitioners' Motion to Submit Supplemental Information |
| 05/03/2022 | Patent Owner's Power of Attorney |
| 05/03/2022 | Patent Owner's Updated Mandatory Notices |
| 05/03/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/03/2022 | Petitioners' Reply in Support of Motion to Submit Supplemental Information |
| 05/06/2022 | Patent Owner's Sur-Reply to Petitioners' Motion to Submit Supplemental Information |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/13/2022 | Order Granting Petitioners' Motion to Submit Supplemental Information |
| 06/06/2022 | Notice of Stipulation to Modify Due Date 1, Due Date 2, and Due Date 3 |
| 06/07/2022 | Panel Change Order |
| 06/17/2022 | Patent Owner's Response |
| 06/24/2022 | Petitioners' Objections to Patent Owner's Evidence |
| 07/26/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |

1

| Date | Document |
|------|----------|
| 09/19/2022 | Petitioners' Reply |
| 09/26/2022 | Patent Owner's Objections to Evidence Filed with Petitioner's Reply |
| 10/11/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 10/11/2022 | Patent Owner's Notice of Deposition of Dr. George B. Holmes, Jr., M.D., FAAOS |
| 10/11/2022 | Notice of Stipulation to Modify Due Date 3 |
| 11/02/2022 | Petitioners' Request for Oral Argument |
| 11/02/2022 | Patent Owner's Sur-Reply |
| 11/02/2022 | Patent Owner's Request for Oral Argument |
| 11/09/2022 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 11/17/2022 | Order Setting Oral Argument |
| 12/12/2022 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 12/14/2022 | Petitioners' Updated Exhibit List |
| 12/14/2022 | Patent Owner's Updated Exhibit List |
| 12/14/2022 | Patent Owner's Objections to Petitioners' Oral Argument Demonstratives Slides |
| 12/14/2022 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 01/27/2023 | Oral Hearing Transcript |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |
| 03/07/2023 | Order Denying Patent Owner's Motion to Submit Supplemental Information |
| 03/08/2023 | Final Written Decision |
| 05/09/2023 | Petitioners' Notice of Appeal |

2

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**July 3, 2023**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**

———————

**Case IPR2021-01451**
**U. S. Patent 9,351,776 B2**

———————

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Huyen H. Nguyen*
*Certifying Officer*



**Prosecution History for IPR2021-01451**

| Date | Document |
|------|----------|
| 08/30/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 9,351,776 |
| 08/30/2021 | Petitioners' Power of Attorney |
| 09/14/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 09/20/2021 | Patent Owner's Mandatory Notices |
| 12/14/2021 | Patent Owner's Preliminary Response |
| 03/11/2022 | Decision - Institution of *Inter Partes* Review |
| 03/11/2022 | Scheduling Order |
| 03/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/05/2022 | Patent Owner's Amended Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/06/2022 | Patent Owner's Updated Mandatory Notices |
| 04/15/2022 | Petitioners' Motion to Submit Supplemental Information |
| 04/15/2022 | Petitioners' Submission of Proposed Supplemental Information |
| 04/25/2022 | Patent Owner's Response to Petitioners' Motion to Submit Supplemental Information |
| 05/03/2022 | Patent Owner's Power of Attorney |
| 05/03/2022 | Patent Owner's Updated Mandatory Notices |
| 05/03/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/03/2022 | Petitioners' Reply in Support of Motion to Submit Supplemental Information |
| 05/06/2022 | Patent Owner's Sur-Reply to Petitioners' Motion to Submit Supplemental Information |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/13/2022 | Order Granting Petitioners' Motion to Submit Supplemental Information |
| 06/06/2022 | Notice of Stipulation to Modify Due Date 1, Due Date 2, and Due Date 3 |
| 06/07/2022 | Panel Change Order |
| 06/17/2022 | Patent Owner's Response |
| 06/24/2022 | Petitioners' Objections to Patent Owner's Evidence |
| 07/26/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |

1

**Appx468**

| Date | Document |
|------|----------|
| 09/19/2022 | Petitioners' Reply |
| 09/26/2022 | Patent Owner's Objections to Evidence Filed with Petitioner's Reply |
| 10/11/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 10/11/2022 | Patent Owner's Notice of Deposition of Dr. George B. Holmes, Jr., M.D., FAAOS |
| 10/11/2022 | Notice of Stipulation to Modify Due Date 3 |
| 11/02/2022 | Petitioners' Request for Oral Argument |
| 11/02/2022 | Patent Owner's Sur-Reply |
| 11/02/2022 | Patent Owner's Request for Oral Argument |
| 11/09/2022 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 11/17/2022 | Order Setting Oral Argument |
| 12/12/2022 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 12/14/2022 | Petitioners' Updated Exhibit List |
| 12/14/2022 | Patent Owner's Updated Exhibit List |
| 12/14/2022 | Patent Owner's Objections to Petitioners' Oral Argument Demonstratives Slides |
| 12/14/2022 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 01/27/2023 | Oral Hearing Transcript |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |
| 03/07/2023 | Order Denying Patent Owner's Motion to Submit Supplemental Information |
| 03/08/2023 | Final Written Decision |
| 05/09/2023 | Petitioners' Notice of Appeal |

2

**Appx469**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>**July 3, 2023**</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**

———————

**Case IPR2021-01452**
**U. S. Patent 9,763,716 B2**

———————

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**


*Huyen H. Nguyen*
*Certifying Officer*



**Prosecution History for IPR2021-01452**

| Date | Document |
|------|----------|
| 08/30/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 9,763,716 |
| 08/30/2021 | Petitioners' Power of Attorney |
| 09/20/2021 | Patent Owner's Mandatory Notices |
| 09/22/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/22/2021 | Patent Owner's Preliminary Response |
| 03/16/2022 | Decision - Institution of *Inter Partes* Review |
| 03/18/2022 | Scheduling Order |
| 03/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/05/2022 | Patent Owner's Amended Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/06/2022 | Patent Owner's Updated Mandatory Notices |
| 04/15/2022 | Petitioners' Motion to Submit Supplemental Information |
| 04/15/2022 | Petitioners' Submission of Proposed Supplemental Information |
| 04/25/2022 | Patent Owner's Response to Petitioners' Motion to Submit Supplemental Information |
| 05/03/2022 | Patent Owner's Power of Attorney |
| 05/03/2022 | Patent Owner's Updated Mandatory Notices |
| 05/03/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/03/2022 | Petitioners' Reply in Support of Motion to Submit Supplemental Information |
| 05/06/2022 | Patent Owner's Sur-Reply to Petitioners' Motion to Submit Supplemental Information |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/13/2022 | Order Granting Petitioners' Motion to Submit Supplemental Information |
| 06/06/2022 | Notice of Stipulation to Modify Due Date 1, Due Date 2, and Due Date 3 |
| 06/07/2022 | Panel Change Order |
| 06/17/2022 | Patent Owner's Response |
| 06/24/2022 | Petitioners' Objections to Patent Owner's Evidence |
| 07/26/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |

1

**Appx471**

| Date | Document |
|------|----------|
| 09/19/2022 | Petitioners' Reply |
| 09/26/2022 | Patent Owner's Objections to Evidence Filed with Petitioner's Reply |
| 10/11/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 10/11/2022 | Patent Owner's Notice of Deposition of Dr. George B. Holmes, Jr., M.D., FAAOS |
| 10/11/2022 | Notice of Stipulation to Modify Due Date 3 |
| 11/02/2022 | Petitioners' Request for Oral Argument |
| 11/02/2022 | Patent Owner's Sur-Reply |
| 11/02/2022 | Patent Owner's Request for Oral Argument |
| 11/09/2022 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 11/17/2022 | Order Setting Oral Argument |
| 12/12/2022 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 12/14/2022 | Petitioners' Updated Exhibit List |
| 12/14/2022 | Patent Owner's Updated Exhibit List |
| 12/14/2022 | Patent Owner's Objections to Petitioners' Oral Argument Demonstratives Slides |
| 12/14/2022 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 01/27/2023 | Oral Hearing Transcript |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |
| 03/07/2023 | Order Denying Patent Owner's Motion to Submit Supplemental Information |
| 03/14/2023 | Final Written Decision |
| 05/09/2023 | Petitioners' Notice of Appeal |

2

**Appx472**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>**July 3, 2023**</u>
<small>(Date)</small>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**

———————

**Case IPR2021-01453**
**U. S. Patent 10,245,085 B2**

———————

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Huyen H. Nguyen*
*Certifying Officer*



**Prosecution History for IPR2021-01453**

| Date | Document |
|------|----------|
| 08/30/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,245,085 |
| 08/30/2021 | Petitioners' Power of Attorney |
| 09/20/2021 | Patent Owner's Mandatory Notices |
| 09/22/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/22/2021 | Patent Owner's Preliminary Response |
| 03/17/2022 | Decision - Institution of *Inter Partes* Review |
| 03/18/2022 | Scheduling Order |
| 03/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/05/2022 | Patent Owner's Amended Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 04/06/2022 | Patent Owner's Updated Mandatory Notices |
| 04/15/2022 | Petitioners' Motion to Submit Supplemental Information |
| 04/15/2022 | Petitioners' Submission of Proposed Supplemental Information |
| 04/25/2022 | Patent Owner's Response to Petitioners' Motion to Submit Supplemental Information |
| 05/03/2022 | Patent Owner's Power of Attorney |
| 05/03/2022 | Patent Owner's Updated Mandatory Notices |
| 05/03/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/03/2022 | Petitioners' Reply in Support of Motion to Submit Supplemental Information |
| 05/06/2022 | Patent Owner's Sur-Reply to Petitioners' Motion to Submit Supplemental Information |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/13/2022 | Order Granting Petitioners' Motion to Submit Supplemental Information |
| 06/06/2022 | Notice of Stipulation to Modify Due Date 1, Due Date 2, and Due Date 3 |
| 06/07/2022 | Panel Change Order |
| 06/17/2022 | Patent Owner's Response |
| 06/24/2022 | Petitioners' Objections to Patent Owner's Evidence |
| 07/26/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |

1

**Appx474**

| Date | Document |
|------|----------|
| 09/19/2022 | Petitioners' Reply |
| 09/26/2022 | Patent Owner's Objections to Evidence Filed with Petitioner's Reply |
| 10/11/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 10/11/2022 | Patent Owner's Notice of Deposition of Dr. George B. Holmes, Jr., M.D., FAAOS |
| 10/11/2022 | Notice of Stipulation to Modify Due Date 3 |
| 11/02/2022 | Petitioners' Request for Oral Argument |
| 11/02/2022 | Patent Owner's Sur-Reply |
| 11/02/2022 | Patent Owner's Request for Oral Argument |
| 11/09/2022 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 11/17/2022 | Order Setting Oral Argument |
| 12/12/2022 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 12/14/2022 | Petitioners' Updated Exhibit List |
| 12/14/2022 | Patent Owner's Updated Exhibit List |
| 12/14/2022 | Patent Owner's Objections to Petitioners' Oral Argument Demonstratives Slides |
| 12/14/2022 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 01/27/2023 | Oral Hearing Transcript |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |
| 03/07/2023 | Order Denying Patent Owner's Motion to Submit Supplemental Information |
| 03/15/2023 | Final Written Decision |
| 05/09/2023 | Petitioners' Notice of Appeal |
| 05/23/2023 | Patent Owner's Notice of Cross-Appeal |

**Appx475**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**July 24, 2023**
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**
————————

**Case IPR2022-00189**
**U. S. Patent 8,529,608 B2**
————————

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**


*Certifying Officer*



**Appx476**

**Prosecution History for IPR2022-00189**

| Date | Document |
|------|----------|
| 11/17/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 8,529,608 |
| 11/17/2021 | Petitioner's Power of Attorney |
| 12/07/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response (EXPUNGED) |
| 12/07/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/08/2021 | Patent Owner's Mandatory Notices |
| 03/07/2022 | Patent Owner's Preliminary Response |
| 05/04/2022 | Patent Owner's Power of Attorney |
| 05/04/2022 | Patent Owner's Updated Mandatory Notices |
| 05/04/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 06/01/2022 | Decision - Institution of *Inter Partes* Review |
| 06/01/2022 | Scheduling Order |
| 06/07/2022 | Panel Change Order |
| 07/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |
| 08/24/2022 | Notice of Stipulation to Modify Due Dates 1-3 |
| 08/31/2022 | Patent Owner's Response |
| 10/18/2022 | Notice of Stipulation to Modify Due Dates 2-3 |
| 10/27/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 12/09/2022 | Petitioners' Reply |
| 01/18/2023 | Petitioners' Request for Oral Argument |
| 01/18/2023 | Patent Owner's Request for Oral Argument |
| 01/24/2023 | Patent Owner's Sur-Reply |
| 01/31/2023 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |

| Date | Document |
|------|----------|
| 02/21/2023 | Order Setting Oral Argument |
| 02/23/2023 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 02/28/2023 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 02/28/2023 | Patent Owner's Updated Exhibit List |
| 02/28/2023 | Patent Owner's Objections to Petitioners' Demonstrative Slides |
| 03/01/2023 | Petitioners' Updated Exhibit List |
| 05/09/2023 | Oral Hearing Transcript |
| 05/30/2023 | Final Written Decision |
| 06/05/2023 | Notice of Appeal |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**July 24, 2023**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**

_____

**Case IPR2022-00190**
**U. S. Patent 9,351,776 B2**

_____

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Prosecution History for IPR2022-00190**

| Date | Document |
|------|----------|
| 11/17/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 9,351,776 |
| 11/17/2021 | Petitioner's Power of Attorney |
| 12/07/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/08/2021 | Patent Owner's Mandatory Notices |
| 03/07/2022 | Patent Owner's Preliminary Response |
| 05/04/2022 | Patent Owner's Power of Attorney |
| 05/04/2022 | Patent Owner's Updated Mandatory Notices |
| 05/04/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 06/01/2022 | Decision - Institution of *Inter Partes* Review |
| 06/01/2022 | Scheduling Order |
| 06/07/2022 | Panel Change Order |
| 07/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |
| 08/24/2022 | Notice of Stipulation to Modify Due Dates 1-3 |
| 08/31/2022 | Patent Owner's Response |
| 10/18/2022 | Notice of Stipulation to Modify Due Dates 2-3 |
| 10/27/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 12/09/2022 | Petitioners' Reply |
| 01/18/2023 | Petitioners' Request for Oral Argument |
| 01/18/2023 | Patent Owner's Request for Oral Argument |
| 01/24/2023 | Patent Owner's Sur-Reply |
| 01/31/2023 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |
| 02/21/2023 | Order Setting Oral Argument |

1

| Date | Document |
|------|----------|
| 02/23/2023 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 02/28/2023 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 02/28/2023 | Patent Owner's Updated Exhibit List |
| 02/28/2023 | Patent Owner's Objections to Petitioners' Demonstrative Slides |
| 03/01/2023 | Petitioners' Updated Exhibit List |
| 05/09/2023 | Oral Hearing Transcript |
| 05/30/2023 | Final Written Decision |
| 06/05/2023 | Notice of Appeal |

**Appx481**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**July 24, 2023**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**STRYKER CORPORATION and**
**WRIGHT MEDICAL TECHNOLOGY, INC.**
**Petitioner,**

**v.**

**OSTEOMED LLC,**
**Patent Owner.**

_____

**Case IPR2022-00191**
**U. S. Patent 9,763,716 B2**

_____

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**


*Certifying Officer*



**Prosecution History for IPR2022-00191**

| Date | Document |
|---|---|
| 11/17/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 9,763,716 |
| 11/17/2021 | Petitioner's Power of Attorney |
| 12/07/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/08/2021 | Patent Owner's Mandatory Notices |
| 03/07/2022 | Patent Owner's Preliminary Response |
| 05/04/2022 | Patent Owner's Power of Attorney |
| 05/04/2022 | Patent Owner's Updated Mandatory Notices |
| 05/04/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane (EXPUNGED) |
| 05/11/2022 | Order Granting Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Devon C. Beane |
| 06/01/2022 | Decision - Institution of *Inter Partes* Review |
| 06/01/2022 | Scheduling Order |
| 06/07/2022 | Panel Change Order |
| 07/28/2022 | Patent Owner's Notice of Deposition of Kenneth A. Gall, Ph.D. |
| 08/05/2022 | Petitioners' Updated Mandatory Notices |
| 08/24/2022 | Notice of Stipulation to Modify Due Dates 1-3 |
| 08/31/2022 | Patent Owner's Response |
| 10/18/2022 | Notice of Stipulation to Modify Due Dates 2-3 |
| 10/27/2022 | Petitioners' Notice of Deposition of Mark Sommers, MS |
| 12/09/2022 | Petitioners' Reply |
| 01/18/2023 | Petitioners' Request for Oral Argument |
| 01/18/2023 | Patent Owner's Request for Oral Argument |
| 01/24/2023 | Patent Owner's Sur-Reply |
| 01/31/2023 | Petitioners' Objections to Patent Owner's Evidence Submitted with Its Sur-Reply |
| 02/03/2023 | Patent Owner's Motion to Submit Supplemental Information |
| 02/10/2023 | Petitioners' Opposition to Patent Owner's Motion to Submit Supplemental Information |

| Date | Document |
|------|----------|
| 02/21/2023 | Order Setting Oral Argument |
| 02/23/2023 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 02/28/2023 | Petitioners' Objections to Patent Owner's Demonstrative Slides |
| 02/28/2023 | Patent Owner's Updated Exhibit List |
| 02/28/2023 | Patent Owner's Objections to Petitioners' Demonstrative Slides |
| 03/01/2023 | Petitioners' Updated Exhibit List |
| 05/09/2023 | Oral Hearing Transcript |
| 05/09/2023 | Oral Hearing Transcript |
| 05/30/2023 | Final Written Decision |
| 06/05/2023 | Notice of Appeal |

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

————————

Case IPR2021-01450

U.S. Patent No. 8,529,608

**PETITION FOR *INTER PARTES* REVIEW**

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

Slater is directed to an ankle fusion plate for arthrodesis. (EX1005, Abstract). "Arthrodesis" means "the surgical immobilization of a joint so that the bones grow solidly together." (EX1020, p. 51).

Figure 1 of Slater illustrates (1) a fusion plate 1 being used to secure three discrete bones (tibia 4, talus 3, and calcaneous 28) across two joints and (2) an alternate embodiment where fusion plate 1 is used to secure two discrete bones (tibia 4 and talus 2, within the oval annotated into Figure 1 immediately below) together across a single joint between the two bones. (EX1005, 12:3-4, 6:17-7:2, 8:13-28, 11:1-4, 12:3-10, 13:5-9, 14:1-8).



**b.    1.1: *"the plate comprises: an elongate spine having: a first end comprising…"***

As shown in Figures 1, 5, and 6, Slater discloses a bone plate comprising an elongate spine having a first end (proximal end of portion 30 (of plate 1) or proximal end of portion 95 (of plate 80)) comprising at least one fixation point (fixation points 35, 34, 33 or fixation points 98, 99) for attaching the first end (proximal end of portion 30 or proximal end of portion 95) to a first discrete bone (tibia 4) on a first

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

screw 25 passes through a first position on a first discrete bone (tibia 4) and a second

position on a second discrete bone (talus 3).  (EX1002, ¶113).



(EX1005, Figs. 1, 7).

### g.    1.6:  *"the transfixation screw comprises…"*

As shown in Figure 1, Slater includes a transfixation screw (25) comprising a

head configured to abut the inner surface of the transfixation screw hole

(unnumbered in Slater's drawings) and a shaft configured to contiguously extend

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

through the first discrete bone (tibia 4), through the joint (2), and into the second

discrete bone (talus 3). (EX1002, ¶114).



(EX1005, Fig. 1, 11:19-25, 13:21-24).

In Slater, when the fixation screw (25) advances through the opening (26) and

into the second discrete bone (talus 3), the second discrete bone (talus 3) is loaded

relative to the first discrete bone (tibia 4), and tensile load is transferred from the

second discrete bone (talus 3), through the screw (25) into the screw head (proximal

end of screw 25) and into the bridge portion (portions of 5 and 20 or portions of 81

and 90) of the plate. (EX1002, ¶114). This transfer occurs because the threads on

the screw and the portion of the screw head that abuts the inner surface of the screw

hole act essentially as a vise to the second bone and the plate, with the first bone held

in between. (EX1002, ¶114; EX1005, 12:32-13:3).

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

### 2.    Dependent Claims 2-5 and 9-10 are Anticipated by Slater

As discussed above, Slater anticipates independent claim 1.  For the reasons

set forth below, Slater also anticipates dependent claims 2-5 and 9-10.

### a.    Dependent Claim 2

Slater discloses that the central axis of the inner surface of the transfixation

screw hole (26 or 93) defines a trajectory configured to cross a neutral bending axis

of the joint once the plate is placed across the joint.  (EX1002, ¶¶115-120).

The term "neutral bending axis" is defined by the 608 patent as "[t]he line

about which the force on joint 106 transitions from tension to compression….In

other words, neutral bending axis 118 defines the boundary line that separates the

tension side of joint 106 from the compression side of joint 106."  (EX1001, 5:47-

52).  Figure 2 of the 608 patent illustrates neutral bending axis 118 in connection

with the metatarsophalangeal joint. (EX1001, Fig. 2).



A POSITA would understand that "the neutral bending axis" of a given joint

would fall approximately down the center of the adjacent bones, for each bone,

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

depending on the cortical thickness on opposing surfaces. (EX1002, ¶¶117-118). In

Slater, the axis of the bone plate approximates the direction of the neutral bending

axis of the joint between the tibia 4 and talus 3. (*Id.*).

In Figure 9, Slater discloses a central axis of
the transfixation screw hole (26 or 93) that defines
a trajectory and even identifies an angle associated
with that trajectory relative to the axis of the bone
plate. (EX1002, ¶119; EX1005, Fig. 9).



Similarly, as shown in Figure 1, when the
Slater plate is placed across the joint, the trajectory
defined by the central axis of the inner surface of
the transfixation hole crosses the neutral bending axis of the joint. (EX1002, ¶120).



(EX1005, Fig. 1; 11:19-27, 12:3-4, 12:32-13:3, 13:20-25).

### b.    Dependent Claim 3

Slater discloses that the first position resides on a compression side of the joint and the second position resides on a tension side of the joint. (EX1002, ¶¶121-127).

As discussed above, the "neutral bending axis 118 defines the boundary line that separates the tension side of joint 106 from the compression side of joint 106." (EX1001, Fig. 2; 5:50-52). Moreover, a POSITA would understand that having a screw cross the joint at the midpoint of the joint would maximize the compressive forces applied across the joint and would cross from the compression side to the tension side of the joint. (EX1002, ¶¶123-126; EX1010, ¶49; EX1016, ¶35).

In the context of Slater and as labeled in Figure 1, a force in the posterior direction on the foot would place both the tibia and ankle joint in compression on the posterior side of the joint. (EX1002, ¶127; EX1005, Fig. 1). A POSITA would recognize that, when walking, the first position in Slater on the first bone (tibia 4) will, at some point during the gait cycle, reside on a compression side of the joint and the second position in Slater on the second bone (talus 3) will reside on a tension side of the joint. (EX1002, ¶127).

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*

### d.    Dependent claim 9

Figure 4 of Slater depicts a lag screw 70 with a "longer shank" and "an abbreviated threaded portion."  (EX1002, ¶135; EX1005, Fig. 4; 12:32-13:3).  As shown in Figure 1, when inserted into the transfixation hole, screw type 70 has a first end of the shaft adjacent to the head and an unthreaded portion configured to extend through the first bone (tibia 4) and, at the second end of the shaft adjacent to





the tip, a threaded portion configured to extend into the second bone (talus 3).  (EX1002, ¶¶134-136).

### e.    Dependent claim 10

Slater discloses a system wherein the elongate spine is configured to form an angle between the first inner surface (31 or 96) and the second inner surface (8 or 83), the angle substantially conforming to a natural bend at a joint between the first bone (tibia 4) and the second bone (talus 3).  (EX1002, ¶¶137-141).  For example, Figure 1 illustrates how an angle is formed between a first and second inner surface, substantially conforming to a natural bend at a joint between the first bone (tibia 4)

Falkner expressly contemplates that the thickness of the bone plates may be varied such that portions of the plate may be thicker in regions that require increased structural stability. (EX1006, ¶35). As can be seen in Figure 1, at least a portion of the bridge portion and the transfixation screw hole (44) has a thickness greater than at least a portion of the thickness of the first and second ends. (EX1006, Fig. 1). In particular, the second end is described in the specification as an "internal portion" and is thinner at the end to facilitate insertion into the bone and becomes thicker towards the bridge portion to increase structural stability. (EX1006, ¶35). Similarly, the portions of the plate surrounding the transfixation screw hole have a thickness greater than at least a portion of the thickness of the second end. (EX1002, ¶229).

### 4.    Dependent Claims 12-13 and 17 are Anticipated by Falkner

As discussed in Section VI.C.3., Falkner anticipates independent claim 11. Moreover, dependent claims 12-13 and 17 mirror the language in dependent claims 2-3 and 10. Thus, for the same reasons described with respect to claims 2-3 and 10, Falkner contains all of the elements of claims 12-13 and 17 and therefore anticipates those claims. (EX1002, ¶¶230-233).

### D.    Ground 4:    Falkner in View of Arnauld Renders Obvious Dependent Claims 4, 5, and 14

As discussed above, Falkner anticipates dependent claim 2 and independent claim 11. Arnauld, an arthrodesis plate for a metatarsophalangeal joint, discloses the additional limitations recited in dependent claims 4-5 and 14, all of which pertain

to the angle of the trajectory of the transfixation screw.  (EX1002, ¶¶234-246).  For

the reasons described below, dependent claims 4-5 and 14 are obvious in view of

Falkner and Arnauld.

### 1.    A POSITA Would Have Been Motivated to Combine Falkner with Arnauld

While Falkner provides an exemplary transfixation angle for use in a fractured

tibia (EX1006, ¶78), Falkner does not expressly provide a suggested transfixation

angle for use across a joint, even though such configuration is contemplated.

(EX1006, ¶21).  Since Falkner does not expressly disclose a transfixation angle for

a joint, a POSITA would look to other bone plates for use with a particular joint

when determining the transfixation angle to use to ensure proper fixation of both

bones of the joint.  (EX1002, ¶241).

As discussed in Section V.C., Arnauld describes an arthrodesis plate for use

with a metatarsophalangeal joint.  (EX1007, Figs. 1, 2).

*Petition for Inter Partes Review of*
*U.S. Patent No. 8,529,608*



Fig.1



Fig.2

As shown in Figures 1 and 2, the Arnauld bone plate includes a leg 20 bent downward at an angle between 20° and 60°. (EX1008, ¶¶23-25). The leg 20 includes a through-hole 25 adapted to receive a screw 30 that is further angled such that, when the plate is placed across the metatarsophalangeal joint, the screw successively passes through the phalangeal epiphysis $P_1$ and the metatarsal epiphysis $M_1$. (EX1008, ¶¶27, 32).

Arnauld explains that the longitudinal axis 31 of screw 30 forms a non-zero angle δ with the longitudinal direction 11 of the plate body 10. (EX1008, ¶27). A

POSITA would understand that direction 11 of Arnauld is approximately the same as the direction of the neutral bending axis as described in the 608 patent. (EX1002, ¶243). In selecting the transfixation angle of the screw, Arnauld states that "[f]or anatomical reasons, the **angle δ is** advantageously chosen to be less than **45°**." (EX1008, ¶28).

At the time of the invention, a POSITA would have been motivated to modify the Falkner bone plate, which is generically described as spanning any suitable bone discontinuity, to include the teachings of Arnauld in order to provide a bone plate specifically for use with a metatarsophalangeal joint. (EX1002, ¶¶244-245). In doing so, a POSITA would have selected a transfixation angle of "less than 45°" ("about 50°") for a Falkner-type plate configured for use with a metatarsophalangeal joint in order to ensure penetration of the transfixation screw in the metatarsal. (EX1002, ¶240, ¶¶243-244; EX1008, ¶28, ¶32; EX1010, ¶49; EX1016, ¶35; Section VI.C.2.b). By obtaining superior positioning of the bones to be fused, a successful fusion or immobilization can result. (EX1002, ¶244).

In any event, the Federal Circuit and its predecessors have long recognized that "it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955). Here, the claimed ranges do not "produce a new and unexpected result" but rather appear to be based on patient anatomy at the metatarsophalangeal joint. (EX1002 at ¶240). As such,

- 61 -

the claimed ranges are obvious.  *See, e.g.*, *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368-69 (Fed. Cir. 2007).

### 2.    Dependent Claims 4 and 5

As discussed above, at the time of the invention, a POSITA seeking to use a Falkner-type bone-plate to fuse a first phalanx and first metatarsal across a metatarsophalangeal joint would have been motivated to combine Arnauld with Falkner to select a transfixation angle of "less than 45°," which renders obvious a transfixation angle of "about 50°" as required by dependent claim 5 and "between about 30° and about 70°" as required by dependent claim 4, measured from the neutral bending axis. (EX1002, ¶240, ¶¶244-245).   As such, Falkner in view of Arnauld renders obvious dependent claims 4 and 5.  (EX1002, ¶¶234-245).

### 3.    Dependent Claim 14

The claim language for claim 14 is identical to claim 5 except that claim 14 depends from independent claim 11.  For the same reasons described above with respect to dependent claim 5, claim 14 is rendered obvious by Falkner in view of Arnauld.  (EX1002, ¶¶235-246).

### E.    Ground 5:  Arnauld in View of Slater Renders Obvious Claims 1-5, 9-14, and 17

As shown below and in the accompanying Declaration, Claims 1-5, 9-14 and 17 are rendered obvious by Arnauld in view of Slater under 35 U.S.C. § 103. (EX1002, ¶¶247-309).

Trials@uspto.gov                                                        Paper 6
571-272-7822                                              Date: March 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY,
INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

———————————

IPR2021-01450
Patent 8,529,608 B2

———————————

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*


DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2021-01450
Patent 8,529,608 B2

> across two joints and (2) an alternate embodiment where fusion
> plate 1 is used to secure two discrete bones (tibia 4 and talus 2,
> within the oval annotated into Figure 1 [above]) together across
> a single joint between the two bones.

Pet. 15 (citing Ex. 1005, 6:17–7:2, 8:13–28, 11:1–4, 12:3–10, 13:5–9, 14:1–

8). Petitioner supports this interpretation of Slater with Dr. Gall's testimony.

Ex. 1002 ¶ 102.

Patent Owner contends that Petitioner is picking-and-choosing

features from among "alternative" embodiments in Slater to combine and

modify to arrive at the claimed subject matter. Prelim. Resp. 8–11. Patent

Owner contends that "Slater fails to describe th[e] alternative [two-bone]

embodiment in detail, only briefly acknowledging that it may be an option"

and, thus, Petitioner is allegedly "forced to rely on expert testimony to fill

the gaps regarding how the three-bone embodiment would be modified for a

two bone application." *Id.* at 10–11; *see also*, *id.* at 11 (Patent Owner

further contending that "Dr. Gall, Petitioners' expert, relies on multiple,

distinct teachings of Slater and alleges that a POSA might somehow

combine to achieve the claimed invention of the '608 Patent.").

We disagree on this record that Petitioner is improperly picking from

and combining unrelated disclosures in Slater to arrive at the claimed subject

matter. It is prohibited, when anticipation is the issue, to pick and choose

from "various disclosures *not directly related to each other* by the teachings

of the cited reference." *In re Arkley*, 455 F.2d 586, 587 (1972) (emphasis

added). But here, the disclosures of Slater relied upon by Petitioner are

sufficiently related to each other as evidenced by at least Figure 1 itself, and

related written description in Slater. The two-bone embodiment appears to

be an "alternate" embodiment only insofar as it reflects another angled

IPR2021-01450
Patent 8,529,608 B2

pathway for the screw so it anchors in a second and not a third bone.  This is not wholly distinct, however, from the three-bone embodiment.  To the contrary, both the two-bone and three-bone embodiments are depicted as alternatives within the plate of Figure 1 itself.  Thus, Figure 1, with the two-bone pathway, is arranged in a manner that meets the preamble of claim 1, and we are persuaded on this record that a person of ordinary skill in the art would understand Slater that way.  Indeed, the fact that related text in Slater about Figure 1 indicates that one or multiple joints may be fused supports Petitioner's and Dr. Gall's interpretation of Slater.  *See, e.g.*, Ex. 1005, 13:3–5 ("As may be seen from figure 1, the screws are placed in a particular orientation and required angle to the *joint/s* required for arthrodesis.") (emphasis added).

Patent Owner criticizes Dr. Gall's analysis "of a single cursory embodiment" on whether Slater discloses a system for fusing two bones across a single joint.  Prelim. Resp. 13.  That criticism is, however, unavailing because "[e]xpert testimony may shed light on what a skilled artisan would reasonably understand or infer from a prior art reference." *Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1373 (Fed. Cir. 2020).  Patent Owner also points out that Slater's disclosure mostly concerns securing three bones across two joints, and that Slater purportedly teaches that adding "more joints" in the fusion is advantageous. Prelim. Resp. 13 (citing, e.g., Ex. 1005, 16:28–30).  Even if that aptly characterizes Slater's disclosure, that does not negate anticipation.  Un-preferred—even disfavored—embodiments may still anticipate a claim. *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) ("A reference is no less anticipatory if, after disclosing the invention,

18

IPR2021-01450
Patent 8,529,608 B2

Resp. 15.  Accordingly, Patent Owner argues, Petitioner resorts to Dr. Gall's testimony, which Patent Owner contends is conclusory and should be disregarded.  *Id.* at 15–16.  Here, Patent Owner contends, Dr. Gall improperly relies on the three-bone embodiment where the screw extends through the tibia and talus before finally anchoring in the calcaneus, with no adequate explanation how anchoring in the calcaneus would shift tensile load from the talus (or the second bone) to the screw head and plate.  *Id.* at 17 (arguing there are "no threads in the second bone" in Slater's three-bone embodiment).  Moreover, Patent Owner argues, the "loading" that Dr. Gall is describing is "not the type of tensile load" in claim 1, which allegedly relates to the biomechanics of the foot or joint during normal activity, not the forces upon insertion of the plate.  *Id.* at 17–18 (citing, e.g., Ex. 1001, 5: 41–46, 5:60–6:3).

Patent Owner's position about whether Slater discloses "transferring the tensile load" as in claim 1 may have merit.  We determine, however, that this question is better resolved on a full record through trial.  At present, Petitioner provides evidence comprising at least Dr. Gall's testimony that a skilled artisan would understand this feature as met in Slater where the screw is angled to cross a joint's neutral bending axis and anchors, not in the calcaneus, but in the talus according to the two-bone embodiment as discussed above.  While Dr. Gall supports his opinion by relying, in part, on Slater's express disclosure about a screw and threaded shank anchoring in the calcaneus (heel bone), Patent Owner provides no evidence to undermine Petitioner's showing and Dr. Gall's opinion that, where only the tibia and talus are involved (as also shown in Figure 1), a person of ordinary skill in the art would recognize that the threads of the screw must engage the talus—

21

IPR2021-01450
Patent 8,529,608 B2

securing the second bone (talus) to the plate via the screw with the tibia held between. Ex. 1002 ¶ 114. We do not agree that Dr. Gall's opinion is so lacking in reasoning or support that the Petition should be denied as a result.

On whether the load in claim 1 differs from the load and load transfer provided by Slater's plate when the tibia is held in a vise-like arrangement between the plate and talus as explained by Petitioner, this too would benefit from further argument and evidence before final resolution. From the '608 patent, it appears that transferring of tensile load as claimed depends at least somewhat on the biomechanics of the foot (or other hinge-type joint) when the joint is subjected to conditions in which it would otherwise flex. *See, e.g.*, Ex. 1001, 5:36–52. On the other hand, the patent explains, a "'tension band' construct" that allows load to be transferred arises when the plate is attached and the fixation screw crosses the joint's neutral bending axis (which axis separates a tension and compression side of the joint) and anchors in a second bone. *See id.* at 5:53–6:18 ("When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 . . . a 'tension band' construct is created that puts transfixation screw 150 under tension when joint 106 flexes."). This "tension-band" construct in the '608 patent, thus, appears consistent with how Slater's plate would work when fixed to the tibia and talus in the manner identified by Petitioner. Lending support for this tension band construct in Slater is Petitioner's analysis of dependent claims 2 and 3, which provides further detail on the trajectory of Slater's fixation screw and the biomechanics of the ankle joint. There, Petitioner explains that Slater's screw extends at a trajectory that traverses a portion of the tibia (first position), a neutral bending axis of the joint, and a portion of the talus (second position) so that,

22

IPR2021-01450
Patent 8,529,608 B2

'interlocking' bone screw has been used to secure the blade portion, when inside bone, to an end region of a fractured bone. The interlocking screw may span the anchor and blade portions (and the fracture) to 'interlock' and tension these portions."))."

Based on the present record, we are doubtful that Petitioner will prevail in showing that Falkner anticipates claim 1. Manifestly, Falkner's relied-upon plate shown in Figure 1 is not arranged as claimed. Ex. 1006, Fig. 1. It is *not* configured to secure two discrete bones (e.g., the tibia and talus) across an intermediate joint between those bones, nor is the plate configured with first and second ends having inner surfaces that substantially conform with a geometry of first and second bones. This is plain from the cross-sectional anatomical views of the tibia, joint, and talus shown in the figure itself. To make the plate so configured as claimed would apparently require at least some level of redesign or modification. Those might be simple, even arguably obvious, changes for the person of ordinary skill in the art in light of Falkner and its overall teachings but Petitioner's challenge is based on anticipation. Indeed, Petitioner's and Dr. Gall's repeated invocation of how Falkner's plate, if used in the hypothetical joint-spanning context, "would have been" configured rings of obviousness, not anticipation. *See, e.g.*, Ex. 1002 ¶ 178.

We recognize that Falkner discloses that its plates may be designed to traverse a joint between bones. *See, e.g.*, Ex. 1006 ¶¶ 21, 23, 29. But there is a dearth of detail about such a hypothetical plate's actual design. On this record, it appears to us that making such a plate or modifying the plate of Figure 1 to render it suitable to, for example, spanning a joint between the tibia and talus would require the person of ordinary skill in the art to make

31

IPR2021-01450
Patent 8,529,608 B2

distinct design choices beyond any embodiment explicitly described in Falkner. Even then, it is not a foregone conclusion that all the claim limitations would be met (e.g., surfaces of the first and second ends that conform to a bone geometry, and a thicker bridge portion relative to the ends). The person of ordinary skill in the art might, for example, decide to conform some or multiple portions of the hypothetical bone plate to the exterior geometries of multiple bones, such as the tibia and talus. Such a design is even arguably suggested elsewhere in Falkner, where it discloses that bone plates "may be sized and shaped to conform to particular portions of a bone (or bones)" or "may be contoured generally to follow an exterior surface of a target bone (or bones)" (Ex. 1006 ¶¶ 33–34). But, here again, our concern is that such a theory drifts from anticipation—a doctrine still rooted in "strict identity"[4]—to obviousness.

The parties' dispute about what is or is not a "second end" in Falkner may turn on claim construction, for which the parties have provided no briefing. Petitioner, in one instance and attempting to show satisfaction of one claim limitation, cites a portion of Falkner's plate that appears to be close to the middle of the plate and characterizes that portion as a "second end." Pet. 43. Yet, when wanting to show that the second end of the plate is thinner than the bridge, Petitioner points to another portion of the plate—the distal-most tip of the plate, which is actually inserted in the bone itself. *Id.* at 46. Petitioner's position on what constitutes the "second end" of Falkner lacks a degree of clarity and consistency. Moreover, Petitioner may be cherry-picking certain features of a single-bone embodiment to keep, which

---

[4] *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002).

IPR2021-01450
Patent 8,529,608 B2

features it sees as favorable to its anticipation position, while purporting to modify other portions of that embodiment (e.g., contouring the plate to a particular bony geometry) in order to render it suitable for a different attachment across multiple bones.[5]  Such picking and choosing is indicative of a theory based on obviousness.

Regarding independent claim 11, Petitioner acknowledges that many of the limitations recited in independent claims 1 and 11 are "nearly identical" with exceptions accounted for in its analysis set forth in the Petition.  Pet. 56–58.  Those differences between claim 1 and 11 identified by Petitioner do not cure the deficiencies of discussed above with regard to claim 1.  Thus, for at least the same reasons as discussed with respect to claim 1, we are not persuaded on the current record that Falkner anticipates claim 11.

In view of the above, we are skeptical that Petitioner will prevail in establishing that independent claims 1 and 11 are anticipated by Falkner. Nevertheless, consistent with precedents and Board guidance, if we institute, we must include all challenged claims and grounds.

---

[5] As a further example, Petitioner identifies opening (52) in Falkner's plate in Figure 1 as the alleged fixation point on a second end of the plate as claimed.  Pet. 43.  But, as described in Falkner, opening (52) and its corresponding bone screw is fixed on the *same side* of the bone discontinuity (fracture) as the plate portion Petitioner identifies as the plate's first end. Ex. 1006, Fig. 1.  Inasmuch as a joint is simply another bone discontinuity in Falkner, Petitioner asserts, with minimal explanation, that a screw would have been placed through opening (52) to secure a second bone (e.g., talus) on the *opposite side* of the joint relative to the plate's first end when the plate is modified for use in this different context.  *Id.* at 44; Ex. 1002 ¶ 177.

Trials@uspto.gov                                                    Paper 20
571-272-7822                                              Date: May 13, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B2)[1]

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

MAJORS, *Administrative Patent Judge.*

ORDER
Granting Petitioner's Motion to Submit Supplemental Information
*37 C.F.R. § 42.123(a)*

---

[1] We exercise our discretion to issue one Order to be filed in each case. The
parties are not authorized to use this style of heading for subsequent papers.

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B
IPR2021-01453 (Patent 10,245,085 B2)

between fixing fractures and fusing bones across a joint appears to reflect the POSA's understanding at about same time that the '608 patent was filed, in the same general subject matter as the '608 patent.  In at least that respect, the Sherman Declarations are relevant to the instituted claims and Petitioner's theory that a POSA would understand Falkner's teachings as applying to bone plates usable for spanning a joint or fixing a fracture.  We do not presently see this supplementation as Petitioner trying to change its theory from anticipation to obviousness, nor will we permit Petitioner to do so—the Petition asserts that Falkner anticipates the claims, and Petitioner is bound by that theory.

The cited testimony about Slater in the Sherman Declarations is also relevant to the instituted claims here.  That testimony is, at minimum, relevant to a POSA's understanding of Slater's disclosure of an embodiment where the plate is attached to only the tibia and talus, and to the sufficiency of that disclosure.  Whether Mr. Sherman's testimony is inconsistent with Patent Owner's past argument on Slater is not something we must decide at this time or for this Motion.[4]  What is important at this time, as discussed above, is that the testimony tends to support—and, thus, is relevant to— Petitioner's and Dr. Gall's position in the Petition that Slater discloses an embodiment where two (and only two) bones are involved in the fusion.

---

[4] Although Patent Owner contends it never denied that Slater includes a two-bone embodiment, Patent Owner also argued that Slater did not disclose claim 1's preamble of a "system for securing two bones together across a joint between the two bones."  Paper 5, 11–14.  Inconsistent or not, it is difficult to reconcile this aspect of Patent Owner's argument with Patent Owner's apparent admission about a two-bone embodiment in Slater.

**UNITED STATES PATENT AND TRADEMARK OFFICE**

―――――――――――――

**PATENT TRIAL AND APPEAL BOARD**

―――――――――――――

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

―――――――――――――

Case IPR2021-01450
U.S. Patent No. 8,529,608

―――――――――――――

**PATENT OWNER RESPONSE**

by the claim." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). In both claims, the preamble addresses a fundamental feature of the invention (i.e., the ability to secure two discrete bones together across a single joint), which is reflected throughout the specification. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (preamble was limiting where it described a "fundamental characteristic of the claimed invention" and the specification "underscore[d] the importance" of the preamble as a limitation). Therefore, the preamble should be limiting.

The term "trajectory" as used in the '608 Patent means a fixed angle relative to the neutral bending axis of the joint. In practice, the neutral bending axis of the joint typically approximates the direction of the elongate axis of the bone plate, so in design, the trajectory is fixed relative to the direction of the elongate axis of the plate such that it crosses the neutral bending axis at a known, fixed trajectory. (Ex. 1001, Fig. 2, 5:53-57; *see also* Ex. 1002, ¶ 118 ("When a bone has a reasonable degree of symmetry, the axis of the bone plate approximates the direction of the neutral bending axis of the joint.")). In this way, the construction of the plate ensures the creation of "the desired tension band construct for the transfixation screw 150." (Ex. 1001, 6:33-39, 5:53-57).

The claims and specification of the '608 Patent confirm this understanding of "a trajectory." (Ex. 2002, ¶ 94). The claims require the transfixation screw "to

absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion." When discussing this claim element (*see*, *e.g.*, Ex. 1001, 6:4-12), the '608 Patent makes clear that "[i]n either case, once transfixation screw 150 has been screwed into joint 106 along a trajectory that crosses the neutral bending axis 118 of joint 106, a tension band construct may be created that enables transfixation screw 150 to absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106." (Ex. 1001, 6:12-18). The claims further require the transfixation screw hole itself is "configured **to direct** the transfixation screw through the transfixation screw hole such that the transfixation screw extends the bridge portion at **a** trajectory." (Ex. 1001, cl. 1 (emphasis added); Ex. 2002, ¶ 95)). A POSITA reading this claim in light of the intrinsic record would understand that this means that the shape of the inner surface of the transfixation screw hole is such that it guides the screw at a fixed angle relative to both the elongate axis of the plate and the neutral bending axis of the joint. (Ex. 2002, ¶ 97).

The '608 Patent explains the claimed "trajectory" is "at a transfixation angle 114 [] relative to neutral bending axis 118 **to achieve the desired tension band construct** once bone plate 100 is secured across joint 106." (Ex. 1001 at 6:25-33 (emphasis added)). Thus, a transfixation angle trajectory relative to neutral bending

axis achieves the desired, and claimed, tension band construct. (*See also* Ex. 1001, 5:53-57 ("When transfixation screw 150 is screwed into joint 106 along a trajectory that crosses neutral bending axis 118 (as show in FIG. 2), a 'tension band' construct is created that puts transfixation screw 150 under tension when joint 106 flexes.")).

This is also supported by other claims in the '608 Patent. (Ex. 2002, ¶ 96). For example, claim 5 recites that the trajectory is "at a transfixation angle of about 50 degrees measured from the neutral bending axis." (Ex. 1001, cl. 5). While claim 4 includes an allowable range of between 30 and 70 degrees, a POSITA would understand that, in the context of the intrinsic record, this means that a given plate has a single fixed angle relative to the neutral bending axis, but that a different plate could have a different fixed angle, with plates having single fixed angles relative to the neutral bending axis in the range between 30 and 70 degrees. (Ex. 2002, ¶ 96; *see also* Ex. 1001, 6:25-30). In other words, in a fixation system compromised of multiple plates, a surgeon could have individual plates with fixed 30, 50, and 70 degree trajectories relative to the neutral bending axis, but there would not be a plate with an inner surface of the transfixation screw hole that would allow variable angles over the entire claimed range between 30 and 70 degrees. (Ex. 2002, ¶ 96). As such, "trajectory" as used in the Challenged Claims should be construed to mean an "allowable fixed angle relative to at least the neutral bending axis of the joint."

(claim 11); Ex. 2002, ¶ 89). Neither the Petition, nor Dr. Gall, provide any rationale for this combination of embodiments, which is particularly troubling in light of *Slater's* discussion of the importance of pliability at the bending region of the plate. More importantly, as detailed above, "[t]he law of anticipation does not permit Petitioner to mix two separate embodiments as though they collectively describe a single embodiment including selective elements from each." *Peddinghaus*, 2021 WL 1897595, at *12 (citing *Net MoneyIN, Inc.*, 545 F.3d at 1369). Because *Slater* does not expressly or inherently disclose that the claimed "bridge portion" include a portion with a "thickness greater than at least a portion of the thickness of either the first end or the second end." it does not anticipate claim 1 of the '608 Patent. This claim element is also present in claim 11 of the '608 Patent and therefore *Slater* does not anticipate claim 11 of the '608 Patent either.

> **d.** ***Slater* fails to disclose "the transfixation screw hole comprising an inner surface configured to direct the transfixation screw . . . at a trajectory"**

*Slater* does not disclose "the transfixation screw hole comprising an inner surface configured to direct the transfixation screw . . . at a trajectory." For this element, Petitioners again improperly use *Slater's* figures as a "catalogue of parts" to recreate the disclosure into one that purports to anticipate the Challenged Claims. Because Figure 1, plate 1 provides no detail regarding the structure of the inner surface of the hole 27, Petitioners use the screw hole depicted in Figure 7 in an

34

attempt to show the claimed "inner surface." (Paper 2, 24). As detailed above, this mix and match puzzle-making cannot support an anticipation challenge.

Putting aside Petitioners' improper piecemeal approach to anticipation, no embodiment in *Slater* describes a "transfixation screw hole comprising an inner surface configured to direct the transfixation screw . . . at a trajectory." A POSITA reviewing the '608 Patent would understand that the claim requires a hole with an inner surface that guides the transfixation screw at an allowable fixed angle relative to at least the neutral bending axis of the joint. (*See* Section III, above).

As detailed in the '608 Patent, the inner surface of the screw hole is used to direct the path of the transfixation screw, whereas in *Slater*, the surgeon determines the path in situ with a range of options available. (Ex. 2002, ¶ 97). *Slater* describes a plate that intentionally allows for varied angles through **the same hole**. Dr. Gall confirmed as much during his deposition:

Q.    When you say "same embodiment," same embodiment of what
do you mean?

A.    The plate along with the plate's capacity to have transfixed - to
have that screw at different angles.

***

Q.      So in your opinion the plate in *Slater* is one plate.  There's not a

different plate for 31 degrees and a different plate for 47 degrees

and a different plate for 57 degrees; right?

A.      Correct.

(Ex. 2003, 40:18-22, 65:24-66:4).

Dr. Gall's testimony is consistent with the disclosure of *Slater* that explains: "[o]ne significant advantage of the plate described [in *Slater*] is the **oblique screw portal allowing for various angles** and the ability to incorporate more joints into the arthrodesis as required."  (Ex. 1005, 16:28-30 (emphasis added); Ex. 2002, ¶ 103).  *Slater* goes on to characterize opening 27 as consistently allowing for more than one angle per plate.  (Ex. 1005, 12: 23-25 ("Opening 27 which is also preformed, receives a countersink screw which is allowed adjustable orientation"); Ex. 2002, ¶ 103).

Based on the Petition and Dr. Gall's declaration and deposition, it appears that the parties agree that *Slater* does not disclose a plate with a hole that guides the transfixation screw at an allowable fixed angle relative to at least the neutral bending axis of the joint.  *Slater* does not disclose "the transfixation screw hole comprising an inner surface configured to direct the transfixation screw . . . at a trajectory" and therefore does not anticipate claim 1 of the '608 Patent.  This claim element is also

36

present in claim 11 of the '608 Patent and therefore *Slater* does not anticipate claim 11 of the '608 Patent either.

e. ***Slater* fails to disclose "the transfixation screw extends through the bridge portion"[3]**

*Slater* does not disclose "the transfixation screw extends through the bridge portion." Notably, neither the Petition nor Dr. Gall's supporting declaration provide any analysis of this claim element other than to simply say it is disclosed in *Slater*. (*See* Paper 2, 22-24; Ex. 1002, ¶ 113). The Petition's silence in this regard cannot be rectified post-Institution. In fact, both the Petition and Dr. Gall's supporting declaration confirm that *Slater* does not disclose this element at all. (Ex. 2002, ¶¶ 105-107).

In every *Slater* embodiment, Dr. Gall identifies the purported "bridge portion" as being the portion of the plate **below** the transfixation screw hole:

---

[3] This element is not present in claim 11.

> **f.** ***Slater*** **fails to disclose "absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion"**

Claim 1 specifies that the transfixation screw "extend[s] through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion."  (Ex. 1001, cl. 1; *see also id.*, cl. 11).

For these claim elements, the Petition relies on Dr. Gall's declaration because nothing in *Slater* expressly or inherently discloses transferring the tensile load from the second bone through the fixation screw head and into the bridge portion of the plate.  For example, Dr. Gall opines, based solely on the arrangement shown in Figure 1, that "because the threads on the [fixation] screw [(25)] and the portion of the screw head that abuts the inner surface of the screw hole act essentially as a vise, to the second bone and the plate, with the first bone held in between."  (Ex. 1002, ¶ 114 (citing Ex. 1005, 12:32-13:3); *see also* Ex. 1002, ¶ 154 (same for cl. 11)).

The concept of a "vise" configuration is not disclosed in *Slater*.  (Ex. 2002, ¶ 109).  Moreover, as detailed in Mr. Sommers' declaration, Dr. Gall's assumption regarding this "vise" like transfer of load depends on his assumption that the threads of the screw type 70 would only be present in the talus in a two-bone construct,

which is not apparent from *Slater's* disclosure.  (Ex. 2002, ¶ 110).  The location of

the threads on the screw impact how and where, if at all, a tensile load would be

transferred from the transfixation screw through to the head of the screw and into

the bridge of the bone plate.  Dr. Gall agreed during his deposition, confirming that

the location of the threads can determine how a joint compresses when a screw is

used, and how load is transferred from the screw to the plate:

> Q.    Okay.  Well, I guess let's stick with the length of the threads, the
>
>        location of the threads, and the length of the shank as being
>
>        potential factors in configuration of the screw.  Those factors are
>
>        going to determine how a joint compresses when the screw is
>
>        used to compress the joint, correct?
>
> A.    Those could be some factors amongst other factors.
>
> Q.    And that's going to affect how load is transferred from the screw
>
>        to the plate as well; correct?
>
> A.    Could be - those could be factors that might contribute.

(Ex. 2003, 44:21-45:15 (objections omitted)).

In other words, not only does *Slater* fail to expressly disclose this "vise"

construct that results in Dr. Gall's opinion that *Slater* discloses tensile load transfer,

*Slater* does not even necessarily require such a configuration such that the limitation

would be inherent in *Slater*'s disclosure.  *Slater* actually describes that different plate

geometries and dimensions "such as alternative thickness distributions and angulations may result in different measured loadings and plate response." (Ex. 1005, 20:14-16; Ex. 2002, ¶ 112). Without describing any geometry or dimensions of a plate accommodating a two-bone screw, *Slater* necessarily fails to disclose how such an undisclosed embodiment would react to different loading scenarios. (Ex. 2002, ¶ 112).

The conclusory nature of Dr. Gall's opinion is apparent from the complete lack of citations to any disclosure in *Slater* describing a transfer and absorption of a tensile load when the second bone is loaded relevant to the first bone. (*See* Ex. 1002, ¶ 114 (strictly relying on a three-bone embodiment, not the two-bone embodiment he relied upon for other claim elements such as the preamble); *see also* Ex. 1002, ¶ 154 (same for cl. 11)). During his deposition, Petitioners transparently attempted to backfill their failure to show this element in the Petition, asking of their own expert about the "finite element analysis" in *Slater*. In response, Dr. Gall explained that this analysis "determine[s] how tensile loads are transferred through the screw into the plate." (Ex. 2003, 92:24-93:7).

This finite element analysis, however, does not provide insight on how tensile load may or may not be transferred through the transfixation screw and certainly does not describe transfer of load to a specific region of the plate itself. (Ex. 2002, ¶¶ 117-119). For example, the test does not mention the talus or the calcaneus, and

41

the test does not provide any specifics on the transfixation screw. (Ex. 2002, ¶ 119). It is unclear if and how the transfixation screw was simulated during testing, and, in particular, *Slater* does not describe how the transfixation screw was affixed or loaded. (*Id.*). Additionally, the angle of intersection for the transfixation screw is unknown and the number of bone penetrations of the transfixation screw are unknown. (*Id.*). If anything, this FEA test suggests that tensile load is felt **above the screw hole formation**, not on the "bridge" of the plate as the Challenged Claims require. (Ex. 2002, ¶ 118).

*Slater* does not disclose a transfixation screw that "absorb[s] tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion" and therefore does not anticipate claim 1 of the '608 Patent. This claim element is similarly present in claim 11 of the '608 Patent and therefore *Slater* does not anticipate claim 11 of the '608 Patent either.

## 2.    Claims 2 and 12

Because *Slater* does not expressly or inherently disclose every element of claims 1 and 11 of the '608 Patent, *Slater* does not anticipate claims 2 and 12 either. *Slater* does not anticipate claims 2 and 12 of the '608 Patent for at least one additional reason. (Ex. 2002, ¶¶ 122-124). Claims 2 and 12, depending from independent claims 1 and 11, respectively, further require "a central axis of the inner

42

Rather, during typical use conditions such as walking, the different portions of the ankle joint are subjected to cyclically changing compression and tension forces. (*Id*.). Because of this change in force direction, a person of ordinary skill in the art would not refer to the ankle joint as one that has a tension side and a compression side. (*Id*.).

In this way, the ankle joint is unlike the MTP joint where the bottom side of the foot is understood to be the tension side of that joint. (Ex. 2002, ¶ 129). Because the ankle joint lacks a defined "compression side" and "tension side," *Slater* fails to disclose any embodiment that has a screw passing through the joint "whereas the first position resides on a compression side of the joint and the second position resides on a tension side of the joint" as required in claims 3 and 13 of the '608 Patent. (Ex. 2002, ¶ 130). Therefore, *Slater* does not anticipate claims 3 and 13 of the '608 Patent.

### 4.    Claims 4, 5, 9, 10, 14, and 17

Claims 4, 5, 9, 10, 14, and 17 depend on the claims detailed above. Because *Slater* does not expressly or inherently disclose every element of claims 1, 2, 3, 11, 12, and 13 of the '608 Patent, *Slater* does not anticipate claims 4, 5, 9, 10, 14, and 17 either.

bones together across a joint between two bones"; (2) a "second end" that includes

a fixation point and an "inner surface configured to substantially conform with a

geometry of the second bone; and (3) "a bridge portion configured to span across the

joint." (Ex. 1001, cl 1; *see also* cl. 11).

>  a.  ***Falkner* fails to disclose a "system for securing two discrete bones together across a joint between the two bones"**

*Falkner*'s plate is not designed to secure "two discrete bones together across

a joint between the two bones." This is plain from Figure 1 itself, which shows a

blade-plate solely on the tibia bone with the talus bone untouched. (Ex. 2002, ¶

134).

---

15-23), Patent Owner responds to Petitioners' arguments in the context of claim

1. This response applies equally to claim 11, unless otherwise noted.



(Ex. 1006, Fig. 1 (annotated)).

While *Falkner* explains that this type of blade-plate may be configured to cross a joint rather than a bone fracture, *Falkner* includes "a dearth of detail about such a hypothetical plate's actual design." (Paper 6, 31; Ex. 2002, ¶ 135). To make a *Falkner*-type plate that crosses a joint would require extensive modification such as:

> [The] angle of blade portion to external portion, size of blade portion, length of plate portion, thickness of blade portion, tip geometry of blade portion, interlocking angle of screw, position of plate in respect to subchondral bone, distance of blade portion in respect to subchondral bone, amount and size of fixation screw in each segment, anatomic structures, kinematic considerations (e.g. expected loading configurations), etc.

(Ex. 2002, ¶ 135).

Because these details are not disclosed anywhere in *Falkner*, it cannot anticipate a claim requiring a plate that spans across a joint. Rather than identify any relevant disclosure from *Falkner*, the Petition relies on Dr. Gall to explain how the plate disclosed in *Falkner* would allegedly meet the claims of the '608 Patent. (*See* Paper 2, 40-49 (citing Ex. 1002, ¶¶ 173-184); *see also* Paper 2, 56-58 (citing Ex. 1002, ¶¶ 218-229 (cl. 11)).

This expert testimony far exceeds what is described in the "four corners of that document [] either expressly or inherently," and as such, *Falkner* cannot be found to anticipate the '608 Patent. *See VirnetX Inc. v. Apple Inc.*, 665 F. App'x 880, 885 (Fed. Cir. 2016). This is not anticipation. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010) ("The requirement that the prior art elements themselves be 'arranged as in the claim' means that claims cannot be 'treated ... as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning.'") (citation omitted). Petitioners' arguments impermissibly stretch the disclosure of *Falkner* to support an invalidity challenge based on anticipation. Because *Falkner* does not disclose all of the limitations of claims 1 and 11 as arranged in the claim, expressly or inherently, Ground 3 fails.

### D.    Ground 4: Claims 4, 5, and 14 are not obvious over *Falkner* in view of *Arnould*

For independent claims 1 and 11 and dependent claim 2, from which dependent claims 4, 5, and 14 depend, Ground 4 relies solely on the anticipation-based analysis of *Falkner* set forth in Ground 3.  (Paper 2, 58 ("*Falkner* anticipates dependent claim 2 and independent claim 11.")).  The Petition only provides an obviousness analysis with respect to additional limitations of dependent claims 4, 5, and 14 and provides no additional analysis of claims 1, 2 or 11.  (Paper 2, 58-62).

As detailed above, Petitioners' Ground 3 *Falkner* anticipation theory fails, therefore, Ground 4 fails for the same reasons.

### E.    Ground 5: Claims 1-5, 9-14, and 17 are not obvious over *Arnould* in view of *Slater*[7]

Ground 5 relies on *Arnould* for "each and every element of independent claim 1" except "at least a portion of said bridge portion having a thickness greater than at least a portion of the thickness of either the first end or the second end."  (Paper 2, 63).  For this element, Petitioners rely on *Slater* in combination with *Arnould*.  This

---

[7]    Because Petitioners cite their arguments for claim 1 in addressing claim 11 (Paper 2, 76-78) and the Board also referred back to the analysis of claim 1 at Institution (Paper 6, 35), Patent Owner responds to Petitioners' arguments in the context of claim 1.  This response applies equally to claim 11, unless otherwise noted.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01450

U.S. Patent No. 8,529,608

**PETITIONERS' REPLY**

*Petitioners' Reply*
*U.S. Patent No. 8,529,608*

## I.    INTRODUCTION

Patent Owner relies heavily on functional limitations ("so as to absorb tensile load," "thereby transferring the tensile load") and statements of intended use ("for securing two discrete bones together across a joint") in an attempt to distinguish the challenged claims from the prior art.   Its other arguments are based on an unreasonably narrow view of the prior art.   For the reasons stated in the Petition and below, the Board should find unpatentable claims 1-6, 8-14, and 17 of the '608 patent.

## II.    CLAIM CONSTRUCTION

### A.    Preamble

Patent Owner fails to demonstrate that the preambles of claims 1 and 11 are limiting.   The preambles recite a system or plate *for* securing two discrete bones together across a joint.  (EX1001, cls. 1, 11).   Simply reciting an intended use is not a limitation that describes a fundamental characteristic of the claimed invention.  *See Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (affirming that preamble phrase "for rehabilitation of unilateral hearing loss" is non-limiting).   This is particularly so here where Patent Owner's own expert, Michael Sherman, testified in pending IPRs that bone plates may be interchangeably used for joints and fractures.  (EX1026, ¶134, 149, 249; EX1025, ¶¶191, 193, 228,

1

Patent Owner's reliance on the "neutral bending axis" as a point of reference for "trajectory" is nonsensical. According to its own expert Mark Sommers, the neutral bending axis of a particular joint may shift depending on the position of the bone plate and the loads exerted on that joint. (EX2002, ¶39; EX1030, 59:19-60:17). Applying that logic to Patent Owner's construction, the "trajectory" cannot be known by analyzing a bone plate or system alone. In any event, the "neutral bending axis" is first introduced in dependent claims 2 and 12, not in the independent claims. (EX1001, cls. 2, 12).

Patent Owner contends that "the shape of the inner surface of the transfixation screw hole is such that it guides the screw ***at a fixed angle*** relative to both the elongate axis of the plate and the neutral axis of the joint." (POR, 19). However, the inner surface of the transfixation screw hole does not, alone, determine the precise angle of the trajectory. (EX1027, ¶¶12-13). Rather, the size, shape, and geometry of the screw also determine what angles the trajectory may have. (*Id.*). This was addressed by the International Searching Authority ("ISA") in opining that OsteoMed's PCT application was unpatentable over Slater:

> [C]laim 11 attempts to define <u>the inner surface of the screw hole</u> in terms of the result to be achieved, namely the trajectory of the screw with respect to the first and second bones. However, this definition is not clear since the screw does not belong to the claimed plate and said ***trajectory depends on several screw features, likes its diameter (if the***

3

**diameter of the screw is smaller than that of the screw hole, the screw may tilt within the hole, thereby affecting the trajectory**).

(EX1004, 151 (emphasis added)).   Additionally, manufacturing tolerances for oblique screw holes and bone plate material may allow for some variability with the screw angle.  (EX1027, ¶¶13-14).

Patent Owner is wrong to suggest that "trajectory" limits the challenged claims to a single, fixed angle.  The meaning of the term "trajectory" cannot be construed in a manner unsupported by the intrinsic evidence for the sole purpose of avoiding prior art.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'").

## III.    THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.    The Challenged Claims are Unpatentable in View of Slater

Regarding Ground 1, Slater anticipates the structural and functional limitations of claims 1-5, 9-14, and 17.  Regarding Ground 2, Patent Owner does not challenge the combination of Slater and Weaver for claims 6 and 8.

### 1.    Slater Anticipates Claims 1 and 11

#### a.    Petitioners Do Not Rely On Discrete Embodiments of Slater

Patent Owner argues that Petitioners improperly rely on different embodiments to "piece together an anticipation theory based on Slater." (POR, 25).

The Board already rejected Patent Owner's argument that Slater discloses distinct "two-bone" and "three-bone" embodiments, acknowledging that the disclosures relied upon by Petitioners "are sufficiently related to each other as evidenced by at least Figure 1 itself, and related written description in Slater." (IPR2021-01450, Paper 6, 17-18).  Slater is replete with references indicating that *the same plate* may be used to fuse two bones or three bones.  (EX1005, 6:18-28, 8:27-28, 12:3-5, 14:1-3, 16:28-32, 17:3-5).  Indeed, Patent Owner's argument is belied by Mr. Sherman's opinion in pending IPRs that "[a] POSITA looking at these disclosures from Slater would understand that the bone plate disclosed has a fixation screw 25 configured to intersect a joint through two discrete bones."  (EX1025, ¶81; EX1026, ¶76).

The Board should also reject Patent Owner's argument that Figures 1 and 5 of Slater disclose distinct embodiments.[1]  (POR, 27-28).  They do not.  (EX1027, ¶¶16-21).  Figure 1 is described as a "***generally schematic view*** of a fusion plate 1 for arthrodesis" showing the plate ***attached to an ankle joint***.  (EX1005, 11:1-4 (emphasis added)).  Figure 5 "shows a side cross sectional elevation view of a plate according to a preferred embodiment ***isolated from an ankle joint***."  (*Id.*, 10:6-7 (emphasis added).

 

(EX1005, Figs. 1, 5).

---

[1] In pending IPRs, Patent Owner freely referenced Figures 1 and 5 in its obviousness analysis without once mentioning or addressing Figures 1 and 5 as allegedly "distinct" embodiments that required combination.  (IPR2022-00487, Pet., 21-25; IPR2022-00488, Pet., 18-19).

The detailed description of Figure 5 refers back to plate 1 of Figure 1 and the screw orientations disclosed therein, thus clarifying that the figures disclose different aspects of the same preferred embodiment. (EX1005, 13:5-6, 14:1-2; EX2003, 72:20-73:7). This is confirmed by the "Brief Description of the Drawings," which lists ***Figures 1-13*** and explains that "[t]he present invention will now be described in more detail according to ***a preferred, but non limiting embodiment*** and with reference to the accompanying illustrations." (EX1005, 9:21-10:27). Similarly, Slater references the "DETAILED DESCRIPTION OF ***THE*** PREFERRED EMBODIMENT," confirming that the disclosure is directed to a single preferred embodiment. (*Id.*, 10:32).

Patent Owner purports to identify certain "differences" between Figures 1 and 5 as "proof" that those figures represent "distinct" embodiments. (POR, 27-28). However, the alleged differences are largely due to the fact that ***Figure 1 is a schematic drawing*** intended to illustrate the positioning of the bone plate and screws ***relative to the joint***, whereas Figure 5 is a cross-sectional drawing intended to illustrate additional details regarding the width and thickness of the bone plate and the geometry of the openings. (EX1005, 11:1-12:10, 13:5-14:10). In any event, the existence of minor differences between the figures does not preclude a finding of

7

anticipation.[2]  *See, e.g., FMC Techs., Inc. v. Onesubsea IP UK Ltd.*, IPR2019-00935, Paper 45 at 60-61 (P.T.A.B. Oct. 14, 2020) ("Patent Owner's arguments are not persuasive because they are premised on treating figures that are schematic drawings as though they are precise engineering drawings."); *see also  Kingston Tech. Co. v. North Star Innovations Inc.*, IPR2018-01794, Paper 36 at 33-34 (Feb. 26, 2020) (rejecting Patent Owner's argument that prior art disclosed ten distinct embodiments and finding the challenged claim unpatentable under § 102(b)).

### b.    Slater Discloses A System And Plate For Securing Two Discrete Bones

Even if the preambles of claims 1 and 11 are limiting, Slater discloses a system for securing two bones across a joint.  (EX1002, ¶¶102, 144; EX1027, ¶¶39-44).  Mr. Sherman agrees.  (EX1025, ¶¶81, 101, 102; EX1026, ¶¶76, 108, 109).  Even Mr. Sommers declines to take the position that Slater fails to enable the so-called two-bone embodiment.   While he makes a semantic argument that Slater fails to "***illustrate or show*** a screw type that would be used only in the tibia and talus bones,"

---

[2] Even if Figures 1 and 5 could somehow be categorized as "distinct," anticipation is established by Petitioners' citations to the so-called Figure 1 "embodiment" for all but one claim limitation.  (Pet., 14-36).  For the "thickness" limitation, Slater expressly discloses, without reference to any figures, that "[t]his location adjacent the ankle joint will preferably be the thickest part of the plate." (EX1005, 8:32-9:1; EX1027, ¶20).

*Petitioners' Reply*
*U.S. Patent No. 8,529,608*



(*Id.*).

### f.    Slater Discloses Absorbing and Transferring Tensile Load

As Dr. Gall explained, Slater discloses the absorption of tensile load by the transfixation screw and the transfer of tensile load through the transfixation screw into the bone plate, including the bridge portion, because the threads on the transfixation screw and the portion of the screw head that abuts the inner surface of the screw hole act as a vise to the second bone and the plate, with the first bone held in between.   (Pet., 25, 34; EX1002, ¶¶114, 154).   Patent Owner has abandoned its POPR argument that the load resulting from the insertion of Slater's screw is not the ***type*** of tensile load described in the claims.   Instead, Patent Owner argues that Slater

does not disclose the "vise" configuration with respect to a two-bone construct. (POR, 39).

It is indisputable that Slater discloses a lag screw for use through an angled formation in the bone plate to cross a joint or joints where the screw head is in "cooperation" with the screw hole. (EX1005, 5:28-6:10, 6:18-28, 12:32-13:3, 19:25-26, 22:13-18, 27:11-17; EX1030, 106:19-107:17; EX2003, 46:23-48:4). This *is* the vise configuration. (EX1002, ¶¶114, 134-136, 153-154; EX1027, ¶¶39-50). As discussed *supra*, Patent Owner's experts concede that lag screws are used to create lag effect, a concept well known in orthopedics whereby a partially threaded screw is used to compress bone parts and absorb tensile load. (EX1030, 68:17-70:3; EX1026, ¶¶121-123). Mr. Sommers even insisted that "you want to really have the screws [threads] only in the second bone," thus further supporting that a POSITA would know to use Slater's lag screw in a tibiotalar joint such that the threads engage only into the second bone. (EX1030, 70:16-19, 71:5-9).

Moreover, Mr. Sommers' description of how the '608 patent transfers tensile load from the screw to the bridge portion is almost identical to Dr. Gall's description of how Slater transfers tensile load from the lag screw to the bridge portion:

> So the tensile forces that are created, they come from the fact that the distal portion of the screw sits in the second bone and then the shaft of the screw extends through the first bone and the head is sitting inside the plate. With that, you have the tension within the screw gets directly

16

> transferred into the head of the screw and therefore, into the plate where it's anchored in.

(EX1030, 67:23-68:7; *see also id.*, 74:6-25, 77:14-22). Mr. Sommers acknowledged that Figure 2 of the '608 patent shows "in concept" how load is transferred into the bridge portion because "you know that those threads at an oblique angle interface with the second bone and the head interfaces and is in contact with the plate and therefore there is a transfer of load." (*Id.*, 75:5-13). In other words, just as the configuration shown in Figure 2 of the '608 patent illustrates how load is transferred into the bridge portion, the configuration shown and described in Slater discloses how load is transferred from the second bone into the lag screw, the screw head, the bone plate, and to the bridge portion. (EX1002, ¶¶114, 154; EX1027, ¶¶47-48). Patent Owner complains that Slater does not expressly describe the transfer of tensile load but such basic concepts are not even found in its own patent. (EX1030, 74:9-13). Slater must be read from the viewpoint of a POSITA, who would know that Slater's configuration discloses the transfer of tensile load. (EX1002, ¶114, 154)); EX1027, ¶¶37, 39, 44; EX2003, 90:24-91:23).

In any event, Slater describes in-vivo studies that ***confirm*** tensile load is transferred from the bone to the screw and to the bone plate. (EX1005, 17:14-20:26; EX2003, 92:17-937; EX1027, ¶49). Slater's testing analyzed the capacity of the bone plate to withstand anticipated loads under conditions "intended to simulate as

closely as possible the in vivo static and dynamic loading conditions." (EX1005, 17:20-21). In the initial simulation, "the results showed that the **highest stresses** occur on the inner surface of the plate approximately were [sic, where] a change in section thickness occurs ***just above the angled screw formation***." (*Id.*, 19:1-6). A POSITA would know that, because of the bridge portion's proximity to the transfixation screw hole, at least some tensile load is necessarily distributed from the angled screw formation to the bridge portion. (EX1027, ¶¶49-50; EX1030, 67:23-68:7, 68:18-24, 74:6-25; EX1040). Notably, the challenged claims do not specify ***how much*** tensile load is transferred. (EX1027, ¶49).

### 2.    Slater Anticipates Claims 2 and 12

Patent Owner argues that Slater's transfixation screw hole "is specifically designed to not have a central axis that defines the screw trajectory." (POR, 43-44). But Figure 9 of Slater belies this argument, expressly showing that the central axis of Slater's transfixation screw hole forms a 34° angle to the longitudinal axis of the bone plate. (EX1027, ¶¶52-53).



Moreover, Patent Owner's argument that

Figure 9 is a "different plate," is simply a rehash of its "multiple embodiment"

*Petitioners' Reply*
*U.S. Patent No. 8,529,608*

independent claims 1 and 11.  Similarly, Patent Owner provides no substantive

response regarding Ground 4.

### 1.    Falkner Discloses Securing Two Discrete Bones Across a Joint

To the extent the preamble is limiting, Patent Owner concedes that the Falkner

blade plate may be used across a joint rather than a fracture, but incorrectly argues

that Falkner includes "a dearth of detail" about the design of such a plate.  (POR,

48).  Falkner unambiguously teaches that ***the same bone plate*** shown in Figure 1

and described in the specification "may be positioned on and/or in any suitable

bone(s) to span any natural or artificial discontinuity within a bone or between

bones."  (EX1006, ¶¶21, 28-29, 33-34, 62).

While Patent Owner argues that using the Falkner bone plate to fuse a joint

"would require extensive modifications," Patent Owner takes the opposite position

in pending IPRs.  (*Compare* POR, 48 *to* IPR2022-00487, Pet., 45, 57, 59, 74-75 *and*

IPR2022-00488, Pet., 31-32, 63-64, 70).  Again, Mr. Sherman repeatedly explained

that "***there are no practical differences*** between fusing a joint. . . and fusing a bone

fracture," and that "bone plates configured for arthrodesis and bone plates

configured to fuse bone fractures have been ***used interchangeably for decades***."

(EX1025, ¶¶164, 191, 193, 228; EX1026, ¶¶134, 149, 249).

The "extensive modifications" suggested by Patent Owner demonstrate a lack of understanding of how joint fusion procedures are performed. For example, Mr. Sommers bases his opinions on the incorrect assumption that using the Falkner plate for joint fusion necessarily entails shifting the plate down so that the tibiotalar joint is in the same location as the fracture shown in Figure 1 of Falkner. (EX2002, ¶140; EX1030, 110:15-25, 112:1-4, 115:10-12, 117:2-6; EX1028, ¶¶20-25).

Dr. George Holmes, a renowned foot and ankle surgeon, confirms that Falkner enables a POSITA to use its plate for joint fusion *without any design modifications*. (EX1028, ¶¶19-20, 25-36). According to Dr. Holmes, a surgeon prepares a joint for fusion by first removing cartilage between the bones and reshaping the surfaces of the bones. (*Id,* ¶30; EX1006, ¶62). In particular, "surgeons typically shave straight (transversely) across the distal surface of the tibia to create a flat surface to oppose with the flat surface of the dorsal surface of the talus" to help create a biomechanically stable joint for fusion. (EX1028, ¶¶31-32). The bones are then positioned to create the optimal biomechanical alignment for proper gait following the fusion. (*Id.,* ¶33). The Falkner plate would be positioned to span the joint in the range between the angled screw hole and the internal blade to optimize purchase and efficacy. (*Id.,* ¶35). Depending on patient anatomy, the plate could be contoured with plate benders. (*Id.,* ¶34).

21

The following modified illustration (Figure 1(b)) shows how a POSITA

would use the same Falkner plate of Figure 1 to fuse a tibiotalar joint:



(EX1028, ¶36).

Falkner's disclosure expressly enables a POSITA to use its bone plate for joint

fusion, and teaches all of the ***structural*** limitations set forth in the challenged claims.

*See, e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379

(Fed. Cir. 2001) ("[A]nticipation does not require actual performance of suggestions

in a disclosure.  Rather, anticipation only requires those suggestions to be enabling

to one of skill in the art….").

### 2.    Falkner Discloses the Claimed "Second End"

Falkner's second end includes a portion of the external bone plate ***as well as***

the entirety of the internal blade.[6]  (Pet., 43-44; EX2003, 86:23-87:2).  Attempting

to avoid Falkner, Patent Owner improperly redefines the "second end" to include

***only*** the internal blade, arguing that, because the "second end" is "internal to" the

bone, it cannot conform to the geometry of the bone.  (POR, 51).

The only structural limitations of the claimed "second end" are that it

comprises "at least one fixation point" and "a second inner surface," and that a

"bridge portion" is disposed between the first and second ends.  Under these

parameters, Falkner's "second end" includes "a second inner surface configured to

substantially conform with a geometry of the second discrete bone."  (EX1002,

¶¶178, 223).  Indeed, Falkner expressly and repeatedly teaches that the inner (bone

facing) surface "may be contoured generally to follow an exterior surface of a target

---

[6] Because Falkner's "second end" includes the internal blade, Falkner clearly
discloses that "at least a portion of said bridge portion ha[s] a thickness greater than
at least a portion of the thickness of…the second end" as required by the challenged
claims.  (Pet., 45-47, 57-58).  Patent Owner does not dispute that Falkner meets the
claim 11 limitation "bridge portion…having a thickness greater than…the first
end."  (EX1006, ¶¶32, 35).

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————————

**PATENT TRIAL AND APPEAL BOARD**

———————————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

———————————

Case IPR2021-01450
U.S. Patent No. 8,529,608

———————————

**PATENT OWNER SUR-REPLY**

"recite the structural differences between the claimed invention and the prior art." (*Id.*, 268). The claims are therefore limited to a system for securing two discrete bones spanning a joint. (*Id.*, 296).

## B.    "trajectory"

Petitioners have two separate complaints regarding the proposed construction of "trajectory": (1) the angle should not be fixed; and (2) the angle is not fixed relative to the "neutral bending axis." Both arguments are contrary to the specification and should be disregarded.

First, the specification makes clear that "trajectory" is a fixed angle. It describes how "increased plate thickness around transfixation screw hole 102 may also enable transfixation screw hole 102 to be *machined* into bone plate 100 at *an angle* relative to the top surface of bone plate 100." (Ex. 1001, 8:47-52).[1] When the screw hole is machined into a plate at an angle (not a range of angles), it is understood that it is going to be at a fixed angle, and in fact, dependent claims 4 and 5 recite those angles as being 30, 50, and 70 degree trajectories. (Ex. 1001, cl. 4, 5). The specification repeatedly refers to "a trajectory" and discusses directing the transfixation screw at a single trajectory. (Ex. 1001, 5:53-57, 6:4-12, cls. 1, 11; *see also* Ex. 2002, ¶95).

---

[1]    All emphasis added unless noted.

If a surgeon had wide latitude on the angle of the screw trajectory and it was not fixed relative to the neutral bending axis of the joint, then there would be no way to ensure that the tensile load is transferred to the bridge portion as claimed, which would frustrate the purpose of the invention.  (Ex. 1030, 86:19-87:21).  To the extent a surgeon needs to have the ability to cross the joint at different angles, he or she would be provided with a kit that includes multiple plates, each one with a single fixed angle of 50, 55, 60, 65 and 70 degrees.  (Ex. 2002, ¶96; *see also* Ex. 1001, 6:25-30).

Second, using the neutral bending axis as a reference point for the trajectory is the only reference point that makes sense based on the specification.  As explained by Mr. Sommers, the neutral bending axis of a particular joint approximates the direction of the elongate axis of the bone plate that is applied to that joint.  (*See* Ex. 2002, ¶94).  When the plate is applied to the compression side of the bone, as described in the '608 Patent, the transfixation screw *must* cross the neutral bending axis in order to transfer the tensile load from the tension side to the compression side.  (Ex. 2002, ¶50; *see also* Ex. 1030, 86:19-87:21).

Contrary to what Petitioners say, Patent Owner's expert did not say the neutral bending axis of a particular joint may shift depending on the position of the bone plate and the loads exerted on that joint.  He explained that the neutral bending axis

changes *as the bone heals*, but that it is usually in the center of the bone.  (Ex. 1030, 60:7-13).  This is entirely consistent with Dr. Gall's testimony.  (*See* Ex. 1002, ¶118).

Thus, "trajectory" should be construed to mean an "allowable fixed angle relative to at least the neutral bending axis of the joint."

## III.    THE CHALLENGED GROUNDS

### A.    Ground 1: Claims 1-5, 9-14, and 17 are not anticipated by *Slater*

#### 1.    *Slater* fails to anticipate Claim 1

##### a.    Petitioners change what is identified as the "bridge portion"

Claim 1 requires "a transfixation screw hole disposed along the spine…such that the transfixation screw extends *through the bridge portion* at a trajectory."  (Ex. 1001, cl. 1).  The Petition identified the claimed "bridge portion" in *Slater* as *not including* the transfixation screw hole; however, now in reply, Petitioners modified the figures *to include* the transfixation screw hole:

| **Figures from Petition** | **Figures from Reply / Ex. 1027** |
|:---:|:---:|




(Petition, 24 vs. Reply, 15 and Ex. 1027, ¶36; *see also* Ex. 1002, ¶¶109-111, 113).

When questioned on this issue, Dr. Gall confirmed that he correctly identified the

bridge portion of *Slater* as ***not including*** the transfixation screw hole:

> Q.   And in paragraph 110 you identify the bridge portion of claim 1; correct?
>
> A.   Yes.
>
> * * *
>
> Q.   Sure. In the annotated figure on page 60, you have circled the bridge portion in yellow; is that correct?
>
> A.   Yes.
>
> Q.   And that circle accurately reflects what you're identifying as the bridge portion of the plate?

A.    Yes.

(Ex. 2003, 51:17-52:7; *see also* Ex. 1002, ¶110).  Petitioners' attempt to modify this unequivocal declaration of the identified bridge portion in *Slater* is untimely, improper, and contradicted by the sworn testimony of Dr. Gall.

Petitioners' original selection of the bridge portion of *Slater*, i.e. without including the transfixation screw hole, is further flawed as the tensile load cannot be transferred from the second bone, through the screw, and into the bridge portion without including the screw hole as part of the bridge.  (*See* Ex. 1030, 67:6-11, 74:6-25; Ex. 1001, 6:12-18; Ex. 2002, ¶50).  Given Petitioners intentionally selected the portion of the *Slater* plate as the bridge portion that did not include the transfixation hole in the Petition to establish the other elements of the independent claims, such a change in theory in *Slater* in reply should not be permitted.

### b.    Petitioners now construe "through" as "alongside"

Petitioners now argue that "through" in claim 1 should be interpreted as "alongside."  (Reply, 12-13).[2]  Given the clear intent during prosecution, and claim

---

[2]  Petitioners also argue the claim was not properly corrected using a certificate of correction.  (Reply, 13-14).  First, the Patent Office accepted the request and issued the certificate of correction.  (Ex. 1004, 336).  Second, the claim amendment on May 14, 2013 clearly shows the error that occurred—applicants

differentiation with claim 11 (which ***does*** claim "alongside the bridge portion"), the

Board should not interpret "through" as "alongside."  The only explanation for this

shift in theories now is that Petitioners realized the Petition failed to identify the

bridge portion of *Slater* as including the transfixation screw hole, as required by

claim 1:

| **Figures from Petition** | **Figures from Reply / Ex. 1027** |
|---|---|

 

---

struck "alongside" and added "through" via underlining, but mistakenly included

a strike-though to the word "through."  (Ex. 1004, 289).  To now argue applicants

intended the term to mean "alongside" when they replaced it with "through" is

illogical.

(Petition, 24 (identifying bridge portion *as not including* transfixation screw) vs. Reply, 15 and Ex. 1027, ¶36 (identifying bridge portion *as including* transfixation screw)). Given the plain language of claim 1, the Board should not interpret "through" as "alongside."

### 2. Petitioners Rely on Two Separate and Distinct Embodiments

Anticipation requires the elements be "arranged or combined in the same way as recited in the claims." *Net MoneyIN*, 545 F.3d at 1370; *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim."). Anticipation is improper where the reference does not "clearly and unequivocally disclose the claimed" invention. *See In re Arkley*, 455 F.2d 586, 587 (1972).[3]

Petitioners continue to rely on components from two separate embodiments (indeed different plates) in *Slater* as disclosing all elements of claims 1 and 11. As Mr. Sommers noted previously, the Figure 5 plate 80 embodiment is unique in numerous ways that make clear it is *not* the same as the Figure 1 plate 1 embodiment:

---

[3] Petitioners have doubled-down on the position that the disclosure in *Slater* expressly discloses the Challenged Claims, failing to even argue that to the extent the disclosure is not express, it is inherent. That argument is therefore waived.



(Ex. 2002, ¶59; Ex. 1005, Figs. 1, 5, 6 (annotated)).

Petitioners offer no response to Patent Owner's identification of these structural differences (*see* POR, 27-28), and instead, now allege that Figure 1 is simply a schematic drawing (Reply, 6), an argument which does not appear in the Petition. The structural differences are not explained by the "schematic" nature of Figure 1. For example, the orientation of openings 11 and 12 are along the length of portion 5 (Fig. 1), whereas the orientation of openings 84 and 85 are perpendicular to the length of portion 81 (Figs 6-7):



(Ex. 1005, Figs. 1, 5-7).

Petitioners' argument the drawings are all directed to a single preferred embodiment because the heading says "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT," (Reply, 7) is belied by the description of Figure 1 ("according to *one embodiment*" and "according to *the embodiment shown*") and Figure 2 ("according to *this embodiment*") compared to that of Figure 5 ("according to *a preferred embodiment*"). (Ex. 1005, 11:2, 11:5, 11:32, 12:15, 13:5-6). It would be an error to find the text of a single heading controls when the specification makes clear that each is directed to a separate embodiment.

As another attempt to find support in the specification, Petitioners point to the detailed description of Figure 5, stating it "refers back to plate 1 of Figure 1," (Reply, 7); however, the first citation is describing plate 80 of Figure 5 (Ex. 1005, 13:5-6),

and the second is referring back to how Figure 1 places screws in the joint (*Id.*, 14:1-2).

The Petition also offers no explanation how the combined disclosures would operate as a single plate, nor does it demonstrate how the tensile load is transferred from the second bone, through the screw and into the bridge portion. The finite element analysis discussed in *Slater* only describes the plate being "fixed along its proximal length onto an idealized tibia," and does not provide any details regarding how securing the transfixation screw into two (or three) bones impacts the analysis. (*See* Ex. 1005, 18:1-2).

Given the missing elements from each embodiment and the mixing and matching Petitioners have done in an attempt to demonstrate disclosure of the Challenged Claims, *Slater* cannot anticipate the Challenged Claims. As a last ditch effort, Petitioners point to rejections made to the corresponding PCT application as evidence of why the '608 Patent is unpatentable over *Slater*. (Reply, 3-4). This, however, cuts against Petitioners' arguments and actually shows it *is* patentable over *Slater*. *Slater*'s inclusion in full in the file history (Ex. 1004, 89-123) is conclusive evidence that the examiner had *Slater* in front of her and determined the claims were patentable over it.

### 3. *Slater* Discloses a Variable Angle Plate

As described above, the claimed transfixation screw hole has a trajectory that is at a fixed angle relative to the neutral bending axis of the joint. (*See* Section II.B). *Slater* allows for "adjustable orientation" in opening 26 based on "a predetermined allowable angular range," which Petitioners identify as the transfixation screw hole. (*See* Petition, 22; *see also* Ex. 1005, 12:23-25, 11:21-22). If a surgeon was permitted to vary the angle of the transfixation screw of the '608 Patent, there would be no guarantee the trajectory would cross the neutral bending axis of the joint and absorb tensile load into the bridge portion when the second bone is loaded relative to the first. Therefore, the purpose of the invention—to provide a fixed angle bone plate applied to the compression side of the joint to absorb the tensile load via the transfixation screw—would be frustrated.

While Petitioners' main rebuttal argument is the angle need not be fixed to meet the claims, Petitioners now argue that "once the screw is threaded into the bone, the screw trajectory, and thus the angle, is fixed." (Reply, 12). First, this theory is new, thus, it is improper and should be disregarded. (*See* Section III.C.1). Secondly, reading opening 26 as having a fixed trajectory is contrary to the disclosure of *Slater*. When *Slater* desired for the trajectory of a certain hole to be fixed, it described the hole as such: "formation 13 of opening 12 directs screw 10 at a predetermined angle which optimises fixation." (Ex. 1005, 11:15-16). Opening 26 is meant to be a

13

variable angle hole. (Ex. 1005, 11:19-22 ("an angle within a predetermined allowable angular range"); *see also* Ex. 2003, 65:1-4).

### 4. Petitioners Rely on Figure 5 for "thickness" limitations

The device in Figure 1 lacks all of the claimed features, and thus cannot anticipate. *See TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1374 (Fed. Cir. 2018) ("Claims cannot be 'anticipated' by devices that are not the same."). Petitioners continue to disregard this, instead arguing that multiple embodiments may be combined. Regarding Petitioners' argument that the pliable regions are at the ends, and the "maximum thickness" is over the ankle joint (Reply, 10), this teaching is not tied to Figure 1, nor does it address *Slater's* discussion of the importance of pliability at the **bending** region of the plate, which is over the joint, not at the ends. (*See* Ex. 1005, 17:2-3). Given that Figure 1 fails to disclose any "bridge" portion thicker than any other portion, *Slater* cannot anticipate the Challenged Claims.

### B. Ground 3: Claims 1-3, 6, 8-13, and 17 are Not Anticipated by *Falkner*

### 1. Petitioners Include New Reply Evidence

Pursuant to 37 C.F.R. § 42.23(b), a petitioner may not bolster its original case-in-chief with new theories and evidence in its reply brief. *Intelligent Bio-Sys., Inc.*, 821 F.3d at 1369. "Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." Consolidated Trial Practice Guide (Nov. 2019) ("CTPG"), 73.

"While replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.*, 74. "Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for the patentability or unpatentability of an original or proposed substitute claim, such as newly raised rationale to combine the prior art references that was not expressed in the petition." *Id*. "It is also improper for a reply to present new evidence (***including new expert testimony***) that could have been presented in a prior filing, for example newly cited prior art references intended to 'gap-fill' by teaching a claim element that was not present in the prior art presented with the petition." *Id*., 74-75.

Relying on a single sentence from *Falkner* that stated "plate 22 may span a joint," the Petition alleged *Falkner* anticipated the Challenged Claims. Now, after Patent Owner and the Board pointed out the fatal flaws in Petitioners' anticipation arguments, Petitioners include a 23-page declaration from a medical doctor alleging why *Falkner* would only need simple modifications to meet the Challenged Claims.[4] (*See* generally, Ex. 1028). There is no reason that the proposed modifications to *Falkner* described in Dr. Holmes' declaration could not have been raised in the

---

[4] As discussed below, this declaration provides substantial modifications that demonstrate *Falkner* is not an anticipatory reference. *See* Section IV.B.3.

15

Petition. "It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" *Intelligent Bio-Sys., Inc.*, 821 F.3d at 1369. It was Petitioners' burden to demonstrate, in the Petition, that *Falkner* anticipated the Challenged Claims, which Petitioners failed to do.

Dr. Holmes makes a veiled attempt in his declaration to respond to "Mr. Sommers' opinions regarding the Falkner plate" to justify the lack of timeliness of his opinion. (Ex. 1028, 13; Ex. 2006, 16:1-6). Petitioners, however, hired Dr. Holmes at least as early as December 2021 (Ex. 2006, 7:4-11), before any declaration from Mr. Sommers was provided. Petitioners were therefore aware at that time the Petition lacked sufficient analysis to support a claim of anticipation by *Falkner*, and Petitioners should have sought leave to serve a reply brief in response to the Preliminary Response.

Petitioners' belated attempt to "gap-fill" deficiencies in the Petition by "belatedly present[ing] evidence" is plainly improper. CTPG, 74. Accordingly, Dr. Holmes' declaration and Section III.B of the Reply should be disregarded in full.

### 2.    The Proposed Modifications to *Falkner* Make it is Impossible for the Tensile Load to be Transferred to the Bridge Portion

As the Board noted, "it is not a foregone conclusion that all the claim limitations would be met" even if the plate in *Falkner* was modified to cross a joint. (*See* Decision, 32).    Instead of providing support in *Falkner* for the proposed changes, Petitioners rely on Dr. Holmes, a completely new expert, to show why the modifications are allegedly disclosed by *Falkner*.    Dr. Holmes relied on very little support from *Falkner*, instead describing why a surgeon would make these changes based on his own experience.    (Ex. 1028, ¶22; *see also* Ex. 2006, 37:13-38:20).

Not only are the modifications not disclosed or described in *Falkner*, the resulting plate demonstrates that the Challenged Claims are not anticipated by *Falkner*.    For example, the claims require transferring the tensile load through the screw and into the bridge portion (claims 1, 11), that the trajectory is configured to cross a neutral bending axis of the joint (claims 2, 12), and that the first position resides on a compression side of the joint and the second position resides on a tension side of the joint (claims 3, 13).    Such limitations cannot be met by Dr. Holmes' modified *Falkner* plate because the screw fails to cross the neutral bending axis into the tension side of the bone, thus making it impossible to transfer the tensile load into the bridge portion:

17

**From Dr. Gall's First
Declaration (Ex. 1002)**

**From Dr. Holmes Reply
Declaration (Ex. 1028)**




(Ex. 1002, ¶197 vs. Ex. 1028, ¶36 (with the neutral bending axis annotated in red)).

In order for the screw to be anchored on the tension side, the length of the internal portion of the plate would need to be extended. However, when Dr. Holmes was asked whether such modifications would need to be done to the length of the plate, he unequivocally answered no:

Q   Are there instances where you would want to extend the length of that internal portion?

A.   Given my understanding of the use of a blade plate for fusion, the length that is represented here is sufficient. Going further across or longer with the insertion portion would not appreciably increase the efficacy of the plate.

(Ex. 2006, 21:20-22:7).

Moreover, neither the original *Falkner* analysis, nor Dr. Holmes' modified analysis, establish a transfixation screw that extends ***through*** the bridge portion. Interestingly, Petitioners and Dr. Gall did not modify what was identified as the bridge portion in *Falkner* in contrast to the modification to *Slater* discussed above:



(Ex. 1002, ¶183; *see also* ¶¶224, 227).  And, because the bridge portion identified by Petitioners does not include the transfixation screw hole nor does the screw cross into the tensile side, the tensile load cannot be transferred as claimed.

### 3.  *Falkner* Fails to Disclose Extensive Modifications Required to Secure Blade-Plate to a Joint

While *Falkner* contemplates in passing that the disclosed blade-plate ***may*** be used across a joint, *Falkner* does not disclose the vast modifications required to anticipate the Challenged Claims.  This is readily apparent from the inclusion of

*seventeen* new paragraphs[5] on how the plate *may* be modified from an entirely new expert for Petitioners in reply.  This inclusion of a new expert in reply with details on how *Falkner could* be modified confirms that Petitioners' *Falkner* theory drifts from anticipation, something the Board recognized in the Institution Decision.  (*See* Decision, 32 ("our concern is that such a theory drifts from anticipation—a doctrine still rooted in 'strict identity'—to obviousness.")).

While Petitioners allege that Dr. Holmes' opinion confirms that *Falkner* explicitly discloses a bone plate "for joint fusion without any design modifications," numerous design modifications are described, including: (1) changing the location of the plate relative to the discontinuity; (2) changing the intersection location of the transfixation screw with the bone discontinuity; (3) removing several portions of bone on the first bone and the second bone so that the plate fits more securely on the bones; (4) reshaping the plate for a new bend above the transfixation screw hole; (5) relocating the first distal screw; and (6) relocating the second distal screw.  (Reply,

---

[5]  Not only is this new declaration at this stage improper because it contains new arguments not presented in the Petition, it is a clear circumvention of the word count of the Petition.  This comes after Petitioners used a citation format of "EX1001" in order to gain 300+ words in the Petition and 100+ words in the Reply.

21). These changes amount to more than slight modifications. By suggesting these modifications would be necessary to use the *Falkner* blade-plate across a joint, Dr. Holmes, and Petitioners, seemingly admit that the theory of anticipation raised in the Petition is obviousness in disguise.

With respect to modifying the location of the plate itself, this not only shifts where the plate is relative to the discontinuity, it moves the intersection location of the transfixation screw substantially closer to the left edge rather than the middle of the bone discontinuity, thus leaving a very small portion of bone between the plate and the intersection location:



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36). Such a change would impact how the tensile load is transferred from the second bone to the bridge portion.

Dr. Holmes' modifications show a substantial amount of bone removed from the joint in order to secure the plate, and assumes that such modifications are necessary because the patient may have been suffering from bone spurs:



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36; *see also* ¶29). However, *Falkner* fails to suggest or disclose any such bone removal may be necessary in order to use the blade-plate over a joint.

Dr. Holmes bends the plate to conform to the new location, with the bend located directly above the transfixation screw hole resulting in a completely new shape of the plate:



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36).

Dr. Holmes moves the first distal screw from a location that anchors into the first bone, to a location that anchors into the second bone:



Dr. Holmes moves the second distal screw from a location that intersects the first and second bone because it "does not appear to be providing any additional fixation":



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36; *see also* ¶21).

Petitioners rely on Dr. Holmes' extensive modifications, none of which are disclosed in *Falkner*, in an effort to show that *Falkner* expressly discloses each and every element of the Challenged Claims.  Given that these arguments were not presented in the Petition, and because the extensive modifications required for *Falkner*'s plate to be used across a joint go beyond what reasonably could be anticipation, the Board should disregard Dr. Holmes' declaration in full.

Trials@uspto.gov                          Paper No. 42
571-272-7822                      Entered: January 27, 202

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

———————

IPR2021-01450  Patent 8,529,608 B
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B2
IPR2021-01453  Patent 10,245,085 B2)

———————

Record of Oral Hearing
Held:  December 15, 2022

———————

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
JAMIE T. WISZ, *Administrative Patent Judges.*

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B2)

1    the distal portion of a screw sits in the second bone.  And

2    then the shaft of the screw extends through the first bone and

3    the head is sitting inside the plate.  With that, you have the

4    tension within the screw gets directly transferred into the

5    head of the screw, and therefore, into the plate where it's

6    anchored in."  So that, of course, sounds very familiar.

7    Let's look at Slide 71.

8        The '608 Patent does not describe the transfer of

9    tensile load into the bone plate anywhere.  If you were to do

10   a word search in the '608 Patent on the word "transfer,"

11   you're not going to find it.  You're not going to find it

12   until you get to claim 1 because it's not there.  Now, does

13   that mean that the concept of transferring tensile load isn't

14   disclosed to a person of skill in the art?  No.  And Mr.

15   Sommers agrees.  Let's look at his testimony from his

16   deposition.

17       He was asked, with respect to the '608 Patent and

18   Figure 2 of the '608 Patent, "Does Figure 2 of the '608 Patent

19   show how a load is transferred into the bridge portion of the

20   bone plate?"  In -- his answer, "In concept, it does.  It

21   cannot show it physically in a line drawing, but in concept,

22   it does because you know that those threads, at an oblique

23   angle, interface with the second bone and the head interfaces

24   and is in contact with the plate.  And therefore, there's a

25   transfer of load."  So that sounds also like exactly what's

IPR2021-01450 (Patent 8,529,608 B
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B

1    the bridge that's the portion that spans the joint because the

2    screw would have insufficient purchase in the first

3    metatarsal.  That's why it's written that way.  And frankly,

4    the public is entitled to rely on what's described in the

5    specification.  Similarly, let's go to Slide 61, every time

6    the specification discusses the relationship between the screw

7    and the bridge portion, the specification states that it

8    extends alongside the bridge portion.

9         So we see this here, "alongside, alongside,

10    alongside."  There's no part of the specification that says

11    the screw is not alongside.  So we do think that Slater

12    discloses this limitation that extends through the bridge

13    portion as properly construed.  Here, you can interpret the

14    claim based on the specification without having to deal with

15    the obvious '112 issues that we have.  The claim should always

16    be read in light of the specification.  And just as the

17    parties don't dispute that extends the bridge portion in the

18    '776 and the '716 is met in the same way as the one side, the

19    same is true.

20         And I do want to just point out, under their

21    construction, that excludes the preferred embodiment.  There

22    is no embodiment that discusses extends through.  It's just

23    simply not supported.

24         JUDGE MARSCHALL:  In the -1453 case for the '085

25    Patent, you proposed a construction of "near at?"

36

IPR2021-01450 (Patent 8,529,608
IPR2021-01451  Patent 9,351,776 B
IPR2021-01452  Patent 9,763,716
IPR2021-01453 (Patent 10,245,085 B2)

1      MS. HWANG:  Yes.

2      JUDGE MARSCHALL:  I take it, if we construed it to

3  mean "adjacent to," you wouldn't have a problem with that?

4  That adjacent to and near are somewhat synonymous; is that

5  accurate?

6      MS. HWANG:  Yes.  Yes.  That would be consistent

7  with the specification, as well.

8      So I do want to hit Falkner, Ground 3, and leave

9  sufficient time for Mr. Sparrow, as well.  But in Falkner,

10  let's go to Slide 94 and, really, Slide 98.  We're back at the

11  preamble again.

12      The issue here is really whether or not the -- I'm

13  sorry -- whether or not Falkner discloses a bone plate that is

14  configured to cross -- I'm sorry -- a bone plate or system for

15  securing two discrete bones together across a joint between

16  the two bones.  And as we know, originally, after the Petition

17  was filed, the POR listed 11 separate modifications that Mr.

18  Sommers and the Patent Owner said had to be done in order for

19  the Falkner plate to be used across a joint.

20      And then we came up and said, No, that's not true.

21  Not only does Falkner specifically say it's this plate that

22  can be used across a joint.  We have the testimony of Dr.

23  George Holmes that pretty much confirms that a surgeon or a

24  person of skill in the art would understand that the Falkner

25  plate could be used across a joint.

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B2)

1    These are medical devices. At doesn't mean near. It means

2    at. Now, if at means at, they have another alternative theory

3    nowhere disclosed in the Petition that, again, we redraw the

4    box, and now we're at.

5          JUDGE MARSCHALL: I take it, you would disagree with

6    the construction of "at" meaning "adjacent to"?

7          MS. BEANE: We would absolutely disagree with that.

8    I think the specification that we've discussed supports "at"

9    means "at." There's clear disclosure in the specification that

10    there can be a transfixation screw hole at the thickened

11    portion 136 of the bridge portion 130. So we would definitely

12    dispute that. And again, that's not a construction that was

13    offered in the Petition.

14          JUDGE MARSCHALL: As I read the specification, I

15    believe it describes a bridge portion and a thickened portion.

16    And a thickened portion may extend beyond the bridge portion;

17    is that accurate?

18          MS. BEANE: I think it also says that as well, yes.

19          JUDGE MARSCHALL: So couldn't the screw being going

20    through the thickened portion without going through the bridge

21    portion if the thickened portion may extend beyond the bridge

22    portion?

23          MS. BEANE: That -- I think that's a fair read of

24    certain embodiments in the '608 Patent. And then again,

25    there's other embodiments where that's not the case.

IPR2021-01450   Patent 8,529,608 B2)
IPR2021-01451   Patent 9,351,776
IPR2021-01452   Patent 9,763,716
IPR2021-01453   Patent 10,245,085 B2

1  support that they can identify -- the Petitioner has

2  identified now in reply that Slater discloses the transfer of

3  tensile load.

4      And this is a big issue because it was a concept

5  that was disclosed readily in the institution decision as

6  really not being apparent from the disclosure of Slater.  It

7  could have benefited from further analysis.  This is the

8  analysis that we they have, which I have here on Slide 28.

9  The finite element analysis test, which shows nothing.

10      JUDGE SNEDDEN:  Maybe I'm having trouble

11  understanding what tensile load is then in that regard because

12  it seems, to me, that it -- the operations -- the mechanics of

13  it, seem very similar.  So if it's not working -- if Slater is

14  not working via tensile load, then how is it working in

15  comparison with what's described in this spec?

16      MS. BEANE:  I don't think it tell us that in Slater.

17  And just on tensile load, my understanding, the way it's been

18  described and how Mr. Sommers explains in the declaration that

19  we've submitted, is that a joint always has a compression and

20  a tension side.  And typically, you would want to put a bone

21  plate on the tension side to compress it and prevent it from

22  opening up.

23      But in some scenarios, you would have to put it on

24  the compression side.  And so you are trying to still prevent

25  that opening of the tension side through some other mechanism.

72

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B
IPR2021-01452 (Patent 9,763,716
IPR2021-01453  Patent 10,245,085 B2)

1      JUDGE SNEDDEN:  What would be the compression side

2   and tensile side?  What are the differences?

3      MS. BEANE:  So in the ankle bone that they've

4   identified, they show the tension side being on the back and

5   the compression side being in the front, which I think makes

6   sense when you think about the ankle, and it would be

7   separating out.  But I also believe, in Slater, they

8   disclosure actually fixing the top and bottom portions and

9   kind of manually compressing that joint.

10      And so it's possible that the transfixation screw in

11   Slater isn't doing anything to transfer load, other than just

12   connecting and compressing those joints.  But I think you

13   have to look in Slater, what is the teaching?  It's not there.

14   I'm sensing I haven't answered your questions.

15      JUDGE SNEDDEN:  I'm not sure I -- I think I'm

16   confused now again about tensile load and what it means.  More

17   of a technical question.

18      MS. BEANE:  Yeah.  I --

19      JUDGE SNEDDEN:  It might take a lot to get through,

20   yeah.

21      MS. BEANE:  I do think that, in my view, reading Mr.

22   Sommers' declaration where he discusses this -- you know, the

23   cantilever bones and the plates being on compression or

24   tension sides of the joint, to me, was very helpful.  Because

25   it is really the goal of this kind of plate where you're

IPR2021-01450  Patent 8,529,608 B
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2)

1    decision, it's not even just any kind of fracture, it's a

2    particular kind of fracture, a metaphyseal fracture that

3    occurs towards the end of a bone, towards the bottom of a

4    bone.  Where, a normal bone plate may not be useful in that

5    setting because it doesn't actually have the ability to fix

6    the fracture.

7            So Falkner came up with a way to address that

8    problem using a blade plate.  And the blade plate concept of

9    Falkner creates this interlocking compression across the bone

10    discontinuity.  It creates this triangle compression, so that

11    as you screw that transfixation screw hole into the end of the

12    plate, again, you're compressing the joint or the bone

13    discontinuity on itself.  This Figure 1 is the only embodiment

14    of any plate disclosed in Falkner.

15            So what does the Petitioner do?  They used the

16    Board's institution decision -- your institution decision as a

17    roadmap to come up with a new theory on reply, with a new

18    expert, with new qualifications.  As you heard today, he's an

19    orthopedic surgeon.  We didn't have an orthopedic surgeon.

20    This was not an expert they presented in their petition.  They

21    could have taken the opportunity to identify the disclosures

22    in Falkner that supported their anticipation theory.  They

23    didn't do that.  They went full-blown obviousness.

24            They've got a new expert.  They've modified the

25    figure.  They've modified the location of the figure.  There's

75

**Appx1301**

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B
IPR2021-01453 (Patent 10,245,085 B2)

1    no explanation as to why you would do that, how you would do

2    that, if you would have any reasonable expectation of success

3    in putting that kind of plate in the location that Dr. Holmes

4    suggests.

5            Why is this important?  I want to show you how Dr.

6    Holmes has modified the Falkner figure.  He starts by saying,

7    The fracture line doesn't have to be here in the corner, even

8    though that's what Falkner says.  Falkner says at paragraph 69

9    that the bridge portion of Falkner -- which is not the claimed

10   bridge portion.  It's a different disclosure of what Falkner's

11   bridge portion is, is this intersection between the interior

12   and exterior plate portions.  And the bone discontinuity

13   should hit the plate at that bridge portion.

14           And why?  Because it's creating that interlocking

15   compression concept to enhance the fixation of this fracture.

16   So Dr. Holmes says, That's not important.  I can move the

17   fracture.  And he's done that in Figure 1(a).  And then he

18   takes the whole plate and moves it down across the joint.

19   Again, this is full-blown obviousness.  This is not in

20   Falkner.  This is new figures that a new expert has created in

21   the reply.

22           So I have here on Slide 37, the citation from

23   Falkner that I just discussed, that, "The bridge portion 54,"

24   which is here, again, at the bottom of Figure 2, that corner

25   part of the plate, "may connect the exterior and interior

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B
IPR2021-01452  Patent 9,763,716 B2
IPR2021-01453 (Patent 10,245,085 B2)

1    portions of the bone plate 22.  The bridge portion may be

2    configured to span a bone discontinuity."  And again, it

3    describes doing that to create this interlocking compression.

4         And I also want to note here -- I don't want to note

5    that here.  I'm going to go to the next slide, 38.  There were

6    other changes.  And I heard today, you know, maybe we've come

7    up with new changes that were required.  We have because we've

8    got a new expert that's now showing us what they actually had

9    to do to place this thing across a joint.  And so we've

10   identified some of those things.

11        And I want to start with the one that I have here on

12   the right side of 38, the contouring of the plate.  Why was

13   this change made?  When you look at Figure 1 of Falkner, we

14   drew the shape of the plate.  And then when you go to Dr.

15   Holmes' modified Figure 1(b), we took that same contouring.

16   The shape of the plate is different.

17        Now, we asked Dr. Holmes about this at his

18   deposition.  He said, This is unintentional.  It was

19   inconsequential.  He had no specific recollection of even

20   doing this flattening of the plate.  But it's not

21   inconsequential because the claims say that the first end of

22   the plate has to conform -- substantially conform to the

23   geometry of the first bone.  They had to move the plate.

24        And frankly, if it was inconsequential or

25   unintentional, I don't know why you would spend the time to

IPR2021-01450 (Patent 8,529,608 B2
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716
IPR2021-01453  Patent 10,245,085 B2)

1    actually modify what the plate looks like on the bone.  Well,

2    they also shaved off parts of the bone.  No disclosure in

3    Falkner about shaving bone.  And frankly, if the doctor is

4    having to shave bone off your joint, perhaps, they would just

5    use a different plate where that wasn't required.

6        There's no explanation as to why you would shave

7    that bone and why you would use a plate where you had to

8    actually cut portions of a patient's bone off when it wasn't

9    necessary.

10       So let's give all the credit to Dr. Holmes.  Let's

11   look at his figure.  Let's say it's all in.  It's totally

12   reasonable to look at Falkner and make all these changes to

13   the plate and come up with a new plate.  It still doesn't

14   satisfy all the limitations of the claims.  And I've

15   highlighted many of those here.  We've got them listed on

16   Slide 39 for Your Honors' attention.  And I think that many of

17   these are very consistent, again, across all the patents, but

18   I want to highlight some of them.

19       The trajectory configured to cross the neutral

20   bending axis.  The second position residing on the tension

21   side of the joint and that transferring of tensile load.  So

22   what does Dr. Holmes' figure do to satisfy these limitations?

23   It doesn't.

24       Dr. Gall, in the Petition, drew the neutral bending

25   axis of the joint disclosed in Falkner as this blue line.  We

78

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2

1    have superimposed that line on Dr. Holmes' figure.  And you

2    can clearly see, plain as day, that the transfixation screw

3    never even touches the tension side of the joint.  So it's not

4    satisfying that claim limitation.  It doesn't reside -- the

5    second end of the screw is not anchored in this -- in the

6    tension side of the joint.  It doesn't cross the neutral

7    bending axis either.

8            Very clear, visually, you can see it.  And because

9    it never crosses the neutral bending axis and isn't touching

10   even the tension side of the joint, it's also not transferring

11   tensile load.  It's never even in the tension side of the

12   joint.  And that's, again, assuming that Falkner even

13   discloses transfer of tensile load, which we've disputed in

14   our Patent Owner response, as well.

15           So we asked Dr. Holmes at his deposition -- I'm

16   going to just stay on Slide 40 for a moment -- "Would you

17   modify this interior portion of the plate?"  So we wanted to

18   make sure we weren't going to hear at the hearing, Oh, well,

19   you could just add some length here and then it would cross

20   the neutral bending axis.  And Dr. Holmes said -- the question

21   was, "Are there instances where you would want to extend the

22   length of that internal portion?"  Dr. Holmes says, "Given my

23   understanding of the use of a blade plate for fusion, the

24   length that is represented here is sufficient."

25           Sufficient.  He wouldn't make any modifications.  He

79

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B
IPR2021-01453 (Patent 10,245,085

1    had the opportunity to do that.  He chose not to.  Falkner, on

2    its face, is not anticipatory.  Even Dr. Holmes' modified

3    Falkner plate, that we see for the first time in reply, is not

4    anticipatory.

5         Just briefly, I want to circle back to the

6    Petition's argument on Falkner.  And I have that up here on

7    Slide 42.  Falkner does not disclose the claimed second end

8    with a fixation point on the second side of the joint and the

9    inner surface configured to conform to the geometry of the

10   second discrete bone.

11        On Slide 43, I have the Petition's assertion of

12   where these elements are met.  And as you can see, the

13   Petition identifies fixation point 52 as being the second end

14   fixation point.  Well, when you look at that fixation point in

15   relation to the bone on Figure 1, it's clearly above the bone

16   discontinuity.  It's not on the second side of the bone.  It's

17   on the first side of the bone.  So you may be asking yourself,

18        Well, why did they choose that fixation point?  They

19   had to choose that because of the limitation that requires

20   that the second end also conform to the geometry of the bone.

21   They had to have some portion of this exterior plate be part

22   of the second end in order to satisfy the limitations.  And

23   that's why we end up with a second end fixation point above

24   the bone discontinuity, and why Dr. Holmes simply shifts the

25   fracture to a new location.

IPR2021-01450 (Patent 8,529,608 B
IPR2021-01451 (Patent 9,351,776 B
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2)

1        MS. BEANE:  Thank you very much for your time today.

2        JUDGE SNEDDEN:  Thank you.  You will reserve 12

3    minutes for rebuttal.  And, Ms. Hwang, you have, I believe, 20

4    minutes, correct?

5        MS. HWANG:  I think that's correct.  And I would

6    like to reserve -- I'll try to reserve 5 minutes for Mr.

7    Sparrow to rebut on Arnould.

8        JUDGE SNEDDEN:  If you could begin with my question,

9    which is what does, perhaps, that rotational load refer to?

10   Do you know the answer to that?  And then just a more general

11   question, if you can maybe get into the concept of tensile

12   load and why, you know, in your argument, that the device in

13   Slater necessarily --

14       MS. HWANG:  Transfers the tensile load?

15       JUDGE SNEDDEN:  Tensile load, yeah.

16       MS. HWANG:  Yes.  So I will confess, I haven't

17   studied the particular page in Slater that you're referring

18   to.  But my understanding is that tensile load is going to

19   include a whole bunch of different kinds of stress.  So it

20   could be bending stress.  It could be torsional stress.  It

21   could be rotational stress.  And so that is my understanding,

22   but I will confess that I am not a person of ordinary skill in

23   the art.

24       But I do want to talk about tensile load a bit more

25   because I think that, in surreply, Patent Owners introduced a

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-0145    Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2)

1    brand-new concept.  And I heard Ms. Beane discussing it just

2    now.  And they've suddenly taken the position that they never

3    took before, that the screw has to cross the neutral bending

4    axis into the tension side of the bone in order to transfer

5    tensile load into the bridge portion.  And that's completely

6    attorney argument.

7        It's not true.  It is simply a false statement.

8    First of all, the claims don't even say that.  The claims, as

9    we looked at before -- claim 1, does not require the screw

10   itself to cross the neutral bending axis into a tension side

11   of the bone.  Claim 1 only says that the screw trajectory has

12   to cross the first position on the first bone, go across the

13   portion of the joint, and go into the second bone.  That's it.

14       There's no requirement and it doesn't tie it to

15   tensile load, nor does it make sense to.  Because what about

16   claim 11 of the '608 or claim 10 or '716 or '776?  Those are

17   claims that they don't positively recite the screw.  So it

18   doesn't make any sense to tie this to that you've got to have

19   this happening in order for a tensile load to be transferring.

20       We spoke earlier that there's two different -- we've

21   -- in the papers, we basically discussed two different kinds

22   of load -- two different kinds of tensile load.  One would be

23   internal, and that's what we were talking about with the lag

24   effect.  And maybe the easiest part to look at, if you're

25   looking at the '608 Patent is, if you look at column 2, lines

87

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B
IPR2021-01453 (Patent 10,245,085 B2)

1   22 to 42, there's a discussion there that says, basically --

2   and I'm going to summarize it -- that, in the '608 Patent,

3   it's describing having a screw that goes across the joint.

4   And then it talks about lag effect.

5        And it says, Okay.  This is how you can transfer --

6   or it doesn't say transfer.  This -- you absorb tensile load

7   into the screw and this is going to help with the construct.

8   So the reason this matters -- and when we talk about the vice,

9   the tensile load that we're talking about is, as you're

10  screwing in that lag screw and you're going through the first

11  bone and into the second bone, and then, at some point, it's

12  going to stop.  Because the head of the screw is going to then

13  abut with the plate.

14       And the screw threads are only in the second bone.

15  Not in the first bone.  So the first bone -- because of the

16  smooth shaft, the first bone's not really doing anything.  So

17  the vice concept is, you're talking about the head of the

18  screw and you're talking about the threads that are in that

19  second bone and they're compressing the bones together.

20       Because, as we've seen, you need to do the -- you

21  have to compress the bones together.  You're trying to mate

22  those bones, press them together, and then you put the bone

23  plate on.  That's what joint fusion is.  And so that's one

24  kind of load.  That's the internal load that we've spoken

25  about.  And again, the claims don't say it has to be internal

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452  Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B2)

1    load or external load.  It just says load.  So that's one

2    kind.  And it is described in the Patent, talking about lag

3    effect.

4         This other idea of tension band construct that Ms.

5    Beane talked about is really talking about applied load, which

6    is external load.  So that's your walking, someone's pressing

7    on the bone.  That's like an external force that is being

8    applied to the bone.  And so because you have that vice

9    construct in place or because you've got a screw in place,

10   going across the joint, necessarily, the -- and I say

11   necessarily, and I'm not saying, Oh, this is an inherency.

12   It's not an inherency argument.  This is all fundamental

13   screw, like, physics.

14        And so this is something that a person of ordinary

15   skill in the art would understand.  And this is what Dr. Gall

16   was talking about.  So when you're talking about the external

17   load, this is where the finite element analysis is.  And that

18   was kind of showing -- the whole point of the finite element

19   analysis, by the way, was they were -- they talk about applied

20   load.

21        So they applied a gigantic amount of force onto the

22   plate or onto the screw and they measured where that force

23   went.  And then they decided, Okay.  You know, the highest

24   amount of stress ended up being in that part above the

25   transfixation screw hole because that's where the thickness

IPR2021-        Patent 8,529,608
IPR2021-01451 (Patent 9,351,776 B
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2)

1    changed.  And so that's how we know -- we know anyway -- even

2    if there was no finite element analysis, we know that's

3    happening.  That's the whole point.  That is the whole point

4    of having a bone plate with a screw.

5            If you're not going to transfer load into the plate,

6    then just don't use the plate.  That's actually a very common

7    thing to happen.  Sadly, one of my daughters broke her ankle,

8    and so I have more knowledge than I should about how this

9    works.  But certainly, there is -- there are many situations

10   where you have to screw certain bones together or certain

11   fragments together using a screw where you're not using a bone

12   plate.  You might have a bone plate on one part, but you have

13   a screw that's not touching the bone plate.

14           But the point we've been trying to make with this

15   whole -- and what the claims talk about is this notion of the

16   screwhead abutting the transfixation screw hole.  When you

17   have that, then the tensile load from the screw is going to go

18   into the plate.  It has to.  That's like that -- that's the

19   whole point of the plate.  If you don't want it to go into the

20   plate, then you just use the screw by itself.  And certainly,

21   that's something that is done.

22           And this idea of tension band construct, that's

23   separately described in the Patent in the introduction area at

24   column 2, lines 42 to 50.  But again, the claims don't talk

25   about a tension band construct.  The neutral bending axis

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453  Patent 10,245,085 B2)

1    doesn't come up until we're in claim 2.  And even then, claim

2    2 doesn't say that the screw has to cross the neutral bending

3    axis, and it certainly doesn't say it has to do so in order

4    for tensile load to be transferred.

5         It's not true.  So first of all, claim 2 just talks

6    about the central axis of the hole.  The head has to cross the

7    neutral bending axis.  That's it.  There's no discussion in

8    any of the claims that the screw itself has to cross the

9    neutral bending axis.  And that's why, you know, the entire

10   tensile load argument that they make on Falkner on the

11   modified figure, it doesn't make any sense.  That's not what

12   was claimed.

13        So I don't know if you have more questions as to the

14   tensile load portion, but I do want to make sure that that

15   part is clear.  And that, you know, you look carefully at the

16   surreply.  Every time they say it's impossible to transfer

17   tensile load unless the screw crosses the neutral bending

18   axis, there's no cites.  That's pure attorney argument.  And

19   it's simply not true.

20        As we talked about, the internal load is transferred

21   by virtue of the lag screw.  The lag screw could care less

22   about neutral bending axis.  It's just you've got the

23   screwhead.  You've got the screw threads.  And because the

24   threads are going into the second bone, compressing the bones

25   together because the shaft doesn't have any threads, that's

91

IPR2021-01450  Patent 8,529,608 B
IPR2021-01451  Patent 9,351,776 B
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B

1    causing that -- there's tensile load there and it's being

2    transferred into the head, and therefore, into the plate.

3        I did want to talk about, just briefly -- let me

4    see.  There were several areas that I wanted to clarify.  So

5    let's go to Slide -- let's start with these alleged design

6    modifications.  So let's go to 111 -- Slide 111.  Here, we

7    know that Figure 1 is purely -- Figure 1 of Falkner -- purely

8    exemplary.  And it's showing the Falkner plate being used for

9    one fracture.

10        That doesn't mean that it's a surgical guide and

11    this is the only way this plate can ever be used.  What's the

12    point of a plate that can only be used in one position as to

13    one fracture?  I do want to go to Falkner at paragraph 69.  We

14    don't have a slide on it, but Ms. Beane had a slide.  And she

15    said that Falkner at paragraph 69 says that the bridge portion

16    of Falkner -- which is different than the bridge portion we

17    are talking about in the '608, she says that it has to span

18    the joint.  And that was her reasoning as to why the bone

19    plate had to be in the same position as shown in Figure 1.

20        But I want you to look carefully at Falkner because

21    Falkner does not say that.  Falkner says that the bridge

22    portion may be configured to span a bone discontinuity.

23    That's very different than saying it has to.

24        And so it's simply not try.  And we know, from the

25    person of skill in the art that's a surgeon, that there's lots

92

IPR2021-01450  Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716
IPR2021-01453  Patent 10,245,085

1    of different positions that you can put the Falkner bone plate

2    and it will work just fine.  Dr. Holmes talked about

3    positioning of the plate at paragraphs 22, 27, and 28.

4         With respect to removing several portions of the

5    bone, let's go to Slide 116.  This idea of resecting the bone,

6    this is not something that we just made up for purposes --

7    this is how joint fusion works.  You don't have joint fusion

8    on the bone that's in Figure 1.  You have to.  You have to

9    resect the bone and you have to have the opposing mating

10   surfaces go together.

11        116 is showing this is contemplated by Falkner.  So

12   Falkner recognizes you have to prepare the target bone or

13   bones for installation of the bone plate.  For example, you

14   know, you remove cartilage and you also have to remove the

15   bone.  If we look at the '608 Patent even -- and we don't have

16   a slide on this -- or do we?  At 115.  I can't remember if

17   this was in the slide.

18        But the point is that, in the '608 Patent, yes.

19   Okay.  At column 4, lines 37 to 43, the '608 Patent recognizes

20   that, when you're using these plates, you have to remove the

21   cartilage from the joint, and then you have to reduce the

22   opposing faces of bones to bleeding bone bed.

23        So this is not something new that was made up.  This

24   is just how this is used.  So again, we've got to be using at

25   the prior art references with an eye towards a person of skill

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2
IPR2021-01452  Patent 9,763,716 B
IPR2021-01453 (Patent 10,245,085 B2)

1     in the art, who is not an automaton.  Let's go to Slide 119

2           The notion of reshaping the plate, this isn't

3     something new thing either.  This is specifically contemplated

4     by Falkner, as well.  Let's go to Slide 120.

5           So at No. 5, "Adjust the shape of the plate, if

6     desired, to adjust the fit of the bone plate in relation to

7     the target bones."  Dr. Holmes, in his declaration, described

8     how you have to do this in pretty much most -- most times,

9     when you're using a bone plate, whether it's for joint fusion

10    or for a fracture or fixation, it's common to have to use

11    plate benders.  Why is it common?  Because everyone's anatomy

12    is different.  You don't know if you're going to have a giant

13    linebacker come in for surgery or if it's going to be a five-

14    year-old child.

15          Even within different age groups, people's bones

16    look different, and they're going to be shaped different.  And

17    you're not going to be able to have a kit of bone plates

18    that's going to fit every person in the world.  It's just not

19    going to happen.  So what they do is they provide -- in the

20    kit to the doctors, they always provide plate benders.  So

21    this is not a new concept.  It's very common, in orthopedics,

22    that you would be using plate benders, particularly, to shape

23    that proximal end of the plate.

24          So Dr. Holmes, in his declaration, talks about that

25    because you don't want the plate to be sticking up.  You need

94

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451 (Patent 9,351,776 B2)
IPR2021-01452 (Patent 9,763,716 B2)
IPR2021-01453 (Patent 10,245,085 B2)

1    it to be flat.  People that have bone plates don't want to

2    have things sticking through the skin.  They need it to be

3    lying flat.  That's why you have plate benders, so that you

4    can make sure that the anatomy is -- it's adjusted for

5    people's anatomy.  Of course, like the Falkner plate, it is --

6    it's supposed to be designed to contour the bones, but it's

7    never going to be perfect.  You've got to have plate benders

8    available in case there isn't a perfect fit.

9        Can you to go to Slide 100, please?  I heard Ms.

10   Beane was talking about structural limitations.  And she

11   showed you a small part of the file history in which there was

12   an amendment made.  This is the full amendment showing that,

13   not only -- the only words that were added to the claim --

14   this is not a structural difference.  The only words added in

15   the preamble were "too discrete," and "between the two bones."

16   Those are not structural differences.

17       There were some other amendments made in the same

18   amendment, such as adding the portion about the bridge having

19   a thickness greater than at least a portion of thickness of

20   either the first end or second end.  That's a structural

21   difference.  That was added.  That's what was being discussed

22   there.  And not -- in fact, if you look at the full amendment

23   and the examiner's objection, you'll see that the whole point

24   was the examiner was saying, you -- there's not a structural

25   difference just because you use a bone plate for a joint

IPR2021-01450 (Patent 8,529,608 B2)
IPR2021-01451  Patent 9,351,776 B2
IPR2021-01452  Patent 9,763,716
IPR2021-01453  Patent 10,245,085 B2

1   requires the tension side to remain the same throughout the

2   operation?

3       MS. BEANE:  Yes.  I think that, in order to achieve

4   the goals that are described in the '608 Patent, it would be

5   the same --

6       JUDGE MARSCHALL:  Okay.

7       MS. BEANE:  -- throughout the use of the plate.

8       JUDGE MARSCHALL:  So that's kind of the claim

9   construction argument we would have to adopt from your end on

10   whether the sides must remain the same.  But the second issue

11   -- and I think Dr. Sommers might agree with this -- that there

12   are tensive and compressive forces operating in Slater,

13   correct?

14       MS. BEANE:  I believe that he did say that.  It's

15   not clear exactly what those forces are and whether they're

16   being absorbed into -- through the plate.

17       JUDGE MARSCHALL:  Okay.  Well, just on my gut, what

18   -- well, it seems like there's tensive forces on Slater.  It

19   seems like they're going to be loading up on the screw head

20   and transmitted through that interface between that screwhead

21   and the plate.  And therefore, if the screwhead is part of the

22   bridge portion, which I understand is another dispute, that

23   those loads would also be transferred to the bridge portion of

24   the plate.  Am I missing something there?

25       MS. BEANE:  I think that you're correct.  If the

**UNITED STATES PATENT AND TRADEMARK OFFICE**

—————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

—————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.

Petitioners,

v.

OSTEOMED LLC,
Patent Owner

—————

Case IPR2021-01450

Patent 8,529,608

—————

**DECLARATION OF KENNETH A. GALL, PH.D. IN SUPPORT OF
PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,529,608**

STRYKER Exhibit 1002
Page 1 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

96.    Ground 3:  Falkner discloses all of the claim elements of Claims 1-3, 6, 8-13, and 17 of the 608 patent and thus anticipates those claims.

97.    Ground 4:  Claims 4, 5, and 14 of the 608 patent would have been obvious over Falkner in view of Arnauld.

98.    Ground 5:  Claims 1-5, 9-14, and 17 of the 608 patent would have been obvious over Arnauld in view of Slater.

99.    Ground 6:  Claims 6 and 8 of the 608 patent would have been obvious over Arnauld in view of Slater and Weaver.

## IX.    GROUND 1:  SLATER ANTICIPATES CHALLENGED CLAIMS 1-5, 9-14, AND 17 OF THE 608 PATENT

100.    In my opinion, Slater discloses all of the elements of each of claims 1-5, 9-14, and 17 of the 608 patent and thus anticipates those claims.

### A.    Independent Claim 1

101.    I have compared claim 1 to Slater in the following chart.  In my opinion, Slater discloses all the elements of claim 1 of the 608 patent and therefore anticipates claim 1.

|  | **608 Patent, Claim 1** | **Slater (Ex. 1005)** |
|---|---|---|
| 102. | 1. A system for securing two discrete bones together across a joint | To the extent the preamble is limiting, Slater includes a system for securing two discrete bones together across a joint between the two bones. |

- 45 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | **608 Patent, Claim 1** | **Slater (Ex. 1005)** |
|---|---|---|
| | between the two bones, comprising: | For example, the Slater Abstract describes "[a] fusion plate for arthrodesis." *See* Ex. 1005 at Abstract. "Arthrodesis" is defined as "the surgical immobilization of a joint so that the bones grow solidly together." Ex. 1020.<br><br>Figure 1 of Slater "shows a side elevation view of a plate according to one embodiment and attached via fixation screws to an abbreviated ankle joint (dotted lines)." Ex. 1005 at 9:28-30. While Figure 1 illustrates that the Slater fusion plate 1 can be used to secure three discrete bones (tibia 4, talus 3, and calcaneous 28) across two joints, Slater also contemplates that the fusion plate 1 can be used to secure two discrete bones (tibia 4 and talus 2, within the oval annotated into Figure 1 immediately below) together across a single joint between the two bones. *Id.* at 12:3-4 ("As may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis.").<br><br> |

- 46 -

STRYKER Exhibit 1002
Page 49 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | *See* Ex. 1005 at Fig. 1.<br><br>*See also id.* at 6:17-18 ("The present invention provides an improved **arthrodesis fusion plate** . . . ."); 6:18-21 ("More particularly the invention provides an ankle plate in which openings in the plate receive fixation screws **allowing compression of bones being fused** and orientation of the fixation screws to optimise accommodation of bone loading for **efficient and effective fusion**."); 6:24-28 ("This invention further relates to a kit including an anterior ankle **fusion plate** and which includes a selection of fasteners for fixation of the ankle plate in a prescribed manner so that the orientation of the screws provide **optimal compression and bone fusion**."); 6:30 ("This ankle **fusion plate** according to the invention . . . ."); 6:34-7 ("Although the invention will be described with reference to its application to ankle fusion it will be appreciated by persons skilled in *the art* that the invention may be applied to the repair/ fusion of other bones requiring axial alignment."); 7:19-21 ("In another broad form the present invention comprises: an implant kit for arthrodesis fusion the kit comprising: a **fusion plate** . . . ."); 8:3 ("a fusion plate for arthrodesis"); 8:13-16 ("Preferably the inner surface of the **first portion of the plate opposes the anterior tibia**. Preferably the inner surface of the **second portion** of the plate **also opposes the anterior tibia**. Preferably, the inner surface of the **third portion of the plate** disposed in the first plane **opposes the talus**."); 8:19-22 ("The second portion of the plate includes a slotted opening which receives a **screw** of a second type which is of **sufficient length to penetrate the tibia, talus and Calcaneus bones**."); 8:27-28 ("The screws in each portion of the plate are directed at required angles according to the joint/s required for **arthrodesis** . . . ."); 9:28-30 ("FIGURE[] 1 |

- 47 -

STRYKER Exhibit 1002
Page 50 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | shows a side elevation view of a plate according to one embodiment and attached via fixation screws to an abbreviated **ankle joint** (dotted lines).”); 11:1-4 (“Referring to figure 1 there is shown a side elevation generally schematic view of a fusion plate 1 for arthrodesis according to one embodiment. Plate 1 is attached to an ankle joint 2 opposing the **Talus bone** 3 **and Tibial bone** 4.”); 12:3-4, 14:1-2 (“As may be seen from figure 1 the screws a[r]e placed in a particular orientation and required angle to the **joint/s required for arthrodesis**.”); 12:4-5, 14:2-3 (“. . . is also necessary to achieve maximal compression of the **fusion site/s**.”); 12:6-10, 14:4-8 (“Preferably, portion 30 is disposed in a first plane which generally aligns with an opposing face of tibia 4. **Portion 20** lies in a second plane at a first angle relative to the first plane and **aligns with** an **opposing face** of the **distal tibia**. **Portion[] 5** li[e]s in a third plane at a second angle relative to the first plane and **engages the talus**.”); 13:5-9 (“Plate 80 which is **attachable to an ankle joint opposing the Talus bone and Tibial bone**, comprises a portion 81 disposed in a first plane which generally aligns with an anterior surface of the talus.”); 15:12-16 (“An ideal **tibial length of the plate** would be approximately 80mm. The contour of geometry over the distal aspect of the tibia will be incorporated into the design of the plate. The **length from the L point out to the phalanges** would be about 25mm in length and at this point the plate would taper out to around 35mm.”); 16:6-9 (“This plate also significantly increases the ease of pantalar fusion and also allows the ability to start with ankle fusion and add the **pantalar arthrodesis component as required**.”); 16:28-30 (“One significant advantage of the plate described herein is the oblique screw portal allowing for various angles and **the ability to incorporate more joints into the arthrodesis** as required.”); 17:3-5 (“The **plate allows the talus to be fused with the tibia** |

- 48 -

STRYKER Exhibit 1002
Page 51 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | thereby providing a supporting bridge which is helpful for patients with large ankle defects."); 17:8-10 ("For example if a surgeon is revising a total ankle replacement the same incision can be used as that used when removing a joint replacement and **treating with arthrodesis**."); 20:14-16 ("**Arthrodesis plates** with different geometry and dimension such an alternative thickness distributions and angulations may result in different measured loadings and plate response."); 21:6-20, 26:14-23 ("1.[/55.] A fusion plate **for arthrodesis**, the plate comprising: . . . ."); 22:17-23:13 ("17. A[ ] kit **for arthrodesis fusion**, the kit comprising: at least one fusion plate; and . . ."); 23:24-25 ("21. A kit according to claim 20 wherein the plate is **fixed to ankle bones**."); *see id.* at 23:26-24:7 (claims 22-26). |
| 103. | the plate comprises: | Slater discloses a bone plate.<br><br><br><br>FIGURE 1 |

- 49 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See* Ex. 1005 at Figs. 1, 5, 6. |
| 104. | an elongate spine having: a first end comprising: | Slater includes an elongate spine (illustrated in Figs. 1, 2, 5, and 6) having a first end (proximal end of portion 30 (of plate 1) or proximal end of portion 95 (of plate 80)).  |

- 50 -

STRYKER Exhibit 1002
Page 53 of 231
IPR2021-01450

**Appx1808**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

STRYKER Exhibit 1002
Page 54 of 231
IPR2021-01450

Appx1809

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br>*See* Ex. 1005 at Figs. 1, 5, 6, 7. |
| 105. | at least one fixation point for attaching the first end to a first discrete bone on a first side of an intermediate joint; and | The first end in Slater (proximal end of portion 30 or proximal end of portion 95) includes at least one fixation point (fixation points 35, 34, 33 or fixation points 98, 99) for attaching the first end (proximal end of portion 30 or proximal end of portion 95) to a first discrete bone (e.g., a tibia) on a first side of an intermediate joint.<br><br>*See* Ex. 1005 at 12:22-23 (illustrated in Fig. 2) ("**Openings 33, 34 and 35** are **preformed** and **receive** a first preferably countersunk **screw** type such as that shown in figure 3."); 13:28-30 (illustrated in Fig. 5) ("**Portion 95 includes openings 98 and 99 which receive fastening screws** each preferably in the same orientation and **which engage the tibia**."). |

- 52 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See* Ex. 1005 at Figs. 1, 5, 6. |
| 106. | a first inner surface configured to substantially conform with a geometry of the first discrete bone; | The first end in Slater (proximal end of portion 30 or proximal end of portion 95) includes a first inner surface (31 or 96).  *See* Ex. 1005 at 11:28-29 (illustrated in Fig. 2) ("**Portion 30 of plate 1 has an inner surface 31** and an outer surface 32 and preferably disposed normal or near normal to the plane of portion 5."); 13:27-28 (illustrated in Fig. 5) ("Portion 95 of plate has an inner surface 96 and an outer surface 97 and preferably |

- 53 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | disposed normal or near normal to the plane of portion."). |
| | | The first surface in Slater (31 or 96) is configured to substantially conform with a geometry of the first discrete bone (e.g., the tibia 4). *See id.* at 9:14-15 ("Preferably, the plates are configured to **generally conform to the anatomic contours** of the ankle joint."); 9:15-18 ("A range of different plate sizes (at least five) is contemplated with **differences in the range of contour** and degree of angle **over the ankle joint** and lengths both **proximally** and distally."); 12:21-22 ("The waisted region 50 generally **confirms [*sic*] to the contour of the tibia**."); 15:12-14 ("The **contour of geometry over the distal aspect of the tibia** will be **incorporated into the design** of the plate."); 16:32-34 ("The plate may also be manufactured with varied thickness at regions requiring additional strength and **contoured to a geometry to best suit ankle anatomy**."); 17:2-3 ("Another advantage of the plate is its pliability at regions when bending may be required for **conformity with bone anatomy**."); 23:15-17 ("A kit according to claim 17 wherein the **plate geometry** is arranged to at least partially **conform to the shape of the anatomy of bones** to which the plate is fixed."). |

- 54 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br>*See id.* at Fig. 1. |
| 107. | a second end comprising:<br><br>at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and | The second end in Slater (distal end of portion 5 or distal end of portion 81) includes at least one fixation point (fixation points 11, 12 or fixation points 84, 85) for attaching the second end (distal end of portion 5 or distal end of portion 81) to a second discrete bone (e.g., a talus) on a second side of a joint. *See* Ex. 1005 at 11:8-10 (illustrated in Figure 1) ("Disposed in portion 5 are fixation screws 9 and 10 which pass through openings 11 and 12 of portion 5 and engage talus 3 at different orientations."); 13:10-12 (illustrated in Figs. 6-7) ("**Disposed in portion 81** are fixation screws (not shown) which pass through **openings 84 and 85 of portion 81 engaging the talus** at selected orientations."). |

- 55 -

STRYKER Exhibit 1002
Page 58 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See id.* at Figs. 1, 6. |
| 108. | a second inner surface configured to substantially conform with a geometry of the second | The second end in Slater (distal end of portion 5 or distal end of portion 81) includes a second inner surface (8 or 83). *See* Ex. 1005 at 11:7-8 (illustrated in Fig. 1) ("Portion 5 has an outer surface 7 and inner surface 8 which opposes talus surface 6 for fixation thereto."); 13:9-10 ("**Portion 81 has an** outer surface 82 and **inner** |

- 56 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | discrete bone; and | **surface 83** which opposes a talus for fixation thereto[.]"). |
| | | The second inner surface in Slater (8 or 83) is configured to substantially conform with a geometry of the second discrete bone (e.g., the talus). *See id.* at 9:8-12 ("The second point of plate depth and width change is over the phalanges at the distal point of the plate. At this point plate according to one embodiment, tapers out and again the thickness at this point would be in the order of about 1mm. **These points will preferably resemble and conform to the typical geometry of the anatomical region**."); 9:14-15 ("Preferably, the plates are configured to **generally conform to the anatomic contours** of the ankle joint."); 9:15-18 ("A range of different plate sizes (at least five) is contemplated with **differences in the range of contour** and degree of angle **over the ankle joint** and lengths both **proximally** and distally."); 14:19-22 ("The depth at the beginning and end points of the generally L shaped contour over the ankle joint formed by portions 81 and 90 . . . ."); 16:32-34 ("The plate may also be manufactured with varied thickness at regions requiring additional strength and **contoured to a geometry to best suit ankle anatomy**."); 17:2-3 ("Another advantage of the plate is its pliability at regions when bending may be required for **conformity with bone anatomy**."); 23:15-17 ("A kit according to claim 17 wherein the **plate geometry** is arranged to at least partially **conform to the shape of the anatomy of bones** to which the plate is fixed."). |

- 57 -

STRYKER Exhibit 1002
Page 60 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br>*See id.* at Fig. 1. |
| 109. | a bridge portion disposed between the first end and the second end, | Slater includes a bridge portion (portions of 5 and 20 or portions of 81 and 90) disposed between the first end (proximal end of portion 30 or proximal end of portion 95) and the second end (distal end of portion 5 or distal end of portion 81). *See* Ex. 1005 at Figs. 1, 6, 7.<br> |

- 58 -

**Appx1816**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See* Ex. 1005 at Figures 1, 6, 7. |
| 110. | the bridge portion configured to span across | Slater includes a bridge portion (portions of 5 and 20 or portions of 81 and 90) that is configured to span across the joint (joint between the talus bone 3 and tibial bone 4). *See* Ex. 1005 at 11:3-4 ("Plate 1 is attached to an |

- 59 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | the joint, | ankle joint 2 opposing the Talus bone 3 and Tibial bone 4."); 14:19-22 ("The depth at the beginning and end points of the generally L shaped contour over the ankle joint **formed by portions 81 and 90** will be at it's maximum thickness as it is at **this region** that the highest loading will occur in normal use.").<br><br><br><br>*See id.* at Fig. 1. |
| 111. | at least a portion of said bridge portion having a thickness greater than at least a portion of the thickness of either the first end or the second end; and | At least a portion of Slater's bridge portion (portions of 5 and 20 or portions of 81 and 90) has a thickness greater than at least a portion of the thickness of either the first end (proximal end of portion 30 or proximal end of portion 95) or the second end (distal end of portion 5 or distal end of portion 81). *See* Ex. 1005 at 8:25-26 ("According to one embodiment, the first portion has a region at is [*sic*] extremity which is thinner."); 8:32-9:1 ("Preferably, the **depth at the beginning and end points of the L shaped contour over the ankle joint** in the **second region** will be at it's **maximum thickness**. This location adjacent the ankle joint will preferably be the **thickest part of the plate** and will preferably fall within the range 4-8mm."); 9:2-6 ("Thickness throughout this specification will refer to the dimension |

STRYKER Exhibit 1002
Page 63 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | measured from the bone engaging face to an opposite outer face.  The plate will taper at least one but preferably two different points of the plate.  A first taper will occur at a proximal point of the plate over the tibia. The desired effect is for the plate to taper in and decrease in thickness proximally."); 14:19-23 ("The depth at the beginning and end points of the **generally L shaped contour** over the ankle joint **formed by portions 81 and 90** will be at it's **maximum thickness** as it is at **this region** that the highest loading will occur in normal use. This depth (the thickest part of the plate) will be within the range 5-6mm."); 24:17-19 ("29[.] A kit according to claim 28 wherein the **plate thickness varies** at different locations and wherein the **portion of the plate** which lays **over the ankle joint** has **maximum thickness**."). <br><br>  <br> FIGURE 7 |

STRYKER Exhibit 1002
Page 64 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br>*See id.* at Figs. 5, 7. |
| 112. | a transfixation screw hole disposed along the spine, | Slater includes a transfixation screw hole (opening 26 or opening 93) disposed along the spine. *See* Ex. 1005 at Figs. 1, 5, 6, 7, 9, and 10.<br><br> |

- 62 -

STRYKER Exhibit 1002
Page 65 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |
| | | *See also id.* at 11:19-21 ("Disposed in portion 20 is **fixation screw 25** which **passes through opening 26** in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. "); 13:21-24 ("Disposed in portion 90 is a **fixation screw** which **passes through opening 93** in formation 94. Formation 94 is configured so that a fixation screw is directed at an angle within a predetermined allowable angular range."). |
| 113. | the transfixation screw hole comprising an inner surface configured to direct the transfixation screw through the transfixation screw hole such that the | As shown below in Figures 1, 6, and 7, Slater includes a transfixation screw hole (26 or 93) that comprises an inner surface (unnumbered in Slater's drawings) configured to direct the transfixation screw (*e.g.,* fixation screw 25) through the transfixation screw hole such that the transfixation screw extends through the bridge portion (portions of 5 and 20 or portions of 81 and 90) at a trajectory configured to pass through a first position on the first discrete bone (*e.g.,* tibia 4), a portion of the joint (*e.g.,* the joint between the talus bone 3 and tibial bone 4), and a second position on the second discrete bone (*e.g.,* talus 3) once the plate (1 or 80) is placed across the joint. |

- 63 -

STRYKER Exhibit 1002
Page 66 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | transfixation screw extends through the bridge portion at a trajectory configured to pass through a first position on the first discrete bone, a portion of the joint, and a second position on the second discrete bone once the plate is placed across the joint; and |  |

STRYKER Exhibit 1002
Page 67 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

STRYKER Exhibit 1002
Page 68 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

*See also id.* at 11:19-25 ("Disposed in portion 20 is **fixation screw 25** which **passes through opening 26** in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. **Screw 25 engages tibia 4, talus 3, and cal[can]eus 28** effectively providing three points of fixation according to this embodiment[.]"); 13:21-25 ("Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. **Formation 94 is configured so that a fixation screw [not shown] is directed at an angle** within a predetermined allowable angular range. Portion 90 is angled relative to portion 81 at a non[-l]imiting angle of about 100 degrees.").

| 114. | the transfixation screw comprises a head configured to abut the | As shown in Figure 1 below, Slater includes a transfixation screw (*e.g.*, fixation screw 25) having a head configured to abut the inner surface of the transfixation screw hole (unnumbered in Slater's drawings) and a shaft configured to contiguously extend through the first discrete bone (*e.g.*, tibia 4), through the joint (*e.g.*, the joint between the talus bone 3 and tibia |

- 66 -

STRYKER Exhibit 1002
Page 69 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | **608 Patent, Claim 1** | **Slater (Ex. 1005)** |
|---|---|---|
| | inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said | bone 4), and into the second discrete bone (*e.g.*, talus 3). *See* Ex. 1005 at Fig. 1.<br><br><br><br>*See also id.* at 11:19-25 ("Disposed in portion 20 is **fixation screw 25** which **passes through opening 26** in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. **Screw 25 engages tibia 4, talus 3, and cal[can]e[o]us 28** effectively providing three points of fixation according to this embodiment[.]"); 13:21-24 ("Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. **Formation 94 is configured so that a fixation screw [not shown] is directed at an angle** within a predetermined allowable angular range.").<br><br>In Slater, when the fixation screw (25) advances through the opening (26) and into the second discrete bone (talus bone 3), the second discrete bone (talus bone 3) is loaded |

- 67 -

STRYKER Exhibit 1002<br>Page 70 of 231<br>IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | bridge portion. | relative to (pulled toward) the first discrete bone (tibial bone 4), and tensile load is transferred from the second discrete bone (talus bone 3), through the screw into the screw head (*e.g.*, proximal end of fixation screw 25) and into the bridge portion (portions of 5 and 20 or portions of 81 and 90) of the plate. This transfer occurs because the threads on the screw and the portion of the screw head that abuts the inner surface of the screw hole act essentially as a vise, to the second bone and the plate, with the first bone held in between. The threads and the portion of the screw that abuts the inner surface of the screw hole apply forces along the length of the screw. *See id.* at 12:32-13:3 ("Figure 4 shows a elevation view of a second screw type 70 according to one embodiment adapted for insertion in the plate of figures 1 and 2 and allowing adjustable orientation. Screw type 70 has a longer shank to increase depth of penetration and has an **abbreviated threaded portion** to allow the majority of the shank to slide through aligned tibial and talus screw holes finally **anchoring in the calcaneus bone**."). <br><br> Although Slater Figure 1 illustrates that the Slater fusion plate 1 can be used to secure three discrete bones (tibia 4, talus 3, and calcaneous 28) across two joints, Slater also contemplates (in both drawings and text) that the fusion plate 1 can be used to secure two discrete bones (tibia 4 and talus 3, within the oval annotated into Figure 1 immediately below) together across a single joint between the two bones. *Id.* at 12:3-4 ("As may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis."). |

- 68 -

STRYKER Exhibit 1002
Page 71 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See id.* at Fig. 1. |

**B.    Dependent Claims 2-5 and 9-10**

115.    Dependent claims 2-5 and 9-10 each depend on claim 1. These claims recite minor features or variations that are also found in Slater. In my opinion, these claims are also anticipated by Slater.

116.    ***Dependent claim 2*** recites "[t]he system of claim 1, wherein a central axis of the inner surface of the transfixation screw hole defines the trajectory; and the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint." Claim 1 is anticipated by Slater, as discussed above. In my opinion, Slater contains all of the elements of claim 2 of the 608 patent and therefore anticipates claim 2.

117.    As an initial matter, the central axis of the inner surface of the Slater

STRYKER Exhibit 1002
Page 72 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

transfixation screw hole (26 or 93) defines a trajectory configured to cross a neutral

bending axis of the joint once the plate is placed across the joint.  Figure 2 of the 608

patent illustrates neutral bending axis 118 in connection with the

metatarsophalangeal joint.  (Ex. 1001 at Fig. 2; 5:47-52).



118.   The 608 patent defines the "neutral bending axis" as "[t]he line about

which the force on joint 106 transitions from tension to compression….In other

words, neutral bending axis 118 defines the boundary line that separates the tension

side of joint 106 from the compression side of joint 106." (Ex. 1001 at 5:47-52).  In

my opinion, a POSITA would understand that the neutral bending axis of a joint

would fall approximately down the center of the adjacent bones, for each bone,

depending on the cortical thickness on opposing surfaces.  When a bone has a

reasonable degree of symmetry, the axis of the bone plate approximates the direction

- 70 -

STRYKER Exhibit 1002
Page 73 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

of the neutral bending axis of the joint.   In Slater, the axis of the bone plate approximates the direction of the neutral bending axis of the joint between tibia 4 and talus 3.

119.   In Figures 1, 5, and 9, Slater discloses a central axis of the transfixation screw hole (26 or 93) that defines a trajectory. In Figure 9, Slater identifies an angle associated with that trajectory.  (Ex. 1005 at Fig. 9).



120.   As shown below in Figure 1, when the Slater plate is placed across the joint, the trajectory defined by the central axis of the inner surface of the transfixation hole crosses the neutral bending axis.  (Ex. 1005 at Fig. 1; 11:19-27 ("Disposed in portion 20 is fixation screw 25 which passes through opening 26 in formation 27. **Formation 27 is configured so that screw 25 is implanted at an angle** within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. Screw 25 engages tibia 4, talus 3, and calcaneus 28 effectively providing three points of fixation according to this embodiment[.] Portion 20 is angled relative to portion 5 at about 100 degrees. This ang[le] is non limiting and may be greater or less than 100 degrees according to the dictates of design[.]"); 12:32-13:3 ("Figure 4

- 71 -

STRYKER Exhibit 1002
Page 74 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

shows a elevation view of a second screw type 70 according to one embodiment adapted for insertion in the plate of figures 1 and 2 and allowing adjustable orientation. Screw type 70 has a longer shank to increase depth of penetration and has an abbreviated threaded portion to allow the **majority of the shank** to **slide through aligned tibial and talus screw holes** finally **anchoring in the calcaneus bone**."); 12:3-4 ("As may be seen from figure 1[,] the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis."); 13:20-25 ("Portion 90 of plate 80 has an outer surface 91 and inner surface 92 which opposes a anterior surface of tibia for fixation thereto. Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. **Formation 94 is configured so that a fixation screw is directed at an angle** within a predetermined allowable angular range. Portion 90 is angled relative to portion 81 at a non[-l]imiting angle of about 100 degrees.")).

- 72 -

STRYKER Exhibit 1002
Page 75 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*



121.   ***Dependent claim 3*** recites "[t]he system of claim 2, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint."  As discussed above, Slater discloses each and every element of the system of claim 2.  In my opinion, Slater contains all of the elements of claim 3 of the 608 patent and therefore anticipates claim 3.

122.   In my opinion, Slater further discloses that the first position on the first discrete bone resides on a compression side of the joint and the second position on the second discrete bone resides on a tension side of the joint.

123.   As an initial matter, the 608 patent explains that the boundary line where the force "transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106," where "the tension side of joint 106" is plantar and the "compression side of joint 106" is dorsal in the example illustrated

- 73 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

in Fig. 2 of the 608 patent. (Ex. 1001 at Fig. 2; 5:47-52).

124.   In my opinion, a POSITA would understand that having a screw crossing the joint at the midpoint of the joint would maximize the compressive forces applied across the joint.

125.   By way of example, Duncan U.S. App. No. 2009/0228048 ("Duncan") (Ex. 1010) and Duncan Provisional Application 61-035,270 (Ex. 1016) disclose a joint fixation plate for use in fixing joints of the hand, namely for interphalangeal joint fusion and metacarpal phalangeal joint fusion.



FIG. 1

126.   As shown in Figure 1 above, the Duncan system includes a first screw that is angulated proximally when inserted into a distal screw hole 62 and a second screw 64 that is angulated distally when inserted in a proximal screw hole.   (Ex. 1010 at Fig. 1; Abstract).   When describing the placement of angled screws 62 and 64 across the joint, Duncan explains that the angled screws "cross the joint at the midpoint of the joint so that the compressive forces applied across the joint surface area would be maximized.   By maximizing these compression forces over the large prepared surface area, a higher success rate of obtaining fusion would be encountered clinically." (Ex. 1010 at ¶49; Ex. 1016 at

- 74 -

STRYKER Exhibit 1002
Page 77 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

¶35).[5]

127.    In my opinion, in the context of Slater, a person or ordinary skill in the art would understand that, in order to maximize the compressive forces applied across a joint, a screw crossing the midpoint of the joint would cross from the compression side to the tension side. (Ex. 1005 at Fig. 1). Indeed, if the screw does not cross the midpoint of the joint, there is no structural support provided on the tension side of the joint. For example, a force in the posterior direction on the foot would place both the tibia and ankle joint in compression on the posterior side of the joint. Similarly, a force that places the ankle joint in plantar flexion would also place the ankle joint in compression on the posterior side of the joint. In such loading, the first position in Slater resides on a compression side of the joint and the second position resides on a tension side of the joint. When walking, for example, at some time during the gait cycle, the foot is in plantar flexion and the



_____

[5] My citation to Duncan is simply for the purpose of confirming a concept that, in my view, was already well-known to a POSITA as of April 28, 2009, the priority date of the 608 patent. Nevertheless, my understanding from counsel is that Duncan is § 102(e) prior art to the 608 patent.

STRYKER Exhibit 1002
Page 78 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

first position in Slater on the first bone (tibia 4) resides on a compression side of the joint. The second position in Slater on the second bone (talus) resides on a tension side of the joint.

128.   **Dependent claim 4** recites "[t]he system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis."

**Dependent claim 5** recites: "[t]he system of claim 2, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis."

129.   As discussed above, Slater discloses each and every element of the system of claim 2.  In my opinion, Slater contains all of the elements of claims 4 and 5 of the 608 patent and therefore anticipates claims 4 and 5.

130.   As shown in Figure 9, Slater discloses a central axis of the transfixation hole defining a trajectory that is configured to pass through the joint at a transfixation angle of 34° measured from the direction of the neutral bending axis.  34° is between about 30 degrees and about 70 degrees, and thus discloses the claim element set forth in dependent claim 4.



- 76 -

STRYKER Exhibit 1002
Page 79 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

131.  Moreover, according to my measurements of the embodiment illustrated in Figure 1, Slater discloses three different transfixation angles for screw 25: 31°, 47° and 57°.  Each of the disclosed angles falls within the claimed range of between about 30 degrees and about 70 degrees measured from the neutral bending axis and thus discloses the claim element set forth in dependent claim 4.  Similarly, the 47° angle is a transfixation angle of "about 50 degrees" and thus discloses the claim element set forth in dependent claim 5.  (Ex. 1005 at Fig. 1).



132.  A POSITA would understand that the transfixation angle will depend on a variety of factors, including the particular joint being fused and the patient's anatomy.  Slater recognizes that "[p]roper plate fixation relies on the integrity of the screw bone interface, screw insertion angle, screw tightness and effective cooperation between screw head and the screw insertion hole.  These requirements dictate plate design for a particular anatomical location and repair objective."  (Ex. 1005 at 5:28-31).

- 77 -

STRYKER Exhibit 1002
Page 80 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

133.   Slater further discloses that the allowable range for the transfixation angle will preferably be within a 40 degree arc to ensure that the screw engages bone on both sides of the joint or fusion line.  (Ex. 1005 at 11:19-25 ("Disposed in portion 20 is fixation screw 25 which passes through opening 26 in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The **allowable range will preferably be within a 40 degree arc**. Screw 25 engages tibia 4, talus 3, and cal[can]eus 28 effectively providing three points of fixation according to this embodiment[.]"); 13:20-24 ("Portion 90 of plate 80 has an outer surface 91 and inner surface 92 which opposes a anterior surface of tibia for fixation thereto. Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. Formation 94 is configured so that a **fixation screw is directed at an angle within a predetermined allowable angular range**.")).  Extreme angles close to 0 degrees or 90 degrees would result in an inability of the screw to sufficiently engage bone on both sides of the joint, and keeping the transfixation screw at 45 degrees plus or minus 20 degrees avoids these extreme angles and resulting lack of bony engagement across necessary bones.

134.   ***Dependent claim 9*** recites "[t]he system of claim 1, wherein the transfixation screw comprises a lag screw having:  at  a  first  end  of  the  shaft

- 78 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

adjacent to the head, an unthreaded portion configured to extend through the first

bone; and at a second end of the shaft adjacent to the tip, a threaded portion

configured to extend into the second bone."  As discussed above, Slater discloses

each and every element of the system of claim 1.  In my opinion, Slater contains all

of the elements of claim 9 of the 608 patent and therefore anticipates claim 9.

135.  In my opinion, while the transfixation screw threading is not



specifically illustrated in Figure 1, the transfixation screw of Slater (60, 70) is illustrated in Figure 4 of Slater as a lag screw.  For

example, the lag screw (70) in Slater has a first end of the shaft adjacent to the head

and an unthreaded portion configured to extend through the first bone (tibial bone 4)

and, at the second end of the shaft adjacent to the tip, a threaded portion configured

to extend into the second bone (talus bone 3).  Slater explains that "Figure 4 shows

a elevation view of a second screw type 70 according to one embodiment adapted

for insertion in the plate of figures 1 and 2 and allowing adjustable orientation.

**Screw type 70 has a longer shank to increase depth of penetration** and has an

**abbreviated threaded portion** to allow the majority of the shank to slide through

aligned tibial and talus screw holes finally anchoring in the calcaneus bone." (Ex.

- 79 -

STRYKER Exhibit 1002
Page 82 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

1005 at 12:32-13:3).

136.   In addition, Figure 4 illustrates a lag transfixation screw (70), while Figure 3 also illustrates a lag screw for use in the "tibial fixation region." (*Id.* at 12:29-31).   No non-lag screws are described in Slater or illustrated in Slater's drawings.

137.   ***Dependent claim 10*** recites "[t]he system of claim 1, wherein the elongate spine is configured to form an angle between the first inner surface and the second inner surface, the angle substantially conforming to a natural bend at a joint between the first bone and the second bone."   As discussed above, Slater discloses each and every element of the system of claim 1.   In my opinion, Slater contains all of the elements of claim 10 of the 608 patent and therefore anticipates claim 10.

138.   In my opinion, Slater discloses a system wherein the elongate spine is configured to form an angle between the first inner surface (31 or 96) and the second inner surface (8 or 83), the angle substantially conforming to a natural bend at a joint between the first bone (tibia 4) and the second bone (talus 3).

- 80 -

STRYKER Exhibit 1002
Page 83 of 231
IPR2021-01450

Appx1838

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

139.   Figures 1 and 9 illustrate how an angle is formed between a first and

second inner surface, substantially conforming to a natural bend at a joint between

the first bone (tibia 4) and the second bone (talus 3).  Ex. 1005, Fig. 1; 11:5-8 ("Plate

1    according    to    the

embodiment    shown

comprises    a    portion    5

disposed   in   a   first   plane

which   generally   aligns   with

an exterior surface 6 of the

talus 3.  Portion 5 has an outer

surface 7 and inner surface 8



which opposes talus surface 6 for fixation thereto."); 11:25-27 ("**Portion 20 is**

**angled relative to portion 5 at about 100 degrees**. This **ang[le]** is non limiting and

**may be greater or less** than 100 degrees **according to the dictates of design**[.]");

11:28-29 ("Portion 30 of plate 1 has an inner surface 31 and an outer surface 32 and

preferably disposed normal or near normal to the plane of portion 5.";   12:6-10

("**portion 30** is disposed in a first pla[n]e which **generally aligns with an opposing**

**face of tibia 4**. **Portion 20** lies in a second plane at a first angle relative to the fi[r]st

plane and **aligns with** an **opposing face** of the **distal tibia**. **Portion[] 5** li[e]s in a

third plane at a second angle relative to the first plane and **engages the talus**.").  (*Id.*

- 81 -

STRYKER Exhibit 1002
Page 84 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

at 9:15-19 ("**A range of different plate sizes** (at least five) **is contemplated with**

**differences in the** range of contour and **degree of angle over the ankle joint** and

lengths both proximally and distally. In practice 2-[]3 three plate sizes are likely to

provided a complete inventory.")).

 140. In the Figure 5/Figure 9 embodiment where an angle is formed between

first inner surface (96) and second inner surface (83), Slater discloses that "Figure 9

[sh]ows the cross sectional side

elevation view of the plate of

figure 5 [and] a non limiting

geometry of the plate according

to o[n]e embodiment. The

dimensions indicated are in

millimetres and indicate

proportionality of the geometry



of the preferred embodiment plate. **Shown are** distances between openings, size of

openings[, and] **relative angles of separate portions** 81, 90 and 95 of the plate."

(Ex. 1005 at 15:19-25; 13:20-25 ("**Portion 90** of plate 80 has an outer surface 91

and **inner surface 92** which **opposes** a **anterior surface of tibia** for fixation thereto.

Disposed in portion 90 is a fixation screw which passes through opening 93 in

formation 94. Formation 94 is configured so that a fixation screw is directed at an

- 82 -

STRYKER Exhibit 1002
Page 85 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

angle within a predetermined allowable angular range. **Portion 90** is **angled relative**

**to portion 81** at a non[-l]imiting **angle** of **about 100 degrees**."); 13:27-28

(illustrated in Fig. 9) ("Portion 95 of plate has an inner surface 96 and an outer

surface 97 and preferably disposed normal or near normal to the plane of portion.")).

141. Slater explains that the angle of the bone plate conforms to the natural

bend at the joint between the first bone and the second bone. (Ex. 1005 at 9:8-12

("The second point of plate depth and width change is over the phalanges at the distal

point of the plate. At this point the plate according to one embodiment, tapers out

and again the thickness at this point would be in the order of about 1mm. **These**

**points will preferably resemble and conform to the typical geometry of the**

**anatomical region**."); 9:14-15 ("Preferably, the plates are configured to **generally**

**conform to the anatomic contours** of the ankle joint."); 9:15-18 ("A range of

different plate sizes (at least five) is contemplated with **differences in the range of**

**contour** and degree of angle **over the ankle joint** and lengths both **proximally** and

distally."); 11:18-19 (illustrated in Fig. 2) ("**Portion 20 of plate 1 has an** outer

surface 21 and **inner surface 22** which opposes anterior surface 23 of tibia 4 for

fixation thereto."); 12:21-22 ("The waisted region 50 generally **conforms to the**

**contour of the tibia**."); 13:9-10 ("**Portion 81 has an** outer surface 82 and **inner**

**surface 83** which opposes a talus for fixation thereto[.]"); 14:19-22 ("The depth at

the beginning and end points of the generally L shaped contour over the ankle joint

- 83 -

STRYKER Exhibit 1002
Page 86 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

formed by portions 81 and 90 . . . .”); 15:12-14 (“The **contour of geometry over the distal aspect of the tibia** will be **incorporated into the design** of the plate.”); 16:32-34 (“The plate may also be manufactured with varied thickness at regions requiring additional strength and **contoured to a geometry to best suit ankle anatomy**.”); 17:2-3 (“Another advantage of the plate is its pliability at regions when bending may be required for **conformity with bone anatomy**.”); 23:15-17 (“A kit according to claim 17 wherein the **plate geometry** is arranged to at least partially **conform to the shape of the anatomy of bones** to which the plate is fixed.”);; 16:32-34 (“The plate may also be manufactured with varied thickness at regions requiring additional strength and **contoured to a geometry to best suit ankle anatomy**.”); 17:2-3 (“Another advantage of the plate is its pliability at regions when bending may be required for **conformity with bone anatomy**.”); 23:15-17 (“A kit according to claim 17 wherein the **plate geometry** is arranged to at least partially **conform to the shape of the anatomy of bones** to which the plate is fixed.”)).

### C.    Independent Claim 11

142.    Independent claim 11 is similar to independent claim 1 except that it recites “a **plate** for securing two discrete bones together across an intermediate joint” instead of “a **system** for securing two discrete bones together across a joint between the two bones.”  Independent claim 11 does not positively recite the “transfixation screw” as in independent claim 1.  In addition, there are minor wording differences

STRYKER Exhibit 1002
Page 87 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

that do not materially affect how the prior art reads on the claim.

143.  I have compared claim 11 to Slater in the following chart.  In my opinion, Slater includes all of the elements of claim 11 of the 608 patent and therefore anticipates claim 11.  For elements that are the same as claim 1, which are many of the elements of claim 11, I incorporate my discussion above regarding those elements.

|  | **608 Patent, Claim 11** | **Slater (Ex. 1005)** |
|---|---|---|
| 144. | 11. A plate for securing two discrete bones together across an intermediate joint, comprising: | The preamble of claim 11 is nearly identical to claim 1 except that it recites a "plate for securing two discrete bones together across an intermediate joint" rather than a "system for securing two discrete bones together across a joint between the two bones."  As discussed above claim 1, and to the extent the preamble is limiting, Slater includes a plate for securing two discrete bones together across an intermediate joint. *See, e.g.*, Ex. 1005 at 9:28-30, 12:3-4, Fig. 1.  *See also id.* at 6:17-37, 7:19-21, 8:3; 8:13-28, 9:28-30, 11:1-4, 12:3-10, 13:5-9, 14:1-8, 15:12-16, 16:6-9, 16:28-30, 17:3-10, 20:14-16, 21:6-20, 26:14-23, 22:17-23:13, claims 21-26. |

- 85 -

STRYKER Exhibit 1002
Page 88 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

|  | **608 Patent, Claim 11** | **Slater (Ex. 1005)** |
|---|---|---|
|  |  | <br><br>*See* Ex. 1005 at Fig. 1. |
| 145. | an elongate spine having:<br><br>a first end comprising: | As I discuss above for claim 1, Slater includes an elongate spine (illustrated in Figs. 1, 2, 5, and 6) having a first end (proximal end of portion 30 (of plate 1) or proximal end of portion 95 (of plate 80)). *See, e.g.*, Ex. 1005 at Figs. 1, 5, 6, 7. |

- 86 -

STRYKER Exhibit 1002
Page 89 of 231
IPR2021-01450

**Appx1844**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

- 87 -

STRYKER Exhibit 1002
Page 90 of 231
IPR2021-01450

**Appx1845**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  *See* Ex. 1005 at Figs. 1, 5, 6, 7. |
| 146. | at least one fixation point for attaching the first end | As I discuss above for claim 1, the first end in Slater (proximal end of portion 30 or proximal end of portion 95) includes at least one fixation point (fixation points 35, 34, 33 or fixation points 98, 99) for attaching the first end |

- 88 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | to a first discrete bone on a first side of an intermediate joint; and | (proximal end of portion 30 or proximal end of portion 95) to a first discrete bone (e.g., a tibia) on a first side of an intermediate joint.  *See, e.g.*, Ex. 1005 at 12:22-23, 13:28-30.  *See* Ex. 1005 at Figs. 1, 5, 6. |
| 147. | a first inner surface | As I discuss above for claim 1, the first end in Slater (proximal end of portion 30 or proximal end of portion 95) |

- 89 -

STRYKER Exhibit 1002
Page 92 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | configured to substantially conform with a geometry of the first discrete bone; | includes a first inner surface (31 or 96).  *See, e.g.*, Ex. 1005 at 11:28-29, 13:27-28.<br><br>The first surface in Slater (31 or 96) is configured to substantially conform with a geometry of the first discrete bone (*e.g.*, the tibia 4).  *See id.* at 9:14-18, 12:21-22, 15:12-14, 16:32-34, 17:2-3, 23:15-17.<br><br><br><br>*See id.* at Fig. 1. |
| 148. | a second end comprising:<br><br>at least one fixation point for attaching the second end to a second discrete bone | As I discuss above for claim 1, the second end in Slater (distal end of portion 5 or distal end of portion 81) includes at least one fixation point (fixation points 11, 12 or fixation points 84, 85) for attaching the second end (distal end of portion 5 or distal end of portion 81) to a second discrete bone (e.g., a talus) on a second side of a joint. *See, e.g.*, Ex. 1005 at 11:8-10, 13:10-12. |

- 90 -

**Appx1848**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | on a second side of the joint; and |  |
| | | *See id.* at Figs. 1, 6. |
| 149. | a second inner surface configured to substantially conform with a geometry of | As I discuss above for claim 1, the second end in Slater (distal end of portion 5 or distal end of portion 81) includes a second inner surface (8 or 83). *See* Ex. 1005 at 11:7-8, 13:9-10. The second inner surface in Slater (8 or 83) is configured to substantially conform with a geometry of the |

STRYKER Exhibit 1002
Page 94 of 231
IPR2021-01450

**Appx1849**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | **608 Patent, Claim 11** | **Slater (Ex. 1005)** |
|---|---|---|
| | the second discrete bone; and | second discrete bone (e.g., the talus). *See id.* at 9:8-18,14:19-22, 16:32-34, 17:2-3, 23:15-17.<br><br><br><br>*See id.* at Fig. 1. |
| 150. | a bridge portion disposed between the first end and the second end, | As I discuss above for claim 1, Slater includes a bridge portion (portions of 5 and 20 or portions of 81 and 90) disposed between the first end (proximal end of portion 30 or proximal end of portion 95) and the second end (distal end of portion 5 or distal end of portion 81). *See, e.g.*, Ex. 1005 at Figs. 1, 6, 7. |

- 92 -

STRYKER Exhibit 1002
Page 95 of 231
IPR2021-01450

**Appx1850**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

FIGURE 1

FIGURE 6

- 93 -

STRYKER Exhibit 1002
Page 96 of 231
IPR2021-01450

**Appx1851**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  FIGURE 7 |
| 151. | the bridge portion configured to span across the joint, | As I discuss above for claim 1, Slater includes a bridge portion (portions of 5 and 20 or portions of 81 and 90) that is configured to span across the joint (joint between the talus bone 3 and tibial bone 4). *See, e.g.*, Ex. 1005 at 11:3-4, 14:19-22.  FIGURE 1 |

- 94 -

**Appx1852**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | **608 Patent, Claim 11** | **Slater (Ex. 1005)** |
|---|---|---|
| | | *See id.* at Fig. 1. |
| 152. | a transfixation screw hole disposed along the spine, | As I discuss above for claim 1, Slater includes a transfixation screw hole (opening 26 or opening 93) disposed along the spine. *See, e.g.*, Ex. 1005 at Figs. 1, 5, 6, 9, and 10.  *See also id.* at 11:19-21, 13:21-24.  |
| 153. | the transfixation | This claim element is similar to the "transfixation screw hole" claim element of claim 1, except that claim 11 recites |

- 95 -

STRYKER Exhibit 1002
Page 98 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint, | that the transfixation screw "extends alongside the bridge portion" (instead of "extends through the bridge portion") and does not expressly recite that the trajectory of the screw hole is configured to pass through "a portion of the joint," as recited in claim 1. These minor differences in claim language do not change how the prior art reads on the claims.<br><br>As I discuss above for claim 1, Slater includes a transfixation screw hole (26 or 93) that comprises an inner surface (unnumbered in Slater's drawings) configured to direct the transfixation screw (*e.g.,* fixation screw 25) through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion (portions of 5 and 20 or portions of 81 and 90) at a trajectory configured to pass through a first position on the first bone (*e.g.,* tibia 4) and a second position on the second bone (*e.g.,* talus 3) once the plate (1 or 80) is placed across the joint (2). *See, e.g.,* Ex. 1005 at Figs. 1, 6, 7. *See also id.* at 11:19-25, 13:21-25.<br><br> |

- 96 -

STRYKER Exhibit 1002
Page 99 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

- 97 -

STRYKER Exhibit 1002
Page 100 of 231
IPR2021-01450

**Appx1855**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | **608 Patent, Claim 11** | **Slater (Ex. 1005)** |
|---|---|---|
| | | |
| 154. | enabling said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge, | As I discuss above for claim 1, Slater teaches that the inner surface (unnumbered) of the transfixation screw hole (26 or 93) enables the transfixation screw (*e.g.,* fixation screw 25) to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge. In particular, the configuration of the inner surface of the transfixation screw hole relative to the head of the transfixation screw permits, when engaged, a tensile force to be absorbed by the screw and transferred into the bridge, applied in the direction of the axis of the transfixation screw. *See, e.g.*, Ex. 1005 at Figs. 1, 4.<br><br> |

- 98 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

| | 608 Patent, Claim 11 | Slater (Ex. 1005) |
|---|---|---|
| | |  |
| | | *See id.* at Figs. 1, 4. |
| | | In Slater, when the fixation screw (25) advances through the opening (26) and into the second bone (talus bone 3), the second bone (talus bone 3) is loaded and tensile load is transferred from the second bone (talus bone 3), through the screw and into the bridge portion (portions of 5 and 20 or portions of 81 and 90) of the plate. This transfer occurs because the threads on the screw and the portion of the screw head that abuts the inner surface of the screw hole act essentially as a vise, to the second bone and the plate, with the first bone held in between. The threads and the portion of the screw that abuts the inner surface of the screw hole apply forces along the length of the screw. *See id.* at 12:32-13:3. |
| 155. | wherein at least a portion of said bridge portion and said transfixation screw hole has a thickness greater than at least a portion of | This claim element is similar to the "thickness" element of claim 1, except that claim 11 specifies that <u>both</u> the "at least a portion of said bridge portion" and "said transfixation screw hole" has a thickness greater than "at least a portion of said first and second ends," whereas claim 1 recites only that "a portion of said bridge portion" has a thickness greater than "at least a portion of the thickness of either the first end or the second end." |
| | | At least a portion of Slater's bridge portion (portions of 5 and 20 or portions of 81 and 90) and the portion of the plate including the transfixation screw hole (26 or 93) have |

- 99 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

where the force "transitions from tension to compression may be referred to as the neutral bending axis 118 of the joint 106," where "the tension side of joint 106" is plantar and the "compression side of joint 106" is dorsal in the example illustrated in Fig. 2 of the 608 patent. (Ex. 1001 at Fig. 2; 5:47-52).

196.   As discussed with respect to Ground 1, in my opinion, a POSITA would understand that having a screw crossing the joint at the midpoint of the joint would maximize the compressive forces applied across the joint.  (Ex. 1010 at ¶49, Ex. 1016 at ¶35).

197.   In my opinion, in the context of Falkner, while Figure 1 illustrates an embodiment wherein the bone plate is placed across a fracture, as discussed above, the Falkner disclosure specifically contemplates that the bone plate can be placed across joint 30.  By maximizing the compressive forces, a POSITA would further understand that a screw crossing the midpoint of the joint would cross from the compression side to the tension side. Indeed, if the screw does not cross the midpoint of the joint, there is no



- 140 -

STRYKER Exhibit 1002
Page 143 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

structural support provided on the tension side of the joint.  For example, if this view is the anterior view of a left foot, inversion of the foot (turning the sole of the left foot towards the body midline) would cause compression on the medial side of the foot and tension on the lateral side.  In such loading, the first position in Falkner resides on a compression side of the joint and the second position resides on a tension side of the joint.

198.   In an embodiment contemplated by Falkner to span a joint 30 instead of a fracture 28, the first position of the transfixation screw 42 would reside on a compression side of joint 30 and, due to the angle of the screw and the length of the screw, the second position of the transfixation screw 42 would reside on a tension side of joint 30.

199.   ***Dependent claim 6*** recites "[t]he system of claim 1, wherein the inner surface of the transfixation screw hole is configured to lockably engage the head of the transfixation screw."  As discussed above, Falkner discloses each and every element of the system of claim 1.  In my opinion, Falkner contains all of the elements of claim 6 of the 608 patent and therefore anticipates claim 6.

200.  In my opinion, Falkner discloses that the inner surface of the transfixation screw hole (oblique opening 44) may be configured to lockably engage the head of the transfixation screw (threaded fastener 42).  For example, Falkner describes transfixation screw (threaded fastener 42) as having a "[h]ead 60 [that]

- 141 -

STRYKER Exhibit 1002
Page 144 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

elongate spine is configured to form an angle between the first inner surface and the

second inner surface, the angle substantially conforming to a natural bend at a joint

between the first bone and the second bone."  Claim 11 is anticipated by Falkner, as

discussed above.  In my opinion, for the same reasons described above with respect

to dependent claim 10, Falkner contains all of the elements of claim 17 of the 608

patent and therefore anticipates claim 17.

## XII.  GROUND 4:  FALKNER IN VIEW OF ARNAULD RENDERS OBVIOUS DEPENDENT CLAIMS 4, 5, AND 14 OF THE 608 PATENT

234.  ***Dependent claim 4*** recites "[t]he system of claim 2, wherein the

trajectory is configured to pass through the joint at a transfixation angle between

about 30 degrees and about 70 degrees measured from the neutral bending axis."

***Dependent claim 5*** recites: "[t]he system of claim 2, wherein the trajectory is

configured to pass through the joint at a transfixation angle of about 50 degrees

measured from the neutral bending axis."

235.  As discussed above, Falkner discloses each and every element of the

system of claim 2.

236.  In my opinion, Falkner in view of the knowledge of a POSITA and/or

Arnauld renders obvious a system wherein the trajectory of the transfixation screw

of the Falkner system 20 is configured to pass through a joint at a transfixation angle

of "about 50 degrees" or "between about 30 degrees and about 70 degrees measured

- 162 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

from the neutral bending axis." Falkner and Arnauld are analogous art because they

both relate to bone plating systems for fusing bone parts.

237.   As discussed above with respect to Ground I (Slater), the 608 patent

identifies the neutral bending axis 118 in connection with the metatarsophalangeal

joint. (Ex. 1001 at Fig. 2; 5:47-52).



238.   As discussed above, while the Falkner figures depict an L-shaped

embodiment, Falkner teaches bone plates of various shapes. (Ex. 1006 at ¶¶33, 44).

Moreover, the Falkner disclosure expressly contemplates that "the bone plate may

be positioned on and/or in any suitable **bone(s)** to span any natural or artificial

discontinuity within a bone or between bones. In the present illustration, plate 22 is

secured to a distal end (metaphyseal) region of a tibia bone 26 and spans fracture 28.

**In other examples, plate 22 may span a joint, such as joint 30 between tibia 26**

- 163 -

STRYKER Exhibit 1002
Page 166 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

**and talus 32, among them.**" (*Id.* at ¶21, ¶¶27-29).

239.    While Falkner provides an exemplary transfixation angle for use in a fractured tibia (*id.* at ¶78), Falkner does not expressly provide a suggested transfixation angle for use across a joint, even though such a bone plate is contemplated. Falkner identifies the nature of the problem, such that "[f]ixation of bone fractures **(or other discontinuities)** can be problematic when these fractures are disposed near the ends of the bones . . .Standard bone plates secured only to the exterior surface of the fractured bones may not be sufficient to immobilize metaphyseal fragments." (Ex. 1006 at ¶4 (emphasis added)).

240.    In my opinion, it would have been obvious to a POSITA to select a transfixation angle of "about 50 degrees" or "between about 30 degrees and about 70 degrees" in order to maximize the compressive forces applied across the joint. Based on the anatomy and the desire to penetrate a sufficient amount of bone to maximize the compressive forces across a joint, a POSITA would place a screw that crosses the joint at the midpoint of the joint at approximately 45° from the neutral bending axis, which is "about 50°" as required by dependent claim 5 and squarely "between about 30° and about 70°" as required by dependent claim 4.

241.    In the alternative, since Falkner does not expressly disclose a transfixation angle for a metatarsophalangeal joint, a POSITA would look to other bone plates for use with that particular joint when determining the transfixation angle

- 164 -

STRYKER Exhibit 1002
Page 167 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

to use to ensure proper fixation of both bones of the joint.

242.    As shown below in Figures 1 and 2, Arnauld describes an arthrodesis

plate for a metatarsal-phalangeal joint.  (Ex. 1008 at Figs. 1, 2).



*Fig.1*



*Fig.2*

243.    The Arnauld bone plate includes a leg 20 adapted to bend downward

relative to the plate body at an angle between 20° and 60° so as to wrap around the

phalangeal epiphysis $P_1$.  (Ex. 1008 at ¶¶23-25).  The leg 20 features a through-hole

25 adapted to receive a screw 30 that is angled such that the screw successively

passes through the phalangeal epiphysis $P_1$ and the metatarsal epiphysis $M_1$.  (Ex.

- 165 -

STRYKER Exhibit 1002
Page 168 of 231
IPR2021-01450

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

1008 at ¶32). Arnauld explains that "hole 25 is provided to receive the screw 30 so that, depending on the direction of observation corresponding to arrow ll, the longitudinal axis 31 of this screw can be inclined in relation to the longitudinal direction 11 of the plate body 10, forming a non-zero angle δ with this direction 11." (*Id.* at ¶27). Direction 11 of Arnauld is approximately the same as the direction of the neutral bending axis of the metatarsophalangeal joint. While Arnauld indicates that the surgeon may choose the transfixation angle of the screw, Arnauld provides guidance, stating that "[i]t can be understood that the smaller this angle δ is, the more the axis 31 of the screw 30 tends to align with an anteroposterior direction, guaranteeing a greater depth of penetration of the screw into the metatarsal for any given length of screw." (*Id.* at ¶27). Arnauld further states that "[f]or anatomical reasons, the **angle δ is** advantageously chosen to be less than **45°**." (*Id.* at ¶28). A transfixation angle of "less than 45°" is "about 50°" as required by dependent claim 5 and "between about 30° and about 70°" as required by dependent claim 4.

244. In my opinion, at the time of the invention, a POSITA would have been motivated to combine Arnauld's transfixation angle with the Falkner bone plate. Selecting a transfixation angle of "less than 45°" for the Falkner plate, as taught by Arnauld, would solve the problem of insufficient immobilization when using the Falkner plate for fusing a metatarsophalangeal joint because "the direction in which the screw 30 is inserted into the hole 25 determines the relative position of the

- 166 -

**Appx1924**

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 8,529,608*

metatarsal and the phalanx when they are fused." (Ex. 1008 at ¶32). By obtaining superior positioning of the bones to be fused, a successful fusion or immobilization can result. Further, in my opinion, a POSITA would reasonably expect that combining the bone plate in Falkner with the transfixation angle in Arnauld would successfully result in "guaranteeing a greater depth of penetration of the screw into the metatarsal." (*Id.* at ¶28).

245.    Thus, in my opinion, a POSITA seeking to use a Falkner-type bone-plate to fuse a first phalanx and first metatarsal across a metatarsophalangeal joint would have been motivated to combine Arnauld with Falkner to select a transfixation angle of "between about 30° and about 70°" as required by dependent claim 4 or "about 50°" as required by dependent claim 5, measured from the neutral bending axis.

246.    ***Dependent claim 14*** recites: "[t]he plate of claim 11, wherein the trajectory is configured to pass through the joint at a transfixation angle of about 50 degrees measured from the neutral bending axis." Claim 11 is anticipated by Falkner, as discussed above. In my opinion, for the same reasons described above with respect to dependent claim 5, claim 14 of the 608 patent is rendered obvious by Falkner in view of the knowledge of a POSITA and/or Arnauld.

- 167 -

STRYKER Exhibit 1002
Page 170 of 231
IPR2021-01450

PTO/SB/14 (07-07)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 073275.0232 |
|---|---|---|
| | Application Number | |

| Title of Invention | Bone Plate with a Transfixation Screw Hole |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Applicant Information:

**Applicant 1**

| Applicant Authority ⦿Inventor | ◯Legal Representative under  35 U.S.C. 117 | | ◯Party of Interest under 35 U.S.C. 118 | |
|---|---|---|---|---|
| Prefix | Given Name | Middle Name | Family Name | Suffix |
| | Lance | Nathan | Terrill | |

| Residence Information (Select One) | ⦿ US Residency | ◯ | Non US Residency | ◯ | Active US Military Service |
|---|---|---|---|---|---|
| City | Dallas | State/Province | TX | Country of Residence | US |

| Citizenship under 37 CFR 1.41(b) | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 3901 Accent Dr. #1333 | | |
|---|---|---|---|
| Address 2 | | | |
| City | Dallas | State/Province | TX |
| Postal Code | 75287 | Country | US |

**Applicant 2**

| Applicant Authority ⦿Inventor | ◯Legal Representative under  35 U.S.C. 117 | | ◯Party of Interest under 35 U.S.C. 118 | |
|---|---|---|---|---|
| Prefix | Given Name | Middle Name | Family Name | Suffix |
| | Bruce | R. | Werber | |

| Residence Information (Select One) | ⦿ US Residency | ◯ | Non US Residency | ◯ | Active US Military Service |
|---|---|---|---|---|---|
| City | Scottsdale | State/Province | AZ | Country of Residence | US |

| Citizenship under 37 CFR 1.41(b) | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 6408 E. Gary Road | | |
|---|---|---|---|
| Address 2 | | | |
| City | Scottsdale | State/Province | AZ |
| Postal Code | 85254 | Country | US |

| All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Correspondence Information:

| Enter either Customer Number or complete the Correspondence Information section below. For further information see 37 CFR 1.33(a). |
|---|
| ☐ An Address is being provided for the correspondence Information of this application. |

EFS Web 2.2.2

OSTEOMED_0001591

STRYKER Exhibit 1004
Page 1 of 498
IPR2021-01450

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING
AUTHORITY (SEPARATE SHEET)

International application No.

PCT/US2010/031328

3.2.1    There is no support in the description for the lockable engagement defined in claim 6 contrary to the requirements of Article 6 PCT. In fact, according to several passages of the description the proximal portion of the transfixation screw should be able to freely rotate with respect to the plate and the first bone so that the second bone can be compressed proximally against the first bone by tightening the transfixation screw.

3.2.2    In its last paragraph, **claim 11** attempts to define <u>the inner surface of the screw hole</u> in terms of the result to be achieved, namely the trajectory of the screw with respect to the first and second bones. However this definition is not clear since the screw does not belong to the claimed plate and said trajectory depends on several screw features, like its diameter (if the diameter of the screw is smaller than that of the screw hole, the screw may tilt within the hole, thereby affecting the trajectory).

3.2.3    **Claims 1 and 11** have been drafted as separate independent claims, although claim 1 could be formulated as dependent on claim 11. The aforementioned claims therefore lack conciseness and as such do not meet the requirements of Article 6 PCT.

OSTEOMED_0001741

STRYKER Exhibit 1004
Page 151 of 498
IPR2021-01450

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau





(43) **International Publication Date**
22 November 2007 (22.11.2007)    **PCT**

(10) **International Publication Number**
**WO 2007/131287 A1**

(51) **International Patent Classification:**
*A61B 17/58* (2006.01)    *A61B 17/62* (2006.01)

(21) **International Application Number:**
PCT/AU2007/000656

(22) **International Filing Date:** 17 May 2007 (17.05.2007)

(25) **Filing Language:** English

(26) **Publication Language:** English

(30) **Priority Data:**
2006902652    17 May 2006 (17.05.2006)    AU

(71) **Applicant and**
(72) **Inventor: SLATER, Gordon** [AU/AU]; 1156 Padman Drive, Albury, New South Wales 2640 (AU).

(74) **Agent: WALSH & ASSOCIATES**; Locked Bag 2011, Glebe Post Office, Glebe, NSW 2037 (AU).

(81) **Designated States** *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM,

AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, SV, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) **Designated States** *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IS, IT, LT, LU, LV, MC, MT, NL, PL, PT, RO, SE, SI, SK, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**
— *with international search report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

(54) **Title:** ANKLE FUSION PLATE



(57) **Abstract:** A fusion plate for arthrodesis, the plate comprising: a plate body including a first portion disposed in a first plane and having a first bone engaging surface and a second opposing surface, a second portion disposed in a second plane and having a first bone engaging surface and a second opposing surface, a third portion disposed in a third plane and having a first bone engaging surface and a second opposing surface. The first portion includes at least one opening which receives at least one fixation means. The second portion includes at least one opening which receives at least one fixation means and the third portion includes at least one opening which receives at least one fixation screw.

**WO 2007/131287 A1**

STRYKER Exhibit 1005
Page 1 of 35
IPR2021-01450

### ANKLE FUSION PLATE

BACKGROUND

5
     The present invention relates to prosthetic devices and more particularly relates to an ankle fusion plate for fusion of the anterior ankle. More particularly the invention relates to an ankle plate in which openings in the plate receive fixation screws allowing compression of bones being fused.

10
The invention further, relates to a method of insertion of an anterior ankle plate so that optimal compression is achieved in anterior ankle joint fusion. This invention further relates to a kit including a selection of ankle fusion plates and a selection of fasteners for fixation of the ankle plate in a prescribed manner such that orientation of the screws provide optimal

15
compression and therefore mechanical advantage. More particularly, this invention relates to an improved apparatus for fusion of ankle joints.

PRIOR ART

20
     The prior art is replete with orthopaedic devices for repairing bones and particularly diseased bones and bone fractures. The prior art teaches a variety of bone fixation systems using plates and screws.

     For example, United States Patent 6,235,034 discloses a bone plate

25
comprising a base plate having at least two screw holes and at least two bone screws capable of securing the bone plate to a bone by insertion through the screw holes into the bone. The bone screws have heads shaped to toggle within the screw holes. A retaining plate is provided that is fixedly attachable to the base plate. The retaining plate covers at least a portion of

30
each of the bone screws. The retaining plate and base plate each contain set screw apertures. A set screw is provided to retain the retaining plate in place over the base plate by screwing the set screw through the set screw apertures in the retaining plate and base plate. This design prevents the bone screw from backing out from the bone once screwed in through the base

35
plate.

1

STRYKER Exhibit 1005
Page 2 of 35
IPR2021-01450

Another example of plate fixation by screw is disclosed in United States Patent 5,951,558 which discloses a fixation device for keeping two or more bone pieces together, either pieces of a broken bone or two distinct bones, for undergoing junction of the pieces by natural welding. The device described is capable of immobilizing flat or round bones, long or short bones, for example, parts of a broken femur or two contiguous vertebrae. The device comprises a fixation plate and fixation screws, the plate having orifices for passing the screws through the plate and fastening the screws into the bone tissue. A screw blocking or locking mechanism is provided in the plate to block the screws in the fastening position once the screws have been passed through the plate and screwed into the bone pieces, for preventing the screws from unscrewing from the bone pieces and moving out of the fixation plate once and after the fixation plate and the screws have been firmly installed in the bones.

Another prior art bone fusion device is taught in United States Patent 6,830,589 which describes expandable bone fusion devices and methods of use. The fusion device according to the invention described in that patent includes a first member and a second member which can be deployed and locked into an expanded configuration to stabilize the adjacent bone during fusion of the bone.

More generally United States Patent 6,663,669 discloses a total ankle replacement system and novel surgical method for total ankle replacement. Novel surgical tools for performing the surgical method are also described. The total ankle replacement system includes the calcaneus in fixation of a lower prosthesis body, thereby significantly increasing the amount of bone available for fixation of the lower prosthesis body and allowing the lower prosthesis body to be anchored with screws. The total ankle replacement system further includes a long tibial stem which can also be anchored into the tibia with, for example, screws, nails, anchors, or some other means of attachment.

STRYKER Exhibit 1005
Page 3 of 35
IPR2021-01450

Bones which have been fractured, either by accident or severed by surgical procedure, must be kept together for lengthy periods of time in order to permit the recalcification and bonding of the severed parts. Accordingly, adjoining parts of a severed or fractured bone are typically clamped together or attached to one another by means of plates, pins or screws driven through the rejoined parts. Movement of the pertinent part of the body may then be kept at a minimum, such as by application of a cast, brace, splint, or other conventional technique, in order to promote healing and avoid mechanical stresses that may cause the bone parts to separate during bodily activity. The surgical procedure of attaching two or more parts of a bone with a pin-like device normally requires an incision into the tissue surrounding the bone and the drilling of a hole through the bone parts to be joined. Due to the significant variation in bone size, configuration, and load requirements, a wide variety of bone fixation devices have been developed in the prior art. In general, the current methods rely upon a variety of metal wires, screws, plates and clamps to stabilize the bone fragments during the healing process. Following a sufficient bone healing period of time, the site may require re-opening to permit removal of the bone fixation device.

The internal fixation techniques commonly followed today frequently rely upon the use of wires, intramedullary pins, plates and screws, and combinations thereof. The particular device or combination of devices is selected to achieve the best anatomic and functional condition of the traumatized bone with the simplest operative procedure and with a minimal use of foreign-implanted stabilizing material. It is important in bone repair that the fracture be stable axially, torsionally and rotationally.

ANKLE FUSION

The goal of ankle replacement is to resurface the ankle joint with mechanical parts that allow continued ankle motion and function without pain. The models currently used include the Agility Ankle and the Scandinavian Total Ankle Replacement (STAR). Not all known systems are approved for use. Like hip and knee replacements, these devices are constructed of metals and plastics, and, as such, are mechanical parts that can wear out. Currently, patients who are best served by an ankle

3

STRYKER Exhibit 1005
Page 4 of 35
IPR2021-01450

replacement are those who will put low mechanical demands on their artificial joints. These include average or lightweight patients who would like to stand and walk with limited or no pain. Certain patient groups are less likely to have good and long-lasting results from ankle replacements,
5 including patients with; previous deep ankle infection, lower limb neuropathy, osteoporosis, high physical demands, obesity, poor skin or vascular problems. Ankle arthroplasty for post-traumatic tibiotalar arthritis remains controversial. The current literature strongly recommends arthrodesis, especially in those patients who will overload the joint: the
10 young, the active and overweight patients. Total ankle arthroplasty has become a viable alternative to ankle arthrodesis. Selected patients can be offered a total ankle replacement as an alternative option to arthrodesis in the treatment of end-stage ankle arthritis. The optimal total ankle replacement patient is an older person who applies low loads and has
15 multiple joint problems.

The ankle joint is a comparatively small joint relative to the weight bearing and torque it must withstand. Total ankle replacement systems attempting to address pain control and improved function have in the past experienced
20 significant failure rates due to the technical difficulty of simulating ankle geometry and loadings. The main alternative to total ankle replacement is arthrodesis. Both procedures are intended to reduce pain but the total ankle replacement is additionally intended to improve function. If an arthrodesis or ankle replacement is not properly aligned, significant gait abnormalities
25 may result. The principal limitations of past total ankle replacement have been loosening of the prosthesis, requiring revision. If the prosthesis requires removal, a subsequent arthrodesis can be considered. Different prostheses require different amounts of removal of bone, potentially compromising the success of a subsequent arthrodesis. Some ankles with
30 implant components often require revision or arthrodesis. Ankle arthrodesis is currently a widely accepted surgical procedure but good, uniform results are not always achievable. Patients treated by compression ankle arthrodesis do not always have an effective fusion rate. The commonly used external fixation devices afford stability in only one plane and do not give rigid

4

STRYKER Exhibit 1005
Page 5 of 35
IPR2021-01450

immobilization. A device known as a Triangular Compression Device has been used successfully. A successful Arthrodesis of the ankle can result in a painless, normal walking gait. However, complications in ankle arthrodesis can be major, and can occur when anatomy, deformity, or bony deficiency

5    is not properly addressed. Arthrodesis is usually   considered after conservative treatment ( such as arthroscopy) fails. Infections, deformity, sensory deficiencies, and bony defects are complications which require special consideration. External compression enhances the likelihood of a successful arthrodesis.

10

Presently ankle fusion has had a rate of failure in the literature between 15% and 70%. It is believed that this is largely a result of Initial fixation that is not rigid enough. As in other areas of the skeletal body, superior fusion rates have been achieved by plating rather than fixation by other means

15    Pantalar fusion has been achieved with a revision foot rod. This has been a very technically difficult device to use with poor fusion rates.

Attempts have in the past been made in the prior art to bend and shape an already existing plate on the market but this does not fulfil the requirements,

20    as screws cannot be placed in the desired places or angles to achieve optimal fixation.

A known plate marketed under the trade mark name Tomofix ™ has been crudely adapted for anterior arthrodesis of the ankle but this is

25    unsatisfactory because the plate is designed for stable fixation of osteotomies close to the knee.

Proper plate fixation relies on the integrity of the screw bone interface, screw insertion angle, screw tightness and effective co operation between

30    screw head and the screw insertion hole. These requirements dictate plate design for a particular anatomical location and repair objective. To date there is no arthrodesis plate and particularly ankle arthrodesis plate which

5

STRYKER Exhibit 1005
Page 6 of 35
IPR2021-01450

satisfies the requisite fixation criteria and which is purpose designed to overcome the prior art disadvantages of the known plates.

Since the ankle is the only joint which to date does not have a specific plate for arthrodesis, there is a long felt want in the field to provide a fusion plate
5   that is effective and useful in primary ankle fusion and which will reduce or eliminate fusion failure rates and which provides appropriate geometry to facilitate integrity of the screw bone interface, screw insertion angle, screw tightness and effective co operation between screw head and the screw insertion hole.

10          INVENTION

15          The present invention seeks to ameliorate or eliminate the aforesaid problems inherent in the prior art devices and apparatuses and particularly those used in ankle arthrodesis.

The present invention provides an improved arthrodesis fusion plate for fusion of the anterior ankle. More particularly the invention provides an ankle plate in which openings in the plate receive fixation screws allowing
20   compression of bones being fused and orientation of the fixation screws to optimise accommodation of bone loading for efficient and effective fusion. The invention further provides a method of insertion of an anterior ankle plate so that optimal compression is achieved and fixation screws are inserted at appropriate angles in anterior ankle joint fusion. This invention
25   further relates to a kit including an anterior ankle fusion plate and which includes a selection of fasteners for fixation of the ankle plate in a prescribed manner so that the orientation of the screws provide optimal compression and bone fusion.

30   This ankle fusion plate according to the invention can be inserted into the anterior ankle joint and is used in primary ankle fusion, covetin severe hind foot deformity, pantalar fusion and also in the salvage of ankle replacement.

Although the invention will be described with reference to its application to
35   ankle fusion it will be appreciated by persons skilled in the art that the

6

STRYKER Exhibit 1005
Page 7 of 35
IPR2021-01450

invention may be applied to the repair/ fusion of other bones requiring axial alignment.

In one broad form the present invention comprises:

a fusion plate for arthrodesis, the plate comprising:

a plate body including a first portion disposed in a first plane and having a first bone engaging surface and a second opposing surface,

a second portion disposed in a second plane and having a first bone engaging surface and a second opposing surface,

a third portion disposed in a third plane and having a first bone engaging surface and a second opposing surface,

the first portion including at least one opening which receives at least one fixation means;

the second portion including at least one opening which receives at least one fixation means ;

the third portion including at least one opening which receives at least one fixation screw.

In another broad form the present invention comprises:

an implant kit for arthrodesis fusion the kit comprising:

a fusion plate; and

a set of plate fixation screws;

the plate comprising, a first portion disposed in a first plane and having inner and outer surfaces, the inner surface opposing a bone surface, the first portion including at least one opening including a formation which receives at least one bone fixation screw in a first orientation, a second portion disposed in a second plane and having inner and outer surfaces, the inner surface opposing a bone surface, the second portion including at least one opening including a formation which receives a bone fixation screw in at least one orientation, a third portion disposed in a third plane and having inner and outer surfaces, the inner surface opposing a bone surface, the third portion including at least one opening which receives at least one bone fixation screw in a first orientation.

7

STRYKER Exhibit 1005
Page 8 of 35
IPR2021-01450

In its broadest form the present invention comprises:

a fusion plate for arthrodesis, the plate comprising:

a plate body including a first portion disposed in a first plane and having a
5   first bone engaging surface and a second opposite surface,

a second portion disposed in a second plane and having a first bone
engaging surface and a second opposing surface,

the first portion including at least one opening which receives at least one
fixation means;

10   the second portion including at least one opening which receives at least one
fixation means.

Preferably the inner surface of the first portion of the plate opposes the
anterior tibia. Preferably the inner surface of the second portion of the plate
15   also opposes the anterior tibia. Preferably, the inner surface of the third
portion of the plate disposed in the first plane opposes the talus. The first
portion includes at least one opening including a formation which receives a
plurality of bone screws of said first type and which on insertion of the plate
are disposed normal to the plane of the plate at that region. The second
20   portion of the plate includes a slotted opening which receives a screw of a
second type which is of sufficient length to penetrate the tibia, talus and
Calcaneus bones. The third portion preferably has two spaced apart openings
which receive at least one of a first screw type which are implanted into the
Talus.

25   According to one embodiment, the first portion has a region at is
extremity which is thinner.

The screws in each portion of the plate are directed at required angles
according to the joint/s required for arthrodesis. This is also necessary to
achieve maximal compression of the fusion site/s. The fixation screw design
30   is adapted to ensure the above plate fitting objectives are achieved.
According to a preferred embodiment, the plate depth changes at different
locations. Preferably, the depth at the beginning and end points of the L
shaped contour over the ankle joint in the second region will be at it's
maximum thickness. This location adjacent the ankle joint will preferably be

8

STRYKER Exhibit 1005
Page 9 of 35
IPR2021-01450

the thickest part of the plate and will preferably fall within the range 4-8mm. Thickness throughout this specification will refer to the dimension measured from the bone engaging face to an opposite outer face The plate will taper at at least one but preferably two different points of the plate. A first taper will
5    occur at a proximal point of the plate over the tibia. The desired effect is for the plate to taper in and decrease in  thickness proximally. The taper decreases down to around 1mm in thickness and at its proximal extent it is 4mm in width. The second point of plate depth and width change is over the phalanges at the distal point of the plate. At this point the plate according to
10    one embodiment, tapers out and again the thickness at this point would be in the order of about 1mm. These points will preferably resemble and conform to the typical geometry of the anatomical region. In locations where this does not occur, further manipulation or moulding of the plate geometry can be achieved as required. Preferably, the plates are configured to generally
15    conform to the anatomic contours of the ankle joint. A range of different plate sizes ( at least five) is contemplated with differences in the range of contour and degree of angle over the ankle joint and lengths both proximally and distally. In practice 2- 3 three plate sizes  are likely to provided a complete inventory.

20

### BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will now be described in more detail according to a
25    preferred, but non limiting embodiment and with reference to the accompanying illustrations wherein:

FIGURE. 1   shows a side elevation view of a plate according to one embodiment and attached via fixation screws to an abbreviated ankle joint (
30    dotted lines)

FIGURE. 2      shows a front elevation view of the plate of figure 1 showing alignment and spacing of predrilled holes for fixation screws.

FIGURE. 3      shows an elevation view of a  first screw type according to
35    one embodiment adapted for insertion in openings for the tibia.

9

STRYKER Exhibit 1005
Page 10 of 35
IPR2021-01450

FIGURE 4        shows an elevation view of a second screw type according
to one embodiment adapted for insertion in the plate of figures 1 and 2 and
allowing adjustable orientation.

5

FIGURE 5        shows a side cross sectional elevation view of a plate
according to a preferred embodiment isolated from an ankle joint.

FIGURE 6        shows a front elevation view of the plate of figure 5 with
corresponding numbering .

10      FIGURE 7        shows a perspective view of the plate of figure 5 with
corresponding numbering .

FIGURE 8        shows a cross sectional view of the plate of figure 5 taken
at A-A in figure 6.

FIGURE 9        shows the cross sectional side elevation view of the plate
15      of figure 5 ( taken along line A of figure 10) showing a non limiting
geometry of the plate according to one embodiment.

FIGURE 10       shows a front elevation view of the plate of figure 9
showing a non limiting geometry of the plate according to one embodiment.

20

FIGURE 11       shows a cross sectional view of the plate of figure 10 taken
at D-D in figure 10 showing a non limiting geometry of the plate according
to one embodiment.

FIGURE 12       shows an enlarged view of detail B in figure 9 showing a
25      non limiting geometry of the opening.

FIGURE 13       shows an enlarged view of detail C in figure 9 showing a
non limiting geometry of the opening.

30

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

10

STRYKER Exhibit 1005
Page 11 of 35
IPR2021-01450

Referring to **figure 1** there is shown a side elevation generally schematic view of a fusion plate 1 for arthrodesis according to one embodiment. Plate 1 is attached to an ankle joint 2 opposing the Talus bone 3 and Tibial bone 4.

5      Plate 1 according to the embodiment shown comprises a portion 5 disposed in a first plane which generally aligns with an anterior surface 6 of the talus 3. Portion 5 has an outer surface 7 and inner surface 8 which opposes talus surface 6 for fixation thereto. Disposed in portion 5 are fixation screws 9 and 10 which pass through openings 11 and 12 of portion 5 and engage talus 3 at

10     different orientations. Screws 9 and 10 are disposed at different angles to a vertical resulting in each having different respective horizontal and vertical components of force along orthogonal X and Y axes. Each of openings 11 and 12 have formations which direct respective screws 9 and 10 in the orientations shown. For example the angle of orientation of countersink in

15     formation 13 of opening 12 directs screw 10 at a predetermined angle which optimises fixation.

Portion 20 of plate 1 has an outer surface 21 and inner surface 22 which opposes anterior surface 23 of tibia 4 for fixation thereto. Disposed in

20     portion 20 is fixation screw 25 which passes through opening 26 in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. Screw 25 engages tibia 4, talus 3, and calcaneus 28 effectively providing three points of fixation

25     according to this embodiment. Portion 20 is angled relative to portion 5 at about 100 degrees. This angel is non limiting and may be greater or less than 100 degrees according to the dictates of design.

Portion 30 of plate 1 has an inner surface 31 and an outer surface 32 and preferably disposed normal or near normal to the plane of portion 5. Portion

30     30 includes openings 33, 34 and 35 which receive fastening screws 36, 37 and 38 each preferably in the same orientation and which engage tibia 4. Screws 36, 37 and 38 are according to one embodiment 4.5mm in diameter and may be of the same screw type as those used for screws 9 and 10 fixing

11

STRYKER Exhibit 1005
Page 12 of 35
IPR2021-01450

portion 5. This diameters is non limiting. Also a different type of fixation screw to the configuration of that shows may be employed.

As may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis. This is

5   also necessary to achieve maximal compression of the fusion site/s.

Preferably, portion 30 is disposed in a first plane which generally aligns with an opposing face of tibia 4. Portion 20 lies in a second plane at a first angle relative to the first plane and aligns with an opposing face of the distal tibia. Portion 5 lies in a third plane at a second angle relative to the first

10   plane and engages the talus.

**Figure 2** shows a front elevation view of the plate of figure 1 showing alignment and spacing of predrilled holes for fixation screws. Figure 2 has corresponding numbering for corresponding parts. From this view it may be

15   seen that according to this embodiment, plate 1 undergoes changes along its length depending upon the bone each part of the plate opposes. Region 30 is narrower than region 20 tapering as the tibia narrows heading proximally. In addition, the loads at region 30 can be absorbed by the thinner profile as internal moments are less. As the plate moves distally, the thickness

20   preferably increases to accommodate the increased compression and rotational loads. The waisted region 50 generally confirms to the contour of the tibia. Openings 33, 34 and 35 are preformed and receive a first preferably countersunk screw type such as that shown in figure 3. Opening 27 which is also preformed, receives a countersink screw which is allowed

25   adjustable orientation. The enlarged slotted holes allow a fine adjustment of the attitude of the screws within a range of around 30 degrees, although it will be appreciated that this range can be narrowed or extended.

**Figure 3** shows an elevation view of a first screw type 60 according to one

30   embodiment adapted for insertion in openings 33, 35 and 36 for the tibial region fixation.

**Figure 4** shows an elevation view of a second screw type 70 according to one embodiment adapted for insertion in the plate of figures 1 and 2 and allowing adjustable orientation. Screw type 70 has a longer shank to increase

12

STRYKER Exhibit 1005
Page 13 of 35
IPR2021-01450

depth of penetration and has an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone.

5      **Figure 5** shows a side elevation view of a plate 80 according to a preferred embodiment isolated from an ankle joint. Plate 80 which is attachable to an ankle joint opposing the Talus bone and Tibial bone, comprises a portion 81 disposed in a first plane which generally aligns with an anterior surface of the talus. Portion 81 has an outer surface 82 and inner surface 83 which

10     opposes a talus for fixation thereto. Disposed in portion 81 are fixation screws ( not shown) which pass through openings 84 and 85 of portion 81 engaging the talus at selected orientations. Screws inserted in openings 84 and 85 are preferably disposed at different angles to a vertical resulting in each having different respective horizontal and vertical components of force

15     along orthogonal X and Y axes. Each of openings 84 and 85 have formations 86 and 87 which direct screws in a particular orientation. The angle of orientation of countersink formations 86 and 87 directs screws at a predetermined angle which optimises fixation.

20     Portion 90 of plate 80 has an outer surface 91 and inner surface 92 which opposes an anterior surface of tibia for fixation thereto. Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. Formation 94 is configured so that a fixation screw is directed at an angle within a predetermined allowable angular range. Portion 90 is angled

25     relative to portion 81 at a non limiting angle of about 100 degrees.

      Portion 95 of plate 1 has an inner surface 96 and an outer surface 97 and preferably disposed normal or near normal to the plane of portion. Portion 95 includes openings 98 and 99 which receive fastening screws each

30     preferably in the same orientation and which engage the tibia. Screws which fix plate 80 via openings 98 and 99 may be of the same screw type as those used for fixation through openings 84 and 85.

13

STRYKER Exhibit 1005
Page 14 of 35
IPR2021-01450

As may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis. This is also necessary to achieve maximal compression of the fusion site/s.

5      Preferably, portion 95 is disposed in a first plane which generally aligns with an opposing face of a tibia. Portion 90 lies in a second plane at a first angle relative to the first plane and also aligns with an opposing face of the distal tibia. Portion 5 lies in a third plane at a second angle relative to the first plane and engages the talus.  Openings 99 and 100 are elongated to allow alignment adjustments.

10

**Figure 6** shows a front elevation view of the  plate of figure 5 with corresponding numbering .

**Figure 7** shows a perspective view of  the  plate of figure 5 with corresponding numbering . ·

15     **Figure 8** shows a cross sectional and plan views of the plate of figure 5 taken at A-A in figure 6.

According to a preferred embodiment the depth/ thickness of the plate 80 will change at different locations on the plate. The depth at the beginning

20     and end points of the generally L shaped contour over the ankle joint formed by portions 81 and 90 will be at it's maximum thickness as it is at this region that the highest loading will occur in normal use.  This depth (the thickest part of the plate) will be within the range 5-6mm. The plate will taper at two different points on the plate. Firstly, the proximal end region of the plate

25     over the tibia. The desired effect is for the plate to taper in and decrease depth at its extremities where loading is least. This would decrease down to around 1mm in thickness and 4mm in width. The second point of plate depth and width change would be over the phalanges at the distal point of the plate. At this point the plate would taper out and again the depth would be

30     that of around the 1mm mark. These points will resemble the average geometry of this anatomical region in the cases where this is not occurring it is at these points that further manipulation or moulding can be achieved if required.

STRYKER Exhibit 1005
Page 15 of 35
IPR2021-01450

In view of the anatomic contour of ankle joint, there are at least five different sized plates with differences in the range of contour and degree of angle over the ankle joint and lengths both proximally and distally. Typically a kit selection or inventory would provide choice of two or three
5   plate sizes .

Preferably, the custom shaped L- plate would need to be moulded to an angle in the region of 110 degrees at the point of the contact with the patient bone surface. The range in sizes for this would preferably be 95, 100, 105
10   110 and 115 degrees, with corresponding lengths to suit.

An ideal tibial length of the plate would be approximately 80mm. The contour of geometry over the distal aspect of the tibia will be incorporated into the design of the plate. The length from the L point out to the phalanges
15   would be about 25mm in length and at this point the plate would taper out to around 35mm. The plate width before tapering in or out would be in the region of 11 mm. One preferred material for the plate is chrome Cobalt.

**Figure 9**     shows the cross sectional side elevation view of the plate
20   of figure 5 with corresponding numbering ( taken along line A of figure 10) showing a non limiting geometry of the plate according to one embodiment. The dimensions indicated are in millimetres and indicate proportionality of the geometry of the preferred embodiment plate. Shown are distances between openings, size of openings relative angles of separate portions 81,
25   90 and 95 of the plate. **Figure 10** shows a front elevation view of the plate of figure 9 showing a non limiting geometry of the plate according to one embodiment. **Figure 11** shows a cross sectional view of the plate of figure 10 taken at D-D in figure 10 showing a non limiting geometry of the plate according to one embodiment. **Figure 12** shows an enlarged view of detail B
30   of opening 100. in figure 9 showing a non limiting geometry of the opening. **Figure 13** shows an enlarged view of detail C of opening 98 in figure 9 showing a non limiting geometry of the opening.

15

STRYKER Exhibit 1005
Page 16 of 35
IPR2021-01450

This plate significantly increases the ease of pantalar fusion and also allows the ability to start with ankle fusion and add the pantalar arthrodesis component as required. It is believed that in the pantalar fusion setting, one of the reasons for failure is necrosis of the talus, which occurs due to the
5   multiple incisions that are needed. Avoiding amedial incision in this procedure will reduce the rate of talus necrosis after pantalar fusion. This plate also significantly increases the ease of pantalar fusion and also allows the ability to start with ankle fusion and add the pantalar arthrodesis component as required.

10

The specific dimensions of any of the bone fixation plate of the present invention can be readily varied depending upon the intended application, as will be apparent to those of skill in the art in view of the disclosure herein. Moreover, although the present invention has been described in terms of
15   certain preferred embodiments, other embodiments of the invention including variations in dimensions, configuration and materials will be apparent to those of skill in the art in view of the disclosure herein. In addition, all features discussed in connection with any one embodiment herein can be readily adapted for use in other embodiments herein. The use
20   of different terms or reference numerals for similar features in different embodiments does not imply differences other than those which may be expressly set forth. Accordingly, the present invention is not limited to the preferred embodiments disclosed herein.

25   The invention may also be provided as a kit including a plurality of plates and associated fixation screws. Typically a kit may comprise three to five plates for a surgeon to select from depending upon the particular anatomy of the patient. One significant advantage of the plate described herein is the oblique screw portal allowing for various angles and the ability to
30   incorporate more joints into the arthrodesis as required. Screw sizes may be adjusted to allow for particular insertion points and specific characteristics (e.g. bone density) of bone at points of fixation. The plate may also be manufactured with varied thickness at regions requiring additional strength and contoured to a geometry to best suit ankle anatomy. Screw openings

16

STRYKER Exhibit 1005
Page 17 of 35
IPR2021-01450

may be offset to allow three point talar fixation and plate compression. Another advantage of the plate is its pliability at regions when bending may be required for conformity with bone anatomy. The plate allows the talus to be fused with the tibia thereby providing a supporting bridge which is
5    helpful for patients with large ankle defects. The plate also reduces the number of incisions in the patient and may be inserted through an anterior section of joint using the same incision required for a total ankle replacement. For example if a surgeon is revising a total ankle replacement, the same incision can be used as that used when removing a joint
10    replacement and treating with arthrodesis. This techniques provides improved results in a case where large amounts of bone dissection following a total ankle replacement.

ANALYSIS OF SIMULATED IN - VIVO PERFORMANCE
15

Studies and testing of a preferred embodiment of the fusion plate have been conducted which determine capacity of the plate to withstand anticipated loadings. The testing considers ankle fusion plate's response to in-vivo loads. The objective of the study was to determine finite element stresses in
20    the plate which result from applied loads and was intended to simulate as closely as possible the in vivo static and dynamic loading conditions. Mechanical properties were taken as that specified as minima in the relevant ISO standards or as specified by the material supplier.

25    Equipment used in the testing

       DELL INSPIRON 5150
       ANSYS/ WORKBENCH V11 .0
       SOLIDEDGE V 19.0
30

The loading regimes selected for the plate system and parameters was used for load simulation are listed below:

| Load Case | Normal Load (N) | Loaded surface |
|-----------|-----------------|----------------|
| 1         | 1,200           | Distal face    |

17

STRYKER Exhibit 1005
Page 18 of 35
IPR2021-01450

WO 2007/131287                                    PCT/AU2007/000656

| 2 | 3600 | Distal face |
|---|---|---|

The plate was screw fixed along its the proximal length onto an idealised tibia. Each screw was initially rigidly fixed into the simulated bone side and had a simulated friction effect of sliding against the plate counter faces.

A second simulation was performed to determine the effects of variable bone density on the distal tibia.

Properties for the 316L stainless steel (BioDur 108) alloy were selected as Young's Modulus, E 200 GPa, Poisson's ratio = 0.3 and a tensile yield strength of 938MPa and ultimate tensile strength of 1269 MPa. The bone stiffness was varied from 0.5GPa to 3 GPa and Poisons ratio of 0.3.

The following load conditions were simulated:

1. Screws rigidly fixed,       1,200N (120kg) Distally fixed.
2. Bone with low stiffness,    1,200N (120kg) Distally loaded.
3. Bone with high stiffness,   1,200N (120kg) Distally loaded.
4. Bone with low stiffness,    3,600N (360kg) Distally loaded.

The resulting stress distributions in the neck and stem were compared.

The simulations were solved as non-linear elastic stress analysis, mesh refinement was applied to the regions of high stress concentration. An initial mesh size was selected as 1mm, the resulting stresses were recorded. A subsequent run was performed with a refined mesh around high stress locations. A mesh density of half was used and the subsequent change in stress was compared to the original run, the results of these simulations was within 10%, thus a mesh density of 1mm was selected for all simulations.

Observations from Results.

18

STRYKER Exhibit 1005
Page 19 of 35
IPR2021-01450

The initial simulation (1,200N - 120kg load) simulated the fixation screws rigidly fixed into the bone, i.e. the bone did not allow the screws to be pulled with the bone. This simulation would be analogous to hard cortical bone fixation of the screws. As would be anticipated the results showed that the
5   highest stresses occur on the inner surface of the plate approximately were a change in section thickness occurs just above the angled screw formation. This is due to the reduction in effective ( cross sectional) area of the plate at that location. The magnitude of peak tensile stress at that location was 495 MPa, which is approximately 47% less than the yield strength of the
10  material, thus providing a factor of safety of 1.9 which well satisfies engineering design standards.

When the bone quality is reduced (stiffness of supporting bone reduces) the stress increases. The stress increases over a range from 495 to 713 to 910
15  MPa moving from optimally stiff bone to low bone quality respectively. The location in the plate of the high stress concentration region was unchanged with the magnitude increasing with decreased bone quality. The testing found that for poor distal tibia bone quality the factor of safety is reduced to approximately 1, as the maximum tensile stress is approximately at the yield
20  strength of the material. The maximum deformation in the plate occurs at the tip of the distal surface ( toe) of the plate and varies from 0.37 to 0.53 and 0.97mm for the highest to lowest bone quality respectively.

25  A simulation was performed to determine the integrity of the plate with a 3,600N load (360kg) on the rigidly supported "home run" lag screw. The maximum stress in the plate is in the same location as before with the exception that it has increased from 495MPa to 1 ,484MPa for the 1,200N (120kg) and 3,600 N (360kg) loads respectively. The ultimate tensile
30  strength of the BioDurl08 alloy is approximately 1269MPa. Thus, for the applied load of 3,600N (360 kg) the material failed at the region of the screw opening ( distal tibia engagement region) where the effective cross sectional area of the plate is reduced to accommodate the fixation screw at that point.

19

STRYKER Exhibit 1005
Page 20 of 35
IPR2021-01450

WO 2007/131287    PCT/AU2007/000656

It can be estimated that the maximum load the tested plate can take prior to failure is 3,075N (308kg).

For perfect (rigid) tibial bone quality the plate can carry 1,200N (120kg) with a factor of safety of 1.9. Decreasing the bone quality decreases the load carry capacity of the plate. With the lowest bone quality (stiffness of 1.0 GPa) for an applied load of 1,200N (120kg) the stress in the plate increased to 910MPa just below the yield strength of the material. The plate tested will only carry approximately 3,000N (300kg) when rigidly fixed to the tibia, at a load of 3,600N (360kg) the stress in the plate exceeds the ultimate strength of the alloy.

The above tests provide performance indications for a plate of the particular type and geometry tested. Arthrodesis plates with different geometry and dimension such as alternative thickness distributions and angulations may result in different measured loadings and plate response. Alternative plates made from different materials and different geometry will be likely to have different load capacity results for equivalent in vivo simulations but without compromise to fusion result provided the right plate is selected from the particular patient. Accordingly, the above observations and findings should be taken as a non limiting example of tested simulated in vivo performance for one plate of a particular size, geometry and material and should not be construed as limiting of load capacities and performance of alternative ankle fusion plates made in accordance with the present invention. Proportionate plate sizes may vary from patient to patient but consistency of plate performance in vivo will be geometry of the plate

It will be recognised by persons skilled in the art that numerous variations and modifications maybe made to the invention as broadly described herein without departing from the overall spirit and scope of the invention.

20

STRYKER Exhibit 1005
Page 21 of 35
IPR2021-01450

THE CLAIMS DEFINING THE INVENTION ARE AS FOLLOWS:

1  A fusion plate for arthrodesis, the plate comprising:

a plate body including a first portion disposed in a first plane and having a first bone engaging surface and a second opposing surface,

a second portion disposed in a second plane and having a first bone engaging surface and a second opposing surface,

a third portion disposed in a third plane and having a first bone engaging surface and a second opposing surface,

the first portion including at least one opening which receives at least one fixation means;

the second portion including at least one opening which receives at least one fixation means ;

the third portion including at least one opening which receives at least one fixation screw.

2  A fusion plate according to claim 1 wherein, the second portion of the plate body is disposed at a first angle relative to the first plane and the third portion is disposed at a second angle relative to the first plane.

3  A fusion plate according to claim 2 wherein the second angle is greater than the first angle .

4  A fusion plate according to claim 3 wherein, the first portion includes an opening of a first size and a second opening of a second size.

5  A fusion plate according to claim 4 wherein the second portion includes a first opening of a first size and a second opening of a second size.

21

STRYKER Exhibit 1005
Page 22 of 35
IPR2021-01450

6        A fusion plate according to claim 5 wherein the third portion includes at least two openings of the same size.

7        A fusion plate according to claim 6 wherein a second opening in the first portion is larger than the first opening.

8        A fusion plate according to claim 7 wherein the second opening in the first portion is elongated.

9        A fusion plate according to claim 8 wherein the first opening in the second portion is the same size as the second opening in the first portion.

10       A fusion plate according to claim 9 wherein the second opening in the second portion is circular.

11       A fusion plate according to claim 10 wherein, the opposing face of the second portion includes a formation which includes said second opening .

12       A fusion plate according to claim 11 wherein the formation is a shoulder including a countersunk recess for receiving a fastener head.

13       A fusion plate according to claim 12 wherein the first and second portion of the plate body are approximately the same width.

14       A fusion plate according to claim 13 wherein the third portion of the plate body has a first proximal narrow end and a second distal flared end.

15       A fusion plate according to claim 14 wherein the flared end has two openings to receive fixation screws.

16       A fusion plate according to claim 15 wherein the plate is symmetrical about a longitudinal axis but asymmetric about a transverse axis normal the longitudinal axis .

17       An implant kit for arthrodesis fusion, the kit comprising:
at least one fusion plate; and

22

STRYKER Exhibit 1005
Page 23 of 35
IPR2021-01450

at least one  set of plate fixation screws;

5

10

each plate comprising, a first portion disposed in a first plane and having inner and outer surfaces, the inner surface opposing a bone surface, the first portion including at least one opening including a formation which receives at least one bone fixation screw in a first orientation,   a second portion disposed in a second plane and having inner and outer surfaces, the inner surface opposing a bone surface, the second portion including at least one opening including a formation which receives a bone fixation screw in at least one orientation,   a third portion disposed in a third plane and having inner and outer surfaces, the inner surface opposing a bone surface, the third portion including at least one opening which receives at least one bone fixation screw in a first orientation.

15     18     A kit according to claim 17 wherein the plate geometry is arranged to at least partially conform to the shape of the anatomy of bones to which the plate is fixed.

       19     A kit according to claim 18 further comprising a selection of said
20            fixation screws of at least two types.

       20     A kit according to claim 19 further comprising a selection of said fixation screws of at least two sizes.

       21     A kit according to claim 20 wherein the plate is fixed to ankle
25            bones.

       22     A kit according to claim 21 wherein the inner surface of the first portion of the plate disposed in the first plane, when fitted to a patient opposes the anterior tibia..

       23     A kit according to claim 22 wherein the inner surface of the
30            second portion of the plate, when fitted to a patient, opposes the anterior tibia.

       24     A kit according to claim 23 wherein the inner surface of the third portion of the plate, when fitted to a patient, opposes the anterior talus.

23

STRYKER Exhibit 1005
Page 24 of 35
IPR2021-01450

25    A kit according to claim 24 wherein the first portion preferably has two spaced apart openings which receive at least one of a first screw type which are implanted into the tibia

26    A kit according to claim 25 wherein the second portion of the plate includes a slotted opening which receives a screw of a second type which is of sufficient length to penetrate the tibia, talus and Calcaneus bones.

27    A kit according to claim 26 wherein the first portion includes at least one opening which receives a plurality of bone screws of said first type and which on insertion of the plate are disposed normal to the plane of the plate at that region.

28    A kit according to claim 27 wherein the openings in the plate are arranged so that fixation screws may each be directed at a predetermined angle.

29    A kit according to claim 28 wherein the plate thickness varies at different locations and wherein the portion of the plate which lays over the ankle joint has maximum thickness.

30    A kit according to claim 29 wherein the thickest part of the plate will be within the range 4-8mm.

31    A kit according to claim 30 wherein the plate has a first taper at a proximal point of the plate over the tibia.

32    A kit according to claim 31 wherein there are at least five plates in the kit.

33    A fusion plate according to claim 3 wherein the first plane is a longitudinal tibial plane, the second is a tibia-talar joint plane including an oblique formation and the third plane is a talar plane lying along the talus.

34    A fusion plate according to claim 33 wherein the first plane extends from the tibia-talar plane proximally along the tibia for approximately 60-65mm.

24

STRYKER Exhibit 1005
Page 25 of 35
IPR2021-01450

35    A fusion plate according to claim 33 wherein as the plate extends along the tibia its thickness decreases from 2.5mm to 2mm.

36    A fusion plate according to claim 33 wherein as the plate extends along the tibia width decreases from 12.5mm to 8mm.

37    A fusion plate according to claim 36 wherein the first portion has two screw openings the first being of smaller size than the second.

38    A fusion plate according to claim 37 wherein the first screw is 4 millimeters in diameter and the second screw opening is elongated.

39    A fusion plate according to claim 38 wherein the elongated opening is 10mm in length and 4.5mm in width.

40    A fusion plate according to claim 39 wherein the elongated opening receives 4.5mm cortical screws.

41    A fusion plate according to claim 40 wherein, the tibia-talar joint plane terminates distally in a generally L shaped convex bend.

42    A fusion plate according to claim 41 wherein the L shaped bend is the thickest part of the plate.

43    A fusion plate according to claim 42 wherein, the plate is 3.5mm thick at the bend.

44    A fusion plate according to claim 43 wherein the plate is 12.5mm thick at the bend.

45    A fusion plate according to claim 44 wherein the second portion includes a shoulder which includes an oblique screw opening.

46    A fusion plate according to claim 45 wherein, the oblique opening receives a 6.5mm cannulated fastening screw.

47    A fusion plate according to claim 46 wherein the oblique opening allow the screw to be inserted at one of a plurality of available angles.

48    A fusion plate according to claim 47 wherein, the third portion lies over the talar bone.

49    A fusion plate according to claim 48 wherein the third portion splays outward distally from a width of about 12.5mm to 20mm.

25

STRYKER Exhibit 1005
Page 26 of 35
IPR2021-01450

50    A fusion plate according to claim 49 wherein the thickness of the third portion decreases distally from about 3.5mm to 2mm.

51    A fusion plate according to claim 50 wherein the plate the angle between the first portion and the third portion is within the range of 95 – 115 degrees.

52    A fusion plate according to claim 51 wherein, the length of the plate along the tibia is between 60 – 65mm.

53    A fusion plate according to claim 52 wherein the length of the plate over the talus is within the range of 20 – 23mm.

54    A fusion plate according to claim 53 wherein the plate is manufactured from materials selected from stainless steel, titanium, polyethylene, plastics or other biomedical material.

55    A fusion plate for arthrodesis, the plate comprising:

a plate body including a first portion disposed in a first plane and having a first bone engaging surface and a second opposite surface,

a second portion disposed in a second plane and having a first bone engaging surface and a second opposing surface,

the first portion including at least one opening which receives at least one fixation means;

the second portion including at least one opening which receives at least one fixation means.

56    A fusion plate according to claim 55  wherein, the second portion of the plate body is disposed at a first angle relative to the first plane.

57    A fusion plate according to claim 56 wherein,  the first portion includes an opening of a first size and a second opening of a second size.

58    A fusion plate according to claim 57 wherein the second portion includes a first opening of a first size and a second opening of a second size.

26

STRYKER Exhibit 1005
Page 27 of 35
IPR2021-01450

59    A fusion plate according to claim 58 wherein a second opening in the first portion is larger than the first opening.

60    A fusion plate according to claim 59 wherein the second opening in the first portion is elongated.

61    A fusion plate according to claim 60 wherein the first opening in the second portion is the same size as the second opening in the first portion.

62    A fusion plate according to claim 61 wherein the second opening in the second portion is circular. the third portion includes at least two openings of the same size.

63    A fusion plate according to claim 62 wherein, the opposing face of the second portion includes a formation which includes said second opening .

64    A fusion plate according to claim 63 wherein the formation is a shoulder including a countersunk recess for receiving a fastener head.

65    A fusion plate according to claim 64 wherein a third portion of the plate body has a first proximal narrow end and a second distal flared end.

66    A fusion plate according to claim 65 wherein the first and second portions of the plate body are approximately the same width.

67    A fusion plate according to claim 66 wherein the flared end has two openings to receive fixation screws.

68    A fusion plate according to claim 67 wherein the plate is symmetrical about a longitudinal axis but asymmetric about a transverse axis normal the longitudinal axis .

27

STRYKER Exhibit 1005
Page 28 of 35
IPR2021-01450



FIGURE 1



CENTRE LINE

FIGURE 2

FIGURE 3

FIGURE 4

STRYKER Exhibit 1005
Page 30 of 35
IPR2021-01450



FIGURE 5

FIGURE 6

FIGURE 7

FIGURE 8

STRYKER Exhibit 1005
Page 31 of 35
IPR2021-01450

WO 2007/131287              PCT/AU2007/000656

4/4



FIGURE 9

FIGURE 10

FIGURE 11

FIGURE 12

FIGURE 13

STRYKER Exhibit 1005
Page 32 of 35
IPR2021-01450

## INTERNATIONAL SEARCH REPORT

| | International application No. |
|---|---|
| | **PCT/AU2007/000656** |

| A. | CLASSIFICATION OF SUBJECT MATTER |
|---|---|

Int. Cl.

*A61B 17/58* (2006.01)    *A61B 17/62* (2006.01)

According to International Patent Classification (IPC) or to both national classification and IPC

| B. | FIELDS SEARCHED |
|---|---|

Minimum documentation searched (classification system followed by classification symbols)

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)

DWPI: IPC A61B 17/- & keywords: (bone, osteo+, oss+, fuse, plate, arthrodesis, or joint, ankle or foot, feet, angle, angular, bend, non-linear) and similar terms.
USPTO: arthrodesis, ankle, plate, fuse
Espace: (arthrodesis) and (ankle) and (plate) and (fuse) and similar words.

C. DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X<br>A | DE 3332765 A1 (STRELI) 15 March 1984<br>Whole document | 55-64<br>1-54, 65-68 |
| X<br>A | US 6355041 B1 (MARTIN) 12 March 2002<br>Whole document | 55-64<br>1-54, 65-68 |

| [X] Further documents are listed in the continuation of Box C | [X] See patent family annex |
|---|---|

| | | | |
|---|---|---|---|
| * | Special categories of cited documents: | "T" | later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
| "A" | document defining the general state of the art which is not considered to be of particular relevance | | |
| "E" | earlier application or patent but published on or after the international filing date | "X" | document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" | document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "O" | document referring to an oral disclosure, use, exhibition or other means | "&" | document member of the same patent family |
| "P" | document published prior to the international filing date but later than the priority date claimed | | |

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 10 July 2007 | 1 7 JUL 2007 |

| Name and mailing address of the ISA/AU | Authorized officer |
|---|---|
| AUSTRALIAN PATENT OFFICE<br>PO BOX 200, WODEN ACT 2606, AUSTRALIA<br>E-mail address: pct@ipaustralia.gov.au<br>Facsimile No. (02) 6285 3929 | **KAREN VIOLANTE**<br>AUSTRALIAN PATENT OFFICE<br>(ISO 9001 Quality Certified Service)<br>Telephone No : (02) 6283 7933 |

Form PCT/ISA/210 (second sheet) (April 2007)

STRYKER Exhibit 1005
Page 33 of 35
IPR2021-01450

**INTERNATIONAL SEARCH REPORT**

| International application No. |
| --- |
| **PCT**/AU2007/000656 |

C (Continuation).    DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| --- | --- | --- |
| X<br>A | US 6440131 B1 (HAIDUKEWYCH) 27 August 2002<br>Whole document | 55-64<br>1-54, 65-68 |
| X<br>A | JP 8-126650 A (MEDICAL YG) 21 May 1996<br>Whole document | 55-64<br>1-54, 65-68 |
| X<br>A | US 2003/0060827 A1 (COUGHLN) 27 March 2003<br>Whole document | 55-64<br>1-54, 65-68 |
| X<br>A | US 2004/0102778 A1 (HUEBNER ET AL) 27 May 2004<br>Whole document | 55-64<br>1-54, 65-68 |
| A | US 2004/0039394 A1 (CONTI ET AL) 26 February 2004<br>Whole document | 1-68 |

Form PCT/ISA/210 (continuation of second sheet) (April 2007)

STRYKER Exhibit 1005
Page 34 of 35
IPR2021-01450

| INTERNATIONAL SEARCH REPORT | International application No. |
|---|---|
| Information on patent family members | PCT/AU2007/000656 |

This Annex lists the known "A" publication level patent family members relating to the patent documents cited in the above-mentioned international search report. The Australian Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

| Patent Document Cited in Search Report | | | | Patent Family Member | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DE | 3332765 | AT | 341382 | AT | 378324 | | GB | 2126903 | |
| | | US | 4565193 | | | | | | |
| US | 6355041 | | NONE | | | | | | |
| US | 6440131 | US | 2002128653 | | | | | | |
| JP | 8126650 | | NONE | | | | | | |
| US | 2003060827 | EP | 1297793 | FR | 2829920 | | HK | 1054494 | |
| | | JP | 2003102744 | | | | | | |
| US | 2004102778 | AU | 2003291114 | AU | 2003294342 | | AU | 2003294414 | |
| | | AU | 2003295749 | EP | 1567071 | | EP | 1572045 | |
| | | GB | 2412590 | GB | 2412875 | | KR | 2005007544 | |
| | | KR | 2005008391 | US | 7090676 | | US | 7153309 | |
| | | US | 7189237 | US | 2004102775 | | US | 2004102776 | |
| | | US | 2004102777 | US | 2004102788 | | US | 2005085818 | |
| | | WO | 2004045384 | WO | 2004045389 | | WO | 2004045455 | |
| | | WO | 2005037114 | WO | 2005046494 | | | | |
| US | 2004039394 | AU | 2003235085 | EP | 1393696 | | JP | 2004130109 | |

Due to data integration issues this family listing may not include 10 digit Australian applications filed since May 2001.

END OF ANNEX

STRYKER Exhibit 1005
Page 35 of 35
IPR2021-01450



US 20050171544A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2005/0171544 A1**
Falkner, JR.                                (43) Pub. Date:        **Aug. 4, 2005**

(54) **BONE PLATE WITH TOOTHED APERTURE**

(75) Inventor:    **James G. Falkner JR.**, Hillsboro, OR
                  (US)

Correspondence Address:
**KOLISCH HARTWELL, P.C.
520 S.W. YAMHILL STREET
SUITE 200
PORTLAND, OR 97204 (US)**

(73) Assignee:   **Acumed LLC**

(21) Appl. No.:  **11/050,342**

(22) Filed:      **Feb. 2, 2005**

**Related U.S. Application Data**

(60) Provisional application No. 60/541,414, filed on Feb.
     2, 2004.

**Publication Classification**

(51) Int. Cl.⁷ .................................................. **A61B 17/58**
(52) U.S. Cl. .............................................................. **606/69**

(57)                  **ABSTRACT**

Systems, including methods and apparatus, and kits, for
fixing bones using bone plates having toothed apertures for
retaining fasteners.



STRYKER Exhibit 1006
Page 1 of 14
IPR2021-01450

Appx2526



STRYKER Exhibit 1006
Page 2 of 14
IPR2021-01450



STRYKER Exhibit 1006
Page 3 of 14
IPR2021-01450

Patent Application Publication   Aug. 4, 2005   Sheet 3 of 3       US 2005/0171544 A1

**Fig. 8**

**Fig. 9**

**Fig. 10**

**Fig. 11**





STRYKER Exhibit 1006
Page 4 of 14
IPR2021-01450

## BONE PLATE WITH TOOTHED APERTURE

### CROSS-REFERENCE TO PRIORITY APPLICATION

[0001]  This application is based upon and claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application Ser. No. 60/541,414, filed Feb. 2, 2004, which is incorporated herein by reference in its entirety for all purposes.

### INTRODUCTION

[0002]  The human skeleton is composed of 206 individual bones that perform a variety of important functions, including support, movement, protection, storage of minerals, and formation of blood cells. To ensure that the skeleton retains its ability to perform these functions, and to reduce pain and disfigurement, bones that become damaged should be repaired promptly and properly. Typically, a fractured or cut bone is treated using a fixation device, which reinforces the bone and keeps it aligned during healing. Fixation devices may include external fixation devices (such as casts and fixators) and/or internal fixation devices (such as bone plates, nails, and/or bone screws), among others.

[0003]  Bone plates are sturdy internal devices, usually made of metal, that mount directly to the bone adjacent a fracture (or other bone discontinuity). To use a bone plate to repair a discontinuity of a bone, a surgeon typically (1) selects an appropriate plate, (2) reduces the discontinuity (e.g., sets the fracture), and (3) fastens the plate to bone fragments disposed on opposite sides of the discontinuity using suitable fasteners, such as screws and/or wires, so that the bone plate spans the discontinuity and the bone fragments are fixed in position.

[0004]  Fixation of bone fractures (or other discontinuities) can be problematic when these fractures are disposed near the ends of bones ("metaphyseal fractures"). Standard bone plates secured only to the exterior surface of the fractured bones may not be sufficient to immobilize metaphyseal fragments. In particular, these fragments may have lower bone density and/or quality so that bone screws cannot achieve sufficient purchase in bone. Accordingly, metaphyseal fractures may not heal properly during fixation, resulting in malunion or persistent nonunion at the fracture sites. Problems with metaphyseal fractures that do not heal properly can be particularly prevalent in larger bones that support greater loads, such as the humerus, the tibia, and the femur, among others.

[0005]  Blade plates may provide a suitable alternative to standard bone plates for fixation of metaphyseal fractures. Blade plates may be shaped to define two adjacent plate portions: an anchor portion, and a blade portion extending transverse to the anchor portion. The anchor portion may be configured, as in a standard plate, to be secured to an exterior surface of a fractured bone, generally extending to a more central (diaphyseal) region of the bone. In contrast, the blade portion may be placed in the interior of the bone, generally in the end (metaphyseal) region of the bone, so that the anchor and blade portions are disposed on opposite sides of the fracture. The blade portion, when properly secured to an end region, thus may stabilize the end region against movement relative to the central region of the bone, to promote healing of the fracture.

[0006]  An "interlocking" bone screw has been used to secure the blade portion, when inside bone, to an end region of a fractured bone. The interlocking screw may span the anchor and blade portions (and the fracture) to "interlock" and tension these portions. For example, the interlocking screw may be placed first through an opening of the anchor portion, next through bone and across the fracture, and then through an opening in the blade portion. The interlocking screw may be oversized, to engage the blade portion in an interference fit at the opening of the blade portion and to limit movement of the blade portion relative to the interlocking screw. However, the interference fit may be difficult to achieve reproducibly and may not be tight enough to prevent slippage of the blade portion relative to the interlocking screw.

### SUMMARY

[0007]  The present teachings provide systems, including methods, apparatus, and kits, for fixing bones using bone plates having toothed apertures for retaining fasteners.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0008]  FIG. 1 is a sectional view of an exemplary system for fixing bones using a bone plate with a toothed aperture, with the bone plate secured to a fractured bone, in accordance with aspects of the present teachings.

[0009]  FIG. 2 is a perspective view of the bone plate of FIG. 1, in accordance with aspects of the present teachings.

[0010]  FIG. 3 is a sectional view of the bone plate of FIG. 1 illustrating exemplary alternative axes along which a bone screw may be directed into threaded engagement with the toothed aperture, in accordance with aspects of the present teachings.

[0011]  FIG. 4 is a fragmentary sectional view of selected portions of the bone plate of FIG. 1, particularly a bridge portion and an internal portion of the bone plate including the toothed aperture, in accordance with aspects of the present teachings.

[0012]  FIG. 5 is a view of the bone plate of FIG. 4, taken generally along line 5-5 of FIG. 4.

[0013]  FIG. 6 is a view of the bone plate and bone screw of FIG. 3, taken generally along line 6-6 of FIG. 3.

[0014]  FIG. 7 is view of the bone plate of FIG. 6, taken as in FIG. 6 but with the bone screw removed.

[0015]  FIG. 8 is a sectional view of another exemplary bone plate with a toothed aperture, showing a drill guide in threaded engagement with an opening of the bone plate and defining a guide axis that extends through the toothed aperture, in accordance with aspects of the present teachings.

[0016]  FIG. 9 is a sectional view of yet another exemplary bone plate with a toothed aperture, with a plurality of threaded fasteners extending from plate openings into threaded engagement with the toothed aperture, in accordance with aspects of the present teachings.

[0017]  FIG. 10 is a fragmentary sectional view of selected portions of an exemplary bone plate having a toothed aperture with nonparallel ridges, in accordance with aspects of the present teachings.

STRYKER Exhibit 1006
Page 5 of 14
IPR2021-01450

[0018]  FIG. 11 is a fragmentary sectional view of selected portions of another exemplary bone plate having a toothed aperture with nonparallel ridges, in accordance with aspects of the present teachings.

## DETAILED DESCRIPTION

[0019]  The present teachings provide systems, including methods, apparatus, and kits, for fixing bones using bone plates having toothed apertures for retaining fasteners. The bone plates may include first and second plate portions disposed adjacent one another. Each plate portion may be an exterior portion configured to be apposed and secured to an exterior surface of bone. Alternatively, one or more of the plate portions may be an interior portion configured to be disposed interior to bone, as in a blade plate. Each bone plate portion may define one or more openings for receiving fasteners, such as bone screws, that secure the plate portions to bone.

[0020]  At least one of the openings may be a toothed aperture, that is, an opening having one or more projections or "teeth" at its perimeter. The toothed aperture may be configured to receive a threaded shank of a bone fastener and retain the threaded shank by rotational coupling with one or more teeth of the aperture, to achieve threaded engagement between the threaded shank and the teeth. Accordingly, the toothed aperture may include teeth configured as relatively short thread-like segments, possibly but not necessarily helical in structure. In some examples, the toothed aperture may be configured to receive and retain one or more bone fasteners that extend from one or more openings of the plate, for intra-plate placement of bone fasteners. Bone plates having toothed apertures may provide, among others, (1) more options for placement of bone screws (more screws per aperture and/or a greater range of permissible screw angles, (2) increased tolerance for misguided screws, (3) improved retention of bone screws, (4) a greater range of permissible angles to which the plate can be bent, and/or (5) intra-plate tensioning, for example, to compress bone.

[0021]  FIG. 1 shows an exemplary system 20 for fixing bones using a bone plate 22 with a toothed aperture 24. The bone plate may be positioned on and/or in any suitable bone(s) to span any natural or artificial discontinuity within a bone or between bones. In the present illustration, plate 22 is secured to a distal end (metaphyseal) region of a tibia bone 26 and spans fracture 28. In other examples, plate 22 may span a joint, such as joint 30 between tibia 26 and talus 32, among others.

[0022]  Bone plate 22 may have first and second plate portions 34, 36 configured to be disposed in any suitable positions relative to the bone. In the present illustration, the first and second plate portions 34, 36 are disposed so that they are, respectively, external to (on) and internal to (in) tibia 26.

[0023]  First (external) plate portion 34 may be secured to tibia 26 adjacent diaphyseal region 38 of the bone using any suitable bone fasteners, such as bone screws 40 in the present illustration. The bone screws may be placed into bone from any suitable number of openings of the bone plate. The external plate portion may be contoured to follow an exterior surface of the bone.

[0024]  Second (internal) plate portion 36 may be disposed substantially interior to tibia 26 (or in a bone adjacent to the tibia) and/or may be apposed to surfaces of the bone that normally lie within the bone. The internal plate portion may define toothed aperture 24, which is configured to receive and retain a threaded fastener 42. The threaded fastener may extend into and/or through only one opening (a toothed aperture) or at least two openings of the bone plate, such as an opening 44 in the external plate portion. Alternatively, or in addition, the threaded fastener may extend between two or more distinct plates.

[0025]  Further aspects of the present teachings are described in the following sections, including (I) overview of bone plates, (II) plate portions, (III) toothed apertures, (IV) methods of using bone plates with toothed apertures, and (V) examples.

[0026]  I. Overview of Bone Plates

[0027]  Bone plates as described herein generally comprise any relatively low-profile (or plate-like) fixation device configured to stabilize at least one bone by attachment to the bone. The fixation device may be configured to span any suitable bone discontinuity so that the fixation device fixes the relative positions of bone fragments (and/or bones) disposed on opposing sides of the bone discontinuity.

[0028]  Suitable discontinuities may occur naturally and/or may result from injury, disease, and/or surgical intervention, among others. Accordingly, exemplary discontinuities for use with the bone plates described herein may include joints, fractures (breaks in bones), osteotomies (cuts in bones), and/or nonunions (for example, produced by injury, disease, or a birth defect), among others.

[0029]  The bone plates described herein may be configured for use on any suitable bone of the human skeleton and/or of another vertebrate species. Exemplary bones may include bones of the arms (radius, ulna, humerus), legs (femur, tibia, fibula, patella), hands/wrists, feet, vertebrae, scapulas, pelvic bones, cranial bones, ribs, and/or clavicles, among others. Particular examples where bone plates having toothed apertures may be suitable include, but are not limited to, discontinuities in or adjacent metaphyseal regions of long bones, such as proximal or distal regions of the humerus, the tibia, and/or the femur. Alternatively, or in addition, these bone plates may be used to fuse joints, such as fusion of the tibiotalocalcaneal (ankle) joint, among others.

[0030]  Each bone plate may be configured to be disposed in any suitable position relative to its target bone. The bone plate (or a plate portion, see Section II) may be configured to be disposed in contact with an exterior surface of the bone and thus may be positioned at least substantially (or completely) exterior to the bone. Alternatively, the bone plate may be configured to be disposed at least partially interior to a bone, that is, apposed to (normally) interior bone surfaces (i.e., subchondral bone) when secured to the bone. The interior bone surfaces may be created during installation of the bone plate (such as by punching the bone plate through the exterior bone surface) and/or may be accessible due to a break, a cut, and/or the like.

[0031]  The bone plates may be formed of any suitable materials. The bone plates may be of a sturdy yet malleable construction. Generally, the bone plates should be stiffer and stronger than the section of bone spanned by the plates, yet flexible (e.g., springy) enough not to strain the bone signifi-

STRYKER Exhibit 1006
Page 6 of 14
IPR2021-01450

3

cantly. Suitable materials for forming the bone plates may be biocompatible materials (such as titanium or titanium alloys, cobalt chromium, stainless steel, plastic, ceramic, etc.) and/or bioabsorbable materials (such as polygalactic acid (PGA), polylactic acid (PLA), copolymers thereof, etc.), among others.

[0032] The bone plates may be configured to reduce irritation to the bone and surrounding tissue. For example, the bone plates may be formed of a biocompatible material, as described above. In addition, the bone plates may have a low and/or feathered profile to reduce their protrusion into adjacent tissue and rounded, burr-free surfaces/edges to reduce the effects of such protrusion.

[0033] The bone plates described herein may be sized and shaped to conform to particular portions of a bone (or bones). The plates may be generally elongate, with a length L, a width W, and a thickness T. Here, length L≧width W≧thickness T. In use, the long axis of the bone plates (or of a plate portion) may be aligned with the long axis of the corresponding bone or may extend obliquely or even transversely relative to the bone's long axis. The length and/or width of the bone plates may be varied according to the intended use, for example, to match the plates with a preselected region of bone(s) and/or a particular injury to the bone. For example, the plates may be generally linear for use on the shaft of a long bone and/or may have a nonlinear shape, such as for use near an end of a bone. In some embodiments, the bone plates may be configured for use on both sides of the body, such as when the bone plates are bilaterally symmetrical. In some embodiments, the bone plates may be asymmetrical and configured for use on either the left or the right side of the body.

[0034] The bone plates (or exterior plate portions, see Section II) may include inner (bone-facing) and outer (bone-opposing) surfaces. One or both of these surfaces may be contoured generally to follow an exterior surface of a target bone (or bones) for which a bone plate is intended, so that the bone plate maintains a low profile and fits onto the bone(s). For example, the inner surface of a plate (or of an exterior plate portion) may be generally complementary in contour to the bone surface. The outer surface of the plate (or of an exterior plate portion) also may correspond in contour to the bone surface and may be generally complementary to the inner surface of the plate. The bone plates may be partially and/or completely precontoured, at the time of manufacture, allowing physicians to apply them to bone(s) with little or no additional bending at the time of application.

[0035] The thickness of the bone plates may be defined by the distance between the inner and outer surfaces of the plates. The thickness of the plates may vary between plates and/or within the plates, according to the intended use. For example, thinner plates may be configured for use on a smaller bone and/or on a bone or bone region where soft tissue irritation is a greater concern. Thickness may be varied within the plates. For example, the plates may become thinner as they extend over protrusions (such as processes, condyles, tuberosities, and/or the like), reducing their profile and/or rigidity, among others. Alternatively, or in addition, the thickness may vary as an internal portion of the bone plate extends into bone, for example, becoming thinner to facilitate insertion of this internal portion or thicker to increase structural stability. The thickness of the

plates also may be varied to facilitate use, for example, to make the plates thinner where they typically need to be deformed by bending and/or twisting the plates, such as at the junction (or bridge region) between plate portions (see Section II). In this way, the plates may be thicker and thus stronger in regions where they may not need to be contoured, such as along the shaft of the bone.

[0036] The bone plates generally include a plurality of openings, also termed apertures. The openings may be adapted to receive fasteners for securing the plates to bone. Alternatively, or in addition, the openings may be adapted (1) to alter the local rigidity of the plates, (2) to permit the plates to be manipulated with a tool (such as an attachable handle), (3) to facilitate attachment of a guide for drilling and/or fastener placement, and/or (4) to facilitate blood flow to bone regions where the bone plates are installed, to promote healing, among others.

[0037] The openings may have any suitable positions, sizes, and/or densities within each portion of a bone plate. The openings may be arrayed generally in a line along a portion of the plate, for example, centered across the width of the plate. Alternatively, the openings may be arranged nonlinearly, for example, disposed in a staggered arrangement. In some embodiments, the openings may be configured so that a set of bone screws can be directed along nonparallel paths, for example, to increase the purchase of the set of bone screws on bone. Further aspects of openings configured to direct bone screws, particularly unicortical bone screws, along nonparallel paths are included in the following patent application, which is incorporated herein by reference: U.S. patent application Ser. No. 10/968,850, filed Oct. 18, 2004.

[0038] The openings may have any suitable shape and structure. Exemplary shapes may include circular, elliptical, rectangular, elongate, etc. The openings may include counterbores configured, for example, to receive a head of a bone screw. The openings may be threaded or nonthreaded, and each bone plate may include one or more threaded and/or nonthreaded openings. In some embodiments, the plates may include one or a plurality of elongate openings (slots) extending axially, obliquely, and/or transversely along each bone plate. The elongate openings may be compression slots that include counterbores to provide compression when heads of bone screws are advanced against the counterbores. Alternatively, or in addition, the elongate openings may be used to adjust the position of bone plates and/or plate portions relative to bone before the plates are fully secured to the bone. One or more of the elongate openings of each bone plate may be a toothed aperture (see Sections III and V).

[0039] The fasteners generally comprise any mechanism for affixing a bone plate to a bone, including screws, pins, and/or wires, among others. A preferred fastener is a bone screw, including unicortical, bicortical, and/or cancellous bone screws. Unicortical and bicortical bone screws typically have relatively small threads for use in hard bone, such as typically found in the shaft portion of a bone, whereas cancellous bone screws typically have relatively larger threads for use in soft bone, such as typically found near the ends (metaphyseal regions) of a long bone. Unicortical bone screws penetrate the bone cortex once, adjacent the bone plate. Bicortical bone screws penetrate the bone cortex

STRYKER Exhibit 1006
Page 7 of 14
IPR2021-01450

4

twice, adjacent the bone plate and opposite the bone plate. Generally, unicortical screws provide less support than bicortical screws, because they penetrate less cortex. The size and shape of the fasteners may be selected based on the size, shape, and disposition of the openings, or vice versa. For example, unicortical bone screws may be suitable with particular arrangements of openings, as described above. In some examples, the bone screws may include a shaft that includes a distal threaded region and a proximal nonthreaded region. This arrangement of threaded and nonthreaded regions may permit the screw to function as a compression screw that spans plate portions and applies an adjustable tension between the plate portions.

[0040]  In some examples, the bone plates may include projections, such as prongs, configured to be received in bone to restrict movement of the bone plates. The projections may be sharp or blunt according to their intended use. Prongs may be used in place of, or in addition to, bone fasteners, for one or more portions of each bone plate.

[0041]  II. Plate Portions

[0042]  The bone plates may have at least one, and generally two or more, plate portions (or anchor portions) configured to be secured to different regions of a bone (or bones). Each plate portion may be structured for a specific region of a bone. For example, the bone plates may include a proximal plate portion for attachment to a more proximal region of a bone, and a distal plate portion for attachment to a more distal region of the same bone. The bone plates may include an external plate portion configured to fit against an exterior surface region of bone adjacent a bone discontinuity. Alternatively, or in addition, the bone plates may include an internal plate portion configured to be received in an interior region of bone (generally, subchondral bone) adjacent the bone discontinuity.

[0043]  The plate portions of a bone plate may have any suitable connection. In some examples, two or more of the plate portions (or the entire plate) may be formed integrally, so that a unitary bone plate includes the plate portions. Alternatively, plate portions may be formed as separate pieces. The separate pieces may be connected by any suitable connection and/or joint, including a fastener(s), welding, a hinge joint, a ball in socket, and/or the like. Further aspects of bone plates having adjustable joints are described in the following patent application, which is incorporated herein by reference: U.S. patent application Ser. No. 10/716,719, filed Nov. 17, 2003. In some examples, the bone plate may be two separate bone plate components configured to be connected by one or more fasteners, such as fasteners that extend from one of the plate components, through bone, and into engagement with another of the plate components.

[0044]  The plate portions of a bone plate may have any suitable relative disposition. The plate portions may be disposed substantially collinear and/or parallel, oblique, or substantially transverse to one another. In some examples, the plate portions may define planes that are disposed oblique or substantially transverse to each other. For example, the bone plate may have an exterior plate portion that fits against the exterior surface of a bone and an interior plate portion that extends at least substantially transverse to the exterior surface to be received in the interior of the bone. Accordingly, in some examples, the bone plate may be generally L-shaped, such as when viewed in profile.

[0045]  The relative disposition of plate portions may be fixed and/or adjustable. In some examples, the plate portions may be connected integrally by a deformable bridge region, so that the bone plate can be bent pre- or peri-operatively to adjust the relative disposition of the plate portions. Alternatively, the plate portions may be distinct pieces connected, for example, through an adjustable joint, as described above.

[0046]  Each plate portion may have one or more openings. Each opening may be configured to receive a bone fastener for placement of the bone fastener into bone. Alternatively, or in addition, the opening may be configured to enable the fastener to span plate portions by extending between an opening in each of two or more plate portions, such as a first opening in a first plate portion and a toothed aperture in a second plate portion.

[0047]  The first opening may have any suitable configuration. For example, the first opening may be configured to receive a head of the fastener and the toothed aperture may be configured to receive a shank of the fastener, or vice versa. The first opening may be threaded or nonthreaded, and may be circular or elongate. Accordingly, the first opening may restrict a fastener of a suitable diameter to substantially one direction of approach (such as with a circular first opening and a close-fitting fastener), or the first opening may be an elongate opening (or, for example, a circular opening large enough to provide a loose fit with the fastener) that permits this fastener be placed at a disposition selected from a range of angular dispositions. In any case, the first opening may define an axis that intersects the toothed aperture suitable for threaded engagement of a fastener. In some examples, the first plate portion may include two or more first openings that permit two or more fasteners to be disposed, alternately and/or concurrently, in threaded engagement with the toothed aperture.

[0048]  An internal plate portion may be configured for installation into bone. Accordingly, the internal plate portion may be thinner than the external plate portion. Alternatively, or in addition, the internal plate portion may taper toward an end of the plate, to provide a leading edge that enters bone first, so that the leading edge can penetrate bone more easily.

[0049]  The internal plate portion may have fewer openings than the external plate portion. In some embodiments, the internal plate portion may have one or more toothed apertures and no additional openings. Alternatively, the internal plate portion may have one or more additional (toothed or nontoothed) openings.

[0050]  III. Toothed Apertures

[0051]  Each bone plate may include one or more toothed apertures. A toothed aperture, as used herein, is any opening (aperture) having one or more projections (teeth) that adjoin the opening. The projections may be formed by any suitable portion of the bone plate, and generally by a wall that defines at least a portion of the perimeter of the aperture. The projections may be configured so that the toothed aperture can receive and axially retain a shank (and/or other feature), particularly a threaded shank, of a fastener.

[0052]  The toothed aperture may have any suitable shape and position in the bone plate. In some examples, the toothed aperture may be elongate, such as generally oval or rectangular, among others. The toothed aperture may extend generally parallel, oblique, or transverse to the long axis of

STRYKER Exhibit 1006
Page 8 of 14
IPR2021-01450

the bone plate (or of the plate portion that defines this aperture). The toothed aperture may be disposed in only one plate portion, such as in an external or internal plate portion, or may extend to be included in two or more plate portions, for example, by extending across a bridge portion of the bone plate. In some examples, each of two or more plate portions of the bone plate may include a distinct toothed aperture. In some examples, one plate portion may have two or more toothed apertures. The toothed aperture may be configured to receive and axially retain one fastener or two or more fasteners.

[0053]    The toothed aperture may have any suitable number and arrangement of projections. The toothed aperture may have a single projection or may have a set of two or more projections. At least a subset of the projections may be arrayed along the perimeter of the aperture to form an array of projections or teeth. The term "along," as used herein relative to an aperture, means arranged generally parallel to the long axis of the aperture. The array of projections may be a substantially linear array, generally with adjacent pairs of projections of the array separated by a depression (such as a groove). The linear array may be described as an array of thread-like segments, although each segment may be nonhelical and/or defined by a generally noncylindrical surface (in contrast to a standard thread or thread segment). The toothed aperture may have all of its projections disposed on the same side of the aperture or may have a subset of one or more projections disposed on each side of a pair of opposing sides (wall portions) of the aperture. In some examples, the toothed aperture may have opposing subsets of projections disposed on opposing sides of the aperture. The opposing subsets may have the same (or a different) spacing of projections. Corresponding, opposing projections of the opposing subsets may be aligned transversely or may be offset, for example, offset along the aperture by about one-half or one-fourth the spacing, among others, between adjacent pairs of projections.

[0054]    Adjacent projections may have any suitable spacing. For example, the projections may be spaced corresponding to the pitch of the thread(s) of a threaded fastener (or an integral multiple of the pitch). (In some examples, the pitch may correspond to an integral multiple of the spacing of the projections.) A spacing corresponding to the pitch may restrict the angular disposition (or range of angular dispositions) at which the fastener can be engaged with the toothed aperture. In some examples, the spacing may be adjusted to allow a different angle of approach of the fastener (such as from different openings) and/or to permit a fastener to engage the projections from a set of two or more angular dispositions (such as different orientations of the fastener from the same opening). The spacing between the projections may be the same along the aperture. Alternatively, the spacing may change along the aperture so that, for example, threaded shanks, with threads of different pitch, may be received at different positions along the toothed aperture.

[0055]    The projections may have any suitable structure. The projections may be configured, for example, as ridges, knobs, or prongs, among others. The ridges may have crests that are blunt or sharp. The ridges may have flanking sides defined by flat, convex, or concave surfaces, among others.

[0056]    The ridges, and particularly their crests, may extend at any suitable orientation (and thus angle) relative to the long axis of the aperture and/or relative to a length-by-width plane defined by the plate portion in which the ridges are disposed. For example, the ridges may be oblique ridges that extend obliquely to this plane. The orientation of the ridges may determine, at least partially, the orientation and/or range of angles at which a fastener can be received by the toothed aperture. For example, ridges oriented more nearly orthogonal to the plane of the toothed aperture (or plate portion), that is, oriented at a larger angle relative to this plane, may receive and retain a fastener approaching from a smaller angle to the toothed aperture, that is, shallower or more nearly tangential to the aperture (for example, from an opening disposed closer to the toothed aperture). Similarly, ridges oriented more nearly parallel to the plane of the toothed aperture (or plate portion), that is, oriented at a smaller angle relative to this plane, may receive and retain a fastener approaching from a larger angle to the toothed aperture, that is, steeper or more nearly orthogonal to the aperture (for example, from an opening disposed farther from the toothed aperture). Accordingly, the orientations/angles of the ridges may vary along the length of the aperture to accommodate the approach of a fastener from different orientations and/or different openings (see Example 4 below). A fastener disposed through a given opening in a first portion of a plate commonly would approach farther (more distal) regions of a toothed aperture in a second portion of the plate at a shallower or more nearly tangential angle than it would approach nearer regions of the toothed aperture. Therefore, ridges in farther regions of a toothed aperture may be oriented at larger angles relative to the plane of the toothed aperture, ridges in nearer regions of the toothed aperture may be oriented at smaller angles relative to the plane of the toothed aperture, and ridges in intermediate portions of the tooth aperture may be oriented at angles that vary continuously and/or discontinuously between these two extremes. Consequently, the average ridge-to-ridge spacing (or the number of ridges per unit length) may be smaller toward the proximal end of the toothed aperture (relatively closer to the bridge portion of the plate) and larger toward the distal end of the toothed aperture (relatively farther from the bridge portion). Similarly, the length of these ridges may be relatively smaller toward the proximal end of a toothed aperture, and relatively larger toward the distal end of the toothed aperture.

[0057]    The orientations/angles of the ridges may be the same or different on opposing sides of the aperture. In some examples, the orientation of the ridges may be approximately orthogonal to an axis defined by an opening that directs a fastener along the axis to the toothed aperture. In some examples, different orientations of the ridges on opposing sides of the aperture may, for example, be suitable to more accurately match a thread of a fastener, locally on opposing sides of the fastener's shank. For example, the ridges on one side of the aperture may define an obtuse angle with the axis and ridges on the other side of the aperture may define an acute angle with the axis, in correspondence with opposing sides of a fastener's helical thread (see Example 4 below).

[0058]    The projections may have any suitable length and height. For example, the projections may be formed as longer ridges (measured along their crests) to decrease the permitted range of angular approach of a fastener to the aperture or as shorter ridges to increase this permitted range. The length of the ridges may be defined at least substantially

STRYKER Exhibit 1006
Page 9 of 14
IPR2021-01450

6

by the local thickness of the plate and the orientation of the ridges (for ridges that extend between opposing surfaces of the plate) and/or may be shorter (or longer) than this local thickness. The height of projections (measured as the distance from the crest to the base of a projection) may correspond at least substantially to the height of a thread on a fastener (measured from the crest to the root of the thread). Alternatively, the height of projections may be less or more than the height of the thread on the fastener.

[0059] Depressions disposed between the projections may have any suitable structure, generally as defined by the structure of flanking projections. For example, narrower projections having concave sides may define wider depressions, and wider projections having convex sides may define narrower depressions, everything else being equal. Accordingly, the shape of the projections and depressions may determine, at least partially, the range of angles at which a fastener can be engaged with the toothed aperture and/or how tightly the fastener fits into the toothed aperture. In some examples, the toothed aperture may be configured so that a received fastener is tightly engaged. Alternatively, the toothed aperture may be configured so that a received fastener can be jiggled axially (in the absence of bone).

[0060] The toothed aperture may have any suitable width. The ridges may have a constant width or, for example, may taper toward one or both opposing ends. Accordingly, portions of the toothed aperture may flare toward a fastener-entry side of the toothed aperture, to facilitate guiding a fastener into the aperture.

[0061] IV. Methods of Using Bone Plates with Toothed Apertures

[0062] Bone plates having toothed apertures, as described herein, may be attached to or otherwise associated with bone using any suitable method. In an exemplary method, a practitioner may perform any suitable combination of the following steps in any suitable order: (1) select a target bone(s) having a discontinuity; (2) select a suitable bone plate having a toothed aperture; (3) select one or more suitable fasteners for use with the bone plate and the target bone, including a threaded fastener configured to be received in the toothed aperture; (4) prepare the target bone(s) for installation of the bone plate (for example, position bone fragments (such as to reduce a fracture) and/or remove cartilage (such as for bone fusion at a joint); (5) adjust the shape of the plate, if desired, to adjust the fit of the bone plate in relation to the target bone(s); (6) place a first (internal) portion of the bone plate in the target bone (such as by insertion into a preformed hole in the bone and/or by forcing the internal portion into the bone); (7) secure a second (external) portion of the bone plate to a surface of the target bone using one or more of the fasteners selected; and (8) place one or more fasteners through one or more openings of the external portion of the plate, through an adjacent bone fragment and across the discontinuity into a spaced bone fragment, and into threaded engagement with the toothed aperture of the internal portion. Step (8) may be facilitated, for example, by using an imaging apparatus (such as a fluoroscope) and/or an external guide device to guide placement of the fastener. Exemplary external guide devices are described in the following patent application, which is incorporated herein by reference: U.S. patent application Ser. No. 10/717,401, filed Nov. 19, 2003.

[0063] The bone plates described herein may be fabricated by any suitable methods. The bone plates or features thereof may be cast, machined, drilled, stamped, formed, and/or bent, among others.

[0064] The bone plates described herein may be provided as kits. The kits may include one or more bone plates having a toothed aperture. One or more fasteners configured to be received in the toothed aperture, particularly from an opening in another portion of the plate.

V. EXAMPLES

[0065] The following examples describe selected aspects and embodiments of the present teachings, including exemplary bone plates with toothed apertures and methods of using these exemplary bone plates to fix bones. These examples and the various features and aspects thereof are included for illustration and are not intended to define or limit the entire scope of the present teachings.

Example 1

Exemplary Bone Plate with a Toothed Aperture

[0066] This example describes an exemplary bone plate including a toothed aperture, in accordance with aspects of the present teachings; see FIGS. 2-7.

[0067] FIG. 2 shows bone plate 22 in the absence of fasteners and bone; bone plate 22 may be used as a blade plate. Various features of this bone plate, such as toothed aperture 24, external portion 34, internal portion 36, and opening 44 were introduced above in relation to FIG. 1.

[0068] External and internal portions 34, 36 may include a plurality of openings. For example, the external portion may include a first set of one or more openings 50, a second set of one or more openings 52, and an oblique opening 44 disposed between the first and second sets. The internal portion 36 may include toothed aperture 24 and one or more additional openings. A bridge portion 54 may include one or more bridge openings 56 disposed generally at the junction between the external and internal plate portions. Each opening may be threaded or nonthreaded and may include (or lack) a counterbore 58 configured, for example, to reduce protrusion of a fastener's head above the outer surface of the plate.

[0069] Bridge portion 54 may connect the exterior and interior portions of bone plate 22. The bridge portion may be configured to span a bone discontinuity. Alternatively, or in addition, the bridge portion may define, at least partially, the angular disposition of the external and internal portions of the bone plate. For example, here, the bridge portion includes an approximate right-angle bend so that the plate portions extend transverse to one another. However, the bridge portion may define any suitable angle and may be configured to permit pre- and/or peri-operative adjustment of the shape of the plate. The bridge portion thus may be narrowed, thinned, annealed, and/or otherwise configured and/or treated to facilitate bending at this portion. Bridge openings (such as opening 56) may permit bending and/or may be suitable to direct fasteners at oblique angles relative to one or more of the plate portions, among others.

[0070] FIG. 3 shows bone plate 22 holding a bone screw 42 in threaded engagement with toothed aperture 24. The

STRYKER Exhibit 1006
Page 10 of 14
IPR2021-01450

bone screw may include a head **60** and a shank **62**. Head **60** may be nonthreaded (as shown here) or may include a thread configured to lock the head to the plate. The shank may be a threaded shank that includes a distal threaded region **64** and a proximal nonthreaded region **66**. Alternatively, the bone screw may include a thread(s) that extends substantially or completely along the shank. The thread may be a relatively deep thread, such as the thread found in cancellous bone screws, or may be a relatively shallow thread, such as the thread found in cortical bone screws.

[0071]  Screw **42** may span external and internal plate portion **34, 36** and lock to toothed aperture **24**, to provide intra-plate tension between the plate portions. For example, the screw may be received first in oblique opening **44** and then thread into toothed aperture by turning the bone screw so that threaded region **64** advances into and engages the projections of toothed aperture **24**. With the head of the screw engaged with the external plate portion, further rotation of screw **42** and thus further advancement of threaded region **64** into/through the aperture applies a tension to the plate.

[0072]  The toothed aperture, bone screw, and oblique opening may be configured to permit the bone screw to thread into the toothed aperture along two or more distinct axes. In the present illustration, bone screw **42** may threadably engage the toothed aperture along axis **68**. Alternatively, bone screw **42** may threadably engage the toothed aperture along alternative axis **70**, as illustrated with the bone screw shown at **72** in phantom outline. Accordingly, a surgeon has greater flexibility in selecting a path for intra-plate placement of the bone screw.

[0073]  FIG. 4 shows selected portions of bone plate **22**, particularly bridge portion **54** and internal portion **36**. Locking aperture **24** may include a plurality of projections (ridges **74**) and depressions (grooves **76**). The ridges and grooves may extend obliquely, shown at **78**, relative to the aperture. Ridges are considered as "oblique ridges" when they extend obliquely to the long axis of the toothed aperture. Furthermore, the toothed aperture may widen or flare toward the external plate portion, shown at **80**, and/or opposing the external plate portion, shown at **82**.

[0074]  Internal portion **36** may be configured to be placed into bone. Accordingly, the interior portion may include a leading end region **84** that is beveled or tapered, to facilitate introducing the interior portion into the bone. In some examples, the leading end region may include a relatively sharp leading edge **86**.

[0075]  FIG. 5 shows a view of toothed aperture **24** taken generally parallel to the orientation of ridges **74** and grooves **76**. The ridges may have concave sides and a blunt crest. The grooves may be cylindrical, that is, corresponding to a portion of a cylinder (such as a half-cylinder).

[0076]  The toothed aperture may be defined by a wall **87** of the internal plate portion. The wall may be distinct from inner and outer surfaces of the bone plate and/or may be included in one or both of these surfaces. The wall may include opposing wall portions **88, 90**, which may extend along the perimeter of the aperture in a generally parallel relationship, as shown here. The ridges and/or grooves thus may be disposed along each wall portion, that is, arrayed generally parallel to the long axis **92** of the toothed aperture.

In some examples, the ridges/grooves (and/or projections/depressions) may be disposed in a linear array along each wall portion. Each ridge and groove (and/or projection and depression) may be defined by, and thus restricted to, only one of the opposing wall portions. One or more (or all) projections of one opposing wall portion may be offset along the long axis of the aperture relative to one or more (or all) projections of the other opposing wall portion. The offset may be a fraction of the spacing between adjacent projections, such as about one-half or about one-fourth of this spacing.

[0077]  FIGS. 6 and 7 show bone plate **22** viewed generally along line 6-6 of FIG. 3, in the presence and absence, respectively, of bone screw **42**. When disposed in threaded engagement with toothed aperture **24**, individual thread segments **94** of the bone screw (FIG. 6) may be received in individual grooves **76** of the toothed aperture (see FIGS. 6 and 7). In some examples, the bone screw may be advanced until a distal section of threaded portion **64** has traveled through the toothed aperture, to be disposed distally thereof, shown at **96**.

[0078]  In an exemplary embodiment, intended only for illustration, bone plate **22** may have the following dimensions: overall unbent length—4.667 inches; bent length—3.542 inches; length from bridge portion opening to end of external portion—3.407 inches; length from bridge portion opening to end of internal portion—1.260 inches; width of plate 0.433 inches; thickness of plate 0.189 inches; angle of axis defined by the oblique opening in relation to the long axis of the internal portion—66 degrees; and spacing between ridges of the toothed aperture (measured parallel to the long axis of the internal portion)—0.146 inches.

Example 2

Exemplary System for Guiding a Fastener to a Toothed Aperture

[0079]  This example describes an exemplary system for defining a guide axis that extends through a toothed aperture; see FIG. 8.

[0080]  FIG. 8 shows a system **100** for drilling and fastener placement. The system includes another exemplary bone plate **102** with a toothed aperture **104**. The bone plate include a threaded opening **106** configured to threadably receive a cannulated drill guide **108**. The drill guide, when engaged with the bone plate in threaded opening **106**, may define an axis **110** along which a fastener may threadably engage the toothed aperture. Accordingly, a drill **112** may be guided along the drill guide to form a hole centered about guide axis **110**. After hole formation in bone, a bone screw or other suitable fastener then may be placed into the threaded aperture and rotatably engaged with toothed aperture **104**. The bone screw may be guided to the toothed aperture while the drill guide is still engaged with the plate and/or after the drill guide is removed. The bone screw thus may have a threaded or nonthreaded head for locking or nonlocking engagement, respectively, threaded opening **106**.

[0081]  In other embodiments, a drill guide may be employed that does not threadably engage the bone plate. In these embodiments, the axis defined by the drill guide may be adjustably selected by a surgeon, to permit greater

STRYKER Exhibit 1006
Page 11 of 14
IPR2021-01450

flexibility in selection of an axis along which a threaded fastener engages the toothed aperture.

### Example 3

#### Exemplary Bone Plate with Increased Intra-Plate Coupling

[0082]  This example describes an exemplary bone plate with a locking aperture targeted by a plurality of plate openings; see FIG. 9.

[0083]  FIG. 9 shows another exemplary bone plate **122** with a toothed aperture **124**. Bone plate **122** is configured so that a plurality of threaded fasteners **126**, **128** may be received in a plurality of oblique openings **130**, **132** and extend to toothed aperture **124** for threaded engagement therein. The fasteners may extend to the toothed aperture along parallel (or nonparallel) axes **134**, **136**.

### Example 4

#### Exemplary Bone Plates with Nonparallel Ridges

[0084]  This example describes exemplary bone plates having toothed apertures with nonparallel ridges; see **FIGS. 10** and **11**.

[0085]  FIG. 10 shows the internal and bridge portions of an exemplary bone plate **142** having a toothed aperture **144** with nonparallel ridges **146**. The nonparallel ridges are defined by one of the opposing wall portions **148** of the plate. (In other words, these ridges are on the same side of the toothed aperture.) Ridges closer to the leading end of the internal portion, shown at **150**, may extend at a smaller angle(s) (such as angle **152**) relative to the long axis of the internal portion (more nearly parallel to this long axis). Ridges closer to the trailing end of the internal portion, shown at **154**, may extend at a larger oblique angle(s) (such as angle **156**) relative to the long axis of the toothed aperture (more nearly perpendicular to this long axis).

[0086]  FIG. 11 shows the internal portion of an exemplary bone plate **162** having a toothed aperture **164** with nonparallel ridges **166**, **168**. Ridges **166** disposed on the far side of the aperture are drawn in solid lines, as in a standard sectional view. (The "far side" corresponds to the wall portion on the left side of the toothed aperture when viewed from the external portion of the plate along fastener placement axis **170**.) Ridges **168** disposed on the opposing, near side (wall portion on the right side) of the aperture are drawn in phantom outline because they normally would not be visible in this sectional view. Here, ridges **166** of the left-sided wall portion define an obtuse angle **172** with axis **170**, and ridges **168** of the right-sided wall portion define an acute angle **174** with axis **170**. These obtuse and acute angles may be selected so that the ridges on the opposing sides of the toothed aperture more closely correspond to the local thread angle on opposing sides of the fastener's threaded shank.

### Example 5

#### Selected Embodiments

[0087]  This example describes selected embodiments of the invention, presented as a series of indexed paragraphs.

[0088]  1. A bone plate, comprising: (A) a first portion defining an opening; and (B) a second portion connected to the first portion and having a wall defining an aperture, the wall including at least one projection configured to retain a fastener placed through the opening and advanced rotationally into the aperture.

[0089]  2. The bone plate of paragraph 1, wherein the opening is elongate.

[0090]  3. The bone plate of paragraph 1, wherein the opening is circular and defines an axis extending obliquely to the long axis of the first portion.

[0091]  4. The bone plate of paragraph 1, wherein the first portion includes a bone-facing surface that is substantially convex along a path extending generally parallel to the long axis of the first portion.

[0092]  5. The bone plate of paragraph 1, wherein the first portion defines a plurality of elongate openings.

[0093]  6. The bone plate of paragraph 1, wherein the first portion defines a plurality of openings, and wherein the at least one projection is configured to retain, concurrently, at least two fasteners placed through at least two of the plurality of openings and advanced rotationally into the aperture.

[0094]  7. The bone plate of paragraph 1, wherein the at least one projection is a set of projections.

[0095]  8. The bone plate of paragraph 7, wherein the set of projections includes a linear array three or more projections.

[0096]  9. The bone plate of paragraph 8, wherein the spacing between each adjacent pair of projections of the linear array is at least substantially the same.

[0097]  10. The bone plate of paragraph 7, wherein the wall includes a pair of opposing walls, and wherein the set of projections includes one or more projections included in each of the opposing walls.

[0098]  11. The bone plate of paragraph 10, wherein each of the opposing walls includes three or more projections.

[0099]  12. The bone plate of paragraph 11, wherein the three or more projections of each opposing wall are disposed in a linear array.

[0100]  13. The bone plate of paragraph 10, wherein each of the opposing walls includes at least two projections having a spacing between the at least two projections, and wherein the spacing of the at least two projections is at least substantially the same for each of the opposing walls.

[0101]  14. The bone plate of paragraph 10, wherein one or more projections of one of the opposing walls is offset from the at least one projection of the other opposing side.

[0102]  15. The bone plate of paragraph 14, wherein one of the opposing walls includes two or more projections having a spacing, the at least one projection of the other opposing wall being offset by one-half the spacing in relation to a transverse axis defined by the toothed aperture.

[0103]  16. The bone plate of paragraph 1, wherein the at least one projection is a plurality of projections and the openings are a plurality of openings, and wherein the toothed aperture is configured to retain at least two fasteners

STRYKER Exhibit 1006
Page 12 of 14
IPR2021-01450

placed through at least two of the plurality of openings and advanced rotationally into the aperture.

[0104]   17. The bone plate of paragraph 1, wherein the aperture defines a plane, and the at least one projection has a crest that extends obliquely to the plane.

[0105]   18. The bone plate of paragraph 17, wherein the at least projection includes a plurality of projections disposed in a linear array, and wherein the crests of the plurality of projections are at least substantially parallel.

[0106]   19. The bone plate of paragraph 1, wherein the at least one projection includes a set of projections separated by depressions, and wherein the projections have sharp crests and wherein the depressions have rounded bottoms.

[0107]   20. The bone plate of paragraph 1, wherein the first portion is configured to appose an exterior surface of the bone, and wherein the second portion is configured to be placed in the bone.

[0108]   21. A bone plate comprising a wall defining an elongate aperture and including opposing projections configured to retain a fastener advanced rotationally into the aperture.

[0109]   22. The bone plate of claim **21**, wherein the opposing projections including opposing arrays of projections.

[0110]   23. The bone plate of claim **22**, wherein each opposing array of projections includes a set of ridges.

[0111]   24. The bone plate of claim **23**, wherein the ridges of the set extend at least substantially parallel to one another.

[0112]   25. The bone plate of claim **23**, wherein the elongate aperture defines a plane, and wherein the ridges extend obliquely to the plane.

[0113]   26. A method of securing the bone plate of any of the preceding numbered paragraphs to a bone, comprising: (A) selecting the bone plate of any one of paragraphs 1-25; and (B) advancing a fastener rotationally into the elongate aperture so that the at least one projection retains the fastener in the elongate aperture.

[0114]   27. A system or kit for repairing bones, comprising (A) a bone plate having a wall defining an aperture, the wall including at least one projection; and (B) a bone fastener configured to be placed into the aperture and retained therein by the at least one projection.

[0115]   28. The system or kit of paragraph 27, wherein the at least one projection includes a pair of opposing linear arrays, each opposing linear array including two or more projections.

[0116]   29. The system or kit of paragraph 28, wherein the two or more projections are configured as ridges having an orientation, and wherein the orientation defines a permissible range of angles from which the bone fastener can be placed into the aperture.

[0117]   The disclosure set forth above may encompass multiple distinct inventions with independent utility. Although each of these inventions has been disclosed in its preferred form(s), the specific embodiments thereof as disclosed and illustrated herein are not to be considered in a limiting sense, because numerous variations are possible. The subject matter of the inventions includes all novel and nonobvious combinations and subcombinations of the various elements, features, functions, and/or properties disclosed herein. The following claims particularly point out certain combinations and subcombinations regarded as novel and nonobvious. Inventions embodied in other combinations and subcombinations of features, functions, elements, and/or properties may be claimed in applications claiming priority from this or a related application. Such claims, whether directed to a different invention or to the same invention, and whether broader, narrower, equal, or different in scope to the original claims, also are regarded as included within the subject matter of the inventions of the present disclosure.

I claim:

1. A bone plate for bone fixation, comprising:

a plate member configured to engage and support a bone and including a wall defining an aperture, the wall including a plurality of teeth disposed along the aperture.

2. The bone plate of claim 1, wherein the wall includes a pair of opposing wall portions disposed in a generally parallel relationship, and wherein each of the plurality of teeth is restricted to one of the wall portions.

3. The bone plate of claim 2, wherein one or more teeth of one opposing wall portion are offset along the aperture from one or more teeth of the other opposing wall portion.

4. The bone plate of claim 1, wherein the plurality of teeth includes a plurality of oblique ridges.

5. The bone plate of claim 1, wherein the plurality of teeth includes a substantially linear array of at least three projections disposed along the aperture.

6. The bone plate of claim 1, wherein the aperture includes opposing ends, and wherein the plurality of teeth is spaced from the opposing ends.

7. The bone plate of claim 1, wherein the plate member includes a first plate portion defining an opening and a second plate portion defining the aperture, and wherein the opening is disposed so that a threaded fastener can be received in at least the opening and advanced rotationally into threaded engagement with one or more of the plurality of teeth, thereby spanning the first and second plate portions with the threaded fastener.

8. The bone plate of claim 7, wherein the first plate portion is configured to be placed on bone, and wherein the second plate portion is configured to extend into bone.

9. The bone plate of claim 8, wherein the second plate portion includes a leading end region, and wherein the leading end region is tapered.

10. A system for bone fixation, comprising:

a fastener; and

a bone plate including a first plate portion defining an opening and a second plate portion including a wall defining an aperture, the wall including a plurality of projections configured to retain the fastener extending along either of at least two axes from the opening.

11. The system of claim 10, wherein the fastener includes a head and a shank, and wherein the shank includes a nonthreaded region adjacent the head and a threaded region spaced from the head.

STRYKER Exhibit 1006
Page 13 of 14
IPR2021-01450

US 2005/0171544 A1

10

**12**. The system of claim 10, wherein the at least two axes are nonparallel.

**13**. The system of claim 10, wherein the second plate portion defines a long axis, and wherein the plurality of projections includes oblique ridges extending at one or more oblique angles relative to the second plate portion.

**14**. The system of claim 10, wherein the bone plate is generally L-shaped.

**15**. The system of claim 10, wherein the first plate portion is configured to be disposed on bone, and wherein the second plate portion is configured to be disposed in bone.

**16**. A method of fixing bone, comprising:

selecting a bone plate including a first plate portion defining an opening and a second plate portion including a wall, the wall defining an aperture and including a plurality of projections disposed along the aperture;

disposing the first plate portion on bone and the second plate portion in bone;

placing a fastener through the opening and into the aperture so that at least one of the plurality of projections engages the fastener to restrict axial movement of the fastener.

**17**. The method of claim 16, wherein the step of disposing is performed at least partially on a tibia bone.

**18**. The method of claim 16, wherein the step of placing includes a step of selecting an axis for fastener placement from a set of two or more nonparallel axes along which the fastener can engage one or more of the plurality of projections.

**19**. The method of claim 16, wherein the aperture includes opposing ends, and wherein the step of placing disposes the threaded fastener in a spaced relationship with each of the opposing ends.

**20**. The method of claim 16, further comprising a step of forming a hole in bone along an axis extending through the opening and the aperture before the step of placing.

\* \* \* \* \*

STRYKER Exhibit 1006
Page 14 of 14
IPR2021-01450

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————————

**PATENT TRIAL AND APPEAL BOARD**

———————————

OsteoMed LLC
Petitioner

v.

Stryker European Operations Holdings LLC
Patent Owner

———————————

CASE IPR2022-00487
U.S. PATENT NO. 9,078,713

———————————

**DECLARATION OF MICHAEL SHERMAN**

1

OSTEOMED EXHIBIT 1002
Page 1 of 123
STRYKER Exhibit 1025
Page 1 of 123
IPR2021-01450

| Ground | Basis | Reference(s) | Claim(s) |
|--------|-------|-------------|----------|
| 5 | Obviousness | Arnould, Zahiri, and Myerson | 34, 35 |

77. Section III(B) sets forth my understanding of obviousness, including a single reference obviousness-based ground, such as that of Ground 1.

### A.   Ground 1: Claims 32, 33, 36 and 37 are Obvious in view of Slater

78. Independent claim 32, and dependent claims 33, 36 and 37, are obvious in view of Slater. Below I explain how each element of claims 32, 33, 36 and 37 is disclosed, taught, and/or suggested by Slater.

### 1.   Slater Through the Eyes of a POSITA

79. As shown in the annotated Figure 1 below, Slater discloses a bone plate comprising a fixation screw that is placed at an angle so that it compresses the ankle joint and intersects the tibia, talus, and potentially the calcaneus, as shown in Fig. 1:

36

OSTEOMED EXHIBIT 1002
Page 36 of 123
STRYKER Exhibit 1025
Page 36 of 123
IPR2021-01450

Appx2765



(Ex. 1004, FIG. 1 (annotated); *see also* 6:14-28, 11:18-27).

80.   Slater's bone plate comprises a predetermined allowable angle range of the fixation screw 25, as depicted by the three possible angles in Figure 1. (Ex. 1004, FIG. 1; *see also* 6:14-28, 11:18-27). Slater further discloses that a key advantage of the bone plate is the ability for the fixation screw to be configured at multiple angles and "incorporate more joints into the arthrodesis as required." (Ex. 1004, 16:25-17:12).

81.   A POSITA looking at these disclosures from Slater would understand that the bone plate disclosed has a fixation screw 25 configured to intersect a joint through two discrete bones.

82.   A POSITA would further recognize that Slater's fixation screw 25 is configured to develop compression across the joint intended to be fused, and

37

OSTEOMED EXHIBIT 1002
Page 37 of 123
STRYKER Exhibit 1025
Page 37 of 123
IPR2021-01450

that the head of the fixation screw 25 is inherently seated in the third

opening 26 in formation 27. (Ex. 1004, 6:14-21; *see also* 12:23-25

("Opening 27 which is also preformed, receives a countersink screw which

is allowed adjustable orientation.").

83.     As shown in the annotated Figure 1 below, Slater's fixation screw 25 enters

the bone plate through opening 26 in formation 27 and anchors into the bone

within a predetermined range of angles:



84.     (Ex. 1004, FIG. 1 (annotated); ¶¶57, 63). Additionally, Figure 1 depicts the

fixation screw 25 in a recessed position in opening 26.Based on these

disclosures from Slater, a POSITA would find it obvious that the fixation

screw 25 (third fixation member) is seated in the third hole (opening 26),

38

OSTEOMED EXHIBIT 1002
Page 38 of 123
STRYKER Exhibit 1025
Page 38 of 123
IPR2021-01450

Appx2767

crosses a joint between two bones, is the only fixation element in the second bone and does not contact the bone plate.

### 2.     Independent Claim 32

85.     Claim 32 is obvious in view of Slater. Below I explain how each element of claim 1 is disclosed, taught, and/or suggested by Slater.

### i.     [32Pre] A method of fusing a joint, the method comprising:

86.     I have been asked to provide an analysis of this claim element, which I understand is the preamble. However, I am not offering an opinion as to whether the preamble of this claim is limiting. Regardless of whether or not the preamble of claim 32 is limiting, it is my opinion that it is disclosed by Slater.

87.     As shown in the annotated Figure 1 below, Slater discloses an arthrodesis fusion plate to fuse the anterior ankle joint between the tibia (first discrete bone) and the talus (second discrete bone):

39

OSTEOMED EXHIBIT 1002
Page 39 of 123
STRYKER Exhibit 1025
Page 39 of 123
IPR2021-01450



(Ex. 1004, FIG. 1 (annotated).

88.    Further, Slater states, "[t]he present invention relates to prosthetic devices and more particularly relates to an ankle fusion plate for fusion of the anterior ankle." (Ex. 1004, 1:6-7; *see also* 6:14-28; 8:13-24).

89.    Based on Figure 1 and the cited portions of Slater, Slater clearly discloses a plate that is used to perform the claimed method of joint fusion.

> ii.    **[32a] spanning first and second bones separated by a joint with a bone plate, such that a first hole of the bone plate is aligned with a first bone of the joint and a second hole of the bone plate is aligned with a second bone of the joint;**

90.    Slater's bone plate is configured to fuse the joint between the tibia (first bone) and the talus (second bone) and comprises a first portion 30 and third

40

OSTEOMED EXHIBIT 1002
Page 40 of 123
STRYKER Exhibit 1025
Page 40 of 123
IPR2021-01450

portion 5, where the first portion 30 attaches to the anterior surface of the tibia (via a screw through a first hole) and the third portion 5 attaches to the anterior surface of the talus (via a screw through a second hole). (Ex. 1004, FIG. 1, 6:14-28, 8:13-24, 13:5-18).

91.    Figure 1, which is reproduced and annotated below, shows the first hole aligned with the first bone and the second hole aligned with the second bone:



(Ex. 1004, FIG. 1 (annotated)).

92.    Based on Figure 1 and the cited portions of Slater, Slater clearly discloses a plate spanning first and second bones separated by a joint with a bone plate, such that a first hole of the bone plate is aligned with a first bone of the joint

OSTEOMED EXHIBIT 1002
Page 41 of 123
STRYKER Exhibit 1025
Page 41 of 123
IPR2021-01450

and a second hole of the bone plate is aligned with a second bone of the joint.

> iii.    **[32b] inserting a first fixation member through the first hole of the plate and into the first bone of the joint;**

93.    Slater's bone plate is configured to receive one or more screws (first fixation member) at an opening (first hole) in the first portion 30 of the plate into the first bone (tibia) of the joint. (Ex. 1004, FIG. 1). Figure 1, which is reproduced and annotated below, shows the first fixation member, first hole, and first bone:



(Ex. 1004, FIG. 1 (annotated)).

94.    Slater describes how "[t]he first portion includes at least one opening including a formation which receives a plurality of bone screws of said first

42

OSTEOMED EXHIBIT 1002
Page 42 of 123
STRYKER Exhibit 1025
Page 42 of 123
IPR2021-01450

Appx2771

type and which on insertion of the plate are disposed normal to the plane of the plate at that region." (Ex. 1004, 8:13-24). Portion 30 of Slater's plate aligns with the anterior surface of the tibia (first bone). (Ex. 1004, 11:28-12:2; *see also* 8:13-24 ("Preferably the inner surface of the first portion of the plate opposes the anterior tibia.")).

95.    Based on Figure 1 and the cited portions of Slater, Slater clearly discloses inserting a first fixation member through the first hole of the plate and into the first bone of the joint.

> iv.    **[32c] inserting a second fixation member through the second hole of the plate and into the second bone of the joint; and**

96.    Slater's bone plate is configured to receive one or more screws at the third portion 5 of the plate through an opening (second hole) into the second bone (talus) of the joint. Figure 1, which is reproduced and annotated below, shows the second fixation member, second hole, and second bone:

43

OSTEOMED EXHIBIT 1002
Page 43 of 123
STRYKER Exhibit 1025
Page 43 of 123
IPR2021-01450

Appx2772



(Ex. 1004, FIG. 1 (annotated)).

97.    Slater describes how "[t]he third portion preferably has two spaced apart openings which receive at least one of a first screw type which are implanted into the Talus." (Ex. 1004, 8:13-24). The opening at portion 30 of Slater's plate allows the bone screw (second fixation member) to implant into the talus (second bone). (Ex. 1004, 8:13-24, 11:1-16).

98.    Based on Figure 1 and the cited portions of Slater, Slater clearly discloses inserting a second fixation member through the second hole of the plate and into the second bone of the joint.

44

OSTEOMED EXHIBIT 1002
Page 44 of 123
STRYKER Exhibit 1025
Page 44 of 123
IPR2021-01450

     **v.**     **[32d] inserting a third fixation member through a third hole in the plate, into the first bone, across the joint, and into the second bone so that a free end of the third fixation member, not attached to any portion of the plate, resides in the second bone**

99.    Slater's bone plate comprises opening 26 (third hole) configured to receive fixation screw 25 (third fixation member) and engage with the tibia and the talus at a predefined angle according to formation 27. Figure 1, which is reproduced and annotated below, shows an embodiment where the third fixation member passes through a third hole into the first bone, across the joint, and into the second bone in a way that the free end is not attached to any portion of the plate and resides in the second bone:



(Ex. 1004, FIG. 1 (annotated)).

45

OSTEOMED EXHIBIT 1002
Page 45 of 123
STRYKER Exhibit 1025
Page 45 of 123
IPR2021-01450

Appx2774

100.  Slater states that "[d]isposed in portion 20 is fixation screw 25 which passes through opening 26 in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. Screw 25 engages tibia 4, talus 3, and calcaneus 28 effectively providing three points of fixation according to this embodiment." (Ex. 1004, 11:18-27).

101.  If the fixation screw 25 (third fixation member) is inserted into opening 26 (third hole) at the angle highlighted in the above image of Figure 1, it would pass first through the tibia (first bone), then through the joint, and then into the talus (second bone).  The free end of fixation screw 25 would then reside in the second bone and not attach to any portion of the plate.

102.  While Slater depicts three specific angles and two discrete lengths of screws in Figure 1, a POSITA would appreciate that orthopedic plate and screw systems are routinely provided with a variety of screw lengths for the surgeon to select from that can be implanted with the range of angles. Providing such a variety of screws permits the surgeon to accommodate the patient's specific anatomy. It is reasonable for the surgeon to select a screw length and angle that only engages 2 bones for some arthroplasty procedures and 3 bones for others depending on the surgical goals for the procedure. A POSITA would also recognize that the screw selected to go into a single

46

OSTEOMED EXHIBIT 1002
Page 46 of 123
STRYKER Exhibit 1025
Page 46 of 123
IPR2021-01450

Appx2775

joint would have a free end not attached to any portion of the plate and that simply resides in the second bone.

103. Based on the angle highlighted in Figure 1 and the cited portions of Slater, Slater discloses inserting a third fixation member through a third hole in the plate, into the first bone, across the joint, and into the second bone so that a free end of the third fixation member, not attached to any portion of the plate, resides in the second bone.

> vi. **[32e] and a head of the third fixation member is seated in the third hole,**

104. Slater's bone plate discloses the need to maintain the integrity of the screw bone interface, through the cooperation of the fixation screws and the screw insertion hole. (*See* Ex. 1004, 5:28-31 ("Proper plate fixation relies on the integrity of the screw bone interface, screw insertion angle, screw tightness and effective co operation between screw head and the screw insertion hole."); *see also* 6:3-9).

105. A POSITA would understand from these disclosures of Slater that "effective co operation between the screw head and the screw insertion hole" would mean that the head of the fixation member is seated in the screw insertion hole.

106. Figures 1 and 2, which are reproduced and annotated below, show the screw head seated in the third hole:

47

OSTEOMED EXHIBIT 1002
Page 47 of 123
STRYKER Exhibit 1025
Page 47 of 123
IPR2021-01450

Appx2776



(Ex. 1004, FIGS. 1, 2 (annotated)).

107.   Slater specifically describes that "[o]pening 27 which is also preformed, receives a countersink screw which is allowed adjustable orientation." (Ex. 1004, 12:23-25).

108.   In addition, Figures 5 and 7, which are reproduced and annotated below, show there is depth to formation 94 such that the head of a fixation screw is seated in the plate:

48

OSTEOMED EXHIBIT 1002
Page 48 of 123
STRYKER Exhibit 1025
Page 48 of 123
IPR2021-01450



(Ex. 1004, FIGS. 5, 7 (annotated)). Slater also describes how "[d]isposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. Formation 94 is configured so that a fixation screw is directed at an angle within a predetermined allowable angular range." (Ex. 1004, 13:21-24).

109. Based on Figures 1, 2, 5, 7 and the cited portions of Slater, a POSITA would understand that Slater discloses a head of the third fixation member is seated in the third hole.

> ### vii.    [32f] the third hole being angled relative to a longitudinal axis of the plate through a thickness of the plate,

110. As shown in the annotated Figure 5 below, Slater discloses an angled fixation screw 25 (third fixation member) configured to pass through

OSTEOMED EXHIBIT 1002
Page 49 of 123
STRYKER Exhibit 1025
Page 49 of 123
IPR2021-01450

opening 93 (third hole) in formation 94, such that the fixation screw is

directed at a predetermined allowable angle range:



(Ex. 1004, FIG. 5 (annotated); *see also* FIG. 1, 13:20-25). Figure 5 shows a

longitudinal cross section of the bone plate relative to angle formation 94. (Ex.

1004, FIG. 5).

111. A POSITA would understand from these disclosures of Slater that the

opening 93 is a third hole that is angled relative to a longitudinal axis of the

plate and the third fixation member passes through a thickness of the plate

through opening 93.

112. Additionally, and as shown in the annotated Figure 5 below, the section of

the plate that contains opening 93 is thicker than the rest of the plate:

50



FIGURE 5

(Ex. 1004, FIG. 5 (annotated)). Slater specifically describes how "the plate depth changes at different locations. Preferably, the depth at the beginning arid end points of the L shaped contour over the ankle joint in the second region will be at its maximum thickness." (Ex. 1004, 8:25-9:19).

113.    Slater also states that "[t]he depth and the beginning and end points of the generally L shaped contour over the ankle joint formed by portions 81 and 90 will be the maximum thickness as it is at this region that the highest loading will occur in normal use." (Ex. 1004, 14:19-22). This indicates to a POSITA that the middle portion of the plate in Slater will be thickest.

114.    A POSITA would understand that the third hole is at an angle relative to the longitudinal axis of the plate and passes through the "maximum thickness" region of the plate. (Ex. 1004, 8:25-9:19, 14:19-22).

51

OSTEOMED EXHIBIT 1002
Page 51 of 123
STRYKER Exhibit 1025
Page 51 of 123
IPR2021-01450

Appx2780

115.    Based on Figure 5 and the cited portions of Slater, a POSITA would understand that Slater discloses the third hole being angled relative to a longitudinal axis of the plate through a thickness of the plate.

> **viii.    [32g] wherein the third fixation member is the only fixation member extending across the joint.**

116.    As shown in the annotated Figure 1 below, Slater discloses that formation 27 configured to receive angle fixation screw 25 at an angle range such that fixation screw 25 is the only screw that passes through the joint between the tibia and the talus:



(Ex. 1004, FIG. 1 (annotated)).

52

OSTEOMED EXHIBIT 1002
Page 52 of 123
STRYKER Exhibit 1025
Page 52 of 123
IPR2021-01450

Appx2781

bone parts while dissipating the force so it does not damage the bone parts. (Ex. 1007, 5:65:6-11).

164.   A POSITA would understand that there are no practical differences between fusing a joint through arthrodesis and fusing a bone fracture. A POSITA would know that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. Therefore, a POSITA would look to the prior art inclusive of Zahiri when making improvements to Slater's bone plate.

165.   Slater contemplates the importance of proper bone plate alignment and would guide a POSITA to incorporate the temporary pin holes disclosed by Zahiri into Slater. (Ex. 1004, 4:17-5:9). Slater specifically discloses that "[i]f an arthrodesis or ankle replacement is not properly aligned, significant gait abnormalities may result." (Ex. 1004, 4:23-25).

166.   Additionally, Zahiri discloses four small holes in the corner of the bone plate intended for used with pins to temporarily hold the bone plate in place during implantation, as shown in Figure 8:

OSTEOMED EXHIBIT 1002
Page 76 of 123
STRYKER Exhibit 1025
Page 76 of 123
IPR2021-01450

188. Based on these disclosures from Slater and Zahiri, a POSITA would find this claim obvious.

**D.    Ground 4: Obviousness over Arnould in view of Zahiri**

189. Independent claim 32, and dependent claims 33 and 36-39, are obvious in view of the combination of Arnould and Zahiri. Below I explain how each element of claims 32, 33 and 36-39 are disclosed, taught, and/or suggested by the combination of Arnould and Zahiri.

**1.    Basis for the Combination of Arnould and Zahiri**

190. The scope and content of the prior art includes Arnould and Zahiri, which collectively disclose all of the elements of claims 32-33 and 36-39. There are no differences between the subject matter of these claims and the combination of Arnould and Zahiri.

191. Arnould and Zahiri disclose bone plates with diagonal fixation members configured to compress the intersection of a first and second bone or across a fracture. (Ex. 1006, ¶6; Ex. 1007, 2:20-31). A POSITA would understand that there are no practical differences between fusing a joint through arthrodesis and fusing a bone fracture. Arnould and Zahiri are therefore in analogous fields of invention. Arnould's bone plate comprises a hole 25 that determines the relative position of a screw 30 that passes through and fuses the joint between the metatarsal and phalanx. (Ex. 1006, ¶31). Arnould

87

OSTEOMED EXHIBIT 1002
Page 87 of 123
STRYKER Exhibit 1025
Page 87 of 123
IPR2021-01450

Appx2816

explains that "the screw works mainly in traction" and that "[w]ith a single action consisting of screwing in this long screw, the surgeon automatically brings the two bones to be fused closer to each other." (Ex. 1006, ¶6).

192. A POSITA knows that screws positioned across an interface, "working in traction" are providing compression at the interface. Arnould further discloses a variable fixation angle between the longitudinal axis of the plate body, selected by the surgeon to fuse the metatarsal and phalanx. (Ex. 1006, ¶¶27, 32). In other words, the surgeon "has the possibility of modifying the angle $\alpha$," indicating the surgeon can choose the angle at which the fixation member is inserted to achieve an optimal interface between the screw and the bone. (Ex. 1006, ¶38).

193. While a POSITA may find that Arnould does not expressly disclose the angle of the third hole positioned relative to the longitudinal axis of the bone plate, Arnould's disclosure would guide a POSITA to incorporate the teachings of Zahiri, and position the third hole at an angle relative to the longitudinal thickness of the bone plate. Zahiri discloses a bone plate configured to fuse a first and second bone part with an angle fixation member and compress the bone fracture:

88

OSTEOMED EXHIBIT 1002
Page 88 of 123
STRYKER Exhibit 1025
Page 88 of 123
IPR2021-01450

Appx2817



Fig. 1

(Ex. 1007, FIG. 1; 2:45-48). Zahiri further discloses an improved system that allows a sufficient amount of force to be applied between two bone parts while dissipating the force so it does not damage the bone parts. (Ex. 1007, 5:65:6-11). A POSITA would understand that there are no practical differences between stabilizing a joint for the purpose of arthrodesis and stabilizing two bone parts for the purpose of fusing a bone fracture. A POSITA would know that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. Therefore, a POSITA would look to Zahiri when making improvements to Arnould's bone plate.

194. While Arnould does not explicitly describe the use of k-wires to temporarily hold the plate in place while the screws are inserted, the figures show pin

89

OSTEOMED EXHIBIT 1002
Page 89 of 123
STRYKER Exhibit 1025
Page 89 of 123
IPR2021-01450

other prior art plates, such as Zahiri, that could be used in such an application.

228.  A POSITA would understand that there are no practical differences between stabilizing a joint for the purpose of arthrodesis and stabilizing two bone parts for the purpose of fusing a bone fracture. A POSITA would know that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. Therefore, a POSITA would look to Zahiri when making improvements to Arnould's bone plate.

229.  Zahiri further discloses an incidence angle of a locking screw "A" that is preferably 90°, 150° or 160° from the guide plate but "in the range of from 90° to 170°." (Ex. 1007, 3:59-67). The incidence angle "A" is measured as the obtuse angle between the guide plate and the locking screw trajectory. (Ex. 1007, FIG. 4).



Fig. 4

107

OSTEOMED EXHIBIT 1002
Page 107 of 123
STRYKER Exhibit 1025
Page 107 of 123
IPR2021-01450

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**PATENT TRIAL AND APPEAL BOARD**

---

OsteoMed LLC
Petitioner,

v.

Stryker European Operations Holdings LLC
Patent Owner

---

CASE: IPR2022-00488
U.S. PATENT NO. 10,993,751

---

**DECLARATION OF MICHAEL SHERMAN**

1

OSTEOMED EXHIBIT 1002
Page 1 of 147
STRYKER Exhibit 1026
Page 1 of 147
IPR2021-01450



(Ex. 1004, FIG. 1 (annotated); *see also* 6:14-28, 11:18-27).

75. Slater's bone plate comprises a predetermined allowable angle range of the fixation screw 25, as depicted by the three possible angles in Figure 1. (Ex. 1004, FIG. 1; *see also* 6:14-28, 11:18-27). Slater further discloses that a key advantage of the bone plate is the ability for the fixation screw to be configured at multiple angles and "incorporate more joints into the arthrodesis as required." (Ex. 1004, 16:25-17:12).

76. A POSITA looking at these disclosures from Slater would understand that the bone plate disclosed has a fixation screw 25 configured to intersect a joint through two discrete bones.

77. A POSITA would further recognize that Slater's fixation screw 25 is configured to develop compression across the joint intended to be fused, and

44

OSTEOMED EXHIBIT 1002
Page 44 of 147
STRYKER Exhibit 1026
Page 44 of 147
IPR2021-01450

that the head of the fixation screw 25 is inherently seated in the third opening 26 in formation 27. (Ex. 1004, 6:14-21). Slater also describes the hole opening which seats the fixation screw: "[o]pening 27 which is also preformed, receives a countersink screw which is allowed adjustable orientation." (Ex. 1004, 12:23-25).

78. As shown in the annotated Figure 1 below, Slater's fixation screw 25 enters the bone plate through opening 26 in formation 27 and anchors into the bone within a predetermined range of angles:



(Ex. 1004, FIG. 1 (annotated); ¶¶57, 63). Additionally, Figure 1 depicts the fixation screw 25 in a recessed position in opening 26.

79. Based on these disclosures from Slater, a POSITA would find it obvious that the fixation screw 25 (third fixation member) is seated in the third hole

45

OSTEOMED EXHIBIT 1002
Page 45 of 147
STRYKER Exhibit 1026
Page 45 of 147
IPR2021-01450

1, it would pass through the tibia (first bone), through the joint, and into the talus (second bone), such that fixation screw 25 resides in the second bone and the free end does not attach to any portion of the plate.

109. While Slater depicts three specific angles and two discrete lengths of screws in Figure 1, a POSITA would appreciate that orthopedic plate and screw systems are routinely provided with a variety of screw lengths for the surgeon to select from that can be implanted with the range of angles. Providing such a variety of screws permits the surgeon to accommodate the patient's specific anatomy. It is reasonable for the surgeon to select a screw length and angle that only engages 2 bones for some arthroplasty procedures and 3 bones for others depending on the surgical goals for the procedure. A POSITA would also recognize that the screw selected to go into a single joint would have a free end not attached to any portion of the plate and that simply resides in the second bone.

110. Based on the angle highlighted in Figure 1 and the portion of Slater cited above, Slater discloses a third fixation member configured to be inserted through said third hole of said bone plate, into the first discrete bone, across said joint, and into the second discrete bone such that a free end of said third fixation member, not attached to any portion of the bone plate, resides in the second discrete bone.

60

OSTEOMED EXHIBIT 1002
Page 60 of 147
STRYKER Exhibit 1026
Page 60 of 147
IPR2021-01450

Appx2912

ii. **Claim 7: The system of claim 1 wherein said third fixation member is configured to develop compression across said joint with lag effect when said third fixation member is tightened.**

120. Slater discloses a fixation screw that is inserted into the bone plate at an appropriate angle to achieve an optimal amount of compression on to perform the joint fusion. For example, Slater states, "[t]he present invention provides an improved arthrodesis fusion plate for fusion of the anterior ankle. More particularly the invention provides an ankle plate in which openings in the plate receive fixation screws allowing compression of bones being fused and orientation of the fixation screws to optimise accommodation of bone loading for efficient and effective fusion." (Ex. 1004, 6:17-

121. While the '751 Patent does not explicitly define lag effect, a POSITA would understand that it is referring to the typical function of a lag screw, which is to compress one member against another. (*See* Ex 1001, 1:40-44 and 2:15-19).

122. In Slater, two or three bones are lagged (compressed) against one another to increase the stability of the arthrodesis. This can be achieved by using a lag screw or by using fully threaded screws and selectively over drilling the near hole.

66

OSTEOMED EXHIBIT 1002
Page 66 of 147
STRYKER Exhibit 1026
Page 66 of 147
IPR2021-01450

123. Therefore, according to the portions of Slater cited above, Slater teaches the use of a third fixation member configured to develop compression across the joint with lag effect when said third fixation member is tightened.

> **iii.     Claim 8: The system of claim 1 wherein the free end of said third fixation member and a free end of said second fixation member are configured to reside adjacent each other within said second discrete bone.**

124. Slater's bone plate comprises screw 10 (second fixation member) and screw 25 (third fixation member), configured to engage with the talus:



(Ex. 1004, FIG. 1 (annotated)).

125. According to Slater, "fixation screws 9 and 10 … pass through openings 11 and 12 of portion 5 and engage talus 3 at 10 different orientations." (Ex.

OSTEOMED EXHIBIT 1002
Page 67 of 147
STRYKER Exhibit 1026
Page 67 of 147
IPR2021-01450

129.    As shown in the annotated Figure 1 below, Slater discloses a bone plate

comprising a fixation screw that is placed at an angle so that it compresses

the ankle joint and intersects the tibia, talus, and potentially the calcaneus:



(Ex. 1004, FIG. 1 (annotated); *see also* 6:14-28, 11:18-27).

130.    Slater's bone plate comprises a predetermined allowable angle range of the

fixation screw 25, as depicted by the three possible angles and multiple

lengths in Figure 1. (Ex. 1004, FIG. 1; *see also* 6:14-28, 11:18-27). Slater

further discloses that a key advantage of the bone plate is the ability to for

the fixation screw to be configured at multiple angles and "incorporate more

joints into the arthrodesis as required." (Ex. 1004, 16:25-17:12)

69

OSTEOMED EXHIBIT 1002
Page 69 of 147
STRYKER Exhibit 1026
Page 69 of 147
IPR2021-01450

131. Therefore, a POSITA would understand that Slater's bone plate discloses an embodiment of the fixation screw 25 configured to intersect a joint between two discrete bones.

132. However, at the very least, Slater's disclosure guides a POSITA to incorporate the teachings of Zahiri, and position the fixation screw 25 at an angle that contacts only two bone fragments. Zahiri discloses a bone plate configured to fuse a first and second bone part with an angled fixation member oriented to compress the bone fracture:



Fig. 1

(Ex. 1007, FIG. 1; *see also* 2:45-48).

133. Zahiri further discloses an improved system that allows a sufficient amount of force to be applied between two bone parts while dissipating the force so it does not damage the bone parts. (Ex. 1007, 5:65:6-11).

OSTEOMED EXHIBIT 1002
Page 70 of 147
STRYKER Exhibit 1026
Page 70 of 147
IPR2021-01450

134. A POSITA would understand that there are no practical differences between fusing a joint through arthrodesis and fusing a bone fracture. A POSITA would know that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. Therefore, a POSITA would look to Zahiri when making improvements to Slater's bone plate.

135. Slater contemplates the importance of proper bone plate alignment and guides a POSITA to incorporate the temporary pin holes disclosed by Zahiri into Slater. (Ex. 1004, 4:17      Slater specifically discloses that "[i]f an arthrodesis or ankle replacement is not properly aligned, significant gait abnormalities may result." (Ex. 1004, 4:23-25).

136. Additionally, Zahiri discloses four small holes in the corner of the bone plate intended for use with pins that temporarily hold the bone plate in place during implantation, as shown in Figure 8:

OSTEOMED EXHIBIT 1002
Page 71 of 147
STRYKER Exhibit 1026
Page 71 of 147
IPR2021-01450

viii.  **[1g] a third fixation member configured to be inserted through said third hole of said bone plate, into the first discrete bone, across said joint, and into the second discrete bone such that a free end of said third fixation member, not attached to any portion of the bone plate, resides in the second discrete bone,**

147.   A POSITA would find that Slater discloses this element, as explained above in Section VIII.A.2.viii. (*See* Ex. 1004, FIG. 1, 11:19-25).

ix.  **[1h] wherein said third fixation member is the only fixation member extending across said joint from the first side of the joint to the second side of the joint.**

148.   Slater discloses this element, as explained above in Section VIII.A.2.vii. (*See* Ex. 1004, FIG. 1, 11:18-27).

### 3.  Independent Claim 11

149.   Certain elements of claim 11 are identical to elements of claim 1 except that claim 1 is directed to a system for fusing two discrete bones whereas claim 11 is directed to a system for fusing two bone parts. A POSITA would find there is no difference with respect to a bone plate used for fusing two discrete bones verses bone parts and that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. For these elements, I will refer back to my earlier analysis instead of repeating it herein.

75

OSTEOMED EXHIBIT 1002
Page 75 of 147
STRYKER Exhibit 1026
Page 75 of 147
IPR2021-01450

possibility of modifying the angle α," indicating the surgeon can choose the angle at which the fixation member is inserted to achieve an optimal interface between the screw and the bone. (Ex. 1006, ¶38).

248.    While a POSITA may find that Arnould does not expressly disclose the angle of the third hole positioned relative to the longitudinal axis of the bone plate, Arnould's disclosure would guide a POSITA to incorporate the teachings of Zahiri, and position the third hole at an angle relative to the longitudinal axis of the bone plate. Zahiri discloses a bone plate configured to fuse a first and second bone part with an angle fixation member and compress the bone fracture:



Fig. 1

(Ex. 1007, FIG. 1; 2:45-48).

249.    Zahiri further discloses an improved system that allows a sufficient amount of force to be applied between two bone parts while dissipating the force so

110

OSTEOMED EXHIBIT 1002
Page 110 of 147
STRYKER Exhibit 1026
Page 110 of 147
IPR2021-01450

Appx2962

it does not damage the bone parts. (Ex. 1007, 5:65:6-11). A POSITA would understand that there are no practical differences between stabilizing a joint for the purpose of arthrodesis and stabilizing two bone parts for the purpose of fusing a bone fracture. A POSITA would know that bone plates configured for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades. Therefore, a POSITA would look to Zahiri when making improvements to Arnould's bone plate.

250. Additionally, Arnould discloses a method for partially affixing the bone plate to the bone by partially immobilizing the plate using a screw that is not tightened fully in an oblong hole so that the surgeon can correctly position and align the plate. (Ex. 1006, ¶31). Arnould discusses the difficultly of proper plate alignment faced by the surgeon during implantation and the importance that proper placement has on patients' comfort. (Ex. 1006, ¶3).

251. Additionally, a POSITA would understand that Figure 2 of Arnould illustrates temporary guide holes (circled in red below) that are used to temporarily secure the plate during the implantation process:

OSTEOMED EXHIBIT 1002
Page 111 of 147
STRYKER Exhibit 1026
Page 111 of 147
IPR2021-01450

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01450

U.S. Patent No. 8,529,608

**<u>REPLY DECLARATION OF KENNETH A. GALL, PH.D.</u>**

STRYKER Exhibit 1027
Page 1 of 48
IPR2021-01450

contemplates that a transfixation screw can pass through a transfixation screw hole at a wide range of angles across the joint. Dependent claim 5, which recites "wherein the trajectory is configured to pass through the joint at a transfixation angle of ***about*** 50 degrees measured from the neutral bending axis" similarly contradicts Mr. Sommers' attempt to limit the trajectory to a single fixed angle.

12.    Third, Mr. Sommers' construction of "trajectory" is nonsensical not only because it contradicts the plain language of the claims and is unsupported by the specification, but also because the inner surface of the transfixation screw hole of the '608 patent does not alone determine the precise angle of the transfixation screw trajectory.

13.    The geometry of the inner surface of the transfixation screw hole cannot, by itself, ensure that the transfixation screw will be placed at any one particular "fixed angle relative to the neutral bending axis." Rather, the geometry of the screw itself may allow the screw to be inserted at multiple angles. For example, a bone screw with a diameter smaller than the diameter of the hole may enable variable angles of fixation. During the prosecution of the '608 patent, the International Searching Authority ("ISA") pointed out that the screw is not recited in claim 11, and the trajectory of the screw depends on features specific to the screw, such as the diameter of the screw:

- 6 -

> [C]laim 11 attempts to define <u>the inner surface of the screw hole</u> in terms of the result to be achieved, namely the trajectory of the screw with respect to the first and second bones. However, this definition is not clear since the screw does not belong to the claimed plate and said ***trajectory depends on several screw features, likes its diameter (if the diameter of the screw is smaller than that of the screw hole, the screw may tilt within the hole, thereby affecting the trajectory)***.

(Ex. 1004 at 151). Internal factors, such as the shape of the screw head and even the material of the plate may also affect screw trajectory. For example, a conically shaped screw head that is mated with a cylindrical screw hole will permit at least some degree of angulation for the screw or the plate may be comprised of a plastically deformable metal that permits variable angles of the screw upon fixation. External factors, such as whether a separate screw guide is used to select the angle of fixation will also affect the screw trajectory.

14.    It would be difficult to manufacture a bone plate with a transfixation screw hole (angled hole) that could only direct a screw at a single fixed angle unless it was an explicit design feature. To direct a screw at a single fixed angle, the transfixation screw hole would need to be designed as an elongated, cylindrical-like, and threaded hole to be used with a screw designed to mate with the dimensions of the hole. This type of transfixation screw hole design is nowhere described in the '608 patent and would be non-trivial to manufacture for a thin dorsal-sided MTP plate positioned across small bones of a joint.

- 7 -

proximal end region of the plate over the tibia.  The desired effect is for the plate to

taper in and decrease depth at its extremities where loading is least.  This would

decrease down to around 1mm in thickness….The second point of plate depth and

width change would be over the phalanges at the distal point of the plate.  At this

point, the plate would taper out and again the depth would be that of around the 1mm

mark." (*Id.* at 14:18-30).

28.     Slater discloses that the "location adjacent the ankle joint will

preferably be the thickest part of the plate and will preferably fall within the range

[of] 4-8mm" but that the first tapered end "decreases down to around 1mm in

thickness" and the second tapered end "would be in the order of about 1mm."  (*Id.*

at 8:34-9:11; *see also id.* 14:22-30).  With a thickness of around 1mm, the tapered

ends are capable of being bent to conform to bone anatomy.  Moreover, these ends

are tapered, or "pliable," because that is "where loading is least."  (*Id.* at 14:23-26).

But to account for the "highest loading," Slater discloses that "the generally L shaped

contour over the ankle joint" is at "it's maximum thickness."  (*Id.* at 14:19-23).

**C.     Slater Discloses a "Transfixation Screw Hole Comprising an Inner Surface Configured to Direct a Transfixation Screw…at a Trajectory…"**

29.     As discussed above in Section III.A. and contrary to Mr. Sommers'

opinion, the inner surface of the screw hole does not alone determine the path of the

transfixation screw.  (Ex. 2002 at ¶97).  Rather, the trajectory of the screw may be

STRYKER Exhibit 1027
Page 20 of 48
IPR2021-01450

dictated by internal and external factors of the screw in relation to the hole, such as the geometry of the screw head, the diameter of the screw in relation to the hole, the material of the plate, and whether a screw guide is used to select an appropriate angle. And while Mr. Sommers' claims that "in *Slater*, the surgeon determines the path in situ with a range of options available to her/him," it is in fact the transfixation screw hole of Slater that provides a predetermined range of angles for the surgeon, along with the "screw sizes [that] may be adjusted to allow for particular insertion points." (Ex. 1005 at 16:30-32). Slater specifies that "[f]ormation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc." (*Id.* at 11:21-23). In my First Declaration, I measured the angles of the screws shown in Figure 1 (31°-57°). (Ex. 1002 at ¶131). As can be seen in Slater Figure 1, the formation 27 is configured so that each of the screw trajectories passes through a first position on the first bone, a portion of the joint, and a second position on the second bone.

30.   In the '608 patent, the term "trajectory" is not as narrow as Mr. Sommers proposes and the specification does not at all discuss any "fixed angle" relative to a "neutral bending axis." Mr. Sommers appears to be adding a structural limitation to the inner surface of the transfixation screw hole that is nowhere described in the '608 patent. For example, the claims recite only that the claimed

- 17 -

STRYKER Exhibit 1027
Page 21 of 48
IPR2021-01450

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01450

"trajectory" is the transfixation screw trajectory such that the trajectory passes

through "a first position on the first [discrete] bone[, a portion of the joint,] and a

second position on the second [discrete bone]" once the plate is placed across the

joint. (Ex. 1001 at cl. 1, 11).  As I stated in my First Declaration, Slater includes a

transfixation screw hole that comprises an inner surface configured to direct the

transfixation screw at a trajectory configured to pass through the tibia, the tibiotalar

joint, and the talus.  (Ex. 1002 at ¶¶113, 153).

31.    Even under Mr. Sommers' construction of "a trajectory," as meaning

"a fixed angle relative to the neutral bending axis of the joint," this element is still

taught by Slater.  For example, while Slater's transfixation screw hole allows the

transfixation screw to be positioned within a predetermined range, once the

transfixation screw "pass[es] through a first position on a first bone, a portion of the

joint, and a second position on the second discrete bone once the plate is placed

across the joint" as claimed, the screw trajectory, and of course the angle, is fixed

relative to the neutral bending axis. (Ex. 1005 at 6:18-24, 8:27-28, 11:21-22; Ex.

1025, ¶102).

**D.    Slater Discloses a Transfixation Screw that "Extends [Through] the Bridge Portion"**

32.    In paragraph 107, Mr. Sommers opines that Slater does not disclose

"the transfixation screw extends through the bridge portion."  The '608 patent does

- 18 -

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01450



(Ex. 1005 at Fig. 1)



(Ex. 1005 at Fig. 7).

### E. Slater Discloses Structural Elements That Absorb and Transfer Tensile Load

37.    In my First Declaration, I explained how a POSITA would have

understood that Slater teaches the transfer of tensile load through the screw, into the

- 21 -

STRYKER Exhibit 1027
Page 25 of 48
IPR2021-01450

head of the screw, and into the bridge portion of the plate. In particular, I explained that

> In Slater, when the fixation screw (25) advances through the opening (26) and into the second discrete bone (talus bone 3), the second discrete bone (talus bone 3) is loaded relative to (pulled toward) the first discrete bone (tibial bone 4), and tensile load is transferred from the second discrete bone (talus bone 3), through the screw into the screw head (e.g., proximal end of fixation screw 25) and into the bridge portion (portions of 5 and 20 or portions of 81 and 90) of the plate. This transfer occurs because the threads on the screw and the portion of the screw head that abuts the inner surface of the screw hole act essentially as a vise, to the second bone and the plate, with the first bone held in between. The threads and the portion of the screw that abuts the inner surface of the screw hole apply forces along the length of the screw. *See id*. at 12:32-13:3.

(E.g., Ex. 1002 at ¶114; *see also id.* at ¶154)

38.    Mr. Sommers does not dispute that a vise configuration transfers tensile load; rather, Mr. Sommers claims that "*Slater* fails to disclose the location of the threads on the transfixation screw and the bone or bones that are anchored with threads." (Ex. 2002 at ¶114). In particular, Mr. Sommers complains that "Dr. Gall's opinion regarding this 'vise' like transfer of load depends on his assumption that the threads of the screw type 70 would only be present in the talus bone." (*Id.* at ¶110).

39.    Contrary to Mr. Sommers' opinion, Slater discloses a vise configuration with the use of a lag screw. A POSITA would have understood that a lag screw for a bone plate includes a smooth shaft and threads only on the terminal end of the screw. In use, the threads of a lag screw are anchored in one bone of a

STRYKER Exhibit 1027
Page 26 of 48
IPR2021-01450

joint while the shank of the screw rotates without engaging the other bone.   The

screw head and the screw threads compress the bones together, resulting in what is

known as "lag effect" between the tibia and the talus.  Such compression of the bones

puts the lag screw in tension.[2]

40.     As I explained in my First Declaration, based on Slater's disclosure of

a lag screw, a POSITA would have understood that the threads of the lag screw

would be located only in the talus when used to fuse the tibia and the talus.  (Ex.

1002 at ¶¶102, 114, 134-136, 144, 153, and 154; *see also* Ex. 2003 at 30:4-9 "Q.

Okay.  And where in the patent does it say that the threads are located in the talus?

A. Again, it's my overall read of the patent. It's what I would think a person of

ordinary skill in the art would see if they read the patent and saw that picture.").  For

example, figure 4 discloses a transfixation lag screw with "a longer shank to increase

depth of penetration" and "an abbreviated threaded portion to allow the majority of

the shank to slide through aligned tibial and talus screw holes finally anchoring in

the calcaneus bone." (Ex. 1005 at 12:34-13:3).  While the description of screw 70

in figure 4 relates to fusing the tibia, talus, and calcaneus, screw 70 may also be used

---

[2] I note that lag-effect can also be achieved through the use of a fully threaded screw
and by overdrilling the channel within the first bone, but not the second bone, such
that the screw will freely rotate without engagement in the first bone and the threads
will catch in the second bone.

- 23 -

to fuse only the tibia and the talus because screw 70 is "adapted for insertion in the plate of figures 1 and 2." (*Id.* at 12:32-34). Moreover, screw 70 is later described as a "'home run' lag screw." (*Id.* at 12:34-13:3; 19:25-26; Ex. 2003 at 42:16-24 ("Q. Is that a different screw than screw type 60, screw type 70, or screw 25? A. I think that's also a lag screw. . . . Q. So is it a different screw than those other three screws described? . . . A. I think it's the same type of screw,")). Additionally, Slater discloses that the size of the transfixation screw may be adjusted when fusing the tibia and the talus, depending on the patient's anatomy. (Ex. 1005 at 16:30-32 "[s]crew sizes may be adjusted to allow for particular insertion points and specific characteristics (e.g. bone density) of bone at points of fixation."). This means that a surgeon has the ability to select a screw of a particular size with an appropriate thread length before performing a tibiotalar joint fusion.

41.    Mr. Sommers' opinion that Slater "lacks the sufficient disclosure relation to location of the thread in the three-bone embodiment and more so in the minimally described two-bone embodiment" (Ex. 2002 at ¶110) appears to be semantic because he admits that Slater discloses a lag screw, lag screws are used to create lag effect, and lag effect is a well-known concept in orthopedics. (Ex. 1030 at 106:19-23 ("Q. [] So Slater discloses the use of a lag screw, correct? . . . I think the word of 'lag screw' is mentioned somewhere, yes."); 69:4-6 ("Q. Okay. So lag

- 24 -

effect creates compression then between two bones? A. Yeah, you can say that.");

69:7-14 ("Q. Okay. When did you first become aware of the concept of lag effect? .

. . A. So lag effect is a common terminology in orthopedics.  So probably 20 years

ago."); 69:23-70:3 ("Q. . . . And lag effect can be achieved with a partially threaded

screw, right? A. That's one possibility, with others.  Q. Okay.  And then lag screws

are used to create lag effect? A. Yes.")).

42.    Mr. Sommers acknowledges that screw type 70 is a lag screw that

achieves lag effect, as pictured in Figure 4 of Slater and described in the Slater

disclosure.  In his deposition, Mr. Sommers explained that "[y]ou want to really have

the screws only in the second bone.  You diminish the lag effect dramatically if you

have threads extending into the first bone, for example."  (Ex. 1030 at 70:16-19).

He further emphasized that "[i]f the threads extend into the first bone, you may not

achieve compression."  (*Id.* at71:8-9).  Based on his own understanding of lag

screws, Mr. Sommers thus concedes that using a lag screw in the so-called two-bone

embodiment of Slater would mean that the threads of the screw type 70 would only

be present in the second bone, the talus.

43.    Mr. Sherman, Patent Owner's technical expert for a related proceeding

against Stryker, also recognizes that Slater discloses a lag screw used to create lag

effect between two bones.  In his sworn testimony, he stated that "[i]n Slater, two or

- 25 -

three bones are lagged (compressed) against one another to increase the stability of the arthrodesis. This can be achieved by using a lag screw." (Ex. 1026 at ¶122). He also stated that "Slater teaches the use of a third fixation member configured to develop compression across the joint with lag effect when said third fixation member is tightened." (*Id.* at ¶123). Furthermore, he stated that a POSITA would have understood that lag effect refers "to the typical function of a lag screw, which is to compress one member against another." (*Id.* at ¶121).

44.    Mr. Sommers speculates that "*Slater* also fails to disclose the transfer of tensile load into specific locations (i.e., the head portion of the transfixation screw and the bridge portion of the bone plate)." (Ex. 2002 at ¶115). However, a POSITA would have understood that the purpose of a screw of any type, including a bone screw, is to absorb and transfer tensile load. Bone screws function by converting rotational forces into internal tension in the screw. This conversion creates compression between the bones that the bone screw is holding together. With the head of the transfixation screw holding a load on one side of the joint and the threads of the screw holding a load on the other side of the joint, tensile load is absorbed in the transfixation screw and transferred along the length of the screw into the screw head. (Ex. 1002 at ¶115; *see also id.* at ¶154; Ex. 1030 at 68:21-24 "And then you have a tension created by the threads in the second bone and the head is somehow

- 26 -

sitting on the first bone"). Slater describes multiple instances where a bone screw provides bone compression via tension in the screw. (Ex. 1005 at 1:7-11 ("More particularly the invention relates to an ankle plate in which openings in the plate receive **fixation screws allowing compression of bones being fused**. The invention further, relates to a method of insertion of an anterior ankle plate so that **optimal compression is achieved**"); 6:18-28 ("More particularly the invention provides an ankle plate in which openings in the plate receive **fixation screws allowing compression of bones being fused** and orientation of the fixation screws to optimise accommodation of bone loading for efficient and effective fusion. The invention further provides a method of insertion of an anterior ankle plate so that **optimal compression is achieved and fixation screws are inserted at appropriate angles** in anterior ankle joint fusion. This invention further relates to a kit including an anterior ankle fusion plate and which includes a selection of fasteners for fixation of the ankle plate in a prescribed manner so that the **orientation of the screws provide optimal compression and bone fusion**."); 8:27-29 ("**The screws** in each portion of the plate **are directed at required angles according to the joint/s** required for arthrodesis. This is also **necessary to achieve maximal compression of the fusion site/s**."); 12:3-5 ("As may be seen from figure 1 **the screws are placed in a particular orientation and required angle to the joint/s** required for arthrodesis.

- 27 -

This is also **necessary to achieve maximal compression of the fusion site/s**.");
14:1-3 ("As may be seen from figure 1 **the screws are placed in a particular
orientation and required angle to the joint/s** required for arthrodesis. This is also
**necessary to achieve maximal compression of the fusion site/s**.")).  I note that the
specification of the '608 patent does not provide extensive detail on the transfer of
tensile load because a POSITA would have understood that a bone screw absorbs
and transfers tensile load.  In static equilibrium, the absorption and transfer of tensile
load provides an equal and opposite force to the generated compression force
between the two bones.  This is a fundamental law of physics and mechanics of
materials.

45.    As I explained in my First Declaration, as the threads of the
transfixation screw engage the second bone, the unthreaded portion of the
transfixation screw freely rotates in the first bone and the threaded portion pulls the
second bone towards the first bone.  (Ex. 1002 at ¶¶114, 154).  As the head of the
transfixation screw comes into contact with the inner surface of the transfixation
screw hole and the transfixation screw advances deeper into the bones, the second
bone is brought closer to the plate, with the first bone held in between.  (*Id.*).
Because of the contact between the head of Slater's transfixation screw and the inner
surface of the transfixation screw hole disposed on the plate, stress is distributed to

- 28 -

the bridge portion because the bridge portion is adjacent the screw hole. Furthermore, in a monolithic bone plate such as Slater's, tensile load is not concentrated at one specific location.

46.     By way of example, according to beam bending theory, the additional stresses that result from a point load, somewhere within the plate, will be at a maximum near the point load and will not fully dissipate until the ends of the plate. This means the stresses from the point load from the transfixation screw will transfer into the bridge portion of the plate, which is in between the point load and the second end of the plate.

47.     Mr. Sommers described the absorption and transfer of tensile load in the '608 patent in a manner that is almost identical to my discussion of the absorption and transfer of tensile load in Slater.  For example, Mr. Sommers describes how the second bone is brought towards the first bone through lag effect and how the tensile forces that created in the screw are transferred into the plate via contact of the screw head and the inner surface of the transfixation screw hole.  (Ex. 1030 at 68:18-24 ("Lag effect is when you have at least two bones that are screwed together where the first bone is basically not necessarily participating in the screw interface, just as a form fit. And then you have a tension created by the threads in the second bone and the head that is somehow sitting on the first bone"); 67:23-68:7 ("Q. Okay. So how

- 29 -

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01450

. . . are tensile forces absorbed in a screw? A. So the tensile forces that are created, they come from the fact that the distal portion of the screw sits in the second bone and then the shaft of the screw extends through the first bone and the head is sitting inside the plate.  With that, you have the tension within the screw gets directly transferred into the head of the screw and therefore into the plate where it's anchored in."); 74:6-22 ("Q. So how do know that . . . load is transferred into the bridge portion from the screw head?   A. Because, as a lag screw functions, the distal threaded portion is engaging with the second bone and creates a tension within the screw that at that point gets transferred to into the head.  That's just a general concept. . . . Q. Okay. So tension[] [is] in the screw.  How does it get to the bridge portion? . . . A. By the head of the screw that sits inside the plate. Q. Okay. So it is the fact that . . . the head of the screw is in contact with the plate? A. Correct.")).   Mr. Sommers confirms that a POSITA would have understood that a lag screw is used to create a lag-effect between the tibia and the talus,[3] which in turn results in tensile load being transferred from the screw into the plate, including the bridge portion.

---

[3] Where a small portion of the threads on a lag screw engage the tibia, compression through lag-effect can be achieved between the tibia and the talus.  While this is not ideal, compression still occurs. A surgeon can also simply over-drill a portion of the tibia for the threads to freely rotate and not engage the first bone.

- 30 -

STRYKER Exhibit 1027
Page 34 of 48
IPR2021-01450

48.     Citing to the stress test simulation described in Slater, Mr. Sommers opines that "[i]f anything, *Slater* suggests that tensile load would actually be felt **above the screw hole**, not below. During a stress test simulation, the data showed that 'the highest stresses occur on the inner surface of the plate approximately w[h]ere a change in section thickness occurs **just above the angled screw formation.**" (Ex. 2002 at ¶¶118-119) (original emphasis).     However, by acknowledging that Slater's finite element analysis discloses that the highest stresses occur above the transfixation screw hole of the Slater plate, Mr. Sommers concedes that tensile load is absorbed and transferred to the plate.

49.     In my opinion, the results of Slater's finite element analysis confirm that upon fixation of the transfixation screw and loading of the foot, tensile load is absorbed and transferred into the bridge portion of Slater. (Ex. 1005 at 17:14-20:11). During the Slater simulation, loads were applied to the plate used with a lag screw and the resulting concentration of stress was analyzed at different locations on the plate. (Ex. 1005 at 19:1-20:2).  A POSITA would have understood that tensile load cannot be transferred to the region above the transfixation screw hole without transferring at least some tensile load to the bridge portion.  This is a basic artifact of the point loading of a beam (the plate).  While the "high[est] stress concentration region" may be located just above the angled screw formation, a POSITA would

- 31 -

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01450

have understood that at least some tensile load is distributed to "at least a portion of

the bridge portion," which is located immediately adjacent to the angled screw

formation.  The claims and the specification of the '608 patent do not discuss any

specific *amount* of tensile load absorbed and transferred.  The claims only require

that "tensile load" is transferred "through the screw into said head and said bridge

portion" (claim 1) and "through said screw into said bridge" (claim 11).  In my

opinion, the finite element analysis demonstrates Slater's disclosure for both of these

limitations.

50.     Finally, as I explained in my First Declaration, external forces that

occur during the gait cycle place loads on the second bone and the vise configuration

of Slater.  (Ex. 1002 at ¶ 127).  For example, as the tibia and talus are drawn apart

under tension, such as during dorsiflexion, the tensile forces generated on the

posterior side of the joint are absorbed in the transfixation screw and transferred to

the bridge portion of the plate on the anterior side of the joint.  As such, any external

load applied to the second bone will be absorbed by the transfixation screw and

transferred through the screw into the screw head and into the bone plate of Slater.

**F.     Slater Discloses a Central Axis of the Inner Surface of the Transfixation Screw Hole**

51.     As I explained in my First Declaration, Slater discloses the limitations

of claims 2 and 12, both of which recite "a central axis of the inner surface of the

- 32 -

STRYKER Exhibit 1027
Page 36 of 48
IPR2021-01450

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01450

U.S. Patent No. 8,529,608

**DECLARATION OF DR. GEORGE B. HOLMES, JR., M.D., FAAOS**

**IN SUPPORT OF PETITIONERS' REPLY**

STRYKER Exhibit 1028
Page 1 of 25
IPR2021-01450

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

## I.    INTRODUCTION

1.    I have been retained in this matter by McAndrews, Held & Malloy, Ltd. on behalf of Petitioners Stryker Corporation ("Stryker") and Wright Medical Technology, Inc. ("Wright Medical") to provide assistance in the *inter partes* review ("IPR") of certain claims of U.S. Patent No. 8,529,608 ("the 608 patent"). The 608 patent is generally directed to a system for securing bones together across a joint.

2.    I understand that Petitioners Stryker and Wright Medical petitioned for *inter partes* review of the 608 patent and have requested that the Patent Trial and Appeal Board ("Board") cancel Claims 1-6, 8-14, and 17 of the 608 patent. I further understand that the 608 patent is purportedly owned by OsteoMed LLC ("OsteoMed").

3.    I understand that OsteoMed recently submitted a Patent Owner's Response supported by the Declaration of Mark Sommers. This declaration is a statement of my opinions on certain issues raised in Mr. Sommers' Deposition and in his Declaration in support of Patent Owner's Response.

## II.    BACKGROUND AND QUALIFICATIONS

4.    In forming my opinions, I relied upon my education, knowledge, and experience and considered the level of ordinary skill in the art as discussed below. A copy of my current *curriculum vitae* is attached to this Declaration, and it provides

- 1 -

a comprehensive description of my academic and employment history along with presentations that I have made, publications and books that I have authored, and books that I have reviewed.

5.      I received a Bachelor of Science degree in Biology from Yale College in 1976, and my Doctorate Degree in Medicine from Yale University School of Medicine in 1980.  During my post-graduate training, I completed an internship and one-year residency in General Surgery at Columbia-Presbyterian Hospital in New York, N.Y. in 1981 and 1982, respectively.   I completed my residency in Orthopaedic Surgery in the Harvard Combined Orthopaedic Program in Boston, MA in 1985.   I served as Chief Resident, Assistant in Orthopaedic Surgery at Massachusetts General Hospital in Boston, MA until 1985.   I completed a Fellowship in Sports Medicine with Lyle Micheli, M.D. at Boston Children's Hospital Medical Center in Boston, MA in June, 1986.  I completed a Fellowship in Foot & Ankle Surgery with Roger A. Mann, M.D.(affiliated with UCSF) at Merritt Hospital in Oakland, CA in December, 1986.

6.      During medical school, I served as a junior fellow at the National Institutes of Health in Bethesda, MA.  Also at the National Institutes of Health, I was a Co-Step Officer in the Public Health Service sector from 1976-1978.    After my Fellowship in Foot & Ankle Surgery, and from 1987-1989,  I served as Chief of

- 2 -

STRYKER Exhibit 1028
Page 4 of 25
IPR2021-01450

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

Orthopaedic Foot & Ankle Surgery and Assistant Professor in the Department of

Orthopaedic Surgery at the University of California at Davis Medical School. In

1990, I served as Chief of Orthopaedic Surgery at Jefferson Park Hospital in

Philadelphia, PA. During that time, I also served as Assistant Professor in the

Department of Orthopaedic Surgery at the Thomas Jefferson University School of

Medicine in Philadelphia, PA. From 1992-2013, I was an Assistant Professor in the

Department of Orthopaedic Surgery at Rush University Medical Center in Chicago,

IL. In 2013, I was elevated to Associate Professor and have held that position until

July 1, 2022. From 2016-2021, I served as the Director of the Foot & Ankle

Fellowship Program at Rush University Medical Center. During my time at Rush

University Medical Center, from 1992-2021, I served as Section Director of Foot &

Ankle Surgery in the Department of Orthopaedic Surgery.

     7.      From 1985-1986, I was affiliated with three hospitals in Boston, MA

including Massachusetts General Hospital, the Spaulding Rehabilitation Hospital,

and the New England Baptist Hospital. From 1986-1989, I was affiliated with seven

hospital systems in California including the Merritt/Perralta Hospital, Providence

Hospital, Children's Hospital, Humana Hospital, University of California at Davis

Medical Center, Mercy Hospital of Sacramento, and the Mather Air Force Base

Hospital. From 1989-1992, I was affiliated with the Thomas Jefferson University

- 3 -

STRYKER Exhibit 1028
Page 5 of 25
IPR2021-01450

Hospital and Jefferson Park Hospital in Philadelphia, PA. From 1992-2021, I have

been affiliated with five hospital systems in Illinois including the Central DuPage

Hospital, the Alexian Brothers hospital system, Elmhurst Outpatient Surgery Center,

Rush-Oak Park Hospital, and Rush University Medical Center.

8.      Over my professional career, I have received a number of awards and

honors. In 2011 and 2021, I was listed as one of the Best Doctors in Chicago by

Chicago Magazine. In 2013, I was voted as one of the Top Doctors in America by

U.S. News & World Report and by Castle Connolly, a healthcare research

information company. I have also received numerous research grant awards for my

work on the assessment of normal intermetatarsal pressures, the treatment of achilles

tendinopathy, and the changes in pedal pressures and posture in women wearing high

heel shoes.

9.      As set forth in my *curriculum vitae*, I have authored a number of

abstracts, articles, books, and book chapters on the subject of foot & ankle surgery.

Examples of abstracts, articles, peer-reviewed articles, books, and/or book chapters

that I have authored or co-authored include: Holmes, G.B. et al., *Epidemiological*

*Factors Associated with Rupture of the Achilles Tendon*, Orthopaedic Transactions,

(1991); Holmes, G.B., *Posterior Tibial Tendon Rupture May Occur Less in RA but*

*Deform More*, Q & A. J. Musculoskeletal Med. 7(9): 8, (1990); Snow, B. et al., *The*

- 4 -

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

*Effects of Wearing High-Heel Shoes on Pedal Pressures*. Orthopaedic Transactions, (1990), Holmes, G.B., *The Anatomy and Pathophysiology of Rupture of the Posterior Tibial Tendon*, Orthopaedic Transactions, (1990); Holmes, G.B., & Mann, R.A., *Etiological Factors Associated with Rupture of the Posterior Tibial Tendon*, Orthopaedic Transactions, 12(3): 767, (1988); Holmes, G.B. & Timmerman, L., *A Quantitative Assessment of the Affect of Metatarsal Pads on Plantar Pressures*, Foot & Ankle, 11(3): 141-145, (1990); Mann et al., *Chronic Rupture of the Achilles Tendon: A New Technique of Repair*, J. Bone & Joint Surg., 73(A): 214-219, (1991); Holmes, G.B. & Mann, R.A., *Possible Epidemiological Factors with Rupture of the Posterior Tibial Tendon,* Foot & Ankle, 13(2): 70-79, (1992); Snow, B. et al., *The Effects of Wearing High-heeled Shoes on Pedal Pressure in Women*, Foot & Ankle, 13(2): 85-92, (1992); Swanson, T.V. et al., *Talar Neck Fractures: A Mechanical Study of Fixation*, J. Bone & Joint Surg., 74(A): 544-551, (1992); Holmes, G.B., *Arthrodesis of the First Metatarsophalangeal Joint Using Interfragmentary Screw and Plate, Technique Tip,* Foot & Ankle, 13(6): 333-335, (1992); Holmes, G.B., *Quantitative Determination of Intermetatarsal Pressure*, Foot & Ankle, 13(9):532-535, (1992); Holmes, G.B. & Hill, N., *Fractures and Dislocations of the Foot and Ankle in Diabetics Associated with Charcot Joint Changes*, Foot & Ankle, 15(3): 182-185, (1994); Holmes, G.B., *The Treatment of Delayed Unions and Nonunions*

- 5 -

STRYKER Exhibit 1028
Page 7 of 25
IPR2021-01450

*of the Proximal Fifth Metatarsal with Pulsed Electromagnetic Fields*, Foot & Ankle, 15(10): 552-556, (1994); Holmes, G.B., *Treatment of Displaced Calcaneal Fractures Using a Small Sinus Tarsi Approach*, Tech. Foot Ankle Surg., 4:35-39, (2005); Holmes, G.B., *Clinical Tip: Eccentric In-Situ Inlay Bone Graft for Delayed Unions and Nonunions of the Base of the Fifth Metatarsal*, Foot Ankle Int., 27(7): 556-558, (2006); Holmes, G.B. & Hsu, A., *Correction of Intermetatarsal Angle in Hallux Valgus Using Small Suture Button Device*, Foot Ankle Int., 34(4): 543-549, (2013); Gross, C. et al., *Revision MTP Joint Arthrodesis for Failed 1st MTP Joint Arthroplasty*, Foot & Ankle Specialist, 6(6):471-478, (2013); Gross, C. et al., *Treatments for Avascular Necrosis of the Talus: A Systematic Review*, Foot & Ankle Specialist, 7:387-397, (2014); Gross, C. et al., *Treatment of Osteonecrosis of the Talus,* JBJS Reviews, 4(7):e2, (2016), Bohl, D.D. et al., *Timing of Early Complications Following Open Reduction and Internal Fixation of Closed Ankle Fractures*, Foot & Ankle Specialist, (2020); Mehraban, N. et al., *Skin Preparation Techniques for Orthopaedic Foot and Ankle Surgery: A Current Concepts Review*, Foot Ankle Int., in press, (2020); Holmes, G.B., *Basic Science of the Foot and Ankle*, Current Opinion in Orthopaedics, 4(3), (1993); Holmes, G.B., *Gait Analysis in Hallux Valgus*, Foot and Ankle Clinics, 2(4): 627-637, (1997); Holmes, G.B., *Hallux Rigidus in Operative Surgery of the Foot*, John S. Gould (Ed.), Philadelphia, W.B.

- 6 -

Appx3055

Saunders, (1993); Holmes, G.B., *Compression Syndromes of the Foot and Ankle in Operative Surgery of the Foot*, John S. Gould (Ed.), Philadelphia, W.B. Saunders, (1993); Holmes, G.B. & Woods, L.C., *Joint Systems: Foot and Ankle in Disability Education*, S.L. Demeter et al (Eds.), St. Louis, Mosby (2003); Holmes, G.B., *Surgical Approaches of the Foot and Ankle*, New York, McGraw-Hill, (1994); and Holmes, G.B. & Lee, S., *Curbside Consultation of the Foot and Ankle*, Slack Incorporated, (2012).

10.    As set forth in my *curriculum vitae*, I have presented on a variety of topics regarding foot & ankle surgery.  Examples of my presentation topics include: *The Biomechanics of Walking & Running* (1986); *Posterior Tibial Tendon Rupture* (1987); *Management of the Diabetic Foot* (1987); *Principles of Management of Fractures of the Talus* (1987); *Lisfranc's Fracture-Dislocation* (1987); *Difficult Foot Fractures* (1987); *Management of Calcaneal Fractures* (1988); *The Foot and Ankle* (1988); *Common Foot Problems* (1988); *Neurologic Problems of the Foot* (1988); *Fractures and Dislocations of the Foot* (1988); *Histological Comparison of the Posterior Tibial Tendon and the Flexor Tendons* (1988); *Etiological Factors Associated with Rupture of the Posterior Tibial Tendon* (1988); *Evaluation and Management of Stress Fractures of the Foot* (1988); *Conditioning and Rehabilitation of Foot Injuries* (1988); *Stress Fractures of the Foot and Ankle*

STRYKER Exhibit 1028
Page 9 of 25
IPR2021-01450

(1989); *The Diabetic Foot* (1989); *Management of Plantar Fasciitis and Heel and Spur Syndrome* (1989); *Ankle Arthroscopy: Principles and Techniques* (1990); *Assessment of the Normal Distribution of Forefoot Plantar Pressures* (1990); *Hallux Rigidus: Conservative Management and First MTP Debridement Arthroplasty* (1990); *First Metatarsophalangeal Joint Arthrodesis using Interfragmentary Screw and Small Fragment Plate Fixation* (1991); *Foot and Ankle Injuries in the Athlete* (1991); *Pathophysiology and Non-Surgical Management of Rearfoot, Midfoot and Forefoot Disorders* (1993); *Achilles Tendon Ruptures* (1993); *Practical Strategies for Foot and Ankle Problems* (1994); *Contused, Bruised or Broken. Diagnosis and Treatment of Lisfranc Fracture Dislocation* (1996); *Tendon Injuries* (1996); *Tarsal Navicular Fractures* (1997); *Management of Calcaneal Fractures* (1998); *Double & Triple Arthrodesis for the Treatment of Cavo Varus Foot* (1998); *Trauma and Reconstruction of the Foot and Ankle* (1998); *Biomechanics of the Foot and Ankle* (2002); *Posterior and Lateral Process Fractures of the Talus* (2003); *Minimally Invasive Surgery for the Treatment of Calcaneus Fractures* (2006); *Surgical Treatment of Hallux Valgus* (2011); *Syndesmosis Injuries* (2011); *Arthropathy of Midfoot and Forefoot* (2013); and *Foot and Ankle Injuries in the Workplace* (2016).

11.    I have also engaged in a number of professional activities.  For example, from 1986-1996, I served as a Medical Staff Physician for the Boston

- 8 -

STRYKER Exhibit 1028
Page 10 of 25
IPR2021-01450

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

Marathon.  From 1987-1989, I was an Orthopaedic Foot & Ankle Consultant for the

Sacramento Kings, a professional basketball team in the NBA.  I have also provided

medical coverage to the Joffrey Ballet, Alvin Ailey Dance Theater, and Philadanco

Dance Company.  From 2004 until 2012, I was the Assistant Team Physician for the

Chicago Bulls, another professional basketball team in the NBA.  Additionally, since

1989, I have served as an Associate Editor for Foot & Ankle International, a peer-

reviewed journal that published articles related to foot & ankle surgery.  Since 2004,

I have served as a Consultant Reviewer for the Journal of the American Academy of

Orthopaedic Surgeons.

12.     In 1981, I was certified as a Diplomat for the National Board of Medical

Examiners.  In 1989, I was certified as a Diplomat for the American Board of

Orthopaedic Surgeons.  And in 1991, I was certified as a Fellow of the American

Academy of Orthopaedic Surgeons.

13.     I was licensed to practice medicine in the State of California from 1986

to approximately 1996.  I obtained a license to practice medicine in the State of

Illinois in 1992 and have held an active license to this day.

14.     I recently retired from my practice as a foot & ankle surgeon, and as of

July 1, 2022, I am now Professor Emeritus in the Department of Orthopaedic

Surgery at Rush University Medical Center in Chicago.

STRYKER Exhibit 1028
Page 11 of 25
IPR2021-01450

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

15.     During my 35+ year career as a foot & ankle surgeon, I performed thousands of surgeries on ankles and feet.  Approximately 40% of those surgeries have been ankle surgeries and approximately 60% of those surgeries have been surgeries distal to the ankle.  I am very familiar with how surgeons select and implant bone plates and bone screws for arthrodesis and osteosynthesis.

16.     I am being compensated for my time in connection with this matter at my standard consulting rate, which is $750 per hour, plus actual expenses.  My compensation is not dependent in any way upon the outcome of this matter.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

17.     I understand that a person of ordinary skill in the art ("POSITA") relating to the subject matter of the 608 patent has been defined as an individual having a bachelor's degree in engineering with at least two years of experience in the field, such as experience with the design of orthopedic implants, or a clinical practitioner with a medical degree and at least two years of experience as an orthopedic surgeon, such as experience with bone fusion procedures.  Additionally, someone with less or different technical education but more practical experience, or more relevant education but less practical experience, could also be considered a POSITA.

18.     I believe that I am qualified to provide opinions about how a POSITA

- 10 -

in April 2009, the priority date of the 608 patent, would have interpreted and understood the prior art relied upon by the Petitioners.  I have focused my analysis on the blade plate disclosed in U.S. Patent Pub. No. 2005/0171544 A1 to Falkner ("Falkner"), referred to as Exhibit 1006, and how it would have been understood by a foot & ankle surgeon in April 2009.  I do not offer any opinions regarding the validity of the 608 patent.

## IV.    FALKNER

19.    I have reviewed Falkner, as well as Mr. Sommers' opinions regarding the Falkner plate.  While I am not familiar with a commercial version of the blade plate disclosed in Falkner, I am familiar with the use of blade plates in ankle surgeries and have implanted blade plates in patients since 1985.  My opinions below are based on how a foot & ankle surgeon would have understood the blade plate of Falkner as of April 28, 2009.

20.    In his Declaration, Mr. Sommers states that "[t]he blade plate disclosed in *Falkner* is designed to cross a bone fracture, not a joint, as can be seen from Figure 1, which shows the *Falkner* blade-plate on the tibia bone with the talus bone unencumbered by either the plate or any screw."  (Ex. 2002 at ¶134).  I agree with Mr. Sommers that Figure 1 shows the Falkner blade plate used to fix a transverse fracture in a tibia.  However, in my opinion, a POSITA would understand that Figure

STRYKER Exhibit 1028
Page 13 of 25
IPR2021-01450

1 is purely exemplary, as a blade plate such as the one disclosed in Falkner is capable of being used with other types of tibia fractures (*e.g.*, oblique, spiral, comminuted, butterfly, and intra-articular).  Additionally, that same blade plate can also be used for fusion of joints such as the tibiotalar joint.  In fact, Falkner specifically discloses that "plate 22 may span a joint, such as joint 30 between tibia 26 and talus 32." (Ex. 1006 at ¶21; *see also id.* at¶¶28, 29, 33, 34).

21.    I have analyzed the position of the blade plate relative to the tibia fracture in Figure 1 of Falkner.  In Figure 1, the distal screw located below the fracture line does not appear to be providing any additional fixation as only one or two threads of the distal screw actually cross the fracture line.  However, because of the proximity of the transverse fracture line to the joint, it is likely that the blade plate was positioned in the location pictured in Figure 1 to avoid anchoring the internal blade portion of the plate into the subchondral bone or into the joint. Positioning of the blade too close to the joint line could risk the development of avascular necrosis or migration of the implant into the joint itself.

22.    Depending on numerous factors, the Falkner blade plate can be shifted proximally or distally such that the bone discontinuity falls in the zone between the angled hole and the internal blade.  For example, it can be positioned around the longitudinal axis of the tibia and the talus, or even placed on the posterior aspect of

STRYKER Exhibit 1028
Page 14 of 25
IPR2021-01450

the tibiotalar joint.  In determining where to place a bone plate, a surgeon will consider factors such as the size, type, and location of the fracture, bone quality, age of the patient, whether the patient is a smoker or diabetic (this affects the condition of the soft tissue), and the condition of the skin, including the existence of open wounds or blisters.

23.    For example, looking at Figure 1 of Falkner, if the transverse fracture was located higher in the tibia (as shown below in Figure 1(a) on the right[1]), or if the fracture pattern was comminuted, it would be preferable to position the Falkner bone plate so that the bone discontinuity is below the angled screw hole 44 and above the distal screw.  This positioning is ideal because this position would optimize the purchase & efficacy of the inter-fragmentary screw as well as the distal purchase of the blade & the distal most two screws.

---

[1] Using Figure 1 of Falkner, I created Figure 1(a) (shown at right) to demonstrate how the Falkner bone plate may be positioned relative to a change in the position of the fracture line.

- 13 -

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450





24.     The toothed aperture in the internal blade of the Falkner plate provides

less flexibility for a surgeon to choose an ideal angle for fixing a fracture.  In general,

foot & ankle surgeons have fewer options for fracture fixation as compared with

joint fusion because fractures have more patterns to which the Falkner plate would

have to be adjusted to achieve an optimal fit as opposed to the singular transverse

plane of a fusion.  That being said, commercially available bone plates for use in the

foot & ankle can be cut to an appropriate size using plate cutters to better fit the

needs of a particular patient.  Such bone plates can also be bent using plate benders

- 14 -

STRYKER Exhibit 1028
Page 16 of 25
IPR2021-01450

to better fit on or conform to the bones of a particular patient. It is particularly common to use plate benders to contour the bone plate to the shape of the bone to minimize irritation to soft tissue and to ensure that the bone plate has the lowest profile possible to minimize discomfort to the patient.

25.     Mr. Sommers opines that "[w]hile *Falkner* explains that the blade-plate may cross a joint between bones, nothing in *Falkner* discloses how such a plate would be designed. In order to work across a joint, the *Falkner* plate itself would very likely require extensive modifications requiring significant experimentation and testing, such as, but not limited to angle of blade portion to external portion, size of blade portion, length of plate portion, thickness of blade portion, tip geometry of blade portion, interlocking angle of screw, position of plate in respect to subchondral bone, distance of blade portion in respect to subchondral bone, amount and size of fixation screws in each segment, anatomic structures, kinematic considerations (e.g. expected loading configurations), etc.   *Falkner* lacks any detail on these modifications and how the modifications would impact the blade-plate's interlocking screw mechanism. These absent details are key to understanding how to design a *Falkner* blade-plate for use across a joint." (Ex. 2002 at ¶135). According to Mr. Sommers, "[i]f a surgeon would need to use a plate across a joint, they could not just simply use that plate as is and span it across the joint." (Ex. 1030

STRYKER Exhibit 1028
Page 17 of 25
IPR2021-01450

at 109:6-8).  The premise of Mr. Sommers's opinion appears to be his belief that, in order to be used across a joint, a surgeon would be required to shift the Falkner plate from its position relative to the transverse fracture as shown in Figure 1 to the exact same position relative to the unresected joint shown in Figure 1.  (Ex. 1031 at 110:15-112:9, 115:10-12; Ex. 2002 at ¶140 ("Having the joint in the same location as the fracture shown in Figure 1 of Falkner would be important for the functionality of the *Falkner* concept.")[2]).  Mr. Sommers is incorrect.

26.    Mr. Sommers does not appear to be familiar with how surgeons prepare bones for joint fusion, or how surgeons determine the positioning of bone plates for joint fusion.  I disagree with Mr. Sommers' opinion that the *Falkner* plate would require extensive modifications in order to work across a joint.  Not only do I believe that a foot & ankle surgeon would understand how to use the Falkner plate across a joint, but in my opinion, a foot & ankle surgeon would have ***more*** flexibility to use the Falkner blade plate for joint fusion as compared with fracture fixation.

27.    As an initial matter, a blade plate such as Falkner's can be positioned in many different ways relative to a bone discontinuity.  Mr. Sommers recognized that determining whether a plate could work in other configurations or for fractures

---

[2] Notably, Mr. Sommers later acknowledged that "the surgeons will place [the blade plate] at the best location to his or her discretion."  (Ex. 1030 at 120:7-13).

STRYKER Exhibit 1028
Page 18 of 25
IPR2021-01450

other than the transverse fracture shown in Figure 1 is "a call by the surgeon."  (Ex. 1030 at 118:13-21; 119:20-120:1; 120:7-13).  I agree.  A blade plate that is required to be placed in one particular orientation relative to one type of bone discontinuity would have little or no use to a foot & ankle surgeon, as no fracture or joint looks the same, particularly across patients of different sizes, shapes, ages, and bone quality.

28.    Moreover, using a bone plate to fuse a joint is not subject to the same anatomical constraints as using a bone plate to fix a fracture.  With fracture fixation, the surgical approach is often dictated by the location and type of fracture.  For example, fractures such as open fractures may have penetrated the skin thereby requiring further attention to soft tissue damage, infection, and wound care.  Additionally, a certain fracture pattern may require reduction and fixation in a specific manner and in a specific location.

29.    Joint fusion is generally performed on patients with osteoarthritis, where cartilage wears away, bones rub against each other and may erode, and bone spurs may form.  Fusing the ankle (tibiotalar) bones together reduces pain by eliminating further degradation of the joint space while promoting pain-free ambulation.

30.    To prepare a joint for fusion, a surgeon must remove any remaining

- 17 -

cartilage between the two bones to be fused. This step is also described in Falkner at ¶62. I note that for a patient needing joint fusion, it is likely that at least some of the cartilage will have already worn away and the surfaces of the articulating bones may have eroded. There can also be the formation of peri-articular/juxta-articular osteophytes (i.e., bone spurs). Indeed, as osteoarthritis progresses, juxta-articular bone over-growth is stimulated at the joint as a result of the ineffective dissipation of abnormally high biomechanical forces transferred to the joint.

31.    A surgeon must also perform an osteotomy of the bones of the joint and remove any bone spurs to ensure that the bones will mate together properly to ensure adequate fusion. (Ex. 1006 at ¶62). Indeed, surgeons have great flexibility to determine how best to shape the bones to promote joint fusion. For a tibiotalar joint fusion, I and other surgeons typically shave straight (transversely) across the distal surface of the tibia to create a flat surface to oppose with the flat surface of the dorsal surface of the talus. Creating flat opposing surfaces for the tibia and talus helps to create a biomechanically stable joint for fusion as well as enhances the biology for healing the fusion. Gaps between the bones at the opposing surfaces could cause instability and hinder the incorporation of bone to bone healing. Surgeons have the option of using bone grafts where necessary to ensure a proper fit between the bones of a joint, allowing great flexibility as to where and how much bone material should

- 18 -

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450

be removed.  In many tibiotalar joint fusions, the resultant fusion will lead to some

degree of shortening in comparison to the length of the original tibia-talus structure.

A loss of some of the height of the joint space can be addressed intra-operatively by

using a spacer bone graft, or non-surgically by providing a heel lift for the patient to

use in their shoe.

32.    To prepare the bones depicted in Figure 1 of Falkner, a surgeon will

resect the distal lip of the tibia, any local osteophytes (bone spurs) and resurface the

talus such that it is flattened.[3]

33.    As with fracture fixation, proper care is taken to avoid damage to any

surrounding neurovascular bundles, ligaments, muscles, and/or tendons.  At this

point, the bones may be positioned for alignment. The surgeon positions the long

axis of the tibia to be at 90 degrees to the foot. The tibia is slightly externally rotated

in reference to the foot. Finally, there may be the necessity to slightly translate the

talus forward in relationship to the tibia. This essentially places the talus in a more

anterior position relative to the tibia. With the Falkner plate, a surgeon would re-

align the talus so that the center of gravity in the midline of the tibia falls through

---

[3] I note that the talus in Figure 1 is merely exemplary in shape. Depending on the
patient and the extent of his or her arthritis, the dorsal, articulating surface of the
talus is typically more flat than what is shown in Figure 1 of Falkner.

- 19 -

the center of the body of the talus. This creates the optimal biomechanical alignment

for proper gait following the fusion.

34.    The plate may also be adjusted to fit the target bones.  For example, for

both joint fusion and fracture fixation, it is common for surgeons to use plate benders

when necessary to ensure that the bone plate conforms to the surfaces of the bones.

Falkner acknowledges that its plate can be bent using plate benders to ensure that

the external portions of the bone plate are contoured to fit the anatomy of the

patient's bones.  (Ex. 1006 at ¶62) ("adjust the shape of the plate, if desired, to adjust

the fit of the bone plate in relation to the target bone(s)").  Bone plates may even be

cut to an appropriate length, as required by the particular anatomy of a given patient.

35.    A surgeon would not assume that the Falkner plate could only be

positioned relative to a bone discontinuity as is shown in Figure 1 relative to a

specific transverse fracture. (*See*, *e.g.*, Ex. 1030 at 119:20-120:1).  As discussed

above, the Falkner plate can be positioned proximally or distally, medially or

laterally, or anteriorly or posteriorly, although a surgeon would understand that the

plate would be positioned so that the joint is between the angled hole and the internal

blade to optimize efficacy and purchase of the angled screw. The precise position

would be selected based on a variety of factors, including the age of the patient, the

bone quality, the location of soft tissue, and the condition of the patient's skin in the

STRYKER Exhibit 1028
Page 22 of 25
IPR2021-01450

target area (avoiding open wounds or blisters), among other factors.

36.     As discussed above, a POSITA would understand that the plate shown in Figure 1 of Falkner could be used for fusing a tibiotalar joint without modifying the plate itself.  For example, if I were to use the Falkner blade plate for fusing the tibiotalar joint, I would first prepare the joint for fusion by removing any remaining cartilage and resecting and resurfacing the tibia and talus as explained above.  I would then use plate benders to bend the proximal portion of the plate to minimize gaps between the inner surface of the plate and the outer surface of the tibia. Thereafter, I would position the Falkner plate across the joint.  An example of one way that I could position the Falkner plate across a tibiotalar joint is shown below in Figure 1(b)[4]:

---

[4] As shown in Figure 1(b) above, the Falkner blade plate can be used for fusion of a tibiotalar joint.  Figure 1(b) was created from Figure 1 of Falkner to illustrate how I might use the Falkner blade plate for fusion of a tibiotalar joint as taught by Falkner.

- 21 -

*Reply Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS*
IPR2021-01450



- 22 -

STRYKER Exhibit 1028
Page 24 of 25
IPR2021-01450

In the Matter Of:

STRYKER vs OSTEOMED

MARK SOMMERS

August 24, 2022



800.211.DEPO (3376)
EsquireSolutions.com

STRYKER Exhibit 1030
Page 1 of 157
IPR2021-01450

1   the more stiffer side of the bone.  And if you apply a

2   plate, for example, it may shift towards the plate

3   because at that point, before it's healed, it's the

4   stiffer side of the bone.

5       Q   Okay.  So how does the location of the plate

6   affect the neutral bending axis?

7       A   It depends on the state of the healing

8   process.  A fully healed bone, they usually have a

9   neutral bending axis that is fairly symmetrically

10   applied inside the bone.  A discontinuity that hasn't

11   healed at all, there's probably the bending axis

12   shifted quite a bit towards the plate or even into the

13   plate.

14       Q   So would you agree that the position of the

15   neutral bending axis can change?

16           MR. ALLOR:  Object to the form.

17           THE WITNESS:  It can shift.

18   BY MR. SPARROW:

19       Q   Okay.  So can a bone plate be located at

20   more than one position relative to a joint?

21       A   Yes.  There's possibilities to -- to put a

22   plate on any side of the bone where it's feasible for

23   the surgeon.

24       Q   Okay.  How about moving a bone plate

25   proximally or distally if you're spanning -- a bone


ESQUIRE
DEPOSITION SOLUTIONS

STRYKER Exhibit 1030
Page 61 of 157
IPR2021-01450

Appx3172

```
1    plate is spanning a joint?

2         A    That's -- that can happen, too.

3         Q    Okay.  And so you talk about the neutral

4    bending axis may shift partially or completely towards

5    or into the plate.  That's not discussed in the '608

6    patent, correct?

7         A    I believe not.

8         Q    Okay.  So there's another image in paragraph

9    40 of your declaration.

10        A    Yes.

11        Q    So this image is not in the '608 patent

12   either, correct?

13        A    That's correct.

14        Q    And the image is not in the '776, the '716

15   or the '085 patent?

16        A    Correct.

17        Q    Okay.  So did you create this image?

18        A    No.  I also found that image at the website

19   of the AO, which is an orthopedic organization.

20        Q    Okay.  And so you're not the author of this

21   image, correct?

22        A    No, I'm not.

23        Q    And you did not provide a citation to

24   provide any attribution to the authors, correct?

25        A    That was just to show the concept
```

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 62 of 157
IPR2021-01450

Appx3173

1        A    Sure.

2        Q    So in plantar flexion the dorsal side of the

3   joint experiences tension, right?

4        A    Yes.

5        Q    Okay.  And so during plantar flexion of the

6   MTP joint, the plantar side of the joint would

7   experience compression?

8        A    Yes.

9        Q    Okay.  And so during plantar flexion of the

10  MTP joint, the plantar side of the joint does not

11  experience tension?

12       A    Yes, that's correct.

13       Q    Okay.

14       A    But that's not what my statement said here,

15  right?

16       Q    I understand.  I was just asking you those

17  questions.

18       A    Got you.  Okay.

19       Q    So also at paragraph 44 you stated that,

20  "The '608 patent describes absorbing these tensile

21  forces through the screw 150 and into the bridge of

22  the bone plate"; is that correct?

23       A    Yes.

24       Q    Okay.  So there's no citation there,

25  correct?

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 65 of 157
IPR2021-01450

Appx3176

1        A    No, I didn't provide a citation there, yeah.

2        Q    So where in the specification of the '608

3   patent does it say that tensile forces are absorbed

4   into the bridge portion?

5        A    So you're referring to where in the '608

6   patent it's --

7        Q    I'm asking you.

8        A    Yeah.

9             So in claim one, the last paragraph, it

10  says, "The transfixation screw comprises a head

11  configured to abut the inner surface of the

12  transfixation screw hole and a shaft configured to

13  contiguously extend through the first discrete bone,

14  through the joint, and into the second discrete bone,

15  so as to absorb tensile load."

16       Q    Okay.  And so you're in the -- what column

17  are you in, reading from?

18       A    12.

19       Q    Okay.  And those are the claims, correct?

20       A    Yeah.

21       Q    So where in the specification does it

22  describe that tensile forces are absorbed into the

23  bridge forces of the bone plate?

24       A    Well, I analyzed the claims.  And that's the

25  wording of the claim.



STRYKER Exhibit 1030
Page 66 of 157
IPR2021-01450

1      Q     So you didn't look at the specification of

2   the '608 patent?

3      A     I did.

4      Q     Okay.  So where --

5      A     But in this regard I analyzed the claims.

6      Q     Okay.  I'm asking you where in the

7   specification of the '608 patent does it describe

8   absorbing tensile forces into the bridge.  Not in the

9   claims, the specification.

10      A     I don't recall exactly where it is right

11   now.

12      Q     Okay.  So you're not sure if there's any

13   text in the specification of the '608 patent that

14   describes this?

15      A     I think it's somewhat described in the text,

16   but I am not sure exactly where right now.

17      Q     You can look, if you would like.

18      A     Okay.

19            (Pause in proceedings, 10:46 a.m. --

20   10:47 a.m.)

21            THE WITNESS:  For one, in paragraph five

22   they described a tension band construct.

23   BY MR. SPARROW:

24      Q     All right.  Where are you?

25      A     That's line 53.

800.211.DEPO (3376)
EsquireSolutions.com



1      Q    53.

2      A    "When transfixation screw is screwed into

3   joint along a trajectory that crosses neutral bending

4   axis, a tension band construct is created that puts

5   transfixation screw under tension when joint flexes."

6      Q    Oh, I was asking about tensile forces

7   absorbed into the bridge of the bone plate.

8      A    The location of the screw, it says it's

9   going through the bridge.  With a tension band

10  construct, it necessarily means that also the forces

11  get transferred into said bridge.

12     Q    So let's turn to figure two of the '608.

13     A    Sure.

14     Q    So -- are you there?  Oh, okay.

15          So does figure two of the '608 patent show

16  how tensile forces are absorbed into the bridge of the

17  bone plate?

18     A    There's no description on how it's done, but

19  it -- it's just that you cannot show it in the drawing

20  like that.  It needs to be described.

21     Q    Okay.

22     A    And that's what they did in the claim one.

23     Q    Okay.  So how is -- how are tensile forces

24  absorbed in a screw?

25     A    So the tensile forces that are created, they

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 68 of 157
IPR2021-01450

1  come from the fact that the distal portion of the

2  screw sits in the second bone.  And then the shaft of

3  the screw extends through the first bone, and the head

4  is sitting inside the plate.  With that, you have --

5  the tension within the screw gets directly transferred

6  into the head of the screw and, therefore, into the

7  plate where it's anchored in.

8       Q    Okay.  So what is causing that internal

9  tension in the screw?  You referenced that.

10      A    It's basically the threads engaging the

11  bone -- the second bone, as I said.

12      Q    Okay.  So at paragraph one -- or excuse

13  me -- 45 --

14      A    45.  Okay.

15      Q    -- you discuss lag effect.

16      A    Yes.

17      Q    What is your understanding of lag effect?

18      A    Lag effect is when you have at least two

19  bones that are screwed together, where the first bone

20  is basically not necessarily participating in the

21  screw interface, just as a form fit.  And then you

22  have a tension created by the threads in the second

23  bone and the head that is somehow sitting on the first

24  bone.

25      Q    Okay.  So you say that it's desirable, the

800.211.DEPO (3376)
EsquireSolutions.com



1  "desired lag effect."  Why is it desirable?

2      A    Because you -- with that concept, with the

3  lag concept, you create compression.

4      Q    Okay.  So lag effect creates compression

5  then between two bones?

6      A    Yeah, you can say that.

7      Q    Okay.  When did you first become aware of

8  the concept of the lag effect?

9      A    In respect to the -- to the work here or --

10     Q    In your experience.

11     A    In my experience?

12     Q    Yes.

13     A    So lag effect is a common terminology in

14  orthopedics.  So probably 20 years ago.

15     Q    Okay.  And was the concept of lag effect

16  used in the foot and ankle space?

17     A    I think, as a common concept, that is --

18  that is used in -- in all of orthopedics.

19     Q    Okay.  And so is it used for joint fusion?

20     A    You can apply it to joint fusion.

21     Q    Okay.

22     A    Sure.

23     Q    And -- okay.  And lag effect can be achieved

24  with a partially threaded screw, right?

25     A    That's one possibility, with others.

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 70 of 157
IPR2021-01450

Appx3181

1     Q    Okay.  And then lag screws are used to

2  create lag effect?

3     A    Yes.

4     Q    Okay.  So -- and the '608 patent discloses a

5  lag screw, correct?

6     A    Yes.

7     Q    So --

8     A    I believe so.

9     Q    Oh, I'm sorry.  I cut you off.  Go ahead.

10    A    I believe so, yeah.

11    Q    So when two bones are compressed together --

12 you were talking about two bones -- and a lag screw is

13 used, the bones will still be compressed together,

14 even if some of the threads extend through both bones,

15 right?

16    A    That's not what the goal is here.  You want

17 to really have the screws only in the second bone.

18 You diminish the lag effect dramatically if you have

19 threads extending into the first bone, for example.

20    Q    But it still occurs?

21    A    Maybe not, depending on the bone quality.

22    Q    Okay.  So if -- you talked about the first

23 part of the -- this screw not participating in the

24 first bone.

25    A    Yes.

800.211.DEPO (3376)
EsquireSolutions.com



```
 1        Q    So is it -- can't the first part of the --
 2   or excuse me -- the first bone, the bore that you
 3   drill --
 4        A    Yeah.
 5        Q    -- if there's threads extending into that
 6   first bone and they're freely rotating, compression
 7   will still be achieved, correct?
 8        A    If the threads extend into the first bone,
 9   you may not achieve compression.
10        Q    If it's -- if there's more space for it to
11   be overdrilled or if it --
12        A    Overdrilling --
13        Q    Oh, sorry.
14             THE COURT REPORTER:  One at a time.
15             You may want to start your question over.
16   BY MR. SPARROW:
17        Q    Okay.  If there's space in the first bone to
18   freely rotate for the threads, is compression still
19   achieved?
20        A    Yes.  You could do that with overdrilling
21   the first bone.
22        Q    And that's with a lag screw?
23        A    That can be a regular screw.
24        Q    A regular screw and a lag screw?
25        A    You wouldn't use a lag screw in this case.
```



STRYKER Exhibit 1030
Page 72 of 157
IPR2021-01450

1      Q    Can you?

2      A    That's not what surgeons would do.  That

3  doesn't make any sense.

4      Q    Are you a surgeon?

5      A    I'm not a surgeon, but I have worked with

6  surgeons extensively.  And that defeats the purpose of

7  a lag screw, right?

8      Q    You tell me.

9      A    Yes, I tell you.

10     Q    So at paragraph 46 you say that "The screw

11  head is engaged in the thicker bridge portion of the

12  bone plate with the result of transferring the load

13  into said bridge portion and so shielding the rest of

14  the plate from excessive bending loads," correct?

15     A    Yes, I said that.

16     Q    And you provide a citation -- what is that?

17  Exhibit 1, column eight, line seven through 11.  So

18  does that citation discuss transferring the load into

19  said bridge portion?

20     A    This section describes the thicker bridge

21  portion.

22     Q    Does it discuss transferring the load into

23  said bridge portion?

24     A    Not in this case, but claim one does.  And

25  so, in combination with this -- there is a thicker

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 73 of 157
IPR2021-01450

1    bridge portion.  And transferring the load into the

2    bridge portion means it's also transferred to the

3    thicker bridge portion.

4        Q    So how do you know that, if it doesn't say

5    that right there in column eight, line seven through

6    11?

7        A    So claim one clearly says it's -- that the

8    screw head sits in the bridge portion.  This

9    description says the bridge portion is a thicker

10   portion, hence the screw head sits in the thicker

11   bridge portion.

12       Q    But it -- that cited section doesn't discuss

13   transferring the load into the bridge portion, does

14   it?

15       A    In combination with claim one, the

16   description in there, it necessarily means that the

17   load is transferred into that bridge portion.

18       Q    Do the words discuss transferring the load

19   into the bridge portion?

20       A    Not in this paragraph.  But, in combination

21   with the -- with claim one, it does.

22       Q    So is there anywhere else in the

23   specification where the result is transferring the

24   load into said bridge portion?  Where does the

25   specification discuss that?

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 74 of 157
IPR2021-01450

```
 1              (Pause in proceedings, 10:58 a.m. -
 2    11:00 a.m.)
 3    BY MR. SPARROW:
 4        Q    All right.  So Mr. Sommers?
 5        A    Yes.
 6        Q    So how do you know that -- that load is
 7    transferred into the bridge portion from the screw
 8    head?
 9        A    Because, as a lag screw functions, the
10    distal thread portion is engaging with the second bone
11    and creates a tension within the screw that at that
12    point gets transferred into the head.  That's just a
13    general concept.
14        Q    Okay.  So tension's in the screw.  How does
15    it get to the bridge portion?
16        A    Via the head of the screw.
17        Q    Say it again?  I'm sorry.
18        A    Via the head of the screw that sits inside
19    the plate.
20        Q    Okay.  So is it the fact that there -- the
21    head of the screw is in contact with the plate?
22        A    Correct.
23        Q    Okay.  So that's how load is transferred to
24    the bridge portion?
25        A    Yes.
```

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 75 of 157
IPR2021-01450

1      Q    Okay.  So let's turn to figure two of the

2    '608 patent.

3      A    Okay.

4           Okay.

5      Q    So -- just given what you said, so does

6    figure two of the '608 patent show how load is

7    transferred into the bridge portion of the bone plate?

8      A    In concept, it does.  It cannot show it

9    physically in a line drawing.  But in concept it does

10   because you know that those threads, at an oblique

11   angle, interface with the second bone.  And the head

12   interfaces and is in contact with the plate.  And,

13   therefore, there is a transfer of load.

14     Q    Okay.  So you can tell just by the structure

15   of the screw --

16     A    That's --

17     Q    -- and the plate?

18     A    That's the intent, yeah.

19     Q    Okay.  And so you can tell, just by looking

20   at a figure, that load is transferred into the bridge

21   portion of the bone plate?

22     A    By the type of the screw and the plate, yes.

23     Q    Okay.  So I have a red pen here.  On figure

24   two could you please circle the claimed bridge

25   portion.

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 76 of 157
IPR2021-01450

1       A    Okay.

2       Q    Let me just see it for you.  My eyes are

3  bad.  Okay.

4            Okay.  So your understanding is that the

5  claimed bridge portion includes -- what did you

6  circle -- the transfixation screw hole, correct?

7       A    Yes.

8       Q    Okay.  So would the -- oh, sorry.  With that

9  same pen, can you please mark where tensile load is

10  transferred.

11           MR. ALLOR:  Object to the form.

12           THE WITNESS:  Explain again what you are

13  looking for.

14  BY MR. SPARROW:

15       Q    Sure.  So can you please mark where you

16  believe tensile load is transferred to on the bone

17  plate --

18       A    Yes.

19       Q    -- of figure two in the '608 patent.

20       A    Right here.

21       Q    Okay.  Sorry.  I --

22       A    And then basically it's from this portion of

23  the --

24       Q    Okay.  Sorry.  My eyes are so bad.

25       A    So the underside of the screw transfers the



STRYKER Exhibit 1030
Page 77 of 157
IPR2021-01450

1    load into the counterpart of the hole in the plate.

2        Q    Okay.  Got it.  Thank you.

3            MR. SPARROW:  So let the record show that

4    Exhibit 1040 is Mr. Sommers' marked-up figure two of

5    the '608 patent.

6    BY MR. SPARROW:

7        Q    And, Mr. Sommers, can you just please

8    confirm that those are your markings in red showing

9    the claimed bridge portion and your opinions regarding

10   the transfer of tensile load.

11           MR. ALLOR:  Object to the form.

12           THE WITNESS:  Yeah.  These are my markings.

13   BY MR. SPARROW:

14       Q    Okay.  So, in your opinion, what causes the

15   transfer of tensile load from the screw head into the

16   bridge portion?

17       A    I think we discussed that already, that the

18   threads engage in the second part of the screw.  And

19   the screw is arrested by the hole in the plate where

20   it -- where it engages with the head of the screw.

21   And the tension that's created by the threads of the

22   second bone is then transferred.

23       Q    Okay.

24           MR. SPARROW:  Could you please mark that

25   1040.

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 78 of 157
IPR2021-01450

1          MR. ALLOR:  And, again, outside the scope.

2    Calling for a legal conclusion.

3          THE WITNESS:  As I said, in the surgical

4    community, a certain range given is understood as a

5    variable angle screw.  And I don't know, in

6    particular, if a surgeon would read it at a certain

7    level.  Typically it's prescribed, that variable angle

8    and a range.

9          MR. McBRIDE:  I don't know -- it's -- we're

10   probably at a good breaking point right now.

11         MR. ALLOR:  Okay.

12         MR. McBRIDE:  And I think lunch is here.

13         (Recess taken, 12:15 p.m. - 1:08 p.m.)

14              FURTHER EXAMINATION

15   BY MR. SPARROW:

16      Q    Okay.  Mr. Sommers, so let's talk about

17   Slater --

18      A    Yeah.

19      Q    -- the Slater reference.  So Slater

20   discloses the use of a lag screw, correct?

21         MR. ALLOR:  Object to the form.

22         THE WITNESS:  I think the word of "lag

23   screw" is mentioned somewhere, yes.

24   BY MR. SPARROW:

25      Q    Are you familiar where?  Do you recall where



STRYKER Exhibit 1030
Page 107 of 157
IPR2021-01450

Appx3218

1   the word is mentioned?

2        A    Not off the top of my head.

3        Q    How about on page 19, line 26?  That would

4   be of Exhibit 1005.

5        A    Yes.  And we're on the lag screw.  Found it.

6        Q    So would you agree that, where a screw is

7   structured as a lag screw, it is threaded only

8   distally?

9             MR. ALLOR:  Object to the form.

10            THE WITNESS:  There's at least distal

11  threads there.  Is it only distally or how far it

12  extends up the shaft?  That depends on the situation.

13  BY MR. SPARROW:

14       Q    Distal threads in the lag screw, correct?

15            MR. ALLOR:  Object to the form.

16            THE WITNESS:  There's at least distal

17  threads in the lag screw.

18  BY MR. SPARROW:

19       Q    Okay.  Thank you.  So how about we switch to

20  the Falkner reference.

21       A    Oh, okay.

22       Q    And then let's turn to paragraph 135 in your

23  declaration for the 1450 proceeding.

24       A    135.  Okay.

25       Q    So you say that "In order" -- you're talking



STRYKER Exhibit 1030
Page 108 of 157
IPR2021-01450

1    that patient loses any function or feel in the foot.

2    BY MR. SPARROW:

3        Q    Okay.  So at paragraph 140 -- turn to that

4    paragraph -- you offered the opinion that "The blade

5    plate would cross the joint at Dr. Gall's," quote,

6    "second end," quote, "not the bridge portion Dr. Gall

7    identified."

8        A    Yes.

9        Q    And then, skipping down, you say "as

10   required in the '608 patent claims.  Having the joint

11   in the same location as the fracture shown in figure

12   one of Falkner would be important for the

13   functionality of the Falkner concept"; is that

14   correct?

15       A    Where are you exactly?  Which --

16       Q    Paragraph 140.

17       A    140.  Oh, on the second page, yeah.  Yeah,

18   I'm there.

19       Q    So what do you mean by "the functionality of

20   the Falkner concept"?

21       A    It's also a little bit of speculation

22   obviously because I was not the designer of this

23   plate.  But they have a fracture shown in it at a

24   certain location between, for example, those two

25   screws and also at a certain location where the



1  oblique transfixation screw is.

2        So shifting it over a joint line, my first

3  inclination would be that, because there's a purpose

4  of where it's depicted, then I would do the same

5  thing.  I would shift it also where the discontinuity

6  at this point is.

7     Q    Okay.  What type of fracture is shown in

8  figure one of Falkner?

9        MR. ALLOR:  Object to the form.

10       THE WITNESS:  What type of fracture?

11  BY MR. SPARROW:

12     Q    Yes.

13     A    It's a transverse fracture of the distal

14  tibia.

15     Q    What are some other types of fractures that

16  may occur along the tibia?

17       MR. ALLOR:  Object to the form.

18       THE WITNESS:  Spiral fractures, oblique

19  fractures, comminuted fractures.

20  BY MR. SPARROW:

21     Q    And those fractures do not always have the

22  same fracture pattern, correct?

23     A    Obviously not.

24     Q    And the fractures do not always share the

25  same location, correct?



STRYKER Exhibit 1030
Page 118 of 157
IPR2021-01450

Appx3229

1    A    Yes.  The fractures would shift based on the

2    fracture type.  Absolutely.

3    Q    Okay.  Would you agree with me that the --

4    the type of fracture of the tibia will depend on the

5    injury?

6    A    That's one component.

7    Q    And then would you agree with me that the

8    location of a fracture on a tibia will depend on the

9    type of injury as well?

10    A    Again, it's one component.  There's other

11    factors that play into it, as well as where the

12    fracture is, like bone quality, for example.

13    Q    Okay.  So, in your opinion, would the

14    Falkner plate have to be modified in order to be used

15    with fracture patterns that are different than the

16    fracture shown in figure one of Falkner?

17        MR. ALLOR:  Object to the form.

18        THE WITNESS:  Yes.  There is a possibility.

19    In this case the traverse fracture it's designed for.

20    Other fractures may work as well, but that would be a

21    call by the surgeon.

22    BY MR. SPARROW:

23    Q    Okay.  So in figure one of Falkner, the

24    fracture is not required to be in that location in

25    order for Falkner's plate to work, correct?

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 119 of 157
IPR2021-01450

```
 1              MR. ALLOR:  Object to the form.

 2              THE WITNESS:  I don't know that.  I mean,

 3      that's a -- that's a case-by-case.

 4      BY MR. SPARROW:

 5         Q    But fractures can occur anywhere along the

 6      tibia?

 7              MR. ALLOR:  Object to form.

 8              THE WITNESS:  Theoretically, yes.

 9      BY MR. SPARROW:

10         Q    So what would be the purpose of the Falkner

11      plate if it was limited to a specific fracture line in

12      a specific location?

13              MR. ALLOR:  Object to the form.

14              THE WITNESS:  This is probably a typical

15      fracture that they looked at, and it needs to be

16      treated like a distal tibia platform fracture.  And

17      for that type of fracture, they designed this type of

18      plate, this kind of fixation construct.

19      BY MR. SPARROW:

20         Q    So are you suggesting that they designed

21      that plate with a single fracture pattern in mind, in

22      a single location?

23         A    I didn't say that.  I mean, I just said this

24      is probably one of -- a typical fracture that they

25      designed it for.  Can it work in other configurations?
```

800.211.DEPO (3376)
EsquireSolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

STRYKER Exhibit 1030
Page 120 of 157
IPR2021-01450

```
1   Maybe.  And that's a call by the surgeon.
2        Q    So are you saying that -- for the bone
3   discontinuity, does it -- does the bone
4   discontinuity -- the location of it, does it have to
5   be between the two distal screws?
6        A    That's how it's depicted at this point, yes.
7        Q    Okay.  Okay.  So, in your opinion, does
8   Falkner require a surgeon to position the blade plate,
9   relative to the bone discontinuity, exactly as shown
10  in figure one?
11       A    Every fracture will look a little different.
12  And the surgeon will place it at the best location to
13  his or her discretion.
14       Q    Okay.  Okay.  If we could turn to the
15  Arnould reference, please.
16       A    Okay.
17       Q    And also paragraph 180 of your declaration.
18       A    Okay.
19       Q    So at paragraph 180 you say that "I can see
20  the downward angle of the screw that passes through
21  the leg 20 in all of the figures of Arnould."
22       A    Mm-hmm.
23       Q    So can you please turn to Exhibit 1008,
24  figure two.  That's the Arnould reference.
25       A    Yeah.
```

800.211.DEPO (3376)
EsquireSolutions.com



STRYKER Exhibit 1030
Page 121 of 157
IPR2021-01450