**Nos. 23-1925, -1926, -1928, -1929,  -1979, 23-2010, -2011, -2012**
**Volume III of III, Appx3270 to Appx12244**

# In the
# United States Court of Appeals
## for the Federal Circuit

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Cross-Appellant.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in
Nos. IPR2021-01450, IPR2021-01451, IPR2021-01452 and IPR2021-01453.

STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,

*Appellants,*

v.

OSTEOMED LLC,

*Appellee.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in
Nos. IPR2022-00189, IPR2022-00190 and IPR2022-00191.

## CORRECTED JOINT APPENDIX

DEVON C. BEANE
JASON A. ENGEL
JONAH B. HEEMSTRA
K&L GATES LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602-4207
(312) 807-4436
devon.beane@klgates.com
jason.engel@klgates.com
Jonah.Heemstra@klgates.com

SHARON A. HWANG
ROBERT A. SURRETTE
SCOTT P. MCBRIDE
SEAN C. SPARROW
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
shwang@mcandrews-ip.com
bsurrette@mcandrews-ip.com
smcbride@mcandrews-ip.com
ssparrow@mcandrews-ip.com



## 2023-1925
## APPENDIX INDEX

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| **Final Written Decisions** | | |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01450, 03/08/2023 | Appx1 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01451, 03/08/2023 | Appx58 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01452, 03/08/2023 | Appx115 |
| 46 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2021-01453, 03/08/2023 | Appx176 |
| 34 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00189, 05/30/2023 | Appx244 |
| 33 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00190, 05/30/2023 | Appx298 |
| 35 | Final Written Decision - 35 U.S.C. §318(a) and 37 C.F.R §42.73 IPR2022-00191, 05/30/2023 | Appx353 |
| **Patents** | | |
| 1001 | U.S. Patent No. 8,529,608 Terrill, 04/28/2009 | Appx409 |
| 1001 | U.S. Patent No. 9,351,776 Terrill, 08/30/2013 | Appx424 |
| 1001 | U.S. Patent No. 9,763,716 Terrill, 05/05/2016 | Appx437 |
| 1001 | U.S. Patent No. 10,245,085 Terrill, 09/18/2017 | Appx451 |
| **Certified Lists** | | |
| N/A | Certified List of Materials from the USPTO for IPR2021-01450, 07/03/2023 | Appx464 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01451, 07/03/2023 | Appx467 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01452, 07/03/2023 | Appx470 |
| N/A | Certified List of Materials from the USPTO for IPR2021-01453, 07/03/2023 | Appx473 |
| N/A | Certified List of Materials from the USPTO for IPR2022-00189, 07/25/2023 | Appx476 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| N/A | Certified List of Materials from the USPTO for IPR2022-00190, 07/25/2023 | Appx479 |
| N/A | Certified List of Materials from the USPTO for IPR2022-00191, 07/25/2023 | Appx482 |
| **Docket for IPR2021-01450** | | |
| 2 | Petition for *Inter Partes* Review, 08/30/2021 | Appx485 |
| 6 | Decision Institution of *Inter Partes* Review, 03/11/2022 | Appx635 |
| 20 | Order Granting Petitioners' Motion to Submit Supplemental Information, 05/13/2022 | Appx996 |
| 23 | Patent Owner Response, 06/17/2022 | Appx1017 |
| 27 | Petitioners' Reply to Patent Owner Response, 09/19/2022 | Appx1096 |
| 33 | Patent Owner Sur-Reply, 11/02/2022 | Appx1154 |
| 42 | Record of Oral Hearing, 01/27/2023 | Appx1227 |
| **Petitioners' Exhibits for IPR2021-01450** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,529,608 | Appx1756 |
| 1004 | Prosecution File History of U.S. 8,529,608 | Appx1993 |
| 1005 | WO 2007/131287 A1 to Slater | Appx2491 |
| 1006 | U.S. Patent Application Publication No. 2005/0171544 A1 to Falkner | Appx2526 |
| 1025 | Declaration of Michael Sherman filed in IPR2022-00487 | Appx2730 |
| 1026 | Declaration of Michael Sherman filed in IPR2022-00488 | Appx2853 |
| 1027 | Reply Declaration of Kenneth A. Gall, Ph.D. | Appx3000 |
| 1028 | Declaration of Dr. George B. Holmes, Jr., M.D., FAAOS in Support of Petitioners' Reply | Appx3048 |
| 1030 | Mark Sommers Deposition Transcript, 08/24/2022 | Appx3112 |
| 1041 | Petitioners' Demonstrative Slides for IPR2021-01450, -01451, -01452, and -01453 | Appx3270 |
| **Patent Owner's Exhibits for IPR2021-01450** | | |
| 2002 | Declaration of Mark Sommers, MS | Appx3494 |
| 2003 | Kenneth A. Gall, Ph.D. Deposition Transcript, 05/19/2022 | Appx3566 |
| 2006 | George B. Holmes, Jr., M.D. Deposition Transcript, 10/21/2022 | Appx3865 |

| Paper/ Exhibit No. | Description | Appendix Pages |
|---|---|---|
| **Docket for IPR2021-01451** | | |
| 6 | Decision Institution of *Inter Partes* Review, 03/11/2022 | Appx4165 |
| 23 | Patent Owner Response, 06/17/2022 | Appx4533 |
| **Exhibits for IPR2021-01451** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. | Appx5152 |
| **Docket for IPR2021-01452** | | |
| 6 | Decision Institution of *Inter Partes* Review, 03/16/2022 | Appx5912 |
| 23 | Patent Owner Response, 06/17/2022 | Appx6301 |
| **Docket for IPR2021-01453** | | |
| 2 | Petition for *Inter Partes* Review, 08/30/2021 | Appx7496 |
| 6 | Decision Institution of *Inter Partes* Review, 03/17/2022 | Appx7631 |
| 23 | Patent Owner Response, 06/17/2022 | Appx7999 |
| 27 | Petitioners' Reply to Patent Owner Response, 09/19/2022 | Appx8063 |
| 33 | Patent Owner Sur-Reply, 11/02/2022 | Appx8116 |
| **Exhibits for IPR2021-01453** | | |
| 1002 | Declaration of Kenneth A. Gall, Ph.D. | Appx8688 |
| 1027 | Reply Declaration of Kenneth A. Gall, Ph.D. | Appx9100 |
| 1031 | Merriam-Webster's Collegiate Dictionary, p. 77 | Appx9153 |
| 2002 | Declaration of Mark Sommers, MS | Appx9156 |
| **Docket for IPR2022-00189** | | |
| 11 | Decision Institution of *Inter Partes* Review, 06/01/2022 | Appx9319 |
| **Docket for IPR2022-00190** | | |
| 10 | Decision Institution of *Inter Partes* Review, 06/01/2022 | Appx10750 |
| **Docket for IPR2022-00191** | | |
| 11 | Decision Institution of Inter Partes Review, 06/01/2022 | Appx11537 |
| **ADDITIONAL MATERIALS** | | |
| | U.S. Patent No. 10,993,751 Prandi, 01/07/2021 | Appx12237 |

# STRYKER CORP. and WRIGHT MEDICAL TECHNOLOGY, INC., Petitioners

## v.

# OSTEOMED LLC, Patent Owner

**IPR2021-01450, IPR2021-01451, IPR2021-01452, IPR2021-01453**
**(U.S. Patent Nos. 8,529,608, 9,351,776, 9,763,716, 10,245,085)**

**Petitioners' Demonstrative Exhibits**
**Exhibit 1041**

PETITIONERS' DEMONSTRATIVE EXHIBITS – NOT EVIDENCE

1

# Ground 1: Slater (§ 102) – "extends [through] the bridge"

## *What is a "bridge portion"?*



**126***b*. As mentioned above, spine **124** includes a bridge portion **130** configured to span across joint **106**. Since bridge

EX1001 (608 Patent), 8:1–2; IPR2021-01450: Petition (Paper 2), 5–6; Reply (Paper 27), 13–14; EX1027 (Gall Reply Decl.), ¶¶32–35

106 – joint
124 – spine
130 – bridge portion

*FIG. 3*

*FIG. 2*

PETITIONERS' DEMONSTRATIVE EXHIBITS – NOT EVIDENCE     55

# Ground 1: Slater ( § 102) – "extends [through] the bridge"

## The transfixation screw hole is "adjacent to the bridge portion 130."

other portions of bone plate 100. For example, transfixation screw hole 102 may be included in thickened section 136, adjacent to bridge portion 130. This may enable a countersink

EX1001 (608 Patent), 8:41-43

EX1027 (Gall Reply Decl.), ¶32

IPR2021-01450: Petition (Paper 2), 5–6; Reply (Paper 27), 12-13

IPR2021-01453: Petition (Paper 2), 5–6; Reply (Paper 27), 12



*FIG. 2*

130 – bridge portion
102 – transfixation screw hole
104a – first bone
104b – second bone

PETITIONERS' DEMONSTRATIVE EXHIBITS – NOT EVIDENCE

58

STRYKER Exhibit 1001
Page 10 of 15
IPR2021-01450

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# PATENT TRIAL AND APPEAL BOARD

---

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

---

Case IPR2021-01450
U.S. Patent No. 8,529,608

---

# DECLARATION OF MARK SOMMERS, MS

1

OSTEOMED EXHIBIT 2002
Stryker Corp., et al. v. OsteoMed LLC
IPR2021-01450

## V.    OVERVIEW OF THE TECHNOLOGY

### A.    General Background of Bone and Joint Fusion

35.    This proceeding generally relates to plates and screws used to provide stable fixation across a joint.

36.    A traumatic event that damages a joint or joint erosion causing cartilage wear can lead to painful joint motion.  Typical surgical treatment options include joint fusion, also termed arthrodesis.  The joint anatomy, location in the body, size of joint, and surgeon preference dictate the type of surgical procedure and the hardware used.

37.    In general, the goal of an arthrodesis procedure surrounding joint injury is to immobilize the joint and eliminate any motion across the former joint space. The surgical procedure usually includes joint space exposure, cartilage debridement, as well as implantation of stabilization hardware for joint immobilization and temporary use restriction.  Typical orthopedic stabilization devices consist of intramedullary devices, such as screws and pins, and externally applied bone plates and screws.  Because the joint was originally allowing motion between two bones, the loading demands of a fusion implant can be very demanding, and, in some cases, lead to implant failure before fusion is achieved.

12

IPR2021-01450
U.S. Patent No. 8,529,608

38.    If a bone is loaded in a manner that is not purely axial (e.g. with forces being applied off-center, or external moments) the bone experiences a loading pattern where one side is under tension and one side under compression. The zone where it changes from tension to compression is called the neutral axis, which is depicted in the image below.



39.    When a bone discontinuity exists that is fixed with an external fixation method (e.g., a plate), the load transfer and distribution changes. In this case, the neutral bending axis may shift partially or completely towards or into the plate. This is highly dependent on the loading configuration and the location of the plate.

40.    Excessive motion or excessive gaps at the joint prevents it from healing properly. For this reason, bone plates are typically not located on the

13

compression side because such an orientation would lead to the tension side

opening up and preventing fusion as shown in the graphical depiction below

relating to a bone fracture.



### B.    The Technology Described in the '608 Patent

41.    Depending on the anatomical location, applying a plate construct on the

tension side is not always feasible, such as in the metatarso-phalangeal

("MTP") joint of the foot.  In that context, normal principles of joint and bone

fusion would dictate a plate on the plantar side of the foot, which is not a

feasible position for a bone plate since this would create a painful condition

due to the patient constantly walking directly on the plate itself.  The '608

14

Patent discloses a dorsal plating system with a transfixation screw that addresses this issue.

42. The '608 Patent is titled "Bone Plate With A Transfixation Screw Hole" that generally describes a plate for fusing the two bones of the MTP joint of the foot. (Ex. 1001).

43. As discussed above, it is not practical to put a bone plate on the tension side of the MTP joint at the plantar side of the foot. As such, the '608 Patent describes a plate applied to the dorsal side of the foot on the compression side of the joint.



FIG. 1

FIG. 2

(Ex. 1001, Figs. 1, 2).

15

44.    With dorsiflexion forces applied to the fusion site, which occur during walking, the plantar side of the bone sees tensile forces.  The '608 Patent describes absorbing these tensile forces through the screw 150 and into the bridge of the bone plate to increase the stability of the construct and increase the chance of bone fusion.

45.    To accomplish this objective, the transfixation screw is affixed via threads only in the second portion of the bone while the smooth shaft is penetrating the first portion. (Ex. 1001, 6:64-7:12).  Alternatively, if the screw has threads along the entirety of the shaft, the '608 Patent describes drilling a pilot hole in the first bone that is larger than the screw shaft to enable a desired lag effect, even if the entirety of the screw is threaded.  (Ex. 1001, 7:12-17).

46.    The screw head is engaged in the thicker bridge portion of the bone plate with the result of transferring the load into said bridge portion and so shielding the rest of the plate from excessive bending loads.  (Ex. 1001, 8:7-11).

47.    As described in claim 1, the construct uses the transfixation screw anchored in the tension side of the bone to absorb tensile load and "transfer[] the tensile load from the second discrete bone, through the screw into said head and said bridge portion" of the plate.  (Ex. 1001, cl. 1).

48.    The claimed invention includes a plate comprised of an elongated section, termed "spine" with holes positioned at various locations to receive bone

16

screws. (Ex. 1001, cls. 1, 11). The plate consists of three portions: a first end, a second end, and a bridge portion designed to span across the joint. (*Id.*). For a fusion to succeed, it is of high importance to create a stable construct and "rigidly hold the bones of a joint in tight approximation without bending or breaking." (Ex. 1001, 3:52-55).

49. The bridge portion may include a thickened section to increase the bending strength at that portion. (Ex. 1001, 8:7-11). With the bridge portion designed to span the joint and the fact that the section above the bone discontinuity sees the highest bending loads, the thicker or wider section lessens the risk of bending or breaking the plate compared to a uniform geometry. (*Id.*).

50. The plate described in the '608 Patent also includes a hole at a fixed angle relative to the plate designed to receive a "transfixation screw." (*See, e.g.*, Ex. 1001, 1:26-45). The direction of this transfixation screw is determined by the inner surface of the screw hole and it is configured to pass through both bone segments in a manner such that the screw trajectory "crosses the neutral bending axis" of the joint. (Ex. 1001, 5:53-6:18). This creates a "tension band construct" with the advantage that the screw will "absorb the tension forces that would otherwise draw the tension side of joint 106 apart when a load is placed on joint 106." (Ex. 1001, 6:12-18).

17

51.    The '608 Patent describes the plate as being anatomically contoured with the inner surface to follow the curvature of the two bones involved in the arthrodesis. (Ex. 1001, 5:11-35).

## VI.    OVERVIEW OF THE ASSERTED PRIOR ART REFERENCES

### A.    *Slater* (Ex. 1005)

52.    As part of my work in this proceeding, I was asked to review PCT Application Publication No. WO 2007/131287 to Slater ("*Slater*") (Ex. 1005). *Slater* is titled "Ankle Fusion Plate."

53.    *Slater* describes orthopedic devices for ankle fusions, which are designed to sit on the anterior surface of the tibia bone with fixation screws affixed to the tibia and the talus bones.

54.    Figure 1 of *Slater* shows a first version of a plate 1 that includes fixation points on the tibia and talus bones and a screw that extends through the tibia, talus, and calcaneus bones. The plate 1 of Figure 1 of *Slater* is also depicted at a different orientation in Figure 2 with the same identifying numbers.

18

IPR2021-01450
U.S. Patent No. 8,529,608




(Ex. 1005, Figs. 1, 2).

55.    While not described in detail anywhere in *Slater*, Figure 1 also depicts, in

phantom, the use of a screw that passes through the tibia and terminates in the

posterior portion of the talus.

56.    *Slater* explains that, with respect to the Figure 1 plate, "[f]ormation 27 is

configured so that screw 25 is implanted at an angle within a predetermined

allowable angular range." (Ex. 1005, 11:21-22). In the claims of *Slater*, the

hole that allows the screw to pass through at multiple angles is described as

"slotted," which means to me that at least a portion of the hole towards the

inner surface of the plate is oblong in one direction in order to allow the screw

19

**Appx3512**

25 to pass through at multiple angles. (Ex. 1005, 24:4-8). Given the depiction of Figure 1, the hole is longer in the vertical or longitudinal plate axis to enable the screw to be placed at a number of angles with respect to this direction.

57. One version of screw 25 is illustrated in Figure 4 of *Slater*, which is described as "adapted for insertion in the plate of figures 1 and 2 and allowing adjustable orientation.  Screw type 70 has a longer shank to increase depth of penetration and has an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone." (Ex. 1005, 12:33-13:3).  While this description of screw type 70 indicates that the threads of the screw would at least be in the calcaneus bone, it does not describe whether there would also be threads in the talus bone.

58. In some joint fusion procedures, such as in ankle joint arthrodeses, a surgeon may use an external compression device or manually compress the joint before inserting the various screws into the bone plate.  If a surgeon were to use such a manual compression of the ankle joint before fixating the *Slater* bone plate, it is conceivable that the threads of the screw type 70 would proximally extend at least partially into the talus bone to increase the bone/screw interface.  Neither Figure 4, nor the corresponding description in

20

*Slater*, illustrate, describe, or show a screw type that would be used in a two-bone configuration of only going in the tibia and talus bones.

59. The plate 80 depicted in Figures 5 through 13 of *Slater* is different than the plate 1 disclosed in Figures 1 and 2 in many respects, including with respect to at least the orientation of the fixation members on each end of the plate, the angle of the bend in the plate, the thickness of the plate at various portions, and the size and location of the hole that is described in both plates as accommodating a screw through multiple bones. I have illustrated some of these differences below with respect to Figures 1, 5, and 6. I also note, as can be seen below, that Figures 1, 5, and 6 use completely different numerals to describe the components of the respective plates.



(Ex. 1005, Figs. 1, 5, 6 (annotated)).

21

**Appx3514**

60.     Additionally, while the plate 1 shown in Figure 1 has a screw through the cross-bone screw hole, the plate shown in Figure 5 does not. *Slater* does not provide any description of what a screw passing through hole 93 of the Figure 5 plate 80 would require.

### B.    *Falkner* (Ex. 1006)

61.     As part of my work in this proceeding, I was asked to review U.S. Patent Application No. 2005/0171544 to Falkner ("*Falkner*") (Ex. 1006). *Falkner* is titled "Bone Plate With Toothed Aperture."

62.     Unlike the plate described in the '608 Patent, the *Falkner* plate includes a portion affixed to the outside of bone, with a transition to a plate portion that penetrates into a bone as depicted in *Falkner*'s Figure 1 below, circled in red. Such a plate type is typically understood as a "blade-plate." The blade-plate is affixed to the bone by typical fixation means, such as screws.



22

(Ex. 1006, Fig. 1 (annotated)).

63.  *Falkner* explains that "[s]tandard bone plates secured only to the exterior surface of the fractured bones may not be sufficient to immobilize metaphyseal fragments."  (Ex. 1006, ¶ [0004]).  To address this problem, *Falkner* describes a plate with two distinct portions—a first portion configured to "fit against an exterior surface"; and a second portion to be "received in an interior region."  (*Id.*, ¶ [0042]).  These portions would be connected as a unitary plate or as separate pieces with a fastener, welding, hinge joint, ball in socket or other acceptable connections.  (*Id.*, ¶ [0043]).

64.  This connection portion between the external and internal plate portions is referred to in *Falkner* as the "bridge."  (Ex. 1006, ¶ [0068]).

65.  Because of the structure of the plate described in *Falkner*, the plate is designed to accommodate a screw that passes through the external portion of the plate and anchors into a toothed aperture on the internal portion of the plate.  This screw (the "interlocking screw") spans the two plate portions to "interlock" and tension these portions.  (*Id.*, ¶ [0006]).

66.  The tension on the plate created by the interlocking screw passing through the plate and anchoring with threads into the toothed aperture portion of the plate interior to the bone creates a triangular construct with improved stabilization

23

of the bone fragments of the discontinuity (specifically, a bone fracture in *Falkner*). (Ex. 1006, ¶ [0071]).

### C.    *Arnould* (Exs. 1007-08)

67.    As part of my work in this proceeding, I was asked to review European Patent No. 1 897 509 B1 to Arnould ("*Arnould*") (Ex. 1007 (French); Ex. 1008 (Certified English)). *Arnould* is titled "Arthrodesis Plate For A Metatarsal-Phalangeal Joint."

68.    *Arnould* discloses an arthrodesis plate for MTP joint fusion as depicted in Figure 1.



(Ex. 1008, Fig. 1).

69.    *Arnould* attempts to solve the problem of putting a plate on the compression side of the MTP joint in a different manner than the mechanism described in

24

96.    My opinion regarding "a trajectory" is also supported by other claims in the '608 Patent.    For example, claim 5 recites that the trajectory is "at a transfixation angle of about 50 degrees measured from the neutral bending axis." (Ex. 1001, cl. 5).  While claim 4 includes an allowable range of between 30 and 70 degrees, I read this to mean that a given claimed plate has a single fixed angle, but that a different claimed plate could have a different fixed angle, with plates having single fixed angles in the range between 30 and 70 degrees.  In other words, in a fixation system compromised of multiple plates, a surgeon could have individual plates with fixed 30, 50, and 70 degree trajectories, but there would not be a plate with an inner surface of the transfixation screw hole that would allow variable angles over the entire claimed range between 30 and 70 degrees.

97.    Based on my understanding of "a trajectory" as required in claim 1 of the '608 Patent, in my opinion, *Slater* fails to disclose this claim element.  In the '608 Patent, the inner surface of the screw hole determines the path of the transfixation screw, whereas in *Slater*, the surgeon determines the path in situ with a range of options available to her/him.  In other words, the '608 Patent describes and claims a plate with a fixed allowable angle for the transfixation screw hole, whereas *Slater* is an intentionally variable angle plate as Dr. Gall explains throughout his declaration.

37

held in between." (Ex. 1002, ¶ 114 (emphasis added)).  However, the concept of a "vise" configuration is not expressly or inherently disclosed by *Slater*.

110.  Moreover, Dr. Gall's opinion regarding this "vise" like transfer of load depends on his assumption that the threads of the screw type 70 would only be present in the talus bone.  As detailed above, *Slater* lacks the sufficient disclosure relating to location of the threads in the three-bone embodiment and more so in the minimally described two-bone embodiment.

111.  The location of the threads on the screw impact how and where, if at all, a tensile load would be transferred from the transfixation screw through to the head of the screw and into the bridge of the bone plate.  During his deposition, Dr. Gall agreed with me that the location of the threads can determine how a joint compresses when a screw is used, and how load is transferred from the screw to the plate.  (Gall Dep. Tr., 44:21-45:15).

112.  *Slater*'s disclosure also contemplates that different geometries and dimensions "such as alternative thickness distributions and angulations may result in different measured loadings and plate response." (Ex. 1005, 20:14-16).  In this way, because *Slater* does not disclose the geometry and dimensions of any plate that would accommodate a screw passing through just two bones, nor the angulation and structure of such a screw, *Slater* also

43

117.   In my opinion, if a situation were created to force the transfixation screw to transfer a tensile load to the bone plate, nothing in *Slater* explains where on the screw or plate that tensile load would be felt.

118.   If anything, *Slater* suggests that tensile load would actually be felt **above the screw hole**, not below.  During a stress test simulation, the data showed that "the highest stresses occur on the inner surface of the plate approximately w[h]ere a change in section thickness occurs **just above the angled screw formation**." (Ex. 1005, 19:5-6 (emphasis added)).  Nevertheless, I do not believe the stress test simulation provides insight on how tensile load may or may not be transferred through the transfixation screw during normal use.  The described study appears to be a stress test simulation using Finite Element Analysis (FEA) to "determine finite element stresses in the plate . . ." for a given metal composition and multiple bone densities.  (Ex. 1005, 17:19-20).

119.   In my opinion, the test and its methodology do not disclose or describe the transfer of tensile load.  For example, the test does not mention the talus or the calcaneus, and the test does not provide any specifics on the transfixation screw.  It is unclear if and how the transfixation screw was simulated during testing, and, in particular, *Slater* does not describe how the transfixation screw was affixed or loaded.  Additionally, the angle of intersection for the

46

transfixation screw is unknown, and the number of bone penetrations of the transfixation screw are unknown.

120.    Thus, for the reasons above, *Slater* fails to disclose that "the transfixation screw comprises a head configured to abut the inner surface of the transfixation screw hole and a shaft configured to contiguously extend through the first discrete bone, through the joint, and into the second discrete bone so as to absorb tensile load when the second discrete bone is loaded relative to the first discrete bone thereby transferring the tensile load from the second discrete bone, through the screw into said head and said bridge portion." Therefore, in my opinion, *Slater* does not anticipate claim 1 of the '608 Patent. This claim element is also present in claim 11 of the '608 Patent and therefore *Slater* does not anticipate claim 11 of the '608 Patent, either.

### 2.    *Claims 2 and 12*

121.    I understand that in order to anticipate a dependent claim, the independent claim must also be anticipated. Because it is my opinion that *Slater* does not expressly or inherently teach every element of claims 1 and 11 of the '608 Patent, it is my opinion that *Slater* does not anticipate claims 2 and 12, either.

122.    In my opinion, *Slater* does not anticipate claims 2 and 12 of the '608 Patent for at least one additional reason. Claim 2 recites:

The system of claim 1, wherein:

47

### 3. *Claims 3 and 13*

126. Because it is my opinion that *Slater* does not expressly or inherently teach every element of claims 1, 2, 11, and 12 of the '608 Patent, it is my opinion that *Slater* does not anticipate claims 3 and 13, either.

127. In my opinion, *Slater* does not anticipate claims 3 and 13 of the '608 Patent for at least one additional reason. Claim 3 recites:

> The system of claim 2, wherein the first position resides on a compression side of the joint and the second position resides on a tension side of the joint.

(Ex. 1001, cl. 3). In my opinion, *Slater* does not disclose a transfixation screw that passes through a compression side of the joint and then the tension side of the joint.

128. The ankle joint, for which *Slater*'s plates are designed, does not have a discrete tension and compression side. Rather, during typical use conditions such as walking, the different portions of the ankle joint are subjected to cyclically changing compression and tension forces. Because of this change in force direction, a POSITA would not refer to the ankle joint as one that has a tension side and a compression side.

129. In this way, the ankle joint is unlike the MTP joint where I would define the plantar side of the foot as the tension side of that joint. During a normal walking cycle, the plantar side of the foot constantly wants to open up so it

49

would be clearly defined as "the tension side" of that joint.  As I described in detail above, this clear delineation of a tension side of the joint is key to the invention of the '608 Patent because the inventors were looking to solve the issue of anatomically needing to place the plate on the compression rather than tension side of the joint.

130.    Because the ankle joint lacks a defined "compression side" and "tension side," *Slater* fails to disclose any embodiment that has a screw passing through the joint "whereas the first position resides on a compression side of the joint and the second position resides on a tension side of the joint" as required in claims 3 and 13 of the '608 Patent.  Therefore, it is my opinion that *Slater* does not anticipate claims 3 and 13 of the '608 Patent.

### 4.    *Claims 5, 9, 10, 13, 14, and 17*

131.    In my opinion, *Slater* does not expressly or inherently teach every element of claims 1, 2, 11, and 12 of the '608 Patent, thus it is my opinion that *Slater* does not anticipate claims 5, 9, 10, 13, 14, and 17, either.

### B.    *Ground 3: Anticipation by Falkner*

132.    As part of my work in this proceeding, I reviewed Dr. Gall's opinion that *Falkner* discloses all of the elements of claims 1-3, 6, 8-13, and 17 of the '608 Patent and thus anticipates those claims.  I disagree with Dr. Gall.

50



(Ex. 1006, Fig. 1 (annotated)).

135. While *Falkner* explains that the blade-plate may cross a joint between bones, nothing in *Falkner* discloses how such a plate would be designed. (Ex. 1006, ¶¶ 21, 23, 29). In order to work across a joint, the *Falkner* plate itself would very likely require extensive modifications requiring significant experimentation and testing, such as, but not limited to angle of blade portion to external portion, size of blade portion, length of plate portion, thickness of blade portion, tip geometry of blade portion, interlocking angle of screw, position of plate in respect to subchondral bone, distance of blade portion in respect to subchondral bone, amount and size of fixation screws in each segment, anatomic structures, kinematic considerations (e.g. expected loading

52

configurations), etc. *Falkner* lacks any detail on these modifications and how the modifications would impact the blade-plate's interlocking screw mechanism. These absent details are key to understanding how to design a *Falkner* blade-plate for use across a joint.

136. Because *Falkner* does not expressly or inherently teach the claimed "system for securing two discrete bones together **across a joint** between the two bones," it does not anticipate claim 1 of the '608 Patent. (Ex. 1001, cl. 1 (emphasis added)). This claim element is also present in claim 11 of the '608 Patent and therefore *Falkner* does not anticipate claim 11 of the '608 Patent, either.

**b.    Second End**

137. Claims 1 and 11 of the '608 Patent require a plate with a "second end" that has "at least one fixation point for attaching the second end to a second discrete bone on a second side of the joint; and a second inner surface configured to substantially conform with a geometry of the second discrete bone." In my opinion, Dr. Gall has not shown this element is present in *Falkner*.

138. Specifically, even assuming the *Falkner* plate is moved to cross a joint rather than a fracture, the fixation point on the "second end" that Dr. Gall identifies

is not on the second bone (or in the case of the *Falkner* disclosure, on the second part of the fractured bone), but rather above the bone discontinuity.

139.   Dr. Gall's annotated image, which I have reproduced below, very clearly identifies a "second end" that extends above the bone discontinuity and with fixation points on that "second end" that are clearly above the bone discontinuity and in case of a joint above the joint, and not in the second portion of the bone.



(Ex. 1002, ¶ 177; Ex. 1006, Fig. 1 (Dr. Gall's annotations)).

140.   Thus, even assuming Dr. Gall is correct that the *Falkner* blade-plate could simply be shifted down to cross the tibia/talus joint, the blade-plate would cross the joint at Dr. Gall's "second end," not the bridge portion Dr. Gall

54

identified (*see* Dr. Gall's annotated image below) and as required in the '608

Patent claims.  Having the joint in the same location as the fracture shown in

Figure 1 of *Falkner* would be important for the functionality of the *Falkner*

concept.



(Ex. 1002, ¶ 179; Ex. 1006, Fig. 2 (Dr. Gall's annotations)).

141.  Therefore, even under Dr. Gall's view, *Falkner* fails to disclose a "second

end" comprising "at least one fixation point for attaching the second end to a

second discrete bone on a second side of the joint."

142.  In my opinion, and probably more important, Dr. Gall has incorrectly

identified the "second end" of the *Falkner* blade-plate.  The plain meaning of

"second end" to a POSITA in referring to a bone plate such as the blade-plate

55

and recognizes that '[t]he bridge portion may be configured to span a bone discontinuity.'")).  But this "bridge portion" of *Falkner* is not the bridge portion that Dr. Gall relies upon for other claim elements.

151.  Dr. Gall states that the disclosure of a bridge portion or region in *Falkner* is not the claimed bridge portion as described in the '608 Patent, as he opines: "Falkner's use of the terminology 'bridge region' or 'bridge portion' to describe the deformable junction between the exemplary external plate 34 and internal plate 36 in the illustrated L-shaped configuration should not be confused with the claimed 'bridge portion' of the OsteoMed patent."  (Ex. 1002, ¶ 179).

152.  Assuming the bridge portion is what Dr. Gall has identified in yellow, *Falkner* does not expressly or inherently teach the claimed "bridge portion configured to span across the joint", because Dr. Gall's bridge portion is not positioned over the discontinuity. Therefore, *Falkner* does not anticipate claim 1 of the '608 Patent.  This claim element is also present in claim 11 of the '608 Patent and therefore *Falkner* does not anticipate claim 11 of the '608 Patent, either.

   **2.    *Claims 2-3, 6, 8-10, 12, 13, 17***

153.  In my opinion, *Falkner* does not expressly or inherently teach every element of claims 1 and 11 of the '608 Patent, thus it is my opinion that *Falkner* does not anticipate claims 2-3, 6, 8-10, 12, 13, 17, either.

Page 1

1          UNITED STATES PATENT AND TRADEMARK OFFICE

2           BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4    STRYKER CORPORATION and      )

5    WRIGHT MEDICAL TECHNOLOGY,   )

6    INC.,                        )

7          Petitioners,           )

8      vs.                        ) Case: IPR2021-01450

9    OSTEOMED, LLC,               )

10         Patent Owner.          )

11

12

13

14           The discovery deposition of

15   KENNETH A. GALL, Ph.D., taken in the above-entitled

16   cause, before Deralyn Gordon, a notary public of

17   Cook County, Illinois, on the 19th day of May,

18   2022, at 500 West Madison Street, 34th Floor,

19   Chicago, Illinois, beginning at approximately

20   9:33 AM CST, pursuant to Notice.

21

22

23   REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

24   LICENSE NO:  084-003957

OSTEOMED EXHIBIT 2003
Stryker Corp., et al. v. OsteoMed LLC
IPR2021-01450

**Appx3566**

Page 28

1    BY MR. ENGEL:

2        Q.    Okay.  Do you cite to anything else in

3    your declaration other than Figure 1 and 12:3-4

4    to support that?

5        A.    That's the citation that's there.  But

6    it is my -- my opinion is based on a read of

7    the overall patent.

8        Q.    Is there anything in your opinion for

9    the '608 patent that's not expressly described

10   in Slater for claim 1?

11           MS. HWANG:  Objection, form.

12       A.    I believe that Slater is an anticipatory

13   reference.  This discloses everything.

14   BY MR. ENGEL:

15       Q.    Expressly?

16           MS. HWANG:  Objection, form and

17   foundation.

18       A.    Yeah, I believe everything is disclosed.

19   BY MR. ENGEL:

20       Q.    All right.  Do you rely on the knowledge

21   of the POSITA to fill any gaps in Slater?

22       A.    I do not.

23       Q.    Slater does not expressly describe how

24   the screw is anchored for the two-bone embodiment,

Page 29

1   does it?

2          MS. HWANG:  Objection, form.

3      A.   I'm not sure I understand that question.

4   BY MR. ENGEL:

5      Q.   Sure.  It doesn't tell you where

6   the threads are located in the two-bone

7   embodiment, does it?

8          MS. HWANG:  Objection, form.

9      A.   Yes, it does tell you where they're

10  located.

11  BY MR. ENGEL:

12     Q.   Where does it say that?

13     A.   Well, I'm not sure if the words are

14  in there or not, but it's my read of the patent

15  plus the picture.

16     Q.   Okay.  Well, show me exactly where it says

17  the threads are located in the two-bone

18  embodiment.

19     A.   Well, I can show you -- there's a picture

20  of it.

21     Q.   Okay.  And are the threads shown in that

22  picture?

23     A.   No, but I know there's threads there.

24     Q.   Okay.  Where are they located?

Page 30

1    A.    In this, in the talus.

2    Q.    How do you know that?

3    A.    From my read of patent.

4    Q.    Okay.  And where in the patent does it say

5    that the threads are located in the talus?

6    A.    Again, it's my overall read of the patent.

7    It's what I would think a person of ordinary skill

8    in the art would see if they read the patent and

9    saw that picture.

10    Q.    Okay.  So you're relying on the level of

11    ordinary skill in the art to make that assumption

12    that the threads would be located in the talus?

13        MS. HWANG:  Objection, foundation and

14    form.  That's not what he said.

15        MR. ENGEL:  You can keep your speaking

16    objections to a form objection.  Thank you.

17    A.    I'm not relying on.  I'm just saying that

18    when looking at the patent, you can see that

19    that's disclosed.

20    BY MR. ENGEL:

21    Q.    Where?

22    A.    In the picture.

23    Q.    In the picture you can tell that

24    the threads are located solely in the talus?

1          MS. HWANG:  Objection, asked and answered

2    multiple times.

3          A.   Yes.

4    BY MR. ENGEL:

5          Q.   How?

6          A.   You just can.  You know that's a screw,

7    and you know that that -- you can see where

8    they're located.

9          Q.   So you know the -- does it describe

10   the length of the shank portion of the screw

11   in that two-bone embodiment?

12         A.   I don't remember if it discusses that

13   exactly.

14         Q.   Okay.  Does it say that there is a

15   shank portion in the two-bone embodiment?

16         A.   Let me look.  I don't remember.

17              Yeah, I don't remember what it says in

18   detail.

19         Q.   Does it tell you the length of the threads

20   in the two-bone embodiment?

21         MS. HWANG:  Objection, form and beyond

22   the scope.

23         A.   I also don't believe -- it's tough to

24   answer your question, because I don't believe --

Page 32

1    you're calling it a two-bone embodiment.

2          As I made clear before, I believe there's

3    one embodiment that allows different screw angles

4    and different numbers of screws -- sorry, not

5    different numbers of screws.

6          That allows different screws to engage

7    with a different number of bones.

8    BY MR. ENGEL:

9      Q.   Does the Slater reference expressly

10    describe the angle that's depicted in Figure 1

11    where the transfixation screw intersects only

12    the two bones?

13          MS. HWANG:   I'm going to object to

14    the form.

15      A.   Which claim are you talking about?

16    BY MR. ENGEL:

17      Q.   I'm talking about Figure 1 of Slater.

18      A.   Right.   But in reference to which claim?

19      Q.   Well, if you need a claim, claim 1.

20      A.   Okay.

21      Q.   But my question was does the Slater

22    reference expressly describe the angle that's

23    depicted in Figure 1 where the transfixation screw

24    intersects only the two bones.   And it's your

Page 33

1    red oval on page 46.

2         A.    Yes.  You can see the angle of the screw

3    in Figure 1.

4         Q.    Okay.  Does it say what that angle is?

5         A.    I don't know if I understand the question.

6    The picture says what it is.

7         Q.    Okay.  But does Slater say the angle of

8    that specific screw is at 50 degrees?

9              MS. HWANG:  Objection, form.

10        A.    I don't know if it needs to or not.  But

11   that picture tells you roughly what angle that's

12   at.

13   BY MR. ENGEL:

14        Q.    Okay.  Does Slater tell you that the --

15   the type of screw that's used when you're only

16   going through two bones?

17        A.    Yeah.  It teaches you to use lag screws

18   in the embodiment.  And the embodiment contains

19   two or three bones.

20        Q.    I guess let's do it a little bit

21   differently.  Let's go to -- can you go to Slater?

22        A.    Sure.

23        Q.    And specifically Exhibit 1005, the

24   1450 proceeding, at page 12.

Page 34

1      A.    Okay.

2      Q.    And I guess let's start with line 29,

3   Figure 3.  Do you see that?

4      A.    I see it.

5      Q.    Okay.  And it says "Figure 3 shows

6   an elevation screw of a first screw type 60

7   according to one embodiment adapted for insertion

8   in openings 33, 35, and 36 for the tibial region

9   fixation."

10          Do you see that?

11     A.    Yes.

12     Q.    And that screw type 60, that's the screw

13  that's used to anchor the bone plate to the tibia;

14  correct?

15     A.    Yes.

16     Q.    And screw type 60 is not what you've

17  called a transfixation screw; correct?

18     A.    Correct.

19     Q.    Now, the next screw type that's discussed

20  on that page is screw type 70; correct?

21     A.    Correct.

22     Q.    And it says "Figure 4 shows an elevation

23  view of a second screw type 70 according to

24  one embodiment adapted for insertion in

Page 35

1   the plates of Figures 1 and 2 and allowing

2   adjustable orientation."

3          Do you see that?

4      A.    Yes.

5      Q.    And it says "Screw type 70 has a

6   longer shank to increase depth of penetration and

7   has an abbreviated threaded portion to allow

8   the majority of the shank to slide through

9   the aligned tibial and talus bones finally

10  anchoring in the calcaneus bone."  Right?

11     A.    Yes.

12     Q.    It says "Screw type 70 intersects all

13  three bones."  Right?

14     A.    Yes.

15     Q.    And there's no description here that

16  screw type 70 could be used to intersect only

17  two bones; correct?

18     A.    This description doesn't have it, but it's

19  in Figure 1.

20     Q.    Okay.  And Figure 1 is screw type 70

21  label?

22     A.    It is not, but you know that it's these

23  screws.

24     Q.    When you say "it's these screws," what do

Page 36

1    you mean by that?

2        A.    The transfixation screws there in

3    Figure 1.

4        Q.    So does it say in Slater that the screw

5    that intersects two bones in Figure 1 would be

6    screw type 70?

7            MS. HWANG:  Objection, form.

8        A.    It doesn't say that in words, but that's

9    disclosed through the text and the figures.

10   BY MR. ENGEL:

11       Q.    All right.  You're going to have to unpack

12   that for me.

13           It doesn't say it in words, but it's

14   disclosed through the text and the figures.  So

15   if it's not in words, how is it disclosed in

16   the text?

17       A.    Through your understanding of the text if

18   you look at the figures and the text together.

19       Q.    And then you draw the conclusion that

20   it has to be the same screw type?

21       A.    You know that that's the screw type.

22       Q.    How do you know that?

23       A.    Because it describes the type of screws.

24   And then it shows in that embodiment the screws

Page 37

1   used at different angles.

2       Q.   It doesn't say that the screw that goes

3   through just the two bones is any type of screw,

4   does it?

5           MS. HWANG:  Objection, form, and asked and

6   answered.

7       A.   My understanding, my read of it, is

8   that this is a single embodiment, that that

9   embodiment contains different screws.  That's

10  the screw you've been describing.  And you can

11  anchor it in different spots.

12  BY MR. ENGEL:

13      Q.   But it can't be the same screw?

14          MS. HWANG:  Objection, form.

15      A.   Well, it can be a -- it can be a screw of

16  different lengths.

17  BY MR. ENGEL:

18      Q.   Okay.  So it's not the same screw?

19          MS. HWANG:  Objection, form.

20      A.   Well, the same screw can have different

21  lengths.

22  BY MR. ENGEL:

23      Q.   And it can have different lengths of

24  threads as well?

Page 38

1          MS. HWANG:  Objection, form.
2      A.    Yeah, I'm not sure I thought about it
3  if it's different lengths of threads or not.
4          But I do believe those three different
5  screws are all different -- different parts of
6  the same embodiment.
7  BY MR. ENGEL:
8      Q.    Now, Slater discusses a fixation screw 25;
9  right?
10     A.    Yes.
11     Q.    And Slater doesn't say this, but it's your
12  opinion that screw 25 is screw type 70?
13     A.    Yes.
14     Q.    But you'll agree that Slater doesn't ever
15  say that; right?
16          MS. HWANG:  Objection, form and beyond
17  the scope.
18     A.    Yeah, I don't know if -- I don't remember
19  if it says it in the text or not.
20          But I do believe that 25 is screw type 70.
21  BY MR. ENGEL:
22     Q.    Now, let's go to 11:18-27 of Slater.
23     A.    Okay.
24     Q.    And in the second sentence it says

Page 39

1    "Disposed in portion 20 is fixation screw 25

2    which passes through opening 26 in formation 27."

3         Do you see that?

4    A.   Yes.

5    Q.   And if you skip the next two sentences,

6    it says "Screw 25 engages tibia, talus, and

7    calcaneus effectively providing three points of

8    fixation according to this embodiment."  Correct?

9    A.   Yes, I see that.

10   Q.   In the embodiment described it provides

11   three points of fixation; correct?

12        MS. HWANG:  Objection, form.

13   A.   I believe that's an option for that

14   embodiment, the three points of fixation.

15   BY MR. ENGEL:

16   Q.   That doesn't discuss that you could have

17   two points of fixation in the text here, does it?

18   A.   Right.  But in the figure you can have

19   two points of fixation.

20   Q.   And that would be a different embodiment

21   than three points of fixation; correct?

22   A.   No.  That would be the same embodiment.

23   Q.   And why do you say that?

24   A.   Because I believe in reading the patent

Page 40

1    and looking at the figure that that's a single

2    embodiment.

3        Q.    Okay.  But where it says three points of

4    fixation according to this embodiment, it's your

5    opinion that two points of fixation is the same

6    embodiment?

7            MS. HWANG:  Objection, form.

8        A.    Yes.

9    BY MR. ENGEL:

10        Q.    Same embodiment of what?

11            MS. HWANG:  Objection, form.

12        A.    I don't know what you mean by that.

13    BY MR. ENGEL:

14        Q.    Well, is it the same embodiment of

15    the plate or a system for fixation?

16            MS. HWANG:  Objection, form.

17    BY MR. ENGEL:

18        Q.    When you say "same embodiment," same

19    embodiment of what do you mean?

20        A.    The plate along with the plate's capacity

21    to have transfixed -- to have that screw at

22    different angles.

23        Q.    But you agree it would have to be

24    different length screws if you're going through

Page 41

1    two versus three bones?

2           MS. HWANG:   Objection, form and

3    foundation.

4       A.    Depending on the scenario, yes, you might

5    need different length screws.

6    BY MR. ENGEL:

7       Q.    In Figure 1 it's clearly a shorter screw

8    that's used that's depicted through two bones;

9    right?

10      A.    I'm sorry.  Yes.  And there's two

11   different length screws shown through the three

12   bones as well.

13      Q.    You think that the screws through

14   three bones are different lengths than each other?

15      A.    Well, they may be close, but I haven't

16   measured them.

17      Q.    You think Figure 1 is to scale?

18      A.    As far as the dimensions?  I do not

19   believe they're to scale.

20      Q.    Now, screw type 60, screw type 70, and

21   screw 25 are the only screws described in Slater;

22   correct?

23           MS. HWANG:   Objection, foundation and

24   form.

Page 42

1     A.    Pretty broad statement.  I don't remember

2   if there's other screws mentioned or not.  Maybe.

3   BY MR. ENGEL:

4     Q.    As you sit here today, are you aware of

5   any screws described in Slater other than screw

6   type 60, screw type 70, and screw 25?

7     A.    Hold on one second.  I want to answer that

8   right.

9           Yeah, for example, there's a section on

10  page 19 that talks about a home run lag screw.

11    Q.    Where is that at?

12    A.    It's under the section that starts with

13  "Analysis of simulated in-vivo performance."  It

14  goes on through a couple of pages, page 19,

15  line 25.

16    Q.    Is that a different screw than screw type

17  60, screw type 70 or screw 25?

18    A.    I think that's also a lag screw.  But you

19  asked me if there was anything else discussed.

20    Q.    So is it a different screw than those

21  other three screws described?

22          MS. HWANG:  Objection, form and

23  foundation.

24    A.    I think it's the same type of screw.  It's

Page 43

 1  a lag screw.

 2  BY MR. ENGEL:

 3      Q.   It's a home run lag screw?

 4      A.   Typically it's a -- it's a screw that's

 5  placed at an angle for fusion or fracture

 6  fixation.

 7      Q.   Does it say that the home run lag screw is

 8  the same as screw type 70?

 9      A.   Well, from looking at this you can see

10  that it's talking about analysis of the stresses

11  in the screw at different -- with and without that

12  screw, which it seems like it's the screw that is

13  placed through there and is actually from this

14  paragraph talking about the tensile stresses that

15  that screw holds.  It seems like the same type of

16  screw.

17      Q.   Okay.  Does it say that anywhere in

18  Slater?

19      A.   Well, it talks about the screw right

20  there, yeah.

21      Q.   Does it say that home run lag screw is

22  screw type 70?

23      A.   I don't know if it uses those exact words,

24  but you can tell where that's from based on

Page 44

1    the analysis that's here.

2        Q.    Now, would you agree that

3    the configuration of a screw could include

4    the length of the threads on the screw?

5        A.    Yes.

6        Q.    And the configuration of a screw could

7    include the location of the threads on the screw?

8        A.    Yes.

9        Q.    And the configuration of a screw could

10   include the length of the shank on the screw as

11   well?

12       A.    Agreed.

13       Q.    And another potential configuration of

14   the screw would be the angle of insertion relative

15   to the plate; correct?

16       A.    I don't know about --

17           MS. HWANG:  I'll object to the form.

18       A.    Yeah, I don't know about that.  I think

19   that that's a little unclear.

20   BY MR. ENGEL:

21       Q.    Okay.  Well, I guess let's stick with

22   the length of the threads, the location of

23   the threads, and the length of the shank as

24   being potential factors in configuration of

**Appx3609**

Page 45

1    the screw.

2         Those factors are going to determine how

3    a joint compresses when the screw is used to

4    compress the joint; correct?

5         MS. HWANG:  Objection, form and

6    foundation.

7    A.   Those could be some factors amongst other

8    factors.

9    BY MR. ENGEL:

10   Q.   And that's going to affect how load is

11   transferred from the screw to the plate as well;

12   correct?

13        MS. HWANG:  Objection, form.

14   A.   Could be -- those could be factors that

15   might contribute.

16   BY MR. ENGEL:

17   Q.   Would the angle of insertion of a screw

18   relative to the plate affect how load is

19   transferred from the screw to the plate?

20        MS. HWANG:  Objection, foundation.

21   A.   Could you be a little more specific?

22   BY MR. ENGEL:

23   Q.   Sure.

24        MR. ENGEL:  You can make a form objection.

Page 46

1    Okay?  Thanks.

2          MS. HWANG:  I think I'm allowed to make

3    foundation objections as well.  I'm making

4    one-word objections.  I'm not making speaking

5    objections.

6    BY MR. ENGEL:

7       Q.   Let's go to page 68 of your declaration.

8    It's page 71 of 231 on the bottom right,

9    paragraph 114.  And for the record we're in

10   Exhibit 1002 of the 1450 proceeding.

11         All right.  And paragraph 114 starts on

12   page 66, but I wanted to ask you a question on

13   page 68.  If you need to look at the full context,

14   please feel free to do so.

15         Are you on page 68?

16      A.   Yes.

17      Q.   Okay.  And the first full sentence on that

18   page starts "This transfer..."

19         Do you see that?

20      A.   On page 68?

21      Q.   Yes.

22      A.   I see it.

23      Q.   And specifically it says "This transfer

24   occurs because the threads on the screw and

Page 47

1  the portion of the screw head that abuts the

2  inner surface of the screw will act essentially as

3  a vise, to the second bone and the plate, with

4  the first bone held in between."

5           Do you see that?

6      A.    Yup.

7      Q.    And that's your opinion; right?

8      A.    I wrote that text, yes.

9      Q.    That's not something that's expressly

10  described in Slater, is it?

11     A.    Well, the transfer of the -- transfer of

12  the stress is described, the transfer of the load,

13  but not the exact text here is not.

14     Q.    You don't have a citation to Slater after

15  that sentence, do you?

16     A.    I do not.

17     Q.    What configuration of screw 25 did you

18  assume to render that opinion?

19     A.    Looking at Figure 1 I'm assuming

20  the two-bone part of that embodiment.

21     Q.    And specifically what configuration of

22  the screw?

23     A.    The screw extending through the tibia into

24  the talus.

Page 48

1    Q.    With the threads located where?

2    A.    In the talus.

3    Q.    Talus only?

4    A.    Correct.

5    Q.    If the threads were in both bones, that

6    would affect the opinion you offer here; right?

7         MS. HWANG:  Objection, form.

8    A.    Hold on.  You're giving me a hypothetical?

9    BY MR. ENGEL:

10   Q.    I'm not giving you a hypothetical.

11        I'm asking -- I'm asking you a question as

12   an expert whether it affects your opinion.

13   A.    What was the condition?

14   Q.    Sure.  You've assumed that the threads are

15   only located in the talus; correct?

16   A.    Yes.

17   Q.    Okay.  There's no text in Slater that

18   says the threads are only located in the talus;

19   right?

20        MS. HWANG:  Objection, asked and answered.

21   A.    I'm basing that on both the specification

22   and the picture.

23   BY MR. ENGEL:

24   Q.    And in the picture it doesn't show where

Page 49

1   the threads are located either, does it?

2          MS. HWANG:  Objection, asked and answered.

3      A.   Again, it's the combination of the two

4   I'm relying on.

5   BY MR. ENGEL:

6      Q.   Okay.  And if the threads were located

7   in both the talus and the tibia, that would affect

8   the statement you've offered on page 68 about it

9   acting as a vise; right?

10         MS. HWANG:  Objection, foundation.

11     A.   It would depend on the nature of that,

12  excuse me, that difference.  It depends on

13  the type of -- you're saying a general difference

14  in the threads or if they're located in both.  It

15  would depend on if there was some other type of

16  scenario with different type of threads.

17  BY MR. ENGEL:

18     Q.   Okay.  For purposes of the opinion

19  you rendered on page 68 that we talked about,

20  you assume the threads on the screw are located

21  only in the talus; correct?

22     A.   Yes.  I assumed it's operating as a

23  lag screw, yes.

24         MS. HWANG:  Jason, we've been going about

**Appx3614**

Page 71

1      A.    I don't have a figure of it with

2    annotation.   You're correct.

3    BY MR. ENGEL:

4      Q.    What would be the central axis angle for

5    Figure 1?

6          MS. HWANG:   Objection, form.

7      A.    Hold on one second.   There would be

8    a couple different angles possible, trajectories

9    possible.

10   BY MR. ENGEL:

11     Q.    For the central axis of the transfixation

12   hole in Figure 1?

13     A.    Yeah, that's not something I've analyzed.

14   I've just got it on Figure 9.

15     Q.    Okay.   So, as you sit here today, you

16   don't have an opinion whether there is a central

17   axis for the plate in Figure 1?

18          MS. HWANG:   Objection, form.

19     A.    I'm just saying it's not something I

20   analyzed.

21          I'm not saying there's not a central axis.

22   BY MR. ENGEL:

23     Q.    Okay.   Are you offering the opinion that

24   there is a central axis of screw hole 26 for

1   Figure 1?

2       A.    I don't think I have it explicitly

3   in there, but yes, I do believe the plate has

4   a central axis.

5       Q.    Did you calculate it?

6       A.    I don't remember if I did or not.

7       Q.    For purposes of your opinion, are the --

8   is the plate in Figure 1 the same plate as in

9   Figure 5?

10      A.    I need to take a look at the patent if

11  we're going to do that.

12            Could you repeat that question, please?

13      Q.    Sure.  For purposes of your opinion,

14  are the -- is the plate in Figure 1 the same plate

15  as in Figure 5?

16            MS. HWANG:  Objection, form and

17  foundation.

18            MR. ENGEL:  Let me ask it a different way.

19  BY MR. ENGEL:

20      Q.    You've offered the opinion that Slater

21  discloses one embodiment; correct?

22            MS. HWANG:  Objection, form.

23      A.    Yes.

24

Page 92

1   Slater.

2          And earlier this morning counsel asked

3   you about the various screws that are disclosed in

4   Slater.  Do you remember that?

5      A.   I do.

6      Q.   And do you recall specifically discussing

7   a screw called a home run lag screw?

8      A.   Yes.

9      Q.   And you referred to page 19 of Slater when

10  discussing the home run lag screw; correct?

11     A.   Correct.

12     Q.   Is the home run lag screw, as described by

13  Slater, a transfixation screw?

14          MR. ENGEL:  Object to the form.

15     A.   Yes.

16  BY MS. HWANG:

17     Q.   In what context is a home run lag screw

18  discussed in Slater?

19          MR. ENGEL:  Object to the form.

20     A.   They're talking about an analysis of

21  how the -- they do an analysis, a finite element

22  analysis.

23  BY MS. HWANG:

24     Q.   What kind of finite element analysis does

**Appx3657**

Page 93

1    Slater discuss with respect to the lag screw?

2         MR. ENGEL:  Object to the scope.

3      A.   They do a finite element analysis where

4    they include the lag screw in the analysis,

5    and they do an analysis without it to determine

6    how tensile loads are transferred through

7    the screw into the plate.

8    BY MS. HWANG:

9      Q.   I'd like to turn back to Exhibit 1002,

10   paragraph 119.  It's page 71.

11     A.   Okay.

12     Q.   And counsel asked you some questions about

13   paragraph 119 earlier today; is that correct?

14     A.   Yes.

15     Q.   And in particular your analysis as

16   described in paragraph 119 relates to your

17   ground one analysis of Slater anticipating

18   dependent claim 2; correct?

19     A.   Correct.

20     Q.   Now, looking at -- let's go to dependent

21   claim 2.  You have it recited at paragraph 116.

22     A.   Okay.

23     Q.   Can you reread the text of claim 2?

24     A.   "The system of claim 1, wherein

Page 94

1   a central axis of the inner surface of

2   the transfixation screw hole defines the

3   trajectory; and the trajectory is configured

4   across a neutral bending axis of the joint once

5   the plate is placed across the joint."

6       Q.    Okay.  Going back when the word

7   "trajectory" first appears in the second line that

8   you read, it says "defines the trajectory."

9   Correct?

10      A.    Yes.

11      Q.    Okay.  And you understand that claim 2 is

12  a dependent claim that depends from claim 1?

13      A.    Yes.

14      Q.    Do you recall what claim 1 of the

15  '608 patent recites?

16          MR. ENGEL:  Object to the form.

17      A.    Yes, I know claim 1.

18  BY MS. HWANG:

19      Q.    Just to make life easier for the

20  record, can we go to Exhibit 1001, which is the

21  '608 patent, and look at claim 1.

22      A.    Okay.

23      Q.    So looking at claim 1, let's look at

24  column 12 around line maybe it's 13 starting with

Page 95

1    "A transfixation screw hole."

2        A.    Yes.

3        Q.    Can you please read that claim element.

4        A.    "A transfixation screw hole disposed

5    along the spine.  The transfixation screw hole

6    comprising an inner surface and figure to direct

7    the transfixation screw hole through

8    the transfixation screw hole such that

9    the transfixation screw extends the bridge portion

10   at a trajectory configured to pass through

11   the first portion of the discrete bone --

12   sorry, through a first portion on the first

13   discrete bone, a portion of the joint, and a

14   second position on the second discrete bone

15   once the plate is placed across the joint and."

16       Q.    Okay.  And the trajectory that's described

17   in claim 1 refers to the trajectory of the screw;

18   is that correct?

19            MR. ENGEL:  Object to the form.

20       A.    Yes.

21   BY MS. HWANG:

22       Q.    Is the trajectory of a transfixation screw

23   necessarily the same as the trajectory of

24   the central axis to the transfixation screw hole?

**Appx3660**

1          MR. ENGEL:  Object to the form.

2     A.    Not necessarily.

3  BY MS. HWANG:

4     Q.    Okay.  But it can be?

5     A.    Correct.

6     Q.    Okay.

7          Let's go to Exhibit 1002, your

8  declaration, paragraph 127.  And I would like

9  for you to read paragraph 127 in its entirety.

10  You can read it to yourself.

11     A.    Okay.

12     Q.    Okay.  So paragraph 127 of Exhibit 1002

13  is part of your analysis of ground one,

14  anticipation by Slater of dependent claim 3;

15  is that accurate?

16     A.    Yes.

17     Q.    And what does dependent claim 3 recite?

18  It's at paragraph 121 of your declaration.

19     A.    "The system of claim 2 wherein the

20  first position resides on a compression side of

21  the joint and the second position resides on

22  the tension side of the joint."

23     Q.    Okay.  So I want to go back to

24  paragraph 127 of Exhibit 1002.  And you had

Page 1

1        UNITED STATES PATENT AND TRADEMARK OFFICE

         BEFORE THE PATENT TRIAL AND APPEAL BOARD

2

3

STRYKER CORPORATION and WRIGHT       )

4  MEDICAL TECHNOLOGY, INC.,          )

                                      )

5                 Petitioners,        )

                                      )

6            -vs-                     )   No. IPR2021-01450

                                      )

7  OSTEOMED LLC,                      )

                                      )

8                 Patent Owner.       )

9

10            Deposition of GEORGE B. HOLMES, JR., M.D.,

11  taken before TRACY L. BLASZAK, CSR, CRR, and Notary

12  Public, pursuant to the Rules of the United States

13  Patent and Trademark Office pertaining to the taking of

14  depositions, at Suite 3500, 500 West Madison Street, in

15  the City of Chicago, Cook County, Illinois at 9:38 a.m.

16  on the 21st day of October, A.D., 2022.

17

18

19

20

21

22

23

24

OSTEOMED EXHIBIT 2006
Stryker Corp., et al. v. OsteoMed LLC
IPR2021-01450

Appx3865

Page 2

1          There were present at the taking of this
2    deposition the following counsel:
3
          McANDREWS, HELD & MALLOY by
4         MS. SHARON A. HWANG
          MR. SEAN C. SPARROW
5         500 West Madison Street
          Suite 3500
6         Chicago, Illinois 60661
          (312) 775-8000
7         shwang@mcandrews-ip.com
          ssparrow@mcandrews-ip.com
8
               on behalf of the Petitioners;
9
10        K&L GATES LLP by
          MS. KATHERINE L. ALLOR
11        70 West Madison Street
          Suite 3100
12        Chicago, Illinois 60602
          (312) 372-1121
13        katy.allor@klgates.com
14             on behalf of the Patent Owner.
15
                    - - - - -
16
17
18
19
20
21
22
23
24

Page 3

1                      DEPOSITION OF
                GEORGE B. HOLMES, JR., M.D.

2
                     October 21, 2022

3
4     EXAMINATION BY:                              PAGE
5    Ms. Katherine L. Allor                          4
                                                    67
6
     Ms. Sharon A. Hwang                            62
7
8
                     * * * * * *
9
10                  INDEX OF EXHIBITS
                  (retained by counsel)
11
12   EXHIBIT        DESCRIPTION                     PAGE
13   Exhibit 1001   U.S. patents 8,529,608, 9,351,776,   17
                    9,763,716 and 10,245,085

14
     Exhibit 1006   U.S. patent application          8
15                  2005/0171655 Falkner
16   Exhibit 1028   Declarations of Dr. George B.    11
                    Holmes, Jr., M.D.
17
     Exhibit 1029   Curriculum vitae of George B.    18
18                  Holmes, Jr., M.D.
19
20                   * * * * * *
21
22
23
24

Page 4

1              GEORGE B. HOLMES, JR., M.D.,

2    called as a witness herein, having been first duly

3    sworn, was examined upon oral interrogatories and

4    testified as follows:

5                         EXAMINATION

6                    by Ms. Allor:

7        Q   Good morning, Dr. Holmes.

8        A   Good morning.

9        Q   Have you ever been deposed before?

10       A   Yes, ma'am.

11       Q   And how many times?

12       A   More than 100.

13       Q   More than 100.  Wow.  In what types of cases?

14       A   The majority have been in reference to

15   independent medical examinations that I performed.  And

16   the other categories would include personal injury,

17   treating physician, as a treating physician I've done

18   depositions as that, and medical malpractice and product

19   liability.

20       Q   Have you ever been deposed in a patent case

21   before?

22       A   I have not.

23       Q   So since you are quite experienced in

24   depositions, I'll just briefly go over the ground rules

Page 5

1    just for today.

2           Everything has to be verbal so that the court

3    reporter can take down your answers.  If you don't

4    understand a question, please ask me to either rephrase

5    or re-ask it in a different way because if you answer

6    the question, I'm going to assume you understood it.

7           Is that fair?

8       A    Fair.

9       Q    And then if you need to take a break, just let

10   me know, and we can stop after you answer a question

11   that's pending or find a good spot to do that.

12      A    Okay.  Thank you.

13      Q    Okay.  And then just sort of to kind of orient

14   us today, you understand that you're here today to

15   discuss four declarations that you provided in four

16   separate IPR proceedings?

17      A    Yes.

18      Q    And those, for the record, those IPR proceedings

19   are IPR2021-01450, and I'll probably refer to that as

20   the 1450 proceeding.

21          Is that okay with you?

22      A    Yes, as long as if I don't understand which one

23   you're referring to, you refresh my memory.

24      Q    Okay.  And then that one is related to patent,

Page 6

1   U.S. patent No. 8,529,608.  And I'll probably refer to

2   that as the '608 patent if that's all right with you?

3       A   Yes.

4       Q   And I think today we'll probably focus on that

5   proceeding because the other four seem very similar.

6   And so to the extent that you have answers that are

7   different for the other three, could you let me know so

8   we can discuss that, is that fair?

9       A   Yes.

10      Q   Okay.  And then the other three proceedings,

11  just to read the numbers into the record, IPR2021-01451,

12  and that's for U.S. patent 9,351,776.  And that one

13  I'll -- if we refer to that individually, I'll call it

14  the '776 patent.

15          Is that all right with you?

16      A   You're talking a lot of numbers, so as long as

17  you keep me oriented, that will be fine.

18      Q   Okay.  And then the other two proceedings, the

19  other one is 2021-1452, that's for U.S. patent

20  9,763,716.  And then the fourth one is IPR2021-01453,

21  and that's for U.S. patent 10,245,085.

22          So I'm going to focus my questions on your

23  declaration from the very first proceeding, the 1450

24  proceeding that's leading into the '608 patent, okay?

1    A    Okay.

2    Q    And so I want to ask you just a few background

3    questions.

4         When were you engaged in this matter?

5    A    My recollection is it was the end of 2021.

6    Q    Do you know if it was either at the beginning of

7    the month of December or at the end of the month of

8    December?

9    A    I can't be more specific.  It was somewhere

10   between November and December of last year.  I cannot be

11   more specific in terms of the exact date.

12   Q    And how did the petitioners in this matter,

13   Stryker and Wright Medical, how did they locate you?

14   A    I believe they located me through my secretary

15   at the time, it was a phone call to her.  And then I

16   believe that that inquiry was then passed on to me

17   either by telling me verbally or supplying a telephone

18   number for contact.

19   Q    And you said you've never done any work in a

20   patent case before, that's right?

21   A    I have never done a patent case, that's correct.

22   Q    And have you looked at the patents that are at

23   issue in this case, the four patents being the '608

24   patent, the '776 patent, the '716 patent, and the '085

Page 8

1    patent?

2      A    With regard to the declarations you just entered

3    into the record, I have reviewed and looked at the

4    patents related to those four declarations.

5      Q    And so you looked at the actual patents that are

6    at issue in the proceeding, not just the prior art

7    reference that your declaration discusses?  And that

8    prior art reference is called Falkner.

9      A    Could you repeat your question.

10      Q    So you understand your declarations are directed

11    to a prior art reference called Falkner?

12      A    Yes.

13      Q    Would you like to see a copy of that reference

14    so that you have it in front of you?

15      A    Yes.

16      MS. ALLOR:  Okay.  So that's been previously marked

17    as Exhibit 1006.

18          (Exhibit 1006 tendered to the witness.)

19      MS. ALLOR:  Q    So is that the only patent that you

20    looked at in conjunction with your declaration?

21      A    I looked at other patents, but with regard to

22    this declaration, I looked at the Falkner patent with

23    regard to this declaration '608 we're talking about

24    today.

Page 9

1      Q   And have you ever done work for Stryker before?

2      A   No.  I've used their products in the course of

3   my career, amongst others, but I don't believe I've ever

4   done any legal work for Stryker.

5      Q   And so that's kind of my follow-on question, is

6   regarding Stryker's products in your own practice, do

7   you have a preference for using their plates and screws

8   and devices over other products?

9      A   I do not.

10     Q   How frequently would you say that you use

11  Stryker products versus other products?

12     A   Given the environment of orthopedic implants,

13  probably 10 to 20 percent max.

14     Q   What about Wright Medical products, have you

15  ever used any of their plates in your orthopedic

16  practice?

17     A   Yes.

18     Q   And how often do you use those Wright Medical

19  plates compared to other plates in your practice?

20     A   Again, given the number of vendors that are

21  available to us, my use of Wright would be less than 10

22  percent.

23     Q   Have you ever used OsteoMed products in your

24  practice?

Page 10

1        A    I believe so.

2        Q    And how often do you use OsteoMed products over

3    other products?

4        A    I would use the same estimation that I use for

5    Wright, probably 10 percent or less given, again, the

6    number of vendors available.

7        Q    And have you ever had any issues with OsteoMed

8    products?

9        A    No.

10       Q    Have you ever had any issues with Stryker

11   products?

12       A    No.

13       Q    Have you ever had any issues with Wright

14   products?

15       A    No.

16       Q    Have you ever used any AccuMed products in your

17   practice?

18       A    Yes.

19       Q    And what types of AccuMed products have you

20   used?

21       A    I believe AccuMed puts out screws and other

22   small joint devices, so I am familiar with that company.

23   I don't use many of their products, but I have used

24   AccuMed at some point in my career.

Page 11

1    Q    And from a percentage-wise of using AccuMed

2   versus other screws and small joint devices, would you

3   say that you use them less than 10 percent of the time?

4    A    That would be correct, yes.

5    Q    What did you do to prepare the declarations that

6   we're here to talk about today?

7    A    They were prepared by my review of the art, I

8   think you mentioned the term the art of the

9   declaration -- I mean, of the patent.  And it was also

10  prepared with the assistance of the person that made the

11  art in the declaration in terms of the figures in the

12  declaration, as well.

13          So it was a conjunction of my opinion, and it

14  was then put into a format where I submitted my CV, and

15  the CV was then included with the declaration.  And I

16  reviewed those issues in the declaration with attorneys.

17   Q    And you said that you prepared figures along

18  with your declaration, is that correct?

19   A    I think there, if you will show me the

20  declaration, the back page.

21   MS. ALLOR:  Sure.  Here are a copy of all four of

22  your declarations.

23          (Exhibit 1028 tendered to the witness.)

24   MS. ALLOR:  Q    They're all marked as Exhibit 1028,

Page 12

1   but they have the different proceeding number on the

2   bottom.

3       A    Okay.

4       Q    So we'll just focus on the one that's on the

5   top, the '608 one.

6       A    There is a figure at the back, figure 1(b).  And

7   I was involved with the creation of that figure.

8       Q    And how did you create that figure?

9       A    This figure is, as you can see, very similar to

10  the front-facing figure in Falkner.  And, basically,

11  using that as a template, the plate was then

12  repositioned with regard to that as being sort of the

13  baseline figure.

14      Q    But you would agree that that figure was

15  modified when it was included in your declaration, the

16  figure 1(a) and 1(b), those are modified figures?  Those

17  do not appear in Falkner?

18      A    Oh, absolutely correct.

19      MS. HWANG:  Objection, form.

20      MS. ALLOR:   Q    And did you personally create those

21  figures or did someone else create them for you?

22      A    Yes.

23      Q    Which -- Sorry.  Did you create the figures?

24      A    Yes to both of your questions.

Page 13

1      Q    So you created them and someone else created

2    them?

3      A    In conjunction, yes, ma'am.

4      Q    Okay.  Now, you said something earlier about

5    working with the person who provided -- or wrote the

6    art.  You're not referring to the actual inventor

7    Falkner, that was not what you meant, right?

8      A    That is absolutely correct.

9      Q    Okay.  So when you talk about working with

10   someone, you were working with someone on your attorney

11   team, is that correct?

12     A    Yes.

13     Q    And how much time did you spend working on this

14   declaration?

15     A    It's hard for me to give you an exact estimate

16   to parcel out the declaration from the time that went

17   into the review prior to the declaration.  So I can't

18   say that of the time I'm involved what percentage was on

19   the declaration itself.

20     Q    So how much time have you spent to date working

21   on this matter?

22     A    Greater than ten hours.

23     Q    Greater than what, sorry?

24     A    Ten.

1    Q    Ten?

2    A    Yes, ma'am.

3    Q    So greater than 10, less than 20?

4    A    Oh, I love that game.  I don't know.  Greater

5    than 10, possibly less than 20.

6    Q    And if you could turn to the last page of your

7    declaration, and this is the '608 declaration, is that

8    your signature at the end?

9    A    Yes, it is.

10    Q    And it looks like you signed that -- There is no

11    date included.

12         When did you sign this?

13    A    I think within the last -- I can't be more

14    specific -- within the last six weeks.

15    Q    Once you were engaged in the November, December

16    timeframe, when did you start actually drafting the

17    declaration?

18    A    I believe, again, this is -- I know we're not

19    supposed to guess, but my best guesstimate is that it

20    was within this last six-week period of time when the

21    draft was concluded with my signature.

22    Q    Did you review any of the papers submitted in

23    this case, either by Stryker or by the patent board or

24    by petitioners -- sorry, by patent owners, OsteoMed?

Page 15

1    A   And so I'm clear, what do you mean by papers?

2    Q   So this is part of an IPR proceeding, and there

3  is papers that we submit by each side to the Patent

4  Office.  There is a petition that Stryker and Wright put

5  together.  There was a preliminary patent owner response

6  by OsteoMed.  There was an institution decision by the

7  Board, and then there was a patent owner response put

8  together by OsteoMed.

9       So those are what I refer to as like the papers

10  of the proceeding.

11    A   I'm not aware of all of the papers you've just

12  mentioned that I've actually seen.

13    Q   So you don't remember reviewing any of those?

14    A   I don't recall reviewing all of those things

15  that you just mentioned.  It's possible that I have.

16  When you used that list of papers, I can't be more

17  specific.

18    Q   Would it be fair to say that if you didn't list

19  those in your declaration as materials reviewed, that

20  you did not look at them?

21    A   Not necessarily.

22    Q   So there might be documents that you reviewed

23  that you didn't list in your declaration?

24    MS. HWANG:  Objection, form.

Page 16

1      THE WITNESS:  My understanding is that the

2   declaration was in specific response to the opinions of

3   Mr. Sommers.  And to that degree of specificity, the

4   declaration is related to that.  That does not preclude

5   that other materials not relevant to this issue may have

6   been reviewed.

7      MS. ALLOR:  Q   With respect to your deposition

8   today, what did you do to prepare for it?

9      A   I have reviewed the petitioners' replies

10  specifically as you noted from '608 on numerous

11  occasions prior to the deposition today.  I have not

12  done any literature search with regard to preparation

13  for today.

14     Q   Did you review your declaration in preparation

15  for today?

16     A   Yes, I guess that's what I was trying to say in

17  response to your answer, yes.

18     Q   Well, the petitioners' reply is a different

19  document than your declaration.

20     A   I'm just looking at the front page here.  I

21  apologize if I was imprecise in answering your question.

22     Q   So just to clarify, so to prepare for today you

23  reviewed your declaration?

24     A   Yes.

1    Q   Did you review the Falkner reference, which you

2    have in front of you?

3    A   Yes.

4    Q   Did you review the '608 patent itself?

5    A   Yes.

6    MS. ALLOR:  And I'll give you a copy of that just so

7    we're clear as to what I'm talking about.  So here are

8    the four patents that are in the proceeding.

9            (Exhibit 1001 tendered to the witness.)

10    MS. ALLOR:  Q   So if you could look at Exhibit

11    1001, that's the '608 patent.  And so that's the

12    document that you reviewed in preparation for today?

13    A   I believe so, yes.

14    Q   And how much time did you spend preparing for

15    today's deposition?

16    A   Probably total maybe eight hours.

17    Q   And how many times did you meet with counsel?

18    A   Once.

19    Q   And when was that?

20    A   Yesterday.

21    Q   And how long did you meet with counsel?

22    A   Probably for about five hours, four or five

23    hours.

24    MS. ALLOR:  I'm going to give you a copy of Exhibit

Page 18

1    1029.

2           (Exhibit 1029 tendered to the witness.)

3       MS. ALLOR:   Q    This is your CV that's been

4    submitted along with your declaration.

5       A    Yes.

6       Q    Does this accurately describe your education and

7    experience?

8       A    It does.

9       Q    And if you could look at paragraphs 4 to 14 of

10   your declaration, so this is under a heading called,

11   background and qualifications.  And it looks like it's a

12   narrative description of your background and

13   qualifications, is that correct?

14      A    Yes.

15      Q    And it accurately describes and summarizes your

16   education and experience?

17      A    Yes.

18      Q    So if we could turn to paragraph 19 of your

19   declaration.  So this is under a heading for Falkner.

20   And I've already given you a copy of that reference.

21           So is it fair to say that you're familiar with

22   the Falkner reference?

23      A    I believe so.

24      Q    And if we look at the front of Falkner, that's

Page 19

1   Exhibit 1006.  Now, what type of plate is shown on the

2   front of it?

3       A    This could be construed as a blade plate,

4   B-L-A-D-E.

5       Q    Now, you say it could be construed.  I mean,

6   what other name would you call this plate?

7       A    I would call it a blade plate.

8       Q    Okay.  So Falkner is describing a blade plate,

9   is that correct?

10      A    Yes.

11      Q    And a blade plate, in general, is meant to be

12  inserted into the bone on the distal end, correct?

13      A    Yes.

14      Q    And the plate of Falkner shows a screw that goes

15  from the external portion of the plate to the internal

16  portion of the plate, and it's threaded into that plate.

17          Do you see that?

18      A    Yes.

19      Q    And that is how this plate is intended to be

20  used, correct?

21      MS. HWANG:  Objection, form.

22      THE WITNESS:  Could you be more specific?

23      MS. ALLOR:  Q   This blade plate is intended to be

24  inserted into the bone and then that longer screw is

Page 20

1    intended to go from the external portion of the plate to

2    the internal portion of the plate and thread into that

3    internal portion, is that correct?

4        A    That construct you just mentioned is correct.

5        Q    Do you have experience using this type of a bone

6    plate?

7        A    Yes.

8        Q    Have you ever used this type of plate to repair

9    a fracture at the position that's being shown in the

10   front of Falkner?

11       A    Yes.

12       Q    Have you ever used this plate for arthrodesis of

13   the ankle joint?

14       A    Yes.

15       Q    And where would you position the plate if you

16   were to be using a blade plate for arthrodesis of the

17   ankle?

18       A    The blade plate would have the portion that is

19   inserted in the bone.  In lieu of being inserted in the

20   tibia, it would be inserted in the talus.

21       Q    And how many times have you performed that type

22   of arthrodesis using a blade plate?

23       MS. HWANG:  Objection, form.

24       THE WITNESS:  I've had a 30-plus-year career, so

Page 21

1   it's difficult to indicate an exact number over 30

2   years.

3        But given my training and my practice, enough

4   times to be comfortable with the procedure itself.

5   MS. ALLOR:   Q   So it is not an uncommon procedure

6   to use a blade plate for arthrodesis of an ankle?

7   A   It is not.

8   Q   Would the length of the plate need to be

9   extended in order to secure the ankle joint compared to

10  what you see in Falkner?

11  MS. HWANG:  Objection, form.

12  THE WITNESS:  The blade plate as shown in Falkner is

13  of sufficient length to be used for a fusion of a tibia

14  and talus.

15  MS. ALLOR:   Q   And when you say sufficient length,

16  are you referring to the portion that is external to the

17  bone or the portion that is internal to the bone?

18  A   Both, but more specifically the external

19  portion.

20  Q   So if we look at the modified figure in your

21  declaration, and it's on page 22, paragraph 36, is that

22  internal portion of sufficient length for ankle fusion?

23  A   It is.

24  Q   Are there instances where you would want to

Page 22

1    extend the length of that internal portion?

2        MS. HWANG:  Objection, form.

3        THE WITNESS:  Given my understanding of the use of a

4    blade plate for fusion, the length that is represented

5    here is sufficient.  Going further across or longer with

6    the insertion portion would not appreciably increase the

7    efficacy of the plate.

8        MS. ALLOR:  Q   So you described some other

9    modifications that would need to occur to the plate in

10   order to apply it to this portion that you're showing

11   here in figure 1(b).

12       MS. HWANG:  Objection, form.

13       MS. ALLOR:  Q   And I believe you described some of

14   these potential modifications in paragraph 24, if you

15   want to refer back.

16           And so you describe how in order to adjust the

17   plate for use over the ankle joint that -- and it says,

18   "Commercially available bone plates for use in the foot

19   and ankle can be cut to an appropriate size using plate

20   cutters to better fit the needs of a particular patient.

21   Such bone plates can also be bent using plate benders to

22   better fit on or conform to the bones of a particular

23   patient."

24           And you say, "It is particularly common to use

Page 23

1   plate benders to contour the bone plate to the shape of

2   the bone to minimize irritation to soft tissue and to

3   ensure that the bone plate has the lowest profile

4   possible to minimize discomfort to the patient."

5           So you're describing there some modifications

6   that need to be done to the blade plate depending on the

7   particular patient, is that correct?

8       MS. HWANG:  Objection, form.

9       THE WITNESS:  I believe your question is a little

10  bit too vague to answer specifically.

11      MS. ALLOR:  Q   So cutting the plate, that would be

12  a modification to it, correct?

13      A   The term cutting a plate is something that is

14  done to a plate by the surgeon for fitting, whether it

15  be a fracture or fusion.  But, yes, that is a change in

16  the pattern of the plate that is used at a surgeon's

17  discretion.

18      Q   And the surgeon would do that once they know

19  what patient they're inserting the plate into and once

20  they've evaluated the geometry of that patient's bone,

21  correct?

22      A   Yes.

23      Q   And is it easy to cut a bone plate?

24      A   Relatively speaking, yes.

Page 24

1      Q    And is it part of the normal procedures for

2    inserting a blade plate, is it typical to have to cut

3    the plate?

4      A    I can answer that question if you allow me to be

5    a little bit more specific from an orthopedic surgeon's

6    perspective.

7      Q    Okay.  That's fine.

8      A    So if we look at figure 1 and figure 1(a) and we

9    use a plate of this size, if, for example, you're in the

10   operating room and you have a limited selection of

11   plates and you may have a small patient, you may have a

12   young child, you may have a female or male patient who

13   is small, that plate may be too big.

14         So when we have plates that are too big for a

15   particular patient, we sometimes will cut a portion of

16   the plate down in order to fit that patient.

17         So that's the term when I use cutting the

18   plate, if you have a mismatch between a patient's leg

19   and the plate that you have available, you sometimes on

20   occasion have to cut the plate to fit the patient.  It's

21   not changing the plate.  It's just figuring how to use a

22   big plate for a smaller person.

23     Q    And how easy is it to cut the plate?

24     A    In the big picture of life, it's relatively

Page 25

1  easy.  It's not something that we don't do.

2      Q   So is it easy to cut it accurately?

3      A   Most things in the OR can be done accurately,

4  yes.

5      Q   And then you also discussed using plate benders

6  to conform the plate to the shape or contour of the

7  bone, correct?

8      A   I did.

9      Q   And how easy is it to use plate benders to bend

10  a plate like what's disclosed in Falkner?

11     A   It is much easier to bend the plate like that's

12  demonstrated in Falkner.  The tools are readily

13  available to bend the plate.  And plate bending is

14  relatively common for any plate application.

15     Q   And if you were to bend or contour a blade plate

16  like what's shown in Falkner, do you have any concerns

17  about that screw, we'll call it the -- I don't know what

18  number it is in the figures -- 44, I believe.  Do you

19  have any issues where screw 44 would no longer thread

20  into the internal portion if you were to contour the

21  plate to the bone?

22     MS. HWANG:  Objection, form.

23     THE WITNESS:  In terms of the general practice of

24  plate bending, I would not have a concern that a bending

1   of the plate would affect the placement of screw 44.

2      MS. ALLOR:  Q   Would you have concerns if you cut

3   the proximal length of the plate down and you no longer

4   had three screws to secure the plate to a bone?

5      MS. HWANG:  Objection, form.

6      THE WITNESS:  As a matter of practice, I'm unaware

7   that any reasonably qualified orthopedic surgeon would

8   cut the plate to the extent that you would not be able

9   to put those screws that are noted at the proximal

10   portion of the plate.  It would not make any sense to

11   cut a plate at that position, ma'am.

12      MS. ALLOR:  Q   So where would you be cutting the

13   plate?

14      MS. HWANG:  Objection, form.

15      THE WITNESS:  As it relates to your previous

16   question, assuming that the plate would be cut just

17   above the transverse screw at No. 44, you could cut the

18   plate between an area of where No. 40 is or in the area

19   where No. 22 is.

20         But, again, to cut it below that, it would not

21   make any sense.  I'm not aware that anyone that I know

22   of in practice would cut it below the third screw.

23      MS. ALLOR:  Q   Okay.  So you would be -- it would

24   be okay to cut off the top two of the three distal -- or

Page 27

1   proximal screws, but you would not want to cut it off so

2   that you could not have that third screw in place?

3        MS. HWANG:  Objection, form.

4        THE WITNESS:  Medicine is probably more nuance than

5   law.  But, in general, if this plate had to be shortened

6   from that particular position, it would be more common

7   and most common to shorten it between the top screw and

8   the second screw.

9        MS. ALLOR:  Q   If we look at the modified figure

10  1(b) again, that's at the end of your declaration on

11  page 22.  So this figure it shows the blade plate of

12  Falkner shifted down so that it is -- so that the screw

13  44 is crossing the tibiotalar joint, is that correct?

14       A    That's correct.

15       Q    Is this the optimal location to cross that joint

16  if you were using this blade plate?

17       MS. HWANG:  Objection, form.

18       THE WITNESS:  It is a good place to cross the joint.

19            That being said, using your term optimal, if we

20  were to use that as a barometer, then you would have a

21  wide range of optimal locations.  So that plate could be

22  up a little higher and it would still be considered

23  optimal.

24       MS. ALLOR:  Q   So why did you select this placement

Page 28

1  for your modified figure 1(b)?

2     A    This placement is representative.  And to answer

3  your question why, it's just a good representative

4  location.  It could have been put up another few

5  millimeters and it still would have been optimal, so.

6          It's almost irrelevant the exact location in

7  reference to this.  The joint is within the area that

8  the plate would provide excellent fixation.

9     Q    Would you say that it could be moved up to match

10 where the fracture line is shown in figure 1 of Falkner,

11 so how the fracture line goes between -- and the screws

12 are not labeled, so I apologize.

13         But the two at the distal end, if you look at

14 figure 1 of Falkner, the fracture line goes between

15 those two screws, do you see that, between the two small

16 distal screws?

17    A    I do see that.

18    Q    Would you say that the joint line could be

19 located in that same place?

20    A    Again, not to harp on this, but orthopedics and

21 medicine is far more nuance than I think black and

22 white.

23         So to answer your question, if this plate is to

24 be used to do an ankle fusion, it is better to have that

Page 29

1  line that you've indicated is the fracture line that

2  went on Falkner between the two screws, it's better to

3  have that line a little bit more proximal because,

4  technically, you want to have a little bit more bone on

5  the other side of the plate than you do for the

6  fracture.

7         That gets into a half-hour lecture on the blood

8  supply of the talus.  It's not relevant.  But to answer

9  your question, the fracture line is probably not the

10  most ideal location as I represented in the fusion in

11  figure 1(b).

12     Q   So the fusion line is ideal for a fusion, is

13  that correct?

14     MS. HWANG:  Objection, form.

15     THE WITNESS:  I did address that issue earlier by

16  saying that that plate could be moved up a little bit

17  more, a few millimeters to where it is closer to what

18  you see in Falkner.

19         However, that being said, I would have a little

20  bit more of a zone of bone closer to what we see in 1(b)

21  than what we see in Falkner.  But that's a discretionary

22  issue with the surgeon as to how much bone he or she

23  needs on the talus side.  There are multiple factors

24  that will determine the width of the bone on the talus

Page 30

1    side.

2      Q    And I apologize.  We've been referring to it as

3    screw 44, but it's actually opening 44 and there is

4    actually a figure No. 42 on there that's referring to

5    the screw, just for clarity.

6          So if we look at your figure 1(b) again, and I

7    know we've already covered this, but I just want to get

8    like a few follow-up questions on this.

9          So there were modifications made to the actual

10    shape and location of the plate when you made this

11    figure 1(b), correct?

12      MS. HWANG:  Objection, form.

13      THE WITNESS:  I think that's a compound question.

14    There was not any modification made to the shape, the

15    overall configuration of the plate and screw

16    configuration.

17      MS. ALLOR:  Q    So you didn't adjust the actual

18    contour of the plate in the image?

19      A    If you look at the figure on the front of

20    Falkner, one can construe that there is a little bit of

21    straightening of the plate itself.  But in the big

22    picture, it's irrelevant because even in Falkner we use

23    benders to contour the plate more exactly to each

24    individual's tibia.

Page 31

1       And any difference between what you see from

2   the proximal tip of the plate to the transverse screw

3   that is No. 42 you identified is purely inconsequential.

4       Q    Whether it's inconsequential, that wasn't my

5   question.  My question was, you did straighten it out a

6   little bit?  Like the figures, if you were to lay them

7   on top of each other, they're not identical, is that

8   correct?

9       A    I have agreed with you that the figures are not

10  identical.  To the extent there is any difference

11  between those two areas may have occurred in the course

12  of doing the subsequent figure 1(b).

13       But to my mind as an orthopedic surgeon, there

14  is no difference and there should be no difference

15  between what you see in figure 1(b) and what you see in

16  Falkner.

17       It was not my intention to have you see any

18  significant relevant difference in the Falkner plate and

19  the plate you see in 1(b).

20      Q    But you would agree you manipulated the image,

21  you modified it to flatten it out to put it in the

22  location that crosses the tibiotalar joint, correct?

23      MS. HWANG:  Objection, form.

24      THE WITNESS:  And, again, I'm sorry that this has

Page 32

1   not been communicated to you more succinctly.  Any

2   change in the configuration between Falkner and 1(b) is,

3   I would say, inconsequential but unintentional if there

4   is a difference.

5           In fact, if I can just -- there is a slight

6   difference even in the way the screws are to some

7   extent, particularly distally.

8           And any difference is in someone doing a

9   Van Gogh and another one doing a copy of a Van Gogh.

10    MS. ALLOR:  Q  Right.  But you would agree that the

11   copy of the Van Gogh is not -- it does not have the same

12   layout identically to what is in figure 1 of Falkner?

13    MS. HWANG:  Objection, form.

14    THE WITNESS:  I believe you've asked that on three

15   occasions, and I've tried to answer it on three

16   occasions.  I have not indicated to you that there is an

17   exact replication of Falkner in 1(b).  I've said that on

18   three occasions.

19    MS. ALLOR:  Q  Well, you said there is

20   unintentional differences.

21           So my question is, was it intentional or was it

22   unintentional?  Did you mean for the plate to look

23   identical and just be shifted down, or did you

24   intentionally modify it and straighten it out and change

Page 33

1    the angle of some of the screws and the placement?

2         MS. HWANG:  Objection, form.

3         THE WITNESS:  I think the original tenor of your

4    question was, was there a difference.  This is my fourth

5    time acknowledging that there is a difference.  I think

6    the record will reflect that I did indicate that any

7    difference is unintentional and, more importantly,

8    inconsequential.

9         MS. ALLOR:  Q   The word unintentional and

10   inconsequential don't mean the same thing to me, so I'm

11   trying to understand.

12              You modified the figure, you pulled it

13   downward, you flattened it out, correct?

14        MS. HWANG:  Objection, form.

15        THE WITNESS:  The figure was pulled down.  I have no

16   specific recollection of flattening, intentionally

17   flattening the figure to make 1(b).

18        MS. ALLOR:  Q   So you don't know who flattened the

19   figure out or whether it was flattened at all?

20        A   As you and I are sitting here today, I do see

21   that it's flatter than what we see in Falkner.  Whether

22   it was done in the process of bringing it down to

23   conform with the bone, it is my understanding that if it

24   was, it was unintentional.  And that's pretty much my

Page 34

1    understanding at this point.

2        Q    And it also shows in the figure, the modified

3    figure 1(b) that some of the bone that was in the figure

4    before has been removed, is that correct?

5        A    That is correct.

6        Q    And that is something that you would have to do

7    in order to use this plate, this plate in Falkner?  In

8    order to use it over a joint such as the tibiotalar as

9    shown, you would need to remove some of the bone, is

10   that correct?

11       A    To use this plate for fusion, some bone has to

12   be removed to conform to the plate.

13       Q    Does Falkner explain in the reference itself how

14   to make these modifications that you have done to the

15   figure 1?

16       THE WITNESS:  Madam Reporter, could you repeat the

17   question, please.

18       MS. ALLOR:  You can read it back to him.

19           (From the record above, the reporter read

20           the following:

21           "Q  Does Falkner explain in the reference

22           itself how to make these modifications that

23           you have done to the figure 1?")

24       THE WITNESS:  In a general sense, yes.

1    MS. ALLOR:  Q   So in a more specific sense, no, is

2  that your answer?

3    A   It would be yes to both.

4    Q   So can you point me to where it describes

5  removing some of the bone in order to place the plate

6  over a joint?

7    A   Yes.

8    Q   You can point me to where?  That's my question.

9    A   Yes.

10    Q   Okay.  Can you point me to where it shows that?

11    A   I can.  Do you want me to do that?

12    Q   Yes, I would like you to point me to where in

13  Falkner it describes removing the bone in order to place

14  the plate over a joint.

15    A   If you refer to paragraph 28, and I'm probably

16  going to go to some extent into 29 and 30.  So in the

17  middle of 28 he says, "Accordingly, exemplary

18  discontinuities for use with bone plates described

19  herein may include joints, fractures, and then osteotomy

20  (cuts in bone)."

21         So what is described as shaving the bone down

22  would be consistent with a cut in the bone.  "Nonunions

23  produced by injury, disease, or birth defects."

24         Paragraph 29, "The bone plates described herein

Page 36

1   may be configured for use on any suitable bone of the

2   human skeleton and/or of another vertebrate species.

3   Exemplary bones may include bones of the arms,

4   hands/wrists, feet, vertebrae," et cetera.

5         At the end of the paragraph he states,

6   "Alternatively, or in addition, these bone plates may be

7   used to fuse joints, such as fusion of the

8   tibiotalocalcaneal (ankle) joint, among others."

9         In paragraph 30, "Each bone plate may be

10  configured," and configured is equivalent to our

11  discussion about plate benders, "to be disposed in any

12  suitable position relative to its target bone.  The bone

13  plate (or a plate portion, see section II) may be

14  configured to be disposed in contact with exterior

15  surface of the bone and thus may be positioned at least

16  substantially exterior to the bone."

17        So in orthopedic speak, the plate can be

18  configured to the bone.  You may need to do osteotomies

19  or breaking of the bone for a fusion or treatment of

20  fractures.

21        It would be generally notable that those

22  descriptions are consistent with shaving the bone down

23  in order to create figure 1(b) as demonstrated in the

24  response.

Page 37

1      Q    So you're reading those three or four paragraphs

2    as describing shaving the bone section down in order to

3    place the plate, is that your opinion?

4      A    That's my opinion.

5      Q    So the last sentence that you didn't read says,

6    "The interior bone surfaces may be created during

7    installation of the bone plate (such as by punching the

8    bone plate through the exterior bone surface) and/or may

9    be accessible due to a break, a cut, or the like."

10          So isn't it actually just describing just the

11    insertion of the plate end into the bone?

12      A    No.

13      Q    So you're reading that as -- all of that as

14    saying that you can shave the bone down and place it

15    wherever you feel like it?

16      A    Madam, if you look at the context of paragraphs

17    27 through 30, within those paragraphs it is clear to an

18    orthopedic surgeon that the modification of the talus to

19    configure with the plate is completely consistent with

20    his description.

21      Q    So if you weren't an orthopedic surgeon, would

22    you read this paragraph to understand that you needed to

23    shave the bone off in order to properly place the plate?

24      MS. HWANG:  Objection, form.

Page 38

1      THE WITNESS:  Ma'am, I'm an orthopedic surgeon, so I

2  see things through an orthopedic surgeon's eyes.  You're

3  an attorney.  You see things through an attorney's eyes.

4        This plate is made for orthopedic surgeons.

5  And an orthopedic surgeon would see that these

6  paragraphs are clearly consistent with the normal

7  practice of orthopedics to apply a plate for a

8  tibiotalar fusion.

9      MS. ALLOR:  Q   But you would agree it doesn't

10  discuss removing portions of the bone so that the plate

11  can be placed?

12      A   As an orthopedic surgeon who does tibiotalar

13  fusions, the wording of these paragraphs are consistent

14  with the understanding that bone would be removed to

15  configure this plate.

16        This is not rocket science.  This is well

17  understood in the practice of orthopedics for a fusion

18  and is noted in the terms of cutting the bone and

19  configuring the plate to dispose it for positioning in a

20  suitable position to align with the bone.

21      Q   So if you go back to paragraph 4 of Falkner in

22  the introduction section and if you take a look at that

23  first sentence, it says, "Fixation of bone fractures (or

24  other discontinuities) can be problematic when these

Page 39

1   fractures are disposed near the ends of bones,

2   (metaphyseal fractures)."

3           Do you agree that that is a problem?

4   A    It's not a problem in the sense it's a problem

5   that it's something a doctor has to consider.  I think

6   I've already mentioned that earlier in the deposition in

7   terms of positioning.

8           You asked me a question earlier regarding to

9   the fracture shown on the front of Falkner 1, and you

10  indicated that that would be a good position to do the

11  fusion.  And I indicated that that fracture line should

12  be in a different line with the fusion line.  And that's

13  taking into consideration these issues of the

14  positioning in the metaphyseal bone.

15          It should be placed to the extent that one does

16  not cause any avascular necrosis.  I think that was also

17  mentioned in my declaration, as well.

18  Q    So I did not say that that was where the joint

19  should be placed, so you're definitely misconstruing

20  what I said earlier.

21          So I just want to ask you a simple question

22  about what we just looked at.  This is describing some

23  issues with fractures at the ends of bones, correct?

24  A    Yes.

Page 40

1    Q    And Falkner in the figures and the description

2    addresses fractures at the ends of bones, correct?

3    A    Amongst the joints itself, yes.  We also

4    mentioned joints, yes.

5    Q    The figures themselves only show the fracture

6    near the end of the bone, correct?

7    A    It shows one fracture at the end of the distal

8    tibia.

9    Q    And this introduction background discussion is

10   describing a problem which is securing fractures that

11   occur at the end of bones, is that right?

12   A    Not exactly, no, ma'am.

13   Q    So what is it describing?

14   A    His wording was can be problematic.  It's not

15   that it is problematic.  It can be.  So that, to my

16   understanding, there is a difference between, quote,

17   something is problematic versus something that could be

18   problematic.

19   Q    So when you read the Falkner reference as a

20   whole, you're not viewing it as something that's being

21   directed to solving this problem of fractures at the end

22   of the bone, is that your opinion?

23   MS. HWANG:  Objection, form.

24   THE WITNESS:  I don't understand your question,

Page 41

1    ma'am.

2        MS. ALLOR:   Q   Do you understand the basics of a

3    patent?

4        A   Yes.

5        Q   And you understand that the way it's laid out it

6    has an introduction, it's got a summary, it's got

7    detailed descriptions, and then it's got figures and

8    claims?

9        A   In a general sense, yes.

10       Q   And in a general sense it's usually directed to

11   solving a problem, which is why it has an invention at

12   the end.

13           Do you understand that?

14       A   I do.

15       Q   Okay.  So my question is, when you read the

16   disclosure of Falkner as a whole and you read that

17   paragraph 4, don't you view it as a patent that is

18   directed to solving the problem of fractures located at

19   the end of a long bone as shown in figure 1?

20       MS. HWANG:  Objection, form and asked and answered.

21       THE WITNESS:  I would not review this patent based

22   upon one paragraph.  If this were as simple as one

23   paragraph, it wouldn't be multiple pages with multiple

24   paragraphs.

Page 42

1          So your question did not take into

2     consideration the fact that he describes use of this

3     device for a fusion.

4          So, yes, as the one figure shows, it shows a

5     specific fracture.  This plate, from his description,

6     can be used for a number of different fractures in the

7     same area as well as a fusion in the total context of

8     the patent.

9     MS. ALLOR:   Q   But you would agree there is no

10    figures disclosing or showing how to use that blade

11    plate in any other location besides the fracture being

12    located between those two screws at the end and the

13    plate being located in the long bone of the tibia?

14    MS. HWANG:  Objection, form.

15    THE WITNESS:  I can indicate -- I am able to

16    indicate that there is just the one demonstrative

17    photograph of the plate superimposed upon a distal tibia

18    fracture.  I will agree that there is one figure.

19    MS. ALLOR:   Q   And if you look at paragraph 69,

20    here it's describing what Falkner refers to as its

21    bridge portion 54.

22          And if you look at the figures, it's not

23    indicated on figure 1, but No. 54 is shown on figure 2

24    and figure 4.

Page 43

1        So you would agree with me that Falkner

2   describes placing the discontinuity at that end where

3   its bridge portion 54, so the Falkner bridge portion 54,

4   is located?

5        A    What figure again are you on now, figure 2?

6        Q    So figures 2 and 4 show No. 54, and it's

7   described in paragraph 69.

8            And so my question is, you would agree with me

9   that Falkner describes placing the discontinuity, and in

10  this case the figures show a fracture line, at the

11  portion that it refers to as the bridge portion 54?

12       MS. HWANG:  Objection, form.

13           And when there is a convenient time for a

14  break, it's been a little over an hour.

15       MS. ALLOR:  Sure.  After he answers, we can do that.

16       THE WITNESS:  And, again, I'm not sure where you

17  would you start.  Could you repeat your question now

18  that you've gotten me focused on the area or could the

19  court reporter repeat it.

20       MS. ALLOR:  Q    Sure.  I'll repeat it.

21           So we're looking at figures 2 and 4 which show

22  Falkner's bridge portion 54.  And it's also described in

23  paragraph 69.

24           You would agree with me that Falkner describes

Page 44

1    the discontinuity as being placed at that bridge

2    portion, correct?

3        MS. HWANG:  Objection, form and outside the scope.

4        THE WITNESS:  The description of the bridge portion

5    in paragraph 69 is a relatively nonconstrained

6    description.  And to the extent the description outlined

7    in paragraph 69, one would construe that the area of

8    bone discontinuity would be in the, quote, bridge

9    portion as outlined more succinctly in paragraph 69 than

10   what we see in the limited figure of figures 2 and 4.

11       MS. ALLOR:  All right.  We can go back to this.

12   We'll take a break now.

13       MS. HWANG:  Okay.

14           (a brief recess was taken from 10:40 a.m. to

15           10:58 a.m.)

16       MS. ALLOR:  Q   Dr. Holmes, so before we went on

17   break we were talking about paragraph 69 and the figures

18   in general, figures 1, 2, and 4.

19           So you would agree with me that figure 1 shows

20   the discontinuity at the distal end of the external

21   portion of the plate with the two screws located on

22   either side of the discontinuity, correct?

23       MS. HWANG:  Objection, form.

24       THE WITNESS:  That was a compound question.  Can you

Page 45

1  break it into its components, please, because if I give

2  an answer, I'm answering two parts of your question.

3     MS. ALLOR:  Q   That's fine.  I can ask it

4  separately.

5          So you agree figure 1 shows the discontinuity

6  at the distal end of the plate, correct?

7     A   Yes.

8     Q   And it also shows a screw on the distal side of

9  the discontinuity and a different screw on the proximal

10  side of the discontinuity, correct?

11     A   Yes, but the distal screw is going across the

12  discontinuity, as well.

13     Q   And those are shorter fixation screws, they're

14  not, obviously, as long as the one that -- as screw 42?

15     A   Correct.

16     Q   And if we look at figure 2 and figure 4, there

17  is a portion that's been identified as the bridge

18  portion 54 of Falkner.  And that portion is located

19  between those two screws, correct?

20     MS. HWANG:  Objection, outside the scope.

21     THE WITNESS:  I don't see what you're talking about.

22  I see 54 on figure 2, but I don't see what you're saying

23  is between those two screws, at least from the vantage

24  point of figure 2.  I just may not be seeing it.

Page 46

1      MS. ALLOR:  Q   So you see in figure 2 there is

2  opening 52 and there is opening 56, correct?

3      A   Yes, I do see that.

4      Q   And the bridge portion 54 of Falkner is

5  identified in figure 2 as being between those two

6  openings, correct?

7      MS. HWANG:  Objection, form and outside the scope.

8      THE WITNESS:  I don't see a specific description of

9  figure 54.  I see the label, but I don't see the

10  description you just stated in the figure.

11      MS. ALLOR:  Q   Well, we were talking about

12  paragraph 69 which described No. 54 as the bridge

13  portion.

14      A   Is there a pending question or is that a

15  statement?

16      Q   My question was, is that portion which spans the

17  discontinuity in between those two screws?

18      MS. HWANG:  Objection, form.

19      THE WITNESS:  Now that question is even more obscure

20  than the one you asked before.

21      MS. ALLOR:  Q   Portion 54 is identified in figure

22  2.

23      A   Yes.

24      Q   It's not on figure 1, you would agree with me?

1      A    I'm on figure 2 with you.

2      Q    Okay.  So if we were to overlay figure 2 onto

3  figure 1, you would have those two screws that are not

4  labeled in figure 1, they would be through the hole, the

5  openings 52 and 56 on figure 2?

6      A    I'm in agreement with that.

7      Q    And figure 2 is showing a portion 54, which is

8  described in paragraph 69 as being the bridge portion 54

9  that spans the discontinuity, correct?

10     A    You are reading that sentence correctly.

11     Q    Okay.  So my question is, is in your modified

12 figure 1(a) you have moved up the discontinuity to a

13 different position, is that correct?

14     A    That is correct.

15     Q    And that is contrary to the teaching of

16 paragraph 69 describing that the bridge portion that is

17 in Falkner, bridge portion 54, should span the

18 discontinuity?

19     MS. HWANG:  Objection, form.

20     THE WITNESS:  I don't agree with -- I don't

21 understand your question, but I don't agree of your

22 description.

23     MS. ALLOR:  Q   You don't agree with me that you

24 moved up the portion of the discontinuity to outside of

Page 48

1    that portion 54?

2        A    Correct, as described in the entire paragraph of

3    69.

4        Q    What do you mean described in the whole

5    paragraph?

6        A    A minute ago you read one sentence.  The

7    sentence you read within 69 paragraph was, "The bridge

8    portion may be configured to span a bone discontinuity."

9    That's one sentence of an entire 20-line paragraph

10   describing the entirety of what he is referring to as

11   the bridge portion.

12       Q    So where else does it describe where to locate

13   bridge portion 54 in Falkner?

14       A    Again, referring to paragraph 69, to start with

15   the beginning, it says, "Bridge portion 54 may connect

16   the exterior and interior portions of bone plate 22."

17            So that definition means that it's a portion,

18   any portion an extent that connects the external portion

19   with the horizontal portion or the anterior portion.

20            It also states later, "Alternatively, or in

21   addition, the bridge portion may define, at least

22   partially, the angular disposition of the external and

23   internal portions of the bone plate."

24            That definition would put that area of the

Page 49

 1  demonstration in 1(b) within the entirety of the bridge

 2  area as described or outlined in paragraph 69.

 3      Q    So you're saying the bridge portion can be

 4  extended upward and that's why you moved the

 5  discontinuity?

 6      MS. HWANG:  Objection, form, outside the scope.

 7      MS. ALLOR:  I am going to ask you to stop saying

 8  outside the scope because this is part of his opinion.

 9  He's moved the discontinuity, and I'm entitled to ask

10  him about his support and reasons for that.

11      MS. HWANG:  Well, you're going way beyond that.  You

12  can ask about the figures that are in his declaration,

13  but you've been focusing, instead, on paragraphs of

14  Falkner that are not part of the declaration.

15      MS. ALLOR:  Well, he didn't cite hardly any

16  paragraphs of Falkner, so I am here to ask him what he

17  relied on.

18      MS. HWANG:  Well, why don't you point him to his

19  declaration and the portions where he does cite to

20  Falkner.

21      MS. ALLOR:  I'm asking him about his moving of the

22  discontinuity, and I'm entitled to ask those questions.

23      MS. HWANG:  You are entitled to ask about, you know,

24  what he did.  But I think you're sort of going beyond

Page 50

1    the scope by bringing in terms that have not been

2    discussed in the declaration.

3        MS. ALLOR:  We can disagree on that.  I'm going to

4    continue asking my questions.

5        Q    So where in Falkner does it describe the ability

6    to move the discontinuity outside of the bridge portion?

7        MS. HWANG:  Objection, form.

8        MS. ALLOR:  Q    The bridge portion 54.

9        MS. HWANG:  Objection to form, outside the scope.

10       THE WITNESS:  As defined by paragraph 69, his

11   definition of the bridge portion states, "Alternatively,

12   or in addition, the bridge portion may define, at least

13   partially, the angular disposition of the external and

14   internal portions of the bone plate."

15           That would be in -- that would be consistent

16   with the demonstration in figure 1(b).  And that line

17   that's drawn in 1(b) between the tibia and the talus can

18   be in multiple positions from that point more distally,

19   as well.

20       MS. ALLOR:  Q    I think we might be talking past

21   each other because I've been asking you about figure

22   1(a), not 1(b).  So 1(a) is on page 14 of your

23   declaration.

24       A    Thank you for that clarification.

1      Q    And this figure is what I've been asking my

2   questions about, is this moving of the alternative

3   fracture line.

4            And where did you find support in Falkner to

5   make that move?

6      A    The Falkner demonstration of the plate, this

7   plate can be used for multiple fracture patterns, and

8   this is a demonstration of an alternative fracture

9   pattern for which this plate would be useful for a

10  reasonable performance of the art of orthopedics for a

11  surgeon and would be consistent with Sommers on page 15,

12  sorry, page 17, 16 and 17 with Falkner -- with Sommers

13  indicating that it would be a call by the surgeon.

14           So, clearly, Sommers also recognized that

15  determining whether the plate would work in other

16  configurations or fractures other than the transverse

17  fracture in figure 1 -- figure 1, that would be the

18  surgeon's call that he -- and I agree with Mr. Sommers

19  that other fracture patterns such as shown in 1(b) would

20  be consistent with the proper use of this plate

21  configuration.

22     Q    So figure 1(a), modified figure 1(a), which is

23  in paragraph 23 of your declaration, you're describing

24  this figure and the modifications that you're making to

Page 52

```
 1   it in paragraphs 21 and 23.

 2           Do you agree with me on that?

 3       MS. HWANG:  Objection, form.

 4       THE WITNESS:  And the paragraphs you indicated were

 5   21 through 23?

 6       MS. ALLOR:  Q   Yes.

 7       A   And, again, the question is, those are the

 8   modifications used between figure 1 and figure 1(a)?

 9       Q   Yes.

10       A   I believe what's indicated in paragraphs 21 and

11   22 and 23 are accurate.

12       Q   Okay.  So my question is, you're describing how

13   you get to figure 1(a) in those preceding paragraphs, 21

14   to 23 is describing the changes, the modifications

15   you're making to the plate to get to figure 1(a),

16   correct?

17       MS. HWANG:  Objection, form.

18       THE WITNESS:  My understanding is there is no

19   modifications of the plate between figure 1 and figure

20   1(a).  That's not being described here.

21       MS. ALLOR:  Q   So the modifications to the fracture

22   line?

23       A   The fracture line is in a different portion of

24   the tibia in 1(a), indicating that in the normal
```

Page 53

1    practice of orthopedic surgery that fracture line can be

2    in a different position than shown in figure 1, and it

3    would be completely acceptable and minimal to use of the

4    aforementioned Falkner plate.

5        Q    And where in these paragraphs do you cite to any

6    disclosure of Falkner that tells you that this plate

7    would be appropriate to be used in this alternative

8    fracture line that you've identified?

9        A    And can I ask you for clarification?  Is your

10   question, another way of asking your question is that is

11   the demonstration of Falkner in figure 1 or the front

12   page of his patent, is your question such that that

13   patent is written for only that exact one demonstration

14   that's shown on the front page, is that your question?

15       Q    My question is, is that Falkner describes the

16   discontinuity being located in the location that it

17   shows it in figure 1.  We just read a couple paragraphs

18   that described it being located at the bridge portion

19   54.

20            And my question is, how did you get to your

21   modified figure?  There is nothing cited in your

22   paragraphs of how you relied on Falkner to move that

23   fracture line.

24       MS. HWANG:  Objection, form.

Page 54

1      THE WITNESS:  Firstly, the description of the bridge

2    portion 54 in paragraph 69 is far more inclusive than

3    what you've indicated that's marked in figure No. 2.

4          Secondly, we talked earlier in the

5    deposition -- and I'm going to ask all parties to help

6    me.  We had a discussion earlier that I quoted three or

7    four paragraphs from Falkner.  Were those paragraphs 29

8    when we talked about --

9      MS. ALLOR:  Q   I believe you were looking at 28,

10    29, and 30 earlier.

11      A    Thank you.

12          The descriptions in paragraphs 28, 29, and 30

13    would, in their totality, indicate and be consistent

14    with the modification of the fracture line that we see

15    in figure 1(a).

16      Q   But you would agree with me that when you move

17    the discontinuity line up, it's no longer located at the

18    bridge portion 54 as described in Falkner?

19      A    And, unfortunately, I disagree with your

20    description.

21          My understanding of how he verbally describes

22    figure 54 is consistent with -- I'm sorry, bridge 54, is

23    consistent with the placement of the modified fracture

24    line of figure 1(a).

1    Q    So you see the dash lines on figure 2 at the

2  corner where No. 54 is?

3    A    I do see two dash lines on figure 2.

4    Q    And is that the bridge portion 54?

5    A    I think technically when you look at figure 2,

6  the 54 in a line, that line does not go to those dash

7  lines.  It goes to the edge of the plate.  So, again,

8  given the figure and given the context of the

9  description of 54, which is far more extensive than the

10  arrow, that does not juxtapose exactly the two dotted

11  lines.  I think that it's more -- it's clarified more

12  succinctly in the description in paragraph 69.

13    Q    So there is no benefit to having a screw on each

14  side of the discontinuity as shown in figure 1?

15    A    For figure 1, those two screws are adding

16  additional support to the entire construct.  But if that

17  line of the fracture line is moved up, the same

18  placement of those screws below the fracture line or in

19  the case of the final photograph on page 22 of my

20  declaration, those screws in those two different

21  positions still provide adequate fixation because the

22  primary fixation will be the three proximal screws and

23  the oblique screw going through the plate and the stem

24  of the blade plate.

Page 56

1    Q   So if I'm understanding this, it's your opinion

2    that it doesn't matter where the discontinuity is

3    located with respect to the end of the plate?

4        MS. HWANG:   Objection, form.

5        THE WITNESS:   My answer to your question from the

6    standpoint of an orthopedic biomechanical construct of

7    this plate is that the same rigidity, the same overall

8    fracture healing will be obtained whether you're looking

9    at 1 or 1(a).

10       Whether you want to make a statement with

11   regard to the contribution of those two screws, the

12   plate configuration is equally rigid with both 1 and

13   1(a) as drawn.

14       MS. ALLOR:   Q   So now I'm going to be done with

15   1(a).

16       Now referring to 1(b), the paragraphs that

17   support your 1(b), it looks like it's paragraphs 24 to

18   36 describe how you got to figure 1(b), is that correct?

19       MS. HWANG:   Object to the form.

20       THE WITNESS:   I'm not sure that it is reasonable to

21   use the term this is how I got to figure 1(b).

22       There is a lot of information starting with

23   paragraph 25.  There is not, in my mind, a direct line

24   between that because there are other issues discussed,

Page 57

1    particularly in paragraph 25.  So it's a bit vague for

2    me to say, yes, that's how I got, using those

3    paragraphs, from paragraph 25 all the way to figure

4    1(b).

5        MS. ALLOR:  Q   Okay.  Then how did you create --

6    how did you come to conclude that figure 1(b) should be

7    drawn the way it's drawn?

8        MS. HWANG:  Objection, asked and answered.

9        THE WITNESS:  The ankle fusion that's demonstrated

10   in 1(b) and with the placement of the plate in 1(b) is

11   an extrapolation from the translation of the plate more

12   distally.  So in lieu of the horizontal tine of the

13   blade plate going into the tibia, it goes into the

14   talus.

15           And the translation of that is relatively

16   straightforward.

17       MS. ALLOR:  Q   In your discussion in these

18   paragraphs where do you rely on the disclosure of

19   Falkner to teach you how to create that modified figure?

20       A   In Falkner's own description it is mentioned

21   that the plate can be used, I think we discussed that

22   with reference to paragraphs 28, 29 and 30, for fusion

23   of a joint.  I think he specifically mentions the

24   tibiotalar joint.  There is also specific mention of the

Page 58

1   plate being configured to conform with the bone.

2            Again, from an orthopedic surgeon standpoint,

3   that's -- we configure every plate to a bone, not just

4   for fractures and fusions but it's part of the common

5   practice.

6            So it's not, again, I used the term before,

7   it's not rocket science to understand that when one does

8   a fusion across a tibiotalar joint, there is certain

9   things that are done that are outlined in Falkner itself

10  that would be consistent with the creation of figure

11  1(b).

12       Q   So are you relying on paragraphs besides the

13  ones we've discussed, 28, 29, 30, to support your

14  opinion?

15       A   If you will allow me the time to go through all

16  of the paragraphs then.

17       Q   Well, sir, I'm looking for citations in your

18  declaration to show me what you relied on, and I'm not

19  finding them.  So that's why I'm asking the questions.

20           What did you rely on in Falkner to help you get

21  to your opinions that you provided?

22       A   I thought I've answered that already, that

23  Falkner indicated that the plate can be used for fusion.

24           In orthopedics we don't have to say you make an

Page 59

1    incision in the skin, you peel back the skin, you move

2    the muscle aside, you then fit the plate.  That's part

3    of the practice of orthopedic surgery.

4            So the fact that Falkner describes the plate

5    being used for a fusion and the contouring of the bone

6    and the plate to fit anatomically, those are the key

7    measures of indicating that it is a very simple step

8    from that description to the translation of the plate

9    across the tibiotalar joint.

10           No orthopedic surgeon would have difficulty in

11   seeing what Falkner states and seeing the creation of

12   figure 1(b) based upon figure 1.

13       Q   But you would agree that the description of what

14   you have done to the plate is not in Falkner expressly?

15       MS. HWANG:  Objection, form.

16       THE WITNESS:  From an orthopedic standpoint, it is

17   expressly described.

18           You may not understand it because you're not a

19   surgeon, but for the context of an orthopedic surgeon

20   doing a plate, looking at the description of the device,

21   yes.

22           Again, you may disagree with me, but it does

23   not have to be word by word you make an incision, you do

24   this, you do that.  Those things are within the context

Page 60

1   of his description.

2       MS. ALLOR:   Q   And what's your understanding of

3   something being expressly disclosed versus understood by

4   someone reading it?

5       MS. HWANG:  Objection, form and objection to the

6   extent it calls for a legal conclusion.

7       THE WITNESS:  I have no difficulty understanding

8   that from the standpoint I'm an orthopedic surgeon.

9   This has been expressed in the description.

10      MS. ALLOR:   Q   So when I look at your opinions that

11  lead up to the modified figure, the only citation I find

12  to Falkner is to paragraph 62.

13          Is that what you relied on is paragraph 62 to

14  support these modifications you made?

15      A   I think I've cited other paragraphs within

16  Falkner today that are consistent with this

17  modification.  You just mentioned earlier when I asked

18  for help, you volunteered to me that I already discussed

19  with you paragraphs 28, 29, and 30.

20          I think at the beginning of this question I

21  also said to you, if you have the time, I'll go through

22  the whole thing again and go through every paragraph

23  line by line up until the end on page 10.

24          But my review in the context of our discussion

Page 61

1   today is that, in my opinion, it is clearly expressed in

2   this description getting from 1 to 1(b) and, actually,

3   1(a), as well.

4       Q    So I just have a couple more questions.

5            So earlier you said that your declaration is in

6   response to Mr. Sommers' declaration.

7            Do you remember that?

8       A    I do.

9       Q    And you understand Mr. Sommers' declaration

10  wasn't provided to Stryker or Wright Medical until June,

11  2022, do you understand that?

12      A    I am not sitting here today understanding the

13  exact date that that declaration was represented to

14  Stryker.

15      Q    I can represent to you that it was filed in this

16  proceeding on June 17th, 2022.  So that's the

17  declaration you're referring to?

18      A    I'm only aware of one declaration of Sommers, so

19  if you say that's the date it was filed, then, granted

20  that's the date it was filed.

21      Q    Okay.  So then why were you hired in November or

22  December of 2021 if Mr. Sommers' declaration did not

23  even exist as of then?

24      MS. HWANG:  Objection, form.

Page 62

1      THE WITNESS:  I don't know why I was hired.  I don't

2   know what the thought process was.  I was asked to

3   review the issues, but as to the where and what for, I

4   can't give you specifics.

5      MS. ALLOR:  Q   So when you were first hired, what

6   were you asked to review?

7      A   I do recall reviewing the description of Falkner

8   and what is labeled here as U.S. patent Terrill.  That's

9   all I recall as discussing today.

10     MS. ALLOR:  That's all the questions I have.

11     MS. HWANG:  Okay.  Can we take a quick break.  I'm

12   going to have some short redirect.

13          (a brief recess was taken from 11:30 a.m. to

14          11:43 a.m.)

15                      EXAMINATION

16                  by Ms. Hwang:

17     Q   Dr. Holmes, I have just a few short questions

18   for you.  I'd like to first turn your attention to

19   Exhibit 1028, your declaration from IPR2021-01450.

20     A   You talk fast, so start again.

21     Q   Okay.  Looking at your declaration, paragraph 24

22   on page 14 of Exhibit 1028.

23     A   Okay.

24     Q   Counsel asked you a few questions about this

Page 63

1    paragraph earlier this morning.  One of the things

2    towards the end of paragraph 24 on page 14 going into

3    page 15 is your discussion that, "Bone plates can be

4    bent using plate benders to better fit on or conform to

5    the bones of a particular patient.  It is particularly

6    common to use plate benders to contour the bone plate to

7    the shape of the bone to minimize irritation to soft

8    tissue and to ensure that the bone plate has the lowest

9    profile possible to minimize discomfort to the patient."

10        Do you see that?

11    A    I do.

12    Q    Now, using plate benders is not changing the

13    design of a bone plate, is that correct?

14    A    That's correct.

15    Q    Does using plate benders require significant

16    experimentation and testing?

17    A    No.

18    Q    Are plate benders included with most bone plate

19    kits?

20    A    Yes.

21    Q    And do you in your experience as an orthopedic

22    surgeon for more than 30 years, has it been common for

23    you to use plate benders for fracture fixation when

24    you're using bone plates?

Page 64

1      MS. ALLOR:  Object to the form.

2      THE WITNESS:  Yes.

3      MS. HWANG:  Q   And would the same be true, that is,

4   common to use plate benders when using a bone plate for

5   a joint fusion?

6      A   It is.

7      Q   Now, going to paragraph 31 of Exhibit 1028, you

8   have a discussion about performing osteotomies of bones

9   of the joint and then a discussion about shaping bones

10   to promote joint fusion.

11          In paragraph 31 when you are discussing shaping

12   bones to promote joint fusion, are you talking about for

13   all joint fusions that you perform or just for use with

14   the Falkner plate?

15      MS. ALLOR:  Object to the form.

16      THE WITNESS:  The term shaping of bones would be

17   utilized for Falkner, but we shape the bones for fusion,

18   for all fusions.

19      MS. HWANG:  Q   Okay.  So the way the tibia and

20   talus are shaped in figure 1(b) that shows the Falkner

21   plate used in a joint fusion of the tibiotalar joint, is

22   that consistent with what shape you would use or how you

23   would prepare the bone or bones in the joint for a

24   fusion of a tibiotalar joint, in any tibiotalar joint --

1      MS. ALLOR:  Object to the form.

2      MS. HWANG:  Q   -- of a fusion?  Sorry.  That is a

3   terrible question.  Let me start over.

4         So in figure 1(b) the shape of the tibia and

5   the talus as shown in figure 1(b) and used with the

6   Falkner bone plate, is that a typical configuration of a

7   tibiotalar joint that has been prepared for joint

8   fusion?

9      MS. ALLOR:  Object to the form.

10      THE WITNESS:  Yes, it is.

11      MS. HWANG:  Q   And looking at -- Can we go to

12   figure 1 of Falkner, Exhibit 1006.  In figure 1 of

13   Exhibit 1006 there is shown a tibia and a talus with the

14   Falkner plate being used for a transverse fracture of

15   the tibia, correct?

16      A   That's correct.

17      Q   Now, looking at the shape and configuration of

18   the tibia and the talus in figure 1, would you ever just

19   put a bone plate across a tibia and talus that have that

20   configuration for a joint fusion?

21      MS. ALLOR:  Object to the form.

22      THE WITNESS:  Does your question mean just as it's

23   shown in this figure without any change?

24      MS. HWANG:  Q   Yes.

Page 66

1      A    No.

2      Q    And in order to use the Falkner plate across a

3  joint for a joint fusion, it would be typical for an

4  orthopedic surgeon to prepare the tibiotalar joint for

5  fusion, correct?

6      MS. ALLOR:  Object to the form.

7      THE WITNESS:  That's correct.

8      MS. HWANG:  Q    And that would involve reshaping the

9  bones to ensure proper fusion, correct?

10      MS. ALLOR:  Object to the form.

11      THE WITNESS:  Yes.

12      MS. HWANG:  Q    I am going to turn back to your

13  declaration, paragraph 33, just ask you to read the

14  paragraph and is there anything in the paragraph that

15  you believe sitting here today requires correction?

16      A    Yes.

17      Q    Can you please tell us what, if anything, in

18  paragraph 33 requires correction?

19      A    The fourth sentence is -- needs to be corrected.

20  The fourth sentence states, "The tibia is slightly

21  externally rotated in reference to the foot."  That

22  should be reversed.  It should be the foot is slightly

23  externally rotated in reference to the talus -- sorry,

24  in reference to the tibia.

Page 67

1    Q    Okay.  Are there any other changes or

2    modifications that you think are necessary with respect

3    to paragraph 33 of your declaration?

4    A    The next sentence should be corrected to state,

5    finally, there may be the necessity to slightly

6    translate the talus backward in relationship to the

7    tibia.  The sentence, as written, is reversed stating

8    forward.  It should be translate -- the talus should be

9    translated posteriorly in relationship to the tibia.

10           And that correction is consistent with the next

11   correction, that this essentially places the tibia in a

12   more anterior position relative to the talus.

13   Q    Okay.  Are there any other corrections that you

14   would like to make to your declaration?

15   A    Those corrections would then be consistent with

16   the follow-up sentences that the center of gravity of

17   the talus should be in the midline of the tibia.  And

18   it's also consistent with the final sentence in

19   paragraph 33 that this creates optimal biomechanical

20   alignment for proper gait following a fusion.

21      MS. HWANG:  I have nothing further.

22                     FURTHER EXAMINATION

23                     by Ms. Allor:

24   Q    And just to clarify, Dr. Holmes, these

Page 68

1  corrections should be made to all four of your

2  declarations?

3       A    That's correct.

4       MS. ALLOR:  Okay.  Thanks.  Nothing else from me.

5       MS. HWANG:  Thank you.

6            (Whereupon, the deposition concluded at

7            11:53 a.m.)

8                          - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Appx3932

Page 69

1    STATE OF ILLINOIS   )

                        )   Ss:

2       COUNTY OF COOK   )

3

4           I, TRACY L. BLASZAK, a Certified Shorthand

5    Reporter, License No. 084-002978, certify:

6           That, prior to being examined, the witness

7    named in the foregoing proceeding, to wit, GEORGE B.

8    HOLMES, JR., M.D., was by me duly sworn to testify to

9    the truth, the whole truth, and nothing but the truth.

10          That said transcript was taken down by me in

11   shorthand on Friday, October 21, 2022, at 9:38 a.m.,

12   before the following adverse parties:  Ms. Sharon A.

13   Hwang and Mr. Sean C. Sparrow, representing Petitioners,

14   Stryker Corporation and Wright Medical Technology, Inc.,

15   and Ms. Katherine L. Allor representing Patent Owner,

16   OsteoMed LLC, and was thereafter reduced to computerized

17   transcription under my direction and is a true record of

18   the testimony.

19          I certify that I have not been disqualified as

20   specified under Rule 28 of the Federal Rules of Civil

21   Procedure.

22

23

24

Page 70

1        I further certify that I am not interested in

2   the event of the action.

3

4

5        DATED:   October 25, 2022

6

7

8                    *Tracy L. Blaszak*

9        _____

         TRACY L. BLASZAK, CSR, CRR

10       Illinois CSR No. 084-002978

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| **&** |
|---|
| **&**   2:3 |

| **0** |
|---|
| **084-002978**   69:5 70:10 |
| **085**   7:24 |

| **1** |
|---|
| **1**   12:6,16,16 22:11 24:8,8 27:10 28:1,10,14 29:11,20 30:6,11 31:12,15,19 32:2 32:12,17 33:17 34:3,15,23 36:23 39:9 41:19 42:23 44:18,19 45:5 46:24 47:3 47:4,12 49:1 50:16,17,22,22 50:22 51:17,17 51:19,22,22 52:8 52:8,13,15,19,20 52:24 53:2,11,17 54:15,24 55:14 55:15 56:9,9,12 56:13,15,16,17 56:18,21 57:4,6 57:10,10 58:11 59:12,12 61:2,2 61:3 64:20 65:4 65:5,12,12,18 |
| **10**   9:13,21 10:5 11:3 14:3,5 60:23 |
| **10,245,085**   3:13 6:21 |

| **100**   4:12,13 |
|---|
| **1001**   3:13 17:9 17:11 |
| **1006**   3:14 8:17 8:18 19:1 65:12 65:13 |
| **1028**   3:16 11:23 11:24 62:19,22 64:7 |
| **1029**   3:17 18:1,2 |
| **10:40**   44:14 |
| **10:58**   44:15 |
| **11**   3:16 |
| **11:30**   62:13 |
| **11:43**   62:14 |
| **11:53**   68:7 |
| **14**   18:9 50:22 62:22 63:2 |
| **1450**   5:20 6:23 |
| **15**   51:11 63:3 |
| **16**   51:12 |
| **17**   3:13 51:12,12 |
| **17th**   61:16 |
| **18**   3:17 |
| **19**   18:18 |

| **2** |
|---|
| **2**   42:23 43:5,6,21 44:10,18 45:16 45:22,24 46:1,5 46:22 47:1,2,5,7 54:3 55:1,3,5 |
| **20**   9:13 14:3,5 48:9 |
| **2005/0171655**   3:15 |
| **2021**   7:5 61:22 |

| **2021-1452**   6:19 |
|---|
| **2022**   1:16 3:2 61:11,16 69:11 70:5 |
| **20644**   70:8 |
| **21**   3:2 52:1,5,10 52:13 69:11 |
| **21st**   1:16 |
| **22**   21:21 26:19 27:11 48:16 52:11 55:19 |
| **23**   51:23 52:1,5 52:11,14 |
| **24**   22:14 56:17 62:21 63:2 |
| **25**   56:23 57:1,3 70:5 |
| **27**   37:17 |
| **28**   35:15,17 54:9 54:12 57:22 58:13 60:19 69:20 |
| **29**   35:16,24 54:7 54:10,12 57:22 58:13 60:19 |

| **3** |
|---|
| **30**   20:24 21:1 35:16 36:9 37:17 54:10,12 57:22 58:13 60:19 63:22 |
| **31**   64:7,11 |
| **3100**   2:11 |
| **312**   2:6,12 |
| **33**   66:13,18 67:3 67:19 |

| **3500**   1:14 2:5 |
|---|
| **36**   21:21 56:18 |
| **372-1121**   2:12 |

| **4** |
|---|
| **4**   3:5 18:9 38:21 41:17 42:24 43:6,21 44:10,18 45:16 |
| **40**   26:18 |
| **42**   30:4 31:3 45:14 |
| **44**   25:18,19 26:1 26:17 27:13 30:3,3 |

| **5** |
|---|
| **500**   1:14 2:5 |
| **52**   46:2 47:5 |
| **54**   42:21,23 43:3 43:3,6,11,22 45:18,22 46:4,9 46:12,21 47:7,8 47:17 48:1,13,15 50:8 53:19 54:2 54:18,22,22 55:2 55:4,6,9 |
| **56**   46:2 47:5 |

| **6** |
|---|
| **60602**   2:12 |
| **60661**   2:6 |
| **608**   6:2,24 7:23 8:23 12:5 14:7 16:10 17:4,11 |
| **62**   3:6 60:12,13 |
| **67**   3:5 |
| **69**   42:19 43:7,23 44:5,7,9,17 46:12 47:8,16 |

48:3,7,14 49:2
50:10 54:2
55:12

**7**

**70**  2:11
**716**  7:24
**775-8000**  2:6
**776**  6:14 7:24

**8**

**8**  3:14
**8,529,608**  3:13
6:1

**9**

**9,351,776**  3:13
6:12
**9,763,716**  3:13
6:20
**9:38**  1:15 69:11

**a**

**a.d.**  1:16
**a.m.**  1:15 44:14
44:15 62:13,14
68:7 69:11
**ability**  50:5
**able**  26:8 42:15
**absolutely**  12:18
13:8
**acceptable**  53:3
**accessible**  37:9
**accumed**  10:16
10:19,21,24 11:1
**accurate**  52:11
**accurately**  18:6
18:15 25:2,3
**acknowledging**
33:5

**action**  70:2
**actual**  8:5 13:6
30:9,17
**adding**  55:15
**addition**  36:6
48:21 50:12
**additional**  55:16
**address**  29:15
**addresses**  40:2
**adequate**  55:21
**adjust**  22:16
30:17
**adverse**  69:12
**affect**  26:1
**aforementioned**
53:4
**ago**  48:6
**agree**  12:14
31:20 32:10
38:9 39:3 42:9
42:18 43:1,8,24
44:19 45:5
46:24 47:20,21
47:23 51:18
52:2 54:16
59:13
**agreed**  31:9
**agreement**  47:6
**align**  38:20
**alignment**  67:20
**allor**  2:10 3:5
4:6 8:16,19
11:21,24 12:20
16:7 17:6,10,24
18:3 19:23 21:5
21:15 22:8,13
23:11 26:2,12,23
27:9,24 30:17

32:10,19 33:9,18
34:18 35:1 38:9
41:2 42:9,19
43:15,20 44:11
44:16 45:3 46:1
46:11,21 47:23
49:7,15,21 50:3
50:8,20 52:6,21
54:9 56:14 57:5
57:17 60:2,10
62:5,10 64:1,15
65:1,9,21 66:6
66:10 67:23
68:4 69:15
**allow**  24:4 58:15
**alternative**  51:2
51:8 53:7
**alternatively**
36:6 48:20
50:11
**anatomically**
59:6
**angle**  33:1
**angular**  48:22
50:13
**ankle**  20:13,17
21:6,9,22 22:17
22:19 28:24
36:8 57:9
**answer**  5:5,10
16:17 23:10
24:4 28:2,23
29:8 32:15 35:2
45:2 56:5
**answered**  41:20
57:8 58:22
**answering**  16:21
45:2

**answers**  5:3 6:6
43:15
**anterior**  48:19
67:12
**apologize**  16:21
28:12 30:2
**appeal**  1:1
**appear**  12:17
**application**  3:14
25:14
**apply**  22:10 38:7
**appreciably**  22:6
**appropriate**
22:19 53:7
**area**  26:18,18
28:7 42:7 43:18
44:7 48:24 49:2
**areas**  31:11
**arms**  36:3
**arrow**  55:10
**art**  8:6,8,11 11:7
11:8,11 13:6
51:10
**arthrodesis**
20:12,16,22 21:6
**aside**  59:2
**asked**  32:14 39:8
41:20 46:20
57:8 60:17 62:2
62:6,24
**asking**  49:21
50:4,21 51:1
53:10 58:19
**assistance**  11:10
**assume**  5:6
**assuming**  26:16
**attention**  62:18

**attorney** 13:10
38:3
**attorney's** 38:3
**attorneys** 11:16
**available** 9:21
10:6 22:18
24:19 25:13
**avascular** 39:16
**aware** 15:11
26:21 61:18

**b**

**b** 1:10 3:1,16,17
4:1 12:6,16 19:4
22:11 27:10
28:1 29:11,20
30:6,11 31:12,15
31:19 32:2,17
33:17 34:3
36:23 49:1
50:16,17,22
51:19 56:16,17
56:18,21 57:4,6
57:10,10 58:11
59:12 61:2
64:20 65:4,5
69:7
**back** 11:20 12:6
22:15 34:18
38:21 44:11
59:1 66:12
**background** 7:2
18:11,12 40:9
**backward** 67:6
**barometer** 27:20
**based** 41:21
59:12

**baseline** 12:13
**basically** 12:10
**basics** 41:2
**beginning** 7:6
48:15 60:20
**behalf** 2:8,14
**believe** 7:14,16
9:3 10:1,21
14:18 17:13
18:23 22:13
23:9 25:18
32:14 52:10
54:9 66:15
**bend** 25:9,11,13
25:15
**benders** 22:21
23:1 25:5,9
30:23 36:11
63:4,6,12,15,18
63:23 64:4
**bending** 25:13
25:24,24
**benefit** 55:13
**bent** 22:21 63:4
**best** 14:19
**better** 22:20,22
28:24 29:2 63:4
**beyond** 49:11,24
**big** 24:13,14,22
24:24 30:21
**biomechanical**
56:6 67:19
**birth** 35:23
**bit** 23:10 24:5
29:3,4,16,20
30:20 31:6 57:1
**black** 28:21

**blade** 19:3,7,8
19:11,23 20:16
20:18,22 21:6,12
22:4 23:6 24:2
25:15 27:11,16
42:10 55:24
57:13
**blaszak** 1:11
69:4 70:9
**blood** 29:7
**board** 1:1 14:23
15:7
**bone** 19:12,24
20:5,19 21:17,17
22:18,21 23:1,2
23:3,20,23 25:7
25:21 26:4 29:4
29:20,22,24
33:23 34:3,9,11
35:5,13,18,20,21
35:22,24 36:1,6
36:9,12,12,15,16
36:18,19,22 37:2
37:6,7,8,8,11,14
37:23 38:10,14
38:18,20,23
39:14 40:6,22
41:19 42:13
44:8 48:8,16,23
50:14 58:1,3
59:5 63:3,6,7,8
63:13,18,24 64:4
64:23 65:6,19
**bones** 22:22 36:3
36:3 39:1,23
40:2,11 63:5
64:8,9,12,16,17
64:23 66:9

**bottom** 12:2
**break** 5:9 37:9
43:14 44:12,17
45:1 62:11
**breaking** 36:19
**bridge** 42:21
43:3,3,11,22
44:1,4,8 45:17
46:4,12 47:8,16
47:17 48:7,11,13
48:15,21 49:1,3
50:6,8,11,12
53:18 54:1,18,22
55:4
**brief** 44:14
62:13
**briefly** 4:24
**bringing** 33:22
50:1

**c**

**c** 2:4 69:13
**call** 6:13 7:15
19:6,7 25:17
51:13,18
**called** 4:2 8:8,11
18:10
**calls** 60:6
**career** 9:3 10:24
20:24
**case** 4:20 7:20
7:21,23 14:23
43:10 55:19
**cases** 4:13
**categories** 4:16
**cause** 39:16
**center** 67:16

**certain** 58:8
**certified** 69:4
**certify** 69:5,19
  70:1
**cetera** 36:4
**change** 23:15
  32:2,24 65:23
**changes** 52:14
  67:1
**changing** 24:21
  63:12
**chicago** 1:15 2:6
  2:12
**child** 24:12
**citation** 60:11
**citations** 58:17
**cite** 49:15,19
  53:5
**cited** 53:21
  60:15
**city** 1:15
**civil** 69:20
**claims** 41:8
**clarification**
  50:24 53:9
**clarified** 55:11
**clarify** 16:22
  67:24
**clarity** 30:5
**clear** 15:1 17:7
  37:17
**clearly** 38:6
  51:14 61:1
**closer** 29:17,20
**come** 57:6
**comfortable**
  21:4

**commercially**
  22:18
**common** 22:24
  25:14 27:6,7
  58:4 63:6,22
  64:4
**communicated**
  32:1
**company** 10:22
**compared** 9:19
  21:9
**completely**
  37:19 53:3
**components**
  45:1
**compound** 30:13
  44:24
**computerized**
  69:16
**concern** 25:24
**concerns** 25:16
  26:2
**conclude** 57:6
**concluded** 14:21
  68:6
**conclusion** 60:6
**configuration**
  30:15,16 32:2
  51:21 56:12
  65:6,17,20
**configurations**
  51:16
**configure** 37:19
  38:15 58:3
**configured** 36:1
  36:10,10,14,18
  48:8 58:1

**configuring**
  38:19
**conform** 22:22
  25:6 33:23
  34:12 58:1 63:4
**conjunction** 8:20
  11:13 13:3
**connect** 48:15
**connects** 48:18
**consider** 39:5
**consideration**
  39:13 42:2
**considered**
  27:22
**consistent** 35:22
  36:22 37:19
  38:6,13 50:15
  51:11,20 54:13
  54:22,23 58:10
  60:16 64:22
  67:10,15,18
**construct** 20:4
  55:16 56:6
**construe** 30:20
  44:7
**construed** 19:3,5
**contact** 7:18
  36:14
**context** 37:16
  42:7 55:8 59:19
  59:24 60:24
**continue** 50:4
**contour** 23:1
  25:6,15,20 30:18
  30:23 63:6
**contouring** 59:5
**contrary** 47:15

**contribution**
  56:11
**convenient**
  43:13
**cook** 1:15 69:2
**copy** 8:13 11:21
  17:6,24 18:20
  32:9,11
**corner** 55:2
**corporation** 1:3
  69:14
**correct** 7:21
  11:4,18 12:18
  13:8,11 18:13
  19:9,12,20 20:3
  20:4 23:7,12,21
  25:7 27:13,14
  29:13 30:11
  31:8,22 33:13
  34:4,5,10 39:23
  40:2,6 44:2,2
  45:6,10,15,19
  46:2,6 47:9,13
  47:14 48:2
  52:16 56:18
  63:13,14 65:15
  65:16 66:5,7,9
  68:3
**corrected** 66:19
  67:4
**correction** 66:15
  66:18 67:10,11
**corrections**
  67:13,15 68:1
**correctly** 47:10
**counsel** 2:2 3:10
  17:17,21 62:24

**county** 1:15 69:2
**couple** 53:17
61:4
**course** 9:2 31:11
**court** 5:2 43:19
**covered** 30:7
**create** 12:8,20
12:21,23 36:23
57:5,19
**created** 13:1,1
37:6
**creates** 67:19
**creation** 12:7
58:10 59:11
**cross** 27:15,18
**crosses** 31:22
**crossing** 27:13
**crr** 1:11 70:9
**csr** 1:11 70:9,10
**curriculum** 3:17
**cut** 22:19 23:23
24:2,15,20,23
25:2 26:2,8,11
26:16,17,20,22
26:24 27:1
35:22 37:9
**cuts** 35:20
**cutters** 22:20
**cutting** 23:11,13
24:17 26:12
38:18
**cv** 11:14,15 18:3

**d**

**d** 19:4
**dash** 55:1,3,6
**date** 7:11 13:20
14:11 61:13,19

61:20
**dated** 70:5
**day** 1:16
**december** 7:7,8
7:10 14:15
61:22
**decision** 15:6
**declaration** 6:23
8:7,20,22,23
11:9,11,12,15,16
11:18,20 12:15
13:14,16,17,19
14:7,7,17 15:19
15:23 16:2,4,14
16:19,23 18:4,10
18:19 21:21
27:10 39:17
49:12,14,19 50:2
50:23 51:23
55:20 58:18
61:5,6,9,13,17
61:18,22 62:19
62:21 66:13
67:3,14
**declarations**
3:16 5:15 8:2,4
8:10 11:5,22
68:2
**defects** 35:23
**define** 48:21
50:12
**defined** 50:10
**definitely** 39:19
**definition** 48:17
48:24 50:11
**degree** 16:3
**demonstrated**
25:12 36:23

57:9
**demonstration**
49:1 50:16 51:6
51:8 53:11,13
**demonstrative**
42:16
**depending** 23:6
**deposed** 4:9,20
**deposition** 1:10
2:2 3:1 16:7,11
17:15 39:6 54:5
68:6
**depositions** 1:14
4:18,24
**describe** 18:6
22:16 48:12
50:5 56:18
**described** 22:8
22:13 35:18,21
35:24 43:7,22
46:12 47:8 48:2
48:4 49:2 52:20
53:18 54:18
59:17
**describes** 18:15
35:4,13 42:2
43:2,9,24 53:15
54:21 59:4
**describing** 19:8
23:5 37:2,10
39:22 40:10,13
42:20 47:16
48:10 51:23
52:12,14
**description** 3:12
18:12 37:20
40:1 42:5 44:4,6
44:6 46:8,10

47:22 54:1,20
55:9,12 57:20
59:8,13,20 60:1
60:9 61:2 62:7
**descriptions**
36:22 41:7
54:12
**design** 63:13
**detailed** 41:7
**determine** 29:24
**determining**
51:15
**device** 42:3
59:20
**devices** 9:8
10:22 11:2
**difference** 31:1
31:10,14,14,18
32:4,6,8 33:4,5,7
40:16
**differences**
32:20
**different** 5:5 6:7
12:1 16:18
39:12 42:6 45:9
47:13 52:23
53:2 55:20
**difficult** 21:1
**difficulty** 59:10
60:7
**direct** 56:23
**directed** 8:10
40:21 41:10,18
**direction** 69:17
**disagree** 50:3
54:19 59:22
**disclosed** 25:10
60:3

**disclosing** 42:10
**disclosure** 41:16
  53:6 57:18
**discomfort** 23:4
  63:9
**discontinuities**
  35:18 38:24
**discontinuity**
  43:2,9 44:1,8,20
  44:22 45:5,9,10
  45:12 46:17
  47:9,12,18,24
  48:8 49:5,9,22
  50:6 53:16
  54:17 55:14
  56:2
**discretion** 23:17
**discretionary**
  29:21
**discuss** 5:15 6:8
  38:10
**discussed** 25:5
  50:2 56:24
  57:21 58:13
  60:18
**discusses** 8:7
**discussing** 62:9
  64:11
**discussion** 36:11
  40:9 54:6 57:17
  60:24 63:3 64:8
  64:9
**disease** 35:23
**dispose** 38:19
**disposed** 36:11
  36:14 39:1
**disposition**
  48:22 50:13

**disqualified**
  69:19
**distal** 19:12
  26:24 28:13,16
  40:7 42:17
  44:20 45:6,8,11
**distally** 32:7
  50:18 57:12
**doctor** 39:5
**document** 16:19
  17:12
**documents**
  15:22
**doing** 31:12 32:8
  32:9 59:20
**dotted** 55:10
**downward**
  33:13
**dr** 3:16 4:7
  44:16 62:17
  67:24
**draft** 14:21
**drafting** 14:16
**drawn** 50:17
  56:13 57:7,7
**due** 37:9
**duly** 4:2 69:8

**e**

**e** 19:4
**earlier** 13:4
  29:15 39:6,8,20
  54:4,6,10 60:17
  61:5 63:1
**easier** 25:11
**easy** 23:23 24:23
  25:1,2,9

**edge** 55:7
**education** 18:6
  18:16
**efficacy** 22:7
**eight** 17:16
**either** 5:4 7:6,17
  14:23 44:22
**ends** 39:1,23
  40:2
**engaged** 7:4
  14:15
**ensure** 23:3 63:8
  66:9
**entered** 8:2
**entire** 48:2,9
  55:16
**entirety** 48:10
  49:1
**entitled** 49:9,22
  49:23
**environment**
  9:12
**equally** 56:12
**equivalent** 36:10
**essentially** 67:11
**estimate** 13:15
**estimation** 10:4
**et** 36:4
**evaluated** 23:20
**event** 70:2
**exact** 7:11 13:15
  21:1 28:6 32:17
  53:13 61:13
**exactly** 30:23
  40:12 55:10
**examination** 3:4
  4:5 62:15 67:22

**examinations**
  4:15
**examined** 4:3
  69:6
**example** 24:9
**excellent** 28:8
**exemplary** 35:17
  36:3
**exhibit** 3:12,13
  3:14,16,17 8:17
  8:18 11:23,24
  17:9,10,24 18:2
  19:1 62:19,22
  64:7 65:12,13
**exhibits** 3:10
**exist** 61:23
**experience** 18:7
  18:16 20:5
  63:21
**experienced**
  4:23
**experimentation**
  63:16
**explain** 34:13,21
**expressed** 60:9
  61:1
**expressly** 59:14
  59:17 60:3
**extend** 22:1
**extended** 21:9
  49:4
**extensive** 55:9
**extent** 6:6 26:8
  31:10 32:7
  35:16 39:15
  44:6 48:18 60:6
**exterior** 36:14
  36:16 37:8

48:16
**external** 19:15
20:1 21:16,18
44:20 48:18,22
50:13
**externally** 66:21
66:23
**extrapolation**
57:11
**eyes** 38:2,3

**f**

**facing** 12:10
**fact** 32:5 42:2
59:4
**factors** 29:23
**fair** 5:7,8 6:8
15:18 18:21
**falkner** 3:15 8:8
8:11,22 12:10,17
13:7 17:1 18:19
18:22,24 19:8,14
20:10 21:10,12
25:10,12,16
27:12 28:10,14
29:2,18,21 30:20
30:22 31:16,18
32:2,12,17 33:21
34:7,13,21 35:13
38:21 39:9 40:1
40:19 41:16
42:20 43:1,3,9
43:24 45:18
46:4 47:17
48:13 49:14,16
49:20 50:5 51:4
51:6,12 53:4,6
53:11,15,22 54:7

54:18 57:19
58:9,20,23 59:4
59:11,14 60:12
60:16 62:7
64:14,17,20 65:6
65:12,14 66:2
**falkner's** 43:22
57:20
**familiar** 10:22
18:21
**far** 28:21 54:2
55:9
**fast** 62:20
**federal** 69:20
**feel** 37:15
**feet** 36:4
**female** 24:12
**figure** 12:6,6,7,8
12:9,10,13,14,16
21:20 22:11
24:8,8 27:9,11
28:1,10,14 29:11
30:4,6,11,19
31:12,15 32:12
33:12,15,17,19
34:2,3,3,15,23
36:23 41:19
42:4,18,23,23,24
43:5,5 44:10,19
45:5,16,16,22,24
46:1,5,9,10,21
46:24 47:1,2,3,4
47:5,7,12 50:16
50:21 51:1,17,17
51:22,22,24 52:8
52:8,13,15,19,19
53:2,11,17,21
54:3,15,22,24

55:1,3,5,8,14,15
56:18,21 57:3,6
57:19 58:10
59:12,12 60:11
64:20 65:4,5,12
65:12,18,23
**figures** 11:11,17
12:16,21,23
25:18 31:6,9
40:1,5 41:7
42:10,22 43:6,10
43:21 44:10,17
44:18 49:12
**figuring** 24:21
**filed** 61:15,19,20
**final** 55:19 67:18
**finally** 67:5
**find** 5:11 51:4
60:11
**finding** 58:19
**fine** 6:17 24:7
45:3
**first** 4:2 6:23
38:23 62:5,18
**firstly** 54:1
**fit** 22:20,22
24:16,20 59:2,6
63:4
**fitting** 23:14
**five** 17:22,22
**fixation** 28:8
38:23 45:13
55:21,22 63:23
**flatten** 31:21
**flattened** 33:13
33:18,19
**flattening** 33:16
33:17

**flatter** 33:21
**focus** 6:4,22 12:4
**focused** 43:18
**focusing** 49:13
**follow** 9:5 30:8
67:16
**following** 2:2
34:20 67:20
69:12
**follows** 4:4
**foot** 22:18 66:21
66:22
**foregoing** 69:7
**form** 12:19
15:24 19:21
20:23 21:11
22:2,12 23:8
25:22 26:5,14
27:3,17 29:14
30:12 31:23
32:13 33:2,14
37:24 40:23
41:20 42:14
43:12 44:3,23
46:7,18 47:19
49:6 50:7,9 52:3
52:17 53:24
56:4,19 59:15
60:5 61:24 64:1
64:15 65:1,9,21
66:6,10
**format** 11:14
**forward** 67:8
**four** 5:15,15 6:5
7:23 8:4 11:21
17:8,22 37:1
54:7 68:1

**fourth**   6:20 33:4 66:19,20
**fracture**   20:9 23:15 28:10,11 28:14 29:1,6,9 39:9,11 40:5,7 42:5,11,18 43:10 51:3,7,8,17,19 52:21,23 53:1,8 53:23 54:14,23 55:17,18 56:8 63:23 65:14
**fractures**   35:19 36:20 38:23 39:1,2,23 40:2 40:10,21 41:18 42:6 51:16 58:4
**frequently**   9:10
**friday**   69:11
**front**   8:14 12:10 16:20 17:2 18:24 19:2 20:10 30:19 39:9 53:11,14
**further**   22:5 67:21,22 70:1
**fuse**   36:7
**fusion**   21:13,22 22:4 23:15 28:24 29:10,12 29:12 34:11 36:7,19 38:8,17 39:11,12 42:3,7 57:9,22 58:8,23 59:5 64:5,10,12 64:17,21,24 65:2 65:8,20 66:3,5,9 67:20

**fusions**   38:13 58:4 64:13,18

**g**

**gait**   67:20
**game**   14:4
**gates**   2:10
**general**   19:11 25:23 27:5 34:24 41:9,10 44:18
**generally**   36:21
**geometry**   23:20
**george**   1:10 3:1 3:16,17 4:1 69:7
**getting**   61:2
**give**   13:15 17:6 17:24 45:1 62:4
**given**   9:12,20 10:5 18:20 21:3 22:3 55:8,8
**go**   4:24 20:1 35:16 38:21 44:11 55:6 58:15 60:21,22 65:11
**goes**   19:14 28:11 28:14 55:7 57:13
**gogh**   32:9,9,11
**going**   5:6 6:22 17:24 22:5 35:16 45:11 49:7,11,24 50:3 54:5 55:23 56:14 57:13 62:12 63:2 64:7 66:12

**good**   4:7,8 5:11 27:18 28:3 39:10
**gotten**   43:18
**granted**   61:19
**gravity**   67:16
**greater**   13:22,23 14:3,4
**ground**   4:24
**guess**   14:19 16:16
**guesstimate**   14:19

**h**

**half**   29:7
**hands**   36:4
**hard**   13:15
**harp**   28:20
**heading**   18:10 18:19
**healing**   56:8
**held**   2:3
**help**   54:5 58:20 60:18
**higher**   27:22
**hired**   61:21 62:1 62:5
**hole**   47:4
**holmes**   1:10 3:1 3:16,18 4:1,7 44:16 62:17 67:24 69:8
**horizontal**   48:19 57:12
**hour**   29:7 43:14
**hours**   13:22 17:16,22,23

**human**   36:2
**hwang**   2:4 3:6 12:19 15:24 19:21 20:23 21:11 22:2,12 23:8 25:22 26:5 26:14 27:3,17 29:14 30:12 31:23 32:13 33:2,14 37:24 40:23 41:20 42:14 43:12 44:3,13,23 45:20 46:7,18 47:19 49:6,11,18,23 50:7,9 52:3,17 53:24 56:4,19 57:8 59:15 60:5 61:24 62:11,16 64:3,19 65:2,11 65:24 66:8,12 67:21 68:5 69:13

**i**

**ideal**   29:10,12
**identical**   31:7,10 32:23
**identically**   32:12
**identified**   31:3 45:17 46:5,21 53:8
**ii**   36:13
**illinois**   1:15 2:6 2:12 69:1 70:10
**image**   30:18 31:20

**implants** 9:12
**importantly** 33:7
**imprecise** 16:21
**incision** 59:1,23
**include** 4:16 35:19 36:3
**included** 11:15 12:15 14:11 63:18
**inclusive** 54:2
**inconsequential** 31:3,4 32:3 33:8 33:10
**increase** 22:6
**independent** 4:15
**index** 3:10
**indicate** 21:1 33:6 42:15,16 54:13
**indicated** 29:1 32:16 39:10,11 42:23 52:4,10 54:3 58:23
**indicating** 51:13 52:24 59:7
**individual's** 30:24
**individually** 6:13
**information** 56:22
**injury** 4:16 35:23
**inquiry** 7:16
**inserted** 19:12 19:24 20:19,19

20:20
**inserting** 23:19 24:2
**insertion** 22:6 37:11
**installation** 37:7
**instances** 21:24
**institution** 15:6
**intended** 19:19 19:23 20:1
**intention** 31:17
**intentional** 32:21
**intentionally** 32:24 33:16
**interested** 70:1
**interior** 37:6 48:16
**internal** 19:15 20:2,3 21:17,22 22:1 25:20 48:23 50:14
**interrogatories** 4:3
**introduction** 38:22 40:9 41:6
**invention** 41:11
**inventor** 13:6
**involve** 66:8
**involved** 12:7 13:18
**ip.com** 2:7,7
**ipr** 5:16,18 15:2
**ipr2021-01450** 1:6 5:19 62:19
**ipr2021-01451** 6:11

**ipr2021-01453** 6:20
**irrelevant** 28:6 30:22
**irritation** 23:2 63:7
**issue** 7:23 8:6 16:5 29:15,22
**issues** 10:7,10,13 11:16 25:19 39:13,23 56:24 62:3

**j**

**joint** 10:22 11:2 20:13 21:9 22:17 27:13,15 27:18 28:7,18 31:22 34:8 35:6 35:14 36:8 39:18 57:23,24 58:8 59:9 64:5,9 64:10,12,13,21 64:21,23,24,24 65:7,7,20 66:3,3 66:4
**joints** 35:19 36:7 40:3,4
**jr** 1:10 3:1,16,18 4:1 69:8
**june** 61:10,16
**juxtapose** 55:10

**k**

**k&l** 2:10
**katherine** 2:10 3:5 69:15
**katy.allor** 2:13

**keep** 6:17
**key** 59:6
**kind** 5:13 9:5
**kits** 63:19
**klgates.com** 2:13
**know** 5:10 6:7 7:6 14:4,18 23:18 25:17 26:21 30:7 33:18 49:23 62:1,2

**l**

**l** 1:11 2:10 3:5 19:4 69:4,15 70:9
**label** 46:9
**labeled** 28:12 47:4 62:8
**laid** 41:5
**law** 27:5
**lay** 31:6
**layout** 32:12
**lead** 60:11
**leading** 6:24
**lecture** 29:7
**leg** 24:18
**legal** 9:4 60:6
**length** 21:8,13 21:15,22 22:1,4 26:3
**liability** 4:19
**license** 69:5
**lieu** 20:19 57:12
**life** 24:24
**limited** 24:10 44:10

line  28:10,11,14
  28:18 29:1,1,3,9
  29:12 39:11,12
  39:12 43:10
  48:9 50:16 51:3
  52:22,23 53:1,8
  53:23 54:14,17
  54:24 55:6,6,17
  55:17,18 56:23
  60:23,23
lines  55:1,3,7,11
list  15:16,18,23
literature  16:12
little  23:9 24:5
  27:22 29:3,4,16
  29:19 30:20
  31:6 43:14
llc  1:7 69:16
llp  2:10
locate  7:13 48:12
located  7:14
  28:19 41:18
  42:12,13 43:4
  44:21 45:18
  53:16,18 54:17
  56:3
location  27:15
  28:4,6 29:10
  30:10 31:22
  42:11 53:16
locations  27:21
long  5:22 6:16
  17:21 41:19
  42:13 45:14
longer  19:24
  22:5 25:19 26:3
  54:17

look  15:20 17:10
  18:9,24 21:20
  24:8 27:9 28:13
  30:6,19 32:22
  37:16 38:22
  42:19,22 45:16
  55:5 60:10
looked  7:22 8:3
  8:5,20,21,22
  39:22
looking  16:20
  43:21 54:9 56:8
  58:17 59:20
  62:21 65:11,17
looks  14:10
  18:11 56:17
lot  6:16 56:22
love  14:4
lowest  23:3 63:8

m

m.d.  1:10 3:1,16
  3:18 4:1 69:8
ma'am  4:10 13:3
  14:2 26:11 38:1
  40:12 41:1
madam  34:16
  37:16
madison  1:14
  2:5,11
majority  4:14
making  51:24
  52:15
male  24:12
malloy  2:3
malpractice  4:18
manipulated
  31:20

marked  8:16
  11:24 54:3
match  28:9
materials  15:19
  16:5
matter  7:4,12
  13:21 26:6 56:2
max  9:13
mcandrews  2:3
  2:7,7
mean  11:9 15:1
  19:5 32:22
  33:10 48:4
  65:22
means  48:17
meant  13:7
  19:11
measures  59:7
medical  1:4 4:15
  4:18 7:13 9:14
  9:18 61:10
  69:14
medicine  27:4
  28:21
meet  17:17,21
memory  5:23
mention  57:24
mentioned  11:8
  15:12,15 20:4
  39:6,17 40:4
  57:20 60:17
mentions  57:23
metaphyseal
  39:2,14
middle  35:17
midline  67:17
millimeters  28:5
  29:17

mind  31:13
  56:23
minimal  53:3
minimize  23:2,4
  63:7,9
minute  48:6
misconstruing
  39:19
mismatch  24:18
modification
  23:12 30:14
  37:18 54:14
  60:17
modifications
  22:9,14 23:5
  30:9 34:14,22
  51:24 52:8,14,19
  52:21 60:14
  67:2
modified  12:15
  12:16 21:20
  27:9 28:1 31:21
  33:12 34:2
  47:11 51:22
  53:21 54:23
  57:19 60:11
modify  32:24
month  7:7,7
morning  4:7,8
  63:1
move  50:6 51:5
  53:22 54:16
  59:1
moved  28:9
  29:16 47:12,24
  49:4,9 55:17
moving  49:21
  51:2

**multiple** 29:23
41:23,23 50:18
51:7
**muscle** 59:2

**n**

**name** 19:6
**named** 69:7
**narrative** 18:12
**near** 39:1 40:6
**necessarily**
15:21
**necessary** 67:2
**necessity** 67:5
**necrosis** 39:16
**need** 5:9 21:8
22:9 23:6 34:9
36:18
**needed** 37:22
**needs** 22:20
29:23 66:19
**never** 7:19,21
**nonconstrained**
44:5
**nonunions** 35:22
**normal** 24:1
38:6 52:24
**notable** 36:21
**notary** 1:11
**noted** 16:10 26:9
38:18
**november** 7:10
14:15 61:21
**nuance** 27:4
28:21
**number** 7:18
9:20 10:6 12:1
21:1 25:18 42:6

**numbers** 6:11,16
**numerous** 16:10

**o**

**object** 56:19
64:1,15 65:1,9
65:21 66:6,10
**objection** 12:19
15:24 19:21
20:23 21:11
22:2,12 23:8
25:22 26:5,14
27:3,17 29:14
30:12 31:23
32:13 33:2,14
37:24 40:23
41:20 42:14
43:12 44:3,23
45:20 46:7,18
47:19 49:6 50:7
50:9 52:3,17
53:24 56:4 57:8
59:15 60:5,5
61:24
**oblique** 55:23
**obscure** 46:19
**obtained** 56:8
**obviously** 45:14
**occasion** 24:20
**occasions** 16:11
32:15,16,18
**occur** 22:9 40:11
**occurred** 31:11
**october** 1:16 3:2
69:11 70:5
**office** 1:1,13
15:4

**oh** 12:18 14:4
**okay** 5:12,13,21
5:24 6:10,18,24
7:1 8:16 12:3
13:4,9 19:8 24:7
26:23,24 35:10
41:15 44:13
47:2,11 52:12
57:5 61:21
62:11,21,23
64:19 67:1,13
68:4
**once** 14:15 17:18
23:18,19
**ones** 58:13
**opening** 30:3
46:2,2
**openings** 46:6
47:5
**operating** 24:10
**opinion** 11:13
37:3,4 40:22
49:8 56:1 58:14
61:1
**opinions** 16:2
58:21 60:10
**optimal** 27:15,19
27:21,23 28:5
67:19
**oral** 4:3
**order** 21:9 22:10
22:16 24:16
34:7,8 35:5,13
36:23 37:2,23
66:2
**orient** 5:13
**oriented** 6:17

**original** 33:3
**orthopedic** 9:12
9:15 24:5 26:7
31:13 36:17
37:18,21 38:1,2
38:4,5,12 53:1
56:6 58:2 59:3
59:10,16,19 60:8
63:21 66:4
**orthopedics**
28:20 38:7,17
51:10 58:24
**osteomed** 1:7
9:23 10:2,7
14:24 15:6,8
69:16
**osteotomies**
36:18 64:8
**osteotomy** 35:19
**outlined** 44:6,9
49:2 58:9
**outside** 44:3
45:20 46:7
47:24 49:6,8
50:6,9
**overall** 30:15
56:7
**overlay** 47:2
**owner** 1:8 2:14
15:5,7 69:15
**owners** 14:24

**p**

**page** 3:4,12
11:20 14:6
16:20 21:21
27:11 50:22
51:11,12 53:12

53:14 55:19
60:23 62:22
63:2,3
pages 41:23
papers 14:22
15:1,3,9,11,16
paragraph 18:18
21:21 22:14
35:15,24 36:5,9
37:22 38:21
41:17,22,23
42:19 43:7,23
44:5,7,9,17
46:12 47:8,16
48:2,5,7,9,14
49:2 50:10
51:23 54:2
55:12 56:23
57:1,3 60:12,13
60:22 62:21
63:1,2 64:7,11
66:13,14,14,18
67:3,19
paragraphs 18:9
37:1,16,17 38:6
38:13 41:24
49:13,16 52:1,4
52:10,13 53:5,17
53:22 54:7,7,12
56:16,17 57:3,18
57:22 58:12,16
60:15,19
parcel 13:16
part 15:2 24:1
49:8,14 58:4
59:2
partially 48:22
50:13

particular 22:20
22:22 23:7
24:15 27:6 63:5
particularly
22:24 32:7 57:1
63:5
parties 54:5
69:12
parts 45:2
passed 7:16
patent 1:1,1,8,13
2:14 3:14 4:20
5:24 6:1,2,12,14
6:19,21,24 7:20
7:21,24,24,24
8:1,19,22 11:9
14:23,24 15:3,5
15:7 17:4,11
41:3,17,21 42:8
53:12,13 62:8
69:15
patents 3:13
7:22,23 8:4,5,21
17:8
patient 22:20,23
23:4,7,19 24:11
24:12,15,16,20
63:5,9
patient's 23:20
24:18
pattern 23:16
51:9
patterns 51:7,19
peel 59:1
pending 5:11
46:14
percent 9:13,22
10:5 11:3

percentage 11:1
13:18
perform 64:13
performance
51:10
performed 4:15
20:21
performing 64:8
period 14:20
person 11:10
13:5 24:22
personal 4:16
personally 12:20
perspective 24:6
pertaining 1:13
petition 15:4
petitioners 1:5
2:8 7:12 14:24
16:9,18 69:13
phone 7:15
photograph
42:17 55:19
physician 4:17
4:17
picture 24:24
30:22
place 27:2,18
28:19 35:5,13
37:3,14,23
placed 38:11
39:15,19 44:1
placement 26:1
27:24 28:2 33:1
54:23 55:18
57:10
places 67:11
placing 43:2,9

plate 12:11 19:1
19:3,6,7,8,11,14
19:15,16,16,19
19:23 20:1,2,6,8
20:12,15,16,18
20:22 21:6,8,12
22:4,7,9,17,19
22:21 23:1,1,3,6
23:11,13,14,16
23:19,23 24:2,3
24:9,13,16,18,19
24:20,21,22,23
25:5,6,9,10,11
25:13,13,14,15
25:21,24 26:1,3
26:4,8,10,11,13
26:16,18 27:5,11
27:16,21 28:8,23
29:5,16 30:10,15
30:18,21,23 31:2
31:18,19 32:22
34:7,7,11,12
35:5,14 36:9,11
36:13,13,17 37:3
37:7,8,11,19,23
38:4,7,10,15,19
42:5,11,13,17
44:21 45:6
48:16,23 50:14
51:6,7,9,15,20
52:15,19 53:4,6
55:7,23,24 56:3
56:7,12 57:10,11
57:13,21 58:1,3
58:23 59:2,4,6,8
59:14,20 63:4,6
63:6,8,12,13,15
63:18,18,23 64:4

64:4,14,21 65:6
65:14,19 66:2
**plates** 9:7,15,19
9:19 22:18,21
24:11,14 35:18
35:24 36:6 63:3
63:24
**please** 5:4 34:17
45:1 66:17
**plus** 20:24
**point** 10:24 34:1
35:4,8,10,12
45:24 49:18
50:18
**portion** 19:15,16
20:1,2,3,18
21:16,17,19,22
22:1,6,10 24:15
25:20 26:10
36:13 42:21
43:3,3,11,11,22
44:2,4,9,21
45:17,18,18 46:4
46:13,16,21 47:7
47:8,16,17,24
48:1,8,11,13,15
48:17,18,18,19
48:19,21 49:3
50:6,8,11,12
52:23 53:18
54:2,18 55:4
**portions** 38:10
48:16,23 49:19
50:14
**position** 20:9,15
26:11 27:6
36:12 38:20
39:10 47:13

53:2 67:12
**positioned** 36:15
**positioning**
38:19 39:7,14
**positions** 50:18
55:21
**possible** 15:15
23:4 63:9
**possibly** 14:5
**posteriorly** 67:9
**potential** 22:14
**practice** 9:6,16
9:19,24 10:17
21:3 25:23 26:6
26:22 38:7,17
53:1 58:5 59:3
**preceding** 52:13
**preclude** 16:4
**preference** 9:7
**preliminary**
15:5
**preparation**
16:12,14 17:12
**prepare** 11:5
16:8,22 64:23
66:4
**prepared** 11:7
11:10,17 65:7
**preparing** 17:14
**present** 2:1
**pretty** 33:24
**previous** 26:15
**previously** 8:16
**primary** 55:22
**prior** 8:6,8,11
13:17 16:11
69:6

**probably** 5:19
6:1,4 9:13 10:5
17:16,22 27:4
29:9 35:15
**problem** 39:3,4
39:4 40:10,21
41:11,18
**problematic**
38:24 40:14,15
40:17,18
**procedure** 21:4
21:5 69:21
**procedures** 24:1
**proceeding** 5:20
6:5,23,24 8:6
12:1 15:2,10
17:8 61:16 69:7
**proceedings**
5:16,18 6:10,18
**process** 33:22
62:2
**produced** 35:23
**product** 4:18
**products** 9:2,6,8
9:11,11,14,23
10:2,3,8,11,14
10:16,19,23
**profile** 23:3 63:9
**promote** 64:10
64:12
**proper** 51:20
66:9 67:20
**properly** 37:23
**provide** 28:8
55:21
**provided** 5:15
13:5 58:21
61:10

**proximal** 26:3,9
27:1 29:3 31:2
45:9 55:22
**public** 1:12
**pulled** 33:12,15
**punching** 37:7
**purely** 31:3
**pursuant** 1:12
**put** 11:14 15:4,7
26:9 28:4 31:21
48:24 65:19
**puts** 10:21

**q**

**qualifications**
18:11,13
**qualified** 26:7
**question** 5:4,6
5:10 8:9 9:5
16:21 23:9 24:4
26:16 28:3,23
29:9 30:13 31:5
31:5 32:21 33:4
34:17 35:8 39:8
39:21 40:24
41:15 42:1 43:8
43:17 44:24
45:2 46:14,16,19
47:11,21 52:7,12
53:10,10,12,14
53:15,20 56:5
60:20 65:3,22
**questions** 6:22
7:3 12:24 30:8
49:22 50:4 51:2
58:19 61:4
62:10,17,24

**quick** 62:11
**quite** 4:23
**quote** 40:16 44:8
**quoted** 54:6

**r**

**range** 27:21
**read** 6:11 34:18
34:19 37:5,22
40:19 41:15,16
48:6,7 53:17
66:13
**readily** 25:12
**reading** 37:1,13
47:10 60:4
**reasonable**
51:10 56:20
**reasonably** 26:7
**reasons** 49:10
**recall** 15:14 62:7
62:9
**recess** 44:14
62:13
**recognized**
51:14
**recollection** 7:5
33:16
**record** 5:18 6:11
8:3 33:6 34:19
69:17
**redirect** 62:12
**reduced** 69:16
**refer** 5:19 6:1,13
15:9 22:15
35:15
**reference** 4:14
8:7,8,11,13 17:1
18:20,22 28:7

**34:13,21 40:19**
57:22 66:21,23
66:24
**referring** 5:23
13:6 21:16 30:2
30:4 48:10,14
56:16 61:17
**refers** 42:20
43:11
**reflect** 33:6
**refresh** 5:23
**regard** 8:2,21,23
12:12 16:12
56:11
**regarding** 9:6
39:8
**related** 5:24 8:4
16:4
**relates** 26:15
**relationship**
67:6,9
**relative** 36:12
67:12
**relatively** 23:24
24:24 25:14
44:5 57:15
**relevant** 16:5
29:8 31:18
**relied** 49:17
53:22 58:18
60:13
**rely** 57:18 58:20
**relying** 58:12
**remember** 15:13
61:7
**remove** 34:9
**removed** 34:4,12
38:14

**removing** 35:5
35:13 38:10
**repair** 20:8
**repeat** 8:9 34:16
43:17,19,20
**rephrase** 5:4
**replication**
32:17
**replies** 16:9
**reply** 16:18
**reporter** 5:3
34:16,19 43:19
69:5
**repositioned**
12:12
**represent** 61:15
**representative**
28:2,3
**represented** 22:4
29:10 61:13
**representing**
69:13,15
**require** 63:15
**requires** 66:15
66:18
**reshaping** 66:8
**respect** 16:7
56:3 67:2
**response** 15:5,7
16:2,17 36:24
61:6
**retained** 3:10
**reversed** 66:22
67:7
**review** 11:7
13:17 14:22
16:14 17:1,4
41:21 60:24

**62:3,6**
**reviewed** 8:3
11:16 15:19,22
16:6,9,23 17:12
**reviewing** 15:13
15:14 62:7
**right** 6:2,15 7:20
13:7 32:10
40:11 44:11
**rigid** 56:12
**rigidity** 56:7
**rocket** 38:16
58:7
**room** 24:10
**rotated** 66:21,23
**rule** 69:20
**rules** 1:12 4:24
69:20

**s**

**saying** 29:16
37:14 45:22
49:3,7
**says** 22:17 35:17
37:5 38:23
48:15
**science** 38:16
58:7
**scope** 44:3 45:20
46:7 49:6,8 50:1
50:9
**screw** 19:14,24
25:17,19 26:1,17
26:22 27:2,7,8
27:12 30:3,5,15
31:2 45:8,9,11
45:14 55:13,23

**screws** 9:7 10:21
11:2 26:4,9 27:1
28:11,15,16 29:2
32:6 33:1 42:12
44:21 45:13,19
45:23 46:17
47:3 55:15,18,20
55:22 56:11
**sean** 2:4 69:13
**search** 16:12
**second** 27:8
**secondly** 54:4
**secretary** 7:14
**section** 36:13
37:2 38:22
**secure** 21:9 26:4
**securing** 40:10
**see** 8:13 12:9
19:17 21:10
28:15,17 29:18
29:20,21 31:1,15
31:15,17,19
33:20,21 36:13
38:2,3,5 44:10
45:21,22,22 46:1
46:3,8,9,9 54:14
55:1,3 63:10
**seeing** 45:24
59:11,11
**seen** 15:12
**select** 27:24
**selection** 24:10
**sense** 26:10,21
34:24 35:1 39:4
41:9,10
**sentence** 37:5
38:23 47:10
48:6,7,9 66:19

**screws** 66:20 67:4,7,18
**sentences** 67:16
**separate** 5:16
**separately** 45:4
**shape** 23:1 25:6
30:10,14 63:7
64:17,22 65:4,17
**shaped** 64:20
**shaping** 64:9,11
64:16
**sharon** 2:4 3:6
69:12
**shave** 37:14,23
**shaving** 35:21
36:22 37:2
**shifted** 27:12
32:23
**short** 62:12,17
**shorten** 27:7
**shortened** 27:5
**shorter** 45:13
**shorthand** 69:4
69:11
**show** 11:19 40:5
43:6,10,21 58:18
**showing** 22:10
42:10 47:7
**shown** 19:1 20:9
21:12 25:16
28:10 34:9 39:9
41:19 42:23
51:19 53:2,14
55:14 65:5,13,23
**shows** 19:14
27:11 34:2
35:10 40:7 42:4
42:4 44:19 45:5
45:8 53:17

64:20
**shwang** 2:7
**side** 15:3 29:5,23
30:1 44:22 45:8
45:10 55:14
**sign** 14:12
**signature** 14:8
14:21 70:8
**signed** 14:10
**significant** 31:18
63:15
**similar** 6:5 12:9
**simple** 39:21
41:22 59:7
**sir** 58:17
**sitting** 33:20
61:12 66:15
**six** 14:14,20
**size** 22:19 24:9
**skeleton** 36:2
**skin** 59:1,1
**slight** 32:5
**slightly** 66:20,22
67:5
**small** 10:22 11:2
24:11,13 28:15
**smaller** 24:22
**soft** 23:2 63:7
**solving** 40:21
41:11,18
**sommers** 16:3
51:11,12,14,18
61:6,9,18,22
**sorry** 12:23
13:23 14:24
31:24 51:12
54:22 65:2
66:23

**sort** 5:13 12:12
49:24
**span** 47:17 48:8
**spans** 46:16 47:9
**sparrow** 2:4
69:13
**speak** 36:17
**speaking** 23:24
**species** 36:2
**specific** 7:9,11
14:14 15:17
16:2 19:22 24:5
33:16 35:1 42:5
46:8 57:24
**specifically**
16:10 21:18
23:10 57:23
**specificity** 16:3
**specifics** 62:4
**specified** 69:20
**spend** 13:13
17:14
**spent** 13:20
**spot** 5:11
**ss** 69:1
**ssparrow** 2:7
**standpoint** 56:6
58:2 59:16 60:8
**start** 14:16 43:17
48:14 62:20
65:3
**starting** 56:22
**state** 67:4 69:1
**stated** 46:10
**statement** 46:15
56:10
**states** 1:1,12
36:5 48:20

50:11 59:11
66:20
**stating** 67:7
**stem** 55:23
**step** 59:7
**stop** 5:10 49:7
**straighten** 31:5
32:24
**straightening**
30:21
**straightforward**
57:16
**street** 1:14 2:5
2:11
**stryker** 1:3 7:13
9:1,4,11 10:10
14:23 15:4
61:10,14 69:14
**stryker's** 9:6
**submit** 15:3
**submitted** 11:14
14:22 18:4
**subsequent**
31:12
**substantially**
36:16
**succinctly** 32:1
44:9 55:12
**sufficient** 21:13
21:15,22 22:5
**suitable** 36:1,12
38:20
**suite** 1:14 2:5,11
**summarizes**
18:15
**summary** 41:6
**superimposed**
42:17

**supply** 29:8
**supplying** 7:17
**support** 49:10
51:4 55:16
56:17 58:13
60:14
**supposed** 14:19
**sure** 11:21 43:15
43:16,20 56:20
**surface** 36:15
37:8
**surfaces** 37:6
**surgeon** 23:14
23:18 26:7
29:22 31:13
37:18,21 38:1,5
38:12 51:11,13
58:2 59:10,19,19
60:8 63:22 66:4
**surgeon's** 23:16
24:5 38:2 51:18
**surgeons** 38:4
**surgery** 53:1
59:3
**sworn** 4:3 69:8

**t**

**take** 5:3,9 38:22
42:1 44:12
62:11
**taken** 1:11 44:14
62:13 69:10
**talk** 11:6 13:9
62:20
**talked** 54:4,8
**talking** 6:16 8:23
17:7 44:17
45:21 46:11

50:20 64:12
**talus** 20:20
21:14 29:8,23,24
37:18 50:17
57:14 64:20
65:5,13,18,19
66:23 67:6,8,12
67:17
**target** 36:12
**teach** 57:19
**teaching** 47:15
**team** 13:11
**technically** 29:4
55:5
**technology** 1:4
69:14
**telephone** 7:17
**tell** 66:17
**telling** 7:17
**tells** 53:6
**template** 12:11
**ten** 13:22,24
14:1
**tendered** 8:18
11:23 17:9 18:2
**tenor** 33:3
**term** 11:8 23:13
24:17 27:19
56:21 58:6
64:16
**terms** 7:11 11:11
25:23 38:18
39:7 50:1
**terrible** 65:3
**terrill** 62:8
**testified** 4:4
**testify** 69:8

**testimony** 69:18
**testing** 63:16
**thank** 5:12 50:24
54:11 68:5
**thanks** 68:4
**thing** 33:10
60:22
**things** 15:14
25:3 38:2,3 58:9
59:24 63:1
**think** 6:4 11:8,19
14:13 28:21
30:13 33:3,5
39:5,16 49:24
50:20 55:5,11
57:21,23 60:15
60:20 67:2
**third** 26:22 27:2
**thought** 58:22
62:2
**thread** 20:2
25:19
**threaded** 19:16
**three** 6:7,10 26:4
26:24 32:14,15
32:18 37:1 54:6
55:22
**tibia** 20:20 21:13
30:24 40:8
42:13,17 50:17
52:24 57:13
64:19 65:4,13,15
65:18,19 66:20
66:24 67:7,9,11
67:17
**tibiotalar** 27:13
31:22 34:8 38:8
38:12 57:24

58:8 59:9 64:21
64:24,24 65:7
66:4
**tibiotalocalcan...**
36:8
**time** 7:15 11:3
13:13,16,18,20
14:20 17:14
33:5 43:13
58:15 60:21
**timeframe** 14:16
**times** 4:11 17:17
20:21 21:4
**tine** 57:12
**tip** 31:2
**tissue** 23:2 63:8
**today** 5:1,14,14
6:4 8:24 11:6
16:8,11,13,15,22
17:12 33:20
60:16 61:1,12
62:9 66:15
**today's** 17:15
**tools** 25:12
**top** 12:5 26:24
27:7 31:7
**total** 17:16 42:7
**totality** 54:13
**tracy** 1:11 69:4
70:9
**trademark** 1:1
1:13
**training** 21:3
**transcript** 69:10
**transcription**
69:17
**translate** 67:6,8

**translated** 67:9
**translation**
57:11,15 59:8
**transverse** 26:17
31:2 51:16
65:14
**treating** 4:17,17
**treatment** 36:19
**trial** 1:1
**tried** 32:15
**true** 64:3 69:17
**truth** 69:9,9,9
**trying** 16:16
33:11
**turn** 14:6 18:18
62:18 66:12
**two** 6:18 26:24
28:13,15,15 29:2
31:11 42:12
44:21 45:2,19,23
46:5,17 47:3
55:3,10,15,20
56:11
**type** 19:1 20:5,8
20:21
**types** 4:13 10:19
**typical** 24:2 65:6
66:3

**u**

**u.s.** 3:13,14 6:1
6:12,19,21 62:8
**unaware** 26:6
**uncommon** 21:5
**understand** 5:4
5:14,22 8:10
33:11 37:22
40:24 41:2,5,13

47:21 58:7
59:18 61:9,11
**understanding**
16:1 22:3 33:23
34:1 38:14
40:16 52:18
54:21 56:1 60:2
60:7 61:12
**understood** 5:6
38:17 60:3
**unfortunately**
54:19
**unintentional**
32:3,20,22 33:7
33:9,24
**united** 1:1,12
**upward** 49:4
**use** 9:10,18,21
10:2,4,4,23 11:3
21:6 22:3,17,18
22:24 24:9,17,21
25:9 27:20
30:22 34:7,8,11
35:18 36:1 42:2
42:10 51:20
53:3 56:21 63:6
63:23 64:4,13,22
66:2
**useful** 51:9
**usually** 41:10
**utilized** 64:17

**v**

**vague** 23:10 57:1
**van** 32:9,9,11
**vantage** 45:23
**vendors** 9:20
10:6

**verbal** 5:2
**verbally** 7:17
54:21
**versus** 9:11 11:2
40:17 60:3
**vertebrae** 36:4
**vertebrate** 36:2
**view** 41:17
**viewing** 40:20
**vitae** 3:17
**volunteered**
60:18
**vs** 1:6

**w**

**want** 7:2 21:24
22:15 27:1 29:4
30:7 35:11
39:21 56:10
**way** 5:5 32:6
41:5 49:11
53:10 57:3,7
64:19
**we've** 30:2,7
58:13
**week** 14:20
**weeks** 14:14
**went** 13:16 29:2
44:16
**west** 1:14 2:5,11
**white** 28:22
**wide** 27:21
**width** 29:24
**wise** 11:1
**wit** 69:7
**witness** 4:2 8:18
11:23 16:1 17:9
18:2 19:22

**[witness - zone]**                                                Page 18

20:24 21:12
22:3 23:9 25:23
26:6,15 27:4,18
29:15 30:13
31:24 32:14
33:3,15 34:16,24
38:1 40:24
41:21 42:15
43:16 44:4,24
45:21 46:8,19
47:20 50:10
52:4,18 54:1
56:5,20 57:9
59:16 60:7 62:1
64:2,16 65:10,22
66:7,11 69:6
**word**   33:9 59:23
59:23
**wording**   38:13
40:14
**work**   7:19 9:1,4
51:15
**working**   13:5,9
13:10,13,20
**wow**   4:13
**wright**   1:3 7:13
9:14,18,21 10:5
10:13 15:4
61:10 69:14
**wrists**   36:4
**written**   53:13
67:7
**wrote**   13:5

**y**

**year**   7:10 20:24
**years**   21:2 63:22

**yesterday**   17:20
**young**   24:12

**z**

**zone**   29:20

www.veritext.com                                                888-391-3376

**Appx3952**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Trials@uspto.gov                                                      Paper 6
571-272-7822                                              Date: March 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY,
INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

_____

IPR2021-01451
Patent 9,351,776 B2

_____

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

> across two joints and (2) an alternate embodiment where fusion
> plate 1 is used to secure two discrete bones (tibia 4 and talus 2,
> within the oval annotated into Figure 1 [above]) together across
> a single joint between the two bones.

Pet. 16–17 (citing Ex. 1005, 12:3–4, 6:17–7:2, 8:13–28, 11:1–4, 12:3–10, 13:5–9, 14:1–8). Petitioner supports this interpretation of Slater with Dr. Gall's testimony. Ex. 1002 ¶ 114.

Patent Owner contends that Petitioner is picking-and-choosing features from among "alternative" embodiments in Slater to combine and modify to arrive at the claimed subject matter. Prelim. Resp. 8–11. Patent Owner contends that "Slater fails to describe th[e] alternative [two-bone] embodiment in detail, only briefly acknowledging that it may be an option" and, thus, Petitioner is allegedly "forced to rely on expert testimony to fill the gaps regarding how the three-bone embodiment would be modified for a two bone application." *Id.* at 10; *see also id.* at 11 (Patent Owner further contending that "Dr. Gall, Petitioners' expert, relies on multiple, distinct teachings of Slater and alleges that a POSA might somehow combine to achieve the claimed invention of the '776 patent.").

We disagree on this record that Petitioner is improperly picking from and combining unrelated disclosures in Slater to arrive at the claimed subject matter. It is prohibited, when anticipation is the issue, to pick and choose from "various disclosures *not directly related to each other* by the teachings of the cited reference." *In re Arkley*, 455 F.2d 586, 587 (1972) (emphasis added). But here, the disclosures of Slater relied upon by Petitioner are sufficiently related to each other as evidenced by at least Figure 1 itself, and related written description in Slater. The two-bone embodiment appears to be an "alternate" embodiment only insofar as it reflects another angled

pathway for the screw so it anchors in a second and not a third bone. This is not wholly distinct, however, from the three-bone embodiment. To the contrary, both the two-bone and three-bone embodiments are depicted as alternatives within the plate of Figure 1 itself. Thus, Figure 1, with the two-bone pathway, is arranged in a manner that meets the preamble of claim 1, and we are persuaded on this record that a person of ordinary skill in the art would understand Slater that way. Indeed, the fact that related text in Slater about Figure 1 indicates that one or multiple joints may be fused supports Petitioner's and Dr. Gall's interpretation of Slater. *See, e.g.*, Ex. 1005, 13:3–5 ("As may be seen from figure 1, the screws are placed in a particular orientation and required angle to the *joint/s* required for arthrodesis.") (emphasis added).

Patent Owner criticizes Dr. Gall's analysis "of a single cursory embodiment" on whether Slater discloses a system for fusing two bones across a single joint. Prelim. Resp. 13. That criticism is, however, unavailing because "[e]xpert testimony may shed light on what a skilled artisan would reasonably understand or infer from a prior art reference." *Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1373 (Fed. Cir. 2020). Patent Owner also points out that Slater's disclosure mostly concerns securing three bones across two joints, and that Slater purportedly teaches that adding "more joints" in the fusion is advantageous. Prelim. Resp. 13 (citing, e.g., Ex. 1005, 16:28–30). Even if that aptly characterizes Slater's disclosure, that does not negate anticipation. Un-preferred—even disfavored—embodiments may still anticipate a claim. *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) ("A reference is no less anticipatory if, after disclosing the invention,

IPR2021-01451
Patent 9,351,776 B2

### E. Remaining Grounds 3–6

Having found that Petitioner has demonstrated a reasonable likelihood of prevailing for at least one claim, we need not reach Petitioner's arguments with respect to the remaining grounds in determining whether to institute *inter partes* review. The Supreme Court has held that a final written decision in an *inter partes* review must decide the patentability of all claims challenged in the corresponding petition. *SAS*, 138 S. Ct. at 1348. The USPTO has also provided guidance on implementing *SAS*. *See* Guidance on the Impact of *SAS* on AIA Trial Proceedings (Apr. 26, 2018), https://www.uspto.gov/patents-application-process/patent-trial-and-appealboard/trials/guidance-impact-sas-aia-trial ("As required by [*SAS*] decision, the PTAB will institute as to all claims or none," and "[a]t this time, if the PTAB institutes a trial, the PTAB will institute on all challenges raised in the petition."); PTAB Consolidated Trial Practice Guide (Nov. 2019), 5–6.

Notwithstanding the above, we direct the parties to the Board's discussion of Grounds 3–6 in the concurrent institution decision for the related IPR2021-01450 proceeding. There we discuss in detail Petitioner's grounds that rely on the Falkner and Arnould references, and Patent Owner's arguments in response. Because the parties' arguments on Grounds 3–6 here mirror the arguments on those same grounds in IPR2021-01450, the parties may consider our reasoning there for information or guidance if needed.

We therefore grant the Petition and institute trial as to all challenged claims of the '776 patent on all grounds asserted by Petitioner.

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**PATENT TRIAL AND APPEAL BOARD**

_____

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

_____

Case IPR2021-01451
U.S. Patent No. 9,351,776

_____

**PATENT OWNER RESPONSE**

**D.    Ground 4: Claims 4, 5, and 13 are not obvious over *Falkner* in view of *Arnould***

For independent claims 1 and 10, from which dependent claims 4, 5, and 13 depend, Ground 4 relies solely on the anticipation-based analysis of *Falkner* set forth in Ground 3.  (Paper 2, 57 ("Falkner anticipates dependent claim 2 and independent claim 10.")).  The Petition only provides an obviousness analysis with respect to additional limitations of dependent claims 4, 5, and 13 and provides no additional analysis of claims 1 or 10.  (Paper 2, 57-60).

As detailed above, Petitioners' Ground 3 *Falkner* anticipation theory fails, therefore, Ground 4 fails for the same reasons.

**E.    Ground 5: Claims 1-5 and 9-13 are not obvious over *Arnould* in view of *Slater*[6]**

Ground 5 relies on *Arnould* for "each and every element of independent claim 1" except "at least a portion of said bridge portion having a depth greater than at least a portion of the depth of either the first end or the second end."  (Paper 2, 61).  For this element, Petitioners rely on *Slater* in combination with *Arnould*.  This combination fails because there is no motivation to thicken the portion of *Arnould*

---

[6]    Because Petitioners cite their arguments for claim 1 in addressing claim 10 (Paper 2, 73-75), Patent Owner responds to Petitioners' arguments in the context of claim 1.  This response applies equally to claim 10, unless otherwise noted.

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

## STRYKER CORPORATION and
## WRIGHT MEDICAL TECHNOLOGY, INC.

Petitioners,

v.

## OSTEOMED LLC,
Patent Owner

---

Case IPR2021-01451

Patent 9,351,776

---

# DECLARATION OF KENNETH A. GALL, PH.D. IN SUPPORT OF
# PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,351,776

STRYKER Exhibit 1002
Page 1 of 225
IPR2021-01451

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 9,351,776*

| | 776 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | discrete bone; and | <u>**surface 83**</u> which opposes a talus for fixation thereto[.]”).<br><br>The second inner surface in Slater (8 or 83) is configured to substantially conform with a geometry of the second discrete bone (e.g., the talus). *See id.* at 9:8-12 (“The second point of plate depth and width change is over the phalanges at the distal point of the plate. At this point the plate according to one embodiment, tapers out and again the thickness at this point would be in the order of about 1mm. <u>**These points will preferably resemble and conform to the typical geometry of the anatomical region**</u>.”); 9:14-15 (“Preferably, the plates are configured to <u>**generally conform to the anatomic contours**</u> of the ankle joint.”); 9:15-18 (“A range of different plate sizes (at least five) is contemplated with <u>**differences in the range of contour**</u> and degree of angle <u>**over the ankle joint**</u> and lengths both <u>**proximally**</u> and distally.”); 14:19-22 (“The depth at the beginning and end points of the generally L shaped contour over the ankle joint formed by portions 81 and 90 . . . .”); 16:32-34 (“The plate may also be manufactured with varied thickness at regions requiring additional strength and <u>**contoured to a geometry to best suit ankle anatomy**</u>.”); 17:2-3 (“Another advantage of the plate is its pliability at regions when bending may be required for <u>**conformity with bone anatomy**</u>.”); 23:15-17 (“A kit according to claim 17 wherein the <u>**plate geometry**</u> is arranged to at least partially <u>**conform to the shape of the anatomy of bones**</u> to which the plate is fixed.”). |

STRYKER Exhibit 1002
Page 68 of 225
IPR2021-01451

Trials@uspto.gov
571-272-7822

Paper 6
Date: March 16, 2022

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

---

IPR2021-01452
Patent 9,763,716 B2

---

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

MAJORS, *Administrative Patent Judge.*


DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

and another distinct embodiment of Slater using a different screw configuration for securing two bones across a single joint."), 13 (asserting that "only three [disclosures in Slater] refer to using the plate across fewer than two joints, and the reference to such plate is only made in passing as a mere alternative"). Accordingly, Patent Owner argues that at least claim 1's preamble is not disclosed in Slater.

We disagree on this record that Petitioner is improperly picking from and combining unrelated disclosures in Slater to arrive at the claimed subject matter. It is prohibited, when anticipation is the issue, to pick and choose from "various disclosures *not directly related to each other* by the teachings of the cited reference." *In re Arkley*, 455 F.2d 586, 587 (1972) (emphasis added). But here, the disclosures of Slater relied upon by Petitioner are sufficiently related to each other as evidenced by at least Figure 1 itself, and related written description in Slater. The two-bone embodiment appears to be an "alternate" embodiment only insofar as it reflects another angled pathway for the screw so it anchors in a second and not a third bone. This is not wholly distinct, however, from the three-bone embodiment. To the contrary, both the two-bone and three-bone embodiments are depicted as alternatives within the plate of Figure 1 itself. Thus, Figure 1, with the two-bone pathway, is arranged in a manner that meets the preamble of claim 1, and we are persuaded on this record that a POSA would understand Slater that way. Indeed, the fact that related text in Slater about Figure 1 indicates that one or multiple joints may be fused supports Petitioner's and Dr. Gall's interpretation of Slater. *See, e.g.*, Ex. 1005, 13:3–5 ("As may be seen from figure 1, the screws are placed in a particular orientation and required angle to the *joint/s* required for arthrodesis.") (emphasis added).

Owner, what Petitioner identifies as the "second end" of Falkner's plate is not, in fact, a "second end." *Id.* at 29 ("The end of the plate is [as] described and claimed, not some portion before the end."). To the contrary, Patent Owner argues that the "second end of the plate of Falkner is inside the bone, and does not conform to the geometry of the second bone" and further, that this internal end portion includes an aperture for receiving the threaded fastener so any attempt to modify its geometry to conform to a second bone would run counter to the design and purpose of Falkner's plate. *Id.* at 32.

Moreover, Patent Owner argues that Falkner fails to disclose "transferring the tensile load" as recited in claim 1. *Id.* at 26–29. Patent Owner contends that Dr. Gall's testimony on this topic is conclusory, that Dr. Gall fails to appreciate differences between compressive forces (as allegedly recited in Falkner's ¶ 71) and tension forces as claimed, and that because Falkner's screw is not being anchored in the second bone but instead in a second (internal) portion of the plate, Dr. Gall's opinion that Falkner's plate transfers tensile forces as claimed is "contrary to the purpose of the screw in Falkner." *Id.*

Based on the present record, we are doubtful that Petitioner will prevail in showing that Falkner anticipates claim 1. Manifestly, Falkner's relied-upon plate shown in Figure 1 is not arranged as claimed. Ex. 1006, Fig. 1. It is *not* configured to secure two discrete bones (e.g., the tibia and talus) across an intermediate joint between those bones, nor is the plate configured with first and second ends having inner surfaces that substantially conform with a geometry of first and second bones. This is plain from the cross-sectional anatomical views of the tibia, joint, and talus shown in the figure itself. To make the plate so configured as claimed would apparently require at least some level of redesign or modification.

38

IPR2021-01452
Patent 9,763,716 B2

Those might be simple, even arguably obvious, changes for the POSA in light of Falkner and its overall teachings but Petitioner's challenge is based on anticipation. Indeed, Petitioner's and Dr. Gall's repeated invocation of how Falkner's plate, if used in the hypothetical joint-spanning context, "would have been" configured rings of obviousness, not anticipation. *See, e.g.*, Ex. 1002 ¶ 204.

We recognize that Falkner discloses that its plates may be designed to traverse a joint between bones. *See, e.g.*, Ex. 1006 ¶¶ 21, 23, 29. But there is a dearth of detail about such a hypothetical plate's actual design. On this record, it appears to us that making such a plate or modifying the plate of Figure 1 to render it suitable to, for example, spanning a joint between the tibia and talus would require the POSA to make distinct design choices beyond any embodiment explicitly described in Falkner. Even then, it is not a foregone conclusion that all the claim limitations would be met (e.g., surfaces of the first and second ends that conform to a bone geometry, and a thicker bridge portion relative to the ends). The POSA might, for example, decide to conform some or multiple portions of the hypothetical bone plate to the exterior geometries of multiple bones, such as the tibia and talus. Such a design is even arguably suggested elsewhere in Falkner, where it discloses that bone plates "may be sized and shaped to conform to particular portions of a bone (or bones)" or "may be contoured generally to follow an exterior surface of a target bone (or bones)" (Ex. 1006 ¶¶ 33–34). But, here again, our concern is that such a theory drifts from anticipation—a doctrine still rooted in "strict identity"[12]—to obviousness.

---

[12] *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002).

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**PATENT TRIAL AND APPEAL BOARD**

_____

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

_____

Case IPR2021-01452
U.S. Patent No. 9,763,716

_____

**PATENT OWNER RESPONSE**

### 2.    Claims 2-3, 6, 8-9, 11-12, and 17-18

*Falkner* does not expressly or inherently disclose every element of claims 1, 10, and 16 of the '716 Patent, therefore *Falkner* does not anticipate claims 2-3, 6, 8-9, 11-12, and 17-18 either.

### D.    Ground 4: Claims 4, 5, 13, and 19 are not obvious over *Falkner* in view of *Arnould*

For independent claims 1, 10, and 16 and dependent claim 2, from which dependent claims 4, 5, 13, and 19 depend, Ground 4 relies solely on the anticipation-based analysis of *Falkner* set forth in Ground 3. (Paper 2, 58 ("Falkner anticipates dependent claim 2 and independent claims 10 and 16.")). The Petition only provides an obviousness analysis with respect to additional limitations of dependent claims 4, 5, and 14 and provides no additional analysis of claims 1, 2, 10, or 16. (Paper 2, 58-61).

As detailed above, Petitioners' Ground 3 *Falkner* anticipation theory fails, therefore, Ground 4 fails for the same reasons.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01453

U.S. Patent No. 10,245,085

**PETITION FOR *INTER PARTES* REVIEW**

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*

**Exhibit 1006:** Falkner U.S. 2005/00171544 ("Falkner"), published on August 4, 2005.

**Exhibit 1007 and Exhibit 1008:** Arnauld EP 1897509, published on March 14, 2008, is Exhibit 1007. The certified English translation of Arnauld EP 1897509 is referenced herein as "Arnauld," Exhibit 1008.

**Exhibit 1009:** Weaver U.S. Patent No. 6,623,486 ("Weaver"), issued on September 23, 2003.

### B.    Grounds for Challenge

Petitioners request cancellation of the Challenged Claims on the following grounds:

| Ground | Proposed Grounds for Rejection |
|---|---|
| 1 | Claims 1-3 and 6-9 are anticipated by Slater |
| 2 | Claims 4 and 5 are obvious over Slater in view of Weaver |
| 3 | Claims 1-8 are anticipated by Falkner |
| 4 | Claim 9 is obvious over Falkner in view of Arnauld |
| 5 | Claims 1-3 and 6-9 are obvious over Arnauld in view of Slater |
| 6 | Claims 4 and 5 are obvious over Arnauld in view of Slater and Weaver |

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*

**f.    1.5:  "*an aperture defining a transfixation screw hole disposed…*"**

As shown below in Figures 5 and 7, Slater includes an aperture defining a transfixation screw hole (opening 26 or 93) disposed along the spine at the thickened portion of the bridge portion.  (EX1002, ¶141); EX1005, Figs. 5, 7).



While Slater does not explicitly identify openings 26 and 93 as "transfixation screw holes," Slater's disclosure makes it clear that openings 26 and 93 each receive a fixation screw that passes through those openings so that the screw is implanted at an angle.  (EX1005, 11:19-21, 13:21-24).

As shown below in Figures 1 and 7, Slater includes a transfixation screw hole (26 or 93) that comprises an inner surface (unnumbered in Slater's drawings) configured to direct the transfixation screw (25) through the transfixation screw hole such that the transfixation screw extends at a trajectory configured to pass through a first position on the first discrete bone (tibia 4) and a second position on the second

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*

discrete bone (talus 3) once the plate (1 or 80) is placed across the joint. (EX1002, ¶142; EX1005, 11:19-25, 13:21-25). Figure 1 shows three separate exemplary angles for the transfixation screw 25, including one example where the screw 25 passes through a first position on a first discrete bone (tibia 4) and a second position on a second discrete bone (talus 3). (EX1002, ¶142).





(EX1005, Figs. 1, 7)

the ankle joint." (EX1005, 9:8-15; 11:7-8, 13:9-10, 14:19-22, 16:32-34, 17:2-3; 23:15-17).

### e.    Dependent Claim 8

Slater discloses that the central axis of the inner surface of the transfixation screw hole (26 or 93) defines a trajectory configured to cross a neutral bending axis of the joint once the plate is placed across the joint. (EX1002, ¶¶160-163).

As discussed above, "the neutral bending axis 118 defines the boundary line that separates the tension side of the joint 106 from the compression side of the joint 106." (EX 1001, Fig. 2; 6:7-10). Further, as discussed above, a POSITA would understand that "the neutral bending axis" of a given joint would fall approximately down the center of the adjacent bones, for each bone, depending on the cortical thickness on opposing surfaces. (EX1002, ¶161). In Slater, the axis of the bone plate approximates the direction of the neutral bending axis of the joint between the tibia 4 and talus 3. (EX1002, ¶161).

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*

In Figure 9, Slater discloses a central axis of the transfixation screw hole (26 or 93) that defines a trajectory and even identifies an angle associated with that trajectory relative to the axis of the bone plate. (EX1002, ¶162; EX1005, Fig. 9).



Similarly, as shown below in Figure 1, when the Slater plate is placed across the joint, the trajectory defined by the central axis of the inner surface of the transfixation hole crosses the neutral bending axis of the joint. (EX1002, ¶163).



(EX1005, Fig. 1; 11:19-27, 12:3-4, 12:32-13:3, 13:20-25).

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*

### f.    Dependent Claim 9

As shown in Figure 9, Slater discloses an embodiment where the central axis of the transfixation hole defines a trajectory that is configured to pass through the joint at a transfixation angle of 34° measured from the axis of the bone plate, which approximates the direction of the neutral bending axis of the joint. (EX1002, ¶¶165-166__;  EX1005, 15:23-25,



FIGURE 9

Fig. 9).  A transfixation angle of 34 degrees is "between about 30 degrees and about 70 degrees," and thus discloses the claim element set forth in dependent claim 9. (EX1002, ¶¶165-166__).

In addition, in Figure 1, Slater discloses three different transfixation angles for screw 25:  31°, 47° and 57°, all of which fall within the claim 9 range of between about 30 and 70 degrees measured from the neutral bending axis of the joint. (EX1002, ¶¶167-169).

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*



(EX1005, Fig. 1).

### B.    Ground 2:   Claims 4 and 5 are Obvious Over Slater in View of Weaver

As discussed above, independent claim 1 is anticipated by Slater.  Moreover, Weaver discloses each and every additional element described in dependent claims 4 and 5, which recite that the inner surface of the transfixation screw hole is configured to lockably engage the head of the transfixation screw (claim 4) and threaded to provide a locking interface with a transfixation screw (claim 5).  As discussed below, dependent claims 4 and 5 are rendered obvious by Slater in view of Weaver.  (EX1002, ¶¶170-178).

Weaver is directed to a bone plate having plate holes for both locking and non-locking screws.  (EX1009, 1:10-13).  Weaver explains that "[a] locking screw has threading on an outer surface of its head that mates with corresponding threading on the surface of the plate hole to lock the screw to the plate.  Bone plates having

transfixation screw would have been an obvious design choice. (EX1002, ¶¶173-178). So too would it have been an obvious design choice to configure the inner surface of Slater's transfixation screw hole (claim 5) as a threaded screw hole to provide a locking interface with a transfixation screw. (EX 1002, ¶¶173-178). Such design choice would have been made, for example, because locking screws "provide a high resistance to shear or torsional forces" and reduce the incidence of screw loosening. (EX1009, 1:46-48, 1:57-58; EX1002, ¶¶173-175, ¶¶176-178).

### C.    Ground 3:  Falkner Anticipates Claims 1-8

As shown below and in the accompanying Declaration, Falkner discloses all elements of claims 1-8, and thus anticipates those claims under 35 U.S.C. § 102(b). (EX1002, ¶¶179-222).

### 1.    Independent Claim 1 is Anticipated by Falkner

#### a.    1.P: Preamble

To the extent the preamble is limiting, Falkner discloses a system 20 for securing a first discrete bone (tibia 26) and a second discrete bone (talus 32) together across a joint 30 between the first discrete bone (tibia 26) and the second discrete bone (talus 32). (EX1002, ¶181).

*Petition for Inter Partes Review of*
*U.S. Patent No. 10,245,085*



Fig. 1

While Figure 1 of Falkner shows an exemplary system for fixing bones, the Falkner disclosure expressly contemplates that "the bone plate may be positioned on and/or in any suitable **bone(s)** to span any natural or artificial discontinuity within a bone or between bones. In the present illustration, plate 22 is secured to a distal end (metaphyseal) region of a tibia bone 26 and spans fracture 28. **In other examples, plate 22 may span a joint, such as joint 30 between tibia 26 and talus 32, among them.**"

(EX1006, ¶21) (emphasis added); (EX1006, ¶¶27-29, 62).

b.    **1.1: "*a plate comprising:  an elongate spine having a first end comprising…*"**

As shown in Figures 1 and 2 below, Falkner discloses a bone plate 22 comprising an elongate spine (22) having a first end comprising at least one attachment point (50) for attaching the first end to the first discrete bone (*e.g.*, tibia 26) on a first side of the joint (30). (EX1002, ¶¶182-184).

Trials@uspto.gov                                              Paper 6
571-272-7822                                      Date: March 17, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

———————————————

IPR2021-01453
Patent 10,245,085 B2

———————————————

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

MARSCHALL, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————————

**PATENT TRIAL AND APPEAL BOARD**

————————————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

————————————

Case IPR2021-01453
U.S. Patent No. 10,245,085

————————————

**PATENT OWNER RESPONSE**



Junction Zone 14

Bending Line 14₁

Fig.2

(Ex. 2002, ¶ 70; Ex. 1008, Fig. 2 (annotated)).

## III.   CLAIM CONSTRUCTION

The Petition was filed after November 13, 2018, and, as such, the proper claim construction standard to be applied is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), in accordance with its regulation, 37 C.F.R. § 42.100(b). *Apple Inc. v. Firstface Co.*, No. 2021-1001, 2021 WL 4156323, at *1 n.1 (Fed. Cir. Sept. 13, 2021). Therefore, these claims should be "given their ordinary and customary meaning [and] that the ordinary and customary meaning of a claim term is the meaning that the term would have to a [POSITA] in question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Phillips*, 415 F.3d at 1312-13.  For purposes of these proceedings, Patent Owner provides a construction for the preamble of claim 1.

With respect to the preamble of the independent claim, it is limiting, and requires a system for securing two discrete bones together across a joint between the two bones.  (Ex. 1001, cl. 1).  "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted).  To determine whether a preamble serves as a limitation, the Board must consider the entire "patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim."  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  The preamble of claim 1 addresses a fundamental feature of the invention (i.e., the ability to secure two discrete bones together across a single joint), which is reflected throughout the specification.  *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (preamble was limiting where it described a "fundamental characteristic of the claimed invention" and the specification "underscore[d] the importance" of the preamble as a limitation).  Therefore, the preamble should be limiting.

Neither the Petition, nor Dr. Gall, provide any rationale for this combination of embodiments, which is particularly troubling in light of *Slater's* discussion of the importance of pliability at the bending region of the plate. More importantly, as detailed above, "[t]he law of anticipation does not permit Petitioner to mix two separate embodiments as though they collectively describe a single embodiment including selective elements from each." *Peddinghaus*, 2021 WL 1897595, at *12 (citing *Net MoneyIN, Inc.*, 545 F.3d at 1369). Because *Slater* does not expressly or inherently disclose that the claimed "bridge portion" include a "thickened portion having a thickness greater than at least a portion of a thickness of either the first end or the second end," it does not anticipate claim 1 of the '085 Patent.

> **d.    *Slater* fails to disclose "a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion"**

*Slater* does not disclose "a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion." Notably, neither the Petition nor Dr. Gall's supporting declaration provide any analysis of this claim element other than to simply say it is disclosed in *Slater*. (*See* Paper 2, 22-23; Ex. 1002, ¶ 140). The Petition's silence in this regard cannot be rectified post-Institution. In fact, both the Petition and Dr. Gall's supporting declaration confirm that *Slater* does not disclose this element at all. (Ex. 2002, ¶¶ 92-94).

In every *Slater* embodiment, Dr. Gall identifies the purported transfixation screw hole as being **above** the thickened portion of the bridge portion:





(*See, e.g.*, Ex. 1002, ¶ 141 (Dr. Gall's annotations); Ex. 2002, ¶ 93).

Given this identification of a screw hole **<u>above</u>** the purported thickened portion of the bridge portion, the transfixation screw does not and cannot be disposed **at** the thickened portion of the bridge portion as required in claim 1 of the '085 Patent. Because *Slater* does not disclose "a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion," it does not anticipate claim 1 of the '085 Patent.

### 2.    Claim 6

Because *Slater* does not expressly or inherently disclose every element of claim 1 of the '085 Patent, *Slater* does not anticipate claim 6 either. *Slater* does not

the ability to incorporate more joints into the arthrodesis as required." (Ex. 1005, 16:28-30). In other words, the oblique hole is specifically designed to not have a central axis that defines the screw trajectory. (Ex. 2002, ¶ 103). As such, *Slater* does not anticipate claim 8 of the '085 Patent.

### 4. Claims 2-3, 7 and 9

Claims 2-3, 7, and 9 depend on the claims detailed above. Because *Slater* does not expressly or inherently disclose every element of claims 1-3 and 6-9 of the '085 Patent, *Slater* does not anticipate claims 1-3 and 6-9 either.

### B. Ground 2: Claims 4 and 5 are not obvious over *Slater* in view of *Weaver*

For independent claim 1, from which dependent claims 4 and 5 depend, Ground 2 relies solely on the anticipation-based analysis of *Slater* set forth in Ground 1. (Paper 2, 34 ("As discussed above, independent claim 1 is anticipated by Slater.")). The Petition only provides an obviousness analysis with respect to the additional limitations of dependent claims 4 and 5, and makes no mention of the limitations of claim 1, including why discrete embodiments of *Slater* would be combined. (Paper 2, 34-37).

As detailed above, Petitioners' Ground 1 *Slater* anticipation theory fails, therefore, Ground 2 fails for the same reasons.

### 3.    Claims 2-6 and 8

*Falkner* does not expressly or inherently disclose every element of claim 1 of the '085 Patent, therefore *Falkner* does not anticipate claims 2-6 and 8 either.

### D.    Ground 4: Claim 9 is not obvious over *Falkner* in view of *Arnould*

For independent claim 1, from which dependent claim 9 depends, Ground 4 relies solely on the anticipation-based analysis of *Falkner* set forth in Ground 3. (Paper 2, 53 ("Falkner anticipates dependent claims 2-8 and independent claim 1.")). The Petition only provides an obviousness analysis with respect to additional limitations of dependent claim 9 and provides no additional analysis of claim 1. (Paper 2, 53-56).

As detailed above, Petitioners' Ground 3 *Falkner* anticipation theory fails, therefore, Ground 4 fails for the same reasons.

### E.    Ground 5: Claims 1-3 and 6-9 are not obvious over *Arnould* in view of *Slater*

Ground 5 relies on *Arnould* for "each and every element of independent claim 1" except "bridge portion further comprising a thickened portion having a thickness greater than at least a portion of a thickness of either the first end or the second end." (Paper 2, 56). For this element, Petitioners rely on *Slater* in combination with *Arnould*. This combination fails because there is no motivation to thicken the portion of *Arnould* that Petitioners identify as the bridge portion. Moreover, the

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01453

U.S. Patent No. 10,245,085

**PETITIONERS' REPLY**

for arthrodesis and bone plates configured to fuse bone fractures have been used interchangeably for decades")). Patent Owner fails to identify a single structural characteristic in the claimed invention that differentiates bone plates used for fractures and those used for joints. *See, e.g.*, *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997) (finding that functional limitations did not give claim patentable weight). Given the dearth of relevant evidence, there is simply no basis to construe the preamble as limiting.

## III.    THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.    The Challenged Claims are Unpatentable in View of Slater

Regarding Ground 1, Slater anticipates the structural and functional limitations of claims 1-3 and 6-9. (EX1002, ¶¶125-169). Regarding Ground 2, Patent Owner does not challenge the combination of Slater and Weaver for claims 4 and 5.

#### 1.    Slater Anticipates Claim 1

##### a.    Petitioners Do Not Rely On Discrete Embodiments of Slater

Patent Owner argues that Petitioners improperly rely on different embodiments to "piece together an anticipation theory based on Slater." (POR, 22). In particular, Patent Owner rehashes its already-rejected POPR argument that Slater describes "distinct two- and three-bone embodiments," and concocts a new

argument that the "Figure 1" and "Figure 5" bone plates are distinct. Neither argument has merit.

The Board already rejected Patent Owner's argument that Slater discloses distinct "two-bone" and "three-bone" embodiments, acknowledging that the disclosures relied upon by Petitioners "are sufficiently related to each other as evidenced by at least Figure 1 itself, and the related written description in Slater." (IPR2021-01453, Paper 6, 16-17). Slater is replete with references indicating that *the same plate* may be used to fuse two bones or three bones. (EX1005, 6:18-28, 8:27-28, 12:3-5, 14:1-3, 16:28-32,17:3-5). Indeed, Patent Owner's argument must be taken with a grain of salt given that, in pending IPRs, Patent Owner's own expert, Mr. Sherman, opined that "[a] POSITA looking at these disclosures from Slater would understand that the bone plate disclosed has a fixation screw 25 configured to intersect a joint through two discrete bones." (EX1025, ¶81; EX1026, ¶76).

The Board should also reject Patent Owner's argument that Figures 1 and 5 of Slater disclose distinct embodiments.[1] (POR, 23-25). They do not. (EX1027,

---

[1] In pending IPRs, Patent Owner freely referenced Figures 1 and 5 in its obviousness analysis without once mentioning or addressing Figures 1 and 5 as allegedly "distinct" embodiments that required combination. (IPR2022-00487, Pet., 21-25; IPR2022-00488, Pet., 18-19). Nor did Patent Owner provide any motivation to combine the alleged Figure 1 embodiment with the Figure 5 embodiment.

¶¶6-11).  Figure 1 is described as a "***generally schematic view*** of a fusion plate 1 for arthrodesis" showing the plate ***attached to an ankle joint***.  (EX1005, 11:1-4 (emphasis added)).  Figure 5 "shows a side cross sectional elevation view of a plate according to a preferred embodiment ***isolated from an ankle joint***."  (*Id.*, 10:6-7 (emphasis added)).




(EX1005, Figs. 1, 5).

The detailed description of Figure 5 refers back to plate 1 of Figure 1 and the screw orientations disclosed therein, thus clarifying that the figures disclose different aspects of the same preferred embodiment.  (EX1005, 13:5-6, 14:1-2; EX2003, 72:20-73:7).  This is confirmed by the "Brief Description of the Drawings," which lists ***Figures 1-13*** and explains that "[t]he present invention will now be described

in more detail according to *a preferred, but non limiting embodiment* and with reference to the accompanying illustrations." (EX1005, 9:21-10:27). Similarly, Slater references the "DETAILED DESCRIPTION OF *THE* PREFERRED EMBODIMENT," confirming that the disclosure is directed to a single preferred embodiment. (*Id.*, 10:32).

Patent Owner purports to identify certain "differences" between Figure 1 and Figure 5 as "proof" that those figures represent "distinct" embodiments. (POR, 24). However, the alleged differences that Patent Owner identifies are largely due to the fact that *Figure 1 is a schematic drawing* intended to illustrate the positioning of the bone plate and screws *relative to the joint*, whereas Figure 5 is a cross-sectional drawing intended to illustrate additional details regarding the width and thickness of the bone plate and the geometry of the openings. (EX1005, 11:1-12:10, 13:5-14:10). In any event, the existence of minor differences between the figures does not preclude a finding of anticipation.[2] *See, e.g.*, *FMC Techs., Inc. v. Onesubsea IP UK Ltd.*, IPR2019-00935, Paper 45 at 60-61 (P.T.A.B. Oct. 14, 2020) ("Patent Owner's

---

[2] Even if Figures 1 and 5 could somehow be categorized as "distinct," anticipation is established by Petitioners' citations to the so-called Figure 1 "embodiment" for all but one claim limitation. (Pet., 17-34). For the "thickness" limitation, Slater expressly discloses, without reference to any figures, that "[t]his location adjacent the ankle joint will preferably be the thickest part of the plate." (EX1005, 8:32-9:1; EX1027, ¶10)

arguments are not persuasive because they are premised on treating figures that are schematic drawings as though they are precise engineering drawings."); *see also Kingston Tech. Co. v. North Star Innovations Inc.*, IPR2018-01794, Paper 36 at 33-34 (Feb. 26, 2020) (rejecting Patent Owner's argument that prior art disclosed ten distinct embodiments and finding the challenged claim unpatentable under § 102(b)).

Patent Owner's assertion that Dr. Gall "changed his view" at his deposition regarding whether Slater discloses multiple embodiments is simply not true. For example, throughout Dr. Gall's declaration, he relies on the preferred embodiment of Slater as illustrated in Figures 1-13, as well as the description of the preferred embodiment set forth in the specification. (Ex. 1002, ¶¶132-169). Likewise, at his deposition, he testified that Slater discloses one embodiment. (EX2003, 72:20-73:7). The positions taken by Dr. Gall in his declaration and at his deposition are entirely consistent. It is ***Patent Owner***, not Dr. Gall, who is taking the unsupportable position that Slater somehow discloses multiple embodiments.

Indeed, Patent Owner's argument appears to be a semantic one based almost entirely on a statement in the Petition asserting that "Figure 1 of Slater illustrates (1) a fusion plate 1 being used to secure three discrete bones (tibia 4, talus 3, and calcaneus 28) across two joints and (2) an ***alternate embodiment*** where fusion plate

1 is used to secure two discrete bones (tibia 4 and talus 2, within the oval annotated into Figure 1 immediately below) together across a single joint between the two bones." (Pet., 18). Patent Owner has seized upon the words "alternate embodiment" and treated such words as an edict or admission that Slater discloses multiple discrete embodiments that preclude an anticipation finding.[3] (POR, 22). But the law is not so fickle. As the Board recognizes,

> [t]he two-bone embodiment appears to be an 'alternate' embodiment only insofar as it reflects another angled pathway for the screw so it anchors in a second and not a third bone. This is not wholly distinct, however, from the three-bone embodiment. To the contrary, both the two-bone and three-bone embodiments are depicted as alternatives within the plate of Figure 1 itself.

(IPR2021-01453, Paper 6, 16).

### b. Slater Discloses A System For Securing Two Discrete Bones

Even if the preamble of claim 1 is limiting, Slater discloses a system for securing two bones across a joint. (EX1002, ¶¶133; IPR2021-01453, Paper 6, n. 6; EX1027, ¶¶12-16). Mr. Sherman agrees. (EX1025, ¶81 ("A POSITA looking at

---

[3] Dr. Gall did not use the words "alternate embodiment" in his declaration, instead simply pointing out that Figure 1 "illustrates that the Slater fusion plate 1 can be used to secure three discrete bones…across two joints" and that "Slater also contemplates that the fusion plate 1 can be used to secure two discrete bones…together across a single joint." (EX1002, ¶133).

these disclosures from Slater would understand that the bone plate disclosed has a

fixation screw 25 configured to intersect a joint ***through two discrete bones***")

(emphasis added); EX1026, ¶76 (same); *see also* EX1025, ¶¶101, 102; EX1026,

¶¶108, 109).

Patent Owner nevertheless argues that Slater fails to describe an embodiment

where fixation screw 25 is used for two bones only, while at the same time admitting

that Slater "includes a primary embodiment with a screw designed to traverse two

joints and three bones." (POR, 27-28). But even Mr. Sommers declines to take the

position that Slater fails to enable the so-called two-bone embodiment. While Mr.

Sommers makes a semantic argument that Slater fails to "***illustrate or show*** a screw

type that would be used only in the tibia and talus bones," he later admitted that

Slater discloses a lag screw, and to achieve lag effect (compression between two

bones), the lag screw should only have threads in the second bone. (EX1030, 68:17-

71:9, 106:16-23; EX2002, ¶83; *see also* EX1026, ¶¶121-123). Since Mr. Sommers

himself recognizes that "you want to really have the screws [threads] only in the

second bone," it is unclear why Patent Owner persists in ignoring Dr. Gall's repeated

explanations that a POSITA knows to use Slater's lag screw in a tibiotalar joint such

that the threads engage only into the second bone. (EX1002, ¶¶142, 144, 146;

EX1030, 70:16-19, 71:5-9; EX2003, 30:4-9). "The law is clear that patent

documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention." *S3 Inc. v. NVIDIA Corp.,* 259 F.3d 1364, 1371 (Fed. Cir. 2001). Here, it is clear that Slater discloses to a POSITA a system for securing two bones across a joint. *Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1366, 1373 (Fed. Cir. 2020) ("In an anticipation analysis, the dispositive question is whether a skilled artisan would 'reasonably understand or infer' from a prior art reference that every claim limitation is disclosed in that single reference.").

In any event, as the Board recognized, "a system for securing two bones is disclosed in Slater." (IPR2021-01453, Paper 6, 14-15 n. 6). Whether the Slater plate is used with a transfixation screw that crosses two bones or three bones does not materially affect the anticipation analysis, especially since the Slater plate is clearly capable of, and intended for use in, fusing two bones together. *See, e.g.*, *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) (finding that a prior art reference may anticipate an apparatus claim "if the reference discloses an apparatus that is reasonably capable of operating so as to meet the claim limitations").

> **c.**     **Slater Discloses the "Thickness Greater Than" Element**

Patent Owner argues that Figure 1 does not disclose the "thickness" limitation and asserts that it is "unclear" whether the thicker bridge portion shown in Figure 5 actually spans the joint. (POR, 29).  Aside from its incorrect argument that Figures 1 and 5 disclose distinct embodiments, Patent Owner wholly fails to address Slater's specification, which unambiguously teaches and claims that the portion of the plate over the ankle joint will preferably be the thickest part of the plate.  (EX1005, 24:17-19, 8:25-9:6) ("the first portion has a region at [its] extremity which is thinner. . . the plate depth changes at different locations. Preferably, the depth at the beginning and end points of the L shaped contour over the ankle joint in the second region will be at it's maximum thickness. ***This location adjacent the ankle joint will preferably be the thickest part of the plate and will preferably fall within the range 4-8 mm***. . . The plate will taper at least one but preferably two different points of the plate. A first taper will occur at a proximal point of the plate over the tibia. The desired effect is for the plate to taper in and decrease in thickness proximally.") (emphasis added); *see also* EX1027, ¶¶18, 20-23).

Patent Owner incorrectly argues that Slater's bridge portion "is purposely designed to be thinner to increase 'pliability at regions when bending may be required for conformity with bone anatomy.'" (POR, 29).  However, the pliable

regions of Slater are the proximal end of the plate over the tibia and the distal end of

the plate over the talus where the plate tapers and conforms to the bones – not the

bridge portion. (EX1005, 9:3-12, 14:18-33; EX1027 ¶¶20-23). Slater describes the

"maximum thickness" of the plate at the bridge portion over the ankle joint as being

"within the range of 4-8mm," while the thickness of the plate at the proximal and

distal ends is "around 1mm." (EX1005, 8:35-9:11, 14:18-30). This explicitly

confirms that Slater teaches that the bridge portion has a thickness greater than both

the first and second ends of the bone plate.

> ### d. Slater Discloses a Transfixation Screw Hole Disposed Along the Spine at the Thickened Portion of the Bridge Portion

Relying on an overly narrow view of the claim term "at," Patent Owner argues

that Slater does not disclose "a transfixation screw hole disposed along the spine at

the thickened portion of the bridge portion" because Dr. Gall identifies the

transfixation screw hole as being "above" the thickened portion of the bridge

portion. (POR, 30-32). But the ordinary meaning of the term "at" is "in, on, or

***near***." (EX1031, 77). In the context of the '085 patent, the term "at the thickened

portion of the bridge portion" means "***near*** the thickened portion of the bridge

portion." As such, Dr. Gall's identification of Slater's transfixation screw hole as

being adjacent to the bridge portion is consistent with the meaning of "at the

thickened portion of the bridge portion" as described in the '085 patent.  (EX1002, ¶141; Pet., 24; EX1027, ¶¶24-26).

For example, the '085 patent explains that the transfixation screw hole "may be included in thickened section 136, ***adjacent to*** bridge portion 130."  (EX1001, 9:6-8).  The '085 patent explains that including the transfixation screw hole in the thickened section 136 "may enable a countersink to be created around transfixation screw hole 102" and "may also enable transfixation screw hole 102 to be machined into bone plate 100 at an angle relative to the top surface of bone plate 100 (e.g., other than perpendicular to the top surface of bone plate 100."  (EX1001, 9:8-17).  The '085 patent nowhere suggests that the transfixation screw hole is ***part of*** the bridge portion, as Patent Owner seems to suggest.

To the contrary, the '085 patent very clearly explains that the "bridge portion 130 [is] configured to span across the joint 106" and "[s]ince bridge portion 130 is configured to span across joint 106, it is typically defined by an unbroken section of spine 124 that is ***free of voids such as positioning holes or screw holes*** that could potentially reduce the bending strength of bridge portion 130."  (EX1001, 8:32-37).  The specification repeatedly refers to the transfixation screw hole as being "adjacent to," and thus, separate from, the bridge portion.  (EX1001, 8:32-41, 8:60-9:8).

Patent Owner cites to no evidence that supports a construction of "bridge portion" that would permit the transfixation screw hole to be part of the bridge portion. Patent Owner is not entitled to claim scope that is "divorced from the context of the written description and prosecution history." *Nystrom v. Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).

Even if the Board allows Patent Owner to pursue a construction that contradicts the intrinsic evidence such that the claimed "bridge portion" can include voids such as the transfixation screw hole, Slater still discloses this claim element. (EX1027, ¶27). The bridge portion would simply be expanded to include Slater's transfixation screw hole. (*Id.*).



(*Id.*).

### 2.    Slater Discloses Claim 6

Claim 6 does not require a "discrete" tension side and compression side of the joint.  (POR, 33).  Moreover, the claim is not expressly limited to a particular joint. The claim recites that the first position resides on "**a** compression side of the joint" and the second position resides on "**a** tension side of the joint."  (EX1001, cl. 6 (emphasis added)).   Nothing in the challenged *apparatus* claim excludes the common scenario where the sides of the joint switch from compression to tension.[4] (EX1002, ¶157).   Patent Owner's attempt to avoid anticipation by importing functional aspects of a specific joint (the metatarsophalangeal – which, notably, is not recited in the challenged claims) into apparatus claims should be rejected.

### 3.    Slater Discloses Claim 8

Patent Owner argues that Slater's transfixation screw hole "is specifically designed to not have a central axis that defines the screw trajectory."  (POR, 35). But Figure 9 of Slater belies this argument, expressly showing that the central axis of Slater's transfixation screw hole forms a 34° angle to the longitudinal axis of the bone plate.  (EX1027, ¶¶29-30).

---

[4] Even in the metatarsophalangeal joint, the tension side and compression side can switch, such as during plantar flexion, which places the dorsal side of the joint in tension. (EX1030, 64:2-4).

*Petitioners' Reply*
*U.S. Patent No. 10,245,085*

Moreover, Patent Owner's argument that Figure 9 is a "different plate," is simply a rehashing of its "multiple embodiment" argument. Figure 9 is a cross-sectional, side elevation view of the Figure 5 plate. (EX1005, 10:14-16). As discussed above, the Slater figures depict different aspects of the same



preferred embodiment shown in schematic Figure 1. (*Id.*, 10:6-7, 14:1-3, 15:19-20).

### B.    Challenged Claims 1-9 are Unpatentable in view of Falkner

All of Patent Owner's arguments relating to Ground 3 are premised on its incorrect argument that the Falkner plate "would require extensive modifications" to cross a joint. (POR, 36-43). Patent Owner provides no substantive response regarding Ground 4.

#### 1.    Falkner Discloses a System for Securing Two Discrete Bones Across a Joint

To the extent the preamble is limiting, Patent Owner concedes that Falkner discloses that its blade plate may be used to cross a joint rather than a fracture, but argues that Falkner includes "a dearth of detail" about the design of such a plate. (POR, 37). But there is no dearth of detail: Falkner unambiguously teaches that ***the same bone plate*** shown in Figure 1 and described in the specification "may be

**UNITED STATES PATENT AND TRADEMARK OFFICE**

––––––––––––––––––

**PATENT TRIAL AND APPEAL BOARD**

––––––––––––––––––

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

––––––––––––––––––

Case IPR2021-01453
U.S. Patent No. 10,245,085

––––––––––––––––––

**PATENT OWNER SUR-REPLY**

(*See* Ex. 1004, 267-268, 289, 291, 296). Specifically, the examiner requested language be added that "recite the structural differences between the claimed invention and the prior art." (*Id.*, 268). The claims are therefore limited to a system for securing two discrete bones together across a joint between the two bones. (*Id.*, 296).

## III.   THE CHALLENGE GROUNDS

### A.   Ground 1: Claims 1-3 and 6-9 are not anticipated by *Slater*

#### 1.   *Slater* fails to anticipate Claim 1

##### a.   Petitioners change what is identified as the "bridge portion" in *Slater*

Claim 1 requires "an aperture defining a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion." (Ex. 1001, cl. 1). The Petition identified the claimed "bridge portion" in *Slater* as ***not including*** the transfixation screw hole; however, now in reply, Petitioners modified the figures ***to include*** the transfixation screw hole:

| **Figures from Petition** | **Figures from Reply / Ex. 1027** |
|---|---|
|  |  |

(Petition, 25 vs. Reply, 13 and Ex. 1027, ¶27; *see also* Ex. 1002, ¶¶138-142 (identifying the bridge portion of *Slater* as ***not including*** the transfixation screw hole)). When questioned on this issue before Petitioners submitted their reply, Dr. Gall confirmed that he correctly identified the bridge portion of *Slater* as ***not including*** the transfixation screw hole:

> Q.    And in paragraph 110 [of the '608 Patent declaration] you
>        identify the bridge portion of claim 1; correct?
>
> A.    Yes.
>
> * * *
>
> Q.    Sure. In the annotated figure on page 60, you have circled the
>        bridge portion in yellow; is that correct?

A.    Yes.

Q.    And that circle accurately reflects what you're identifying as the bridge portion of the plate?

A.    Yes.

(Ex. 2003, 51:17-52:7).  Petitioners' attempt to modify this unequivocal declaration of the identified bridge portion in *Slater* is untimely, improper, and contradicted by the sworn testimony of Dr. Gall.  Given that Petitioners intentionally selected the portion of the *Slater* plate as the bridge portion that did not include the transfixation hole in the Petition to establish the other elements of the independent claims, such a change in theory as to what the "bridge portion" is in *Slater* in reply should not be permitted.

### b.    Petitioners now construe "at" as "near"

Petitioners now argue in reply that "*at* the thickened portion of the bridge portion" in claim 1 should be interpreted as "*near* the thickened portion of the bridge portion." (Reply, 11-12)[1].  Petitioners submitted new extrinsic evidence in the form of a generic dictionary definition to support such an interpretation.  (*See e.g.*, Ex. 1031, 77).  Such an interpretation is contrary to the specification, which uses the phrase "adjacent to" when it meant for a desired location to be near something.  (*See*

---

[1]    All emphasis added unless noted.

Ex. 1001, 9:6-8). If the transfixation screw hole is permitted to be ***near*** the thickened portion of the bridge portion, but not part of the thickened portion of the bridge portion, there is no guarantee that the trajectory of the screw hole would cross the neutral bending axis of the joint.

Given the clear and unambiguous language of claim 1, the Board should not interpret "a transfixation screw hole disposed along the spine ***at*** the thickened portion of the bridge portion" as "***near*** the thickened portion of the bridge portion." The only explanation for this shift in theories now is that Petitioners realized the Petition failed to identify the bridge portion of *Slater* as including the transfixation screw hole, as required by claim 1:

**Figures from Petition**  **<span style="color:red">Figures from Reply / Ex. 1027</span>**





(Petition, 25 (identifying bridge portion **as not including** transfixation screw) vs. Reply, 13 and Ex. 1027, ¶27 (identifying bridge portion **as including** transfixation screw)).  Given the plain language of claim 1, the Board should not interpret "at" as "near."

## 2.     Petitioners Rely on Two Separate and Distinct Embodiments

Anticipation requires the elements be "arranged or combined in the same way as recited in the claims."  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim.").  Anticipation is improper where the reference does not "clearly and unequivocally disclose the claimed" invention.  *See In re Arkley*, 455 F.2d 586, 587 (1972).[2]

Petitioners continue to rely on components from two separate embodiments (indeed different plates) in *Slater* as disclosing all elements of claim 1.  As Mr. Sommers noted previously, the Figure 5 plate 80 embodiment is unique in numerous

---

[2] Petitioners have doubled-down on the position that the disclosure in *Slater* expressly discloses the Challenged Claims, failing to even argue that to the extent the disclosure is not express, it is inherent.  That argument is therefore waived.

7

Petitioners' belated attempt to "gap-fill" deficiencies in the Petition by "belatedly present[ing] evidence" is plainly improper. CTPG, 74. Accordingly, Dr. Holmes' declaration and Section III.B of the Reply should be disregarded in full.

**2.    The Proposed Modifications to *Falkner* Make it is Impossible for the Trajectory to Cross the Neutral Bending Axis**

As the Board noted, "it is not a foregone conclusion that all the claim limitations would be met" even if the plate in *Falkner* was modified to cross a joint. (*See* Decision, 32).    Instead of providing support in *Falkner* for the proposed changes, Petitioners rely on Dr. Holmes, a completely new expert, to show why the proposed modifications are allegedly disclosed by *Falkner*.   Dr. Holmes relied on very little support from *Falkner*, instead describing why a surgeon would make these changes based on his own experience.  (Ex. 1028, ¶22; *see also* Ex. 2006, 37:13-38:20).

Not only do Petitioners propose modifications not disclosed or described in *Falkner*, the resulting plate demonstrates that the claims of the '085 Patent are not anticipated by *Falkner*.  For example, the claims require a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion (claim 1), that the trajectory is configured to cross a neutral bending axis of the joint (claim 8), and that the first position resides on a compression side of the joint and the second position resides on a tension side of the joint (claim 6).  Such limitations cannot be

14

met by Dr. Holmes' modified *Falkner* plate because the screw fails to cross the neutral bending axis into the tension side of the bone:

**From Dr. Gall's First Declaration (Ex. 1002)**     **From Dr. Holmes Reply Declaration (Ex. 1028)**




(Ex. 1002, ¶212 vs. Ex. 1028, ¶36 (with the neutral bending axis annotated in red)). In order for the screw to be anchored on the tension side, the length of the internal portion of the plate would need to be extended. However, when Dr. Holmes was asked whether such modifications would need to be done to the length of the plate, he unequivocally answered no:

> Q    So if we look at the modified figure in your declaration, and it's on page 22, paragraph 36, is that internal portion of sufficient length for ankle fusion?
>
> A    It is.

Q    Are there instances where you would want to extend the length of that internal portion?

A.    Given my understanding of the use of a blade plate for fusion, the length that is represented here is sufficient. Going further across or longer with the insertion portion would not appreciably increase the efficacy of the plate.

(Ex. 2006, 21:20-22:7).

Moreover, neither the original *Falkner* analysis, nor Dr. Holmes' modified analysis, establish a transfixation screw disposed at the thickened portion of the bridge portion.    Interestingly, Petitioners and Dr. Gall did not modify what was identified as the bridge portion in *Falkner* in contrast to the modification to *Slater* discussed above:



(Ex. 1002, ¶190). And, because the bridge portion identified by Petitioners does not include the transfixation screw hole nor does the transfixation screw cross the neutral bending axis of the joint, *Falkner* does not anticipate claims 1-8 of the '085 Patent.

### 3.     *Falkner* Fails to Disclose Extensive Modifications Required to Secure Blade-Plate to a Joint

While *Falkner* contemplates in passing that the disclosed blade-plate **may** be used across a joint, *Falkner* does not disclose the vast modifications required to anticipate the Challenged Claims. This is readily apparent from the inclusion of **seventeen** new paragraphs[4] on how the plate **may** be modified from an entirely new expert for Petitioners in reply. This inclusion of a new expert in reply with details on how *Falkner* **could** be modified confirms that Petitioners' *Falkner* theory drifts from anticipation, something the Board recognized in the Institution Decision. (*See* Decision, 23 ("our concern is that such a theory drifts from anticipation—a doctrine still rooted in 'strict identity'—to obviousness.")).

---

[4]  Not only is this new declaration at this stage improper because it contains new arguments not presented in the Petition, it is a clear circumvention of the word count of the Petition. This comes after Petitioners used a citation format of "EX1001" in order to gain 300+ words in the Petition and 100+ words in the Reply.

While Petitioners allege that Dr. Holmes' opinion confirms that *Falkner* explicitly discloses a bone plate "for joint fusion without any design modifications," numerous design modifications are described, including: (1) changing the location of the plate relative to the discontinuity; (2) changing the intersection location of the transfixation screw with the bone discontinuity; (3) removing several portions of bone on the first bone and the second bone so that the plate fits more securely on the bones; (4) reshaping the plate for a new bend above the transfixation screw hole; (5) relocating the first distal screw; and (6) relocating the second distal screw.  (Reply, 17).  These changes amount to more than slight modifications.  By suggesting these modifications would be necessary to use the *Falkner* blade-plate across a joint, Dr. Holmes, and Petitioners, seemingly admit that the theory of anticipation raised in the Petition is obviousness in disguise.

With respect to modifying the location of the plate itself, this not only shifts where the plate is relative to the discontinuity, it moves the intersection location of the transfixation screw substantially closer to the left edge rather than the middle of the bone discontinuity, thus leaving a very small portion of bone between the plate and the intersection location:



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36).  Such a change would impact

whether the trajectory can cross the neutral bending axis of the joint.

Dr. Holmes' modifications show a substantial amount of bone removed from

the joint in order to secure the plate, and assumes that such modifications are

necessary because the patient may have been suffering from bone spurs:




(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36; *see also* ¶29).  However, *Falkner* fails to suggest or disclose any such bone removal may be necessary in order to use the blade-plate over a joint.

Dr. Holmes bends the plate to conform to the new location, with the bend located directly above the transfixation screw hole resulting in a completely new shape of the plate:



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36).

Dr. Holmes moves the first distal screw from a location that anchors into the first bone, to a location that anchors into the second bone:



Dr. Holmes moves the second distal screw from a location that intersects the first and second bone because it "does not appear to be providing any additional fixation":



(Ex. 1006, Fig. 1 (annotated) vs. Ex. 1028, ¶36; *see also* ¶21).

Petitioners rely on Dr. Holmes' extensive modifications, none of which are disclosed in *Falkner*, in an effort to show that *Falkner* expressly discloses each and every element of the Challenged Claims. Given that these arguments were not presented in the Petition, and because the extensive modifications required for *Falkner*'s plate to be used across a joint go beyond what reasonably could be anticipation, the Board should disregard Dr. Holmes' declaration in full.

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC.

Petitioners,


v.


OSTEOMED LLC,
Patent Owner

_____


Case IPR2021-01453

Patent 10,245,085

_____


# DECLARATION OF KENNETH A. GALL, PH.D. IN SUPPORT OF PETITION FOR _INTER PARTES_ REVIEW OF U.S. PATENT NO. 10,245,085

STRYKER Exhibit 1002
Page 1 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br><br>*See id.* at Fig. 1. |
| 140. | the bridge portion further comprising a thickened portion having a thickness greater than at least a portion of the thickness of either the first end or the second end; and | Slater's bridge portion further comprises a thickened portion (portions of 5 and 20 or portions of 81 and 90) having a thickness greater than at least a portion of the thickness of either the first end (proximal end of portion 30 or proximal end of portion 95) or the second end (distal end of portion 5 or distal end of portion 81). *See* Ex. 1005 at 8:25-26 ("According to one embodiment, the first portion has a region at is [*sic*] extremity which is thinner."); 8:32-9:1 ("Preferably, the **depth at the beginning and end points of the L shaped contour over the ankle region** will be at it's **maximum thickness**. This location adjacent the ankle joint will preferably be the **thickest part of the plate** and will preferably fall within the range 4-8mm."); 9:2-6 ("Thickness throughout this specification will refer to the dimension measured from the bone engaging face to an opposite outer face. The plate will taper at least one but preferably two different points of the plate. A first taper will occur at a proximal point of the plate over the tibia. The desired effect is for the plate to taper in and decrease in thickness proximally."); 14:19-23 ("The |

- 73 -

STRYKER Exhibit 1002
Page 76 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | depth at the beginning and end points of the **generally L shaped contour** over the ankle joint **formed by portions 81 and 90** will be at it's **maximum thickness** as it is at **this region** that the highest loading will occur in normal use. This depth (the thickest part of the plate) will be within the range 5-6mm."); 24:17-19 ("29[.] A kit according to claim 28 wherein the **plate thickness varies** at different locations and wherein the **portion of the plate** which lays **over the ankle joint** has **maximum thickness**.").<br><br><br>FIGURE 7 |

- 74 -

STRYKER Exhibit 1002
Page 77 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | | <br><br>*See id.* at Figs. 5, 7. |
| 141. | an aperture defining a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion, | Slater includes an aperture defining a transfixation screw hole (opening 26 or opening 93) disposed along the spine at the thickened portion of the bridge portion. *See* Ex. 1005 at Figs. 1, 5, 6, 7, 9, and 10.<br><br> |

- 75 -

STRYKER Exhibit 1002
Page 78 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  FIGURE 7 *See also id.* at 11:19-21 ("Disposed in portion 20 is **fixation screw 25** which **passes through opening 26** in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. "); 13:21-24 ("Disposed in portion 90 is a **fixation screw** which **passes through opening 93** in formation 94. Formation 94 is configured so that a fixation screw is directed at an angle within a predetermined allowable angular range."). |
| 142. | the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation | As shown below in Figures 1, 6, and 7, Slater includes a transfixation screw hole (26 or 93) that comprises an inner surface (unnumbered in Slater's drawings) configured to direct a transfixation screw (*e.g.*, fixation screw 25) through the transfixation screw hole such that the transfixation screw extends at a trajectory configured to pass through a first position on the first discrete bone (*e.g.*, tibia 4) and a second position on the second discrete bone (*e.g.*, talus 3) once the plate (1 or 80) is placed across the joint. |

- 76 -

STRYKER Exhibit 1002
Page 79 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | screw hole such that the transfixation screw extends at a trajectory configured to pass through a first position on the first discrete bone and a second position on the second discrete bone once the plate is placed across the joint. |  |

STRYKER Exhibit 1002
Page 80 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |

STRYKER Exhibit 1002
Page 81 of 184
IPR2021-01453

Appx8768

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

| | 085 Patent, Claim 1 | Slater (Ex. 1005) |
|---|---|---|
| | |  |
| | | *See also id.* at 11:19-25 ("Disposed in portion 20 is **fixation screw 25** which **passes through opening 26** in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. **Screw 25 engages tibia 4, talus 3, and cal[can]eus 28** effectively providing three points of fixation according to this embodiment[.]"); 13:21-25 ("Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. **Formation 94 is configured so that a fixation screw [not shown] is directed at an angle** within a predetermined allowable angular range. Portion 90 is angled relative to portion 81 at a non[-l]imiting angle of about 100 degrees."). |

## B.   Dependent Claims 2-3 and 6-9

143.   Dependent claims 2-3 and 6-9 depend on claim 1.  These claims recite

minor features or variations that are also found in Slater.  In my opinion, these claims

- 79 -

STRYKER Exhibit 1002
Page 82 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

[*sic*] **to the contour of the tibia**."); 15:12-14 ("The **contour of geometry over the distal aspect of the tibia** will be **incorporated into the design** of the plate."); 16:32-34 ("The plate may also be manufactured with varied thickness at regions requiring additional strength and **contoured to a geometry to best suit ankle anatomy**."); 17:2-3 ("Another advantage of the plate is its pliability at regions when bending may be required for **conformity with bone anatomy**."); 23:15-17 ("A kit according to claim 17 wherein the **plate geometry** is arranged to at least partially **conform to the shape of the anatomy of bones** to which the plate is fixed."); 11:7-8 (illustrated in Fig. 1) ("Portion 5 has an outer surface 7 and inner surface 8 which opposes talus surface 6 for fixation thereto."); 13:9-10 ("**Portion 81 has an** outer surface 82 and **inner surface 83** which opposes a talus for fixation thereto[.]"); 9:8-12 ("The second point of plate depth and width change is over the phalanges at the distal point of the plate. At this point the plate according to one embodiment, tapers out and again the thickness at this point would be in the order of about 1mm. **These points will preferably resemble and conform to the typical geometry of the anatomical region**.")).

160.    ***Dependent claim 8*** recites "[t]he system of claim 1, wherein:  a central axis of the inner surface of the transfixation screw hole defines the trajectory; and the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint."  Claim 1 is anticipated by Slater, as discussed above.  In

- 88 -

STRYKER Exhibit 1002
Page 91 of 184
IPR2021-01453

Appx8778

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

my opinion, Slater contains all of the elements of claim 8 of the 085 patent and

therefore anticipates claim 8.

161.   As discussed above, the 085 patent defines the "neutral bending axis"

as "[t]he line about which the force on joint 106 transitions from tension to

compression….In other words, neutral bending axis 118 defines the boundary line

that separates the tension side of joint 106 from the compression side of joint 106."

(Ex. 1001 at 6:4-10).  In my opinion, a POSITA would understand that the neutral

bending axis of a joint would fall approximately down the center of the adjacent

bones, for each bone, depending on the cortical thickness on opposing surfaces.

When a bone has a reasonable degree of symmetry, the axis of the bone plate

approximates the direction of the neutral bending axis of the joint. In Slater, the axis

of the bone plate approximates the direction of the neutral bending axis of the joint

between tibia 4 and talus 3.

162.   In Figures 1, 5, and 9, Slater discloses a central axis of the transfixation

screw hole (26 or 93) that defines a trajectory.  In Figure 9, Slater identifies an angle

associated with that trajectory.  (Ex. 1005 at Fig. 9).

STRYKER Exhibit 1002
Page 92 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*



163.   As shown below in Figure 1, when the Slater plate is placed across the joint, the trajectory defined by the central axis of the inner surface of the transfixation hole crosses the neutral bending axis.  (Ex. 1005 at Fig. 1; 11:19-27 ("Disposed in portion 20 is fixation screw 25 which passes through opening 26 in formation 27. **Formation 27 is configured so that screw 25 is implanted at an angle** within a predetermined allowable angular range. The allowable range will preferably be within a 40 degree arc. Screw 25 engages tibia 4, talus 3, and calcaneus 28 effectively providing three points of fixation according to this embodiment[.] Portion 20 is angled



- 90 -

STRYKER Exhibit 1002
Page 93 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

relative to portion 5 at about 100 degrees. This ang[le] is non limiting and may be greater or less than 100 degrees according to the dictates of design[.]"); 12:32-13:3 ("Figure 4 shows a elevation view of a second screw type 70 according to one embodiment adapted for insertion in the plate of figures 1 and 2 and allowing adjustable orientation. Screw type 70 has a longer shank to increase depth of penetration and has an abbreviated threaded portion to allow the **majority of the shank** to **slide through aligned tibial and talus screw holes** finally **anchoring in the calcaneus bone**."); 12:3-4 ("As may be seen from figure 1[,] the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis."); 13:20-25 ("Portion 90 of plate 80 has an outer surface 91 and inner surface 92 which opposes a anterior surface of tibia for fixation thereto. Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. **Formation 94 is configured so that a fixation screw is directed at an angle** within a predetermined allowable angular range. Portion 90 is angled relative to portion 81 at a non[-l]imiting angle of about 100 degrees.")).

164. ***Dependent claim 9*** recites "[t]he system of claim 8 wherein the trajectory is configured to pass through the joint at a transfixation angle between about 30 degrees and about 70 degrees measured from the neutral bending axis."

165. As discussed above, Slater discloses each and every element of the system of claim 8. In my opinion, Slater contains all of the elements of claim 9 of

- 91 -

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

the 085 patent and therefore anticipates claim 9.

166.   As shown in Figure 9, Slater discloses a central axis of the transfixation hole defining a trajectory that is configured to pass through the joint at a transfixation angle of 34° measured from the direction of the neutral bending axis.  34° is between about 30 degrees and about 70 degrees, and thus discloses the claim element set forth in dependent claim 9.



167.   Moreover, according to my measurements of the embodiment illustrated in Figure 1, Slater discloses three different transfixation angles for screw 25:  31°, 47° and 57°.  Each of the disclosed angles falls within the claimed range of between about 30 degrees and about 70 degrees measured from the neutral bending axis and thus discloses the claim element set forth in dependent claim 9.   (Ex. 1005 at Fig. 1).

STRYKER Exhibit 1002
Page 95 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*



168.  A POSITA would understand that the transfixation angle will depend on a variety of factors, including the particular joint being fused and the patient's anatomy.  Slater recognizes that "[p]roper plate fixation relies on the integrity of the screw bone interface, screw insertion angle, screw tightness and effective cooperation between screw head and the screw insertion hole.  These requirements dictate plate design for a particular anatomical location and repair objective."  (Ex. 1005 at 5:28-31).

169.  Slater further discloses that the allowable range for the transfixation angle will preferably be within a 40 degree arc to ensure that the screw engages bone on both sides of the joint or fusion line.  (Ex. 1005 at 11:19-25 ("Disposed in portion 20 is fixation screw 25 which passes through opening 26 in formation 27. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined

STRYKER Exhibit 1002
Page 96 of 184
IPR2021-01453

Declaration of Kenneth A. Gall, Ph.D. in Support of
*Petition for Inter Partes Review of U.S. Patent No. 10,245,085*

allowable angular range. Formation 27 is configured so that screw 25 is implanted at an angle within a predetermined allowable angular range. The **allowable range will preferably be within a 40 degree arc**. Screw 25 engages tibia 4, talus 3, and cal[can]eus 28 effectively providing three points of fixation according to this embodiment[.]"); 13:20-24 ("Portion 90 of plate 80 has an outer surface 91 and inner surface 92 which opposes a anterior surface of tibia for fixation thereto. Disposed in portion 90 is a fixation screw which passes through opening 93 in formation 94. Formation 94 is configured so that a **fixation screw is directed at an angle within a predetermined allowable angular range**.")). Extreme angles close to 0 degrees or 90 degrees would result in an inability of the screw to sufficiently engage bone on both sides of the joint, and keeping the transfixation screw at 45 degrees plus or minus 20 degrees avoids these extreme angles and resulting lack of bony engagement across necessary bones.

## X.    GROUND 2:  SLATER IN VIEW WEAVER RENDERS OBVIOUS DEPENDENT CLAIMS 4 AND 5 OF THE 085 PATENT

170.    ***Dependent claim 4*** recites "[t]he system of claim 1, wherein the inner surface of the transfixation screw hole is configured to lockably engage a head of a transfixation screw."  As discussed above, independent claim 1 is anticipated by Slater.  In my opinion, claim 4 is rendered obvious by Slater in view of Weaver (Ex. 1009).  Slater and Weaver are analogous art to the 085 patent because they both

- 94 -

STRYKER Exhibit 1002
Page 97 of 184
IPR2021-01453

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.
Petitioners,

v.

OSTEOMED LLC,
Patent Owner

_____

Case IPR2021-01453

U.S. Patent No. 10,245,085

**<u>REPLY DECLARATION OF KENNETH A. GALL, PH.D.</u>**

STRYKER Exhibit 1027
Page 1 of 28
IPR2021-01453

having a bachelor's degree in engineering with at least two years of experience in the field, such as experience with the design of orthopedic implants, or a clinical practitioner with a medical degree and at least two years of experience as an orthopedic surgeon, such as experience with bone fusion procedures. Additionally, someone with less or different technical education but more practical experience, or more relevant education but less practical experience, could also be considered a POSITA.

4.    I believe that I am qualified to provide opinions about how one of ordinary skill in the art in April 2009, the priority date for the '085 patent, would have interpreted and understood the '085 patent and the prior art relied upon by the Petitioners.

## III.    SLATER – ANTICIPATION OF ALL CHALLENGED CLAIMS

5.    I explained in my First Declaration that Slater anticipates claims 1-3 and 6-9 of the '085 patent. (Ex. 1002 at ¶¶125-169). Mr. Sommers did not dispute in his declaration that Slater discloses most of the limitations of the Asserted Claims. However, I address some of Mr. Sommers' statements below.

### A.    Slater's Preferred Embodiment

6.    Throughout his declaration, Mr. Sommers refers to the plates illustrated in Slater Figure 1 and Slater Figure 5 as "different embodiments." In addition, Mr. Sommers opines that while Slater "depicts a screw, in phantom, in the Figure 1 plate

- 2 -

that extends through the tibia and ends in the talus, the disclosure of Slater does not describe this 'two-bone embodiment' at all." (Ex. 2002 at ¶75~~54~~). I disagree. In my opinion, a POSITA would have understood that Slater discloses a single preferred embodiment, different aspects of which are shown in a schematic with the ankle joint in Figures 1 and 2, and in greater detail in isolation from the ankle joint in Figures 5-13. The same bone plate that is described throughout the Slater specification may be used to fuse two-bones or three-bones, depending on the screw length and pathway chosen by the surgeon.

7.      As I explained in my First Declaration, Slater discloses "an ankle plate in which openings in the plate receive fixation screws allowing compression of bones being fused and orientation of the fixation screws to optimise [sic] accommodation of bone loading for efficient and effective fusion." (Ex. 1005 at 6:18-21). "The plate allows the talus to be fused with the tibia thereby providing a supporting bridge which is helpful for patients with large ankle defects." (*Id.* at 17:3-5). Slater's bone plating system is described "according to a preferred, but non limiting embodiment" and is shown in Figures 1-13. (*Id.* at 9:21-10:27; *see also id.* at 10:32). For example, Figure 1 depicts an ankle joint and is a "generally schematic view of a fusion plate 1 for arthrodesis" (*Id.* at 11:1-4; *see also id.* at 11:4-12:10).

- 3 -

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01453



(*Id.* at Fig. 1).

8.    Figure 5 "shows a side cross sectional elevation view of a plate according to a preferred embodiment isolated from an ankle joint." (*Id.* at 10:6-7).



- 4 -

STRYKER Exhibit 1027
Page 8 of 28
IPR2021-01453

(*Id.* at Fig. 5).  While describing the additional details of the plate shown in Figure 5 (*Id.* at 13:5-14:10), Slater states: "[a]s may be seen from figure 1 the screws are placed in a particular orientation and required angle to the joint/s required for arthrodesis.  This is also necessary to achieve maximal compression of the fusion site/s." (*Id.* at 14:1-2).

9.    A POSITA would have understood that the Slater figures are directed to the same preferred embodiment.  While there may be minor differences between the Figure 1 schematic and the Figure 5 drawing, those differences appear to be due to the schematic nature of Figure 1.  The Slater disclosure does not reference any differences nor does the Slater disclosure appear to treat Figure 1 and Figure 5 as being directed to different embodiments.  To the contrary, it appears that Figure 1 is intended to illustrate different features of the Slater invention, such as the positioning of the bone plate and screws relative to an ankle joint, while Figure 5 illustrates the geometry of the bone plate and the screw holes with the plate being isolated from the ankle joint.

10.    Many features of Slater are described without reference to any figure.  For example, Slater discloses that "the plate depth changes at different locations.  Preferably, the depth at the beginning and end points of the L-shaped contour over the ankle joint in the second region will be at its maximum thickness." (*Id.* at 8:31-

STRYKER Exhibit 1027
Page 9 of 28
IPR2021-01453

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01453

35). "The plate will taper at at [sic] least one but preferably two different points of

the plate." (*Id.* at 9:3-4). "The desired effect is for the plate to taper in and decrease

in thickness proximally." (*Id.* at 9:5-6; *see also id.* at 9:2-3 ("Thickness throughout

this specification will refer to the dimension measured from the bone engaging face

to an opposite outer face.")).

11.    The figures serve to better illustrate to the reader certain features

described in the Slater disclosure.  For example, Figure 1 helps the reader understand

how "the screws are placed in a particular orientation and required angle to the joint/s

required for arthrodesis."  (*Id.* at 12:3-5).



- 6 -

Figure 5, shown below, shows additional details of the bone plate, including the shape of the angled hole and the changing thickness and tapering of the bone plate.



(Ex. 1001 at Fig. 5; *see also* 14:18-22, 14:25-26, 8:25-26).

### B. Slater Discloses to A POSITA A System For Securing Two Bones Across a Joint

12.     The invention of Slater relates to "an ankle plate in which openings in the plate receive **fixation screws allowing compression of bones being fused**. The invention further, relates to a method of insertion of an anterior ankle plate so that **optimal compression is achieved**." (Ex. 1005 at 1:7-11; *sSee also id.* at 6:18-28

- 7 -

STRYKER Exhibit 1027
Page 11 of 28
IPR2021-01453

("More particularly the invention provides an ankle plate in which openings in the plate receive **fixation screws allowing compression of bones being fused** and orientation of the fixation screws to optimise accommodation of bone loading for efficient and effective fusion. The invention further provides a method of insertion of an anterior ankle plate so that **optimal compression is achieved and fixation screws are inserted at appropriate angles** in anterior ankle joint fusion. This invention further relates to a kit including an anterior ankle fusion plate and which includes a selection of fasteners for fixation of the ankle plate in a prescribed manner so that the **orientation of the screws provide optimal compression and bone fusion**."); 8:27-29 ("**The screws** in each portion of the plate **are directed at required angles according to the joint/s** required for arthrodesis. This is also **necessary to achieve maximal compression of the fusion site/s**."); 12:3-5 ("As may be seen from figure 1 **the screws are placed in a particular orientation and required angle to the joint/s** required for arthrodesis. This is also **necessary to achieve maximal compression of the fusion site/s**."); 14:1-3 ("As may be seen from figure 1 **the screws are placed in a particular orientation and required angle to the joint/s** required for arthrodesis. This is also **necessary to achieve maximal compression of the fusion site/s**.")).

- 8 -

STRYKER Exhibit 1027
Page 12 of 28
IPR2021-01453

13.    A POSITA would have understood that a lag screw for a bone plate includes a smooth shaft and threads only on the terminal end of the screw. In use, the threads of a lag screw are anchored in one bone of a joint while the shank of the screw rotates without engaging the other bone. The screw head and the screw threads compress the bones together, resulting in what is known as "lag effect" between the tibia and the talus. Such compression of the bones puts the lag screw in tension. As I explained in my First Declaration, based on Slater's disclosure of a lag screw, a POSITA would have understood that the threads of the lag screw would be located only in the talus when used to fuse the tibia and the talus. (Ex. 1002 at ¶¶102, 133, 142, 146-148; *see also* Ex. 2003 at 30:4-9 "Q. Okay. And where in the patent does it say that the threads are located in the talus? A. Again, it's my overall read of the patent. It's what I would think a person of ordinary skill in the art would see if they read the patent and saw that picture."). For example, figure 4 discloses a transfixation lag screw with "a longer shank to increase depth of penetration" and "an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone." (Ex. 1005 at 12:34-13:3). While the description of screw 70 in figure 4 relates to fusing the tibia, talus, and calcaneus, screw 70 may also be used to fuse only the tibia and the talus because screw 70 is "adapted for insertion in the plate of figures 1 and 2."

STRYKER Exhibit 1027
Page 13 of 28
IPR2021-01453

(*Id.* at 12:32-34). Moreover, screw 70 is later described as a "'home run' lag screw."

(*Id.* at 12:34-13:3, 19:25-26; Ex. 2003 at 42:16-24 ("Q. Is that a different screw than

screw type 60, screw type 70, or screw 25? A. I think that's also a lag screw. . . . Q.

So is it a different screw than those other three screws described? . . . A. I think it's

the same type of screw,")). Additionally, Slater discloses that the size of the

transfixation screw may be adjusted when fusing the tibia and the talus, depending

on the patient's anatomy. (Ex. 1005 at 16:30-32 "[s]crew sizes may be adjusted to

allow for particular insertion points and specific characteristics (e.g. bone density)

of bone at points of fixation."). This means that a surgeon has the ability to select a

screw of a particular size with an appropriate thread length before performing a

tibiotalar joint fusion.

14.    Mr. Sommers' opinion that "Neither Figure 4, nor the corresponding

description in *Slater,* illustrate or show a screw type that would be used only in the

tibia and talus bones" (Ex. 1002 at ¶77) ~~*Slater* "lacks the sufficient disclosure~~

~~relation to location of the thread in the three-bone embodiment and more so in the~~

~~minimally described two-bone embodiment" (Ex. 2002, ¶110)~~ appears to be a

semantic argument because he admits that Slater discloses a lag screw, lag screws

are used to create lag effect, and lag effect is a well known concept in orthopedics.

(Ex. 1030 at 106:19-23 ("Q. [] So Slater discloses the use of a lag screw, correct? . .

- 10 -

. I think the word of 'lag screw' is mentioned somewhere, yes."); 69:4-6 ("Q. Okay. So lag effect creates compression then between two bones? A. Yeah, you can say that."); 69:7-14 ("Q. Okay. When did you first become aware of the concept of lag effect? . . . A. So lag effect is a common terminology in orthopedics. So probably 20 years ago."); 69:23-70:3 ("Q. . . . And lag effect can be achieved with a partially threaded screw, right? A. That's one possibility, with others. Q. Okay. And then lag screws are used to create lag effect? A. Yes.")).

15.     Mr. Sommers acknowledges that screw type 70 is a lag screw that achieves lag effect, as pictured in Figure 4 of Slater and described in the Slater disclosure. In his deposition, Mr. Sommers explained that "[y]ou want to really have the screws only in the second bone. You diminish the lag effect dramatically if you have threads extending into the first bone, for example." (Ex. 1030 at 70:16-19). He further emphasized that "[i]f the threads extend into the first bone, you may not achieve compression." (*Id.*, 71:8-9). Based on his own understanding of lag screws, Mr. Sommers thus concedes that using a lag screw in the so-called two-bone embodiment of Slater would mean that the threads of the screw type 70 would only be present in the second bone, the talus.

16.     Mr. Sherman, Patent Owner's technical expert for a related proceeding against Stryker, also recognizes that Slater discloses a lag screw used to create lag

- 11 -

effect between two bones.  In his sworn testimony, he stated that "[i]n Slater, two or three bones are lagged (compressed) against one another to increase the stability of the arthrodesis.  This can be achieved by using a lag screw." (Ex. 1026 at ¶122).  He also stated that "Slater teaches the use of a third fixation member configured to develop compression across the joint with lag effect when said third fixation member is tightened." (*Id.* at ¶123).  Furthermore, he stated that a POSITA would have understood that lag effect refers "to the typical function of a lag screw, which is to compress one member against another." (*Id.* at ¶121).

**C.    Slater Discloses the Bridge Portion Further Comprising a Thickened Portion Having a Thickness Greater Than At Least A Portion of a Thickness of Either the First End or the Second End**

17.    In paragraphs 85-91, Mr. Sommers disputes that Slater discloses a bridge portion further comprising a thickened portion having a thickness greater than at least a portion of a thickness of either the first end or the second end.  Pointing to the "generally schematic view" of Figure 1, Mr. Sommers claims that "the portion of plate 1 that spans the joint in Figure 1 of *Slater* is actually as thin, if not thinner than other portions of the Figure 1 plate." (Ex. 2002 at ¶86).

18.    Mr. Sommers ignores the detailed description of Slater which discloses that "the depth at the beginning and end points of the L shaped contour over the ankle joint in the second region will be at it's maximum thickness. This location adjacent the ankle joint will preferably be the thickest part of the plate and will

- 12 -

preferably fall within the range 4-8mm." (Ex. 1005 at 8:32-9:1; *see also id.* at 8:25-26; 8:32-9:11; 14:18-30; 24:17-19).

19.    Mr. Sommers, however, states that "[it] makes sense that the plate 1 of Figure 1 of *Slater* is depicted as thinner at the point where it spans the joint because *Slater* explains, '[a]nother advantage of the plate is its pliability at regions when bending may be required for conformity with bone anatomy.' (Ex. 1005 at 17:2-3). For this reason, it is preferable for this region the plate to be thinner not thicker." (Ex. 2002 at ¶87).

20.    Slater makes it clear that the bridge portion that spans the ankle joint is the thickest, not the thinnest, part of the plate, and that the tapered ends are the thinnest part of the plate. The "pliability" of Slater's plate is in reference to the tapered ends—not the bridge portion—and the need to conform the ends to the external surfaces of the tibia and the talus. Moreover, conforming the ends of the plate to the bones will ensure that they do not stick up at the ends.

21.    For example, Slater explains that "[t]he plate will taper at at [*sic*] least one but preferably two different points of the plate. A first taper will occur at a proximal point of the plate over the tibia. The desired effect is for the plate to taper in and decrease in thickness proximally. The taper decreases down to around 1mm in thickness…. The second point of plate depth and width change is over the

- 13 -

phalanges at the distal point of the plate.  At this point the plate according to one

embodiment, tapers out and again the thickness at this point would be in the order

of about 1mm.  ***These points will preferably resemble and conform to the typical***

***geometry of the anatomical region***."  (Ex. 1005 at 9:3-12).

22.     Similarly, Slater states that "the depth/thickness of the plate 80 will

change at different locations on the plate. The depth at the beginning and end points

of the generally L shaped contour over the ankle joint formed by portions 81 and 90

will be at it's maximum thickness as it is at this region that the highest loading will

occur in normal use.  This depth (the thickest part of the plate) will be within the

range 5-6mm.  The plate will taper at two different points on the plate.  Firstly, the

proximal end region of the plate over the tibia.  The desired effect is for the plate to

taper in and decrease depth at its extremities where loading is least.  This would

decrease down to around 1mm in thickness….The second point of plate depth and

width change would be over the phalanges at the distal point of the plate.  At this

point, the plate would taper out and again the depth would be that of around the 1mm

mark." (*Id.* at 14:18-30).

23.     Slater discloses that the "location adjacent the ankle joint will

preferably be the thickest part of the plate and will preferably fall within the range

[of] 4-8mm" but that the first tapered end "decreases down to around 1mm in

- 14 -

thickness" and the second tapered end "would be in the order of about 1mm." (*Id.* at 8:34-9:11; *see also id.* 14:22-30).  With a thickness of around 1mm, the tapered ends are capable of being bent to conform to bone anatomy.  Moreover, these ends are tapered, or "pliable," because that is "where loading is least." (*Id.* at 14:23-26).  But to account for the "highest loading," Slater discloses that "the generally L shaped contour over the ankle joint" is at "it's maximum thickness." (*Id.* at 14:19-23).

    **D.**    **Slater Discloses a Transfixation Screw Hole Disposed Along the Spine at the Thickened Portion of the Bridge Portion**

24.    In paragraph 92, Mr. Sommers opines that Slater does not disclose "a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion."  The '085 patent does not discuss how the transfixation screw hole can be "disposed along the spine at the thickened portion of the bridge portion." The reason that the transfixation screw hole cannot be "disposed along the spine at the thickened portion of the bridge portion" is because the "bridge portion 130 [is] configured to span across the joint 106" and that "[s]ince bridge portion 130 is configured to span across joint 106, it is typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130." (Ex. 1001 at 8:31-37).  In fact, the transfixation screw hole is described as "adjacent to [the] bridge portion." (Ex. 1001 at 8:61-63, 9:6-8).

- 15 -

STRYKER Exhibit 1027
Page 19 of 28
IPR2021-01453

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01453

25.    Requiring that the transfixation screw hole be a part of the bridge portion contradicts the specification of the '085 patent by introducing a positioning hole into the bridge portion.  Any plate material that is cored or hollowed-out of the bridge portion would "reduce the bending strength" of the bridge portion and would not serve the purposes of the bridge portion which is "to increase the bending strength."  (*Id.* at 8:36-39).

26.    If the transfixation screw hole were disposed in the portion of the plate that spans the joint, the screw would have insufficient purchase in the first metatarsal (104a).  (Ex. 1001 at Fig. 2). This configuration would not result in a successful joint fusion of two bones.

27.    If the Board somehow determines that Mr. Sommers is able to combine two different structural features (the transfixation screw hole and the bridge portion) into a single element, then the transfixation screw hole of Slater can simply be deemed to be part of the claimed bridge portion.  And in that case, the transfixation screw hole is "disposed along the spine at the thickened portion of the bridge portion."

- 16 -

STRYKER Exhibit 1027
Page 20 of 28
IPR2021-01453

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01453



(Ex. 1005 at Fig. 1).



(Ex. 1005 at Fig. 7).

### E. Slater Discloses a Central Axis of the Inner Surface of the Transfixation Screw Hole

28.    As I explained in my First Declaration, Slater discloses the limitations

of claim 8, which recites "a central axis of the inner surface of the transfixation screw

- 17 -

STRYKER Exhibit 1027
Page 21 of 28
IPR2021-01453

hole defines the trajectory; and the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint." (Ex. 1002 at ¶¶160-163).

29.    Mr. Sommers takes the odd position that the transfixation screw hole of Slater does not disclose a central axis because "the oblique hole is specifically designed to not have a central axis that defines the screw trajectory." (Ex. 2002 at ¶103). His position is demonstrably false. As shown in Figure 9, the transfixation screw hole of Slater allows for a predetermined range of angles yet has a central axis that defines the trajectory. In particular, Figure 9 illustrates a 34° angle that is associated with the trajectory, which is measured from the central axis of the oblique hole to the longitudinal axis of the plate.



(Ex. 1005 at Fig. 9).

STRYKER Exhibit 1027
Page 22 of 28
IPR2021-01453

*Reply Declaration of Kenneth A. Gall, PH.D.*
IPR2021-01453

30.     While the transfixation screw hole of Slater permits multiple trajectories within a predetermined range, one of those selected trajectories may align with the central axis of the inner surface of the transfixation screw hole.

31.     Therefore, Slater anticipates claim 8.

## IV.     ARNOULD IN VIEW OF SLATER – OBVIOUSNESS OF ALL CHALLENGED CLAIMS

32.     I explained in my First Declaration that Arnould in view of Slater renders obvious claims 1-3 and 6-9 of the '085 patent. (Ex. 1002 at ¶¶234-274).  Mr. Sommers does not dispute that Arnould in view of Slater discloses most of the limitations of the Asserted Claims.  I address some of Mr. Sommers' statements below.

### A.     A POSITA Would Have Been Motivated to Combine Arnould with Slater

33.     In Paragraph 133, Mr. Sommers opines that "a POSITA would not have been motivated to include a thickened bridge portion, such as the thickened bridge of *Slater*, in order to strengthen the bone plate across the portion of the *Arnould* plate where the highest loading will occur."  Mr. Sommers does not dispute that the junction zone 14 is the portion of the Arnould plate where the highest loading will occur, but rather opines that there "would be no reason to thicken this 'junction zone 14 … because it is designed in a specific manner to allow a surgeon to bend the plate at that junction zone in order to conform the plate in situ to a patient's bone anatomy.

- 19 -

STRYKER Exhibit 1027
Page 23 of 28
IPR2021-01453

# Merriam-Webster's Collegiate® Dictionary

## ELEVENTH EDITION



Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.

STRYKER Exhibit 1031
Page 1 of 3
IPR2021-01453

**asym·met·ri·cal·ly** \-tri-k(ə-)lē\ *adv* — **asym·me·try** \(ˌ)ā-ˈsi-mə-trē\ *n*

**asymp·tom·at·ic** \ˌā-ˌsim(p)-tə-ˈma-tik\ *adj* (1856) : presenting no symptoms of disease — **asymp·tom·at·i·cal·ly** \-ti-k(ə-)lē\ *adv*

**as·ymp·tote** \ˈa-səm(p)-ˌtōt\ *n* [prob. fr. NL *asymptotus*, fr. Gk *asymptōtos* not meeting, fr. *a-* + *symptōtos* to meet — more at SYMPTOM] (1656) : a straight line associated with a curve such that as a point moves along an infinite branch of the curve the distance from the point to the line approaches zero and the slope of the curve at the point approaches the slope of the line — **as·ymp·tot·ic** \ˌa-səm(p)-ˈtä-tik\ *adj* — **as·ymp·tot·i·cal·ly** \-ti-k(ə-)lē\ *adv*

**asyn·ap·sis** \ˌā-sə-ˈnap-səs\ *n, pl* **-ap·ses** \-ˌsēz\ [NL ²*a-* + *synapsis*] (1930) : failure of pairing of homologous chromosomes in meiosis

**asyn·chro·nous** \(ˌ)ā-ˈsiŋ-krə-nəs, -ˈsan-\ *adj* (1748) **1** : not synchronous **2** : of, used in, or being digital communication (as between computers) in which there is no timing requirement for transmission and in which the start of each character is individually signaled by the transmitting device — **asyn·chro·nous·ly** *adv*

**asyn·chro·ny** \-krə-nē\ *n* (1875) : the quality or state of being asynchronous : absence or lack of concurrence in time

**asyn·de·tic** \ˌa-sən-ˈde-tik\ *adj* (ca. 1864) : marked by asyndeton — **as·yn·det·i·cal·ly** \-ti-k(ə-)lē\ *adv*

**asyn·de·ton** \ə-ˈsin-də-ˌtän, (ˌ)ā-ˈsin-, -tən\ *n, pl* **-tons** *or* **-ta** \-də-tə\ [LL, fr. Gk, fr. neut. of *asyndetos* unconnected, fr. *a-* + *syndetos* bound together, fr. *syndein* to bind together, fr. *syn-* + *dein* to bind — more at DIADEM] (1555) : omission of the conjunctions that ordinarily join coordinate words or clauses (as in "I came, I saw, I conquered")

¹**at** \ət, ˈat\ *prep* [ME, fr. OE *æt*; akin to OHG *az* at, L *ad*] (bef. 12c) **1** — used as a function word to indicate presence or occurrence in, on, or near ⟨staying ~ a hotel⟩ ⟨~ a party⟩ ⟨sick ~ heart⟩ **2** — used as a function word to indicate the goal of an inclined or implied action or motion ⟨aim ~ the target⟩ ⟨creditors are ~ him again⟩ **3** — used as a function word to indicate that with which one is occupied or employed ⟨~ work⟩ ⟨~ the controls⟩ ⟨good ~ chess⟩ **4** — used as a function word to indicate situation in an active or passive state or condition ⟨~ liberty⟩ ⟨~ rest⟩ **5** — used as a function word to indicate the means, cause, or manner ⟨sold ~ auction⟩ ⟨laughed ~ my joke⟩ ⟨act ~ your own discretion⟩ **6 a** — used as a function word to indicate the rate, degree, or position in a scale or series ⟨the temperature ~ 90⟩ ⟨~ first⟩ **b** — used as a function word to indicate age or position in time ⟨will retire ~ 65⟩

²**at** \ˈat\ *abbr* (Vät\ *n, pl* **at** *also* **at** [Lao] (1955) — see *kip* at MONEY table

³**at** *abbr* **1** assault **2** atmosphere **3** atomic

**At** *symbol* astatine

**AT** *abbr* **1** air temperature **2** ampere-turn **3** automatic transmission

**at-** — see AD-

**at·a·brine** \ˈa-tə-brən\ *n* [fr. *Atabrine*, a trademark] (1933) : QUINACRINE

**atac·tic** \(ˌ)ā-ˈtak-tik\ *adj* [ISV ²*a-* + *-tactic*] (1957) : of, relating to, or being a polymer exhibiting no stereochemical regularity of structure ⟨~ polypropylene⟩ — compare ISOTACTIC

**At·a·lan·ta** \ˌa-tə-ˈlan-tə\ *n, fr. Gk Atalantē*] (14c) : a fleet-footed huntress in Greek mythology who challenges her suitors to a race and is defeated by Hippomenes when she stops to pick up three golden apples he has dropped

**at all** *adv* (14c) : in any way or respect : to the least extent or degree : under any circumstances ⟨doesn't smoke *at all*⟩

**at·a·man** \ˈa-tə-ˌman\ *n* [Russ] (1835) : HETMAN

**at·a·mas·co lily** \ˌa-tə-ˈmas-(ˌ)kō-\ *n* [Virginia Algonquian *attamusco*] (1743) : any of a genus (*Zephyranthes*) of American bulbous herbs of the amaryllis family with pink, white, or yellowish flowers; *esp* : one (*Z. atamasco*) of the southeastern U.S. with white flowers usu. tinged with purple

**at·a·vism** \ˈa-tə-ˌvi-zəm\ *n* [F *atavisme*, fr. L *atavus* ancestor, fr. *at-* (prob. akin to *atta* daddy) + *avus* grandfather — more at UNCLE] (1833) **1 a** : recurrence in an organism of a trait or character typical of an ancestral form and usu. due to genetic recombination **b** : recurrence of or reversion to a past state, manner, outlook, approach, or activity ⟨architectural ~⟩ **2** : one that manifests atavism : THROWBACK — **at·a·vis·tic** \ˌa-tə-ˈvis-tik\ *adj* — **at·a·vis·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**atax·ia** \ā-ˈtak-sē-ə, ə-\ *n* [Gk, fr. *a-* + *tassein* to put in order] (1670) : an inability to coordinate voluntary muscular movements that is symptomatic of some central nervous system disorders and injuries and not due to muscle weakness — called also *incoordination* — **atax·ic** \-sik\ *adj*

**atax·ia–tel·an·gi·ec·ta·sia** \-ˌte-ˌlan-jē-ˌek-ˈtā-zh(ē-)ə, -tē-, -tə-\ *n* (1961) : an inherited systemic disorder marked esp. by progressive pathological changes in the nervous system resulting in loss of motor coordination and by increased susceptibility to cancer esp. of lymphoid tissue

**at bat** *n* (1941) : an official turn at batting charged to a baseball player except when the player walks, sacrifices, is hit by a pitched ball, or is interfered with by the catcher ⟨three hits in five *at bats*⟩

**ATC** *abbr* air traffic control

**ate** *past of* EAT

**Ate** \ˈä-tē, ˈā-(ˌ)tē\ *n* [Gk *Atē*] (1583) : a Greek goddess personifying foolhardy and ruinous impulse

¹**-ate** *n suffix* [ME -*at*, fr. AF, fr. L *-atus, -atum*, masc. & neut. of *-atus*, pp. ending] **1** : one acted upon (in a specified way) ⟨distillate⟩ **2** [NL *-atum*, fr. L] : chemical compound or complex anion derived from a (specified) compound or element ⟨phenolate⟩; *esp* : salt or ester of an acid with a name ending in *-ic* and not beginning with *hydro-* ⟨borate⟩

²**-ate** *n suffix* [ME *-at*, fr. AF, fr. L *-atus*, fr. *-a*, stem vowel of 1st conj. + *-tus*, suffix of pp. — more at ⁶-ED] : marked by having ⟨craniate⟩

⁴**-ate** *vb suffix* [ME *-aten*, fr. L *-atus*, pp. ending] : act on (in a specified way) ⟨insulate⟩ : cause to be modified or affected by ⟨camphorate⟩ : cause to become ⟨activate⟩ : furnish with ⟨capacitate⟩

---

**-ated** *adj suffix* : ³-ATE ⟨*pileated*⟩

**at·el·ec·ta·sis** \ˌa-tel-ˈek-tə-səs\ *n, pl* **-ta·ses** \-ˌsēz\ [NL, fr. Gk *atelēs* incomplete, defective (fr. *a-* ²*a-* + *telos* end) + *ektasis* extension, fr. *ek-teinein* to stretch out, fr. *ex-* + *teinein* to stretch — more at TELOS, THIN] (1859) : collapse of the expanded lung; *also* : defective expansion of the pulmonary alveoli at birth

**ate·lier** \ˌa-təl-ˈyā\ *n* [F, fr. MF *astelier* woodpile, fr. *astele* splinter, fr. LL *astella*, dim. of L *astula*] (1699) **1** : an artist's or designer's studio or workroom **2** : WORKSHOP

**ate·moya** \ˌā-tə-ˈmōi-ə, ˌa-\ *n* [*ates* sweetsop (fr. Tag) + cherimoya] (1914) : a white-pulped tropical fruit of a tree that is a hybrid of the sweetsop and the cherimoya

**a tem·po** \ä-ˈtem-(ˌ)pō\ *adv or adj* [It] (1834) : in time — used as a direction in music to return to the original tempo

**aten·o·lol** \(ˌ)ā-ˈtem-pə-ˌrol\ *adj* (1870) : independent of or unaffected by time : TIMELESS

**aten·o·lol** \ə-ˈte-nə-ˌlol, -ˌlol\ *n* [prob. fr. *antihypertensive* + *-olol* (as in *propranolol*)] (1972) : a beta blocker $C_{14}H_{22}N_2O_3$ used in the treatment of hypertension

**ATF** *abbr* [Bureau of] Alcohol, Tobacco, Firearms and Explosives

**Ath·a·bas·can** \ˌa-thə-ˈbas-kən\ *or* **Ath·a·bas·kan** \-ˌkan\ *also* **Ath·a·pas·kan** \-ˈpas-kən\ *or* **Ath·a·pas·can** \-ˈpas-\ *n* [Athabasca, a Cree band, fr. Cree dial. *aθapaska·w*, name for the area east of Lake Athabasca, lit., (where) there are reeds one after another] (1846) **1** : a family of American Indian languages spoken primarily in western Canada, Alaska, and the U.S. Southwest **2** : a member of a people speaking an Athabascan language

**Ath·a·na·sian** \ˌa-thə-ˈnā-zhən, -shən\ *adj* (1586) : of or relating to Athanasius or his advocacy of the homoousian doctrine against Arianism

**Athanasian Creed** *n* (1586) : a Christian creed originating in Europe about A.D. 400 and relating esp. to the Trinity and Incarnation

**athe·ism** \ˈā-thē-ˌi-zəm\ *n* [MF *athéisme*, fr. *athée* atheist, fr. Gk *atheos* godless, fr. *a-* + *theos* god] (1546) **1** *archaic* : UNGODLINESS, WICKEDNESS **2 a** : a disbelief in the existence of deity **b** : the doctrine that there is no deity

**athe·ist** \ˈā-thē-ist\ *n* (1551) : one who believes that there is no deity — **athe·is·tic** \ˌā-thē-ˈis-tik\ *or* **athe·is·ti·cal** \-ti-kəl\ *adj* — **athe·is·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**athe·ling** \ˈa-thə-liŋ, -thə-\ *n* [ME, fr. OE *ætheling*, fr. *æthelu* nobility, akin to OHG *adal* nobility] (bef. 12c) : an Anglo-Saxon prince or nobleman; *esp* : the heir apparent or a prince of the royal family

**Athe·na** \ə-ˈthē-nə\ *or* **Athe·ne** \-nē\ *n* [L *Athena*, fr. Gk *Athēnē*] (14c) : the Greek goddess of wisdom — compare MINERVA

**ath·e·nae·um** *or* **ath·e·ne·um** \ˌa-thə-ˈnē-əm\ *n* [L *Athenaeum*, a school in ancient Rome for the study of arts, fr. Gk *Athēnaion*, a temple of Athena, fr. *Athēnē*] (1799) **1** : a building or room in which books, periodicals, and newspapers are kept for use **2** : a literary or scientific association

**athe·o·ret·i·cal** \ˌā-thē-ə-ˈre-ti-kəl, -thir-ˈe-\ *adj* (1969) : not based on or concerned with theory

**athero·** *comb form* [Gk *athēra*] : atheroma ⟨*atherogenesis*⟩

**athero·gen·e·sis** \ˌa-thə-rō-ˈje-nə-səs\ *n* (1953) : the formation of atheroma

**ath·ero·gen·ic** \-ˈje-nik\ *adj* (1954) : relating to or causing atherogenesis ⟨an ~ diet⟩

**ath·er·o·ma** \ˌa-thə-ˈrō-mə\ *n, pl* **-mas** *also* **-ma·ta** \-mə-tə\ NL *atheromat-, atheroma*, fr. L, a tumor containing matter resembling gruel, fr. Gk *athērōma*, fr. *athēra* gruel] (1875) **1** : fatty degeneration of the inner coat of the arteries **2** : an abnormal fatty deposit in an artery — **ath·er·o·ma·tous** \-rō-mə-təs\ *adj*

**ath·ero·scle·ro·sis** \ˌa-thə-rō-sklə-ˈrō-səs\ *n* [NL] (1910) : an arteriosclerosis characterized by atheromatous deposits in and fibrosis of the inner layer of the arteries — **ath·ero·scle·rot·ic** \-ˈrä-tik\ *adj*

**athirst** \ə-ˈthərst\ *adj* [ME, fr. OE *ofthyrst*, pp. of *ofthyrstan* to suffer from thirst, fr. *of* off, from + *thyrstan* to thirst — more at OF] (bef. 12c) **1** *archaic* : THIRSTY **2** : having a strong eager desire ⟨I that for ever feel ~ for glory — John Keats⟩ *syn* see EAGER

**ath·lete** \ˈath-ˌlēt, ˌath-ˈlēt\ *n* [ME, fr. L *athleta*, fr. Gk *athlētēs*, fr. *athlein* to contend for a prize, fr. *athlon* prize, contest] (15c) : a person who is trained or skilled in exercises, sports, or games requiring physical strength, agility, or stamina

**athlete's foot** *n* (1928) : ringworm of the feet

**ath·let·ic** \ath-ˈle-tik, ˌa-thə-ˈle-\ *adj* (1636) **1** : of or relating to athletes or athletics **2** : characteristic of an athlete; *esp* : VIGOROUS, ACTIVE **3** : MESOMORPHIC **4** : used by athletes — **ath·let·i·cal·ly** \-ti-k(ə-)lē\ *adv* — **ath·let·i·cism** \-ˈle-tə-ˌsi-zəm\ *n*

**ath·let·ics** \ath-ˈle-tiks, -thə-ˈle-\ *n pl but sing or pl in constr* (1749) **1** : exercises, sports, or games engaged in by athletes **2** : the practice or principles of athletic activities

**athletic supporter** *n* (1927) : a supporter (as of elasticized fabric) for the genitals worn by men participating in sports or strenuous activities

**at-home** \ət-ˈhōm, ˌat-ˌhōm\ *adj* (1951) **1** : intended or suitable for one's home ⟨an ~ dress⟩ **2** : being or occurring at one's home ⟨~ entertainment⟩

**at home** *n* (1745) : a reception given at one's home

**-athon** *n comb form* [marathon] : event or activity lasting a long time or involving a great deal of something ⟨talkathon⟩

**athwart** \ə-ˈthwort, *naut often* -ˈthort\ *prep* (15c) **1** : ACROSS **2** : in opposition to ⟨ran counter to ... the New England prejudices — R. G. Cole⟩

²**athwart** *adv* (ca. 1500) **1** : across esp. in an oblique direction **2** : in opposition to the right or expected course (and quite ~ goes all decorum — Shak.)

**athwart·ship** \-ˌship\ *adj* (1775) : being across the ship from side to side ⟨an ~ longitudinal framing⟩

**athwart·ships** \-ˌships\ *adv* (1718) : across the ship from side to side

---

\ə\ abut \ᵊ\ kitten, F table \ər\ further \a\ ash \ā\ ace \ä\ mop, mar \au\ out \ch\ chin \e\ bet \ē\ easy \g\ go \i\ hit \ī\ ice \j\ job \ŋ\ sing \ō\ go \o\ law \oi\ boy \th\ thin \t͟h\ the \ü\ loot \u̇\ foot \y\ yet \zh\ vision, beige \k, ⁿ, œ, ᵫ, ᵊ\ *see* Guide to Pronunciation

STRYKER Exhibit 1031
Page 3 of 3
IPR2021-01453

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————————

**PATENT TRIAL AND APPEAL BOARD**

———————————

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioners,

v.

OSTEOMED LLC,
Patent Owner.

———————————

Case IPR2021-01453
U.S. Patent No. 10,245,085

———————————

**DECLARATION OF MARK SOMMERS, MS**

1

OSTEOMED EXHIBIT 2002
Stryker Corp., et al. v. OsteoMed LLC
IPR2021-01453

expressly or inherently teach every element of claim 1 of the '085 Patent, it is my opinion that *Slater* does not anticipate claim 8, either.

101.   In my opinion, *Slater* does not anticipate claim 8 of the '085 Patent for at least one additional reason.  Claim 8 recites:

> The system of claim 1, wherein:
>
>> a central axis of the inner surface of the transfixation screw hole defines the trajectory; and
>>
>> the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint.

(Ex. 1001, cl. 8).  In my opinion, *Slater* does not disclose the claimed "central axis."

102.   With respect to the claimed "central axis," Dr. Gall again picks and chooses disclosures from different plates in *Slater* since no single plate shows the elements as arranged in claim 8 of the '085 Patent.  (*See* Ex. 1002, ¶¶ 162-163).  While Dr. Gall identifies plate 1 of *Slater* as disclosing a "central axis," I disagree that this is shown or disclosed in *Slater*.

103.   Specifically, the hole Dr. Gall identifies as the transfixation screw hole of *Slater* is described as an "oblique screw portal allowing for various angles and the ability to incorporate more joints into the arthrodesis as required." (Ex. 1005, 16:28-30; Ex. 1002, ¶ 133).  In other words, the oblique hole is

38

IPR2021-01453
U.S. Patent No. 10,245,085

specifically designed to not have a central axis that defines the screw trajectory.

104. Therefore, in my opinion, *Slater* does not anticipate claim 8 of the '085 Patent.

### 4.    *Claims 2-3, 7 and 9*

105. In my opinion, *Slater* does not expressly or inherently teach every element of claims 1, 6, and 8 of the '085 Patent, thus it is my opinion that *Slater* does not anticipate claims 2-3, 7, and 9, either.

### B.    *Ground 3: Anticipation by Falkner*

106. As part of my work in this proceeding, I reviewed Dr. Gall's opinion that *Falkner* discloses all of the elements of claims 1-8 of the '085 Patent and thus anticipates those claims. I disagree with Dr. Gall.

### 1.    *Claim 1*

107. In my opinion, *Falkner* does not expressly or inherently teach multiple requirements of claim 1 of the '085 Patent, including (1) "system for securing a first discrete bone and a second discrete bone together across a joint between the first discrete bone and the second discrete bone"; (2) a "second end" that includes an attachment point; and (3) "a bridge portion having a portion configured to span across the joint." (Ex. 1001, cl 1). I discuss each of these insufficiencies in more detail below.

39

Trials@uspto.gov                                      Paper 11
571-272-7822                                    Date: June 1, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY,
INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

———————————

IPR2022-00189
Patent 8,529,608 B2

———————————

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

this internal end portion includes an aperture for receiving the threaded fastener so modifying its geometry to conform to a second bone would run counter to the design and purpose of Falkner's plate. *Id.* at 27–28.

Patent Owner also contends that Falkner fails to disclose "transferring the tensile load" as allegedly recited in claim 11. *Id.* at 22–25. Patent Owner contends that Dr. Gall fails to appreciate differences between compressive forces (as allegedly recited in Falkner's ¶ 71) and tensile forces, and that, because Falkner's screw is not being anchored in the second bone but instead in a second (internal) portion of the plate, Dr. Gall's opinion that Falkner's plate transfers tensile forces is "contrary to the actual disclosures in Falkner regarding the Falkner screw that is designed to be anchored in the end of the second end of the plate in order to provide tension between the two ends of the plate." *Id.* at 24 (citing Ex. 1006 ¶ 6 ("An 'interlocking' bone screw has been used to secure the blade portion, when inside bone, to an end region of a fractured bone. The interlocking screw may span the anchor and blade portions (and the fracture) to 'interlock' and tension these portions.")).

Based on the present record, we are doubtful that Petitioner will prevail on Ground 2. Falkner's cited plate in Figures 1 and 2 is not arranged as claimed. Ex. 1006, Fig. 1. It is *not* configured to secure two discrete bones (e.g., the tibia and talus) across an intermediate joint between those bones, nor is the plate configured with first and second ends having inner surfaces that substantially conform with a geometry of first and second discrete bones. This is plain from the cross-sectional anatomical views of the tibia, joint, and talus shown in the figure itself. To make the plate so configured would seemingly require redesign or modifications. Those might

Trials@uspto.gov
571-272-7822

Paper 10
Date: June 1, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

_____

IPR2022-00190
Patent 9,351,776 B2

_____

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and TIMOTHY G. MAJORS, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

fastener so modifying its geometry to conform to a second bone would run counter to the design and purpose of Falkner's plate. *Id*. at 27–28.

Patent Owner also contends that Falkner fails to disclose "transferring the tensile load" as allegedly recited in claim 10. *Id*. at 22–25. Patent Owner contends that Dr. Gall fails to appreciate differences between compressive forces (as allegedly recited in Falkner's ¶ 71) and tensile forces, and that, because Falkner's screw is not being anchored in the second bone but instead in a second (internal) portion of the plate, Dr. Gall's opinion that Falkner's plate transfers tensile forces is "contrary to the actual disclosures in Falkner regarding the Falkner screw that is designed to be anchored in the end of the second end of the plate in order to provide tension between the two ends of the plate." *Id*. at 24 (citing Ex. 1006 ¶ 6 ("An 'interlocking' bone screw has been used to secure the blade portion, when inside bone, to an end region of a fractured bone. The interlocking screw may span the anchor and blade portions (and the fracture) to 'interlock' and tension these portions.")).

Based on the present record, we are doubtful that Petitioner will prevail on Ground 2. Falkner's cited plate in Figures 1 and 2 is not arranged as claimed. Ex. 1006, Fig. 1. It is *not* configured to secure two discrete bones (e.g., the tibia and talus) across an intermediate joint between those bones, nor is the plate configured with first and second ends having inner surfaces that substantially conform with a geometry of first and second discrete bones. This is plain from the cross-sectional anatomical views of the tibia, joint, and talus shown in the figure itself. To make the plate so configured would seemingly require redesign or modifications. Those might be simple design changes for a POSA based on their knowledge and

Trials@uspto.gov
571-272-7822

Paper 11
Date: June 1, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

STRYKER CORPORATION and
WRIGHT MEDICAL TECHNOLOGY, INC,
Petitioner,

v.

OSTEOMED LLC,
Patent Owner.

———————————

IPR2022-00191
Patent 9,763,716 B2

———————————

Before SHERIDAN K. SNEDDEN, RICHARD H. MARSCHALL, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

MAJORS, *Administrative Patent Judge.*


DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

US010993751B1

(12) **United States Patent**     (10) **Patent No.:**     **US 10,993,751 B1**
Prandi et al.     (45) **Date of Patent:**     *****May 4, 2021**

(54) **ORTHOPEDIC IMPLANT IN THE FORM OF A PLATE TO BE FIXED BETWEEN TWO BONE PARTS**

(71) Applicant: **Stryker European Operations Holdings LLC**, Kalamazoo, MI (US)

(72) Inventors: **Bernard Prandi**, Rennes (FR); **Keith Wapner**, Philadelphia, PA (US); **Charles P. Wapner**, Media, PA (US); **Peter W. Wapner**, Media, PA (US)

(73) Assignee: **Stryker European Operations Holdings LLC**, Kalamazoo, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/143,709**

(22) Filed: **Jan. 7, 2021**

**Related U.S. Application Data**

(63) Continuation of application No. 16/429,834, filed on Jun. 3, 2019, which is a continuation of application
(Continued)

(30) **Foreign Application Priority Data**

Oct. 2, 2008     (FR) ...................................... 0856694

(51) **Int. Cl.**
*A61B 17/80*     (2006.01)
*A61B 17/84*     (2006.01)
*A61B 17/68*     (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61B 17/8014* (2013.01); *A61B 17/8004* (2013.01); *A61B 17/808* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC  . A61B 17/80; A61B 17/8014; A61B 17/8052; A61B 17/8057; A61B 17/809
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,486,303 A    10/1949  Longfellow
3,528,085 A     9/1970  Reynolds
(Continued)

FOREIGN PATENT DOCUMENTS

DE          3027148  A1   12/1981
DE          8227727  U1   12/1982
(Continued)

OTHER PUBLICATIONS

Manual of Small Animal Fracture Repair and Management, Jan. 1, 1998, pp. 80-81.
(Continued)

*Primary Examiner* — Christopher J Beccia
(74) *Attorney, Agent, or Firm* — Lerner, David, Littenberg, Krumholz & Mentlik, LLP

(57)          **ABSTRACT**

The invention relates to a plate fixed between two bone parts by way of screws engaged in holes formed in the thickness of said plate. The plate comprises an angled member or rib which is inclined according to an angle of between about 30° and 60° in relation to the plane defined by the plate. The angled member or rib has a hole for engaging a screw and is located in the central part of the width, over a determined part of the length of the plate, so that the screw brings the two bone parts into a compressive position.

**18 Claims, 2 Drawing Sheets**



### Related U.S. Application Data

No. 15/130,147, filed on Apr. 15, 2016, now Pat. No. 10,349,988, which is a continuation of application No. 14/734,676, filed on Jun. 9, 2015, now Pat. No. 9,333,013, which is a continuation of application No. 14/041,706, filed on Sep. 30, 2013, now Pat. No. 9,078,713, which is a continuation of application No. 12/918,071, filed as application No. PCT/FR2009/051879 on Oct. 2, 2009, now Pat. No. 8,556,946.

(52) **U.S. Cl.**
CPC ........ *A61B 17/809* (2013.01); *A61B 17/8052* (2013.01); *A61B 17/8057* (2013.01); *A61B 17/8061* (2013.01); *A61B 17/846* (2013.01); *A61B 2017/681* (2013.01)

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,534,731 | A | 10/1970 | Muller |
| 3,552,389 | A | 1/1971 | Allgower et al. |
| 3,779,240 | A | 12/1973 | Kondo |
| RE28,841 | E | 6/1976 | Allgower et al. |
| 4,388,921 | A | 6/1983 | Sutter et al. |
| 4,408,601 | A | 10/1983 | Wenk |
| RE31,628 | E | 7/1984 | Allgower et al. |
| 4,493,317 | A | 1/1985 | Klaue |
| 4,503,737 | A | 3/1985 | DiGiovanni |
| 4,513,744 | A | 4/1985 | Klaue |
| 4,651,724 | A | 3/1987 | Berentey et al. |
| 4,800,874 | A | 1/1989 | David et al. |
| 4,957,496 | A | 9/1990 | Schmidt |
| 4,988,350 | A | 1/1991 | Herzberg |
| 5,105,690 | A | 4/1992 | Lazzara et al. |
| 5,304,180 | A | 4/1994 | Slocum |
| 5,347,894 | A | 9/1994 | Fischer |
| 5,487,741 | A | 1/1996 | Maruyama et al. |
| 5,662,655 | A | 9/1997 | Laboureau et al. |
| 5,667,510 | A | 9/1997 | Combs |
| 5,674,222 | A | 10/1997 | Berger et al. |
| 5,709,686 | A | 1/1998 | Talos et al. |
| 5,810,822 | A | 9/1998 | Mortier |
| 5,827,285 | A | 10/1998 | Bramlet |
| 5,853,413 | A | 12/1998 | Carter et al. |
| 5,904,684 | A | 5/1999 | Rooks |
| 5,931,839 | A | 8/1999 | Medoff |
| 6,146,382 | A | 11/2000 | Hurlbert |
| 6,183,475 | B1 | 2/2001 | Lester et al. |
| 6,348,052 | B1 | 2/2002 | Sammarco |
| 6,379,359 | B1 | 4/2002 | Dahners |
| 6,383,186 | B1 | 5/2002 | Michelson |
| 6,533,786 | B1 | 3/2003 | Needham et al. |
| 6,544,266 | B1 | 4/2003 | Roger et al. |
| 6,565,570 | B2 | 5/2003 | Sterett et al. |
| 6,576,018 | B1 | 6/2003 | Holt |
| 6,623,486 | B1 | 9/2003 | Weaver et al. |
| 6,626,907 | B2 | 9/2003 | Campbell et al. |
| 6,669,700 | B1 | 12/2003 | Farris et al. |
| 6,669,701 | B2 | 12/2003 | Steiner et al. |
| 6,692,503 | B2 | 2/2004 | Foley et al. |
| 6,712,820 | B2 | 3/2004 | Orbay |
| 6,719,759 | B2 | 4/2004 | Wagner et al. |
| 6,730,091 | B1 | 5/2004 | Pfefferle et al. |
| 6,764,489 | B2 | 7/2004 | Ferree |
| 6,960,211 | B1 | 11/2005 | Pfefferle et al. |
| 7,037,342 | B2 | 5/2006 | Nilsson et al. |
| 7,044,951 | B2 | 5/2006 | Medoff et al. |
| 7,108,697 | B2 | 9/2006 | Mingozzi et al. |
| 7,137,987 | B2 | 11/2006 | Patterson et al. |
| 7,179,260 | B2 | 2/2007 | Gerlach et al. |
| 7,326,218 | B2 | 2/2008 | Sterett et al. |
| 7,341,589 | B2 | 3/2008 | Weaver et al. |
| 7,344,538 | B2 | 3/2008 | Myerson et al. |
| D587,370 | S | 2/2009 | Coillard-Lavirotte et al. |

| | | | |
|---|---|---|---|
| 7,491,220 | B2 | 2/2009 | Coughln |
| D596,294 | S | 7/2009 | Coillard-Lavirotte et al. |
| 7,695,472 | B2 | 4/2010 | Young |
| 7,766,948 | B1 | 8/2010 | Leung |
| 7,771,457 | B2 | 8/2010 | Kay et al. |
| D623,745 | S | 9/2010 | Kay et al. |
| 7,799,061 | B2 | 9/2010 | Kay et al. |
| 7,819,903 | B2 | 10/2010 | Fraser et al. |
| 7,857,836 | B2 | 12/2010 | Huebner et al. |
| 7,931,680 | B2 | 4/2011 | Myerson et al. |
| 8,080,010 | B2 | 12/2011 | Schulz et al. |
| 8,100,954 | B2 | 1/2012 | Kay et al. |
| 8,100,983 | B2 | 1/2012 | Schulte |
| 8,852,246 | B2 | 10/2014 | Hansson |
| 9,078,713 | B2 * | 7/2015 | Prandi ................. A61B 17/808 |
| 10,349,988 | B2 * | 7/2019 | Prandi ................. A61B 17/846 |
| 2001/0011172 | A1 | 8/2001 | Orbay et al. |
| 2001/0047172 | A1 | 11/2001 | Foley et al. |
| 2002/0045901 | A1 | 4/2002 | Wagner et al. |
| 2002/0128653 | A1 * | 9/2002 | Haidukewych .... A61B 17/8066 606/286 |
| 2002/0183752 | A1 | 12/2002 | Steiner et al. |
| 2003/0040748 | A1 | 2/2003 | Aikins et al. |
| 2003/0060827 | A1 | 3/2003 | Coughln |
| 2003/0195516 | A1 | 10/2003 | Sterett et al. |
| 2003/0199875 | A1 | 10/2003 | Mingozzi et al. |
| 2004/0059334 | A1 | 3/2004 | Weaver et al. |
| 2004/0092929 | A1 | 5/2004 | Zindrick |
| 2004/0093081 | A1 | 5/2004 | Nilsson et al. |
| 2004/0097950 | A1 | 5/2004 | Foley et al. |
| 2004/0167522 | A1 | 8/2004 | Niederberger et al. |
| 2004/0172028 | A1 | 9/2004 | Roger |
| 2004/0181228 | A1 | 9/2004 | Wagner et al. |
| 2004/0186477 | A1 | 9/2004 | Winquist et al. |
| 2004/0210234 | A1 | 10/2004 | Coillard-Lavirotte et al. |
| 2004/0214137 | A1 | 10/2004 | Walton |
| 2004/0236332 | A1 | 11/2004 | Frigg |
| 2005/0010226 | A1 | 1/2005 | Grady et al. |
| 2005/0015089 | A1 | 1/2005 | Young et al. |
| 2005/0070904 | A1 | 3/2005 | Gerlach et al. |
| 2005/0080421 | A1 | 4/2005 | Weaver et al. |
| 2005/0085913 | A1 | 4/2005 | Fraser et al. |
| 2005/0090825 | A1 | 4/2005 | Pfefferle et al. |
| 2005/0171544 | A1 | 8/2005 | Falkner |
| 2005/0182408 | A1 | 8/2005 | Pfefferle et al. |
| 2005/0277937 | A1 | 12/2005 | Leung et al. |
| 2005/0277941 | A1 | 12/2005 | Trumble et al. |
| 2006/0004362 | A1 | 1/2006 | Patterson et al. |
| 2006/0015102 | A1 | 1/2006 | Toullec et al. |
| 2006/0058796 | A1 | 3/2006 | Hartlegen et al. |
| 2006/0106387 | A1 | 5/2006 | Fanger et al. |
| 2006/0122607 | A1 | 6/2006 | Kolb |
| 2006/0149261 | A1 | 7/2006 | Nilsson et al. |
| 2006/0173459 | A1 | 8/2006 | Kay et al. |
| 2006/0200145 | A1 | 9/2006 | Kay et al. |
| 2006/0235397 | A1 | 10/2006 | Sanders et al. |
| 2006/0241607 | A1 | 10/2006 | Myerson et al. |
| 2006/0241608 | A1 | 10/2006 | Myerson et al. |
| 2006/0241609 | A1 | 10/2006 | Myerson et al. |
| 2007/0142920 | A1 | 6/2007 | Niemi |
| 2007/0233106 | A1 | 10/2007 | Horan et al. |
| 2007/0270850 | A1 * | 11/2007 | Geissler ................. A61B 17/15 606/326 |
| 2008/0015593 | A1 | 1/2008 | Pfefferle et al. |
| 2008/0051791 | A1 | 2/2008 | Young et al. |
| 2008/0091197 | A1 | 4/2008 | Coughln |
| 2008/0114360 | A1 | 5/2008 | Da Frota Carrera |
| 2008/0132960 | A1 | 6/2008 | Weaver et al. |
| 2008/0161860 | A1 | 7/2008 | Ahrens et al. |
| 2008/0208262 | A1 | 8/2008 | Butler et al. |
| 2008/0249572 | A1 | 10/2008 | Tandon |
| 2008/0249573 | A1 | 10/2008 | Buhren et al. |
| 2009/0024173 | A1 | 1/2009 | Reis, Jr. |
| 2009/0036933 | A1 | 2/2009 | Dube et al. |
| 2009/0093849 | A1 | 4/2009 | Grabowski |
| 2009/0118769 | A1 | 5/2009 | Sixto, Jr. et al. |
| 2009/0198285 | A1 | 8/2009 | Raven, III |
| 2009/0210010 | A1 | 8/2009 | Strnad et al. |

**US 10,993,751 B1**

Page 3

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0210011 A1* | 8/2009 | Den Hartog | A61B 17/8014 606/280 |
| 2009/0210013 A1 | 8/2009 | Kay et al. | |
| 2009/0228048 A1 | 9/2009 | Duncan et al. | |
| 2009/0234359 A1 | 9/2009 | Onoue et al. | |
| 2009/0275987 A1 | 11/2009 | Graham et al. | |
| 2009/0306724 A1 | 12/2009 | Leither et al. | |
| 2009/0312759 A1 | 12/2009 | Ducharme et al. | |
| 2010/0016900 A1 | 1/2010 | Terres et al. | |
| 2010/0057214 A1 | 3/2010 | Graham et al. | |
| 2010/0121324 A1 | 5/2010 | Tyber et al. | |
| 2010/0121325 A1 | 5/2010 | Tyber et al. | |
| 2010/0125300 A1 | 5/2010 | Blitz et al. | |
| 2010/0160973 A1 | 6/2010 | Leung | |
| 2010/0217328 A1 | 8/2010 | Terrill et al. | |
| 2010/0256638 A1 | 10/2010 | Tyber et al. | |
| 2010/0256639 A1 | 10/2010 | Tyber et al. | |
| 2010/0274293 A1 | 10/2010 | Terrill et al. | |
| 2010/0305618 A1 | 12/2010 | Kay et al. | |
| 2010/0324556 A1 | 12/2010 | Tyber et al. | |
| 2011/0004253 A1 | 1/2011 | Fraser et al. | |
| 2011/0009866 A1 | 1/2011 | Johnson et al. | |
| 2011/0046681 A1 | 2/2011 | Prandi et al. | |
| 2011/0087229 A1 | 4/2011 | Kubiak et al. | |
| 2011/0087295 A1 | 4/2011 | Kubiak et al. | |
| 2011/0092981 A1 | 4/2011 | Ng et al. | |
| 2011/0093017 A1 | 4/2011 | Prasad et al. | |
| 2011/0093018 A1 | 4/2011 | Prasad et al. | |
| 2011/0118739 A1 | 5/2011 | Tyber et al. | |
| 2011/0125153 A1 | 5/2011 | Tyber et al. | |
| 2011/0213367 A1 | 9/2011 | Tyber et al. | |
| 2011/0218535 A1 | 9/2011 | Wang et al. | |
| 2011/0230884 A1 | 9/2011 | Mantzaris et al. | |
| 2011/0264148 A1 | 10/2011 | Prandi et al. | |
| 2011/0306976 A1 | 12/2011 | Kubiak et al. | |
| 2011/0306977 A1 | 12/2011 | Michel et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 3630862 A1 | 3/1988 |
| EP | 0 705 572 A2 | 4/1996 |
| EP | 1707227 A2 | 10/2006 |
| EP | 1897509 A1 | 3/2008 |
| FR | 590290 B | 6/1925 |
| FR | 2362616 A1 | 3/1978 |
| FR | 2764183 A1 | 12/1998 |
| FR | 2846870 A1 | 5/2004 |
| FR | 2912895 A1 | 8/2008 |
| WO | 95016403 A1 | 6/1995 |
| WO | 9528887 A1 | 11/1995 |
| WO | 1996005778 A1 | 2/1996 |
| WO | 2002098306 A1 | 12/2002 |
| WO | 2007131287 A1 | 11/2007 |

OTHER PUBLICATIONS

Catalogue General 1987-1988, plaques d'osteosynthese, bone plates, Division of Pfzer Hospital Products Group, Bagneux, France.

Vitallium Screw-Plate-Systems of Prof. R. Judet, 12 pages, 1974, Howmedica International, Inc. Shannon Industrial Estate, Co. Clare, Ireland.

European Search Report for Application No. 16185971 dated Feb. 9, 2017.

*Osteomed LLC v. Stryker Corporation*, In the US District Court for the Northern District of Illinois, Eastern Division, Answer to Complaint and Counterclaims, dated Jan. 29, 2021; 83 pages.

* cited by examiner



Fig. 1



Fig. 2



Fig. 3



Fig. 4

US 10,993,751 B1

1

# ORTHOPEDIC IMPLANT IN THE FORM OF A PLATE TO BE FIXED BETWEEN TWO BONE PARTS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 16/429,834, filed Jun. 3, 2019, which is a continuation of U.S. application Ser. No. 15/130,147, filed Apr. 15, 2016 and now U.S. Pat. No. 10,349,988, which is a continuation of U.S. application Ser. No. 14/734,676, filed Jun. 9, 2015 and now U.S. Pat. No. 9,333,013, which is a continuation of U.S. application Ser. No. 14/041,706, filed Sep. 30, 2013 and now U.S. Pat. No. 9,078,713, which is a continuation of U.S. application Ser. No. 12/918,071, filed Oct. 29, 2010 and now U.S. Pat. No. 8,556,946, which is a national phase entry under 35 U.S.C. § 371 of International Application No. PCT/FR2009/051879, filed Oct. 2, 2009, published in French, which claims priority from French Patent Application No. 0856694, filed Oct. 2, 2008, all of which are incorporated herein by reference in their entireties.

## BACKGROUND OF THE INVENTION

The invention relates to the technical field of orthopedic implants.

More particularly, the invention relates to a plate for arthrodesis or osteosynthesis adapted to be fixed between two bone parts.

In a manner known to one having ordinary skill in the art, this type of plate generally has holes for engaging screws, allowing arthrodesis between two bones or osteosynthesis between two bone fragments. This is, for example, the case for bones of the hand or foot, without however excluding other applications, particularly in the field of the spine. Depending on the pathology to be treated, these plates can have a general rectilinear or other geometric shapes.

From this state of the art, one of the objects the invention proposes to attain is to improve, in a sure and efficient manner, compression in a precise direction between the bone parts subjected to the plate.

To attain the given object to enhance the compression between the two relative bone parts, according to the invention, the plate has a formation that orients at least one screw at an angle with respect to a plane defined by the plate, the angle being between about 30° and 60°.

According to an advantageous embodiment, the formation is a tab that is angled according to an angle between 30° and 60°, and having a hole for engaging the screw. The angled tab results from a cut out and a deformation of a portion of the plate.

In another embodiment, the formation is a hole angled at an angle between 30° and 60° for engaging the screw.

Considering the problem to be solved, the formation is located on a determined portion of the length of the plate so that the screw ensures the compression of the two bone parts.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention is described hereinafter in more detail, with reference to the attached drawings in which:

FIG. 1 is a perspective view of an embodiment of the plate;

FIG. 2 is a side view of the plate;

2

FIGS. 3 and 4 are perspective views showing the mounting of the plate between two bone parts and their orientation by means of the plate according to the invention, the bone parts being shown schematically.

## DETAILED DESCRIPTION

According to the invention, the plate 1 has at least one formation 1a adapted to enable the positioning of at least one screw 2, at an angle a of between 30° and 60° with respect to a plane of the plate (FIG. 2).

In one embodiment, the formation 1a is an angled tab cut out and deformed from the plate. For example, the deformation is made with a cutting-punching operation. This angled tab has a hole 1a1 for screw 2. The angled tab 1a is positioned along the length of the plate so that after the screw 2 is fitted to it, the screw ensures the compression together of the two bone parts, as indicated below in the description.

In another embodiment, to allow for an angular orientation of the screw 2 according to an angle between about 30° and 60°, the formation 1a can be formed as an angled hole. It must be noted that the tab 1a enables adaptation of the angle as a function of the pathology to be treated, given that it is possible to deform this tab at will. In other words, the angle can be adjusted over a few degrees directly by the surgeon in the operating room, using an appropriate tool.

With reference to FIGS. 3 and 4 that show the positioning of the plate 1 between two bone parts O1 and O2:

Once the osteotomies have been carried out, a template of the plate, which does not have a guide formation, enables the position of the tab to be determined.

After determining the position of the tab, the surgeon makes a corresponding recess with the appropriate rasp.

Once the plate having the tab has been positioned, the surgeon sets one or two screws 3, on a side of the site of the osteosynthesis or the arthrodesis toward the tab. A temporary fastening pin can, possibly, be positioned in a complementary lug.

The screw 2 is then engaged in the hole 1a1 of the tab 1a to place the fracture in compression.

Once the compression has been done, the surgeon can screw one or several other additional fastening screws 3 and remove the temporary pin.

In a known manner, this plate 1 has smooth and/or threaded holes for the fastening screws 3 set in the bone parts O1 and O2 to engage in, as shown in FIGS. 3 and 4.

Similarly, the plate 1 can have at least one hole 1c for a pin for temporarily positioning the plate 1. Advantageously, the plate 1 can have a guide 1c for the insertion of a pin on the side of one of the bone parts O1 and another guide 1d for the insertion of another pin on the side of the other bone part O2.

Considering the effect of the desired compression, such as indicated above, the guide 1c is a circular hole whose diameter corresponds substantially to that of the pin, whereas the other guide 1d can be an elongated slot.

These provisions thus enable the bone to slide under the plate 1 as the screws are set, while ensuring compression along a precise direction, generally axially or parallel to the plate. The pins are of any known and appropriate type, and perfectly known to one having ordinary skill in the art.

The plate 1 can have several shapes, so that the holes 1a in particular can be aligned or arrayed, all or in part, according to the corners of a triangle or of a quadrilateral. These provisions, in triangle or in quadrilateral, of the screws, improve the stability of the mounting.

US 10,993,751 B1

3

It must be noted also that the plate **1**, no matter its shape, can be longitudinally bent so as to adapt to the curvature of the bone, consequently enabling the screws to form an angle between them.

The advantages are readily apparent from the description. The invention claimed is:

**1**. A system for fusing a first discrete bone and a second discrete bone separated by a joint, said system comprising:

a bone plate having a length sufficient to span the joint, said bone plate having a first end and a second end along said length, said length defining a longitudinal axis, said bone plate defining:

a first hole at or adjacent the first end, said first hole configured to align with the first discrete bone on a first side of the joint;

a second hole at or adjacent the second end, said second hole configured to align with the second discrete bone on a second side of the joint; and

a third hole located between said first hole and said second hole, wherein said third hole is angled relative to the longitudinal axis of said bone plate;

a first fixation member configured to be inserted through the first hole of the bone plate and into the first discrete bone of the joint;

a second fixation member configured to inserted through said second hole of said bone plate and into the second discrete bone of said joint; and

a third fixation member configured to be inserted through said third hole of said bone plate, into the first discrete bone, across said joint, and into the second discrete bone such that a free end of said third fixation member, not attached to any portion of the bone plate, resides in the second discrete bone, wherein said third fixation member is the only fixation member extending across said joint from the first side of the joint to the second side of the joint.

**2**. The system of claim **1** wherein said bone plate is contoured to anatomically fit bones in a human foot.

**3**. The system of claim **1** wherein said joint is a metatarsophalangeal joint.

**4**. The system of claim **1** wherein said joint is a naviculocuneiform joint.

**5**. The system of claim **1** wherein said joint is a calcaneocuboid joint.

**6**. The system of claim **1** wherein said joint is a tarsometatarsal joint.

**7**. The system of claim **1** wherein said third fixation member is configured to develop compression across said joint with lag effect when said third fixation member is tightened.

**8**. The system of claim **1** wherein the free end of said third fixation member and a free end of said second fixation member are configured to reside adjacent each other within said second discrete bone.

**9**. The system of claim **1** wherein said bone plate includes at least one pin hole adjacent said first hole, said pin hole configured to receive a temporary fixation member.

**10**. The system of claim **1** wherein said bone plate includes at least one pin hole adjacent said second hole, said pin hole configured to receive a temporary fixation member.

**11**. A system for fusing first and second bone parts, said system comprising:

a bone plate having a length sufficient to span a fracture or joint of a patient such that said bone plate is positionable alongside first and second bone parts straddling the fracture or joint, said bone plate having:

a first hole configured to align with the first bone part,

4

a second hole configured to align with the second bone part,

a third hole and a fourth located between the first hole and the second hole, said third and fourth hole having an axis that is configured to cross the fracture or joint during use, the third hole defining a first area and the fourth hole defining a second area, the second area being smaller than the first area, and

a fifth hole located adjacent either the first hole or the second hole, said fifth hole being smaller in area than said first hole or said second hole;

a first fixation member configured to be inserted through the first hole of said bone plate and into the first bone part;

a second fixation member configured to be inserted through the second hole of said bone plate and into the second bone part;

a third fixation member configured to be inserted through the third and fourth hole in the bone plate, into the first bone part, across the fracture or joint, and into the second bone part, wherein a free end of said third fixation member does not attach to any portion of the bone plate and wherein the third fixation member is the only fixation member extending across the fracture or joint, the third fixation member having a fixation head defining a head area, the head area being greater than the second area and less than the first area; and

a temporary fixation member configured to be inserted through the fifth hole in the bone plate.

**12**. The system of claim **11** wherein the bone plate is contoured to anatomically fit bones in a human foot.

**13**. The system of claim **11** wherein the free end of the third fixation member and a free end of the second fixation member are configured to reside adjacent each other within said second bone part.

**14**. The system of claim **11** wherein the bone plate is substantially planar.

**15**. The system of claim **11** wherein the fifth hole is a pin hole.

**16**. The system of claim **11** wherein the temporary fixation member is a guide pin.

**17**. An orthopedic implant comprising;

a bone plate having a proximal surface and an opposite distal bone contacting surface, said bone plate having a length sufficient to span a fracture or joint of a patient such that said bone plate is positionable alongside first and second bone parts straddling the fracture or joint,

said bone plate having a first hole configured to align with the first bone part, the first hole sized to accept a first bone screw,

a second hole configured to align with the second bone part, the second hole sized to accept a second bone screw,

a third hole located between said first hole and said second hole, said third hole sized to accept a third bone screw having a screw head, said third hole being angled relative to said bone plate such that, during use, said third bone screw is positioned to extend through said third hole and cross the fracture or joint, said third hole being configured to allow the entire screw head to be seated below the proximal surface of said bone plate,

and a pin hole located adjacent either said first hole or said second hole, said pin hole being smaller in area than said first hole or said second hole, said pin hole extending from said proximal surface of said bone plate to said distal surface, said pin hole being configured to accept a temporary fixation member.

5

6

**18**. The orthopedic implant of claim **17** wherein the temporary fixation is a guide pin.

\* \* \* \* \*